IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-02285-BNB

CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO,

      Plaintiff,

v.

REGGIE BICHA,
in his official capacity as Executive Director
of the Colorado Department of Human Services, and

RONALD B. HALE,
in his official capacity as Superintendent
of the Colorado Mental Health Institute at Pueblo,

      Defendants.

---

## MOTION TO REOPEN ACTION FOR ENFORCEMENT OF SETTLEMENT AGREEMENT

---

Plaintiff, Center for Legal Advocacy (DLC), d.b.a. Disability Law Colorado respectfully moves the Court to reopen this action for enforcement of the settlement agreement between Plaintiff and Defendants. In support of this Motion, Disability Law Colorado ("DLC") states as follows:

### Certification pursuant to D.C.Colo.LCivR 7.1

Counsel for Plaintiff and Defendants have had substantial dialogue beginning in July 2015 about the matters raised in this motion. That conferral has included numerous letters, emails,

phone calls, and face-to-face meetings, but the parties have been unable to resolve what DLC believes are breaches of the agreement that settled this action. On October 23, 2015, Defendants informed Plaintiffs that they oppose the relief sought herein.

## INTRODUCTION

1.      Plaintiff filed a complaint on August 31, 2011, against Defendants, Reggie Bicha, Executive Director of the Colorado Department of Human Services and Teresa A. Bernal, Interim Superintendent of the Colorado Mental Health Institute at Pueblo ("CMHIP") in their official capacities. (Doc. 1.) The complaint alleged that these Colorado Officials failed to timely admit pre-trial detainees in jails across the State of Colorado into CMHIP, the State's only forensic mental health facility, for competency evaluations and restorative treatment for those determined to be incompetent to stand trial.  This failure created unconstitutional delays to provide competency evaluations and treatment for up to eighty pretrial detainees, for as long as six months.  As a result, presumptively innocent pretrial detainees were languishing in Colorado's jails in violation of their due process rights under the Fourteenth Amendment of the United States Constitution. Colorado was denying people with serious mental illness their constitutionally protected liberty interest in freedom from incarceration absent a criminal conviction.

2.      The parties participated in several settlement conferences with Magistrate Judge Boyd N. Boland, which produced a Settlement Agreement. (Doc. 51-1, attached hereto as Exhibit 1.) The Agreement was incorporated by reference in the Court's Order of Dismissal under Fed. R. Civ. P. 41(a)(2) (the "Dismissal Order"). (Doc. No.  52, attached hereto as Exhibit 2.)

3.     As set forth below, Defendants have breached the Settlement Agreement and DLC seeks the aid of this Court to enforce the Agreement, a role the Court expressly reserved for itself in the Dismissal Order.

4.     The current situation is tragic and disturbing. There are an estimated 100 people locked up in jails across the State of Colorado waiting for court-ordered competency examinations or for restorative treatment.  They are waiting in jail for competency evaluations and treatment for far longer than the 28 days permitted for admission to CMHIP for inpatient competency evaluations or admission for restorative treatment and 30 days for outpatient competency evaluations (evaluations in jails).

5.     Many of these people who are suffering from serious mental illness are being held in jail due to an arrest on minor offenses, but they cannot afford the most minimal bail to be released from jail as they wait resolution of their cases.  As a result of the lengthy wait times to be admitted to CMHIP for medication, competency evaluation, and restoration, they often stay in jails waiting for admission to CMHIP longer than, while presumptively innocent, the offered plea bargain would have afforded them if they had plead guilty on arrest, or in some cases, if they even served the entire sentence on the top charge.

6.     One example of this involves the case of J.L.  On May 2, 2015, J.L. was arrested and charged with relatively minor offenses of verbal harassment and misdemeanor menacing. While out on a personal recognizance bond, he was arrested and charged with a misdemeanor violation of a protection order in Elbert County.  J.L. was housed in a county jail of a rural county. J.L. is severely mentally ill and went off his schizophrenia medications shortly before the events giving rise to his charges.  (*See* Affidavit of Douglas K. Wilson, attached hereto as Exhibit 3.)

