**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 11-CV-02285-NYW**

CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO**,**

      Plaintiff**,**

**v.**

REGGIE BICHA,
in his official capacity as Executive Director
of the Colorado Department of Human Services, and

RONALD B. HALE,
in his official capacity as Superintendent
of the Colorado Mental Health Institute at Pueblo**,**

      Defendants**.**

---

**UNOPPOSED MOTION TO REOPEN ACTION FOR ENFORCEMENT
OF SETTLEMENT AGREEMENT**

---

      Plaintiff, Center for Legal Advocacy, d/b/a Disability Law Colorado ("DLC"),

respectfully moves the Court to reopen this action for enforcement of the settlement agreement

between Plaintiff and Defendants Reggie Bicha, in his official capacity as Executive Director of

the Colorado Department of Human Services (the "Department") and Ronald B. Hale,[1] in his

official capacity as Superintendent of the Colorado Mental Health Institute at Pueblo

---

[1] Ronald Hale has been replaced by Chief Executive Officer Jill Marshall, a caption change
which the parties will make once the case is reopened.  Upon reopening, Plaintiffs will add Dr.
Robert Werthwein, Director of the Office of Behavioral Health, who is also responsible for the
contractual and constitutional violations at issue.

("CMHIP"). This motion is deemed unopposed pursuant to the terms of the parties' Amended

and Restated Settlement Agreement ¶ 6(c) (Dkt. 78-1) (the "Settlement Agreement").

### Certification pursuant to D.C.Colo.LCivR 7.1

Counsel for Plaintiff and Defendants have communicated since June 2017 about the

issues raised in this motion.  These conferrals have included numerous letters, emails, phone

calls, at least five multi-hour in-person meetings, a full-day stakeholder meeting and a follow-up

half day settlement meeting.  However, the parties have been unable to resolve what DLC

believes constitute egregious breaches of the Settlement Agreement that settled this action twice

previously.  While this motion is deemed unopposed pursuant to the parties' Settlement

Agreement, Defendants have advised DLC that they do oppose the relief sought herein and they

also oppose reopening to the extent the motion goes beyond challenging the Department's

invocation of departmental special circumstances.

### INTRODUCTION

1.      Despite consenting to two court-approved settlement agreements with DLC, the

State of Colorado, through the Department of Human Services and cabinet-level officials,

continues to disregard the constitutional rights of some of the most vulnerable members of our

community—individuals who suffer from severe mental illness—by failing to provide timely

competency examinations and restorative treatment.  Through inaction, the State continues to

unlawfully jail presumed innocent people solely because they suffer from mental illness.  This

situation is unconstitutional, unconscionable, and unacceptable.

2.      The State claims that it lacks sufficient capacity to meet the needs of this helpless

population, but ignores that it is statutorily charged with providing these mental health services

and must timely do so to comport with due process.  There should be no excuses, particularly

after ten years of largely empty promises to fix the problem and address foreseeable increases in referrals.  Rather than partner with and fund community mental health treatment centers or initiate and support legislative changes to remedy the current situation, the State has unconstitutionally used county jails as its own private self-storage to house the mentally ill. County jails are ill-equipped to provide the necessary mental health care and treatment to these individuals and lengthy stays further jeopardize their health and welfare.

3.      Many pretrial detainees who are suffering from serious mental illness are being held in jail due to an arrest on minor offenses, but they cannot afford the most minimal bail to be released from jail as they wait resolution of their cases.  A natural and desperate consequence of the extraordinary length of jail stays that are occurring in breach of the Settlement Agreement is that there is no place to keep detainees safe from themselves and other inmates while in jail except to lock them away in solitary confinement or "lock down." Solitary confinement is far from therapeutic, and most of the time it is contraindicated for an individual who is experiencing psychosis or delusions.  In some cases, while being physically restrained or forcibly taken to isolation, detainees may flail or intentionally hit the corrections officers who are trying to move them, resulting in felony assault charges being added to the list of criminal charges facing the detainee.

