IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-02285-NYW

CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO,

    Plaintiff,

v.

REGGIE BICHA,
in his official capacity as Executive Director
of the Colorado Department of Human Services, and

JILL MARSHALL, in her official capacity
as Chief Executive Officer of the Colorado Mental Health
Institute at Pueblo,

    Defendants.

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
TO ENFORCE SETTLEMENT AGREEMENT**

---

The July 2016 Settlement Agreement (Dkt. 78-1) set deadlines by which Defendants must—unless validly invoking a six-month exception for "Departmental Special Circumstances" ("DSC")—admit jailed persons awaiting competency evaluations or restorative treatment to the state mental hospital ("CMHIP").  Plaintiff seeks legal rulings that Defendants (a) currently are in breach of those deadlines; (b) could not legally have invoked the DSC exception a second time in December 2017; and (c) did not satisfy the six-month DSC exception in December 2017.  Based on those rulings, the Court should order immediate compliance with the deadlines (upon pain of contempt).

**Background**

The 2016 Settlement Agreement set "timeframe" deadlines for admitting jailed persons needing state hospitalization for competency evaluations and restorative treatment: Defendants must admit such persons within 28 days and maintain a monthly "days waiting" average of 24 days. Dkt. 78-1. These deadlines, needed to ensure timely mental health evaluation and treatment, do not mean pretrial detainees will receive hospital admission within 28 days of arrest; to the contrary, the deadlines are triggered only after a court order for competency evaluation or treatment renders a jailed detainee "ready for admission."[1] This means that pretrial detainees often are forced to wait weeks or months in jail before the 28-day clock begins to run.

This 2016 Settlement Agreement, addressing the State's unconstitutional warehousing of mentally incompetent persons in Colorado's county jails, replaced a prior 2012 agreement that Defendants violated. The unconstitutionally prolonged detentions, dating back more than a decade, spawned multiple contempt citations against state officials in 2007. *See People v. Zuniga*, No. 06CR999 (Colo. Dist. Ct. Jan. 3, 2007); *People v. Kirkwood*, No. 06CR5797 (Colo. Dist. Ct. Jan. 3, 2007); *People v. Sims*, No. 05CR2272 (Colo. Dist. Ct. Jan. 3, 2007) (attached as Ex. 1). After Denver District Court Judge Egelhoff appointed special counsel to litigate contempt citations against the Director of Human Services and the CMHIP Superintendent to alleviate the problem of jail wait times for individuals awaiting competency evaluations. In those instances, jail detainees were sitting in jail for many months awaiting transport to CMHIP for competency evaluations. The contempt citations and orders resulted in a comprehensive

---

[1] The "Ready for Admission Date" is "the date on which the Hospital has received the Court Order for admission to the Hospital and the Collateral Materials." Dkt. 78-1 ¶ 1(s); *see id.* ¶ 1(e) (defining collateral materials as relevant police incident reports and charging documents). The delays challenged here do not result from delayed receipt of any collateral materials.

settlement agreement that, at that time, effectively resolved that systemic issue but ultimately expired. This federal litigation, filed by Plaintiff in 2011, then ensued.

The 2012 agreement that should have resolved this federal case was finalized after several settlement conferences with then-Magistrate Judge Boland. Dkt. 51-1. It was incorporated by reference in the 2012 dismissal order under Fed. R. Civ. P. 41(a)(2). Dkt. 52.

In 2015, the Court reopened the matter after Plaintiff presented evidence that Defendants had breached the 2012 agreement, including by falsifying monthly report data and failing to disclose a waitlist showing more than 80 people waiting in jails beyond the deadlines. Dkt. 62 (order reopening case); *see* Dkt. 53 (motion to reopen). Mediation helped produce the 2016 Settlement Agreement, which this Court retained jurisdiction to enforce. Dkt. 78-1 ¶¶ 3, 4.

Defendants soon began failing to meet their deadlines again. On June 22, 2017, less than a year after the 2016 agreement, they invoked the six-month DSC exception. *See* Ex. 2 (first DSC Notice). Defendants claimed they could not meet the deadlines due to "an unanticipated spike in court-ordered referrals for inpatient competency evaluation and restoration treatment services." *Id.* at 1.

