IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-02285-NYW


CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO,

      Plaintiff,

v.

REGGIE BICHA,
In his official capacity as Executive Director
Of the Colorado Department of Human Services, and

JILL MARSHALL,
In her official capacity as Superintendent
Of the Colorado Mental Health Institute at Pueblo

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

      This matter is before the Court because of a dispute between the Plaintiff, Disability Law Colorado, and the Defendants, Reggie Bicha and Jill Marshall, concerning whether there has been a breach of a settlement agreement between the parties. The purpose of the contract is to address certain constitutional rights of individuals living with a mental health disorder who are charged, but not convicted, with committing criminal offenses in Colorado. While the subject of the contract is important, the dispute presently before this Court is a contract dispute.

1

Disability Law Colorado attempts to cloud the legal issue before this Court by introducing extraneous facts detailing compelling circumstances some individuals face while incarcerated before trial. Disability Law Colorado cannot show that Defendants Bicha and Marshall are responsible for such circumstances. Further, what Disability Law Colorado fails to acknowledge is that the contract has met, and continues to meet, its essential purpose: defendants in Colorado are ensured a greater level of constitutional protection than would otherwise be afforded by state or federal law in this jurisdiction.

Now, Disability Law Colorado disputes a provision in the parties' contract that it bargained for. Disability Law Colorado asks this Court to impose remedies not contemplated by the parties' contract, because of its failure to accept the risk associated with the provision it now disputes. The law does not support this result. As a consequence, summary judgement should be awarded in favor of Defendants Bicha and Marshall.

## BACKGROUND

When an individual living with a mental health disorder comes into contact with the criminal justice system, his or her experience of that system is impacted by community mental health centers, behavioral health organizations, law enforcement officers, county jails, jail clinicians, public defenders and defense counsel, prosecutors, judges, and state mental health institutes. The action, or inaction, of these actors directly impacts whether an

individual living with a mental health disorder will become engaged with the criminal justice system, what will happen to that individual during that time, and when, if at all, he or she will be able to exit that system.

Situated squarely in the middle of the criminal justice system is the Colorado Department of Human Services (the Department).[1] The Department's role is specific and it is allowed very little discretion. The Colorado General Assembly's directive is clear: the Department is to provide a competency evaluation for any defendant when the issue of competency to stand trial is raised, and the Department is to provide restoration to competency services for any defendant found by the court to be incompetent to proceed. §§ 16-8.5-101, et seq., 27-60-105, C.R.S. (2017).

Because of its statutorily-defined and non-discretionary role, the Department cannot control whether a defendant is ordered to receive its services in the first place, and whether those services must take place at a state mental health institute or in the community. Instead, a judge makes that decision which is almost always influenced by the arguments of a prosecutor or defense counsel and the availability, or lack thereof, of supportive services from community mental health centers. The Department has no control over this part of the system, yet it is expected to perform its

---

[1] The Colorado Department of Human Services is led by Defendant Reggie Bicha and the Colorado Mental Health Institute at Pueblo is led by Defendant Jill Marshall, both named as Defendants in their official capacities. Accordingly, both Defendants are collectively referred to hereafter as the Department.

statutory duties and absorb the impact on its resources when these decisions are made.

At times, the volume of court orders requiring the Department to provide competency evaluation and restoration to competency services (restoration services) has resulted in a list of individuals waiting to receive those evaluations and services. Because of this, in 2011, Disability Law Colorado filed the complaint in this matter, challenging the length of the time individuals were waiting to receive competency evaluations and restoration services.

Shortly thereafter, the Department entered into settlement negotiations with Disability Law Colorado to resolve the issues raised in the complaint. After several rounds of in-person settlement negotiations mediated by former Magistrate Judge Boyd N. Boland, and months of post-mediation negotiations, the parties reached a resolution. Dkts. 51-1, 82, ¶ 16. The resulting Settlement Agreement (the 2012 Agreement) put into place certain timeframes for the Department to: 1) complete outpatient (in-jail) competency evaluations; 2) offer admission for inpatient competency evaluations; and 3) offer admission for inpatient restoration services. Dkt. 51-1 ¶ 2(a)-(b), and Appendix 1. By agreeing to these timeframes, the parties put into place requirements that are otherwise absent in state or federal law in this jurisdiction.

