## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 11-CV-02285-NYW**

CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO**,**

      Plaintiff**,**

**v.**

REGGIE BICHA,
in his official capacity as Executive Director
of the Colorado Department of Human Services, and

JILL MARSHALL, in her official capacity
as Chief Executive Officer of the Colorado Mental Health
Institute at Pueblo,

      Defendants**.**

---

## PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO ENFORCE SETTLEMENT AGREEMENT

---

As of July 31, 2018, 281 individuals with mental illness were suffering in our Colorado jails because Defendants, the persons statutorily responsible for their care and treatment, have abandoned them. At all times since December 2017, the State has had a list of at least 100 people waiting for inpatient restoration services at CMHIP[1] or at RISE who have waited in jails longer than the agreed-upon 28-day maximum. Every person on the wait list since December 23, 2017 (which DLC estimates is close to 1,000 people) is a breach of the parties' Settlement Agreement.

---

[1] Plaintiff uses the same shortened names here as it did in its opening brief.

Defendants violated the constitutional rights of every one of these detainees by their failure to timely admit and treat them.

This is not an abstract issue. The first person alphabetically on the July 2018 wait list, B.A., waited 133 days to be admitted to CMHIP for treatment to restore him to competency. Ex. 9 (the State's August 2018 report) at 2. His "Ready for Admission" date was February 22, 2018. He should have been transported to CMHIP by March 22, 2018. He was admitted on July 6, 2018—105 days longer than the 28 days the State agreed upon.

Another detainee, A.B., has been Ready for Admission since April 23, 2018. *Id.* at 6. He has been charged with four misdemeanors. He should have been admitted for inpatient restoration treatment by May 21, 2018. As of the end of July, after 98 days, he was still locked in jail waiting to be admitted to CMHIP.

Another detainee, R.B., has been Ready for Admission since April 16, 2018. *Id.* at 7. He has been charged with two misdemeanors (Resisting Arrest and Obstructing a Peace Officer) and two public order violations (Consuming Alcohol in Public and Disorderly Conduct/Offensive Gesture), and was found incompetent to stand trial. He should have been admitted to CMHIP for treatment to restore him to competency by May 14, 2018. As of the end of July, after 105 days, he was still languishing in jail waiting for Defendants to help him. R.B. cannot stand trial for his charges, his right to a speedy trial is tolled, and he cannot bond out. Instead, the Defendants keep him locked up in a jail cell, while he desperately needs treatment to be able to comprehend the low level criminal charges against him and then reasonably consult with his lawyer.

The final detainee on the list, A.Z., has been Ready for Admission since April 16, 2018. *Id.* at 68. He is charged with a single count of assault on a peace officer with bodily fluids for

spitting on a police officer and has been found incompetent to stand trial.  Like R.B., he should have been admitted to CMHIP for treatment to restore him to competency by May 14, 2018 but remains, 105 days later as of the end of July, waiting in jail.

As of the end of July 2018, there were almost 300 other individuals on the wait list, all with their own tragic stories and many with families anxiously wondering why their child or spouse or parent is stuck behind bars in legal limbo.

In its motion for summary judgment, the State did not mention or address the plight of these human beings.  It claims Plaintiff is "cloud[ing] the legal issue before this Court by introducing extraneous facts detailing compelling circumstances some individuals face while incarcerated before trial."  Dkt. 97 at 2.  To the contrary, the wait times faced by perhaps 1,000 Coloradans suffering in jails is the precise legal issue before this Court and establishes Defendants' numerous breaches of the Settlement Agreement.  After patting itself on the back that it can conduct timely outpatient evaluations and supplying the Court with 1,000 pages of meaningless records on that point, the State devotes two sentences buried on page 8 to admit that it is out of compliance as to inpatient restorative treatment but that "it continues to work creatively and expeditiously to tackle the challenge of achieving and maintaining compliance with the inpatient restoration services timeframes."  Dkt. 97 at 8.

A five-year period (2015 to 2019) when the State will be more often out of compliance than in compliance does not demonstrate a creative or expeditious effort.  It reflects a failure to follow the Constitution and a colossal breach of the Settlement Agreement.

