## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-02285-NYW

CENTER FOR LEGAL ADVOCACY, d/b/a DISABILITY LAW COLORADO,

      Plaintiff,

v.

REGGIE BICHA, in his official capacity as Executive Director of the Colorado Department of Human Services; and
JILL MARSHALL, in her official capacity as Superintendent of the Colorado Mental Health Institute at Pueblo,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Plaintiff Center for Legal Advocacy d/b/a Disability Law Colorado's ("DLC" or "Plaintiff") Motion for Summary Judgment to Enforce Settlement ("Motion" or "Motion for Summary Judgment") [#96] and Defendants Reggie Bicha and Jill Marshall's (collectively, "Defendants" or "Department") Motion for Summary Judgment (or "Motion") [#97].  The Motions are before the undersigned pursuant to the Order of Reference dated February 21, 2012 [#44], the Order of Reassignment dated November 19, 2015 [#58], 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2.  The court retained ancillary jurisdiction to consider the issues raised in the Parties' Motions for Summary Judgment, because the Parties' consented to this court retaining jurisdiction to enforce the terms of the 2016 Settlement Agreement and the court fully incorporated the terms of the 2016 Settlement Agreement in its Order of Dismissal under Rule 41(a)(2) of the Federal Rules of Civil Procedure. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994).  Accordingly, having reviewed the Motions and associated briefing, and the evidence and comments offered at the

September 28, 2018 Motions Hearing, the court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Summary Judgment; **DENIES** Defendants' Motion for Summary Judgment; and **SETS** this action for a Status Conference.

## BACKGROUND

The court draws the following facts from the record before it, including the Parties' Joint Statement of Undisputed Facts. [#104].

1.    The Department is required to provide competency evaluations for any defendant when the issue of competency to stand trial is raised. *See* Colo. Rev. Stat. § 16-8.5-101, *et seq.*

2.    The Department is required to provide restoration services for any defendant found by the court to be incompetent to proceed. *See id.* at §§ 16-8.5-101, *et seq.*, 27-60-105.

3.    In 2007, there were contempt citations issued in Denver District Court related to pretrial detainees waiting extended periods of time in Denver County Jail. *See, e.g.*, Am. Contempt Citation, *People v. Zuniga*, No. 06CR999 (Colo. Dist. Ct. Jan. 3, 2007); Contempt Citation, *People v. Kirkwood*, No. 06CR5797 (Colo. Dist. Ct. Jan. 3, 2007); Am. Contempt Citation, *People v. Sims*, No. 05CR2272 (Colo. Dist. Ct. Jan. 3, 2007) (collectively [#105-1]).    In 2006, Denver District Court Judge Egelhoff appointed special counsel to litigate contempt citations against the Executive Director of the Colorado Department of Human Services and the Superintendent of the Colorado Mental Health Institute at Pueblo ("CMHIP").    In those instances, pretrial detainees were sitting in jail for many months awaiting transport to CMHIP for competency evaluations.    The contempt citations and orders were resolved through a settlement agreement.    The agreement required CMHIP to offer admission to pretrial detainees within 28 days of a court order requiring in-patient competency evaluations or restorative treatment, and to maintain a quarterly average of 24 days for both categories.

4.     Some period after that settlement agreement expired, the Department and CMHIP did not transport pretrial detainees to CMHIP for competency evaluation or restoration treatment within 28 days after they were ready for admission.

5.     Plaintiff initially commenced this matter on August 31, 2011.  [#1].  The complaint alleged that Defendants failed to timely admit pretrial detainees in jails across Colorado into CMHIP, the State's only forensic mental health hospital charged with providing court-ordered evaluations and accepting custody of pretrial detainees for restorative treatment, for competency evaluations, and restorative treatment for those determined to be incompetent to stand trial.  *Id.* The complaint alleged this failure created unconstitutional delays to provide competency evaluations and treatment for up to 80 pretrial detainees for as long as six months.   *Id.*

6.     In 2012, the parties entered into settlement negotiations to resolve issues related to the length of the time individuals were waiting to receive competency evaluations and restoration services.

7.     After settlement negotiations mediated by former Magistrate Judge Boyd N. Boland, and post-mediation negotiations, the parties reached the 2012 Agreement resolving the case.

8.     The 2012 Agreement put into place timeframes for the Department to: 1) complete outpatient (in-jail) competency evaluations; 2) offer admission for inpatient competency evaluations; and 3) offer admission for inpatient restoration services.  [#51-1; #105-15].

9.     The 2012 Agreement included a provision called Special Circumstances, which "recognizes that to some extent the Department's ability to perform its statutory obligations and its obligations under [the 2012 Agreement] is based on factors beyond the Department's control."

10.    The 2012 Agreement defines Departmental Special Circumstances ("DSC") as:

circumstances beyond the control of the Department which impact the [Department's] ability to comply with the timeframes set forth in Paragraph

2.  This could mean an unanticipated spike in referrals, a substantial and material decrease in the Hospital's budget, or another sentinel event impacting clinical decisions system wide. These examples are provided for illustration only.  [DSC] is a flexible concept, due to the unique and often unforeseen nature of these events.

11.  The 2012 Agreement states that:

if [DSC] is invoked and then agreed upon by the parties, the timeframe requirements of Paragraph 2 shall be suspended as to all Pretrial Detainees affected by the invoked [DSC] for a period of six months from the date of the Department's invocation.

12.  The 2012 Agreement states that:

if the timeframe requirements of Paragraph 2 of [the 2012 Agreement] are temporarily suspended pursuant to the provisions of Paragraph 6(c), the duration of [the 2012 Agreement] shall be extended for a period equal to the length of time of the suspension of the timeframe requirements…[and] then the Department will receive only a reduction in the duration for the number of months it was in compliance for the year.

13.  The 2012 Agreement states that "upon the first anniversary of the full execution of [the 2012 Agreement] and if the Department has fully complied with the terms of [the 2012 Agreement]," the duration of the 2012 Agreement would be reduced by one year.

14.  Both parties certified that they fully and carefully reviewed the 2012 Agreement and consulted with their respective attorneys regarding the legal effect and meaning of the 2012 Agreement and all terms and conditions thereof.

