IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-02285-NYW

CENTER FOR LEGAL ADVOCACY, d/b/a
DISABILITY LAW COLORADO,

      Plaintiff,

v.

MICHELLE BARNES,
in her official capacity as Executive Director
of the Colorado Department of Human Services, and

JILL MARSHALL,
in her official capacity as Chief Executive Officer
of the Colorado Mental Health Institute at Pueblo,

      Defendants.

---

## CONSENT DECREE

## TABLE OF CONTENTS

**Page**

I.     FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
       CONSENT DECREE. ........................................................................ 1

II.    PARTIES, PURPOSE, INTENT ............................................................ 4

III.   JURISDICTION, VENUE, AND STANDING ....................................... 8

IV.    PARTIES BOUND AND INTERPRETATION OF THIS AGREEMENT ................... 8

V.     DEFINITIONS ........................................................................................ 9

VI.    TIMEFRAMES ..................................................................................... 14

    32.   Recent Compliance with Timeframes ........................................ 14

    33.   Timeframes ................................................................................. 14

           (a)   Admission of Pretrial Detainees for Inpatient Competency
              Evaluations and Restoration Treatment ....................... 14

      (b)   Performance of Jail Competency Evaluations ....................... 14

    34.   Interim Jail Mental Health Treatment ........................................ 15

    35.   Release of Pretrial Detainees for Community-Based Restoration
       Treatment .................................................................................... 15

    36.   Transportation of Pretrial Detainees ......................................... 16

    37.   Daily Fines for Non-Compliance with Timeframes ................... 16

    38.   Notification of Non-Compliance with Timeframes .................... 16

VII.   ADDITIONAL REQUIRED ACTION FOR SUSTAINABLE LONG-TERM
       COMPLIANCE ...................................................................................... 17

    39.   Civil Bed Freeze ........................................................................ 17

    40.   Comprehensive and Cohesive Plan ............................................ 18

    41.   Increase Community Restoration Services ................................. 18

    42.   Additional Department Hires ...................................................... 19

      (a)   Forensic Support Team ........................................................ 20

      (b)   Data Management Team ....................................................... 21

    43.   Develop and Implement a Triage System ................................... 21

    44.   Legislative Actions .................................................................... 21

# TABLE OF CONTENTS

(continued)

**Page**

VIII.   SPECIAL MASTER AND REPORTING OBLIGATIONS   ..........................22

    45.   Selection of a Special Master   ..................................22

    46.   Special Master Duties and Reporting   ..........................22

        (a)   Special Master Duties   ..................................22

        (b)   Special Master Reporting   ..............................24

    47.   Visitation and Access   ........................................25

    48.   Compensation   ................................................26

    49.   Resignation or Replacement of Special Master   ..................26

    50.   Duration of Engagement   ......................................26

IX.   REPORTING AND MEETING OBLIGATIONS.   ..........................26

    51.   Compliance Plan Reports   ....................................26

    52.   Monthly Data Reports   ........................................27

    53.   Monthly Cumulative Information Report   ......................28

    54.   Timing of Reports   ............................................29

    55.   Distribution of Monthly Reports   ..............................29

    56.   Meetings   ....................................................29

X.   SPECIAL CIRCUMSTANCES   ..........................................30

    57.   Special Circumstances   ........................................30

        (a)   Special Circumstances Defined   ........................30

        (b)   Effect of Invocation of Individual Special Circumstances   ....31

        (c)   Effect of Invocation of Departmental Special Circumstances   ..............32

        (d)   Effect on Reporting Requirements   ......................33

XI.   DURATION   ..........................................................33

    58.   Duration and Certification   ....................................33

XII.   DISPUTE RESOLUTION AND REMEDIES   ..............................34

    59.   Dispute Resolution   ..........................................34

        (a)   Dispute Resolution Generally   ..........................34

        (b)   Dispute Resolution for Non-Contempt Proceedings   ..............34

## TABLE OF CONTENTS

(continued)

**Page**

    (c)    Dispute Resolution for Contempt Proceedings  .......................................35

  60.   Remedies for Non-Contempt Violations of the Consent Decree  .......................35

    (a)    Timeframe Violations  .................................................................35

    (b)    Material Violations  ..................................................................35

    (c)    Liquidated Damages  ................................................................35

    (d)    Non-Timeframe Violations Adjudicated by Contempt  ..........................36

XIII.   MISCELLANEOUS PROVISIONS  ..................................................................36

  61.   Effective Date of the Consent Decree  ...................................................36

  62.   Remedies by Pretrial Detainees Not Precluded  ....................................36

  63.   Contempt Actions Against Other Agencies, Non-Complying Sheriff's Offices, District Attorney's Offices, and Defense Counsel Not Precluded  ........36

  64.   Complete Consent Decree; Modification; and Waiver  ......................................37

  65.   Attorney's Fees and Costs  .................................................................37

  66.   Written Notice  ...............................................................................38

XIV.   RESERVATION OF JURISDICTION AND ENFORCEMENT  ..................................39

XV.   FINAL JUDGMENT  ..................................................................................40

**TABLE 1**:  TIMEFRAMES AND FINES FOR COMPETENCY SERVICES.  .......................41

THIS MATTER comes before the Court pursuant to the Parties' Joint Motion for Approval and Entry of Consent Decree.

THE PARTIES, by and through their respective counsel, have jointly stipulated to all facts set forth herein and agreed to entry of a consent decree to resolve this Lawsuit under the terms and conditions set forth herein.

THE COURT, having reviewed the Parties' Joint Motion for Approval and Entry of Consent Decree and being fully advised in the matters contained therein, hereby FINDS that good cause exists for approval and entry of the Consent Decree as follows:

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE CONSENT DECREE

1.      On August 31, 2011, Plaintiff, the Center for Legal Advocacy, d/b/a Disability Law Colorado ("DLC") commenced this action (the "Lawsuit") against Defendants Reggie Bicha, in his official capacity as Executive Director of the Colorado Department of Human Services, and Teresa Bernal, in her official capacity as Interim Superintendent of the Colorado Mental Health Institute at Pueblo ("CMHIP"), challenging Defendants' alleged failure to comply with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires Defendants to timely provide competency evaluations and restoration treatment to pretrial detainees in Colorado jails.

2.      The Colorado Department of Human Services (the "Department") has a statutory obligation under C.R.S. §§ 16-8.5-101 *et seq*. (2018) to provide competency evaluations for persons charged with criminal offenses when the issue of competency is raised, and to provide restoration treatment for persons found incompetent to proceed.

3.     The Parties settled the Lawsuit pursuant to a Settlement Agreement executed on April 6, 2012 (the "2012 Settlement Agreement"), which was incorporated into the Order of Dismissal entered by the District Court in the Lawsuit. Dkt. 52.

4.     The 2012 Settlement Agreement included a provision called Special Circumstances, which recognized that to some extent the Department's ability to perform its statutory obligations and its obligations under the 2012 Settlement Agreement is based on factors beyond the Department's control. Dkt. 51-1.

5.     The Department invoked Departmental Special Circumstances on August 3, 2015, citing: (1) the dramatic increase in court referrals for evaluations and treatment; and (2) unprecedented staffing shortages at CMHIP. DLC disputed the Department's invocation and filed a motion to reopen the litigation for enforcement of the 2012 Settlement Agreement, which this Court granted. Dkt. 62. After the Parties conducted settlement negotiations, they entered into an Amended and Restated Settlement Agreement which was filed with the Court on July 28, 2016 (the "2016 Settlement Agreement"). Dkt. 78.

