

Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

Submitted August 28, 2019

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director  of the Colorado
Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental
Health Institute at Pueblo, Defendants.

Page 2

August 28, 2019

*Re: Civil Action No.  11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our August 28, 2019 status report mandated by the Consent Decree filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW.  As you know, the Consent Decree (following your earlier court order) requires us to monitor progress and provide recommendations for improvement to the Colorado Department of Human Services (CDHS). Specifically, the Consent Decree (p.24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter.  The Special Master's status report was submitted on January 28, 2019.  Dkt. 146.  The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter.  Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Since our appointment as Special Master on January 2, 2019, the parties entered into mediation, resulting in the Consent Decree filed March 15, 2019.  This Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and eventually attain compliance with all time frames and deadlines mandated in the Consent Decree.  The Department has initiated many of these steps, demonstrating meaningful progress, in ways we detail through the remainder of this report. *In particular, this report will focus on developments since our prior quarterly report, which was submitted May 28, 2019.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................4
  KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS................................6
    KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES.................................................7
    KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES.................................................8
    KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES......................................11

CONSENT DECREE SECTION VI UPDATES....................................................................................12
  ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION
  TREATMENT .........................................................................................................................12
    Wait Times for Inpatient Evaluation ................................................................13
    Wait Times for Inpatient Restoration ................................................................15
  PERFORMANCE OF JAIL COMPETENCY EVALUATIONS ........................................................19
  INTERIM JAIL MENTAL HEALTH TREATMENT .....................................................................21
  RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT...................23
  TRANSPORTATION OF PRETRIAL DETAINEES ......................................................................24
  NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES.................................................25

CONSENT DECREE SECTION VII UPDATES...................................................................................26
  CIVIL BED FREEZE ................................................................................................................26
  COMPREHENSIVE AND COHESIVE PLAN ............................................................................27
  INCREASE COMMUNITY RESTORATION SERVICES ..............................................................30

CONCLUSION ........................................................................................................................34

# INTRODUCTION

The Consent Decree filed March 15, 2019 prescribed a variety of steps the Department must take, and timelines it must meet, to improve the competency assessment and restoration system in Colorado.  Since the Consent Decree was filed in March, the Department has begun taking many of these steps (detailed through the remainder of this report), in ways that we consider generally responsive, and in ways that appear to recognize the gravity and complexity of the challenges they face.

Nevertheless, the Department's important planning and action steps thus far have *not* yet caused significant changes to the waiting list, or waiting times, of the defendants ordered to receive competency-related services.  As you'll see in the next section, these important markers of progress have changed little since the implementation of the Consent Decree.  We are not yet alarmed by this; many of the key interventions prescribed in the Consent Decree began only recently.  For example, the triage system began June 1, 2019, and the Forensic Support Team (FST) has only very recently hired staff and begun training.  Whereas the Department's progress preceding our May 28th report was largely organizing and planning key interventions, their progress since our May 28th report has been largely *launching* these key interventions.  In particular, significant steps since our last report include:

- Enacting the Triage system, a key compromise from the Consent Decree, which requires the Department to rapidly (i.e., within 7 days) admit for competence restoration the most acutely ill defendants ("Tier 1") and less rapidly admit those who less urgently need hospitalization ("Tier 2").

- Admitting these Tier 1 defendants for inpatient restoration in a prompt manner, consistent with the requirements of the Consent Decree.

- Hiring new, well-qualified staff for key leadership roles, i.e., the Forensic Services Director and the Forensic Services Support Team Director.[1]

- Launching the Forensic Support Team (FST), another key component of the Consent Decree.  The FST will ensure monitoring and treatment for those incompetent-to-proceed (ITP) defendants in jail awaiting hospitalization, as well as those ITP defendants ordered to community-based restoration.

- Developing a draft of a "comprehensive and cohesive plan" for competency services in Colorado, and sharing this draft plan beyond the Department.

---

[1] We support the position descriptions and the two individuals hired for these two positions.

- Dramatically improving data systems, analysis, and reporting of competency-related information.

- Implementing enhanced competency evaluation reports, consistent with mandates from the Consent Decree and SB19-223. These reports now include more in-depth information regarding competency of the defendant as well as opinions on placement for restoration (inpatient vs. community-based restoration) and urgency of clinical need (Tier 1 vs. Tier 2).

- Opening 18 new beds for competency restoration at the Boulder County Jail's RISE program. This program replicates the RISE program at Arapahoe County Jail.

- Disseminating a request for proposals for sheriff's departments across Colorado to request funding for enhanced mental health services for defendants awaiting competency services in local county jails. This funding was provided by SB19-223.

We have not expected the planning and launch of these interventions to have substantial effect on CDHS competency-related timelines immediately.  However, we *do* expect these interventions *should* yield *some progr*ess towards meeting key time frame requirements and reducing waitlists by our next reporting period.

Since the Department has just launched several key interventions, some of the primary challenges (i.e., the areas for closest scrutiny and support) we identified in our prior quarterly report still remain:

- Better educating the court and the bar about the triage system and other new interventions, so that they will act in ways that support (rather than undermine) the triage system and the broader goals of admitting the most acutely ill defendants most rapidly.  These educational efforts will need to be prompt and assertive in order to help courts understand and support new procedures and less often issue "show cause" orders that compromise CDHS goals of triaging by greatest clinical need. Although the Department has described some dissemination efforts, *we consider further dissemination efforts crucial in the very near future*.

- Ensuring adequate training and reliability among evaluators as learn to include triage opinions and restoration placement recommendations in their competence evaluation reports. Furthermore, these changes for evaluators require attention to their morale and engagement. Generally, the evaluators have been frustrated with the ways changes have been implemented, and it will remain crucial to enlist their engagement in these changes and improve collaborative relationships with the Department leadership.

We also anticipate the following new challenges:

- Using the newly launched Forensic Support Team to assist and support defendants found incompetent to proceed (ITP) who are either in jail awaiting transfer to Colorado Mental Health Institute at Pueblo (CMHIP) or in the community receiving community-based restoration treatment.  As the Department knows, the first several months after launching any new initiative will require significant monitoring, revision, and changes as unanticipated challenges inevitably arise.

- Accelerating restoration services for defendants designated Tier 2. Whereas the Department has been remarkably prompt in hospitalizing the Tier 1 patients, full adherence to the Consent Decree will require improving timely service to Tier 2 defendants as well.

Overall, we continue to affirm the Department's efforts to enact the changes prescribed in the Consent Decree.  As detailed throughout the report, there remain several significant challenges, and room for improvement in certain areas.  But, broadly, *the Department's efforts to comply with the Consent Decree have been well-conceived, and usually well-executed*.