7.      J.L.'s attorney, and deputy public defender, raised competency on June 18, 2015. On July 24, 2015 the Elbert County Court received the outpatient competency report.  On August 12, 2015, J.L. was found incompetent and ordered to be committed to CMHIP for treatment and restoration.   Since then, CMHIP has kept pushing his anticipated admittance date back, from October to November and now December.  His anticipated admission date now is early December, 2015.  J.L's father (who is one of the victims) has been in constant contact with J.L's attorney and is worried about how debilitating a long county jail stint will be for J.L. because of his schizophrenia.  J.L. has been without medication for so long and is so delusional that if provided a personal recognizance bond without support from a community mental health provider, his mental illness will land him derelict on the streets or he will pick up new charges and end up back in jail.   On or about October 1, J.L. was moved from the Elbert County jail to Douglas County jail due to the availability of a mental health unit in the Douglas County Jail. (*See* id. ¶ 4(e)).  As of this date, J.L., who was found incompetent to proceed, has been waiting to be admitted to CMHIP for 90 days—well beyond the 28 day timeframe agreed upon by the Defendants in the Settlement Agreement.

8.      J.L. and all of the others currently awaiting competency evaluations or restoration treatment are stranded between Colorado's criminal justice and mental health systems, and because of their mental illness, many of them cannot comprehend the nature of the criminal proceedings, or assist counsel to defend against the criminal accusations, in accordance with C.R.S. § 16-8.5-102.  These people have a constitutional right to care and treatment to stop the symptoms of their mental illness from interfering with their ability to comprehend the nature of why they have been arrested and how to assist in their defense.  In the last six months, courts

- 4 -

have ordered immediate transport to CMHIP for these individuals, understanding that these people need to be in a therapeutic environment and around mental health professionals that will assist them with the burdens of their illness, suicidal thoughts and actions.  But, as of now, CMHIP is refusing to admit these individuals in a timely manner, denying them of the help they need.

9.      The cases of N.C. and S.D. exemplify this tragic situation.  N.C. was arrested in Boulder, Colorado in early September 2015 on low level felony offenses. He was extremely suicidal on arrest, which included bringing razor blades into the jail upon arrest for the purpose of committing suicide.  N.C. swallowed the razor blades while in the jail, and once the court was informed of his mental illness and risk to commit suicide, it ordered in September that N.C. be transported to the hospital for a competency examination.   But CMHIP indicated it would not be admitting N.C. until February 2016.  Since that time, N.C. attempted to commit suicide by hanging himself in his cell.  Adding a Kafkaesque element to N.C.'s situation, he was charged with introducing contraband (razors) into the jail.  (Plaintiff can provide testimonial and documentary evidence supporting this account at a hearing on this motion.)

10.      S.D. was charged and arrested in Arapahoe County on a Boulder warrant on June 26, 2015 for allegedly driving under restraint in Boulder County Jail.  He was advised in Boulder County of the charges against him on June 29, 2015.  He was provided a plea bargain to plead guilty to a 3 point ticket and the case would be dismissed with no jail. However, after S.D. was arrested he was unable to appear in court because he was experiencing serious symptoms of his mental illness.  After seeing the state he was in, his lawyer requested that S.D. be evaluated for competency in the jail (an outpatient evaluation) and the court ordered it on July 2, 2015.  S.D.

then sat in the Boulder County Jail for another two-and-a-half months without receiving an evaluation.  Because of his severe illness, S.D. refused to bathe, was covered in his own feces, his cell was covered in feces, and he refused to speak or respond to questions in English or Spanish.  S.D. has no known family or friends. His lawyer indicates that he was one of the most severely ill clients she has ever seen.  On September 14, 2015, after waiting more than 90 days for a competency examination, with no confirmed date of examination in sight, S.D.'s lawyer was finally capable of convincing the deputy district attorney to dismiss the case, and S.D. was taken by ambulance or sheriff to a psychiatric hospital and put on a mental health hold.  (*See* Ex. 3 ¶ 4(a).)

11.     A natural and desperate consequence to the extraordinary length of jail stays that are occurring in breach of the agreement is that there is no place to keep detainees safe from themselves or other inmates while in jail except to lock them away in solitary confinement or "lock down." Solitary confinement is not therapeutic, and most of the time it is contraindicated for an individual who is experiencing psychosis or delusions.  In some cases, while being physically restrained, or being forcibly taken to isolation, detainees may flail or intentionally hit the corrections officers who are trying to move them, resulting in felony assault charges being added to the list of criminal charges facing the detainee.