4.      Recent studies show that there are more inmates suffering from serious mental illness housed in Colorado's jails than at CMHIP. Currently, there are close to 300 individuals or 2000 individuals per year languishing in county jails in limbo.  They are presumed, or have been determined by a judge, to lack the ability to proceed in their criminal cases, yet they remain locked up for an indefinite period of time waiting for the State to provide its competency examination or restoration services.  The State is obligated under the terms of the Settlement

Agreement to admit these individuals for examination or restorative treatment at CMHIP within 28 days.  Some of these individuals have been waiting for *more than 100 days*.  For those found incompetent and waiting for treatment at CMHIP, their wait can amount to five months from the date they were arrested.  The wait times bear no relationship to the offenses these individuals have been charged with, which are often low-level and non-violent misdemeanor charges stemming from their mental illnesses.  The result of these lengthy, unconstitutional delays is a vicious cycle.  The longer the State makes these individuals wait for evaluation and restorative services, the more exacerbated their mental illnesses become, thereby leading to longer restorative timeframes and a higher likelihood that these individuals will be deemed permanently incompetent.  In many cases, the wait times exceed the amount of time (if any) these presumptively innocent individuals would have served if they had pled guilty.

5.      For DLC, Colorado's federally-charged protection and advocacy system for people with disabilities, this is more than just a numbers game.  Not only do the current delays violate the timeframes Defendants twice agreed to in the settlement agreements, they also are in violation of the United States Constitution.  These individuals have the right to be treated with dignity and respect.  For the pretrial detainees warehoused in Colorado's jails, Defendants' unconstitutional and unconscionable delays providing competency evaluations and restorative treatment are the result of ineptitude, a tragic pattern of institutional indifference, or both.

6.      In the Settlement Agreement, Defendants agreed to timelines for handling in-patient competency evaluations and restorative treatment at CMHIP.  Specifically, Defendants are required to offer admission to such persons within 28 days from when they are deemed ready for admission.  Defendants are also required to maintain a monthly "days waiting" average of 24

days.  The purpose of these timeframes is to ensure timely evaluation and treatment of the mentally incompetent and to prevent the very circumstances that exist today.

7.      If, however, the Department's ability to meet the timeframes under the Settlement Agreement was impacted by a special circumstance outside of its control that is unforeseen or unanticipated, then the Department could invoke "Departmental Special Circumstances" to temporarily suspend the timeframe requirements of the Settlement Agreement for no longer than six months to allow the Department sufficient time to return to compliance.

8.      Unfortunately, Defendants have made little effort to comply with the timeframes they reaffirmed only two years ago, and have instead abused Departmental Special Circumstances to excuse their conduct.  Initially, the Department invoked Departmental Special Circumstances in June 2017.  The Department re-invoked it in December 2017, on the day that it would have been in further breach, claiming it can consecutively invoke Departmental Special Circumstances for the same problem.

9.      The problem with Defendants' invocation of Departmental Special Circumstances is that:  (1) Defendants cannot invoke Departmental Special Circumstances based on circumstances that are within their control and have persisted for more than a decade and by definition are not unanticipated or unforeseen; and (2) even if Defendants' initial invocation in June 2017 was well-grounded (which it was not), they could not re-invoke Departmental Special Circumstances six months later in December 2017 for the same alleged reason.  Under that logic, Defendants could re-invoke Departmental Special Circumstances every six months and *never* have to return to compliance.  Allowing Defendants to misuse the Settlement Agreement by placing the timelines on hold for a year or more (or forever) eviscerates the agreement's purpose

to protect the constitutional rights of the mentally ill by requiring timely evaluation and treatment.

10.     DLC did not come to this Court without exhausting all other options first.  It has spent a year negotiating with the State.  In late February 2018, DLC and Defendants held a stakeholder meeting lasting an entire day.  The parties, prosecutors, public defenders, mental health practitioners, judges, state court administrators, and the legislative budget liaison participated to find solutions.  At the stakeholder meeting, the State left DLC with the impression that it was negotiating in good faith and looking for long-term solutions.

11.     The larger stakeholder group discussed proposed legislation that parties could accept and help solve the problem.  The Defendants assured DLC it would support and pursue legislation that would help pretrial detainees and address the long jail wait times.  The Defendants introduced a bill (SB-252) that would have reduced the number of pretrial detainees taking up beds at CMHIP and the jails.  DLC supported SB-252 as proposed (as well as three other bills to help with the jail waits, all of which passed).  The Defendants then revised the bill to add a provision that would have allowed them to keep pretrial detainees found incompetent locked down in jails for up to five months while providing some undefined type of jail-based restorative services—services which Colorado's county jails are ill-equipped to provide and to date have never provided.