Then, on December 22, 2017, the day the Department's six-month suspension period was set to expire, Defendants invoked the six-month DSC exception a second time. Ex. 3 (second DSC Notice). That DSC notice cited an "unabated" and "sustained increase" in court orders for evaluation and restoration as the reason why Defendants could not meet the deadlines. *See id.* at 1-2. Defendants had no legal or factual basis to invoke DSC back-to-back.

That second DSC invocation, even if valid, would have expired on June 22, 2018, and Defendants have not made a third DSC invocation. For more than a year, Defendants have been in abject noncompliance with the agreed-upon deadlines of the 2016 Settlement Agreement.

Instead of waiting a maximum of 28 days, detainees routinely sit in jails waiting more than 100 days—two to three extra months—to be transported for inpatient restoration treatment. The wait list now surpasses 200 detainees.

## Argument[2]

Plaintiff seeks enforcement, as well as construction, of the 2016 Settlement Agreement. The issues, on which material facts are undisputed, are whether Defendants are now in "non-compliance with the Settlement Agreement" (and whether they previously were in non-compliance when they invoked DSC) and, if so, the appropriate "remedies." *See* Dkt. 88 at 2.

Defendants' pre-June 2018 non-compliance, including whether they wrongly invoked DSC to suspend timeframes for another six-month period beginning December 2017, is relevant not just when considering contempt remedies but also to extending the 2016 agreement's duration beyond July 31, 2021. *See* Dkt. 78-1 ¶¶ 4(a-c) (framework for extensions to the agreement's duration).

The controlling law is straightforward. The "violation of a settlement agreement over which the court has retained jurisdiction is subject to state contract law regarding the prima facie elements, affirmative defenses, and remedies of and for breach of contract." *See Macias v. N.M. Dep't of Labor*, 300 F.R.D. 529, 553 (D.N.M. 2014) (citations omitted). Because the parties

---

[2] The Court has ordered that this motion to enforce the settlement agreement be styled as a motion for summary judgment. Dkt. 90 at 1. DLC omits a standard of review section and adopts this Court's prior recitations of the well-established F.R.C.P. 56 summary judgment standard. *E.g.*, *Chesser v. Dir. Fed. Bureau of Prisons*, No. 15-cv-01939-NYW, 2018 WL 3729511, at *2 (D. Colo. Aug. 6, 2018) (laying out standard).

The Court has instructed the parties to create a joint evidentiary submission and list of stipulated facts. Dkt. 90 at 2. The facts here, which are largely the statistics produced from tabulating Defendants' own monthly records, should all be undisputed and DLC will confer with Defendants to create that list and joint evidentiary submission by the September 17, 2018 deadline.

indisputably entered into the agreement, and there is no denying that Plaintiff complied with its obligations, the only issue is whether Defendants have breached their obligations. *See* Colo. Jury Instr., Civil § 30:10 (breach of contract elements).

Defendants now are breaching the agreed-upon deadlines and have been in breach ever since December 22, 2017, when they invoked DSC for a second time. The Court should order immediate compliance (upon pain of contempt).

**I.      Defendants are violating the 2016 Settlement Agreement.**

A.      <u>Defendants have not met the deadlines for more than a year</u>.

In every month since June 2017, Defendants have failed to admit all eligible pretrial detainees within 28 days and failed to maintain a monthly average of 24 days. The report of an Independent Consultant, issued in accord with the Settlement Agreement's paragraph 7, found that "currently the State is clearly failing to meet the deadlines contained in the Settlement Agreement." Ex. 4 (Independent Consultant report).

The below chart shows the noncompliance. It details the timelines since June 2017 for restorative treatment at CMHIP or a second facility in Arapahoe County, known as RISE.

| Month | Entries for Detainees on Wait List, 28+ Days | Average Wait Time | Longest Wait Time |
|---|---|---|---|
| June 2017 | 3 | 23.93 | 29 |
| July 2017 | 36 | 28.12 | 45 |
| August 2017 | 87 | 37.35 | 56 |
| September 2017 | 104 | 47.26 | 68 |
| October 2017 | 120 | 58.17 | 88 |
| November 2017 | 145 | 66.46 | 87 |
| December 2017 | 170 | 67.14 | 129 |
| January 2018 | 177 | 72.84 | 129 |
| February 2018 | 194 | 74.51 | 114 |
| March 2018 | 221 | 90.24 | 133 |
| April 2018 | 214 | 87.34 | 136 |

| Month | Entries for Detainees on Wait List, 28+ Days | Average Wait Time | Longest Wait Time |
|---|---|---|---|
| May 2018 | 217 | 96.56 | 144 |
| June 2018 | 211 | 95.53 | 144 |
| July 2018 | 281 | 80.62 | 149 |

Thus, in each month from March through July 2018, more than 200 detainees improperly held in jail awaiting restorative treatment beyond the timeframes, with the longest waiting at least 149 days—over *five times* the agreed-upon maximum wait time for a detainee. The monthly averages for inpatient evaluation and restoration are nearly *quadruple* the 24-day average required by the Settlement Agreement.