In addition to imposing an affirmative obligation on the Department to meet these timeframe requirements, the 2012 Agreement also recognized the fact that "the ability to perform its statutory obligations and obligations under [that agreement] is based on factors beyond the Department's control." Dkt. 51-1 ¶ 6. As a result, the parties agreed to a provision in the 2012 Agreement which, when invoked by the Department and in certain circumstances, would temporarily suspend its obligations under that agreement. *Id*. That provision of the 2012 Agreement was titled—and is commonly referred to by the parties as—"Departmental Special Circumstances" (DSC). *Id*., ¶ 6(a)(ii). But, invoking DSC did not come without a price to the Department. That is, every time the Department invoked DSC, the 2012 Agreement would be extended equal to the length of time DSC was invoked. *Id*., ¶ 4(c).

Upon signing the 2012 Agreement, the parties jointly agreed to dismissal of the underlying complaint. Through its hard work, the Department maintained several years of compliance with the timeframe requirements. In fact, since July 2015, the Department has successfully complied with the timeframe requirements related to outpatient competency evaluations. *See* Exhibit A - Report C: Outpatient Jail Evaluations: 7/1/2015-7/31/2015 through 7/1/2018-7/31/2018, "Days Waiting" column (showing compliance because there are no defendants waiting more than 30 days).

However, in August 2015, due to circumstances beyond its control, the Department could no longer meet all of the timeframe requirements of the 2012 Agreement, and chose to invoke DSC. Dkt. 57, § I(a). A dispute between the parties ensued, concerning, in relevant part, the Department's invocation of DSC. As a result, in October 2015, Disability Law Colorado moved to reopen the matter for enforcement of the 2012 Agreement, and between December 2015 and February 2016, conducted limited discovery on the issue of DSC. Dkts. 53, 63, 65.

Shortly thereafter, in 2016, the parties engaged in settlement negotiations, including two days of mediation, lengthy subsequent negotiations, and the exchange of multiple drafts of what ultimately became the current Amended and Restated Settlement Agreement (the Agreement). Dkts. 65, 67, 69, 71, 78, and 82, ¶ 27. The Agreement is the product of over three months and hundreds of hours of work by both parties and their counsel. *Id*. Upon signing the Agreement, the parties jointly agreed to dismissal of Disability Law Colorado's motion to reopen the matter for enforcement. Dkt. 78.

Changes to the Agreement demonstrate that Disability Law Colorado paid special attention to the provisions in dispute and in the end, the current Agreement contains many of the same provisions as the 2012 Agreement. Important here, the only substantive difference in the definition of DSC between the two settlement agreements was substitution of "substantial and

material decrease in the Hospital's budget or another sentinel event" with "a national or statewide disaster." *Compare*, Dkt. 51-1, ¶ 6(a)(ii), with Dkt. 78-1, ¶ 6(a)(ii). Additionally, the only substantive difference in the length of DSC was the addition of language allowing the Department to terminate DSC in less than six months. *Compare*, Dkt. 51-1, ¶ 6(c), with Dkt. 78-1, ¶ 6(c). Notably, the consequence for the Department invoking DSC—extending the duration of the Agreement—was not altered as a result of the parties' negotiations in 2016. *Compare*, Dkt. 51-1, ¶ 4(c), with Dkt. 78-1, ¶ 4(c). However, the parties <u>did</u> materially alter provisions concerning the duration of the Agreement in the event of non-compliance with the timeframes where DSC was not invoked. *Compare*, Dkt. 51-1, ¶ 4(b) (providing for a year reduction in duration for every year of compliance), with Dkt. 78-1, ¶ 4(b) (providing for a reduction of three months for every month of compliance <u>and</u> an increase of three months for every month of non-compliance not resulting from DSC).