This case is simple.  The State breached the Settlement Agreement in December 2017 by claiming it could re-invoke DSC for the same reason it did six months before and because its stated

3

reason (an unanticipated spike, when the numbers *decreased* in fiscal year 2017-18) was baseless. The State continued to be in breach in June 2018 by not returning to compliance (and not invoking DSC for an improper third straight time) and the State remains in breach today. There is nothing to support Defendants' request for summary judgment in light of these undisputed facts. DLC asks this Court for the basic remedies of finding breach, ordering Defendants to comply with the parties' agreement, and awarding DLC its fees.

The State argues that the Settlement Agreement, a contract, contains an exclusive remedy that allows the State to *never* come back into compliance. According to the State, it may repeatedly invoke DSC and all this Court can do is add one month to the end of the endless agreement for every month invoked. Alternatively, the State can elect not to invoke DSC at all and all this Court can do is add three months to the end of an endless agreement. The State argues that DLC and this Court have no authority to enforce compliance with the terms of the Settlement Agreement, leaving the Plaintiff and this Court to simply express concern that thousands of Coloradans are suffering for months and months in jail without any ability to hold the State accountable.

That cannot be right. The detainees have not yet pled to a charge, and cannot because they are impaired by their mental illness. They are simply awaiting treatment to restore them to a place of comprehension about where they are and why they are there. The State's position that it can hold these detainees indefinitely, without consequence, because it is working on it, is unacceptable and offensive. This violates the Settlement Agreement. This violates the United States Constitution. This violates standards of human decency.

### Response to Defendants' Statement of Undisputed Facts

Though many of the facts are irrelevant to the issues before this Court, DLC does not dispute Defendants' Statements of Undisputed Facts, except to note that DLC has challenged whether the Department's December 2017 invocation was proper (paragraph 23).

### ARGUMENT

I.      **Defendants—not Plaintiff—are violating the 2016 Settlement Agreement.**

A.      <u>Defendants have not met the deadlines for more than a year</u>.

The wait list statistics are damning. Every pretrial detainee should be admitted for restoration within 28 days and the average should be 24 days. Instead, this has been the reality since June 2017:

| Month | Entries for Detainees on Wait List, 28+ Days | Average Wait Time | Longest Wait Time |
|---|---|---|---|
| June 2017 | 3 | 23.93 | 29 |
| July 2017 | 36 | 28.12 | 45 |
| August 2017 | 87 | 37.35 | 56 |
| September 2017 | 104 | 47.26 | 68 |
| October 2017 | 120 | 58.17 | 88 |
| November 2017 | 145 | 66.46 | 87 |
| December 2017 | 170 | 67.14 | 129 |
| January 2018 | 177 | 72.84 | 129 |
| February 2018 | 194 | 74.51 | 114 |
| March 2018 | 221 | 90.24 | 133 |
| April 2018 | 214 | 87.34 | 136 |
| May 2018 | 217 | 96.56 | 144 |
| June 2018 | 211 | 95.53 | 144 |
| July 2018 | 281 | 80.62 | 149 |

The State in its opening brief does not address these failures but does not refute these facts. Nor could it because these figures are derived from their own monthly reports. Instead, the State

congratulates itself for complying with the timeframes for outpatient evaluations, and submits a staggering 28 exhibits totaling 1,000 pages of irrelevant material to support this undisputed proposition, which is not the subject of DLC's motion to reopen or of the State's prior invocations of DSC.  Dkt. 97 at 5, Dkt. 97-1 through -28.  The State then crows about its inpatient evaluations now being in compliance, when DLC again has not reopened this case because of inpatient evaluations.  Dkt. 97 at 8.

The State said very little and did not attach the over 1,000 pages of monthly records which would show *14 straight months* of increasing constitutional violations of detainees waiting months (and now approaching a half a year) for inpatient restorations.[2]  That was the basis for the State invoking DLC in June and December 2017.  That was the basis of this reopened action.  That is what is at issue here.

The State's other misdirected arguments fail.  The State tries to blame everyone else in the criminal justice system for its failures, claiming "the Department's role is specific and it is allowed very little discretion."  Dkt. 97 at 3.  The Department has full powers and responsibilities over the detainees in its custody—the inpatient evaluations and restorations.  C.R.S. § 16-8.5-111(2)(b). The General Assembly also required the Department beginning on July 1, 2018, to, among other things, enact a program to oversee outpatient restorations and maintain an adequate pool of outpatient competency restoration providers.  C.R.S. § 27-60-105(4).  This would help lessen the

---

[2] DLC will submit at the hearing all of the State's monthly reports since July 2017 as to inpatient restorations documenting the wait list but, in the interest of efficiency, does not attach them here.