15.  The 2012 agreement was incorporated by reference in the Court's Order of Dismissal on April 9, 2012 under Fed. R. Civ. P. 41(a)(2).  [#52].

16.  In August 2015, the Department invoked DSC.

17.  In October 2015, the Plaintiff moved to reopen the matter for enforcement of the 2012 agreement, in part because it disputed DSC.  [#53].

18.  After two days of mediation, engaging in subsequent settlement negotiations, and

exchanging multiple drafts, the parties entered into an Amended and Restated Settlement Agreement ("Settlement Agreement" or "2016 Agreement") [#78-1] resolving the case.

19.    The Settlement Agreement is the product of over three months and hundreds of hours of work by both parties.  The current 2016 Settlement Agreement was filed with the Court on July 28, 2016.  [#78-1; #105-17].

20.    This Court retained jurisdiction to enforce the Settlement Agreement.  [#78 at ¶¶ 3, 4; #105-16].   Under the 2016 Settlement Agreement, the Department is required to offer admission to pretrial detainees to the hospital for restorative treatment or inpatient competency evaluations no later than 28 days after the pretrial detainee is ready for admission.   [#105-16 at ¶ 2(a)].  The Department also must maintain a monthly average of 24 days or less for both types of offers of admission.  *See id.*

21.    The 2016 Agreement includes a provision called Special Circumstances, which recognizes that "to some extent the Department's ability to perform its statutory obligations and its obligations under [the Agreement] are based on factors beyond its control."

22.    The 2016 Agreement defines DSC as:

circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in Paragraph 2. This could mean an unanticipated spike in referrals, a national or statewide disaster impacting admissions decisions system wide.  These examples are provided for illustration only. [DSC] is a flexible concept, due to the unique and often unforeseen nature of these events.

23.    The 2016 Agreement states that:

upon the invocation of [DSC], the timeframe requirements of Paragraph 2 shall be automatically suspended for six months, unless the Department notifies [Disability Law Colorado] that a shorter period of time is sufficient to resolve [DSC], commencing with the month in which the Notice of [DSC] is transmitted to [Disability Law Colorado].

24.    The 2016 Agreement states that:

if the timeframe requirements of Paragraph 2 of [the Agreement] are temporarily suspended pursuant to the provisions of Paragraph 6(c), the duration of [the Agreement] shall be extended for a period equal to the length of time of the suspension of the timeframe requirements.

25.   This language reflects a modification from the 2012 Agreement. *Id*.

26.   The 2016 Agreement states that:

the term of the Agreement shall be reduced by three months for each of the number of months of certified timeliness compliance for the prior calendar year…[and] the term of the Agreement shall be increased by three months for each month during the prior calendar year that the Department was not in full compliance with the timeliness requirements of [the Agreement].

27.   Both parties certified that they fully and carefully reviewed the 2016 Agreement and consulted with their respective attorneys regarding the legal effect and meaning of the 2016 Agreement and all terms and conditions thereof.

28.   The 2016 Settlement Agreement states that

[t]he Hospital may invoke Individual Special Circumstances more than once for the same Pretrial Detainee, but it must follow the notification and conferral procedures in Paragraph 6(b) each time it seeks to invoke Individual Special Circumstances.

[#105-15 at ¶ 6(b)(ii)]. The Settlement Agreement does not contain a similar provision for DSC. [*Id*. at ¶ 6(c)].

29.   In June 2017, the Department invoked DSC based on "an unanticipated spike in court-ordered referrals for inpatient competency evaluation and restoration treatment services." [#105-2 at 1].

30.   In December 2017, the Department invoked DSC. [#105-3]. That DSC notice was based on the fact that "the sustained increase in the number of court orders for inpatient competency restoration treatment had outpaced the Department's capacity and was beyond its control." *See* [*id.* at 1–2].

31.     The December 2017 DSC invocation, the validity of which Plaintiff disputes, would have expired on June 22, 2018.   *Id.*

32.     The Department's invocation of DSC in both June 2017 and December 2017 complied with the 2016 Agreement's notice requirements.

33.     In June 2018, the Department did not invoke DSC.

34.     The Department has not complied with the Settlement Agreement timeframes concerning inpatient restoration treatment since June 2017.

35.     The Department has complied with the Settlement Agreement timeframes concerning outpatient competency evaluations since July 2015.

36.     The Department has complied with the Settlement Agreement timeframes concerning inpatient competency evaluations since May 2018.

37.     The June 2018 "Best Referrals Per Month" report [#105-8] accurately states the number of orders for competency evaluation and restoration treatment services received by the Department from January 2017 through July 2018.

38.     Chart 1 details the timelines since June 2017 for restorative treatment at CMHIP or a second facility in Arapahoe County, known as RISE, as calculated by the Department.

## Chart 1

| Month | Number of Pretrial Detainees on Report A Waiting 28+ Days | Average Wait Time | Longest Wait Time |
|---|---|---|---|
| June 2017 | 3 | 23.5 | 29 |
| July 2017 | 33 | 27.2 | 45 |
| August 2017 | 73 | 39.5 | 56 |
| September 2017 | 90 | 46.7 | 68 |
| October 2017 | 114 | 59.4 | 88 |
| November 2017 | 133 | 67.2 | 87 |
| December 2017 | 147 | 66.4 | 129 |

| | | | |
|---|---|---|---|
| January 2018 | 165 | 69.8 | 129 |
| February 2018 | 175 | 72.6 | 114 |
| March 2018 | 203 | 93.6 | 133 |
| April 2018 | 195 | 82.4 | 136 |
| May 2018 | 200 | 91.7 | 144 |
| June 2018 | 189 | 94.6 | 144 |
| July 2018 | 175 | 81.7 | 149 |
| August 2018 | 170 | 81.1 | 149 |

[#105-9]. In each month from July 2017 through present, Defendants have failed to maintain a 24-day monthly average for inpatient restorative treatment.

39.   Chart 2 details the timelines since June 2017 for inpatient competency evaluations at CMHIP or a second facility in Arapahoe County, known as RISE, as calculated by the Department.