6.     Another dispute has arisen between the Parties. The Department invoked Departmental Special Circumstances for the second time on June 22, 2017, citing in support an unanticipated spike in court-ordered referrals for inpatient competency evaluations and restorations. On December 22, 2017, the day the Department's June 22, 2017 invocation was set to expire, the Department invoked Departmental Special Circumstances for a third time, citing a sustained increase in the number of court-ordered referrals for inpatient competency evaluations and restorations. DLC disputed the Department's second and third invocations as improper under the terms of the 2016 Settlement Agreement. Defendants' present inability to comply with the timeframes required by the 2016 Settlement Agreement has created a lengthy waitlist of pretrial

detainees, some of whom have been forced to wait in jail for more than 150 days for a competency evaluation or restoration treatment.

7.      DLC moved to reopen the action for enforcement of the 2016 Settlement Agreement on June 13, 2018 (Dkt. 82), and this Court entered an order reopening that matter on June 14, 2018. Dkt. 83.

8.      The parties filed cross-motions for summary judgment (Dkts. 96 and 97) and this Court held a September 28, 2018 hearing on them. This Court issued an order on November 9, 2018 granting in part and denying in part DLC's motion for summary judgment and denying Defendants' motion for summary judgment. Dkt. 113. This Court held that: (1) the 2016 Settlement Agreement permits Defendants to invoke Departmental Special Circumstances consecutively; and (2) the Defendants have been in breach of the 2016 Settlement Agreement's timeframes for inpatient restorations since June 2018. *Id.* The Court found that in each month from July 2017 through the present, Defendants have failed to maintain a 24-day monthly average for inpatient restoration treatment. The Court reserved ruling on whether Defendants breached the 2016 Settlement Agreement by their invocations of Departmental Special Circumstances in June 2017 and December 2017 and whether the Defendants acted in bad faith.

9.      The Court set this matter for a five-day evidentiary hearing to commence on March 18, 2019 on whether Defendants properly invoked Departmental Special Circumstances in June 2017 and December 2017, so the Court can rule upon a forthcoming motion by DLC to enforce and to determine the appropriate scope and terms of an injunction going forward to address the Department's performance of inpatient restoration services. Dkt. 113.

10.     After setting the case for hearing and commencing discovery, this Court granted DLC's motion for appointment of a Special Master. Dkts. 117 & 123. On December 28, 2018, the

Court appointed Groundswell Services and its team of Drs. Neil Gowensmith and Daniel Murrie as Special Master in this matter. Dkt. 130. Their duties, duration, and scope are outlined in the Order Appointing Special Master. Dkt. 130.

11.     On January 28, 2019, pursuant to the Court's order, the Special Master submitted a report with a Review of the Department's Plan for Compliance and provided recommendations regarding the Plan. Dkt. 146.

12.     On January 30, 2019, the Parties notified the Court that they agreed to mediate a resolution. The Court stayed discovery production, and the March 18, 2019 hearing was reset to commence on June 3, 2019, in the event mediation was unsuccessful. The Court set a March 15, 2019 deadline to produce a signed Consent Decree or to file a joint status report if the Parties cannot reach an agreement.

13.     This Consent Decree resolves the Lawsuit. This Consent Decree is being entered in order to ensure that pretrial detainees obtain timely competency evaluation and restoration services, while both avoiding harming other persons with mental or developmental disabilities in the Department's care and avoiding protracted, costly and uncertain litigation. The terms of that resolution are embodied in this Consent Decree.

NOW, THEREFORE, with the consent of the Parties to this Decree, it is hereby ORDERED, ADJUDGED, AND DECREED that:

## II.     PARTIES, PURPOSE, INTENT

14.     DLC is an independent nonprofit corporation headquartered in Denver, Colorado. DLC was designated in 1977 by Governor Richard Lamm as Colorado's protection and advocacy system ("P&A System") to protect and advocate for the rights of persons with mental illness and developmental disabilities under the Developmental Disabilities Assistance and Bill of Rights Act. 42 U.S.C. §§ 15041-45. Since 1986, DLC has received federal grants on an annual basis, and has

established and administered a P&A System in Colorado for individuals with mental illness pursuant to 42 U.S.C. §§ 10803 and 10805 of the Protection and Advocacy for Individuals with Mental Illness Act (the "PAIMI Act"). Since 1986, DLC has been and is currently the eligible P&A System for individuals with mental illness in Colorado as defined at 42 U.S.C. § 10802(2).

15.    DLC has a governing board of directors which is composed of members who broadly represent and who are knowledgeable about the needs of individuals with mental illness. DLC's board of directors includes members who have received or are receiving mental health services or who have family members who have received or are receiving mental health services.

16.    DLC's constituents include individuals with mental illness, who have been abused, neglected and/or suffered civil rights violations. DLC has established a PAIMI Advisory Council, over sixty percent (60%) of whose members themselves have received or are receiving mental health services or have family who have received or are receiving mental health services. The PAIMI Advisory Council advises the P&A System on the policies and priorities designed to protect and advocate for the rights of individuals with mental illness. The Chair of DLC's PAIMI Advisory Council, who is also a member of DLC's board of directors, has a family member who has received and is receiving mental health services.

17.    Together, DLC's board of directors and PAIMI Advisory Council have developed the annual priorities and objectives of the P&A System for individuals with mental illness. DLC's PAIMI Program Priorities and objectives state that DLC will monitor facilities, including jails, and investigate reports/complaints of abuse, neglect and rights violations, and take action to remedy any abuse, neglect and/or civil rights violations. When the rights of its constituents are violated, DLC is authorized by statute to pursue legal remedies on their behalf, such as through litigation. 42 U.S.C. § 10805(a)(1)(A)(B) & (C). To the extent DLC expends its resources to protect the rights

of its constituents in county jails waiting for competency evaluations or restoration treatment, its resources are diverted away from assisting other constituents.

18.     DLC has established a public opinion survey for constituents and interested persons, such as family members, to comment on DLC's priorities and objectives and a grievance procedure for clients or prospective clients, which allows its constituents with mental illness and family members of such individuals to assure them that DLC and the PAIMI Program are operating in compliance with the provisions of the PAIMI Act.

19.     DLC's constituents who are detained and charged with crimes are hindered from asserting their own constitutional rights. Obstacles they face include the imminent mootness of individual claims as they are likely to be admitted to CMHIP for restoration treatment during the pendency of any case they might bring. In addition, pretrial detainees who are presumed or determined to be incompetent to proceed are often impaired and unable to direct or participate in litigation on their own behalf.

20.     Defendant Michelle Barnes is sued in her official capacity as the Executive Director of the Colorado Department of Human Services. As relevant here, the Department is responsible under Colorado law for the operation of CMHIP and the provision of competency evaluations and restoration treatment. Forensic Services within the Department's Office of Behavioral Health provides court-ordered competency evaluations.

21.     Defendant Jill Marshall is sued in her official capacity as the Chief Executive Officer of CMHIP. As relevant here, CMHIP currently is the state's principal forensic mental health hospital that accepts custody of pretrial detainees for competency evaluations and restoration treatment.