We begin by addressing the Department's compliance with time frame requirements, because this is the primary focus of the Consent Decree (and the focus that the Consent Decree prescribes for these quarterly reports).  Indeed, we consider these time frames our "key metrics" — or primary markers of progress — that we review in each quarterly report.  However, we then expand to address the other interventions prescribed by the Consent Decree because progress in these interventions will likely contribute to progress in achieving the overall goal of compliance with time frame requirements.

## KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ...  Such **reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.  (Consent Decree p.24)

> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. We anticipate that these will be the key metrics to demonstrate progress over the next few years, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so we review those steps in subsequent sections of the report.

## KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES

As summarized in the table below, the Department has been meeting the timelines for competence evaluation that the Consent Decree prescribed beginning June 2019. Indeed, the Department was meeting these evaluation time frames even before June 2019.

| *Wait Times for Competence Evaluation Services*[2] | | | | |
|---|---|---|---|---|
| | June 2019 Average Wait | July 2019 Average Wait | June 2019 Requirement | January 2020 Requirement |
| Jail-based Competency Evaluations | 21.8 | 23.7 | 28 days | 8 days |
| Inpatient Competency Evaluations | 11.2 | 14.4 | 21 days | 21 days |

Generally, timely competence evaluation has been a relative strength of the Department. Well before the recent Consent Decree, they followed the national trend of de-centralizing evaluations, moving them from solely an inpatient service to a localized service in the community. During recent history, their evaluations have almost always met the prescribed time frames. Quite recently, they appeared at risk of failing to meet these time frames, due to a shortage of evaluators (some permanently left positions, while others were on temporary leave). But rapid hiring and contracting of evaluators seems to have averted significant delays,[3] and the Department appears likely to meet evaluation time frames in the next month. However, as

---

[2] Data from July 2019 is the most recent data available from CDHS.

[3] According to the CDHS representatives with whom we have spoken about this. Ultimately, the August 2019 Monthly Compliance Report (due September 7, 2019) will reveal evaluation timelines for the month of August.

detailed later in the report (addressing Consent Decree paragraph 33), we anticipate they will need to take additional steps over the next year to maintain their compliance, particularly when the prescribed time frames decrease in July 2020.  But overall, *the Department has performed well with respect to competence evaluation time frames*.

## KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES

In contrast to their prompt *evaluation* services, the Department has consistently failed to provide prompt *restoration* services.  Over the past six months preceding our last report, defendants who were admitted for inpatient restoration treatment at CMHIP or RISE waited, on average, 71 days.[4]  Of course, this figure included all defendants referred for restoration, without distinction between those more, versus less, acute needs.  Since that last quarterly report, however, a key change prescribed in the Consent Decree came into effect on June 1, 2019.  The Consent Decree prescribed a new triage system[5] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2").  Tier 1 defendants must receive services within 7 days of the competency hearing, whereas Tier 2 defendants need not receive services for 56 days (with Tier 2 deadlines shortening in the future).

Overall, recent CDHS monthly reports describe excellent adherence to the 7-day deadline for defendants whom the court has designated as Tier 1 (i.e., average wait times well under 7 days).[6]  However, wait times for Tier 2 defendants still far exceed the time frames prescribed in the Consent Decree (i.e., average wait times exceeding 80 days, approximately one month beyond the required 56 days).

---

[4] Average waiting period November 2018 – April 2019, as calculated from data provided by the Department (see p.7 of their Monthly report filed May 7, 2019).

[5] See Consent Decree paragraph 43.

[6] According to Special Master Compliance Plan report July 2019 p.10 (submitted August 7, 2019).

Summary statistics are presented below:

| Average Wait Times for Inpatient Competence Restoration Services | | | | |
|---|---|---|---|---|
| | June 2019 | July 2019 | June 2019 Requirement | January 2020 Requirement |
| Tier 1 | 1 | 4.4 | 7 days | 7 days |
| Tier 2 | 80.8 | 93.6 | 56 days | 49 days |

However, each of these summary statistics requires more discussion.  First, the figures for Tier 1 defendants reflect only Tier 1 defendants as defined in the Consent Decree, that is, *defendants whom the court has designated as Tier 1 and ordered to the hospital*.  This represents only a fraction of the number of defendants whom CDHS evaluators have recommended as Tier 1 (for example, the June figure is based on two defendants and the July figure is based on 7 defendants) because many of their cases are resolved before the court enters an order designating them as Tier 1.

Specifically, CDHS[7] explained that since the implementation of the triage system on June 1, there have been 53 unique individuals whom the Court Services evaluators have opined as Tier 1 (as of August 23). Of those 53, most (37) were admitted to CMHIP, usually well before the court ordered admission. For one defendant whom an evaluator recommended Tier 1 status, jail medical staff conveyed he was stabilized and the Court did not enter an order for hospitalization (he remained in jail).  Another individual was ordered to outpatient restoration services, and one individual was stabilized to the point he did not require hospitalization.  For the remaining, CDHS is reportedly awaiting a court order (as of their last update).

In many respects, this summary bodes well for CDHS efforts to implement the triage system.  *According to CDHS administrators and data management personnel, the vast majority of defendants whom evaluators designate as Tier 1 are admitted to the hospital promptly (i.e., well within seven days), and often even before the Court designates them as Tier 1 and orders admission*.  For those that have not, CDHS has offered what appear to be plausible explanations.

Frankly, it is difficult at this stage to understand these few exceptions or the circumstances surrounding them. Once the Forensic Support Team (FST; see later in this report) launches later this month, the FST will have close oversight of these defendants.  But in this brief interim period (i.e., after the launch of the Triage system but before the launch of FST), there has been little

[7] According to email from CDHS staff Stephanie Sollie to Special Masters dated August 23, 2019.

mechanism for close oversight of these situations.  Consequently, we have requested CDHS to provide an individualized accounting of each person opined by evaluators as Tier 1 (i.e., dates of admission for those that were admitted and a detailed description of the remainder).  We view this Tier 1 population as the heart of the Consent Decree — those defendants who are identified most urgently needing hospital-level care — and we must ensure that their needs are met in ways consistent with the letter and spirit of the Consent Decree.  We look forward to reviewing CDHS's detailed account of each Tier 1 defendant's pathway, and reporting this information to you in our next quarterly report to the Court.