12.     The cases of C.R. and J.E. exemplify this terrible circumstance.  C.R. was charged with minor crimes all as a result of conduct related to his untreated mental illness.  The court determined C.R. to be incompetent, and on July 8, 2015, an Adams County Judge ordered that he be committed to CMHIP for restorative treatment.  C.R. was not transported to CMHIP until September 11, 2015, more than two months later.  In that time, his attorney reported that

Adams County jail records reflected that C.R. was getting taunted because he was concerned he would be raped, and this perseveration about rape is alleged to be a part of his mental illness. Eventually, this taunting caused C.R. to get into an altercation with the inmate and C.R. was disciplined and given three days of solitary confinement. This caused him to become severely suicidal and traumatized him. Again, he got into an altercation with his new cellmate who tried to kick him out of his bunk. He was disciplined again with three days in solitary confinement. This caused additional delusions and psychosis. C.R. refused mental health medication, and he cannot be forcibly medicated in the jail, so C.R. was left untreated and very ill.

13.     C.R. was finally transported on September 11, 2015, more than 90 days past the agreed upon timeline for C.R.'s admission to CMHIP. At CMHIP, where he was provided with mental health medication, C.R. was "restored" to competency in seven days and returned back to Adams County Jail. But, that medication is not available to C.R. at the jail. When he returned to the jail, the district attorney offered him a misdemeanor plea and immediate release, and instead of another four month wait for a second competency evaluation in the jail, where he is left unmedicated, C.R. is declining to challenge the finding that he was competent. (C.R.'s counsel contacted Ms. Eytan in early July 2015 who told counsel of CMHIP's delay. However, Ms. Eytan indicated she would investigate, but all the settlement reports indicated that CMHIP was meeting all timelines and C.R.'s delay must be related to some administrative issue. It was the investigation of this case that caused the revelation that CMHIP was in fact manufacturing data to make it appear as if it were complying with the Agreement. Plaintiff can provide testimonial and documentary evidence supporting this account at a hearing on this motion.)

14.     J.E. was charged with misdemeanors of resisting arrest, harassment, and reckless endangerment.  After an order for an evaluation issued on July 30, 2015, J.E. was found incompetent to proceed on August 20, 2015 and ordered to be transferred to CMHIP.  While waiting in Larimer County Jail for admission to CMHIP for restoration to competency, J.E. was charged with a felony assault.  The victim of the alleged assault was a corrections officer that was trying to subdue J.E.  And, upon information and belief, the true cause of this alleged assault is a result of her untreated schizophrenia.  J.E. is not to be transferred to restoration until December 29, 2015, more than 120 days past the date on which J.E. was ordered transferred to CMHIP.  And, when or if J.E. returns to court restored to competency she will have to defend not only against misdemeanor offenses, but new felony assault charges picked up while she was awaiting mental health treatment.  It is likely that five months in jail would be longer than any plea bargain she would have been offered upon arrest in July.  (Plaintiff can provide testimonial and documentary evidence supporting this account at a hearing on this motion.).

15.     As described more fully below, DLC did not immediately learn of the crisis building in Colorado's jails because the monthly reporting the Department was required to make under the Settlement Agreement was false and misleading, and did not accurately report the status of all pretrial detainees referred for competency evaluations and restorative treatment.

16.     The first report under the Settlement Agreement was the July 2012 report due September 1, 2012.  The August 2012 Report was due on October 1st and so on, such that the reports run one month behind.  (*See* Declaration of Jennifer L. Purrington ¶ 2, attached hereto as Exhibit 4.)  Early on in the reporting process DLC's Staff Attorney, Jennifer L. Purrington, audited several entries in the monthly settlement reports and determined that the information

and data being reported by the Department was accurate.  Thereafter, DLC relied exclusively on the information and data provided by the Department in determining compliance with the Settlement Agreement deadlines.  (*Id*. ¶ 5.)

17.     All original monthly reports provided to DLC up through June 2015 showed that the "days waiting,"  "averages," and "out-patient" evaluation times were within the terms of the Settlement Agreement other than requests for special circumstances which were granted. (*Id*. ¶ 7.)