12.     Jail-based restoration is unconstitutional.  The Department's former Chief Medical Officer (who resigned partway through the legislative process) had previously stated in similar jail wait litigation in Washington that such lengthy jail restoration was improper.  The parties' Independent Consultant submitted his report from similar jail wait litigation in

Pennsylvania and his affidavit from parallel litigation in Louisiana which stated the same, and advised the Defendants of his opinion that unchecked and lengthy jail restoration is improper.

13.     Nevertheless, the Department pushed for SB 18-252, claiming it was the only way to resolve this lawsuit and the State's decade of constitutional violations.  Had the bill been enacted, it would have lacked any meaningful protections for the thousands of mentally ill Colorado pretrial detainees who would have been subjected to the statute.  The bill only failed when Colorado State Senator Irene Aguilar filibustered.

14.     The Defendants' continued inability to reduce wait times and willful disregard for the constitutional rights of this most vulnerable population shows that the State is unwilling, unable, or does not care to provide the constitutionally-mandated services for which it is solely responsible.  As a result, after a year of conferral with the State, DLC seeks the aid of this Court to reopen the matter and enforce the Settlement Agreement (a role the Court expressly reserved for itself in the Dismissal Order), and permit the underlying claims to move forward based on the State's continuing constitutional violations.

## PROCEDURAL BACKGROUND

15.     DLC initially commenced this matter on August 31, 2011.  Dkt. 1.  The complaint alleged that Defendants failed to timely admit pre-trial detainees in jails across Colorado into CMHIP, the State's only forensic mental health facility, for competency evaluations and restorative treatment for those determined to be incompetent to stand trial.  *Id.*  This failure created unconstitutional delays to provide competency evaluations and treatment for up to 80 pretrial detainees, for as long as six months.  *Id.*

16.     The parties participated in several settlement conferences with now-retired Magistrate Judge Boland, which produced the first settlement agreement.  Dkt. 51-1.  The

agreement was incorporated by reference in the Court's Order of Dismissal on April 9, 2012 under Fed. R. Civ. P. 41(a)(2).  Dkt.  52.

17.     In July and August 2015, Plaintiff learned that Defendants had breached the Settlement Agreement, including by falsifying data in the monthly report, and moved to reopen the matter for enforcement of the agreement.  Dkt. 53.  After the matter was reopened by the Court (Dkt. 62), the parties engaged in mediation and again resolved the matter through the current Settlement Agreement, which was filed with the Court on July 28, 2016.  Dkt. 78-1.  This Court retained jurisdiction to enforce the Settlement Agreement.  *Id.* ¶¶ 3, 4.

18.     Less than one year later, Defendants again failed to meet the timeframes set forth in the parties' Settlement Agreement.  Declaration of Jennifer Purrington, attached as Exhibit 1, at Ex. A (6/22/2017 Notice of Invocation of DSC).   As a result, on June 22, 2017, Defendants invoked Departmental Special Circumstances under the Settlement Agreement.  *Id.*  Defendants claimed that they could not comply with the Settlement Agreement timeframes due to "an unanticipated spike in court-ordered referrals for inpatient competency evaluation and restoration treatment services."  *Id*. at 1.

19.     Under the Settlement Agreement, the Department's invocation of Departmental Special Circumstances results in an automatic suspension of the evaluation and restoration timeframes for up to six months.  Dkt. 78-1 ¶ 6(c).  The Settlement Agreement, however, does not afford the Department any additional time to return to compliance if it remains unable to meet the timeframes set forth in the agreement after expiration of the six-month suspension period.  *See id.*

20.     On December 22, 2017—the day the Department's six-month suspension period was set to expire—the Department sent DLC another notice of invocation of Departmental

Special Circumstances.  Purrington Decl., Ex. B (Dec. 22, 2017 Notice).  In that notice, the

Department claimed Departmental Special Circumstances due to an "unabated" and "sustained

increase" in court orders for evaluation and restoration as the reason why the Department

remained unable to comply with the evaluation and restoration timeframes set forth in the

Settlement Agreement.  *See id.* at 1-2.