These troubling numbers document cases in which real harms are being inflicted on vulnerable detainees needing mental health treatment. The State, in letters to judges and attorneys involved in numerous cases since April 2018, admits that it is holding pretrial detainees in jail for months even though it concedes the detainees would be better served in the community. Ex. 5 (Department's letters to judges). In the past year, Defendants have received at least 15 orders to show cause related to their failure to timely provide competency and restoration services to pretrial detainnes and 44 orders for immediate placement at CMHIP. *See* Ex. 6 (CORA Response). In some of these orders, judges have raised the potential for contempt citations if the detained criminal defendants are not transported for restoration within a certain time period. *Id*.

The wait times bear no relationship to the offenses these individuals have been charged with, which are often low-level and non-violent misdemeanor charges stemming from their mental illnesses. The result of these lengthy, unconstitutional delays is a vicious cycle. The longer the State keeps these individuals locked in jail (usually in administrative segregation or in

solitary isolation with permission to leave the cell for one hour a day) while awaiting evaluation and restorative services, the more exacerbated their mental illnesses become, thereby leading to longer restorative timeframes and a higher likelihood that these individuals will be deemed permanently incompetent. In many cases, the wait times exceed the amount of time (if any) these presumptively innocent individuals would have served if they had pled guilty.

B.   The second DSC invocation (in December 2017) was improper.

Defendants had no authority under the Settlement Agreement to make a *second* DSC invocation, on December 22, 2017 (the day on which their first invocation in June 2017 was set to expire). Accordingly, Defendants were in noncompliance during all six months, from December 2017 through June 2018, covered by that second invocation.

There is a "six months" limit on when invoking DSC may leave timeframe limits "temporarily suspended." Dkt. 78-1 ¶¶ 6 & 6(c). Allowing successive DSC invocations, suspending timeframes twelve months (or potentially indefinitely), would violate contract construction principles by rendering those limits meaningless. *See Summit Bank & Tr. v. Am. Modern Home Ins. Co.*, 71 F. Supp. 3d 1168, 1171 (D. Colo. 2014) ("The review of the contract must strive to give effect to all provisions so that none is rendered meaningless."). Under this logic, the State would never be in breach, as it could serially re-invoke DSC every six months in perpetuity and never need to come back into compliance. It also would eliminate the three-month extension provision found in the Settlement Agreement, which increases the term of the agreement by three months for each month in a given calendar year that the Department is unable to meet the timeframes set forth in Paragraph 2 of the agreement. *See* Dkt. 78-1 ¶ 4(b).

While the Settlement Agreement *does* expressly permit successive invocations of Individual Special Circumstances (a separate "time out" provision limited to one specific

person), it does not allow successive invocations of Departmental Special Circumstances. Specifically, the agreement allows multiple invocations for *individual cases* through the inclusion of express language in the agreement, but contains no provision for broader invocations of *departmental* special circumstances. *Compare id.* ¶ 6(b), *with id.* ¶ 6(c). Nor would Plaintiff ever have agreed to such terms, which would severely infringe the constitutional rights of pretrial detainees.

At the very least, the second DSC invocation breached the implied covenant of good faith and fair dealing intended to "effectuate the intentions of the parties or to honor their reasonable expectations." *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). At worst, it is a willful breach reflecting the State's deliberate indifference to the constitutional rights of pretrial detainees with mental illness.

C.     Neither DSC invocation was justified under the requisite standard.

Neither the first nor second DSC invocation satisfied the standard for invoking Departmental Special Circumstances.[3] The Settlement Agreement defines Departmental Special Circumstances as "*circumstances beyond the control of the Department* which impact the Department's ability to comply with the timeframes set forth in Paragraph 2." Dkt. 78-1 ¶ 6(a)(ii) (emphasis added). "This could mean an unanticipated spike in referrals, a national or statewide disaster impacting admissions decisions system wide," or some other "unique" or "unforeseen" circumstance. *Id*.