In June 2017, due to circumstances beyond its control, the Department could no longer meet the timeframe requirements of the Agreement and chose to invoke DSC. Dkt. 82-1, Exhibit A, pp. 9-12. While it worked to address the circumstances that led to DSC through myriad of approaches, circumstances beyond the Department's control also led to the Department choosing to invoke DSC in December 2017. *Id.*, Exhibit B, pp. 16-22.

Because of its efforts, the Department has successfully complied with the timeframe requirements related to inpatient competency evaluations since June 2018. *See* Exhibit B - Report B: Inpatient Evaluations: 6/1/2018-6/30/2018 through 7/1/2018-7/31/2018, "Days Waiting" column (showing compliance because there are no defendants waiting more than 28 days). DSC remains available to it, given that circumstances beyond its control continue to impact the Department's ability to meet timeframe requirements concerning inpatient restoration services. However, in June 2018 the Department chose not to invoke DSC. Instead, it continues to work creatively and expeditiously to tackle the challenge of achieving and maintaining compliance with the inpatient restoration services timeframes. Ultimately, each of the Department's actions—invoking DSC in June 2017, invoking DSC in December 2017, and choosing not to invoke DSC in June 2018—were contemplated by the Agreement, and therefore, do not amount to breach.

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:

1. The Department is required to provide competency evaluations for any defendant when the issue of competency to stand trial is raised. § 16-8.5-101, et seq., C.R.S. (2017).

2. The Department is required to provide restoration services for any defendant found by the court to be incompetent to proceed. §§ 16-8.5-101, et seq., 27-60-105, C.R.S. (2017).

3.     In 2012, the parties entered into settlement negotiations to resolve issues related to the length of the time individuals were waiting to receive competency evaluations and restoration services. Dkts. 51-1, 82, ¶ 16.

4.     After settlement negotiations mediated by former Magistrate Judge Boyd N. Boland, and post-mediation negotiations, the parties reached the 2012 Agreement resolving the case. Dkts. 51-1, 82, ¶ 16.

5.     The 2012 Agreement put into place timeframes for the Department to: 1) complete outpatient (in-jail) competency evaluations; 2) offer admission for inpatient competency evaluations; and 3) offer admission for inpatient restoration services. Dkt. 51-1 ¶ 2(a)-(b), Appendix 1.

6.     The 2012 Agreement included a provision called Special Circumstances, which "recognizes that to some extent the Department's ability to perform its statutory obligations and its obligations under [the 2012 Agreement] is based on factors beyond the Department's control." Dkt. 51-1 ¶ 6.

7.     The 2012 Agreement defines DSC as:

> circumstances beyond the control of the Department which impact the [Department's] ability to comply with the timeframes set forth in Paragraph 2. This could mean an unanticipated spike in referrals, a substantial and material decrease in the Hospital's budget, or another sentinel event impacting clinical decisions system wide. These examples are provided for illustration only. [DSC] is a flexible concept, due to the unique and often unforeseen nature of these events.

Dkt. 51-1 ¶ 6(a)(ii).

8.     The 2012 Agreement states that:

> if [DSC] is invoked and then agreed upon by the parties, the
> timeframe requirements of Paragraph 2 shall be suspended as to
> all Pretrial Detainees affected by the invoked [DSC] for a period
> of six months from the date of the Department's invocation.

Dkt. 51-1, ¶ 6(c).

9.     The 2012 Agreement states that:

> if the timeframe requirements of Paragraph 2 of [the 2012
> Agreement] are temporarily suspended pursuant to the
> provisions of Paragraph 6(c), the duration of [the 2012
> Agreement] shall be extended for a period equal to the length of
> time of the suspension of the timeframe requirements…[and]
> then the Department will receive only a reduction in the
> duration for the number of months it was in compliance for the
> year.

Dkt. 51-1, ¶ 4(c).

10.     The 2012 Agreement states that "upon the first anniversary of the full execution of [the 2012 Agreement] and if the Department has fully complied with the terms of [the 2012 Agreement]," the duration of the 2012 Agreement would be reduced by one year. Dkt. 51-1, ¶ 4(b).