61866115

demand for inpatient restorations and reduce the wait list.  To date, the State has not complied with this statutory mandate.

The State boldly asserts that the essential purpose of the Agreement is still being fulfilled because the Settlement Agreement's timelines (that the State has not met in more than a year) represent some extra favor that the State has bestowed upon these detainees as timelines "are otherwise absent in state or federal law in this jurisdiction."  Dkt. 97 at 4.  This is false for two reasons.

First, "[c]ontracts cannot simply be abrogated or ignored, and must be given effect in light of their essential purpose and effect."  *Bennett Bear Creek Farm Water & San. Dist. v. City & Cnty. of Denver*, 928 P.2d 1254, 1266 (Colo. 1996).  The essential purpose of the Settlement Agreement is to ensure timely evaluation and restorative treatment of pretrial detainees.  The State is failing to satisfy the timeframes established by the agreement as to inpatient restorations and thus is failing to fulfill the agreement's essential purpose.

Second, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."  *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).  "Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals."  *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003).  Here, Defendants clearly have violated, and are continuing to violate, the due process protections granted to incompetent criminal defendants awaiting admission to the state hospital for restorative treatment by failing to timely admit them.

7

Several courts that have addressed this precise issue—the delay in transferring an incompetent defendant from pretrial detention to a psychiatric hospital for restorative treatment—have issued orders requiring admission in as short as *seven* days—one-quarter the length of time Defendants have under the current Settlement Agreement.  *See, e.g.*, *Mink*, 322 F.3d at 1121-22; *Trueblood v. Wash. State Dep't of Social & Health Servs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015), *reversed as to evaluations only, not admission for treatment, by* 822 F.3d 1037 (9th Cir. 2016).   In another case, a Louisiana federal court entered a preliminary injunction requiring admission within 21 days of the court's order requiring commitment—a 25% shorter timeframe than Defendants are provided under the Settlement Agreement.  *See Advocacy Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hospitals*, 731 F. Supp. 2d 603, 620, 627 (E.D. La. 2010).

More recently, another federal district court in Washington ruled that "indefinitely incarcerating incompetent defendants while they awaited competency restoration, because there was no room in the state hospital, violated their constitutional due process rights" because an incompetent criminal defendant has a liberty interest to be free from incarceration and to receive restorative treatment.  *Willis v. Wash. State Dep't of Social & Health Servs.*, 2017 WL 1064390, at *6 (W.D. Wash. Mar. 21, 2017); *see also State v. Hand*, 199 Wash. App. 887, 895-98 (finding that 61-day delay in admission for competency restoration treatment was unreasonable and violated substantive due process rights of detainee).

Other courts addressing delays like those here have concluded that such delays are "far beyond any constitutional boundary."  *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 938, 944 (E.D. Ark. 2002) (finding six-month average wait time for admission to state psychiatric hospital unconstitutional); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998, 1004 (D. Utah 2016) (denying

motion to dismiss due process claim on behalf of incompetent defendants forced to wait as long as six months before admission to state hospital for restorative treatment).

In sum, other courts interpreting the same United States Constitution which is binding on Colorado have ordered shorter timelines than what DLC agreed to (in the spirit of compromise) and held that the wait times now seen here were violations of due process.

B.    The second DSC invocation in December 2017 was improper and a breach.

Under the rules of contract interpretation, "[t]he review of the contract must strive to give effect to all provisions so that none is rendered meaningless."   *See Summit Bank & Tr. v. Am. Modern Home Ins. Co.*, 71 F. Supp. 3d 1168, 1171 (D. Colo. 2014).  The State correctly asserts that "[a] fundamental tenet of contract interpretation is that provisions cannot be read in isolation." Dkt. 97 at 14 (citing *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1179 (10th Cir. 2000)).  The State argues another basic tenet is that "[p]arties are presumed to have bargained for any risks that are central to the substance of the contract."  Dkt. 97 at 15 (citing *United States v. Winstar Corp.*, 518 U.S. 839, 905 (1996)).