**Chart 2**

| Month | Number of Pretrial Detainees on Report B Waiting 28+ Days | Average Wait Time | Longest Wait Time | Total Number of Referrals |
|---|---|---|---|---|
| June 2017 | 0 | 17.2 | 27 | 51 |
| July 2017 | 17 | 26.7 | 44 | 45 |
| August 2017 | 24 | 34.6 | 51 | 53 |
| September 2017 | 29 | 32.4 | 62 | 63 |
| October 2017 | 39 | 51.7 | 77 | 68 |
| November 2017 | 40 | 59.8 | 80 | 72 |
| December 2017 | 28 | 60.6 | 86 | 50 |
| January 2018 | 28 | 60.3 | 95 | 51 |
| February 2018 | 27 | 68.5 | 111 | 46 |
| March 2018 | 13 | 16.5 | 77 | 54 |
| April 2018 | 0 | 6.8 | 13 | 12 |
| May 2018 | 1 | 11.2 | 49 | 22 |
| June 2018 | 0 | 14.4 | 22 | 10 |
| July 2018 | 0 | 9.4 | 22 | 17 |
| August 2018 | 0 | 14.4 | 18 | 24 |

[#105-10].

40.    Chart 3 details the timelines since June 2017 for outpatient competency evaluations conducted by CMHIP, as calculated by the Department.

**Chart 3**

| Month | Number of Pretrial Detainees on Report C Waiting 30+ Days | Average Wait Time | Longest Wait Time | Total Number of Referrals |
|---|---|---|---|---|
| June 2017 | 0 | 15.4 | 28 | 149 |
| July 2017 | 0 | 20.6 | 30 | 137 |
| August 2017 | 0 | 20.6 | 30 | 145 |
| September 2017 | 0 | 20.0 | 30 | 150 |
| October 2017 | 0 | 20.7 | 29 | 156 |
| November 2017 | 0 | 19.3 | 27 | 152 |
| December 2017 | 0 | 20.6 | 29 | 155 |
| January 2018 | 0 | 20.3 | 29 | 155 |
| February 2018 | 0 | 20.9 | 29 | 149 |
| March 2018 | 0 | 21.3 | 29 | 151 |
| April 2018 | 0 | 20.8 | 29 | 142 |
| May 2018 | 0 | 22.9 | 29 | 134 |
| June 2018 | 0 | 21.8 | 29 | 144 |
| July 2018 | 0 | 20.3 | 29 | 145 |
| August 2018 | 0 | 20.9 | 30 | 169 |

[#105-11].

41.    Chart 4 contains the monthly totals of new evaluations and restorations, as calculated by the Department.

**Chart 4**

| Fiscal Year | In Patient Competency Evaluations | In Patient Restorations |
|---|---|---|
| June 2016 | 25 | 45 |
| July 2016 | 21 | 47 |
| August 2016 | 32 | 46 |
| September 2016 | 25 | 53 |
| October 2016 | 28 | 43 |
| November 2016 | 23 | 72 |
| December 2016 | 24 | 48 |
| January 2017 | 27 | 58 |
| February 2017 | 28 | 58 |
| March 2017 | 27 | 54 |
| April 2017 | 29 | 74 |

| | | |
|---|---|---|
| May 2017 | 26 | 84 |
| June 2017 | 37 | 73 |
| July 2017 | 23 | 64 |
| August 2017 | 31 | 77 |
| September 2017 | 31 | 67 |
| October 2017 | 28 | 66 |
| November 2017 | 19 | 76 |
| December 2017 | 14 | 69 |
| January 2018 | 20 | 77 |
| February 2018 | 18 | 79 |
| March 2018 | 30 | 66 |
| April 2018 | 10 | 64 |
| May 2018 | 22 | 74 |
| June 2018 | 11 | 76 |
| July 2018 | 15 | 67 |
| August 2018 | 22 | 90 |

[#105-8; #105-12].

42.    Chart 5 shows the number of referrals for in-patient evaluation and restoration for each fiscal year from 2005 through 2017 and the percentage of change on an annual basis.

### Chart 5

| Fiscal Year | In Patient Competency Evaluations | % Change | In Patient Restorations | % Change |
|---|---|---|---|---|
| 2005-06 | 115 | - | 167 | - |
| 2006-07 | 144 | 25.2% | 224 | 34.1% |
| 2007-08 | 184 | 27.8% | 219 | -2.2% |
| 2008-09 | 238 | 29.3% | 170 | -22.4% |
| 2009-10 | 275 | 15.5% | 212 | 24.7% |
| 2010-11 | 276 | 0.4% | 213 | 0.5% |
| 2011-12 | 287 | 3.9% | 269 | 26.3% |
| 2012-13 | 355 | 23.7% | 274 | 1.9% |
| 2013-14 | 378 | 6.4% | 342 | 24.8% |
| 2014-15 | 415 | 9.7% | 462 | 35.1% |
| 2015-16 | 326 | -21.4% | 550 | 19.0% |
| 2016-17 | 327 | 0.3% | 711 | 29.3% |
| 2017-18 | 257 | -21.41% | 849 | 19.41% |

[#105-13].

43.    From July 2017 to July 2018, Defendants received 15 orders to show cause related to competency and restoration services at CMHIP and 44 orders for immediate placement at CMHIP.

[#105-5 (CORA Response)].

44.    In July 2018, Judge Jones of the Denver District Court issued an order requiring the Department to admit a pretrial detainee who had been in jail waiting for restorative treatment for months. [#105-6 (Judge Jones order)].

45.    In another case, Judge Brody of the Denver District Court issued an order to show cause and contempt citation against Defendants. [#105-7 (Judge Brody order)]. Judge Brody vacated the show cause order and contempt citation against Defendants on August 24, 2018.

46.    [#105-4] is comprised of true and correct copies of 15 letters which the Department sent to state district court judges in April 2018 requesting that the judge convert the order for the defendant referenced in the letter to receive inpatient restoration to an order for outpatient restoration services.