22.     This Consent Decree will require the Department to ensure that thousands of future pretrial detainees will not be forced to wait in jail for months before receiving their court-ordered competency evaluations and restoration treatment in violation of their constitutional rights; at the same time, the Department will avoid negatively impacting other persons with mental health or developmental disabilities or juveniles in their care. In doing so, the Department will be required to implement concrete reforms that will allow for long-term compliance with this Consent Decree. The Parties believe that with the guidance of the Court and the Special Master (to be discussed *infra*) the Department will be able to:

(a)     Develop a comprehensive, cohesive approach to planning to maintain compliance with this Consent Decree.

(b)     Adhere to the admission timeframes for pretrial detainees, and at the same time avoid causing harm to and/or displacement to other people with mental or developmental disabilities in their care.

(c)     Maximize the use of competency services in the community, by funding, developing, recruiting, and supporting a variety of community services. Dkt. 146.

(d)     Create a team that will develop a centralized, data-driven system that captures, analyzes, and disseminates data in a reliable and meaningful manner to inform decisions and planning. *Id.*

(e)     Develop and implement a triage system that considers clinical needs to assign individualized services. *Id.*

(f)     Implement state-wide uniform standards for competency evaluators and evaluations and conduct rigorous training for forensic evaluators and restoration providers to ensure evaluations are of high quality. *Id.*

(g)     Prepare budget requests and propose and support legislation which are calculated to meet the terms of the Consent Decree and take all necessary next steps and exert good faith efforts to obtain adequate funding from the Colorado General Assembly.

## III.   JURISDICTION, VENUE, AND STANDING

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because it arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

24.     Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to this Complaint occurred in this District.

25.     DLC has standing in the Lawsuit to assert due process claims on behalf of its constituents, persons within the State of Colorado with a mental illness and/or intellectual disability who have been charged with a criminal offense, ordered to receive a competency evaluation or restoration treatment, and who await the provision of that treatment in Colorado jails.

## IV.   PARTIES BOUND AND INTERPRETATION OF THIS AGREEMENT

26.     In entering this Consent Decree, Defendants do not admit any violation of law. This Consent Decree shall not be interpreted in any court, administrative, or other proceeding as evidence of Defendants' liability.

27.     The parties agree that the right to timely competency services implicates rights secured and protected by the Fourteenth Amendment of the United States Constitution, Article 1, and 42 U.S.C. §1983.

28.     This Consent Decree is legally binding and judicially enforceable. This Consent Decree shall be applicable to and binding upon the parties, their officers, agents and employees, and their successors and assigns.

29.     Until the Consent Decree is terminated, the parties hereby consent to the Court's continuing supervision in this matter, until further order of the Court, and to its authority to interpret the provisions of this Agreement, to review and adopt plans necessary to implementation of its terms, to modify its terms as may be needed to effect its purposes, and to take appropriate actions within its equitable powers to ensure its enforcement and the fulfillment of its terms and purposes.

30.     The terms of this Consent Decree shall be interpreted consistent with its overall purposes and principles.

## V.    DEFINITIONS

31.     The following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Consent Decree):

(a)     "Arrest Date" means the day, month, and year a Pretrial Detainee was arrested for the case in which competency has been raised.

(b)     "Collateral Materials" means the relevant police incident reports and the charging documents, either the criminal information or indictment.

(c)     "Community-Based Competency Evaluation" means a Competency Evaluation of a Community-Based Service Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

(d)     "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Service Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

(e)      "Community-Based Services Recipient" means a defendant who has been ordered to receive a Community-Based Competency Evaluation or Restoration Treatment.

(f)      "Competency Evaluation" means a court-ordered evaluation for competency to proceed, administered by the Department, and the accompanying report prepared by the Department and more fully described in C.R.S. §§ 16-8.5-103, 105.

(g)      "Competency Services" means Competency Evaluations and Restoration Treatment.

(h)      "Competency Services Recipient" means a Pretrial Detainee or a Community-Based Services Recipient.

(i)      "Competent to Proceed" means that a court has ordered that a defendant in a criminal case does not have a mental disability or developmental disability that prevents the defendant from having sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents the defendant from having a rational and factual understanding of the criminal proceedings. C.R.S. § 16-8.5-101(4).

(j)      "County Jail" means a jail or detention facility which houses a Pretrial Detainee. County Jail does not include a behavioral health unit located within a county jail (e.g., RISE).

(k)      "Court Order" means a written order, issued by a court, and signed by a judge that directs the transfer of custody of a Pretrial Detainee to the Department.

(l)      "Court Liaison" means a person who is hired by the Colorado Judicial Branch's State Court Administrator's Office as a dedicated behavioral health court liaison in each state judicial district, pursuant to C.R.S. §§ 16-11.9-203, 204, who facilitates

10

communication and collaboration between judicial and behavioral health systems, and keeps judges, district attorneys, and defense attorneys informed about the availability of community-based behavioral health services.

(m) "Days Waiting" means the number of days elapsed between the Ready for Admission date and the Offered Admission date.

(n) "Department" means the Colorado Department of Human Services. Any reference to the Department includes the Office of Behavioral Health and the Hospital, which are divisions of the Department and do not have independent authority or obligations under Title 16, Article 8.5, C.R.S.

(o) "Department Plan" mean the Department's comprehensive description of its efforts to achieve long-term compliance with this Consent Decree by providing timely competency services without undermining the broader system of mental health care.

(p) "Evaluator Signed Date" means the date the Jail Competency Evaluation is signed by the evaluator after having been completed.

(q) "Hold and Wait Evaluation" means an in-custody evaluation of a Pretrial Detainee that is conducted in another facility, after transport by the sheriff of the commitment county to the alternative facility. For example, a sheriff in a county in which there are no evaluation services may transport the Pretrial Detainee to the nearest county where these services are available, wait for the evaluator to complete the interview and examination, and return the Pretrial Detainee to the jail in the county of commitment.

(r) "Hospital" means the Colorado Mental Health Institute at Fort Logan (CMHIFL) or Colorado Mental Health Institute at Pueblo (CMHIP).

(s)     "Inpatient Competency Evaluation" means a Competency Evaluation of a Pretrial Detainee that is ordered to be performed at the Hospital or in a separate locked facility that is established for the purpose of providing Inpatient Competency Evaluations and Restoration Treatment. This includes Competency Evaluations conducted at the RISE program or a similar program located on a dedicated behavioral health unit at a county jail.

(t)     "Inpatient Restoration Treatment" means the Restoration Treatment of a Pretrial Detainee that is performed at the Hospital or at a separate locked facility that provides comprehensive Restoration Treatment to the Pretrial Detainee. This includes Restoration Treatment that is provided at the RISE program or a similar program located on a dedicated behavioral health unit at a county jail.

(u)     "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the timeframes in the Consent Decree.

(v)     "Jail Competency Evaluation" means a Competency Evaluation performed in the County Jail where the Pretrial Detainee is being held.

(w)     "Medically Cleared" means that a Pretrial Detainee is, in the opinion of the Department's medical staff, appropriate for Inpatient Competency Evaluation or Inpatient Restoration Treatment.