Regarding Tier 2 defendants, progress has been limited.  Average wait times still far exceed the time limits in the Consent Decree, just as they did for all defendants in prior months.  Thus, the Tier 1 figures suggest that the Triage System serves the purpose for which it was designed: i.e., prioritizing the most acutely ill defendants and moving them into the hospital rapidly.  However, the Tier 2 figures reveal that CDHS continues to struggle with some of the primary challenges that prompted the Consent Decree: i.e., responding to the volume of defendants referred for inpatient restoration, and admitting them into the hospital within a reasonable time frame.

KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

Beyond the wait times for restoration services (and progress towards the time frame requirements of the Consent Decree), another key metric for gauging the Department's progress is the *waiting list* for competence restoration services.  In the months preceding our prior report, the waitlist averaged around 150 to 160 defendants.[8]  But again, with the initiation of the Triage system on June 1, we must consider the waitlist according to Tier status.  Central to the Triage system is an acknowledgement that some incompetent defendants are so acutely ill that they require treatment almost immediately (Tier 1, who require treatment within 7 days), whereas others can safely await treatment (Tier 2, who can wait several weeks).

| *Number of Defendants on Waiting List for Inpatient Restoration[9]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | April 2019 | May 2019 | June 2019 | July 2019 |
| Combined | 153.29 | 158.63 | 159.96 | N/A | N/A |
| Tier 1 | N/A | N/A | N/A | 6 | 8 |
| Tier 2 | N/A | N/A | N/A | 182 | 168 |

---

[8] At present, the Department provides waitlist data as daily figures, so the monthly figures in the table reflect averaged daily figures.

[9] According to Special Master Compliance Plan report July 2019 p.10 (submitted August 7, 2019)

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[10] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment.  The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribes the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations (whether inpatient or in jail).[11]  Admission time frames become progressively shorter at each six-month increment. Evaluation time frames are reduced in July 2020.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 | 7 days | 28 days | 14 days | 21 days |

[10] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services.  Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[11] Fine amounts are tied to delays beyond each of the time frames listed.  However, these fines are discussed elsewhere in this report.

As summarized earlier in this report ("Key Metrics"), *the Department generally meets June 1 time frames for competency evaluations, and even meets the time frame for admitting Tier 1 defendants to restoration.  But they far exceed the time frames for Tier 2 admissions to competency restoration.*

## Wait Times for Inpatient Evaluation

As detailed below, the Department has been quite successful in timely admission for inpatient competence evaluations (versus restoration):

| *Recent Wait Times for Inpatient Evaluation* | | | |
|---|---|---|---|
| Month | Number admitted to CHMIP for inpatient evaluation | Average days waited prior to admission to CMHIP or RISE | People who waited more than 28 days |
| Jul 19 | 18 | 14.4 | 0 |
| Jun 19 | 14 | 11.2 | 0 |
| May 19 | 12 | 11.7 | 0 |
| Apr 19 | 18 | 12.6 | 0 |
| Mar 19 | 18 | 16.4 | 1 |
| Feb 19 | 13 | 13.3 | 0 |
| Average | 15.5 | 13.2 | .17 |

Over the past six months, 15.5 people per month, on average, were admitted for an inpatient evaluation at CMHIP.  The average wait time for admission to CMHIP for inpatient competency evaluation was 13.2 days (almost 4 days fewer than the 6-month average we reported in the prior quarterly report).  The Department regularly met its goal of admitting all people ordered for inpatient evaluation within 28 days.  Indeed, the average wait prior to admission has generally decreased over the past year.  *Overall then, the Department has consistently met the time frames for inpatient competence evaluation.*

According to CDHS reports, only a fraction of those defendants ordered for inpatient evaluation actually met the strict criteria for involuntary hospitalization (C.R.S. § 27-65-105).[12]  Specifically,

CDHS reported that during the past 5 months, only about 1 in 5 admissions for inpatient evaluation met that strict "27-65" criteria.[13] Certainly some defendants warrant hospitalization even if they do not meet the strict criteria, so more analysis is needed to determine just how many of these referrals urgently needed hospitalization (even if they did not meet strict criteria for civil commitment).

At the time of our last Quarterly report, there appeared to be an increase in admissions for inpatient evaluation, perhaps reflecting increasing court efforts to "fast track" defendants for admission at the evaluation stage, in an effort to bypass lengthy delays at the restoration stage (i.e., following a finding of incompetence in a jail-based evaluation).  However, this trend has not continued.  That is, admissions of inpatient evaluations have held generally steady, rather than continued their rapid increase.  Therefore, although CMHIP should always make efforts to minimize inappropriate admissions at the evaluation stage, we are no longer as concerned that courts are ordering inordinate inpatient evaluations to "workaround" delays in admission for restoration.  We anticipate that as CDHS disseminates information about the triage system to courts and counsel, fewer "workarounds" will occur.

---

[12] C.R.S. § 27-65-105: (1)  Emergency procedure may be invoked under either one of the following two conditions:

(a)(I)  When any person appears to have a mental health disorder and, as a result of such mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then an intervening professional, as specified in subsection (1)(a)(II) of this section, upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation…

(b)  Upon an affidavit sworn to or affirmed before a judge that relates sufficient facts to establish that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation.

[13] From the August 7, 2019 CDHS Monthly Compliance Plan Report (p. 17).

## Wait Times for Inpatient <u>Restoration</u>

Compared to the timely inpatient competence evaluations, there are far more concerns regarding inpatient restoration at CMHIP.  Over the past few years, wait times consistently exceeded the 30-day time frames mandated by an earlier Settlement Agreement.  However, the required time frames changed significantly as of June 1, 2019, per the Consent Decree.  The maximum time frame for many defendants (those labeled as Tier 2) waiting in jails has been extended to 56 days.  The time frame for defendants with the most urgent clinical needs (those labeled Tier 1) will be only 7 days.

| *Recent Wait Times for Inpatient Restoration[14]* | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number of people admitted to CHMIP for inpatient restoration | | Average days waited for admission to CMHIP inpatient restoration | | People who waited more than the max days for admission to CMHIP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Jul 19 | 6 | 59 | 4.4 | 93.6 | 1 | * |
| Jun 19 | 2 | 44 | 1 | 80.8 | 0 | * |
| May 19 | 57 | | 106.6 | | 56 | |
| Apr 19 | 51 | | 59.1 | | 39 | |
| Mar 19 | 41 | | 61.6 | | 32 | |
| Feb 19 | 54 | | 65.6 | | 43 | |

*\* CDHS has not provided in their monthly report the number of Tier 2 individuals who waited more than the maximum allowable days for admission to CMHIP for inpatient restoration. (Perhaps because 56 days had not passed between the start of the triage system and their August 7, 2019 report).  We have requested these data.*

---

[14] According to Special Master Compliance Plan report July 2019 p.9-10 (submitted August 7, 2019).