18.     From the inception of the Settlement Agreement through mid-July 2015, DLC did not receive any reports or complaints from or on behalf of inmates alleging excessive delays in the admissions process. (*Id*. ¶ 6.)

19.     But in mid- July 2015, DLC began receiving reports and complaints from public defenders, private attorneys, family members, and a judge that inmates were not being admitted to CMHIP for evaluation and restoration within the settlement deadlines and in some cases it was taking months for inmates to be admitted to CMHIP.  (*Id*. ¶ 6.)  DLC later learned that reporting provided by the Defendants was false and misleading. (*Id*. ¶¶ 18-20, 25.)

## ARGUMENT

**A.      This Court Is Authorized to Reopen this Action to Enforce the Settlement Agreement, and Good Cause Exists to Do So**

20.     During the pendency of this action, the Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 2201-02, and pursuant to 42 U.S.C. § 1983.  (Ex. 2 ¶ 1.)

21.     The Dismissal Order states, "The Parties shall comply with the terms of their Settlement Agreement entered into on April 6, 2012, a copy of which is attached hereto and incorporated by reference as if fully set forth herein." (*Id*. ¶ 3.)  The Dismissal Order also

retained continuing jurisdiction over the settlement and enforcement of the Settlement

Agreement until after the conclusion of the term of the agreement under the authority of

*Kokkenen v. Guardian Life Insurance Co.*, 511 U.S. 375, 381-82 (1994) and *Bell v. Board of County*

*Commissioners*, 451 F.3d 1097, 1103 (10th Cir. 2006). (*Id.* ¶ 5.)

22.     The Agreement continues in effect and has not been modified or amended by

mutual written agreement or waiver.

23.     A district court may reopen a case and retain jurisdiction over the implementation

and enforcement of a settlement agreement when, as here, its dismissal order expressly states

that it will maintain continuing jurisdiction. *Kokkonen,* 511 U.S. at 381-83; *see also Mitchell v.*

*Estrada*, No. 03-cv-00387, 2012 WL 2919604, at *2 (D. Colo. 2012).

24.     As illustrated by the circumstances described in the Introduction to this Motion,

and as further explained below, there is good cause to reopen this action to permit DLC to

enforce the terms of the Settlement Agreement.  Without such enforcement, many

presumptively innocent pretrial detainees in Colorado will languish in jail, in dangerous and

debilitating conditions, waiting for competency evaluations and restorative treatment, for periods

far longer than is permitted under the United States Constitution.

**B.     Defendants Failed to Meet the Requirements for Conducting Competency**
**Evaluations and Restorative Treatment under the Express Terms of the Settlement**
**Agreement**

25.     The keystone of the Settlement Agreement is a timeframe within which the

Defendants are obligated to conduct competency evaluations and restorative treatment. The

Settlement Agreement requires Defendants to admit pretrial detainees to CMHIP for in-patient

restorative treatment and competency evaluations no later than 28 days after the pretrial

detainees' "Ready for Admission Date," with such date defined as, "the date on which the hospital has received the Court Order for admission to the Hospital, and, in the case of a court-ordered Competency Evaluation, the Collateral Materials required for the evaluation must be received by the Hospital for a Pretrial Detainee to be 'Ready for Admission.'" (Ex. 1 §§ 1(p), 2.) The Settlement Agreement also requires CMHIP to maintain a "Monthly Average of 24 days or less for all admissions within a calendar month." (*Id*. § 1(l).) Defendants have breached the Settlement Agreement by failing to admit pretrial detainees within 28 days of their ready for admission date and by failing to maintain a "Monthly Average" of 24 days.

26.     The July 2015 monthly Monitoring Report shows that Defendants failed to meet the 28-day admissions deadline in all but three cases out of 103. In addition to the data provided below, the August data recently received from CMHIP shows that the Defendants again failed to meet the 28-day admissions deadline in all but two cases out of 148 within the August report. (*See* Ex. 4, pp. 6-12, Tables 1A & 1B.) The average for May 2015, using the audited report, was 27.35 days. The average for June 2015, using the audited report, was 43.57. The average for July was 48.18 and the average for August was 58.87. In each of those months, Defendants were in breach of the 24-day monthly average required by the Settlement Agreement.