21.     It is undisputed that Defendants are out of compliance with the timeframes set

forth in the Settlement Agreement.  In his September 2017 report, the Independent Consultant

charged with overseeing the Defendants' compliance with the Settlement Agreement concludes

that "currently the State is clearly failing to meet the deadlines contained in the Settlement

Agreement."  Purrington Decl., at Ex. C at 4 (9/4/2017 Report of Independent Consultant).

## ARGUMENT

**A.     This Matter Should Be Reopened for Enforcement of the Settlement Agreement.**

22.     This motion is deemed unopposed pursuant to the Settlement Agreement.  Dkt.

78-1, ¶ 6(c).  The agreement states that if "DLC decides to challenge the invocation of

Departmental Special Circumstances, it may do so by filing a motion to reopen the Action to

seek enforcement of this Agreement.  The Department agrees that it will not oppose a motion to

reopen the Action challenging the invocation of Departmental Special Circumstances and DLC

may designate any such motion as 'unopposed.'"  *Id.*

23.     During the pendency of this action, the Court had jurisdiction pursuant to

28 U.S.C. §§ 1331, 1343(a)(3), and 2201-02, and 42 U.S.C. § 1983.  Dkt. 80.

24.     Upon dismissal of the matter, both originally and after the matter was reopened

and resettled in 2016, the parties agreed that "the Court shall retain continuing jurisdiction over

the settlement and enforcement of the Settlement Agreement for the duration of the agreement

plus 60 days following the delivery of the final report made by Defendants under the Agreement." Dkt. 52 ¶ 4; Dkt. 80 ¶ 4. The Court also retained continuing jurisdiction over the settlement and enforcement of the Settlement Agreement until after the conclusion of the term of the agreement under the authority of *Kokkenen v. Guardian Life Insurance Co.*, 511 U.S. 375, 381-82 (1994), and *Bell v. Board of County Commissioners*, 451 F.3d 1097, 1103 (10th Cir. 2006). Dkt. 52 at 1; Dkt. 80 at 1.

25.     The Settlement Agreement approved by the Court and incorporated in its dismissal order entered on July 29, 2016 remains in effect today and has not been modified or amended by mutual written agreement or waiver.

26.     It is settled that the Court may reopen a case and retain jurisdiction over the implementation and enforcement of a settlement agreement when, as here, its dismissal order expressly states that it will maintain continuing jurisdiction. *Kokkonen,* 511 U.S. at 381-83.

27.     Because the State cannot meet its obligations under the Settlement Agreement and has resorted to improperly invoking Departmental Special Circumstances to cover its failings, the Court should find good cause pursuant to D.C.COLO.LCivR 41.2 to reopen the matter to enforce the Settlement Agreement, without prejudice to prosecution of the underlying claims for the State's continuing constitutional violations.

**B.     Defendants Have Failed to Meet the Requirements for Conducting Competency Evaluations and Restorative Treatment under the Express Terms of the Settlement Agreement.**

28.     The keystone of the Settlement Agreement is timeframes within which the Defendants are obligated to conduct competency evaluations and restorative treatment. *See* Dkt. 78-1 ¶ 2. Under the Settlement Agreement, the Department is required to admit all pretrial detainees to CMHIP for in-patient restorative treatment and competency evaluations within 28

days of the pretrial detainees being deemed ready for admission. *Id.* at ¶ 2(a).  The Department

also must maintain a monthly average of 24 days or fewer for all detainees for both competency

examinations and restorative treatment.  *See id.*

29.     The below chart details the Defendants' failure to meet the Settlement Agreement

timelines since June 2017 for restorative treatment at CMHIP or its second facility in Arapahoe

County.

| Month | Detainees on Wait List, 28+ Days | Average Wait Time | Longest Wait Time |
|---|---|---|---|
| June 2017 | 3 | 23.93 | 29 |
| July 2017 | 19 | 28.12 | 45 |
| August 2017 | 87 | 37.35 | 56 |
| September 2017 | 104 | 47.26 | 68 |
| October 2017 | 120 | 58.17 | 88 |
| November 2017 | 144 | 66.46 | 87 |
| December 2017 | 170 | 67.14 | 129 |
| January 2018 | 177 | 72.84 | 129 |
| February 2018 | 193 | 74.51 | 114 |
| March 2018 | 221 | 90.24 | 133 |
| April 2018 | 213 | 87.34 | 136 |
| May 2018 | 206 | 93.98 | 142 |

Purrington Decl., ¶ 11.