---

[3] To streamline this case, DLC is not seeking an order from this Court that the June 2017 DSC invocation was invalid (though it could have and believes it would prevail). It presents these facts and arguments because the grounds for the alleged "unanticipated" spike is relevant to the Court's analysis of whether the December 2017 DSC re-invocation was improper because re-invocation was not permitted *and* because the reason stated was invalid.

Defendants' original June 2017 DSC invocation alleged that the Department had "experienced an unanticipated spike in court-ordered referrals for inpatient competency evaluation and restoration treatment services." Ex. 2. It added that the increase in referrals, combined with "a decrease in the number of discharges," has "result[ed] in fewer beds available to meet the demand." *Id.* The second invocation, in December 2017, similarly stated that "the sustained increase in the number of court orders for inpatient competency restoration treatment has outpaced the Department's capacity and is beyond its control." Ex. 3.

These invocations did not satisfy basic DSC requirements: that the event be something "outside the control of the Department"—something "unique" or "unforeseen," akin to a "statewide disaster." Dkt. 78-1 ¶¶ 6 & 6(c). The basis for Defendants' invocation—lack of capacity caused by an increase in referrals—is wholly within the Department's control. Notably, the Department's failure to maintain adequate facilities to keep up with the pace of referrals is a problem that has plagued timely admission of pretrial detainees to CMHIP for decades. *See* Dkt. 53 ¶¶ 39-58; *see also* Dkt. 53-8 ¶¶ 8-25. It, thus, cannot be considered a "statewide disaster," or otherwise "unique" or "unforeseen."

In any event, the State's own data shows their invocation is based on a false premise. Here are the monthly totals of new evaluations and restorations:

| Fiscal Year | In Patient Competency Evaluations | In Patient Restorations |
| --- | --- | --- |
| June 2016 | 25 | 45 |
| July 2016 | 21 | 47 |
| August 2016 | 32 | 46 |
| September 2016 | 25 | 53 |
| October 2016 | 28 | 43 |
| November 2016 | 23 | 72 |
| December 2016 | 24 | 48 |
| January 2017 | 27 | 58 |
| February 2017 | 28 | 58 |
| March 2017 | 27 | 54 |

| Fiscal Year | In Patient Competency Evaluations | In Patient Restorations |
|---|---|---|
| April 2017 | 29 | 75 |
| May 2017 | 26 | 84 |
| June 2017 | 37 | 73 |
| July 2017 | 22 | 66 |
| August 2017 | 31 | 76 |
| September 2017 | 30 | 66 |
| October 2017 | 25 | 66 |
| November 2017 | 19 | 76 |
| December 2017 | 14 | 68 |
| January 2018 | 19 | 77 |
| February 2018 | 17 | 78 |
| March 2018 | 30 | 65 |
| April 2018 | 9 | 71 |
| May 2018 | 22 | 69 |
| June 2018 | 14 | 68 |
| July 2018 | 15 | 65 |

Evaluations have increased and decreased but remained relatively flat over the last two years. *See id.* April 2018's total of 9 evaluations was the lowest monthly total in over two years. As for restorations, there was some increase leading into the spring of 2017 when they peaked at 84, but they have since decreased back to a lower level. This alleged unanticipated increase was the same reason (along with staff shortages then) given in 2015 to invoke DSC under the 2012 agreement, after which the Department agreed to the same timeframes in the operative 2016 agreement. An "unanticipated" spike cannot have lasted from 2015 through 2019.

Defendants' claim of an unanticipated spike is further discredited by the annual data for the last ten years. Here are the yearly statistics since 2005:

| Fiscal Year | In Patient Competency Evaluations | % Change | In Patient Restorations | % Change |
|---|---|---|---|---|
| 2005-06 | 115 | - | 167 | - |
| 2006-07 | 144 | 25.2% | 224 | 34.1% |
| 2007-08 | 184 | 27.8% | 219 | -2.2% |
| 2008-09 | 238 | 29.3% | 170 | -22.4% |
| 2009-10 | 275 | 15.5% | 212 | 24.7% |
| 2010-11 | 276 | 0.4% | 213 | 0.5% |
| 2011-12 | 287 | 3.9% | 268 | 25.8% |
| 2012-13 | 355 | 23.7% | 274 | 2.2% |
| 2013-14 | 378 | 6.4% | 342 | 24.8% |
| 2014-15 | 415 | 9.7% | 462 | 35.1% |
| 2015-16 | 326 | -21.4% | 550 | 19.0% |
| 2016-17 | 327 | 0.3% | 711 | 29.3% |
| 2017-18 | 252 | -22.94% | 848 | 19.27% |