11.     Both parties certified that they fully and carefully reviewed the 2012 Agreement and consulted with their respective attorneys regarding the legal effect and meaning of the 2012 Agreement and all terms and conditions thereof. Dkt. 51-1, ¶ 13(b).

12.     In August 2015, the Department invoked DSC. Dkt. 57, ¶ I(a).

13.     In October 2015, Disability Law Colorado moved to reopen the matter for enforcement of the 2012 Agreement, in part, because it disputed DSC. Dkts. 53, 63.

14. After two days of mediation, engaging in subsequent settlement negotiations, and exchanging multiple drafts, the parties entered into the Agreement resolving the case. Dkts. 65, 67, 69, 71, and 78.

15. The Agreement is the product of over three months and hundreds of hours of work by both parties. Dkts. 65, 67, 69, 71, and 78.

16. The Agreement includes a provision called Special Circumstances, which recognizes that "to some extent the Department's ability to perform its statutory obligations and its obligations under [the Agreement] are based on factors beyond its control." Dkt. 78-1 ¶ 6.

17. The Agreement defines DSC as:

> circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in Paragraph 2. This could mean an unanticipated spike in referrals, a national or statewide disaster impacting admissions decisions system wide. These examples are provided for illustration only. [DSC] is a flexible concept, due to the unique and often unforeseen nature of these events.

Dkt. 78-1 ¶ 6(a)(ii).

18. The Agreement states that:

> upon the invocation of [DSC], the timeframe requirements of Paragraph 2 shall be automatically suspended for six months, unless the Department notifies [Disability Law Colorado] that a shorter period of time is sufficient to resolve [DSC], commencing with the month in which the Notice of [DSC] is transmitted to [Disability Law Colorado].

Dkt. 78-1, ¶ 6(c).

19. The Agreement states that:

> if the timeframe requirements of Paragraph 2 of [the
> Agreement] are temporarily suspended pursuant to the
> provisions of Paragraph 6(c), the duration of [the Agreement]
> shall be extended for a period equal to the length of time of the
> suspension of the timeframe requirements.

Dkt. 78-1, ¶ 4(c). This language reflects a modification from the 2012

Agreement. *Id*.

20.    The Agreement states that:

> the term of the Agreement shall be reduced by three months for
> each of the number of months of certified timeliness compliance
> for the prior calendar year…[and] the term of the Agreement
> shall be increased by three months for each month during the
> prior calendar year that the Department was not in full
> compliance with the timeliness requirements of [the
> Agreement].

Dkt. 78-1, ¶ 4(b).

21.    Both parties certified that they fully and carefully reviewed the

Agreement and consulted with their respective attorneys regarding the legal

effect and meaning of the Agreement and all terms and conditions thereof.

Dkt. 78-1, ¶ 15.

22.    In June 2017, the Department invoked DSC. Dkt. 82-1, Exhibit

A, pp. 9-12.

23.    In December 2017, the Department invoked DSC. Dkt. 82-1,

Exhibit B, pp. 16-22.

24.    The Department's invocation of DSC in both June 2017 and

December 2018 complied with the Agreement's notice requirements. Dkts 78-

1, ¶ 6(c), 82-1, Exhibit A, pp. 9-12, Exhibit B, pp. 16-22.

25.     In June 2018, the Department did not invoke DSC. Dkt. 88, ¶ I(A)(iii).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine dispute of any material fact and a movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A judge's function at summary judgment is not to weigh the evidence, but to determine whether there is a genuine dispute for trial. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A dispute is genuine when the trier of fact could reasonably enter judgment for either party. *Anderson,* 477 U.S. at 248. A fact is material if it might reasonably affect the outcome of the case. *Id*. The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When considering a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

## ARGUMENT

The parties agree that the issues before the Court are: 1) whether the Agreement grants the Department the right to invoke DSC consecutively, without limitation; 2) whether the Department breached, or was in non-

compliance, with the Agreement timeframes when it invoked DSC in December 2017, claiming it can consecutively invoke DSC; 3) whether the Department breached, or was in non-compliance, with the Agreement when it did not invoke DSC on June 21, 2018; and 4) if the Department was in breach of, or non-compliance with, the Agreement, what remedies this Court should impose. Dkt. 88. The Department turns to each issue in turn.