The Settlement Agreement's section on *Individual* Special Circumstances includes an explicit provision for the Defendants to seek consecutive invocations.  Dkt. 78-1 ¶ 6(b).  The Settlement Agreement's next section, *Departmental* Special Circumstances, does *not* include an explicit provision to seek consecutive invocations.  *See id.* ¶ 6(c).

The State bargained for the right to invoke Individual Special Circumstances consecutively for the same person and did *not* bargain for (and DLC correspondingly did not agree to) the right to consecutively invoke DSC.  There is no interpretation that allows for consecutive invocations of DSC, whether reading the contract as a whole or the provisions in isolation.  There would be no

9

reason for the parties to have explicitly provided for consecutive invocations for Individual Special Circumstances in section 6(b) if, as Defendants assert, the agreement by silence provided for that same right in the DSC context *in the very next section 6(c)*.  That makes no sense.

The State's newly conjured up right would render the entire contract, especially the length of the agreement, worthless.  It would permit the State to leave people with mental illness in jails without treatment for months, even years, with the only recourse being that the now-unenforceable agreement would never expire.[3]  The State's newly conjured up escape clause would also violate the State's duty of good faith and fair dealing.

     C.     <u>Neither DSC invocation was justified under the requisite standard</u>.

DLC stands on the statistics it presented in its opening brief.  Dkt. 96 at 9-11.  The State claims an unanticipated spike for a foreseeable, continued level of inpatient restorations.  However, their statistics on a monthly and annual basis demonstrate a *decrease*, not increase, in the demands on the State to provide inpatient services.  Fiscal year 2017-18 saw a 22.9% decrease in the number of inpatient evaluations, the other source of demand for the inpatient beds at CMHIP and RISE. Dkt. 96 at 11.  Totaling up how many detainees needed either inpatient restorations or evaluations show that monthly total dropped from 110 in May and June 2017 to just 82 in December 2017 (and 80 in July 2018).  Dkt. 96 at 10.

If the State claims every month, no matter what the truth is, to have an "unanticipated increase," then Defendants will never attempt to come back into compliance and will serially

---

[3] DLC has also not consented to a modification of the Settlement Agreement to provide the State with a right to consecutively invoke DSC.  Dkt. 78-1 ¶ 16.  To the contrary, DSC has challenged the State's invocation in December 2017 by the process provided in the Settlement Agreement.

invoke DSC.  It would be an absurd reading of the Settlement Agreement, or any contract, to read into it a clause that guts the agreement's essential purpose and allows one party to commit hundreds and then thousands of material breaches in perpetuity without consequence or redress.  It also represents the State's breach of the covenant of good faith and fair dealing through its improper invocation of DSC.

> D.   The State is in breach since June 2018.

The situation is even more straightforward since June 2018.  The State's improper December 2017 invocation (if effective at all) expired after six months on June 22, 2018.  The State admits it is not in compliance as to inpatient restorations and it is undisputed that it has not re-invoked DSC for a third time.  Dkt. 97 at 8.  This is a breach.

In response, the State makes two unavailing arguments.  First, it claims that DLC is in breach of the Settlement Agreement because it has filed this motion to reopen and is pursuing enforcement of the agreement.  Dkt. 97 at 18-19, 20-21.  This is absurd.  The State cannot identify one performance obligation of DLC under the agreement which it has failed to do.  Under the black-letter law of Colorado and every other jurisdiction, that means DLC has substantially performed.  Arguing for a remedy to which a party may or may not be entitled does not mean that party breached the agreement.  It means the breach existed but another remedy is appropriate.

Most fundamentally, the State's argument assumes that DLC is not entitled to seek enforcement of the agreement because the DLC limited itself in the case of all breaches of the agreement to the narrow remedy of extending the agreement indefinitely into the future.  This argument fails as a matter of law and logic.

The State's argument that the contract provides for an exclusive remedy is baseless.  "A contract which excludes some remedy given by law should be so definite and positive in its terms as to show the clear intention of the parties to do so." *Middleton v. Klingler*, 410 N.W.2d 184, 186 (S.D. 1987) (citing 17 C.J.S. Contracts § 36(2), 655 (1963)).  "[E]ven if a contract specifies a remedy for breach of that contract, 'a contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity.'" *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 16, 1760 (Del. 2002) (citation omitted); *see David v. Hitti*, 480 P.2d 581, 584 (Colo. App. 1970) (rejecting exclusive remedy theory).