## LEGAL STANDARD

Pursuant to Rule 56, the court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). And though the court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant[,]" *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016), the nonmovant must point to

competent summary judgment evidence, *see Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004), and may not rely on "mere reargument of his case or a denial of an opponent's allegation[,]" *see* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

And when, as here, the parties file cross-motions for summary judgment, the court considers each separately—the denial of one does not require the grant of another. *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). Rather, the court may enter summary judgment only if the moving party carries its burden of demonstrating that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

## ANALYSIS

As currently postured by the Motions for Summary Judgment, the Parties stipulated to four issues for the court's consideration:

1. Whether the Settlement Agreement between the parties grants Defendants the right to invoke "Departmental Special Circumstances" consecutively, without limitations;

2. Whether Defendants breached the Settlement Agreement or whether the Defendants were in non-compliance with the Settlement Agreement timeframes, when they re-invoked "Departmental Special Circumstances" in December 2017, claiming it can consecutively invoke Departmental Special Circumstances;

3. Whether Defendants breached the Settlement Agreement or whether the Defendants were in non-compliance with the Settlement Agreement timeframes, on June 21, 2018 when they did not invoke "Department Special Circumstances"; and

4. If the Court finds Defendants either breached the Settlement Agreement or were in non-compliance with the Settlement Agreement timeframes, the remedies that the Court should impose.

*See* [#88 at 2]. These issues present contract interpretation and breach of contract questions, requiring the court to apply state contract law in addressing the "construction of a purported

settlement agreement[.]" *Walters v. Wal-Mart Stores, Inc.*, 703 F.3d 1167, 1172 (10th Cir. 2013) (brackets and internal quotation marks omitted).

In Colorado, to recover for an alleged breach of contract a plaintiff must prove: (1) the existence of a contract; (2) the plaintiff's performance of its contractual obligations or its justification(s) for non-performance; (3) the defendant's failure to perform; and (4) the plaintiff's damages. *See Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). For purposes of issues 1 and 2, "[t]he interpretation of a contract under Colorado law is a legal question." *Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 491 (10th Cir. 2002) (citing *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990)) (further citation omitted). It is therefore appropriate at summary judgment for the court to interpret the terms of the 2016 Settlement Agreement. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 213 F. Supp. 3d 1333, 1340 (D. Colo. 2016) (applying Colorado law). But "[o]nce the terms of the agreement have been identified, the fact finder must determine whether the party accused of breaching has performed its obligations under the contract. Whether a party has performed its obligations under a contract or breached is a *question of fact*." *Lake Durango Water Co. v. Pub. Utilities Comm'n of State of Colorado*, 67 P.3d 12, 21 (Colo. 2003) (emphasis added).

With this framework in mind, the court turns to the issues presented by the Parties.

## I.    Departmental Special Circumstances

Per the 2016 Settlement Agreement, Defendants agreed to certain timeframes for admissions for restorative treatment and the performance of competency evaluations. *See* [#78-1 at ¶ 2]. These timeframes include admission "no later than 28 days after the Pretrial Detainee is Ready for Admission, [i.e., when CMHIP receives the court order for admission and collateral

materials],” and a monthly average of “24 days or less for both types of Offers of Admission.” [*Id.* at ¶ 2(a)]. There is no dispute between the Parties, or before this court, that Defendants have not complied with the timeframes concerning inpatient restoration treatment since June 2017, though complying with the timeframes concerning outpatient competency evaluations since July 2015, *see* [#104 at ¶¶ 34–35], and have only come into compliance with the timeframes concerning inpatient competency evaluations beginning in May 2018, *see* [*id.* at ¶ 36]. But the parties recognized that factors beyond Defendants’ control might interfere with their ability to meet these required timeframes, so the 2016 Settlement Agreement provides for two categories of special circumstances that temporarily suspend the required timeframes. *See* [#78-1 at ¶ 6].

> Relevant here, DSC

> Means circumstances beyond the control of the Department which impact the Department’s ability to comply with the timeframes set forth in Paragraph 2. This could mean an unanticipated spike in referrals, a national or statewide disaster impacting admissions decisions system wide. These examples are provided for illustration only. [DSC] is a flexible concept, due to the unique and often unforeseen nature of these events.

[#78-1 at ¶ 6(a)(ii)]. When invoking DSC, the Department

> shall notify DLC. . ., and . . . the Department shall provide a detailed explanation of the basis for invoking [DSC], a plan to remedy the [DSC], and the projected timeframe for resolution. The period of [DSC] shall commence on the date that the Notice . . . is transmitted to DLC. Upon invocation of [DSC], the timeframe requirements of Paragraph 2 shall be automatically suspended for six months, unless the Department notifies DLC that a shorter time period is sufficient . . ., commencing with the month in which the Notice . . . is transmitted to DLC. . . . If DLC decides to challenge the invocation of [DSC], it may do so by filing a motion to reopen the Action to seek enforcement of this Agreement. . . .

[*Id.* at ¶ 6(c)].

## A.    Consecutive Invocations

To answer the first issue presented by the Parties, the court “‘must examine [the 2016 Settlement Agreement’s] terms and attempt to determine the intent of the parties.’” *Level 3*

14

*Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005)).   In deciphering the parties' intent, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used." *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1127 (10th Cir. 2011) (internal quotation marks omitted) (applying Colorado law).   "When a contractual term unambiguously resolves the parties' dispute, the interpreting court's task is over" because the court is to enforce a written contract pursuant to its clear terms. *See Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1060 (D. Colo. 2013) (quotation marks omitted) (applying Colorado law).   If, however, the contractual terms are ambiguous, i.e., susceptible to more than one reasonable interpretation, the court may consider extraneous evidence to determine the parties' intent; but the mere difference of opinion regarding the interpretation of a term does not itself create an ambiguity.   *See Running Foxes Petroleum, Inc. v. Nighthawk Prod. LLC*, 175 F. Supp. 3d 1279, 1279, 1287 (D. Colo. 2016) (citing *Ad Two, Inc. v. City & Cty. of Denver*, 9 P.3d 373, 376–77 (Colo. 2000)).