(x)     "Offered Admission Date" means the date the Department offers the Pretrial Detainee admission for Inpatient Restoration Treatment or Inpatient Competency Evaluation. Before the Department offers admission to a Pretrial Detainee, the following three criteria must be satisfied: (1) the Department has an open bed for the Pretrial Detainee

12

at the location for the Inpatient Evaluation or Inpatient Restoration Treatment; (2) the location for Inpatient Evaluation or Inpatient Restoration Treatment is ready to receive the Pretrial Detainee for admission; and (3) the Department notifies the County Jail of the same.

(y)     "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services. Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

(z)     "Ready for Admission Date" means the date on which the Department has received the Court Order for Competency Services and, in the case of Competency Evaluations or Restoration Treatment when the Competency Evaluation was not conducted by the Department, the Department has also received the Collateral Materials.

(aa)     "Restoration Treatment" means mental health care and treatment provided for the purpose of restoring a Competency Services Recipient.

(bb)     "Settlement Payment" has the meaning set forth in Part XIII.

(cc)     "Special Master" means Court-appointed Groundswell Services and its team of Drs. Neil Gowensmith and Daniel Murrie (Dkt. 130), or any successor appointee whose duties and authority are set forth in Dkt. 130 and in this Consent Decree.

(dd)     "Tier 1" means a Pretrial Detainee who has been ordered to   receive Inpatient Restoration Treatment and whom a competency evaluator has determined either: (1) appears to have a mental health disorder and, as a result of such mental health disorder, appears to be a danger to others or to himself or herself, or appears to be gravely disabled

or (2) has a mental health disorder, and as a result of either (1) or (2), delaying hospitalization beyond seven days would cause harm to the Pretrial Detainee or others.

(ee)    "Tier 2" means a Pretrial Detainee who has been ordered to receive Inpatient Restoration Treatment and who does not meet Tier 1 criteria.

## VI.    TIMEFRAMES

32.    <u>Recent Compliance with Timeframes</u>. The Department has been out of compliance with the 2016 Settlement Agreement Timeframes to provide timely restoration services since June 2017. The Department has complied with the required timeframes to provide competency evaluations since May 2018 but was out of compliance for those timeframes from June 2017 to April 2018. Dkt. 113 ¶ 39 & Chart 2.

33.    <u>Timeframes</u>

(a)    <u>Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment.</u> The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (**Table 1**). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

(b)    <u>Performance of Jail Competency Evaluations</u>. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (**Table 1**), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will

be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

34.     Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

35.     Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

36.    <u>Transportation of Pretrial Detainees.</u>  If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

37.    <u>Daily Fines for Non-Compliance with Timeframes.</u>  Beginning on June 1, 2019, through the conclusion of the Consent Decree, the Department agrees to comply with timeframes and fines as set forth in the attached table (**Table 1**). Such fines shall be capped on a June 1 to May 31 timeframe at $10,000,000, indexed for inflation yearly pursuant to the CPI-U. The liquidated damages for material violations as set forth in Paragraph 60(c) shall not be counted toward this cap.

38.    <u>Notification of Non-Compliance with Timeframes.</u>  The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a)    Only one notice per Pretrial Detainee shall be provided and should include:

(i)    The name of the Pretrial Detainee;

(ii)    The Pretrial Detainee's location;

(iii)    The Pretrial Detainee's charges based on information available to the Department;

(iv)    The Pretrial Detainee's bond amount based on information available to the Department;

(v)    Whether a forensic assessment has been made on whether restoration in the community is appropriate;

(vi)    Whether the Pretrial Detainee has previously been found incompetent;

16

(vii)     What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b)     The Department shall accompany its Monthly Data Report (*see* Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c)     The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in an interest-bearing account created for the purpose of funding non-Department services for persons with mental illness. The account will be managed by a third-party agreed upon by the parties; the parties will identify and agree to said third-party no later than **December 31, 2019**. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines or third-party account manager shall be handled through the dispute resolution process identified in Paragraph 59.

## VII.    ADDITIONAL REQUIRED ACTION FOR SUSTAINABLE LONG-TERM COMPLIANCE

39.     Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from

17

the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

40.     <u>Comprehensive and Cohesive Plan</u>. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

41.     <u>Increase Community Restoration Services</u>. The Parties agree that the Department is responsible for directly providing or contracting with individuals or agencies to provide Competency Services. The Parties agree that County Jails are not the best place for Pretrial Detainees to wait for treatment or receive treatment. The Parties agree that it is in the best interests of some Pretrial Detainees to receive Competency Services in the community, as those Pretrial Detainees will avoid unnecessary institutionalization and will receive treatment in the least restrictive environment. Additionally, the movement of appropriate Pretrial Detainees to the community will lessen the need for more Hospital beds and hiring additional qualified staff by the Department. The Parties agree that increased community restoration is a key component to comply with the timeframes in this Consent Decree as to Competency Services. The Special Master's

Recommendation Number 2 is for the Department to "[r]educe emphasis on inpatient beds and increase emphasis on community services." Dkt. 146 at 17. The Special Master's Recommendation Number 3 is to "[f]urther prioritize outpatient competence restoration." Dkt. 146 at 23. As a result, the Department shall:

      (a)    Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

      (b)    The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

      (c)    The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

      42.    <u>Additional Department Hires.</u> By June 1, 2019, the Department shall submit a plan to the Special Master and DLC to hire the following positions by August 1, 2019. The

Department's plans and job descriptions shall be guided by the recommendations of the Special Master and the January 28, 2019 Special Report. *See* Dkt. 146.

     (a)    <u>Forensic Support Team.</u> The Forensic Support Team will be formalized to follow the Special Master's Recommendation Number 6. Dkt. 146. The team will include a full-time Supervising Coordinator who is familiar with the Department's duties and obligations herein, as well as the Department's and Hospital's processes and procedures in providing services to Pretrial Detainees, and whose responsibilities will include to: (1) interface with the Colorado Department of Health Care Policy and Financing (HCPF) regarding persons ordered to be evaluated for competency and those determined to be incompetent; (2) confer with the Special Master; (3) focus on budget and cost of inpatient versus outpatient care; (4) work directly with Office of Behavioral Health staff to assist in reducing the waitlist and meeting the timeframes of the Consent Decree; and (5) interface with the Court Liaisons or representatives funded by the judiciary to interface with the courts, Department, and community mental health centers. The Supervising Coordinator will work directly with the Special Master to ensure the Department's compliance with the terms of this Consent Decree and to assist with other issues involving Pretrial Detainees on an individual or system-wide basis to increase the Department's performance with providing timely Competency Services. In addition, the Forensic Support Team will include an effective number of coordinators (to be approved by the Special Master) responsible for each judicial district who can provide a centralized structure for stakeholders to immediately access detailed information about programs, clients, and settings and can complement the Court Liaison Program.

(b)    <u>Data Management Team.</u> The Data Management Team will be formalized in a plan on the schedule identified in Paragraph 42 to follow the Special Master's Recommendation Number 5. Dkt. 146. This team will be dedicated and designed to specifically assist with implementation of the Department's Plan by collecting specific data on which the Department will base its projections and recommendations, calculate inpatient bed space, assess community restoration capacity, and determine financial estimates. The team will be comprised of at least three full-time employees dedicated to collecting and analyzing data affecting the competency system. The Special Master shall approve of the type of employees that shall be hired to comprise the Data Management Team.