As the table reveals, most of the defendants now designated as Tier 2 wait much longer than the required 56 days before admission. In June and July, a total of 103 Tier 2 individuals were admitted to CMHIP, with their days waited prior to admission averaging 88.1 days. However, the much smaller group of patients designated as Tier 1 were admitted rapidly, consistent with the mandates of the Consent Decree.  In June and July, a total of 8 Tier 1 individuals were admitted to CMHIP, with their days waited prior to admission averaging 3.55 days.

In many ways, these Tier 1 numbers are commendable. As mentioned previously, we view the Tier 1 individuals as the highest priority for the Consent Decree and the CDHS competency system.  We are pleased that those whom CDHS categorized as Tier 1 were admitted rapidly (on average).  However, confusion remains regarding the discrepancy between the numbers of individuals opined by evaluators as Tier 1 in June and July (40 in total)[15] and the numbers admitted.  CDHS has explained that many of these individuals were subsequently admitted in August, that some had orders vacated, and that some were awaiting decisions from court. However, the discrepancy seems unexpectedly large; we have asked CDHS to track each of these Tier 1 individuals and provide specific information regarding each person's location, dates of transfer, updated legal status, and other information.

The Tier 2 timelines are more problematic. Tier 2 individuals are mandated to CMHIP, but with less urgency.  To date, CMHIP has been able to nimbly create space for Tier 1 individuals, inevitably by prioritizing them over Tier 2 individuals.  However, Tier 2 individuals must also be admitted within certain time frames.  The only options for reducing their wait times are to create space for them in CMHIP (by reducing restoration lengths of stay or creating new beds) or to transfer them to community-based treatment (if they are appropriate for such treatment).  In short, while Tier 1 individuals must be prioritized for admission (thereby treating those who need it most), successful compliance with the Consent Decree must *also* reduce Tier 2 time frames; such compliance will demonstrate that CDHS' competency system has created adequate capacity for all levels of competency restoration.

In our last Quarterly Report, we identified several pending developments that would greatly influence the Department's capacity to reduce these wait times for inpatient restoration. Fortunately, most of these developed in ways conducive to meeting the requirements of the Consent Decree, though a few challenges remain.  For example,

- First, all parties recognized that the launch of the Triage System would be pivotal to the Department's success, and that many (then unknown) aspects of the triage decisions would influence the Department's ability to comply with the timelines in the Consent Decree.  In particular, all were concerned that a very high proportion of Tier 1 designations might make it nearly impossible to admit such defendants in the required time frame (7 days).   But preliminary data suggests that evaluators designated roughly

---

[15] Information taken from August 7, 2019 CDHS Monthly Compliance Report, p.16.

one-third of defendants as Tier 1, a proportion that has proven manageable for the Department. Indeed, the Department reports that most of these were admitted for inpatient restoration even before the Court ordered admission. More broadly, this suggests the new Triage procedures have been successful in making meaningful distinctions among defendants, and identifying those at highest need.

- Second, the Boulder County Jail's RISE program — which opened as scheduled in June — provided another option for inpatient-like restoration service. These 18 new beds reduced the pressure on the CMHIP inpatient restoration waitlist and (though calculations are impossible given the new triage policy separating Tier 1 and Tier 2 waitlists) likely decreased wait times for some defendants. Although the exact impact of the RISE beds cannot be precisely determined (amid other simultaneous changes in the complex CDHS competency system), 18 new beds are beneficial.

- On the other hand, the Department continued to struggle with "show cause" orders from judges ordering defendants into inpatient restoration before their standing on the waitlist would warrant, thereby bypassing other defendants who have been waiting longer, and contributing to overall delays. All parties anticipated that these orders would decrease, given efforts by CDHS and DLC to educate the bar and the courts on these risks. However, the Department reports that the number of show cause orders has remained roughly consistent, and (because of their unpredictable nature) actually pose more challenges to CMHIP admissions than the Tier 1 urgent admissions. We continue to recommend an aggressive "marketing" campaign to educate the judiciary about the new triage system and discourage use of show cause orders.

At least two other emerging factors should influence inpatient restoration waitlists:

- First, the Department is launching the Forensic Support Team (FST) near the end of August. Mandated by the Consent Decree, the FST consists of 18 mental health positions (1 director, 2 supervisory "Coordinator" positions, and 15 "Forensic Navigator" positions), providing coverage to all of Colorado's judicial districts. This team, dedicated exclusively to persons receiving competency services, is responsible for monitoring defendants awaiting transfer to CMHIP for inpatient competency restoration while in jail, coordinating jail-to-community based restoration treatment discharges, monitoring care and restoration progress for defendants in community-based restoration treatment, supporting their community tenure, and providing a centralized and consistent point of contact for competency-related stakeholders.

The FST will be operational later than the August 1 date mandated in the Consent Decree. This is disappointing. But other than this delay, we have been impressed with most aspects of the FST development. The Department has hired a strong FST leader and has begun carefully detailing the ways in which the FST will supplement and coordinate

with the Bridges Program liaisons[16] (who are employed by the courts, rather than the Department).  The Department created a comprehensive two-week orientation for the FST Navigators, including coordination with the Bridges liaisons.  Indeed, these complementary services appear to be developing solid lines of communications and procedures for collaboration, to deliver complementary services that minimize redundancy or gaps in responsibilities.

We anticipate that the FST will help fine-tune the Triage System.  For example, when a Tier 2 defendant becomes acutely ill, the FST can facilitate transition to Tier 1 status.  Likewise, when a Tier 2 defendant improves, FST may facilitate transition to Community-Based Restoration Treatment (CBRT).  The latter circumstance is especially important in ultimately reducing the waitlist for competency restoration.  Similarly, we anticipate that as FST proves reliable to Courts, Courts will become increasingly comfortable recommending certain types of defendants for CBRT (as described next).

- Finally, the impending policy of including placement recommendations (i.e., inpatient vs. outpatient restoration) in evaluator reports may influence waitlists.  Optimally, as community-based restoration treatment options become increasingly available, along with a stronger support system (through the relatively new Bridges liaisons and the entirely new FST) for defendants in outpatient restoration, evaluators and courts will be increasingly comfortable prioritizing community-based restoration treatment (CBRT) over inpatient restoration at CMHIP.  This should reduce substantially the number of defendants waiting for inpatient restoration.  Again, this will require evaluators who consistently and reliably offer well-informed placement opinions.  It will also require a proactive Bridges and FST system, and available slots among CBRT providers (all discussed later in this report).