27.     Based upon reports provided in September 2015, wait times for pretrial detainees to be admitted to CMHIP for competency evaluations or restorative treatment have grown to around 100 days. Individuals waiting for restorative treatment waited up to ninety days for their evaluation, and then another ninety days for transport to treatment, resulting in an up to six-month delay before they receive constitutionally required restorative treatment.

28.     The Settlement Agreement also imposes time frames for the completion of out-patient competency evaluations in the county jails instead of at CMHIP. The Agreement requires that "[t]he Department shall complete all Out-Patient Evaluations of a Pretrial Detainee no later than 30 days after the Hospital's receipt of a Court Order directing the evaluation and receipt of Collateral Materials." (Ex. 1 § 2(b).) It has been recently reported that the Department is in breach of the Settlement Agreement by failing to complete outpatient evaluations within thirty days, some of which have taken up to one hundred days to complete. (*See* Ex. 3 ¶ 4(b).)

29.     It is estimated that 25% of pretrial detainees listed in the Department's reports are individuals being held in jail as a result of an arrest on petty or misdemeanor offenses. Tragically, the length of their detention while waiting for an evaluation or treatment exceeds what jail sentence they likely would have received if they had pled guilty on the day they were arrested. Many of these pretrial detainees are seriously mentally ill, psychotic, in danger of harming themselves or others, and are victimized by other detainees as they wait for a humane environment to be evaluated and treated. (*See id*. ¶¶ 2-4.)

## C.     Defendants Also Breached the Settlement Agreement by Providing Plaintiffs' Counsel, the Pro-Bono Monitors, with False and Misleading Monthly Monitoring Reports

30.     The Settlement Agreement requires Defendants to submit monthly monitoring reports to DLC setting forth dates and data that reflect, among other things, the "Days Waiting" the "Ready for Admission" date; and the "Offered Admission" date for pretrial detainees. (Ex. 1, § 3(a)-(c).) The Plaintiff has reviewed these reports and reconciled the data on a *pro bono* basis for the last two-and-a-half years.

31.     Defendants have breached the Settlement Agreement by submitting monthly monitoring reports containing materially inaccurate and false dates and data. Audited reports recently provided by the Defendants to DLC, after DLC confronted the Department, show that inaccurate data has been provided to DLC as early as March 2015, with six instances in March, one in April, twenty-two in May, and sixty-four in June. (*See* Ex. 4 ¶ 18.). Currently DLC has determined that Defendants provided them with incorrect data in four separate reports. (*See id*. ¶¶ 18-26.) DLC relied on the Department's inaccurate monthly reports to determine compliance with the Settlement Agreement. (*Id*. ¶ 5.)

32.     DLC believes that Defendants have been in breach of the Settlement Agreement for months preceding mid-July 2015, the time when DLC first became aware that a problem existed with timely performance under the Settlement Agreement. DLC believes that Defendants have been in breach of the Settlement Agreement from at least March 2015. (*See id*., ¶ 25.)

**D.     Defendants Took Unilateral Action Detrimentally Slowing Admissions, Creating a Wait List, and Violating Hundreds of Individuals' Constitutional Rights**

33.     In late July 2015, DLC learned of a pretrial detainee whose attorney claimed had waited more than sixty days to obtain restorative treatment at CMHIP. DLC received similar reports around that time, consisting of desperate calls for help and complaints from inmates' family members, public defenders, a county jail and a county court judge exposing that CMHIP was taking months in some cases to admit pretrial detainees for competency evaluations and restorative mental health treatment. One source told DLC that the Department had issued an internal directive limiting admissions to no more than one per day. (*See* Declaration of Mark J. Ivandick ¶ 3, attached hereto as Exhibit 5.)

34.     It was evident the data the Defendants had been providing DLC with was false and misleading, and the information regarding the directive limiting admissions was deeply concerning.  Upon learning this information, Plaintiffs contacted counsel for the Defendants on July 31, 2015.  (*See* Ex. 4, ¶¶ 25-26; Ex. 5, ¶ 3.)