30.     Since June 2017, Defendants have failed to admit all pretrial detainees within 28

days of their ready for admission date and failed to maintain a monthly average of 24 days.

31.     Based upon recent reports, wait times for pretrial detainees to be admitted to

CMHIP for restorative treatment have exceeded 100 days.  The March 2018 data showed 221

detainees out of compliance for restoration, with the longest waiting 133 days.  The April 2018

data are no better.  A total of 213 detainees were out of compliance for restoration, with the

longest waiting 136 days.  And in May 2018, there were 206 detainees out of compliance for

restoration, with the longest detainee having to wait 142 days in jail.

32.     The monthly averages for inpatient evaluation and restoration are nearly *quadruple* the 24-day average required by the Settlement Agreement.  According to the March 2018 data, the average wait time for restoration was 90.2 days, 87.3 days in April 2018, and 94 days in May 2018.  The State claims it will not be back in compliance until *July 2019*.  By that point, it would have been in breach of the Settlement Agreement for 24 consecutive months.

33.     It is estimated that 25-30% of pretrial detainees listed in the Department's reports are individuals being held in jail as a result of an arrest on a petty, misdemeanor, non-violent, or drug offense.  Tragically, the length of their detention while waiting for an evaluation or treatment exceeds the jail sentence they likely would have received if they had pled guilty on the day they were arrested.  Many of these pretrial detainees are seriously mentally ill and in danger of harming themselves or others, and are victimized by other detainees as they wait for a humane environment to be evaluated and treated.  *See* Purrington Decl., ¶ 12.

34.     The Department's abysmal effort in 2017 is part of an accelerating trend of failing to stay in compliance with the Settlement Agreement and the United States Constitution.  In 2015, Defendants were unable to comply with the Settlement Agreement for ten of the twelve months.  *Id*. at ¶ 13.  In 2016, they were out of compliance for five out of twelve months.  *Id*.  In 2017, Defendants were out of compliance for the last seven months of the year.  *Id*.  It appears the Defendants will not be back in compliance until July 2019.  The result will be a five-year period in which they have spent more time out of compliance than in compliance.

**C.     Defendants Are in Breach of the Settlement Agreement through Their Improper Invocation of Departmental Special Circumstances.**

35.     The Settlement Agreement recognizes "that to some extent the Department's ability to perform its statutory obligations and its obligations under th[e] Agreement is based on factors beyond its control."  Dkt. 78-1 ¶ 6.  To account for this, the parties built into the

Settlement Agreement a mechanism that allows the Department to temporarily suspend the timeframe requirements of the Agreement through invocation of "Special Circumstances." *Id.*

36.     At-issue here is the Department's attempt to invoke "Departmental Special Circumstances" pursuant to Paragraph 6(a)(ii) of the Agreement.  The Settlement Agreement defines Departmental Special Circumstances as "circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in Paragraph 2. *Id.* at ¶ 6(a)(ii).  "This could mean an *unanticipated* spike in referrals, a national or statewide disaster impacting admissions decisions system wide," or some other "unique" or "unforeseen" circumstance. *Id.* (emphasis added).  Critically, the circumstance must be "*beyond the control of the Department*." *Id.* (emphasis added).

> **(1)     Defendants have improperly claimed Departmental Special Circumstances for circumstances within their control and which have persisted for decades.**

37.     In June 2017, the Department invoked Departmental Special Circumstances on the alleged basis that it "has experienced an unanticipated spike in court-ordered referrals for inpatient competency evaluation and restoration treatment services." *See* Purrington Decl., Ex. A at 1; *but see id.* at 3 (claiming "[a] steady increase in the number of orders for inpatient restoration treatment," rather than an unanticipated spike).  The Department claims, in that letter, that the increase in referrals, combined with "a decrease in the number of discharges," has "result[ed] in fewer beds available to meet the demand." *Id.* at 3.

38.     The Department's December 2017 letter arguing for a second invocation of Departmental Special Circumstances states the same basis as the June 2017 notice:  "the sustained increase in the number of court orders for inpatient competency restoration treatment has outpaced the Department's capacity and is beyond its control."  Purrington Decl., Ex. B at 2.