Evaluations have stabilized nearly 40% *below* the level they reached in 2014-15 (when the Department complied for most of the fiscal year). While there was a 29% increase in restorations from 2016-17, the Department has seen six increases of at least 24% in the last ten years. That 29% increase could not have been "unanticipated," as the Department should have been preparing for such increases; its budgetary and planning failures were controllable. In fiscal year 2017-18, when the State has claimed to invoke DSC the entire time, it had an increase of 19%, a level which it has seen for five consecutive fiscal years and in seven of the last 9 fiscal years.

In sum, the State faces an increasing demand on its system. But the increase has been a trend for the last decade and is not unanticipated. The Agreement does not give the Defendants a pass from their constitutional duties for an increase, but only for an unanticipated one that is outside its control. There was nothing unforeseen and unique about the Department's lack of capacity to handle the 2017 increases in demand for restorations and the Department's own data undercuts its claimed increase.

What is unanticipated is the State's utter failure for a decade to create a plan of action to resolve these problems so that it could carry out its duties and obligations. It never sought guidance from experts or the independent consultant, and it did not commission a study or work with community stakeholders. Instead, it continued its typical myopic response to request funds for more bed space. And, in May 2018, it unsuccessfully sought legislative approval to enact a statute (SB18-252) that would have permitted the Defendants to incarcerate persons waiting in jail for restoration treatment for 5 months (instead of the agreed upon 28 days), in violation of the United States Constitution and the Settlement Agreement.

## II.     The Court should compel immediate compliance upon pain of contempt.

It is estimated that 25-30% of pretrial detainees listed in the Department's reports are individuals being held in jail as a result of an arrest on a petty, misdemeanor, non-violent, or drug offense. Tragically, the length of their detention while waiting for an evaluation or treatment exceeds the jail sentence they likely would have received (if any) if they had pled guilty on the day they were arrested. Many of these pretrial detainees are seriously mentally ill and in danger of harming themselves or others, and are victimized by other detainees as they wait for a humane environment to be evaluated and treated.

Beneath the bluster, the State admits they are violating the constitutional rights of thousands of Coloradans stuck on the waiting list. The State sent letters to judges and attorneys involved in 15 cases since April 2018. Ex. 5. In the letters, the State admits that it is holding pretrial detainees in jail for months whom it concedes would be better served in the community. *Id.* Sadly, the effort has not been as successful as it could have been because the State has failed to partner with community mental health centers—for example, the letters fail to provide judges any direction on what resources exist in the community if the detainees were to be released.

The Department's abysmal effort in 2017 and 2018 is part of an accelerating trend of failing to stay in compliance with the Settlement Agreement and the United States Constitution. In 2015, Defendants were unable to comply with the Settlement Agreement for ten of the twelve months. In 2016, they were out of compliance for five out of twelve months. In 2017, Defendants were out of compliance for the last seven months of the year. As of August 2018, they have been out of compliance for all of 2018, and it appears Defendants will not be back in compliance until at least July 2019 absent the Court's involvement. The result will be a five-year period in which they have spent more time out of compliance than in compliance.

With court intervention, however, compliance is possible. Specifically in cases where courts have issued orders to show cause or threatened Defendants with contempt, Defendants transport pretrial detainees for services quickly. In the past year, the Department has received at least 15 orders to show cause related to competency and restoration services at CMHIP and 44 orders for immediate placement at CMHIP. Ex. 6. In some of these orders, but not all, the judges have raised the potential for contempt citations if the defendants are not transported for restoration within a certain time period. *Id.*

Last month, Judge Jones of the Denver District Court issued an order requiring the immediate transport of a pretrial detainee who had been in jail waiting for restorative treatment for months or longer. Ex. 7 (Judge Jones Order). The immediate transport order highlights Defendants' egregious conduct at-issue here:

> Subsequent to Defendant's motion, the Court received a letter from CDHS, dated July 5, 2018, indicating Defendant has yet to be admitted for restoration and requesting an extension to October 16, 2018 "to allow for admission and treatment prior to reassessment." In other words, it is likely to be 6 months from the date of this Court's restoration order on April 13 before CDHS complies--perhaps--with the order and responds to the Court. This is unacceptable on numerous levels: it flouts this Court's order and unduly delays not just one, but Defendant's three pending 2016 cases; it appears to violate a federal court

> settlement agreement; it is part of a pattern of conduct by CDHS (this Court has lost count of how often this scenario has occurred over the past 6 months); and, most importantly, it violates Defendant's constitutional rights.
>
> The Court orders CDHS to admit Defendant for restoration treatment within 7 days of this Order. Failure to do so will result in the issuance of a contempt citation.

*Id*. The pretrial detainee was transported within just seven days of the order.

In another case, Judge Brody of the Denver District Court issued an order to show cause and contempt citation against Defendants. Ex. 8 (Judge Brody orders). In that case, the court had issued three separate orders requiring transport of the pretrial detainee, who had been found incompetent to proceed and committed to the custody of Defendants for restoration back in March of 2018. The August 24, 2018 contempt hearing was vacated yesterday when Defendants again transported the pretrial detainee while hundreds more wait in line.

Plaintiff has tried with stakeholders across the State to force Defendants to adhere to the timelines in the Settlement Agreement. These efforts when dealing with individuals can never be as effective as a Court order requiring systemic compliance.

This Court has that authority and power. This Court specifically reserved jurisdiction twice, in 2011 and in 2015, to address the situation at hand today. This Court has the power to find that Defendants are in breach of the Settlement Agreement and order their immediate compliance with the timelines enshrined within it. Plaintiff believes this step is the only way to force the Defendants to make the systemic improvements that they have spent years failing to do. The Court should order immediate compliance. If Defendants fail (again), then Plaintiff will pursue the available options such as contempt, along with its attendant fines and penalties.

Because of the absurdity of the December 2017 consecutive invocation, the Court should make it clear in any order that the Defendants cannot invoke Department Special Circumstances

yet again for this same alleged unabated increase in admissions but must find a way to comply with the Settlement Agreement's timelines for the admission of pretrial detainees for evaluations and treatment.

## CONCLUSION

The Court should issue legal rulings that Defendants (a) currently are in breach of the 2016 Settlement Agreement; (b) could not legally have invoked the DSC exception a second time in December 2017; and (c) breached the Agreement by failing to satisfy the six-month DSC exception in December 2017.  Based on those rulings, the Court should order immediate compliance with the deadlines (upon pain of contempt).  Finally, the Court should also award Plaintiff's counsel their reasonable costs and attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

DATED:  August 15, 2018.

Respectfully submitted,

*s/ Iris Eytan*
Iris Eytan
EYTAN NIELSEN LLC
3200 Cherry Creek South Drive
Denver, CO 80209
Telephone: 720.440.8155
Facsimile: 720.440.8156
Email: iris@eytan-nielsen.com

*s/ Caleb Durling*
Caleb Durling
FOX ROTHSCHILD LLP
1225 Seventeenth Street, Suite 2200
Denver, CO 80202
Phone: (303) 945-7416
Email: cdurling@foxrothschild.com

*Attorneys for Plaintiff Center for Legal Advocacy, d/b/a Disability Law Colorado*

*s/ Mark J. Ivandick*
Mark J. Ivandick
Jennifer Purrington
DISABILITY LAW COLORADO
455 Sherman St., Ste. 130
Denver, CO 80203
Telephone: 303.722.0300
Facsimile: 303.722.0720
Email: mivandick@disabilitylawco.org

*s/ Ellie Lockwood*
Ellie Lockwood
Timothy P. Scalo
SNELL AND WILMER LLP
1200 Seventeenth Street, Suite 1900
Denver, CO 80202
Telephone: 303-634-2000
Facsimile: 303-634-2020
Email: elockwood@swlaw.com;
tscalo@swlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 15, 2018, a true and correct copy of this motion was electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Tanja E. Wheeler
Lauren Peach
Libbie McCarthy
First Assistant Attorney General
Colorado Department of Law
State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Ph: 720-508-6151
Fax: 720-508-6041
tanja.wheeler@coag.gov
Lauren.Peach@coag.gov
Libbie.McCarthy@coag.gov

*Counsel for Defendants*

/s/Sandy Braverman
Sandy Braverman