I.  The Agreement grants the Department the right to invoke Departmental Special Circumstances more than one time and consecutively.

The language of the Agreement and law governing contract construction confirms that the Department may invoke DSC consecutively and there is no limit on the number of times it may do so.

A settlement agreement is a contract, and thus questions of its construction and scope are governed by principles of contract law. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000); *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993). "Where sophisticated parties enter into an agreement setting forth their rights and obligations, the terms of the agreement should control unless the agreement would otherwise be void under state law." *Colorado Interstate Corp. v. CIT Grp./Equip. Fin., Inc.*, 993 F.2d 743, 749 (10th Cir. 1993). A fundamental tenet of contract interpretation is that provisions cannot be read in isolation. *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1179 (10th Cir.

2000). Each contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none. *Id.*

Moreover, the court will first take the instrument by its four corners, in order to ascertain its true meaning. *Ewing's Lessee v. Burnet*, 36 U.S. 41, 54 (1837); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007) (it is only where the terms of an agreement are ambiguous that the court may look beyond the four corners of the agreement)(internal quotations omitted). Notably, a disagreement between the parties concerning the meaning of contract terms does not render such provisions ambiguous. *Level 3 Commc'ns, LLC v. Liebert Corp.,* 535 F.3d 1146, 1155 (10th Cir. 2008). Parties are presumed to have bargained for any risks that are central to the substance of the contract. *United States v. Winstar Corp.*, 518 U.S. 839, 905 (1996). If the risk was foreseeable, there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed. *Id.*

Under the Agreement, DSC means "circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in paragraph 2." Dkt 78-1, ¶ 6(a)(ii). DSC is a "flexible concept, due to the unique and often unforeseen nature of these events." *Id.* The definition of DSC also includes a non-exclusive list of examples, including situations where there is an unanticipated spike in referrals, or a national or statewide disaster impacting admissions decisions system-wide.

*Id*. DSC is based on the parties' recognition that "to some extent the Department's ability to perform its statutory obligations and its obligations under this Agreement is based on factors beyond its control." *Id*., ¶ 6.

The parties bargained for the availability of DSC, but did not bargain for the limitations on DSC that Disability Law Colorado now suggests. As a result, the Court should enforce the Agreement as written. *Colorado Interstate Corp., Inc*., 993 F.2d at 749. Disability Law Colorado, a sophisticated party, assumed the risks associated with its failure to bargain for restrictions on DSC that it now seeks. *Winstar Corp.*, 518 U.S. at 905. The risk that the Department may need to invoke DSC more than once or consecutively was foreseeable, so the absence of limiting language confirms that Disability Law Colorado assumed that risk. *Id*. Disability Law Colorado had ample opportunity to seek to eliminate DSC altogether, or to demand revisions consistent with the language it now suggests the Court read into the Agreement. Disability Law Colorado did neither and, therefore, assumed the associated risks. *Id*.

Viewing the contract as a whole supports applying DSC as written without new restrictions. *Ewing's Lessee*, 36 U.S. at 54. For example, because the parties agreed that an undefined range of circumstances beyond the Department's control might influence its ability to comply with the timeframes, it makes sense that the parties did not bargain for the arbitrary restrictions on DSC that Disability Law Colorado now suggests.

Because the four corners of the Agreement do not limit the number of times or the timing of invoking DSC, the Department reasonably expected that it could invoke DSC as written, and did so. *Id.* And, the terms of the Agreement are not ambiguous—they simply do not include the restrictions that Disability Law Colorado suggests. As a result, the Court should look only to the four corners of the Agreement, and apply it as written. *Brammer-Hoelter*, 492 F.3d at 1211.

If Disability Law Colorado did not intend to agree that the Department may invoke DSC more than once, the onus was on Disability Law Colorado to express its intent. Instead, Disability Law Colorado bargained for the current Agreement, which does not prohibit consecutive invocation of DSC or limit the number of times DSC may be invoked. Based on the parties' negotiations and the twice-agreed upon language of the Agreement, the Department has a justified expectation that it may invoke DSC consecutively and that its ability to do so is not limited.