An Illinois federal court rejected a similar argument made by the government that a counterparty adopted an exclusive remedy, stating, "[N]othing in . . . the contract as a whole suggests that the parties intended to limit the Conference's rights to the aforementioned remedies. If the parties wished to limit the Conference's remedies, they could have easily included language to that effect. They did not. Absent such an express limitation, the Conference's remedial rights must be deemed cumulative and the breach of contract claim must be allowed to proceed." *U.S. v. Illinois*, 144 F. Supp. 2d 990, 993 (C.D. Ill. 2001).

Here, there is no language indicating that the sole and exclusive remedy of DLC for any breach of the agreement is for the agreement to extend.  The provision stating the three-month addition for months in breach is not captioned "remedies" but is in the section titled "duration of the agreement."  Dkt. 78-1 ¶ 4(b).  It says nothing about being a remedy, let alone the sole and exclusive remedy—language necessary for the Court to give any consideration to the State's argument.  Moreover, other remedies are listed elsewhere in the agreement.  For example, the agreement provides that DLC can challenge an invocation of DSC by coming to this Court to

12

reopen the case—a remedy which DLC has now elected to do *twice*.  *Id.* ¶ 6(c); Dkts. 53 & 91 (DLC's motions to reopen).

Because the State did not raise this argument in opposing reopening last time in 2015, the State is thus suggesting that the amended 2016 Settlement Agreement included a deliberate narrowing of remedies down to simply extending the agreement indefinitely.  There is no support in the text of the amended agreement to reflect that significant change.

The notion that DLC would have limited itself to the sole remedy of indefinitely extending an agreement which the State could then indefinitely breach is illogical.  If true, it would make no sense that DLC bargained for the right to come back to this Court to challenge the State's invocation of DSC and for the Court to have jurisdiction to oversee the enforcement of this agreement (which the State has already breached once by supplying falsified data in 2015) if the only available remedy was an indefinite extension to an indefinite agreement with no means of enforcement.

Such an interpretation would result in an agreement which the State could choose to never comply with and would destroy the essential purpose of the agreement.  There is no textual support for such an interpretation which would gut the agreement of any meaning.

## II.    As a Remedy for the Breach of Contract, the Court Should Order Immediate Compliance Upon Pain of Contempt.

The parties agree that the analysis of a settlement agreement is that of any other contract. Dkt. 97 at 14.  The elements of breach of contract in Colorado are well established:  (1) the parties entered into the contract; (2) defendant has breached the contract by failing to perform as promised;

13

and (3) plaintiff has substantially performed its duties under the contract. Colo. Jury Instr., Civil § 30:10; *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (cited in Dkt. 97 at 18).

There is no dispute there is an agreement, in the form of the Settlement Agreement filed with this Court. Dkt. 97 at 4, 6. DLC has performed its limited obligations under the agreement. *See* Dkt. 78-1. DLC has demonstrated breaches of the agreement in the hundreds of pretrial detainees who are waiting in excess of the 28-day maximum and 24-day average for inpatient restoration, a fact which the State does not deny. DLC has shown above why the December 2017 re-invocation was invalid and the State admits it has not invoked at all in June 2018. Thus, no DSC applies since December 2017 and the State is not in compliance with the Settlement Agreement's timelines and is in breach.

One remedy for a breached settlement agreement is to request that the Court order the breaching party to comply with its terms. *See, e.g.*, *Feerer v. Amoco Prod. Co.*, 242 F.3d 1259, 1263 (10th Cir. 2001) (affirming district court's enforcement of settlement agreement and rejecting party's incorrect interpretation of settlement agreement's terms); *Starr v. Roche*, 33 F. App'x 432, 434 (10th Cir. 2002) (affirming district court's enforcement of settlement agreement when one party refused to comply); *Huntwise, Inc. v. MAT Sports, LLC*, No. 03-cv—01591-WYD-MEH, 2008 WL 4854161, at *3 (D. Colo. Nov. 10, 2008) ("Plaintiff's request to enforce the agreement should be granted.").