All agree that the language of Paragraph 6(a)(ii) is clear: upon proper Notice, the Department may invoke DSC, thereby suspending the required timeframes of Paragraph 2(a) for up to 6 months beginning with the month in which the Department transmits Notice.   Equally as clear is the absence of any language within the provisions themselves qualifying the Department's ability to invoke DSC.   The Parties offer opposing interpretations of what this silence means. Plaintiff contends that this silence prohibits Defendants from invoking DSC "consecutively, without limitations" (though clarifying at the Motions Hearing that Defendant could invoke DSC more than once, non-consecutively after coming into compliance with the Agreement following a prior invocation of DSC) because doing so would foster infinite suspensions of the relevant

timeframes, rendering the 2016 Settlement Agreement a "dead letter." Defendants counter that because the plain language of the 2016 Settlement Agreement does not prohibit consecutive invocations of DSC, the court should not and cannot supply a term neither party bargained for. Despite the court's concern that consecutive invocations of DSC could simply result in infinite extensions, I respectfully agree with Defendants.

As mentioned, "[t]o determine the meaning of a contract, courts are guided by the general rules of contract construction and should seek to give effect to all provisions so that none will be rendered meaningless." *Chandler-McPhail v. Duffey*, 194 P.3d 434, 437 (Colo. App. 2008). That is, "the meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation" so as to harmonize all provisions. *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013) (brackets and internal quotation marks omitted). But courts "should neither rewrite the agreement nor limit its effect by a strained construction" when its terms are clear, *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 833 (10th Cir. 2016) (internal quotation marks omitted) (applying Colorado law), because "it is not the business of the courts to draft a better contract for the parties than they did for themselves[,]" *id.* at 836. Indeed, contracts between "competent parties, voluntarily and fairly made, should be enforceable according to the terms to which they freely commit themselves[,]" including "mutually bargained-for duties and risks." *Ravenstar, LLC v. One Ski Hill Place, LLC*, 401 P.3d 552, 555 (Colo. 2017) (internal quotation marks omitted).

Plaintiff offers several reasons as to why the 2016 Settlement Agreement limits the Department's ability to invoke DSC consecutively. ***First***, consecutive invocation of DSC would render meaningless the timeframes prescribed by Paragraph 2 because the Department could "serially re-invoke DSC every six months in perpetuity and never come back into compliance."

[#96 at 7]; *see also* [#101 at 9–10].  ***Second***, and relatedly, consecutive invocation of DSC "would eliminate the three-month extension provision" contained in Paragraph 4(b) that extends the term of the 2016 Settlement Agreement three months for every one month of noncompliance in the prior calendar year.  *See* [#96 at 7; #101 at 10].  While these are troubling possibilities that the court noted at the Motions Hearing, the 2016 Settlement Agreement provides mechanisms to protect the timeframes in Paragraph 2 and the extensions to the 2016 Settlement Agreement's lifespan in Paragraph 4(b).  Most notably, the 2016 Settlement Agreement unequivocally provides Plaintiff the right "to challenge the invocation of [DSC] . . . by filing a motion to reopen the Action to seek enforcement of this Agreement."  [#78-1 at ¶ 6(c)].  This is exactly what Plaintiff did here.  And while Defendants dispute whether the stipulated issues between the Parties encompass this point, Plaintiff indeed challenges whether unanticipated spikes in referrals is a sufficient basis for invoking DSC.

    ***Third***, Plaintiff argues that consecutive invocation of DSC would be at odds with the provision concerning Individual Special Circumstances that "expressly permit[s] successive invocations of Individual Special Circumstances"; because DSC omits this same language, Plaintiff argues that the court cannot reasonably interpret DSC to allow for consecutive invocation.  [#96 at 7–8; #101 at 9–10].  While it is correct that the court must not read provisions in isolation and must harmonize all provisions, I find that these two provisions cover distinct performance obligations, defined by discrete circumstances—one directed at the macro-level consideration of the Department and the other directed at the micro-level consideration of an individual.  [#102 at 8].  That is, accepting Plaintiff's interpretation would insert a qualification on DSC that the 2016 Settlement Agreement does not expressly provide.  *See Magnetic Copy Servs., Inc. v. Seismic Specialists, Inc.*, 805 P.2d 1161, 1164 (Colo. App. 1990) ("The contract does not state that

[defendant]'s performance was conditioned upon any set of circumstances. Furthermore, the contract does not state or imply that providing 3,000 tapes within a year is merely a goal or objective. Hence, we will not read the contract as so stating."). Had Plaintiff sought to further restrict the manner by which the Department could invoke DSC it "could have and should have done so expressly." *Feerer v. Amoco Prod. Co.*, 242 F.3d 1259, 1264 (10th Cir. 2001) (holding under New Mexico law that nothing in the settlement agreement supported the defendants' position on reallocating costs to the plaintiffs where no such provision allowed for this and this did not appear to be the parties' intent).[1]

Moreover, Plaintiff's argument runs counter to its clarification at the Motions Hearing that Defendants could invoke DSC more than once during the lifespan of the 2016 Settlement Agreement but only after coming into compliance with Paragraph 2 following a prior invocation of DSC. But this interpretation of DSC does not necessarily follow from the plain language of Individual Special Circumstances that allows the Department to invoke "more than once for the same Pretrial Detainee", *see* [#78-1 at ¶ 6(b)(ii)], which Plaintiff interprets as allowing consecutive invocation. Indeed, if the Parties' intent was to allow for multiple invocations of both Individual Special Circumstances *and* DSC, then the absence of the same language in the DSC provision has no effect on that understanding. And the absence of explicit language limiting the invocation of DSC counsels against an interpretation that limits the Department's ability in this regard based on Plaintiff's interpretation of Individual Special Circumstances.

---

[1] In the realm of statutory interpretation, it is axiomatic that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 693 F.3d 1303, 1309 (10th Cir. 2012). But it is far from clear that the same is true of contractual interpretation, especially where, as here, the omission of certain language would qualify conduct that the 2016 Settlement Agreement does not explicitly restrict. *See Magnetic Copy Servs., Inc.*, 805 P.2d at 1164.