43.    <u>Develop and Implement a Triage System.</u> The Special Master's Recommendation Number 4 recognizes a need for the Department to prioritize a triage approach over traditional waitlist approaches. Dkt. 146 at 27. Therefore, by June 1, 2019, the Department shall develop and implement a triage system to screen each Pretrial Detainee and make recommendations to the committing court as to the most clinically appropriate level of care to restore the Pretrial Detainee to competency. The Department shall seek suggestions from the Special Master on the development of a triage system, and two weeks prior to the implementation of the triage system it shall be approved by the Special Master. The Department shall continue to fine-tune the triage system with the assistance of the Special Master and shall include the progress of the triage system in its annual submission of the Department Plan.

44.    <u>Legislative Actions.</u> The Parties agree that they will not propose, sponsor, or support any legislation that would violate the terms of this Consent Decree. The Department will provide DLC and the Special Master with all budget requests and proposed legislation affecting

this Consent Decree when they are sent to the Colorado General Assembly. The Special Master shall provide its opinion and recommendations on the proposed legislation and how it could impact the short- or long-term compliance with the Consent Decree. A copy of the final budget approved by the Colorado General Assembly shall be sent to the Special Master and DLC immediately following approval of the budget.

## VIII.   SPECIAL MASTER AND REPORTING OBLIGATIONS

45.   <u>Selection of a Special Master</u>. The Court has appointed Groundswell Services and its team of Drs. Neil Gowensmith and Daniel Murrie as the Special Master. Dkt. 130.

46.   <u>Special Master Duties and Reporting.</u> The Special Master's duties have been set forth by the Court in its Order appointing the Special Master and are fully incorporated and amended as set forth in this Consent Decree. Dkt. 113 at 6-7 §§ A(1)-(11); *id.* at 7-8 § B.

(a)   <u>Special Master Duties</u>:

(i)   Review and approve of the Department's Plans to increase timeliness of performance of Competency Services.

(ii)   Recommend plans for the Department's consideration that propose methods for addressing short- and long-term compliance with the timeframes for Competency Services that may ultimately be adopted in whole or in part as part of the Court's injunctive relief to address the ongoing breach of the Amended and Restated Settlement Agreement, and compliance with the Consent Decree.

(iii)   Develop a system of data collection, review, and analysis of Departmental data and continued monitoring related to Competency Services, to include reporting by the Department to the Special Master (timing identified below) and reporting by the Special Master (timing identified below) analyzing such data and making recommendations to the Court and the Parties based on such data.

(iv)    Identify actual areas within the statewide system which have caused, are causing, or may cause non-compliance with the timeframe requirements of the Consent Decree concerning delivery of Competency Services.

(v)    Make recommendations to the Department for improved performance in the timely delivery of Competency Services.

(vi)    Assist and approve the Department's design of a plan to address compliance with the Consent Decree timeframes concerning delivery of Competency Services, support the Department's implementation of its plan, and monitor the Department's compliance with all terms of the Consent Decree during the duration of the Appointment.

(vii)    Survey the Department's efforts to attain compliance with the Consent Decree's timeframe requirements concerning delivery of Competency Services and report to the Court and Parties (timing identified below) on the progress towards reaching compliance on those timeframes on a monthly basis, including documenting which efforts require action or approval by third parties.

(viii)    Assist the Court in fashioning and evaluating compliance with any future sanctions or injunctive relief ordered by the Court.

(ix)    Make other recommendations to the Court and the Parties on how to improve delivery of Competency Services for the purpose of effectuating compliance with the Consent Decree timelines concerning delivery of Competency Services, including how to audit the Department's performance.

(x)    Approve of the Department's planning and implementation of Section VII above.

(xi)    Submit reports to the Court and the Parties, as defined in Dkt. 130, the timing identified below.

(b)    <u>Special Master Reporting:</u>  In order for the Special Master to make such recommendations to the Court and the Department as specified above, the Department shall provide all information the Special Master seeks for the purpose of carrying out its specific duties and obligations or which are reasonably related to this Consent Decree.

(i)    As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019.  Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.

(ii)    The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

(iii)     The Special Master shall have reasonable access to, and the Department shall provide the Special Master with, all records that the Special Master requests within a reasonable timeframe from the date of such request. The Special Master shall be able to request the Department organize the data in a format which is necessary for the Special Master's efficient review. As a component of its reporting, the Special Master may select a sample of Pretrial Detainees from the Department's monthly reporting and audit the timeliness by the Department of that sample's Offered Admission dates for Competency Services. The Special Master shall include its findings of any such audit in its reports, and those reports shall be provided to the Parties and filed with the Court, with any private or confidential information redacted from the public filing. This Consent Decree meets the By Law exception to HIPAA's confidentiality mandates for the exchange of health care records and information.

(iv)     The Special Master shall have the right to confer and subcontract with additional experts (but not allow double billing), as it determines in the exercise of its professional judgment would be helpful to the Court or the Parties, including for preparation of additional reports, studies, or research.

(v)     The Special Master's report shall include the Department's responses to the Special Master's recommendations, at the Special Master's discretion.

47.     Visitation and Access. The Special Master shall have the general authority and responsibility to: visit and access Colorado facilities; confer with stakeholders in the criminal justice and mental health systems; review documents, staff procedures, and records of individuals

who are subject to this Consent Decree; and access budget and resources available, and funding streams related to, the Department's duties under the Consent Decree and Competency Services. Neither the Special Master nor the Parties shall publicly disclose information obtained by the Special Master pursuant to this paragraph, which would otherwise be privileged or confidential, without consent of all the Parties and/or order of the Court.

48.    Compensation. For the duration of this Consent Decree, the Special Master's invoices must be submitted to the Court for payment by the Department. The Department shall compensate the Special Master and its staff at the Special Master's standard rates. The Department shall reimburse all reasonable expenses of the Special Master and its staff consistent with the State's government rates, procurement guidelines, and Department policy, including for travel and accommodations.

49.    Resignation or Replacement of Special Master. In the event the Special Master resigns or otherwise becomes unavailable, the Parties shall attempt to agree on a successor Special Master with relevant experience and shall jointly present the candidate to the Court for appointment. If the Parties are unable to agree, the Parties will submit a joint list of candidates to the Court for selection and appointment by the Court. If either Party has a concern with the Special Master, it may bring a motion before the Court under Federal Rule of Civil Procedure 53.

50.    Duration of Engagement. The Special Master shall be engaged and paid for by the Department for the duration of the Consent Decree.

## IX.    REPORTING AND MEETING OBLIGATIONS

51.    Compliance Plan Reports. The Department will provide monthly reports to DLC and the Special Master in compliance with the Order for Special Master. Dkt. 113 at A. 9. The first report was produced on February 28, 2019. The Parties agree that the reports shall be due seven days after the first of every month commencing April 1, 2019, or on the next business day if the

seventh day of the month falls on a weekend or holiday. The Special Master and the Parties will agree on the content and organization of those reports, which will include an update on all the aspects of compliance included in Sections VI and VII, as well as an update on the recommendations of the Special Master and the Department's efforts and responses to those recommendations.