---

[16] The Statewide Behavioral Health Court Liaison Program (or "Bridges Program") is a recently-implemented program operated by the Colorado State Court Administrator pursuant to SB18-251. It created 27 mental health positions, placed in each of Colorado's judicial districts, for the purpose of facilitating communication and collaboration among judicial, health care, and behavioral health systems. Liaisons are primarily dedicated to working with competency-related cases and defendants.

## PERFORMANCE OF JAIL COMPETENCY EVALUATIONS

> 33. (b) Performance of Jail Competency Evaluations.  The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld.  Counties not specifically identified are counties that use the "Hold and Wait" court ordered process.  Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting.  Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

During this past quarter, the mandated time limit for a jail-based evaluation decreased from 30 to 28 days, per the Consent Decree. According to data they provided, the Department still achieved almost perfect compliance with this time frame.[17]  The exceptions were brief, and they could be reasonably categorized as Individual Special Circumstances.  Our understanding is that the Department faced some challenges due to periods in which they were short-staffed (some evaluators left their positions, while others were on temporary leave), but they ultimately met the timelines.  Prior to this period, the Department had maintained perfect compliance with the previous 30-day time frame for many months.  The Department has also taken strides to hire additional contracted evaluators in the community, pursue increased pay in order to recruit and retain high quality evaluators, and proceed with creating new evaluator positions in early 2020.

As in our prior Quarterly Report, we continue to commend the Department's timely completion of jail-based evaluations, but also encourage them to consider several developments that may make it more challenging to maintain this success in the future.  We are confident the Department can continue providing timely jail-based evaluations, particularly if they plan well for the following:

- The recent "close call" in which the Department came close to missing more jail-based evaluation deadlines, and averted problems by rapidly contracting with new evaluators, demonstrates their commitment to meeting deadlines.  But the incident also demonstrates that compliance can be precarious without a steady, sufficient workforce. In the past, the Department has sometimes been in a position of providing hasty responses to unanticipated challenges. We encourage the Department to carefully anticipate workforce challenges and needs (e.g., compensation and retention) well in advance of crises.

---

[17] Data taken from the August 7, 2019 CDHS Monthly Compliance Plan Report covering July (pp. 20).

- One challenge in maintaining a strong workforce of evaluators involves morale.  In general, CDHS evaluators have expressed frustration with the ways in which CDHS administration implemented the recent changes in evaluations that were mandated by the Consent Decree and SB19-223.  Evaluators have complained that implementation has been hasty, ill-defined, and neglected evaluator expertise.  In many respects, we are sympathetic to the evaluators' frustrations.  We are urging CDHS to better enlist evaluator expertise.  After an initial meeting between evaluator supervisors and CDHS upper administration, we are more optimistic about a path forward in which CDHS better enlists evaluators in these systematic changes.

- On July 1, 2020, the new time frame for jail-based evaluations will decrease to 21 days.  The Department must produce data well in advance of this change to determine how many additional evaluators they will need to hire in order to meet this shortened deadline.  Their analysis should occur soon enough to adjust the budget and secure funding to hire these additional positions.  Our understanding is that the Department has been preparing a "time study" of evaluator workloads and time required.  They have recently opted to pursue a consultant to conduct the time study; we encourage them to proceed as soon as possible.

- Also, as the time frames change, workloads must be reasonable.  We have not reviewed data on the number of evaluations assigned to a 1.0 FTE Court Services evaluator; again, we will do so in the future.  We raise this issue for three reasons:

  o *The upcoming 2020 time frames.*  It may be unreasonable to expect evaluators to complete evaluations 25% sooner without a review of appropriate workloads and/or without hiring additional evaluators.  Workloads will almost certainly need to be adjusted as these new time frames are implemented.

  o *New required content.*  The Consent Decree and SB19-223 both require that evaluators include additional content in their evaluation reports. Evaluators have already raised concerns that these new demands will require more time.

  o *Involvement in training and setting policy.*  We strongly encourage CDHS to solicit input from the Court Services evaluator team in terms of trainings and policy.  The branch has special expertise in forensic evaluations and forensic standards; CDHS administration should capitalize on this knowledge when developing training materials, quality assurance standards, workload expectations, and other evaluation matters.

Finally, with respect to competence evaluations, we completed a preliminary quality review of sample competence evaluation reports (i.e., one report from each CDHS evaluator).  Generally, our impressions were positive.  Though there was some room for improvement (which we addressed in feedback) the reports generally reflected good professional practice, and revealed no gross problems.

## INTERIM JAIL MENTAL HEALTH TREATMENT[18]

> 34.  Interim Jail Mental Health Treatment.  If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.*  to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible.  This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment.  Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment.  A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

The Department is required to partner with county jails to develop a program of coordinated services for individuals receiving competency-related services.  These services are currently managed statewide through the Jail-Based Behavioral Services program (JBBS) and are funded by the approximately $2.5 million per year recently appropriated by SB19-223.

Essentially, the Department utilizes JBBS as a hub for coordinating subcontracted services across Colorado.  These subcontracted providers are now asked to provide adequate mental health services to inmates involved with competency-related services.  Interim mental health treatment for defendants receiving competency-related services is critical.  It lies at the heart of the long litigation and conflict between the Disability Law Center (DLC) and the Department.  DLC and its constituents have long argued that county jail conditions — and insufficient mental health services — cause harm to incarcerated incompetent defendants as they wait in jail for transfer to CMHIP.  If services were substantially improved, however, this concern could be assuaged.  The goal of Interim Mental Health Treatment is to do just that — screen, monitor, assess, and treat those receiving competency-related services in county jails so that they remain physically safe and clinically stable until their transfer to competency restoration services.

However, the structure of JBBS creates some challenges.  Because the JBBS-subcontracted providers differ across counties and jurisdictions, no two providers are alike.  Services differ.  Some providers have strong connections with local and private inpatient hospitalization facilities, while others have weaker ties.  Workforce and qualifications also differ among providers.  This poses some challenges for CDHS; while individualized services are enhanced given the local nature of the providers within JBBS, uniformity and leverage across providers are more difficult.

---

[18] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree.  It is NOT a proxy or substitute for competency restoration services.

Case 1:11-cv-02285-NYW   Document 176   Filed 08/28/19   USDC Colorado   Page 22 of 34

This challenge is currently embodied in the Department's push to encourage JBBS providers to expand jail mental health services to competency-related defendants.  Since our last quarterly report, CDHS has made considerable progress in a number of areas regarding JBBS and enhanced mental health services for competency-involved inmates; however, challenges remain.