35.     After tiresome inquiries, Defendants finally disclosed an email to Plaintiff in September 2015 that proved Defendants issued a written directive to limit patient admissions to no more than one admission per day starting on June 2, 2015. (*See* Ex. 5 ¶ 3.) Plaintiff was never notified of that policy change at the time it was implemented, or later on July 28, 2015, when Superintendent Hale denied its existence, which is disturbing in light of the fact that such a policy could only have the effect of causing the Department to fail to comply with the Settlement Agreement. The unilateral directive limiting admissions caused a wait list to grow to more than 70 inmates waiting for admission to CMHIP for competency evaluations and restorative treatment.

36.     Defendants' unilateral action in developing a policy that delayed admissions, without consulting Plaintiff, denying that such a policy existed, and by submitting monthly reports containing false and misleading data and then invoking Departmental Special Circumstances, is a breach of their duties of good faith and fair dealing under the Settlement Agreement. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (explaining that "every contract contains an implied duty of good faith and fair dealing" to "effectuate the intentions of the parties or to honor their reasonable expectations").

37.     At first, DLC did not detect the Department's violation of the Settlement Agreement because the growing problem initially was hidden by the Department in the false and

misleading monthly reports. It was only through reports and complaints from families of detainees, the lawyers representing them, and a judge's report that DLC learned of the collapse of the Department's compliance with the Settlement Agreement. By now, the waiting list for competency evaluations has grown to approximately 100 detainees.

38.     Plaintiff has used good faith efforts to try and resolve the dispute concerning the Defendants invocation of Departmental Special Circumstances; however, these efforts have failed to resolve the defendants' breach of the Settlement Agreement and therefore Plaintiff is seeking judicial enforcement of the settlement agreement.  (*See* Ex 1. ¶ 6(c).)

**E.     Defendants Have Improperly Invoked "Departmental Special Circumstances" to Justify Their Breaches of the Settlement Agreement**

39.     On August 3, 2015, months after missing admission deadlines and submitting misleading monthly reports to Plaintiff, the Defendants invoked "Departmental Special Circumstances" citing circumstances beyond the control of the Department which impact CMHIP's ability to comply with the admission timeframes set by the Settlement Agreement. (*See* Ex. 4 ¶ 10.) The Department also requested the invocation of "Departmental Special Circumstances" be applied retroactively to June 30, 2015.  Essentially, the Department claims it can no longer meet the admissions timeframes because of two factors; (1) a dramatic increase in the number of referrals for evaluations and treatment, and (2) unprecedented staffing shortages at CMHIP.

40.     On August 20, 2015, the parties conferenced and reviewed the reasons for invoking "Departmental Special Circumstances" discussing various issues and options related to solving the looming problem.  Plaintiffs being unaware of the severity of the problem, the cause, and the resources available, indicated that they were relying on the Department's expertise in

operating a mental health system and the Department was asked to develop a "short-term" "quick and innovative solution" to address the crisis at hand. (Ex. 5 ¶ 6.) The goal:  to clear the wait list and return to the admission time frames of the Settlement Agreement.

41.     Additionally at the August 20th meeting, in anticipation of evaluating the Department's Proposal, Plaintiffs requested the corrected monthly reports from March 2015 forward, as well as a copy of the current wait list and documentation of the alleged June 2015 directive to only admit one patient a day.  Defendants agreed to provide the Plaintiff with these items. (*Id*. ¶ 7.)

42.     On September 3, 2015, the Department submitted its Proposal to cure its breach of the Settlement Agreement.  The Proposal did not offer a "short-term" "quick and innovative solution" to address the crisis at hand.  (*See* Ex. D to the Purrington Declaration, Ex. 4.) Therefore, Plaintiff found the Department's Proposal to be ineffective to address the crisis it created, or allowed to develop.  (*See* Ex. E to the Purrington Declaration, Ex. 4.)

43.     The current and historical staffing problems at CMHIP were discussed. Significantly, Plaintiff rejected that this crisis was the result of a "Departmental Special Circumstance."  It was, rather, a failure to tend to the historical and systemic issues affecting the mental health system in Colorado, and a failure to work with and fund the community mental health system.  Indeed, Defendants have been aware of the systemic issues causing the problem of delayed admissions for at least the last twenty years. (*Id.* ¶ 8-9.)