39.     Departmental Special Circumstances invocations must satisfy two requirements. First, the basis for invocation of Departmental Special Circumstances must be something "outside the control of the Department."  Dkt. 78-1 at ¶ 6.  In addition, that basis must be something "unique" or "unforeseen."  *Id*. at ¶ 6(c).

40.     The Department fails to meet either requirement.  First, the Department's recent attempts to invoke Departmental Special Circumstances do not qualify under the express definition of Departmental Special Circumstances because the basis for the Department's invocation—lack of capacity caused by an increase in referrals—is wholly within the Department's control.

41.     Notably, the Department's failure to maintain adequate facilities to keep up with the pace of referrals is a problem that has plagued timely admission of pretrial detainees to CMHIP for decades.  *See* Dkt. 53 at ¶¶ 39-58; *see also* Dkt. 53-8 at ¶¶ 8-25.  It, thus, cannot be considered a "statewide disaster," or otherwise "unique" or "unforeseen."

42.     In any event, the State's own data shows their invocation is based on a false premise.  Below are the monthly totals of new evaluations and restorations.

| Fiscal Year | In Patient Competency Evaluations | In Patient Restorations |
|---|---|---|
| June 2016 | 25 | 45 |
| July 2016 | 21 | 47 |
| August 2016 | 32 | 46 |
| September 2016 | 25 | 53 |
| October 2016 | 28 | 43 |
| November 2016 | 23 | 72 |
| December 2016 | 24 | 48 |
| January 2017 | 27 | 58 |
| February 2017 | 28 | 58 |
| March 2017 | 27 | 54 |
| April 2017 | 29 | 75 |
| May 2017 | 26 | 84 |
| June 2017 | 37 | 73 |
| July 2017 | 22 | 66 |

| | | |
|---|---|---|
| August 2017 | 31 | 76 |
| September 2017 | 30 | 66 |
| October 2017 | 25 | 66 |
| November 2017 | 19 | 76 |
| December 2017 | 14 | 68 |
| January 2018 | 19 | 77 |
| February 2018 | 17 | 78 |
| March 2018 | 30 | 65 |
| April 2018 | 9 | 71 |

Purrington Decl., ¶ 14.

43.     The data indicates that there has been no unabated increase.  Evaluations have increased and decreased but remained relatively flat over the last two years.  As for restorations, there was some increase leading into the spring of 2017 when they peaked at 84, but they have since decreased back to a lower level.

44.     The annual data for the last ten years further discredits the Defendants' claim of an unanticipated spike.  The below table (based on information provided by Defendants to DLC) shows the number of referrals for in-patient evaluation and restoration for each fiscal year from 2005 through 2017 and the percentage of change on an annual basis.

| Fiscal Year | In Patient Competency Evaluations | % Change | In Patient Restorations | % Change |
|---|---|---|---|---|
| 2005-06 | 115 | - | 167 | - |
| 2006-07 | 144 | 25.2% | 224 | 34.1% |
| 2007-08 | 184 | 27.8% | 219 | -2.2% |
| 2008-09 | 238 | 29.3% | 170 | -22.4% |
| 2009-10 | 275 | 15.5% | 212 | 24.7% |
| 2010-11 | 276 | 0.4% | 213 | 0.5% |
| 2011-12 | 287 | 3.9% | 268 | 25.8% |
| 2012-13 | 355 | 23.7% | 274 | 2.2% |
| 2013-14 | 378 | 6.4% | 342 | 24.8% |
| 2014-15 | 415 | 9.7% | 462 | 35.1% |
| 2015-16 | 326 | -21.4% | 550 | 19.0% |
| 2016-17 | 327 | 0.3% | 711 | 29.3% |

Purrington Decl., ¶ 15.

45.     The long-term data shows that evaluations have stabilized nearly 20% *below* the level they reached in 2014-15 (when the Department complied for most of the fiscal year).  It is true there was a 29% increase in restorations in 2016-17, but the Department has seen six increases of at least 24% in restorations in the last ten years.  When the Department has had five 24% or more increases in a short period of time, the sixth one cannot credibly be claimed to be "unanticipated."  At that point, the Department should be preparing for increases of that size most years and its failure to budget and plan for that is a failure within its control.