II.     The Department's December 2017 invocation of Departmental Special Circumstances is contemplated by the Agreement, and does not constitute breach of the Agreement.

The Department's second invocation of DSC is not a breach of contract because the parties bargained for, agreed to, and included a provision in the Agreement allowing DSC but not limiting it.

A breach of contract is always a non-performance of a contractual duty, but not every non-performance of duty is a breach of contract. Corbin, *Corbin*

on Contracts § 943 (1952); *See also* RESTATEMENT (FIRST) of CONTRACTS § 312 (AM. LAW INST. 1932). When a contract calls for the performance of services, "Colorado presumptively applies the law of the state where the majority of the services are to be performed." *Calabrese Found., Inc. v. Inv. Advisors, Inc.*, 831 F. Supp. 1507, 1512 (D. Colo. 1993) (quoting *Sequa Corp. v. Lititech, Inc.*, 780 F. Supp. 1349, 1351 (D. Colo. 1992)). Under Colorado law, a party alleging breach of contract has the burden of proving: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1033 (10th Cir. 2018), *as revised* (Apr. 13, 2018) (citing *W. Distrib. Co v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)); *see also, e.g. Stoole v. Metro. Prop. & Cas. Ins. Co.*, 17-CV-0613-NYW, 2018 WL 3126112, at *3 (D. Colo. June 26, 2018).

Disability Law Colorado cannot meet its burden under *Spring Creek*, 887 F.3d at 1033. It is undisputed that the Agreement is a binding contract between the parties. However, Disability Law Colorado has not demonstrated that it performed its duties under the Agreement, particularly as it relates to the application of remedies if the Department is unable to meet the Agreement's timeframes or to provide justification for its non-performance. *Id.*, *see also supra* pp. 21-24. The contract's express remedies provide that when DSC is invoked, or if the Department has otherwise been unable to

meet the timeframes in the agreement, the duration of the Agreement will be extended. Dkt. 78-1, ¶ 4, *see also supra* pp. 23-26. Now, Disability Law Colorado refuses to comply with those contract terms. Dkt. 82, pp. 19-20.

Second, Disability Law Colorado cannot meet its burden under *Spring Creek* to show that the Department failed to perform under the terms of the Agreement by invoking DSC in December 2017. The Agreement specifically grants the Department the right to invoke DSC and does not include a limitation on how often it may do so. *Supra* pp. 14-18. It is undisputed that the Department followed the Agreement's enumerated steps to invoke DSC,[2] that is, the Department: 1) gave written notice of its DSC invocation; 2) provided a detailed explanation of the basis for invoking DSC; 3) provided a plan to remedy the DSC; and 4) provided a projected timeframe for resolution of DSC. Dkt. 78-1, ¶ 6(c). Because the Department's non-performance of the timeframes upon invocation of DSC was contemplated by the Agreement, such non-performance does not constitute a failure to perform its obligations.

Even assuming *arguendo*, that the contract could be construed to include a restriction on consecutive or multiple DSC invocations, the Agreement provides the remedy for failing to meet its timeframes, and does not define failure to meet the timeframes (either through DSC or otherwise) as a breach of the Agreement. This demonstrates that the parties assumed

---

[2] Though Disability Law Colorado disputes whether the Department could invoke DSC for a second time at all, it has not disputed that the Department followed the steps outlined in the Agreement to invoke DSC

the risk of the Department's non-performance related to the Agreement's timeframes, created a provision to address that risk (i.e., extension of the agreement), and, intentionally did not define realization of that risk as a breach. *Winstar Corp.*, 518 U.S. at 905.

Because Disability Law Colorado cannot meet its burden to prove that the Department failed to comply with the Agreement, and because remedies for non-performance are already contemplated by the Agreement, Disability Law Colorado cannot show damages. As a result, Disability Law Colorado cannot meet its burden under *Spring Creek* and the Court should reject its breach of contract claim. *Spring Creek*, 887 F.3d at 1033.