DLC asks for that same remedy here as in *Feerer*, *Starr*, and *Huntwise*. Indeed, that was why DLC has requested twice that this Court retain jurisdiction of this Settlement Agreement, so it could act in this very situation and order the State to fulfill its promises. There is nothing novel or unique about this request, which stems from the basic contractual remedy of specific

14

performance.  As stated above, DLC did not elect the exclusive, worthless remedy of indefinite extensions to the agreement but retained its right to pursue all remedies available to it under law.

The State's own cases confirm that DLC's remedy is reasonable.  The State cites two cases where the Tenth Circuit affirmed awards of attorney's fees to be paid by the government for their bad faith conduct in not honoring settlement agreements.  *United States v. McCall*, 235 F.3d 1211, 1217 (10th Cir. 2000) (cited in Dkt. 97 at 14); *Anthony v. United States*, 987 F.2d 670, 674 (10th Cir. 1993) (stating that "where the government enters into an agreement with its citizens, it has a duty to act with at least a minimum standard of decency, honor, and reliability") (internal quotations and citation omitted; cited in Dkt. 97 at 14).  The Defendants here have operated since at least 2015 far below the government's minimum standard of decency, honor, and reliability. The legal positions taken here that an agreement brokered with Magistrate Boland is not worth the paper it is written on is another example of the State taking extreme positions unsupported by basic contract law.

The State cited another case for the proposition that sophisticated parties entering into an agreement should be bound to the agreement's terms.  *Colo. Interstate Corp. v. CIT Grp./Equip. Fin., Inc.*, 993 F.2d 743, 749 (10th Cir. 1993) (quoted in Dkt. 97 at 14).  DLC agrees and notes the case's next sentence states "there are significant policy reasons for upholding hell or high water clauses" in those sophisticated contracts.  *Id.*  Here, the State committed itself to a "hell or high water" clause to comply with the 24- and 28-day deadlines absent the six-month exception for DSC.  The State now wants to have the ability to *never* comply with those deadlines under the fig leaf of serial DSC invocations or ending DLC's ability to compel the State to comply with the agreement.  The State is the most sophisticated party.  It entered into this agreement for the first

15

time over a decade ago in *Zuniga* and twice has agreed to the current framework.  It must comply, come hell or high water.

## CONCLUSION

The Court should rule that Defendants (a) currently are in breach of the 2016 Settlement Agreement; (b) could not legally have invoked the DSC exception a second time in December 2017; and (c) breached the Agreement by failing to satisfy the six-month DSC exception in December 2017.  The Court should deny the State's motion for summary judgment.  Based on those rulings, the Court should order immediate compliance with the Settlement Agreement's deadlines (upon pain of contempt).  Finally, the Court should also award Plaintiff's counsel their reasonable costs and attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

16

61866115

DATED:  September 5, 2018.

Respectfully submitted,

*s/ Iris Eytan*
Iris Eytan
EYTAN NIELSEN LLC
3200 Cherry Creek South Drive
Denver, CO 80209
Telephone: 720.440.8155
Facsimile: 720.440.8156
Email: iris@eytan-nielsen.com


*s/ Caleb Durling*
Caleb Durling
FOX ROTHSCHILD LLP
1225 Seventeenth Street, Suite 2200
Denver, CO 80202
Phone: (303) 945-7416
Email: cdurling@foxrothschild.com


*Attorneys for Plaintiff Center for Legal Advocacy,*
*d/b/a Disability Law Colorado*

*s/ Mark J. Ivandick*
Mark J. Ivandick
Jennifer Purrington
DISABILITY LAW COLORADO
455 Sherman St., Ste. 130
Denver, CO 80203
Telephone: 303.722.0300
Facsimile: 303.722.0720
Email: mivandick@disabilitylawco.org


*s/ Ellie Lockwood*
Ellie Lockwood
Timothy P. Scalo
SNELL AND WILMER LLP
1200 Seventeenth Street, Suite 1900
Denver, CO 80202
Telephone: 303-634-2000
Facsimile: 303-634-2020
Email: elockwood@swlaw.com;
tscalo@swlaw.com

61866115

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 5, 2018, a true and correct copy of this motion was electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Tanja E. Wheeler
Lauren Peach
Libbie McCarthy
First Assistant Attorney General
Colorado Department of Law
State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203

*Counsel for Defendants*

*/s/Linda Casanova*
Linda Casanova

18

61866115