**Finally**, Plaintiff argues that at the least, permitting consecutive invocation of DSC would breach Defendants' duty of good faith and fair dealing. [#96 at 8; #101 at 10]. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *See* RESTATEMENT (SECOND) OF CONTRACTS § 205. In Colorado, this duty exists "to effectuate the intentions of the parties or to honor their reasonable expectations[,]" and may be invoked "when the manner of performance under a specific contract term allows for discretion on the part of either party[,]" i.e., one party has the power to set or control the terms of performance after formation. *See City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (internal citations and quotation marks omitted). The 2016 Settlement Agreement, specifically Paragraph 2, does not provide discretion to Defendants as to their performance obligations; nor does it appear that Defendants could dictate their performance obligations after formation. Further, the duty of good faith and fair dealing, if raised as to the Department's ability to invoke DSC, cannot "contradict terms or conditions for which a party has bargained." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). As discussed above, Plaintiff's interpretation of Paragraphs 6(a)(ii) and 6(c) as limiting the Department's ability to invoke DSC consecutively interjects a new substantive term into the 2016 Settlement Agreement that would "vary or contradict the contract's express provisions." *United States for use & benefit of Fisher Sand & Gravel Co. v. Kirkland Constr., LLP*, 76 F. Supp. 3d 1199, 1215 (D. Colo. 2014) (applying Colorado law). Thus, to the extent that Plaintiff contends that the second, consecutive invocation of DSC breached the implied covenant of good faith and fair dealing [#96 at 8], this court respectfully disagrees.

To conclude, Plaintiff asks this court to read into the 2016 Settlement Agreement a restriction on the Department's ability to invoke DSC consecutively—a restriction the Agreement does not express. Because I find the terms of the 2016 Settlement Agreement clear and

unambiguous, I conclude that a reasonable interpretation of Paragraphs 6(a)(ii) and 6(c) permits Defendants to invoke DSC consecutively. This conclusion, however, does not completely resolve the matter before the court. Indeed, even the Parties framed the first issue as "[w]hether the Settlement Agreement between the parties grants Defendants the right to invoke 'Departmental Special Circumstances' consecutively, *without limitations*." Based on the arguments in the papers, the Parties appear to approach the qualifier of "without limitations" as a numeric one. But far more salient to this court is that the issue clearly underlying the original action, the 2016 Settlement Agreement, and this action is a non-numeric one. This court has already concluded that Defendants can invoke DSC consecutively, but it does not conclude that Defendants' ability to invoke DSC consecutively is without limitations. The 2016 Settlement Agreement expressly limits the invocation of DSC to "circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in Paragraph 2." [#78-1 at ¶ 6(a)(ii)].

### B.  Limitations on the Invocation of DSC

As posed, the second issue presented to the court is:

> Whether Defendants breached the Settlement Agreement or whether the Defendants were in non-compliance with the Settlement Agreement timeframes, when they re-invoked "Departmental Special Circumstances" in December 2017, claiming it can consecutively invoke Departmental Special Circumstances.

It is clear to this court that the central issue of dispute, and the question that is far harder to answer, is whether Defendants rightfully invoked DSC in June 2017 and then extended it in December 2017 *even if* the Agreement allowed Defendants to invoke DSC consecutively. Put another way, were there "circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes set forth in [the Settlement Agreement]?" *See* [#78-1 at ¶ 6(a)(ii)]. At oral argument, counsel for Defendants argued that this substantive issue was not before the court, as the only basis for breach argued by Plaintiff was the consecutive invocation of

DSC.  But in Plaintiff's Motion for Summary Judgment it clearly argues that the invocations of DSC "did not satisfy the basic DSC requirements."  [#96 at 9].  And Defendants argued, in Response, that their invocations of DSC were proper, because they were substantively "outside the control of the Department."  [#102 at 12–15].  And upon Reply, Plaintiff continues to challenge whether the DSC invocation was justified under the standard set forth in the 2016 Settlement Agreement.  [#101 at 10–11].  Even if the Parties did not expressly articulate this issue as one of the four presented to the court for resolution, all Parties clearly had notice and argued the issue. Furthermore, Rule 56(f) of the Federal Rules of Civil Procedure contemplates that a court may render a determination as to summary judgment independent of the Parties' motions.  Fed. R. Civ. P. 56(f).  And the 2016 Settlement Agreement clearly contemplates that Plaintiff may substantively challenge the invocation of DSC.  [#78-1 at ¶ 6(c)].

But the issue of whether the Department properly invoked DSC, first in June 2017 and then again in December 2017, is not undisputed.  Rather, it is rife with disputes of material fact, and no discovery on these issues has occurred.  Plaintiff contends that the basis of Defendants' invocation—the lack of capacity caused by an increase in referrals—"is wholly within the Department's control."  [#96 at 9].  And it insists that "the Department's failure to maintain adequate facilities to keep up with the pace of referrals is a problem that has plagued timely admission of pretrial detainees to CMHIP for decades."  [*Id.*].  Indeed, Plaintiff suggests that the demand for the Department's mental health evaluations, including both the inpatient restorations and evaluations, shows that monthly totals have dropped, rather than increased, in the time period at issue.  [*Id.* at 10].

For their part, Defendants argue that the invocation of DSC complies with the terms of the 2016 Settlement Agreement.  [#102 at 11–13].  They insist that an unanticipated spike in

court-ordered referrals for inpatient competency and restoration treatment services caused it to invoke DSC, and that those spikes in demand are out of its control. [*Id.*]. But Defendants never explain, and rather simply assume, that the increase in court-ordered restoration services and evaluations necessarily renders the Department unable to comply with the timeframes set forth in the 2016 Settlement Agreement. [#102 at 14–15]. And contrary to Defendants' contention that DLC "does not dispute whether the Department had the resources to manage the elevated volume of orders when it invoked DSC in December 2017," [*id.* at 14], DLC does appear to dispute that very conclusion in addition to challenging whether the Department has adequately planned for such foreseeable increases. [#101 at 11]. This material dispute of fact precludes summary judgment in any party's favor as to whether Defendants have breached the 2016 Settlement Agreement by their invocations of DSC in June and December 2017.[2]

### C. Failure to Invoke DSC

The third issue raised by the Parties is whether Defendants are in breach of the Settlement Agreement as of June 22, 2018, when the Department continued its noncompliance with the