52.     Monthly Data Reports.

(a)     In an organized format approved by the Special Master, as long as this Consent Decree remains in force, the Department's monthly data reports will identify:

(i)     The Competency Services Recipient for whom a Court Order for Restoration Treatment, Competency Evaluation, or Collateral Materials has been received by the Department (even if no other data is available during that month) to include:

(1)     The name of the referred Competency Services Recipient;

(2)     The Competency Services Recipient's CMHIP Patient ID number, if applicable;

(3)     The county or counties referring the Competency Services Recipient;

(4)     The case number(s) of the criminal case(s) in which the Court Order was issued;

(5)     The date of the Competency Services Recipient's arrest and bond amount, as shown in the Department's records;

(6)     The date of the Court Order;

(7)     The type and location of Competency Services ordered;

(8)     The date the Court Order was received by the Hospital;

(9)     The date that the Department learned that the Court Order was vacated or converted to another type of evaluation or restoration process;

(10)   The date the Collateral Materials were received by the Department;

(11)   The Evaluator Signed Date;

(12)   The defense attorney's name if shown in the Department's records;

(13)   The criminal charges filed against the Competency Services Recipient as shown in the Department's records;

(14)   The Ready for Admission date;

(15)   The Offered Admission date;

(16)   The Hospital's Offered Admission deadline for that specific Pretrial Detainee, based on the Ready for Admission date;

(17)   The date of admission;

(18)   The type of Competency Service;

(19)   The location of the Competency Service;

(20)   The number of Days Waiting for each Pretrial Detainee;

(21)   The number of days between the Ready for Admission Date and the date of the monthly report for each Pretrial Detainee awaiting admission;

(ii)   A list of Pretrial Detainees for whom the Department has invoked Individual Special Circumstances and its reasons for doing so; and

(iii)   If there is a wait list or backlog for Competency Services, a list of the Pretrial Detainees waiting the longest to the shortest number of days.

(b)   The content and categories of the Monthly Report may be subject to change as programs are established or upon request from the Special Master.

53.   <u>Monthly Cumulative Information Report</u>. The Department will generate another report monthly that will include cumulative information designed to allow the Special Master and DLC to monitor the historic areas that have caused delayed admissions in the past. Specifically,

the Department has cited dramatic increases in referrals and unprecedented staffing shortages. The Special Master also believes a lack of community restoration services has contributed to delayed admissions. In a format accepted by the Special Master, and possibly integrated into the Monthly Compliance Report, this report will include the following information: (1) the number of referrals for Competency Services each month, including the type and location for each; (2) the number of staff employed each month by category (nursing positions, security positions, mental health professionals, etc.) and how many vacancies remain in each staffing category; (3) the number of temporary staff and the number of security staff employed each month; and (4) the number of Pretrial Detainees identified for Community-Based Restoration Treatment and the movement of those Pretrial Detainees into the community. The Special Master shall also assist the Department at their request in developing reporting protocols, Competency Services Recipient data, and formats for updating the parties on Consent Decree activities.

54.     Timing of Reports. The first report under this Consent Decree shall be made on April 8, 2019. Thereafter, monthly reports shall be provided on the seventh day of each month following the reporting month or on the next business day if the seventh day of the month falls on a weekend or holiday.

55.     Distribution of Monthly Reports. The monthly report shall be provided to DLC and the Special Master in Microsoft Access format and PDF format, unless another format is agreed upon in writing by the Parties and the Special Master.

56.     Meetings. The Special Master shall convene and chair meetings and disseminate a written summary of each meeting. The summary shall include action steps and agreements of the parties including timeframes for follow-up activities. During the first year after the Effective Date, meetings shall be held monthly, and quarterly thereafter, but may be scheduled at greater intervals

at the Special Master's discretion. The Parties shall treat the meetings as a serious opportunity to raise concerns or potential barriers with the system of institutions involved in achieving or maintaining full compliance with the Consent Decree. Each Party shall designate appropriate senior representatives, based on the agenda for each meeting, to participate in the meetings so that meaningful discussion can occur, and may include outside stakeholders, as appropriate based on the agenda. The first monthly meeting shall be scheduled for a mutually agreeable date in April 2019.

## X.   SPECIAL CIRCUMSTANCES

57.   <u>Special Circumstances</u>. To some extent, the Department's ability to perform its statutory obligations and its obligations under this Consent Decree may be based on factors beyond its control. As a result, and subject to the terms and conditions of this Paragraph, the timeframe requirements of this Consent Decree may be temporarily suspended in the following circumstances:

(a)   <u>Special Circumstances Defined.</u> The Department may invoke, under this Paragraph 57, two categories of Special Circumstances:

(i)   "Individual Special Circumstances" means a situation that delays the Offer of Admission to a Pretrial Detainee, where the circumstances are not within the control of the Department. Individual Special Circumstances is a flexible concept. These situations may include, for example and without limitation, the following: (1) requests by a court, County Jail, defense counsel, or the Department that admission be delayed because additional information or testing required for the evaluation is outstanding; (2) a court has ordered a Hold and Wait Evaluation, and the sheriff must transport the Pretrial Detainee to the nearest county where there are services available; (3) the Pretrial Detainee is not Medically Cleared for admission

due to illness or other non-psychiatric medical need, but not a need that can be satisfied by a plan for a reasonable accommodation; or (4) when the Pretrial Detainee is approaching the deadline for transfer to an inpatient facility, restoration to competency is imminent, and treatment providers responsible for the Pretrial Detainee's care determine that transfer is not clinically appropriate. Upon resolution of the Individual Special Circumstance, the Pretrial Detainee must be Offered Admission for Competency Services immediately but no longer than three days, unless in derogation of a Tier 1 need, in which case the Pretrial Detainee will be offered the next available bed.

(ii)    "Departmental Special Circumstances" means circumstances the Department could not reasonably foresee, prepare for, address through advanced planning, and that are beyond the control of the Department, which impact the Department's ability to comply with this Consent Decree. The failure or refusal of the Colorado General Assembly (or any other funding source) to adequately fund the Department's operations, programs, or plan shall not be considered a Departmental Special Circumstance. In order to invoke this paragraph, the Department would first need to obtain consent from DLC or seek relief and have such relief granted under the dispute resolution paragraph outlined below.

(b)    Effect of Invocation of Individual Special Circumstances.    DLC and the Special Master will review the reporting of Individual Special Circumstances. If DLC questions the Department's invocation of Individual Special Circumstances, the Parties will confer to review the reasons for invocation of Individual Special Circumstances and to determine issues for resolution. Additionally, the Department may proactively seek

31

confirmation that an event qualifies as an Individual Special Circumstance by contacting a representative of DLC or the Special Master in advance of formal reporting of the event. If the Department believes Individual Special Circumstances have become a systemic issue, it will follow the Departmental Special Circumstances procedure below. The Parties shall use good faith efforts to try and resolve any disputes concerning the invocation of Individual Special Circumstances. However, if the Parties do not reach an agreement through good faith efforts at resolution, the Parties will follow the dispute resolution process described in Section XII.

(i)     If the Parties agree to the invocation of Individual Special Circumstances for a particular Pretrial Detainee, the timeframe requirements of this Consent Decree shall be suspended as to that individual Pretrial Detainee for a period to be determined by the Special Master.

(ii)    The Department may invoke Individual Special Circumstances more than once for the same Pretrial Detainee, but it must follow the notification and conferral procedures in Paragraph 57(b) each time it seeks to invoke Individual Special Circumstances.