Two significant positive developments have occurred since our last quarterly report. First, the Department hired Jagruti Shah as the new Forensic Services Director.  This is particularly helpful for the Interim Jail Mental Health requirement, because Ms. Shah's former position oversaw JBBS and all related contracts.  Her promotion ensures that a working knowledge of JBBS will be well-represented in the highest levels of the Department's forensic mental health administration. Secondly, the Department put out a call to expand contracts to all current JBBS-contracted providers to expand existing mental health services to competency-involved inmates in July 2019.

However, responses so far illustrate the challenges of relying on a system built of subcontractors. To date, CDHS has received responses from six providers.  Two contractors requested funding, two declined funding, and two stated that there are still considering a response.  This is the definition of a "mixed bag."  While we are pleased that two county providers will be seeking funding, we are somewhat disappointed that the response rate has been so lukewarm.  Such is the reality of relying upon a network of contracted providers.

In conversations with Ms. Shah, she has stated that this has been a typical pattern for most providers with previous initiatives.  She remains optimistic that several other providers will submit proposals, and she maintains that she is in close contact with counties who have yet to submit responses.  We rely on Ms. Shah's experience and expertise in this area, and tentatively defer to her optimism as it is based on years of experience with these providers in similar contexts.  However, Interim Jail Mental Health Treatment is a key focus in the Consent Decree, and if many providers continue to decline funding, the Department must find alternate ways to meet the needs of those inmates receiving competency services in county jails.

Therefore, we have requested the Department to provide a list of all JBBS providers and a list of those who are seeking funding.  We will also ask to review the requests for funding.  We want to ensure that the mental health services at each county jail adequately address the individualized clinical needs of each person receiving competency-related services.[19]  To be fair, some providers who legitimately decline funding may already be able to offer a sufficient continuum of services.  However, we are reluctant to assume this to be true for all providers that decline funding – or even those that request funding.  We therefore will more carefully monitor the quality of the proposed service plans before our next quarterly report, and we plan to follow up with in-person visits afterward.

_____

[19] This service continuum and its associated decision-making processes are detailed in our May 2019 quarterly report.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[20]

35.  Release of Pretrial Detainees for Community-Based Restoration Treatment.  If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has made further progress on the requirement to develop discharge plans for persons identified as appropriate for Community-Based Restoration Treatment (CBRT). However, important work remains.  In the quarter preceding our prior report, the Department solicited drafted discharge plans from the Bridges Program and compared them with their own CMHIP and CMHIFL discharge plans.  They also reviewed other policies and procedures from Bridges.

Ultimately, it became clear that the Bridges Program and the new Forensic Support Team (FST) must work together to facilitate discharge and share responsibilities.  The teams will be relying on similar (partially, but not entirely, overlapping) bodies of information.  Thus, a crucial task over the past quarter has been for the Department and the Bridges team to communicate in planning services, so that they can ultimately collaborate in a way that minimizes redundancies and gaps.  The Department recently developed a "responsibility matrix" to delineate responsibilities for the FST and the Department, particularly as they relate to the Bridges Team. This was not implemented on July 1, as scheduled, because the Forensic Support Team was not hired until recently, and begins work near the end of August.

As the FST launches, it will be crucial that they work collaboratively with the Bridges court liaisons. Thus far, the leadership of each service has met to plan collaboratively, and the FST training has incorporated the Bridges team.  They have scheduled additional meetings (including some in which we will be involved) for broad planning, and for collaborative problem-solving as the FST program becomes operational.  Given these collaborative efforts surrounding the FST launch, we are optimistic that FST and Bridges will jointly work to care for defendants involved in the competency services, and facilitate transitions to the community as appropriate.
As the FST launches at the end of this month, we continue to request the specific documents, policies, and protocols that FST will use to facilitate services and transitions between levels of care.

---

[20] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

## TRANSPORTATION OF PRETRIAL DETAINEES

> 36.  Transportation of Pretrial Detainees.  If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Over the past quarter, a total of 44 defendants were admitted to CMHIP for an inpatient competency evaluation, of whom only 12 met C.R.S. § 27-65-125 criteria, according to hospital staff.[21]  None of these defendants who met civil commitment criteria were returned to a local jail.[22]

As mentioned in our prior quarterly report, the recent SB19-223 includes language that could allow CMHIP to keep a defendant ordered for inpatient evaluation at CMHIP from the time that the evaluator opines him or her incompetent to proceed (rather than requiring C.R.S. § 27-65-125 criteria be met, or that the originating court adjudicates the defendant as incompetent).  This is now found in C.R.S. § 16-8.5-105 (IV-b-5) and reads as follows:

> *When the court orders an inpatient evaluation, the court shall advise the defendant that restoration services may commence immediately if the evaluation concludes that the defendant is incompetent to proceed, unless either party objects at the time of the advisement, or within 72 hours after the receipt of the written evaluation submitted to the court.*

This is a significant change in the law that will require CMHIP and Department administrators to determine policies and procedures governing the decision-making in these circumstances.  At times, CMHIP may need to balance these incompetent individuals already in the hospital and in need of hospital-level care with those Tier 1 or Tier 2 defendants in county jails approaching their deadlines for admission.  We recommend that the decisions among these individuals be made primarily on clinical grounds, but we also understand the need to admit individuals who have been waiting in county jails for extended periods of time.  We anticipate further discussion discussion with the Department around their plans for these situations.

---

[21] According to the July Special Master Compliance Report (p.24), submitted by CDHS on August 7, 2019.

[22] See the Department's monthly report (p. 16) filed May 7, 2019.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38.  Notification of Non-Compliance with Timeframes.  The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services.  The account will be managed by a court-appointed administrator.  Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master.  Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

The Department has indeed consistently provided notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree (since June 1, 2019).  Likewise, the Department has completed a "Fines Report," as prescribed by the Consent Decree.  Finally, as prescribed by the Consent Decree, the Department has indeed paid these fines into a trust account (managed by Cordes & Company, LLP).

Regarding the use of these fines, a small committee comprising Department administration (Worthwein, Scofidio), a representative from the Plaintiff (i.e., Disability Law Colorado leader, Ivandick), and the Special Masters has begun meeting.  Thus far, the committee has explored how funds from the fines will be collected, managed, and distributed (including the need for an identified, formal procedure for reviewing available funds, interested vendors, and outcomes of expenditures).  But this committee has not formalized or finalized these procedures.  The committee has also held discussions about priorities for funding (i.e., services beyond those which the Department is responsible for delivering, that will nevertheless serve those likely to be involved in the competency system and will likely reduce waitlists and wait times).  As of now, over $1 million in fines have been collected, so it will be important to finalize procedures in the relatively near future, in order to make use of those fines in the fairly near future.