44.     *Neiberger v. Hawkins*, Civil Case No. 99-B-1120 (MJW), was filed in this court in 1999 against the Colorado Department of Human Services and CMHIP's superintendent, Robert Hawkins, by a group of patients committed to CMHIP for care and treatment after being found

not guilty by reason of insanity. The third amended complaint alleged that these patients' constitutional rights were being violated for among other claims, a continued pattern of substandard care, as a result of Defendants' failure to secure the financial and human resources necessary to provide minimally adequate care. Specifically, Defendants were accused of operating CMHIP's forensic institute at staffing levels below the levels necessary to provide minimally adequate care to its patients. The Plaintiffs requested relief including a request that the Court mandate the Defendants to immediately take the steps necessary to reduce dangerous understaffing. (*Id*. ¶ 10.)

45.    The *Neiberger* plaintiffs filed a motion for a preliminary injunction supported by evidence alleging, among other things, that for the prior eight years, CMHIP had been understaffed. That understaffing has been a persistent problem since at least 1994. In 1994, a situational analysis was reviewed at an executive retreat that stated CMHIP was understaffed by at least 80 positions of which 25-30 positions were nursing positions. The understaffing pattern continued and was documented by the state agency, the Health Care Financing Administration, (HCFA), responsible for funding operations at CMHIP. In 1996, HCFA surveyors found understaffing at CMHIP citing 26 nursing vacancies. (*Id*. ¶ 11.)

46.    In fiscal years 2000 and 2001 the Joint Accreditation of Hospitals Commission (JAHCO) threatened to de-certify CMHIP due to inadequate staffing. Despite serious understaffing, the *Neiberger* defendants did not request funds from the legislature for the immediate increases in staffing necessary to meet the minimum staffing levels. (*Id*. ¶ 12.)

47.     In 2002, *Neiberger* settled and Defendants agreed to fill vacant staff positions with permanent employees and committed to maintaining future staffing ratios at levels to avoid understaffing. (*Id.* ¶ 13.)

48.     By late 2006, however, there were approximately 85 pretrial detainees in county jails across Colorado, who were experiencing significant wait times, some as long as six months, to be admitted to CMHIP for competency evaluations and restorative mental health treatment. (*Id.* ¶ 14.)

49.     Denver District Court Judge M. Egelhoff issued a show cause order in the cases *People v. Zuniga*, 06CR999, *People v. Kirkwood*, 06CR5797, and *People v. Sims*, 05CR2277.  Judge Egelhoff then found the Colorado Department of Human Services, (CDHS) and CMHIP in contempt of his orders to admit three inmates to CMHIP for competency evaluations and restorative mental health treatment. (Ex. 5 ¶ 15.)

50.     Judge Egelhoff appointed special counsel (undersigned counsel among them) to prosecute the contempt citations, and the Department and CMHIP claimed staff shortages and lack of bed space as the principle reason for the delays in admitting pretrial detainees. Settlement conferences in those cases produced a global settlement agreement for all of the pre-trial detainees on the wait-list, known as the "Zuniga agreement."  The Zuniga agreement required CMHIP to admit pretrial detainees from across the state within 24 days of receipt of a court order for evaluation or restorative treatment. (*Id.* ¶ 16.)

51.     The Zuniga agreement expired in June 2009, which by design coincided with the opening of the 200-plus bed Hawkin's High Security Forensics Institute (HSFI) on the CMHIP

campus. The parties and mediator was assured that the HSFI would solve the admissions problems in the future, thus a June 2009 expiration date. (*Id.* ¶ 17.)

52.     With the opening of the HSFI and over the next year or so, CMHIP experienced significant stresses on its operations and staffing. The economic downturn created high state deficits and the need for budget cuts and hiring freezes, as well as administrative staff furloughs. The long-standing challenges in recruiting mental health staff remained as a significant impediment to CMHIP's ability to timely admit pretrial detainees for evaluation and treatment. In addition, the number of court-ordered referrals continued to increase. (*Id.* ¶ 18.)

53.     After three patient deaths at CMHIP, CDHS hired a group of nationally recognized mental health consultants to complete a thorough review of CMHIP's operations. The consultants' report delivered in November 2010 found that CMHIP was significantly understaffed by as much as 20%, which translated to approximately 50 nursing staff, with psychiatric staffing falling below the agreed upon levels of the most recent lawsuit, the Neiberger case. Requests for relief in hiring emergency staffing by way of locum tenens have been denied, thereby resulting in additional stress on CMHIP's operations. (*Id.* ¶ 19.)