46.     In sum, the State faces an increasing demand on its system.  But the increase has been a trend for the last decade and thus cannot be characterized as unanticipated.  The Agreement does not give the Defendants a pass from their constitutional duties for an increase, but only for an unanticipated one that is *outside its control*.  There was nothing unforeseen and unique about the Department's lack of capacity to handle the 2017 increases in demand for restorations and the Department's own data undercuts its claimed increase.  What is different is the State's utter failure since June 2017 to respond and react to it.

47.     Regardless, states across the country have been held accountable through court rulings and consent decrees in similar litigation.  The State's defense that more persons with mental illness have been filling up jails is not a new phenomenon.  In 2015, an increase was predictable in reviewing the data regarding the number of persons with serious mental illness entering jails and prisons.  The State failed to mitigate this situation, work with the Independent Consultant in any meaningful way, or set up contracts and forge relationships with other public and private agencies to assist in outpatient restoration.

48.     Beneath the bluster, the State admits they are violating the constitutional rights of thousands of Coloradans stuck on the waiting list.  At DLC's suggestion, the State sent letters to

judges and attorneys involved in 15 cases since April 2018. Purrington Decl., Ex. D. In the letters, the State admits that it is holding pretrial detainees in jail for months whom it concedes would be better served in the community. Sadly, the effort has not been as successful as it could have been because the State has failed to partner with community mental health centers—for example, the letters fail to provide a judge any direction on what resources exist in the court's community if the detainee were to be released.

>           **(2)     Defendants have improperly invoked Departmental Special Circumstances consecutively to suspend the timeframe requirements of the Settlement Agreement in perpetuity.**

49. On December 22, 2017, the day on which the Department's June invocation of Departmental Special Circumstances was set to expire, Defendants provided DLC with a second notice of invocation of Departmental Special Circumstances. Purrington Decl. at Ex. B. The basis for Defendants' second invocation was the same it previously provided six months earlier. *See id.* at 2.

50. The Settlement Agreement does not allow the State to consecutively invoke Departmental Special Circumstances to extend the automatic six-month suspension period for up to another six months. Dkt. 78-1 at ¶ 6(c).

51. Allowing the Department to re-invoke Departmental Special Circumstances the day the prior invocation ended, as it claimed to do on December 22, 2017, would render the timeframes set forth in the Settlement Agreement meaningless. *Summit Bank & Tr. v. Am. Modern Home Ins. Co.*, 71 F. Supp. 3d 1168, 1171 (D. Colo. 2014) ("The review of the contract must strive to give effect to all provisions so that none is rendered meaningless."). Such an interpretation would render the maximum six-month timeframe for Departmental Special Circumstances a nullity. Under this logic, the State could serially re-invoke Departmental

Special Circumstances every six months in perpetuity and *never* need to come back into compliance.  It also would eliminate the three-month penalty provision found in the Settlement Agreement, which increases the term of the agreement by three months for each month in a given calendar year that the Department is unable to meet the timeframes set forth in Paragraph 2 of the agreement.  *See* Dkt. 78-1 at ¶ 4(b).

52.     While the Settlement Agreement does permit the State to invoke Individual Special Circumstances (a separate "time out" provision limited to one specific person) more than once so long as it follows the procedures set forth in the agreement, it is silent with respect to the invocation of Departmental Special Circumstances.  *See id.* at ¶ 6(b)(ii).  DLC agreed to allow multiple invocations for individuals through the inclusion of express language in the agreement, but it did not agree to the same procedure for departmental special circumstances.  *Compare id.* at ¶ 6(b), *with id.* at ¶ 6(c).

53.     The Defendants' consecutive invocation of Departmental Special Circumstances constitutes a breach of the Settlement Agreement and a breach of the implied covenant of good faith and fair dealing, at best.  *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (explaining that "every contract contains an implied duty of good faith and fair dealing" to "effectuate the intentions of the parties or to honor their reasonable expectations").  At worst, it is a willful and intentional breach of the agreement and demonstrates the State's continuous and deliberate indifference to the due process rights of Colorado's mentally ill.  The Court should reopen this case and explore the claims emanating from this bad-faith conduct by Defendants.

### (3)  The Independent Consultant

54.     As part of the Settlement Agreement, the parties agreed to have an Independent Consultant monitor the State's compliance with the settlement timeframes and assist the State to

avoid this constitutional problem for a third time.  The Independent Consultant has been ineffective, and in this crisis has still not reviewed the data, nor completed the quarterly report due in April 2018, which would identify areas of non-compliance and provide expert recommendations to get back into compliance.  Once again, DLC is left to attempt to monitor the State, without full information.