III. The Department's decision not to invoke Departmental Special Circumstances on June 21, 2018 is contemplated by the Agreement, and does not constitute breach of the Agreement.

Where the Agreement allows for the Department's non-performance of the timeframes, the Department has not breached the contract but rather has utilized a provision that the parties agreed to. In order to prevail on this issue, Disability Law Colorado has the burden to meet the four *Spring Creek* elements of a breach of contract claim—the existence of a contract; Disability Law Colorado's performance or some justification for nonperformance; the Department's failure to perform; and the damages to Disability Law Colorado. *Spring Creek Expl. & Prod. Co., LLC*, 887 F.3d at 1033.

It remains undisputed that a binding contract exists, and for the same reasons discussed above, Disability Law Colorado has failed to perform its

obligations under the Agreement without justification. *Supra* p. 18. Likewise, for the same reasons discussed above, the Department's inability to meet the Agreement's timeframes in June 2018 does not amount to a breach. *Supra* pp. 18-19. Because the Department's non-performance in June 2018 was contemplated by the Agreement, it does not constitute a failure to perform its obligations. Indeed, the Agreement provides the remedy for failing to meet its timeframes, and does not define failure to meet the timeframes (either through DSC or otherwise) as a breach of the Agreement. Specifically, the Agreement provides that when the Department has not invoked DSC, and has not met the timeframe requirements, the duration of the Agreement will be increased by three months for each month that the Department was not in full compliance. Dkt 78-1, ¶ 4(b).

Disability Law Colorado was not compelled or coerced into making the contract, including the terms addressing non-performance absent DSC, but knowingly and voluntarily agreed to terms of the Agreement. Dkt. 78-1, ¶ 15. As argued in detail below, DLC is a competent party who contracted for one remedy to apply when the Department invokes DSC and another remedy to apply when the Department is not in full compliance with the timeframes of the Agreement but has not invoked DSC.

The Court's inquiry into whether the Department breached the Agreement when it chose not to invoke DSC in June 2018 should begin and end by applying the plain language of the Agreement, which contemplated

this situation. Disability Law Colorado cannot meet the *Spring Creek* elements to prove breach, so their breach claim should be rejected.

IV.  <u>This Court should only impose the remedies agreed upon by the parties and set forth in the Agreement.</u>

Disability Law Colorado asks the Court both to ignore remedies it agreed to, and to create new ones not included in the Agreement. The law does not support this result. *Colorado Interstate Corp.,* 993 F.2d at 749.

The law is well-established that a court must enforce the contract which the parties themselves have made. *May v. Le Claire*, 78 U.S. 217, 227 (1870) (Contracts entered into in a spirit of peace and for the settlement of unadjusted demands on both sides, will not, where executed by persons of intelligence, and under circumstances which indicate caution and a knowledge of what is done, be readily questioned in equity as in fact not fair; but, on the contrary, will be protected and enforced); *Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*, 571 F. Supp. 2d 1199, 1212 (D. Colo. 2008), *aff'd*, 410 F. App'x 151 (10th Cir. 2011); *Citywide Bank of Denver v. Herman*, 978 F. Supp. 966, 977 (D. Colo. 1997) (citing *R.T.C. v. Avon Center Holdings, Inc.,* 832 P.2d 1073, 1075 (Colo. App. 1992) ("A settlement agreement is a contract between two parties. The law favors compromise and settlement and such a resolution will typically be sustained by the court.")). This is particularly true where the parties are sophisticated and informed by advice of counsel. *Colorado Interstate Corp.,* 993 F.2d at 749.

Here, the parties, represented by counsel, entered into the Agreement after participating in two days of mediation, engaging in lengthy settlement negotiations, and exchanging multiple drafts of what ultimately became the Agreement. Dkts. 65, 67, 69, 71, and 78. The Agreement is the product of over three months and hundreds of hours of work by both parties. *Id*. Both parties certified that they fully and carefully reviewed the Agreement and consulted with their respective attorneys regarding the legal effect and meaning of the Agreement and all terms and conditions thereof. Dkt. 78-1, ¶ 15.