---

[2] The court is keenly aware that the separation of powers doctrine counsels against a court's review of an executive agency's exercise of powers properly within its own sphere. *See, e.g.*, *Kort v. Hufnagel*, 729 P.2d 370 (Colo. 1986) (en banc). And the court is generally wary of passing over the manner by which an agency allocates it limited resources, seeks funding from the Legislature, and explores alternatives to address budgetary shortfalls. Here, however, that review appears intertwined with the contractual provisions that require the Department to invoke DSC based only on "circumstances beyond the control of the Department which impact the Department's ability to comply with the timeframes." To determine whether a circumstance is "beyond the control of the Department which impacts its ability to comply with the timeframe," the court cannot look only at whether the triggering event is beyond the control of the Department, but must consider the totality of the circumstances, including the Department's actions or inactions to address trends in demand for mental health evaluations and restoration services. For instance, the court would not consider a spike in the number of court-ordered services as a circumstance "outside the control of the Department which impacts the Department's ability to comply with the timeframes," if the facts demonstrate the Department was aware of the increasing trend in demand for mental health evaluations and restoration services but failed to take reasonable steps to address the rising needs.

timeframes contemplated by the 2016 Settlement Agreement but did not invoke DSC. Plaintiff argues that the Department may not simply choose not to comply with the timeframes of the 2016 Settlement Agreement without cause. [#101 at 11]. Defendants argue that their failure to satisfy the timeframes does not require the invocation of DSC, does not amount to breach, and simply results in the increased duration of the 2016 Settlement Agreement by three months for each month that the Department is not in full compliance. [#97 at 21 (citing #78-1 at ¶ 4(b))]. Plaintiff contends that Defendants' interpretation of the 2016 Settlement Agreement is "absurd." [#101 at 11–12]. As urged by Defendants, this court's inquiry begins and end by applying the plain language of the Agreement. [#97 at 21].

In applying the general principles of contract law, this court finds that the issue of whether Defendants breached the 2016 Settlement Agreement is distinct from the remedies available to address such breach. To prevail on summary judgment as to breach, Plaintiff must demonstrate that there is no genuine issue of material fact that: (1) a contract exists; (2) plaintiff performed its contractual obligations or its non-performance was justified; (3) the defendant failed to perform; and (4) the plaintiff suffered damages.

*First*, there is no material factual dispute that a contract exists, i.e., the 2016 Settlement Agreement. *Second*, I respectfully disagree with Defendants that DLC has not demonstrated that it has performed its duties under the Agreement because it "refuses to comply with those contract terms" that suspend the timeframe obligations when the Department invokes DSC. [#97 at 18– 19]. There is no contractual term that DLC simply has to accept the Department's invocation of DSC and thereby "comply" with the extensions of time to the overall Agreement. Indeed, as pointed out by Plaintiff, the 2016 Settlement Agreement specifically reserves and contemplates that DLC may challenge the Department's invocation of DSC if the Parties are unable to reach a

resolution as to any disagreement.  [#78-1 at ¶ 6(c)].  And even without that term, the court finds

no law, either statutory or common law, which suggests that a plaintiff's good faith allegations of

contractual breach somehow transforms into a failure to perform its contractual obligations that

then obviates its ability to prove breach.  Therefore, I conclude that there is no material dispute

that DLC has performed its contractual obligation under the 2016 Settlement Agreement.

      *Third*, the court considers whether Defendants failed to perform under the 2016 Settlement

Agreement as of June 2018.  Defendants argue that "for the same reasons discussed above, the

Department's inability to meet the Agreement's timeframes in June 2018 does not amount to

breach."  [#97 at 21].  I respectfully disagree.  As an initial matter, due to the factual disputes as

discussed above, the court cannot conclude at this juncture that Defendants' invocation of DSC in

either or both June and December 2017 was proper under the 2016 Settlement Agreement.  *See*

*supra*, pp. 20–22.  Therefore, the issue of breach has not been resolved in Defendants' favor.

Equally as significant, the 2016 Settlement Agreement does not contemplate that Defendants can

simply ignore the timeframes to which they agreed without breaching the Agreement.  The contract

is clear that a proper invocation of DSC temporarily suspends the timeframe requirements of

Paragraph 2 of the Agreement, thereby precluding a finding of breach based on failure to satisfy

the timeframe requirements.  [#78-1 at ¶ 4(c)].  But nothing in the Agreement suggests that the

Department can simply decline to comply with the timeframes to which it is contractually bound

in Paragraph 2 with the only consequence being the extension of the Agreement's duration for

three months.  [#97 at 21].  If that were the case, there would be no need for Defendants to ever

invoke DSC or justify the Department's inability to comply with the timeframes to which it

knowingly and voluntarily agreed.  [#78-1 at ¶ 15].

The Parties agree that the Department has complied with the timeframes concerning inpatient competency evaluations since May 2018.  [#104 at ¶ 36]. The Parties further agree that the Department has complied with the timeframes concerning outpatient competency evaluations since July 2015.  [*Id.* at ¶ 35].  But there is no dispute that since June 2017, Defendants have failed to maintain a 24-day monthly average for inpatient restorative treatment.  [*Id.* at ¶¶ 34, 38].  And there is also no dispute that the Department did not invoke DSC as of June 2018.  [*Id.* at ¶ 33]. Finally, Defendants identify no other provision of the 2016 Settlement Agreement or other circumstance that excuses them from maintaining a 24-day monthly average for inpatient restorative treatment.  Therefore, this court concludes that the undisputed facts before it establish that Defendants have failed to perform under the 2016 Settlement Agreement as of June 2018 given their failure to maintain a 24-day monthly average for inpatent restorative treatment.

*Finally*, the court considers whether DLC suffered damages.  Defendants do not argue that the individuals who DLC represents have not suffered damages.  Plaintiff argues that Defendants have "violated the constitutional rights of everyone of these detainees by their failure to timely admit and treat them," [#101 at 2], and provides examples of the harms suffered by these individuals.  Therefore, this court concludes that there is no genuine issue of material fact that DLC has suffered damages, and that as of June 2018, Defendants are in breach of the 2016 Settlement Agreement.