(c)    Effect of Invocation of Departmental Special Circumstances.    If the Department determines that Departmental Special Circumstances exist, it shall notify the Court, the Special Master, and DLC in writing, and in such notification, the Department shall provide a detailed explanation of the basis for invoking Departmental Special Circumstances, a plan to remedy the Departmental Special Circumstances, and the projected timeframe for resolution. The period of Departmental Special Circumstances shall commence on the date that the Notice of Departmental Special Circumstances is

provided to the Court. Upon the invocation of Departmental Special Circumstances, the timeframe requirements of this Consent Decree shall be automatically suspended for six months, unless the Department notifies DLC that a shorter time is sufficient to resolve Departmental Special Circumstances, commencing with the month in which the Notice of Departmental Special Circumstances is provided to the Court. The Department shall provide written notice to DLC of its intent to terminate Departmental Special Circumstances. Upon DLC's receipt of a Notice of Departmental Special Circumstances, it may request supporting documentation for the Department's notice, and the Parties shall confer to review the reasons for invocation of Departmental Special Circumstances, to resolve questions that the Special Master or DLC may have about the circumstances that triggered the notice, and to assess whether the Parties are able to resolve any disagreement concerning invocation of Departmental Special Circumstances. If DLC decides to challenge the invocation of Departmental Special Circumstances, it may do so by following the dispute resolution procedure identified in Section XII. The Department is prohibited from invoking Departmental Special Circumstances consecutively. The Department cannot invoke Departmental Special Circumstances any sooner than June 1, 2021.

(d)     Effect on Reporting Requirements.   A Notice of Departmental Special Circumstances shall not affect the Department's reporting obligations under this Consent Decree. In addition to such reporting obligations, the Department will provide a monthly written status report to DLC and the Special Master on its plans and progress to remedy Departmental Special Circumstances.

## XI.   DURATION

58.   Duration and Certification. The terms and provisions of this Consent Decree shall remain in force until December 1, 2025, except that a sustained period of two years of compliance

by the Department with all terms of this Consent Decree, including the strictest timeframes identified herein, as certified by the Special Master, shall result in termination of this Consent Decree. In the event the Department complies with all terms of this Consent Decree and the strictest timeframes for one year, while concurrently reducing Tier 2 timeframes to 21 days for that one year period, such compliance shall result in termination of this Consent Decree.

## XII.   DISPUTE RESOLUTION AND REMEDIES

59.   <u>Dispute Resolution.</u>

(a)   <u>Dispute Resolution Generally.</u>  Any dispute concerning the interpretation or implementation of this Consent Decree, other than those for which DLC seeks the remedy of contempt, shall first be submitted to the Special Master, who shall attempt to informally mediate and resolve the dispute. The Special Master may make use of such informal dispute resolution processes as it deems necessary, which may include, but are not limited to, informal suggestions or recommendations and compulsory conferences of the Parties.

(b)   <u>Dispute Resolution for Non-Contempt Proceedings.</u>  If informal attempts fail to resolve the matters identified in the preceding paragraph, or if the Special Master believes the Department has materially violated this Consent Decree or has in some other manner acted in bad faith, the Special Master or any Party may submit a written request to Judge Hegarty (or, in the event he is no longer serving as a <u>magistrate</u> judge in this District, a magistrate judge successor or someone mutually agreed upon by the parties) for an evidentiary hearing, requesting specific relief and a decision. A copy of this request shall be served upon opposing counsel and the Special Master. Judge Hegarty shall determine whether the dispute requires an evidentiary hearing, and, if so, schedule such hearing at the convenience of the Parties. Judge Hegarty shall file a written decision supported by written findings of fact and may impose any relief permitted by this Consent Decree. This includes,

but is not limited to, attorney's fees. Judge Hegarty's decision shall become final and binding upon the Parties.

(c)   <u>Dispute Resolution for Contempt Proceedings.</u>   In the event that DLC believes the Department's violation of this Consent Decree warrants contempt, DLC shall first attempt mediation through Judge Hegarty, who will conduct the proceeding on an expedited basis. Upon a finding by Judge Hegarty that the matter cannot be mediated, DLC may file a Motion for Order to Show Cause on the matter in controversy with this Court.

60.   <u>Remedies for Non-Contempt Violations of the Consent Decree</u>.

(a)   <u>Timeframe Violations</u>.   The Parties agree that, in addition to the fines set forth in Paragraph 37 and the penalties set forth in Paragraph 60(b), DLC shall be entitled to seek its attorney's fees and costs for pursuing such violations. In no event, however, shall the Department be subject to contempt strictly for violations of the timeframes for the delivery of Competency Services, except that sustained and/or egregious violations of those timeframes may constitute a material violation of this Consent Decree.

(b)   <u>Material Violations.</u>   Upon a finding of a material violation, Judge Hegarty may order immediate enforcement of the agreement, order injunctive relief, impose liquidated damages (as detailed below), attorney's fees, or fashion any other relief deemed appropriate for the Department's violation of this Consent Decree.

(c)   <u>Liquidated Damages</u>.   The Parties further agree that if Judge Hegarty finds a material violation of this Consent Decree, the damages sustained by the Pretrial Detainees because of such violation would be difficult, if not impossible, to ascertain. The Parties agree to provide for damages rather than a penalty and agree that in addition to other remedies available to DLC, Judge Hegarty can award liquidated damages of up to $10,000

a day for each day Judge Hegarty determines the violation to have occurred and continuing until the violation is remedied.

      (d)    <u>Non-Timeframe Violations Adjudicated by Contempt</u>.  Nothing set forth herein is intended to, or in any way shall, limit the Court's power to enforce the Department's compliance with this Consent Decree through contempt (except for a violation of the timeframes, which the parties have agreed is not subject to contempt). In such proceedings, the Court shall have all powers afforded by law to remedy the contempt and/or punish the Department for violation of this Consent Decree.

## XIII.  MISCELLANEOUS PROVISIONS

61.    <u>Effective Date of the Consent Decree.</u>  This Consent Decree shall become effective on the date of the Court's entry.

62.    <u>Remedies by Pretrial Detainees Not Precluded</u>.  Nothing in this Consent Decree limits a Pretrial Detainee, or his or her counsel, from bringing other court action, such as contempt of court proceedings, if the circumstances warrant such action. However, the provisions of this Consent Decree are intended to be enforced solely by the United States District Court for the District of Colorado. In any court action brought by a Pretrial Detainee for contempt of court, the Department retains all defenses to such action, including but not limited to those attending C.R.C.P. 107. Nevertheless, the Parties agree that the terms of this Consent Decree are not binding or enforceable as to individual Pretrial Detainees, because they are not parties to this Lawsuit.

63.    <u>Contempt Actions Against Other Agencies, Non-Complying Sheriff's Offices, District Attorney's Offices, and Defense Counsel Not Precluded</u>.  Nothing in this Consent Decree

precludes any court from issuing contempt citations to sheriffs for failing to comply with orders to transport Pretrial Detainees to or from the Hospital, district attorneys for violating timelines

ordered by courts to provide Collateral Materials, or defense attorneys who fail to comply with orders related to Competency Services.