## CONSENT DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

> 39.  Civil Bed Freeze.  The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services.  On February 7, 2019, the Department agreed to stop this practice.  The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes.  This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department continues to report that they have removed the "civil bed freeze" as mandated by the Consent Decree.  That is, they have not re-purposed the civil beds at CMHIFL for competence restoration, as they had once proposed.  Per our request, the Department continues to provide a census report on the CMHIFL patients in their monthly report.  As of their most recent report, the CMHIFL population includes a total of 90 patients, 85 of whom were civil patients.  Although five patients have a forensic status, the Department has explained these special circumstances to the Plaintiff and the Special Master, and provided reasonable justification in the monthly report.  All parties have agreed these reflect reasonable exceptions.

During monthly multi-party meetings, the Department has discussed any potential changes to the use of any CMHIFL beds (e.g., allocating a few new beds at CMHIFL to accommodate inpatient competence evaluations, not restoration, which may reduce the need to transport Denver-area defendants to CMHIP for inpatient evaluation).  Generally, the Plaintiffs and Special Masters have agreed with the minor changes they have proposed, because these tend to reflect efficient steps that better serve the Departments' consumers.

For the foreseeable future, the Department will continue to wrestle with the reality that too few civil beds exist in Colorado.  One of the Consent Decree's indirect goals is to increase civil capacity through the reduced need for forensic beds; the Department will need to continue to monitor this trend and the outcomes of relevant initiatives in the Consent Decree to determine the ongoing and future needs for civil beds.

## COMPREHENSIVE AND COHESIVE PLAN

> 40.  Comprehensive and Cohesive Plan.  The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan.  Dkt. 146.  By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider.  As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures.  Dkt. 146 at 42.  On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department continues to move closer to developing a comprehensive, cohesive plan.  The final plan is due to be submitted in January 2020.  As we detailed in our last quarterly report, the Department has taken substantial steps to:

1.  Coordinate and align policies and services within a long-term vision for competency-related services, and

2.  Ensure that their emerging plan is supported by, and integrated with, statutory improvements and efforts from other stakeholders regarding competency services. Indeed, they have shared the preliminary plan with the Governor's Blueprint Task Force subcommittee that is addressing competence-related issues.

The Department has continued developing the plan through the efforts detailed in our previous quarterly report (i.e., various internal meetings, specific coordination initiatives, participation in the Governor's blueprint taskforce committee, etc.).  We affirm these efforts and encourage them to continue.

Along with these important accomplishments, *we see the following as important, remaining next steps towards a "Comprehensive, Cohesive Plan" for the Department to take in the near future:*

- *Write the plan*.  The final, written plan is due in January 2020, though it will be important to share drafts with us and other stakeholders before then.  The written plan should include an articulation of the larger vision for competency services in Colorado, along with specific goals.  It should also include descriptions of the components of the competency services system, policies and protocols, a glossary, desired outcomes, and visual representations of the entire system (described below) and the smaller component parts.

- *Create a visual representation of the new competency services system.*  This should be a 1-2 page representation of how the different components are integrated and interconnected.  It should be tailored to a lay audience, so that stakeholders outside the Department can see the system, see where they fit into the system, and understand the context for their functions and roles in the system.

- *Educating all stakeholders, both within and outside of the Department.*  A comprehensive system cannot be cohesive if employees do not understand how they fit into the larger plan, and a cohesive system cannot be comprehensive if external stakeholders are not aligned with the vision and mission of the system.  It is important for Department employees to understand the changing system in which they work.  While important for all employees, some particular sets of employees will need special attention:

    o  *Court Services evaluators:* They will soon be asked to opine on issues they have never before been asked to address (triage priority, inpatient vs. outpatient placement, and legislatively-mandated details about their cases).  This is the most significant change in Court Services since the transition to conducting jail-based evaluations many years ago.  Evaluators must understand the new system in which they work — how their opinions will affect clinical care, triage priority, and so on.  A large system of care will soon surround ITP defendants.  Without knowledge of this system (or a proper understanding of their role in it), evaluators may resort to overly conservative, risk aversive decisions.

    o  *CMHIP staff:* The makeup of the hospital continues to change to a disproportionately forensic population.  The hospital is accredited as an acute-care facility.  Long-time staff may be frustrated by this gradual change.  Long-term care is at times being supplanted by shorter-term restoration efforts.  Continued efforts to maintain morale and help CMHIP personnel see their critical role in addressing important clinical functions for ITP defendants are important.

    o  *CMHIFL staff:* Even more so, the exclusively civil Ft. Logan hospital is slated to begin admitting forensic patients in the coming year.  This will be a substantial shift for hospital administrators and the personnel working in those units alike.  Cross-training from CMHIP and dedicated planning to that transition will be critical.

    o  *New positions (Forensic Support Team, Data Management)*: These new positions were created exclusively for the new competency services system.  Data positions need to understand the larger system so that data can best be collected and analyzed.  Perhaps more than any other positions, the Forensic Support Team (FST) positions must understand how they fit into the continuum of competency services so that they can reliably and accurately monitor clinical status, competency progress, and options for placement.  In addition, the FST positions will at times need to act as buffers against stakeholder pressures to hospitalize CBRT participants, attend to crises, and provide a voice of expertise and reason during court proceedings.  A thorough knowledge of the system is imperative.

- *Coordinating with NASMHPD and other resources.* The Forensic Services Director must reach out and utilize the network of national professionals in the National Association for State Mental Health Program Directors (NASMHPD), particularly the Forensic Division, the American Psychology-Law Society, and other organizations.  Colorado can learn lessons from other state administrators about how similar programs have been successfully launched and implemented, how to maintain evaluator morale, how to evaluate evaluator and programmatic outcomes, and so on.  The forensic leaders at the Department should have the resources to attend national meetings of these organizations and become involved in ways that help the Department.

- *Refine legislative bills.* Inevitably, SB19-222 and SB19-223 will require adjustment as they are implemented.  The Department must collect outcome data for each bill and begin making drafted adjustments to both bills in late 2019 / early 2020.

- *Refine workloads and expectations within new programs.*  Analogously, the new Department programs (triage, CBRT, data team) will require careful monitoring of outcomes so that necessary adjustments can be made.  Adjustments might include revised workloads for Court Service evaluators, jurisdictions for FST Navigators, contracts for CBRT providers, intensity of JBBS services for defendants at various stages of the competency process, and so on.  Additional positions may be needed over time (Court Service evaluators, for example).  In short, the Department is launching many promising initiatives; all of these are new and complicated enough that they will inevitably require close observation and fine-tuning.

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system.  This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein.  This plan shall be approved by the Special Master.

As in our past quarterly report, the Department continues to make progress in developing a wide-scale outpatient, community-based restoration treatment program (CBRT).  Their formal CBRT program began in March of 2018, and referrals for outpatient restoration have tended to hover around 34 defendants per month for the past several months (though June referrals dropped to an unusual low of 29).  Although we hope to see these referrals — in particular, the proportion of defendants referred for CBRT (detailed in 41(c) below) — increase further, we perceive the Department taking meaningful steps towards further CBRT:

- The Department has increasingly established contracts with the community mental health centers (nearly all of them, at this point) to provide CBRT.

- The Department increasingly considers and describes outpatient restoration the default approach for restoration, unless there is clear reason for inpatient restoration. Simply shifting the "default setting" (particularly as evaluators and judges understand it) will help to increase community-based restoration, and decrease unnecessary inpatient admissions.

- Part of SB19-223 allocated an additional $2.26 million to support community services consistent with competence restoration goals (and, as we understand it, with a substantial portion of that funding earmarked exclusively for competency-related services).

- The Department has allocated $500,000 to Mental Health Center of Denver (MHCD) and Denver Pre-trial Services to establish a pilot program that bolsters case management, treatment, and supervision in order to expand CBRT in the Denver metro area.  Though a pilot program, this type of targeted intervention in such a high-need area may be sufficient, even by itself, to influence waiting list and wait time figures for the state. The Department reports that they expect to finalize the contract late in August 2019.

Along with these important accomplishments, *we see the following as important, remaining next steps for the Department to take in the near future:*

- Consistently increase the number, and percentage, of incompetent defendants to CBRT (see discussion of 41c below).

- Continue educating evaluators, the defense bar, and the courts that CBRT is available, and should be considered the default option.

- Further train evaluators, who must soon include recommendations for restoration location (inpatient or outpatient) in the conclusion of any report that opines a defendant is not competent.  Evaluators will need to better understand the CBRT system, and become reliable with one another (i.e., offering similar opinions in similar cases) in recommending CBRT versus inpatient restoration.

- Provide to the Special Masters requested data on CBRT process and outcomes.  Such data will be important for quality assurance, improving services, and further planning.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location.  The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

At this point, the Department has explored contracts for private hospital beds, but does not seem to consider this an urgent priority relative to other tasks.  We agree that private hospital beds are unlikely to be a primary part of improving the waitlist.  Rather, we believe they may play a small role, such as the following examples:

- Serving as a local site for defendants receiving outpatient restoration services — when they decompensate either in jail or in the community and warrant more intensive clinical care — to receive local services rapidly (rather than await transfer to CMHIP).

- Serving as additional inpatient restoration sites, akin to providing additional CMHIP beds in various locations around Colorado.

Again, we consider use of private hospital beds one of many plausible, minor supportive strategies that may augment the much broader improvements in the Department's system of competency-related services.  But we see this strategy as far less urgent (and far less likely to make a broad impact) than the other steps they are pursuing, detailed throughout this report.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care.  Dkt. 146 at 29.  The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019.  The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department.  On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

Prior to our last quarterly report, we used the most recent six-month period of available data (i.e., Nov 2018 – April 2019) to set the "baseline" for future performance goals.  We also recommend using proportional metrics when pursuing goals that are fundamentally proportional in nature (i.e., a 10% increase in community-based restoration and a 10% decrease in inpatient restoration).  In other words, while the Department may not have full control over the actual number of referrals, they have greater control over the proportion of referrals they direct to outpatient versus inpatient restoration.  Therefore, we chose to set the baseline figures, and establish subsequent performance goals, *based on proportions instead of raw numbers*.  Thus, calculating target goals for restoration based on these *percentages of individuals* referred to inpatient versus outpatient services yields the following goals:

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| **Baseline (past 6 months)** | Recent 6-month average: 69% | Recent 6-month average: 31% |
| **December 1, 2019 goal** | 69% reduced by 10% = 62% | 31% increased by 10% = 34% |
| **June 1, 2020 goal** | 62% reduced by 10% = 56% | 34% increased by 10% = 37% |
| Note: All percentages rounded to nearest 1%. | | |

Therefore, the December 1, 2019 performance goal to reduce inpatient restoration by 10% and increase outpatient restoration by 10% should yield no more than 62% of defendants referred for inpatient restoration and no less than 34% of defendants referred for outpatient (community-based) restoration.

As of this quarter (i.e., preceding August 28, 2019), *the portion of defendants referred to CBRT has averaged 28.8%, which was lower than the prior period*.[23]  Indeed, the Department had maintained 34% (their December 2019 goal) for a few months prior to the last quarterly report, but inpatient referrals inexplicably decreased in May (27%) and June (26%) of 2019.  The Department could identify no clear reason for this decrease, *but this decrease suggests they may require more concentrated efforts to increase CBRT referrals among all defendants for whom they are appropriate*.

We are hopeful that the following interventions (already underway) will help the Department comply with Paragraph 41 of the Consent Decree by increasing outpatient restoration to 34%, on average, for the period spanning June 1, 2019 through December 1, 2019. Specifically, we

---

[23] According to the July Special Master Compliance Report (p.31-32), submitted by CDHS on August 7, 2019.

recommend:

- Further efforts to educate evaluators, the bar, and the judiciary about CBRT, particularly the ways in which the newly launched FST can support CBRT efforts.

- Launching the FST with special attention to supporting CBRT in all instances when the defendants are an appropriate fit for outpatient restoration.

## CONCLUSION

As detailed throughout this report, we perceive the Department has made significant and meaningful progress in enacting the elements prescribed in the Consent Decree.  Indeed, key interventions prescribed by the Consent Decree (e.g., the triage system, the Forensic Support Team) have launched during this reporting period.  At present, these have not significantly changed the overall key metrics such as the waiting list or waiting times for restoration services, but they do reveal that the Department is generally responding promptly to those identified as Tier 1.  Put simply, the most acutely ill defendants — those whose welfare was a primary focus in the current legislation and Consent Decree — do *seem to be receiving more prompt treatment upon launch of the Triage System*.  We have requested the Department provide even more detail on this population in the coming months, and we hope to see continued, prompt service to them.  At the same time, it will be important for the Department to begin accelerating inpatient restoration treatment for Tier 2 defendants, whose needs may be less urgent, but nevertheless important.  We will continue to work with the Department on these (and other) matters, and we encourage you to contact us with any questions or requests.  We appreciate the opportunity to serve the court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.

Daniel Murrie, Ph.D.