54.     The consultants found that CMHIP's understaffing appears to be related to, among other things, inadequate funding and recommended that CDHS should advocate for increased funding for staffing at CMHIP as a priority with the Colorado legislature. (*Id.* ¶ 20.)

55.     Staffing shortages, underfunding by the legislature, a long-standing pattern of increases in forensic referrals and the Zuniga agreement requirements that pushed CMHIP for faster admissions to the HSFI (24 days from court order to admission) combined once again to slow admissions of pretrial detainees below constitutional standards. (*Id.* ¶ 21.)

56.     After receiving the consultants' report, Plaintiff began monitoring CMHIP's recruitment efforts and its progress in obtaining funding from the legislature to hire approximately 54 nursing positions.  But in April 2011, Defendants received a supplemental budget increase for only 21.5 additional nursing staff.  (*Id*. ¶¶ 22-23.)

57.     In June 2011, Interim Superintendent Bernal, in response to a recent survey by the Centers for Medicare and Medicaid Services that noted staffing and patient acuity as areas of concern, informed staff that obtaining additional funding to increase staffing would be unlikely due to the distressed budget.  She also noted there were pressures from the community to admit patients from the jails as the wait list from the jails was then over 70 with the longest wait of over 80 days. (*Id*. ¶ 24.)

58.     With no end in sight to the understaffing problem, resulting in the development of yet another wait list resulting in unconstitutional delays in admissions and out-patient evaluations, Plaintiffs filed the Complaint in this action on August 31, 2011, which in turn led to the Settlement Agreement at issue. (*Id*. ¶ 25.)

59.     It is undeniable that the system has collapsed.  But, it also undeniable that the reason for the collapse is not due to unanticipated or special circumstances. From the perspective of the pretrial detainees in Colorado's jails, the unconstitutional and unconscionable delay in the provision of competency evaluations is the result of a tragic pattern of institutional indifference.

WHEREFORE, Plaintiff respectfully requests that the Court grant this Motion and enter an order:

a.     reopening this action to conduct proceedings to enforce the Settlement Agreement;

b.     setting an evidentiary hearing on Defendants' performance under the Settlement Agreement;

c.     finding that the Defendants breached the Settlement Agreement as alleged herein;

d.     directing Defendants to eliminate the wait list by February 3, 2016, or sooner;

e.     directing Defendants to comply with the deadlines set out in the Settlement Agreement for all referrals made on and after December 1, 2015;

f.     appointing an independent monitor, acceptable to Plaintiff, with real-time access to necessary information to monitor Defendants' performance under the Settlement Agreement;

g.     awarding Plaintiff its reasonable costs and attorneys' fees associated with the preparation and filing of this motion and the conduct of any further proceedings; and

h.     granting such other or further relief against Defendants as the Court deems just and proper.

Dated this 28th day of October, 2015.

Respectfully submitted,

/s/ Jason M. Lynch
Jason M. Lynch
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone:  303.892.9400
Facsimile: 303.893.1379
Email: jason.lynch@dgslaw.com

/s/ Iris Eytan
Iris Eytan
EYTAN NIELSEN LLC
3200 Cherry Creek South Drive
Denver, CO 80209
Telephone: 720.440.8155
Facsimile: 720.440.8156
Email: iris@eytan-nielsen.com

/s/ Mark J. Ivandick
Mark J. Ivandick
DISABILITY LAW COLORADO
455 Sherman St., Ste. 130
Denver, CO 80203
Telephone: 303.722.0300
Facsimile: 303.722.0720
Email: mivandick@disabilitylawco.org

/s/ Ellie Lockwood
Ellie Lockwood
REILLY POZNER LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
Telephone: 303.893-6100
Facsimile: 303-893-6110
Email: elockwood@rplaw.com

Attorneys for Plaintiff Disability Law Colorado

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 28th day of October, 2015, a true and correct copy of this MOTION TO REOPEN ACTION FOR ENFORCEMENT OF SETTLEMENT AGREEMENT was electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Tanya Smith, Esq.
Office of the Attorney General
1525 Sherman Street, 6th Floor
Denver, CO 80203
Tanya.smith@state.co.us

*/s/ Janie Cohen*