## CONCLUSION

55.     It is undeniable that the system is (and has been for decades) in a state of disrepair.  But the reason for the disrepair is not outside the Department's control or due to unique, unanticipated or special circumstances.  Rather, it is wholly due to Defendants' ineptitude, lack of vision, and continuous and willful disregard for the health and well-being of the very people they are statutorily tasked with helping:  the mentally ill.

56.     DLC is at a loss.  It has engaged in negotiations and litigation with Defendants for seven years to no avail.  The Independent Consultant has been ineffective.  The Defendants have spent more time in the last four years out of compliance with the Settlement Agreement than they have spent meeting the timeframes they agreed to abide by in good faith.  DLC seeks this Court's assistance to protect and preserve the constitutional rights of these individuals and to enforce the Settlement Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant this Motion and enter an order:

> a.   reopening this action to conduct proceedings to enforce the Settlement Agreement, including permitting limited, expedited discovery and setting an evidentiary hearing;
>
> b.   reopening this action to permit the underlying claims for the State's continuing constitutional violations, including holding a preliminary injunction regarding the

State's continuing constitutional violations and the appropriate sanctions for those continuing violations;

c.   declaring that Defendants breached the Settlement Agreement;

d.   directing Defendants to eliminate the wait list by August 1, 2018, or sooner, and notifying Defendants that their failure to do so could result in a finding of contempt, including associated fines or penalties;

e.   directing Defendants to comply with the deadlines set out in the Settlement Agreement for all referrals made on and after August 1, 2018 and notifying Defendants that their failure to do so could result in a finding of contempt, including associated fines and/or penalties;

f.   appointing an independent court monitor to oversee and scrutinize Defendants' future performance under the Settlement Agreement;

g.   extending the Amended Settlement Agreement by three months for each month Defendants failed to comply with the timeframes in the Settlement Agreement;

h.   awarding Plaintiff its reasonable costs and attorneys' fees associated with the preparation and filing of this motion and the conduct of any further proceedings; and

i.   granting such other or further relief against Defendants as the Court deems just and proper.

*///*

DATED:  June 13, 2018.

Respectfully submitted,

*s/ Iris Eytan*
Iris Eytan
EYTAN NIELSEN LLC
3200 Cherry Creek South Drive
Denver, CO 80209
Telephone: 720.440.8155
Facsimile: 720.440.8156
Email: iris@eytan-nielsen.com


*s/ Caleb Durling*
Caleb Durling
ROLLIN BRASWELL FISHER LLC
8350 East Crescent Pkwy., Suite 100
Greenwood Village, Colorado 80111
Telephone: 303-945-7415
Facsimile: 303-974-7468
Email: cdurling@rbf.law


*Attorneys for Plaintiff Center for Legal Advocacy,
d/b/a Disability Law Colorado*

*s/ Mark J. Ivandick*
Mark J. Ivandick
Jennifer Purrington
DISABILITY LAW COLORADO
455 Sherman St., Ste. 130
Denver, CO 80203
Telephone: 303.722.0300
Facsimile: 303.722.0720
Email: mivandick@disabilitylawco.org


*s/ Ellie Lockwood*
Ellie Lockwood
SNELL AND WILMER LLP
1200 Seventeenth Street, Suite 1900
Denver, CO 80202
Telephone: 303-634-2000
Facsimile: 303-634-2020
Email: elockwood@swlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 13, 2018, a true and correct copy of this

MOTION TO REOPEN ACTION FOR ENFORCEMENT OF SETTLEMENT AGREEMENT

was electronically filed the foregoing with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to the following e-mail addresses:

      Tanja E. Wheeler
      Lauren Peach
      Libbie McCarthy
      First Assistant Attorney General
      Colorado Department of Law
      State Services Section
      Ralph L. Carr Colorado Judicial Center
      1300 Broadway, 6th Floor
      Denver, CO 80203
      Ph: 720-508-6151
      Fax: 720-508-6041
      tanja.wheeler@coag.gov
      Lauren.Peach@coag.gov
      Libbie.McCarthy@coag.gov

      *Counsel for Defendants*

                                    */s/Sandy Braverman*
                                    Sandy Braverman