This certification applies to all provisions of the Agreement, including section 4, titled "Duration of Agreement," which includes the remedies requiring the Agreement to be extended for DSC invocation and the Department's inability to meet the Agreement's timeframes. Dkt. 78-1, ¶ 4(b), (c). The parties' knowing and intentional agreement concerning the remedies is further supported by comparing the present Agreement with the 2012 Agreement. *Compare* Dkt. 78-1, ¶ 4(b), (c) (providing for both increase and reduction in the length of the agreement) with Dkt. 51-1, ¶ 4(b) (providing only for reduction in the length of the agreement). Indeed, although the parties modified those portions of the Agreement, they did not modify them to include provisions Disability Law Colorado now seeks.

Enforcing the terms of the Agreement penalizes the Department for its non-performance of the timeframe requirements through an increase in the length of time it is subject to the Agreement. *Id*., 78-1 ¶ 4(b), (c). It also serves

as a deterrent for future non-performance of the timeframes.[3] This provides Disability Law Colorado with a remedy for the Department's non-performance of the agreed-upon timeframes.

Because the contract was entered into knowingly under circumstances indicating caution of what is to be done, and by sophisticated, represented parties, the Court should not question the fairness of the Agreement and should instead, protect and enforce the Agreement as written. *May*, 78 U.S. at 227; *Lab. Corp. of Am. Holdings,* 571 F. Supp. 2d at 1212; *Colorado Interstate Corp.,* 993 F.2d at 749. The Court should apply the remedies bargained for in the Agreement, which it retained jurisdiction to enforce.[4] Dkt. 78.

## CONCLUSION

The Department is entitled to summary judgment as a matter of law because the Agreement permitted the Department to invoke DSC in June 2017 and in December 2017, and the Agreement did not require the Department to invoke DSC in June 2018. There is no genuine dispute of material fact as to these matters. Therefore, this Court should impose the remedies for DSC or non-performance negotiated and agreed upon by the parties, as memorialized in the Agreement.

---

[3] There is no evidence that these remedies have failed their intended purpose.
[4] Conversely, five of the remaining remedies proposed by Disability Law Colorado are inequitable, go beyond the scope of Agreement, and the Court's specific preservation of its jurisdiction to enforce the terms of the Agreement. *See* Dkt. 82, pp. 19-20 ¶¶ (b)-(f).

CYNTHIA H. COFFMAN
Attorney General

*s/ Tanya E. Wheeler*
_____

TANYA E. WHEELER, 37089*
First Assistant Attorney General
ELIZABETH J. MCCARTHY, 37799*
Senior Assistant Attorney General
LAUREN K. PEACH, 49234*
Assistant Attorney General
State Services Section
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6151
FAX: (720) 508-6041
Email: tanja.wheeler@coag.gov
libbie.mccarthy@coag.gov
lauren.peach@coag.gov

*Counsel of Record

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE (CM/ECF)

The undersigned hereby certifies that on this __15th__ day of August 2018, a true and correct copy of this **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Caleb Durling
FOX ROTHSCHILD LLP
1225 17th Street
Suite 2200
Denver, CO 80202
Telephone: 303-945-7415
Facsimile: 303-974-7468
Email: cdurling@foxrothschild.com

Iris Eytan
EYTAN NIELSEN LLC
3200 Cherry Creek South Drive
Denver, CO 80209
Telephone: 720-440-8155
Facsimile: 720-440-8156
Email: iris@eytan-nielsen.com

Ellie Lockwood
Timothy P. Scalo
SNELL AND WILMER LLP
1200 Seventeenth Street, Suite 1900
Denver, CO 80202
Telephone: 303-634-2000
Facsimile: 303-634-2020
Email: elockwood@swlaw.com

Mark J. Ivandick
Jennifer Purrington
DISABILITY LAW COLORADO
455 Sherman St., Ste. 130
Denver, CO 80203
Telephone: 303-722-0300
Facsimile: 303-722-0720
Email:mivandick@disabilitylawco.org

*/s/ Sandra Martinez*