## II.   Appropriate Remedies

Having found breach, this court turns to the fourth issue identified by the Parties: the remedies that the court should impose.  Defendants argue that the sole remedy for their breach of the timeframes for inpatient restoration is "the extension of the Agreement by three months for each month during the prior calendar year that the Department was not in full compliance with the

timeliness requirement of this Agreement." [#78-1 at ¶ 4(b)]. Plaintiff argues that the extension of the 2016 Settlement Agreement is not the exclusive remedy for Defendants' breach of contract because the contract does not explicitly limit relief to this exclusive remedy. [#101 at 12]. In addition, Plaintiff urges this court to order immediate compliance upon pain of contempt and attorney's fees and costs. [#101 at 13–15].

### A.    Specific Performance

To the extent that Defendants argue that the only remedy available to Plaintiff is the extension of the 2016 Settlement Agreement under Paragraph 4(c), this court respectfully rejects that argument. It is clear that under Colorado law, specific performance is an equitable remedy for breach of contract. *Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 740 (Colo. 2007) (citing *Setchell v. Dellacroce*, 169 Colo. 212, 216, 454 P.2d 804, 806 (1969)). Here, Defendants do not raise any sovereign immunity concerns about the court's authority to order specific performance of the 2016 Settlement Agreement against a state agency, and in fact it appears expressly waived by Defendants' agreement that DLC may seek enforcement of the Agreement. [#78-1 at ¶ 6(c)]. In addition, while the extension of the contract by three months for each month the Department is out of compliance is a remedy, it is not the exclusive relief that Plaintiff may seek. The contract does not limit Plaintiff's ability to enforce the 2016 Settlement Agreement only as to enforcing the extension of its duration; indeed, the court declines to read such a limitation into the 2016 Settlement Agreement when the Parties have failed to expressly contract for it.

But while the court finds that injunctive relief is appropriate to bring Defendants into compliance with the timeframe requirements for inpatient restoration of 28 days for any individual and a 24-day monthly average, it is not clear based on the record before the court that an order

mandating immediate compliance is feasible or just. The court notes that it is troubled by the fact that the Department has not complied with the timeframes concerning inpatient restoration treatment for almost eighteen months. [#104 at ¶¶34–37]. But the vast majority of the time at issue, i.e., June 2017 to June 2018, is covered by the Department's invocation of DSC—the propriety of which is vigorously contested and yet resolved. And whether the Department's invocation of DSC was proper weighs heavily in the court's consideration of what injunctive relief is necessary and what time Defendants would be provided to come into compliance.[3]

Therefore, while the court finds Defendants in breach of the 2016 Settlement Agreement for their failure to meet the timeframes for inpatient restoration services after June 2018, it declines to enter an order for injunctive relief at this time. Instead, the court **ORDERS** that the Parties be prepared to address an expedited schedule on the issue of whether DSC was properly invoked in June 2017 and December 2017 at the forthcoming Status Conference with the understanding that this court is inclined to permit Defendants no more than six months (and perhaps far less) from the date of any Order disposing of the issue to come back into compliance.

### B.     Attorney's Fees and Costs

Plaintiff also seeks attorney's fees and costs associated with reopening of this action and the enforcement of the 2016 Settlement Agreement under 42 U.S.C. §§ 1983 and 1988. [#96 at

---

[3] The court nevertheless notes that the 2016 Settlement Agreement contemplates that even in the case of a proper invocation of DSC, Defendants are required to "provide a detailed explanation of the basis for invoking Departmental Special Circumstances, a plan to remedy the Departmental Special Circumstance, and the projected timeframe for resolution." [#78-1 at ¶ 6(c)]. Defendants' Notices of Invocation of Department Special Circumstances do not identify a projected timeframe for resolution. [#96-2; #96-3]. And based on the record before the court, it is not clear that the Department has, in any substantive and meaningful way, "provided regular updates agreed upon by the Parties concerning the multi-facted strategies outlined" in the December 2017 Notice. [#96-3 at 8]. Indeed, the lack of invocation of DSC in June 2018 coupled with the lack of a timeframe for remediation to address the extended timeframes for inpatient restoration suggests that a court-imposed deadline may be necessary to break the inertia of the circumstances.

15].  But these Motions do not arise arise under those civil rights statutes, because the claim at issue now is a state contract claim reserved to the court by its own Order retaining jurisdiction. [#52 at ¶ 4; #80 at ¶ 4].  The 2016 Settlement Agreement also has no separate provision that contemplates attorney's fees and costs in conjunction with a motion to enforce.  *See generally* [#78-1].

Colorado applies the "American Rule," which requires each party in a lawsuit to bear its own legal expenses and, "thus, in the absence of an express statute, court rule, or contractual provision to the contrary, attorney fees generally are not recoverable by the prevailing party in a contract or tort action."  *First Citizens Bank & Tr. Co. v. Stewart Title Guar. Co.*, 320 P.3d 406, 413 (Colo. App. 2014).  A narrow exception to the American Rule allows a trial court to award attorney's fees when a party's opponent acts in bad faith, vexatiously, wantonly, or for oppressive reasons.  *See United states v. McCall*, 235 F.3d 1211, 1216 (10th Cir. 2000).  Here there has been no finding of bad faith to date to justify the award of attorney's fees.  Accordingly, I find that a ruling on attorney's fees and costs is premature, and I defer ruling on any request for attorney's fees and the appropriate amount of any such fees until the court completes its adjudication of the enforcement of the 2016 Settlement Agreement.

## CONCLUSION

For the reasons set forth herein, the court hereby **ORDERS** that:

(1)     Plaintiff's Motion for Summary Judgment [#96] is **GRANTED IN PART and DENIED IN PART**;

(2)     Defendants' Motion for Summary Judgment [#97] is **DENIED**; and

(3)     A Status Conference is **SET** for **November 30, 2018 at 9:00 a.m.** to discuss any discovery and to set an evidentiary hearing on the issue of whether the DSC was

properly invoked in June 2017 and December 2017, so that the court can rule upon a forthcoming motion to enforce and to determine the appropriate scope and terms of an injunction going forward to address the Department's performance of inpatient restoration services.

DATED:  November 9, 2018                          BY THE COURT:

 

_____
Nina Y. Wang
United States Magistrate Judge