64.     _Complete Consent Decree; Modification; and Waiver_.   This Consent Decree constitutes the entire agreement between the Parties and supersedes all prior and contemporaneous agreements, representations, warranties, and understandings of the Parties. This Consent Decree replaces and supersedes the Amended and Restated Settlement Agreement executed by the Parties on July 28, 2016 in its entirety. No supplement, modification, or amendment of this Consent Decree shall be binding unless entered by the Court.

65.     _Attorney's Fees and Costs._ Part of the effect of this Consent Decree is to settle the specific matters outlined or referenced in this Consent Decree as to the Parties up to the date the Consent Decree is finalized. Accordingly, the Colorado State Office of Risk Management shall pay DLC's counsel the lump sum amount of $654,177.50 (the dollar amount is contingent upon the State Claims Board's approval of this amount on March 26, 2019) in full and final settlement of all costs and fees, including attorney's fees, incurred by DLC's counsel starting on June 1, 2017, up to and including the date this Consent Decree is finalized and signed by all Parties hereto (the "Settlement Payment"). When the final amount is approved by the State Claims Board, DLC's counsel shall enter a separately filed binding agreement related to the Settlement Payment, which agreement shall be on the then-current, Controller-approved standard settlement agreement. The Settlement Payment shall be paid to Eytan Nielsen LLC as follows:  A warrant in the amount of $654,177.50 (or in the dollar amount approved by the State Claims board on March 26, 2019) will be made payable to Eytan Nielsen LLC. The warrant will be delivered to Eytan Nielsen LLC within 30 days from March 26, 2019, or as soon after March 26, 2019 as practicable. Prior to delivery of the warrant, the Controller-approved settlement document will be signed by all Parties and the

Controller. No withholding for payment of federal, state or local taxes will occur respecting any warrant issued pursuant to this Consent Decree other than those required by federal or state law or rules governing the Controller. Eytan Nielsen LLC will complete, execute and provide an original of I.R.S. form W-9 in conjunction with submitting the signed Consent Decree as an initial step in completing the arrangements described here. A Form 1099 will be issued to Eytan Nielsen LLC on the Settlement Payment. The Settlement Payment made hereunder shall not be designated as wages, salary or back pay, except to the extent required by federal or state law or by rules governing the Controller, but is instead made in compromise of all claims arising from or related to the subject matter of this Consent Decree for those matters up to and including the date this Consent Decree is fully executed and entered by the Court.

66.     Written Notice.  Any notice or other communication required or permitted under this Consent Decree shall be in writing and shall be deemed to have been duly given when (1) mailed by United States registered or certified mail, return receipt requested, (2) mailed by overnight express mail or other nationally recognized overnight or same-day delivery service, (3) sent as a PDF attachment to electronic mail, or (4) delivered in person, to the Parties at the following addresses:

|  |  |
|---|---|
| If DLC, to: | Disability Law Colorado<br>455 Sherman Street, #130<br>Denver, Colorado 80203 |
| Attention: | Mark Ivandick<br>mivandick@disabilitylawco.org |
|  | Jennifer Purrington<br>jpurrington@disabilitylawco.org |

|  |  |
|---|---|
| With a copy to: | Iris Eytan, Esq.<br>EYTAN NIELSEN LLC<br>3200 Cherry Creek South Drive<br>Denver, CO 80209<br>iris@eytan-nielsen.com |
| If the Department, to: | Department of Human Services<br>1575 Sherman Street<br>Denver, Colorado 80203 |
| Attention: | Michelle Barnes<br>michelle.barnes@state.co.us |
| If the Hospital, to: | Colorado Mental Health Institute at Pueblo<br>1600 West 24th Street<br>Pueblo, Colorado 81003 |
| Attention: | Jill Marshall, M.P.H.<br>jill.marshall@state.co.us |
| With a copy to: | Office of the Attorney General<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 6th Floor<br>Denver, CO 80203 |
| Attention: | Tanja Wheeler<br>tanja.wheeler@coag.gov |
|  | Ann Pogue<br>ann.pogue@coag.gov |
|  | Sarah Richelson<br>sarah.richelson@coag.gov |

A Party may change the names or address where notice is to be given by providing notice to the other Parties of such change in accordance with this Paragraph.

## XIV.   RESERVATION OF JURISDICTION AND ENFORCEMENT

67.   The Court hereby retains jurisdiction over this Consent Decree.

68.   The Court hereby also retains jurisdiction to enforce the terms of this Consent Decree, upon Final Approval, until the Consent Decree is terminated and for 60 days after the Department provides the final monthly report.

69.     Nothing in this Consent Decree requires or permits the Department to violate a court order.

70.     Minor or transitory mistakes shall not be considered a violation of this Consent Decree.

## XV.   FINAL JUDGMENT

Based on the pleadings, counsels' stipulation of facts, and representations of counsel for both parties, the Court does find:  The facts alleged in Paragraphs 1 through 13 warrant the Court's approval of this Consent Decree.

Upon entry of this Consent Decree by the Court, this Consent Decree shall constitute the final judgment between and among the Plaintiff and Defendants. The Court enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58 that is fully enforceable by all plenary powers of the Court.

IT IS SO ORDERED, this 2nd day of April, 2019.

_____
Hon. Nina Y. Wang
United States Magistrate Judge

**APPROVED FOR ENTRY:**

/s/Mark Ivandick_____
*Center for Legal Advocacy, d/b/a Disability Law Colorado*
Name:  Mark Ivandick
Title:   Managing Attorney
Dated:  March 27, 2019

/s/Jill Marshall_____
*Colorado Mental Health Institute at Pueblo*
Name:  Jill Marshall
Title:   Chief Executive Officer, in her official capacity
Dated: March 27, 2019

/s/Michelle Barnes_____
*Colorado Department of Human Services*
Name:  Michelle Barnes
Title:   Executive Director, in her official capacity
Dated: March 27, 2019

**TABLE 1:  Timeframes and Fines for Competency Services**

| Deadlines | Tier 1: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Tier 2: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Maximum Timeframes to Offer Admission for Inpatient Competency Evaluations and Corresponding Fines | Maximum Timeframes to Complete Jail Competency Evaluations and Corresponding Fines |
|---|---|---|---|---|
| June 1, 2019 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 56 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-56 days, $500 per day for each Pretrial Detainee waiting more than 56 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days | 28 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 28 days |
| January 1, 2020 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 49 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-49 days, $500 per day for each Pretrial Detainee waiting more than 49 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days | 28 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 28 days |

| Deadlines | Tier 1: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Tier 2: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Maximum Timeframes to Offer Admission for Inpatient Competency Evaluations and Corresponding Fines | Maximum Timeframes to Complete Jail Competency Evaluations and Corresponding Fines |
|---|---|---|---|---|
| July 1, 2020 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 42 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-42 days, $500 per day for each Pretrial Detainee waiting more than 42 days | 14 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |
| January 1, 2021 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 35 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-35 days, $500 per day for each Pretrial Detainee waiting more than 35 days | 14 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |

| Deadlines | Tier 1: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Tier 2: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Maximum Timeframes to Offer Admission for Inpatient Competency Evaluations and Corresponding Fines | Maximum Timeframes to Complete Jail Competency Evaluations and Corresponding Fines |
|---|---|---|---|---|
| July 1, 2021 | 7 days<br><br>Fines:  $500 per day for each Pretrial Detainee waiting more than 7 days | 28 days<br><br>Assess for admission every 10 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 28 days | 14 days<br><br>Fines:  $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |