

Groundswell Services, Inc.

SPECIAL MASTER REPORT to JUDGE WANG

Submitted November 27, 2019

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director  of the Colorado
Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental
Health Institute at Pueblo, Defendants.

November 27, 2019

*Re: Civil Action No.  11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our November 28, 2019 status report mandated by the Consent Decree filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW.  As you know, the Consent Decree (following your earlier court order) requires us to monitor progress and provide recommendations for improvement to the Colorado Department of Human Services (CDHS). Specifically, the Consent Decree (p.24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter.  The Special Master's status report was submitted on January 28, 2019.  Dkt. 146.  The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter.  Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.

> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Since our appointment as Special Master on January 2, 2019, the parties entered into mediation, resulting in the Consent Decree filed March 15, 2019.  This Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and eventually attain compliance with all time frames and deadlines mandated in the Consent Decree.  The Department has initiated many of these steps, demonstrating meaningful progress, in ways we detail through the remainder of this report.  *In particular, this report will focus on developments since our prior quarterly report, which was submitted August 28, 2019.*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................4

   KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS................................8

      KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES ..................................................9

      KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES.................................................10

      KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES ......................................12

CONSENT DECREE SECTION VI UPDATES ................................................................13

   ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION

   TREATMENT .........................................................................................................13

      Wait Times for Inpatient Evaluation ..........................................................14

      Wait Times for Inpatient Restoration..........................................................16

   PERFORMANCE OF JAIL COMPETENCY EVALUATIONS.......................................................18

   INTERIM JAIL MENTAL HEALTH TREATMENT...............................................................21

   RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT .................23

   TRANSPORTATION OF PRETRIAL DETAINEES ...............................................................26

   NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES .............................................27

CONSENT DECREE SECTION VII UPDATES ...............................................................29

   CIVIL BED FREEZE..................................................................................................29

   COMPREHENSIVE AND COHESIVE PLAN...................................................................30

   INCREASE COMMUNITY RESTORATION SERVICES ..........................................................32

CONCLUSION ................................................................................................................36

# INTRODUCTION

The Consent Decree filed March 15, 2019 prescribed a variety of steps the Department must take, and timelines it must meet, to improve the competency assessment and restoration system in Colorado.  After the Consent Decree was filed in March, the Department began taking many of these steps (detailed through the remainder of this report) in ways that we consider generally responsive, and in ways that appear to recognize the gravity and complexity of the challenges they face.

Broadly speaking, we consider three goals of the Consent Decree to be primary:
      a) Reducing the overall *number* of people on the waitlist for competence restoration
         services,
      b) Reducing the *wait times* for people on the waitlist, particularly people with the most
         acute psychiatric illness, and
      c) Reducing *harm* to people on the waitlist.

Progress on the first goal has been quite modest, but slight improvements are apparent, particularly over the last month.  Progress on the second goal has been much more substantial, though solely for people with the most acute psychiatric illness.  Similarly, progress on the third goal has been mixed.  The ability to quickly hospitalize those who are most ill has undoubtedly reduced the overall scope of human suffering, though there was one suicide among this group (described further, below), and those with less acute illness tend to wait in the hospital longer.  This report details progress on these three primary markers as well as other key developments.

*Progress:*
Key developments include the launch of several new initiatives.  Whereas our prior reports addressed the Department's planning and implementation, we are now beginning to see the outcomes of those new initiatives the Consent Decree prescribed.  Specifically, the Department has:

- Maintained an active Triage system, a key compromise from the Consent Decree, which requires the Department to rapidly (i.e., within 7 days) admit for competence restoration the most acutely ill defendants ("Tier 1") and less rapidly admit those who less urgently need hospitalization ("Tier 2").

- Admitted these Tier 1 defendants for inpatient restoration in a prompt manner, consistent with the requirements of the Consent Decree.  This is the most significant improvement to the competency system in several years, and the Department has maintained near-perfect compliance with these ambitious seven-day requirements.

- Launched the Forensic Support Team (FST), another key component of the Consent Decree.  The FST has just begun monitoring incompetent-to-proceed (ITP) defendants in jail awaiting hospitalization, and has intervened well in several crisis and emergency

situations.  The presence of a team to monitor the defendants on the waitlist is a significant improvement over last year, when the Department had no such service, and a fundamental change to the Colorado competency system.

- Coordinated a draft of the Department's "comprehensive and cohesive plan" for competency services in Colorado with the Governor's task force on competency-related issues.

- Maintained and expanded data systems, analysis, and reporting of competency-related information.

- Implemented enhanced competency evaluation reports, consistent with mandates from the Consent Decree and SB19-223.  These reports now include more in-depth information regarding competency of the defendant as well as opinions on placement for restoration (inpatient vs. community-based restoration) and urgency of clinical need (Tier 1 vs. Tier 2).  A large training event for evaluators, led by a national expert, further aided Department evaluators in these goals.

- Opened 18 new beds for competency restoration at the Boulder County Jail's RISE program.  This program replicates the RISE program at Arapahoe County Jail.

- Opened new contracted beds at one private hospital in the metro area, for a total of five new beds (with an additional three in the near future).

- Finally, via the Fines Committee prescribed by the Consent Decree (p.17), the Department, Disability Law Colorado (DLC), and the Special Master have collaborated with the Colorado Coalition for the Homeless to fund Fusion Studios, which will provide housing in the community to many competency-involved individuals over the next five years, beginning by January 2020.

As anticipated in our last report, these developments have yielded some progress towards meeting key time frame requirements.  In short, defendants opined to be Tier 1 are now admitted to CMHIP promptly, within the Consent Decree's 7-day timeframe.  However, the overall size of the waitlist remains only slightly lower than in March 2019, and the wait for Tier 2 defendants has decreased only slightly.

*Challenges:*
The Department has also experienced significant setbacks and challenges.  Recently, one defendant on the waitlist for hospitalization committed suicide before she was transferred to the hospital.  There were also two suicides among individuals involved in competence-restoration services in the community (though these do not fall directly within the scope of the Consent Decree).  These incidents, and other developments, underscore some of the current challenges for the Department, including:

- Using the newly launched Forensic Support Team (FST) to aid defendants found incompetent to proceed (ITP) who are either in jail awaiting transfer to Colorado Mental Health Institute at Pueblo (CMHIP) or in the community receiving community-based restoration treatment. The FST launched in earnest somewhat behind schedule, and continues to clarify its role vis-a-vis the complementary Court-operated Bridges Court Liaison program and clarify its role with defendants in the community. As the Department knows, the first several months after launching any new initiative will require significant monitoring, revision, and changes as unanticipated challenges inevitably arise.

- Accelerating restoration services for defendants designated Tier 2. Whereas the Department has been remarkably prompt in hospitalizing the Tier 1 patients, full adherence to the Consent Decree will require improving timely service to Tier 2 defendants as well.

- Appropriately responding to the recent suicides among competence-involved individuals, and learning from these incidents to prevent others.[1] Frankly, suicides (and other human suffering among defendants in the competency system) are exactly the type of outcome the Consent Decree attempts to minimize. Though not all the factors surrounding these incidents are under Department control, the Department *must* learn from these incidents to prevent similar situations.

- Ensuring that sheriff's departments and county jails are better prepared to provide enhanced mental health services for defendants awaiting competency services in local county jails. This funding was provided by SB19-223; while the response to requests for proposals has been largely unanimous, the scope and breadth of services varies widely – such that some counties may still be operating with inadequate in-jail mental health services. Lessons from the recent in-jail suicide should shape future Department collaborations with the jails.

Beyond these emerging challenges, some of the primary challenges (i.e., the areas for closest scrutiny and support) we identified in our prior quarterly report remain:

- Better educating the court and the bar about the triage system and other new interventions, so that they will act in ways that support the triage system and the broader

---

[1] Our discussion of these recent suicides is limited in detail, because we are still awaiting crucial information about the incidents. To be clear, our impression is that the Department has responded rapidly and appears generally responsive to our requests for information. But the incident involved jail-based mental health services from a contracted mental health care provider, and we do not have full or prompt access to information from that source. We have requested all relevant records relating to both the in-jail suicide and the in-community suicides and we anticipate further discussion of these in our subsequent report. We may also decide to submit a separate confidential report, if indicated.

goals of admitting the most acutely ill defendants most rapidly.  These educational efforts will need to be prompt and assertive in order to help courts understand and support new procedures and less often issue "show cause" orders that compromise CDHS goals of triaging by greatest clinical need.  Although the Department has described some dissemination efforts, further dissemination efforts remain crucial in the very near future.

- Ensuring adequate training and reliability among evaluators as they learn to include triage opinions and restoration placement recommendations in their competence evaluation reports.  As we have discussed with the Department, the initial training efforts were inadequate and delayed.  Consequently, evaluators have been deeply frustrated and morale has been strained.  More recently, we have taken a more active role with evaluators.  The Department has made changes to evaluator leadership and has better engaged evaluators and supervisors.  Morale and progress seems to be improving.

- Monitoring both the FST and the Community-Based Restoration Treatment (CBRT) systems.  These systems (especially the FST) are relatively new programs, and both appear to be experiencing some understandable identity confusion and growing pains.  Both have experienced suicide either directly or indirectly, neither have a functioning data collection or analysis system in operation, and both experience role confusion from outside stakeholders.  We therefore devoted more space to these two programs in this quarterly report than in previous reports; potential problem areas and suggested recommendations are discussed in their respective sections.

Overall, we continue to affirm the Department's efforts to enact the changes prescribed in the Consent Decree.  Their efforts to comply with the Consent Decree have been well-conceived and usually well-executed.  However, the recent suicides require significant attention: identifying root causes and lessons learned, then making necessary changes immediately.  We remain encouraged by: the triage system, improving morale of Court Services evaluators, CBRT service availability, and the increased role of the FST.  But it remains crucial to address some of the more persistent problems: long waitlists for Tier 2 individuals, poor leverage with interim jail mental health services, looming shortages of Court Services evaluators, poor data management in certain areas, and lingering role confusion with the Bridges program.

We begin by addressing the Department's compliance with time frame requirements, because this is the primary focus of the Consent Decree (and the focus that the Consent Decree prescribes for these quarterly reports).  Indeed, we consider these time frames our "key metrics" — or primary markers of progress — that we review in each quarterly report.  However, we then expand to address the other interventions prescribed by the Consent Decree because progress in these interventions will likely contribute to progress in achieving the overall goal of compliance with time frame requirements.

## KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of these quarterly reports must be the Department's compliance with time frame requirements:

(i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such **reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p.24)

(ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree.  This includes both time frames for competence *evaluation* and for competence *restoration*.  We anticipate that these will be the key metrics to demonstrate progress over the next few years, so they are our starting point in the report, as well as a primary focus.  Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES

As summarized in the table below, the Department has been meeting the timelines for competence evaluation that the Consent Decree prescribed beginning June 2019.  Indeed, the Department was meeting these evaluation time frames even before June 2019.

| Average Wait Times for Competence Evaluation Services[2] | | | | | | |
|---|---|---|---|---|---|---|
| | Jun-Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | June 2019 Requirement | January 2020 Requirement |
| Jail-based Competency Evaluations | 22.8 | 22.3 | 21.3 | 23.7* | 28 days | 28 days |
| Inpatient Competency Evaluations | 12.8 | 20* | 12.7 | 20.8* | 21 days | 21 days |

* = at least one defendant waited longer than max time frame for the evaluation

Generally, timely competence evaluation has been a relative strength of the Department.  Well before the recent Consent Decree, they followed the national trend of de-centralizing evaluations, moving them from solely an inpatient service to a localized service in the community.  During recent history, their evaluations have *almost* always met the prescribed time frames.  Recently, however, their success in meeting these time frames appears more tenuous, as they lack an adequate workforce of evaluators and (as of the most recent data from this week) they appear close to missing some evaluation deadlines.  This vulnerability underscores the need to rapidly recruit and retain good forensic evaluators (discussed later in this report).  Similarly, we anticipate the Department will need to take additional steps over the next year to maintain their compliance, particularly when the prescribed time frames decrease to 21 days in July 2020.

Overall, the Department has performed well with respect to competence *evaluation* time frames over the past year, but will need to aggressively and rapidly improve the evaluator workforce to maintain this compliance.

---

[2] Data from October 2019 is the most recent data available from CDHS.  Average wait times for Jun-Jul 2019 reflect a reasonable approximation of the average wait times; exact sample sizes were not used to calculate a precise average.

## KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES

In contrast to their prompt *evaluation* services, the Department has consistently failed to provide prompt *restoration* services.  In the months before the Triage system launched, defendants who were admitted for inpatient restoration treatment at CMHIP or RISE waited, on average, 71 days.[3]  Of course, this figure included all defendants referred for restoration, without distinction between those with more, versus less, acute needs.  Since then, however, the Department launched on June 1, 2019 the Consent-Decree-mandated triage system,[4] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2").  Tier 1 defendants must receive services within 7 days of the competency hearing, whereas Tier 2 defendants need not receive services for 56 days (with Tier 2 deadlines shortening in the future).

Overall, recent CDHS monthly reports describe excellent adherence to the 7-day deadline for defendants whom the court has designated as Tier 1 (i.e., average wait times well under 7 days).[5] However, wait times for Tier 2 defendants still far exceed the time frames prescribed in the Consent Decree (i.e., average wait times exceeding 80 days, well beyond the required 56 days).

| *Average Wait Times for Inpatient Competence Restoration Services*[6] | | | | | | |
|---|---|---|---|---|---|---|
| | Jun-Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | June 2019 Requirement | January 2020 Requirement |
| Tier 1 | 3.64* | 3.2 | 5.2 | 3.7 | 7 days | 7 days |
| Tier 2 | 87.2** | 80.8** | 99.8** | 94.5** | 56 days | 49 days |

\* = at least one defendant waited longer than maximum time frame for restoration services
\*\* = most defendants waited longer than maximum time frame for restoration services

However, each of these summary statistics requires more discussion.  First, the figures for Tier 1 defendants reflect only Tier 1 defendants as defined in the Consent Decree; that is, *defendants whom the court has designated as Tier 1 and ordered to the hospital*.  This represents only a

---

[3] Average waiting period November 2018 – April 2019, as calculated from data provided by the Department (see p.7 of their Monthly report filed May 7, 2019).

[4] See Consent Decree paragraph 43.

[5] According to Special Master Compliance Plan report October 2019 p.10 (submitted November 7, 2019).

[6] Average wait times for Tier 2 defendants reflect a reasonable approximation of the average wait times; exact sample sizes were not used to calculate a precise average.

fraction of the number of defendants whom CDHS evaluators have recommended as Tier 1 (for example, the June figure is based on two defendants and the July figure is based on 7 defendants) because some are admitted to CMHIP or have charges dismissed before the court enters an order designating them as Tier 1.

---

**An initial process review:**
 Shortly after the launch of the triage system, we conducted individualized reviews of the first 53 cases in which Court Services evaluators opined defendants as Tier 1 to ensure that each of these defendants were indeed admitted as required within the Consent Decree time frames.  As written in our August 2019 report:

> We view this Tier 1 population as the heart of the Consent Decree — those defendants who are identified most urgently needing hospital-level care — and we must ensure that their needs are met in ways consistent with the letter and spirit of the Consent Decree.  We look forward to reviewing CDHS's detailed account of each Tier 1 defendant's pathway, and reporting this information to you in our next quarterly report to the Court.

As a result of this initial review, we are confident that each defendant opined Tier 1 and ordered by the court to inpatient restoration within 7 days of their adjudication was indeed admitted to CMHIP within that time frame.

---

To date, the Department reports that a total of 83 individuals have been opined as Tier 1 by Court Services Evaluators and admitted to CMHIP via the Consent Decree criteria.  Of these, 81 were admitted within the 7-day maximum time frame.  In many respects, this summary bodes well for CDHS efforts to implement the triage system.  According to CDHS administrators and data management personnel, the vast majority of defendants whom evaluators designate as Tier 1 are admitted to the hospital promptly (i.e., well within seven days), and often even before the Court designates them as Tier 1 and orders admission.  For those that have not, CDHS has offered what appear to be plausible explanations.

Regarding Tier 2 defendants, progress has been limited.  Average wait times still far exceed the time limits in the Consent Decree, just as they did for all defendants in prior months.  Tier 2 defendants have typically waited between 81 and 100 days between August and October 2019, when the maximum time frame for that time period was 56 days.  Thus, the Tier 1 figures suggest that the Triage System serves the purpose for which it was designed: prioritizing the most acutely ill defendants and moving them into the hospital rapidly.  However, the Tier 2 figures reveal that CDHS continues to struggle with some of the primary challenges that prompted the Consent Decree: responding to the volume of defendants referred for inpatient restoration, and admitting them into the hospital within a reasonable time frame.

Overall, Tier 1 admissions occur on time, while Tier 2 admissions still far exceed maximum admission time frames.

KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

Beyond the wait times for restoration services (and progress towards the time frame requirements of the Consent Decree), another key metric for gauging the Department's progress is the *waiting list* for competence restoration services.  In the months preceding launch of the Triage system, the waitlist averaged around 150 to 180 defendants.[7]  But again, with the initiation of the Triage system on June 1, we must consider the waitlist according to Tier status. Central to the Triage system is an acknowledgement that some incompetent defendants are so acutely ill that they require treatment almost immediately (Tier 1, who require treatment within 7 days), whereas others can safely await treatment (Tier 2, who can wait several weeks).

| *Number of Defendants on Waiting List for Inpatient Restoration*[8] | | | | | |
|---|---|---|---|---|---|
| | March 2019 | July 2019 | Aug 2019 | Sep 2019 | Oct 2019 |
| Combined | 157 | | | | |
| Tier 1 | N/A | 1 | 0 | 0 | 0 |
| Tier 2 | N/A | 168 | 169 | 152 | 145 |

The number of persons on the waitlist is still quite high.  This number is driven largely by the number of court orders that OBH receives, but can be decreased by the availability of inpatient restoration beds and alternative restoration settings.  The number has fluctuated since March 2019, but overall has decreased slightly since then.

Overall, there has been a slight, but meaningful, decrease in the number of individuals on the waitlist for restoration services over the past quarter. This decrease appears genuinely attributable to Department interventions and not simply to a decrease in referrals.

---

[7] At present, the Department provides waitlist data as daily figures, so the monthly figures in the table reflect averaged daily figures.

[8] According to the Department's Special Master Compliance Plan report October 2019 p.10 (submitted November 7, 2019).

## CONSENT DECREE SECTION VI UPDATES

### ADMISSION OF PRETRIAL DETAINEES[9] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment.  The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribes the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations (whether inpatient or in jail).[10]  Admission time frames become progressively shorter at each six-month increment. Evaluation time frames are reduced in July 2020.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 | 7 days | 28 days | 14 days | 21 days |

As summarized earlier in this report ("Key Metrics"), *the Department generally meets June 1 time frames for competency evaluations, and even meets the time frame for admitting Tier 1 defendants to restoration.  But they far exceed the time frames for Tier 2 admissions to competency restoration.*

---

[9] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services.  Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

## Wait Times for Inpatient <u>Evaluation</u>

As detailed below, the Department has been quite successful in timely admission for inpatient competence *evaluations* (versus restoration):

| Recent Wait Times for Inpatient Evaluation | | | |
|---|---|---|---|
| Month | Number admitted to CHMIP for inpatient evaluation | Average days waited prior to admission to CMHIP or RISE | People who waited more than 28 days |
| Oct 2019 | 5 | 20.8* | 2 |
| Sep 2019 | 2 | 12.7 | 0 |
| Aug 2019 | 9 | 20.0 | 1 |
| May - Jul 2019 average | 14.7 | 12.3 | 0 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than max time frame for inpatient evaluation services

Over the past three months, an average of 5.3 people per month were admitted for an inpatient evaluation at CMHIP (compared to a 14.7 average for the previous quarter).  The average wait time for admission to CMHIP for inpatient competency evaluation was 17.8 days (more than 5 days longer than the average for the previous quarter).  Although the number of admissions was much lower than the previous quarter, the wait time is longer and more people have waited longer than the maximum 28-day time frame.  The reason for this discrepancy is unclear, but likely relates to Department efforts to admit Tier 1 patients for restoration within the 7-day timeframe (which inevitably causes longer waits for other admissions).  Although the Department has continued to handle most of these inpatient evaluations as "same-day" evaluations, which do not require full admission and multi-day stay (thereby reserving hospital beds for those who need them more), the waits are increasing.  This is in contrast to the previous quarter, which showed a shorter wait time and no persons waiting more than 28 days.  *Overall then, the Department did not consistently meet the time frames for inpatient competence evaluation.*

---

[10] Fine amounts are tied to delays beyond each of the time frames listed.  However, these fines are discussed elsewhere in this report.

According to CDHS reports, only a fraction of those defendants ordered for inpatient evaluation actually met the strict criteria for involuntary hospitalization (C.R.S. § 27-65-105).[11]  Specifically, CDHS reported that during the past 3 months, 50% of admissions for inpatient evaluation met that strict "27-65" criteria for involuntary hospitalization.[12]  This contrasts with the earlier 20% rate, calculated when more defendants were sent to CMHIP for inpatient evaluation.  In most respects, this is a positive trend: fewer defendants are sent for inpatient evaluation, and of that smaller group more meet inpatient admission criteria.  That is, those ordered to the hospital were more likely to be those who met criteria for hospitalization.  On the other hand, the average wait time for admission is longer than before, and more people are waiting more than 28 days before admission, a problem that becomes even more important if those delayed are those patients who meet "27-65" criteria and likely need prompt hospitalization.

---

[11] C.R.S. § 27-65-105: (1)  Emergency procedure may be invoked under either one of the following two conditions:

(a)(I)  When any person appears to have a mental health disorder and, as a result of such mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then an intervening professional, as specified in subsection (1)(a)(II) of this section, upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation…

(b)  Upon an affidavit sworn to or affirmed before a judge that relates sufficient facts to establish that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation.

[12] From the November 7, 2019 CDHS Monthly Compliance Plan Report (p.17).

## Wait Times for Inpatient <u>Restoration</u>

Compared to the timely inpatient evaluations, there are far more concerns regarding inpatient *restoration* at CMHIP.  Over the past few years, wait times consistently exceeded the 30-day time frames mandated by an earlier Settlement Agreement.  However, the required time frames changed as of June 1, 2019, per the Consent Decree.  The maximum time frame for many defendants (those labeled as Tier 2) waiting in jails has been extended to 56 days.  The time frame for defendants with the most urgent clinical needs (those labeled Tier 1) is now only 7 days.

| Recent Wait Times for Inpatient Restoration[13] | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number of people admitted to CMHIP for inpatient restoration | | Average days waited for admission to CMHIP inpatient restoration | | People who waited more than the max days for admission to CMHIP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Oct 19 | 18 | 62 | 3.7 | 94.5 | 0 | * |
| Sep 19 | 14 | 65 | 5.2 | 99.8 | 0 | * |
| Aug 19 | 24 | 39 | 3.2 | 80.8 | 0 | * |
| Jun - Jul 19 | 10.5 | 51 | 3.64 | 87.2 | 1 | * |
| Mar 19 | 41 | | 61.6 | | 32 | |

*\* CDHS has not provided in their monthly report the number of Tier 2 individuals who waited more than the maximum allowable days for admission to CMHIP for restoration.  We have requested these data.*

As the table reveals, most of the defendants now designated as Tier 2 wait much longer than the required 56 days before admission.  For example, in October, a total of 62 Tier 2 individuals were admitted to CMHIP, with their waiting time for admission averaging 94.5 days.  However, the much smaller group of patients designated as Tier 1 were admitted rapidly, consistent with the mandates of the Consent Decree.  In October, a total of 18 Tier 1 individuals were admitted to CMHIP, with their days waited prior to admission averaging 3.7 days.  To date, a total of 83 individuals designated as Tier 1 have been admitted within 7 days of being adjudicated as ITP.[14]

As noted in our last quarterly report, the Department's rapid response to those identified as Tier 1 is remarkable.  In many ways, the Tier 1 individuals are the highest priority for the Consent Decree and the CDHS competency system.  We are pleased that those whom CDHS categorized as Tier 1 were admitted rapidly.

However, the progress towards meeting Tier 2 timelines remains problematic.  Tier 2 individuals are mandated to CMHIP, but with less urgency.  CMHIP has continued to nimbly create space for Tier 1 individuals, inevitably by prioritizing them over Tier 2 individuals.  However, Tier 2 individuals must also be admitted within certain time frames.  The only options for reducing their wait times are to create space for them in CMHIP (by reducing restoration lengths of stay or creating new beds) or to transfer them to community-based treatment (if they are appropriate for community treatment).  In short, while Tier 1 individuals must be prioritized for admission (thereby treating those who need it most), successful compliance with the Consent Decree must *also* reduce Tier 2 time frames; such compliance will demonstrate that CDHS' competency system has created adequate capacity for all levels of competency restoration.

---

[13] According to the Department's Special Master Compliance Plan report October 2019 p.9-10 (submitted November 7, 2019).

[14] Some Tier 1 individuals admitted to CMHIP are not reflected in the table due to timing of admissions (primarily persons admitted in early November).

## PERFORMANCE OF JAIL COMPETENCY EVALUATIONS

> 33. (b) Performance of Jail Competency Evaluations.  The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld.  Counties not specifically identified are counties that use the "Hold and Wait" court ordered process.  Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting.  Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The mandated time limit for a jail-based evaluation is now 28 days, per the Consent Decree. According to data they provided, the Department once again achieved almost perfect compliance with this time frame.[15]

While we affirm their success in meeting these timelines, we also have growing concerns about how they have met the timelines, and whether they will be able to continue to do so. Specifically,

- Evaluation referrals are beginning to exceed the capacity of the current workforce, and the Department is for the first time in recent history likely to fail to meet evaluation time frames.

- Indeed, meeting the time frames in the manner they have been appears unsustainable. Our recent review of sample reports and monthly workloads among evaluators has made it clear that the Department's success in meeting timelines has been possible by greatly over-relying on one particularly prolific evaluator.  This evaluator (who is also employed in another role in a CDHS facility) contracts to complete a grossly disproportionate number of evaluations, even compared to the full-time employee evaluators, and his reports are of disproportionately poor quality.  While we understand the apparent benefit that this contractor provides (in terms of raw numbers and meeting deadlines) we believe the risks of this arrangement far outweigh the benefits.  We have emphasized to the Department that this evaluator should be completing far fewer evaluations of far higher quality.  It will be crucial to replace this arrangement with one that relies on reasonable workloads and demands higher quality.[16]

---

[15] Data taken from the November 7, 2019 CDHS Monthly Compliance Plan Report covering October (p.20).

- Another challenge in maintaining a strong workforce of evaluators involves morale (as we discussed in our prior report).  In general, CDHS evaluators have expressed frustration with the ways in which CDHS administration implemented the recent changes in evaluations that were mandated by the Consent Decree and SB19-223.  Evaluators complained that implementation has been hasty, ill-defined, and neglected evaluator expertise.  In many respects, we are sympathetic to the evaluators' frustrations.  We are pleased to report that the Department has (albeit belatedly), begun to better enlist evaluator expertise and support supervisors in training roles.  These significant changes seem to have improved morale, but the relationship between administration and evaluators has been tenuous.  Continued repair to this relationship will be crucial to recruiting and retaining the type of evaluator workforce that the Department will need to maintain compliance with evaluation time frames.

- To their credit, the Department recognizes that their capacity to meet these evaluation timelines is tenuous and will require rapid efforts to recruit new employees and contractors. They have begun to explore evaluator pay and recruitment strategies in other states. Unfortunately, their past recruitment efforts have appeared only marginally successful.  When we interviewed a sample of evaluators who have undergone (or withdrawn from) the Department's hiring process, it became clear that the process was marked by lengthy delays, mixed-messages, and other process flaws that greatly discourage the qualified evaluators they would most like to recruit.  Some of these flaws are described as "bureaucracy" or "bureaucratic delays," and appear located more in CDHS Human Resources or other departments than in the clinical leadership, but some were clearly within the control of clinical leadership.  It will be crucial for the clinical leadership to address all of these barriers to hiring in order to recruit a sufficient workforce for timely evaluations.

- In particular, on July 1, 2020, the new time frame for jail-based evaluations will decrease to 21 days.  The Department must produce data well in advance of this change to determine how many additional evaluators they will need to hire in order to meet this shortened deadline.  Their analysis should occur soon enough to adjust the budget and secure funding to hire these additional positions (again, we are encouraged to see they have recently begun exploring evaluator salaries in other states).  Our understanding is that the Department has been planning (for many months) a "time study" of evaluator workloads and time required, but we encourage them to proceed as soon as possible.  Data from the past week suggests that the Department may be missing some evaluation deadlines for the first time in many months, so prompt efforts to assess and increase the capacity of their workforce will be crucial.

---

[16] To be clear, our ongoing reviews of reports from CDHS full-time Court Services evaluators continues to confirm our impressions that the quality of reports among full-time evaluators is generally quite strong. The poor quality reports from this prolific evaluator are a clear outlier.

Overall, we affirm the Department for their generally consistent compliance with evaluation time frames.  However, the more we have investigated the evaluation workforce and services, the more it becomes clear that their compliance with this timeframe is tenuous.  This compliance is unlikely to be sustainable without aggressive improvements to the workforce.

## INTERIM JAIL MENTAL HEALTH TREATMENT[17]

> 34.  Interim Jail Mental Health Treatment.  If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S.  §§ 27-60-105 *et seq.*  to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible.  This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment.  Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment.  A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

As we have discussed in prior reports, the Department is required to partner with county jails to develop a program of coordinated services for individuals receiving competency-related services. These services are currently managed statewide through the Jail-Based Behavioral Services program (JBBS) and are funded approximately $2.5 million per year by the recently appropriated by SB19-223.  Essentially, the Department utilizes JBBS as a hub for coordinating subcontracted services across Colorado.  These subcontracted providers are now asked to provide adequate mental health services to inmates involved with competency-related services.  Interim mental health treatment is critical to screen, monitor, assess, and treat those receiving competency-related services in county jails so that they remain physically safe and clinically stable until their transfer to competency restoration services.

However, the structure of JBBS creates some challenges.  Because the JBBS-subcontracted providers differ across counties and jurisdictions, no two providers are alike, and their services differ.  Some providers have strong connections with local and private inpatient hospitalization facilities, while others have weaker ties.  Workforce and qualifications also differ among providers.  This poses some challenges for CDHS; while individualized services are enhanced given the local nature of the providers within JBBS, uniformity and leverage across providers are more difficult.

Since our last quarterly report, all but one county have expressed interest in receiving funding for enhanced mental health services.  These good developments result from direct, individualized outreach from Ms. Shah and Dr. Werthwein (OBH Director) to the few remaining sheriff's offices.  Further, OBH prepared a document that lists the scope of OBH-contracted

---

[17] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree.  It is NOT a proxy or substitute for competency restoration services.

services within each county jail statewide; a review of this document is similarly encouraging in that nearly all county jails are providing OBH-supported enhanced mental health services (or are in contract negotiations to do so).

However, significant challenges remain.  These contracts with county jails embody a wide variety of depth and breadth of services.  There is little uniformity among the contracts.  Moreover, OBH has very little leverage over these services aside from the contract.  Quality of services, frequency of communication, and fidelity to expectations are rather loosely assured without a stringent contracting and quality management oversight.  Unfortunately, OBH has few resources to provide this oversight, so in reality the actual mental health services available in county jails *could* be inadequate.  OBH has proposed to develop an "inter-agency agreement" which would allow for more oversight and more flexibility in service changes, rather than utilizing individual contracts; although supported by both DLC and the Special Masters, such an agreement will not be ready before March 2020.

Many of these concerns about quality, frequency, and intensity of mental health services are highlighted by the recent suicide in Pitkin County Jail.  At least based on initial investigation, there appear to be substantial concerns about the response to the deceased's mental health needs from both the Pitkin County sheriff's office and their third-party mental health provider. These concerns only heighten the need to ensure quality and adequacy of mental health services and responses in county jails.  We have appreciated and supported the Department's response since that incident, but are somewhat dismayed at what appears to be a patchwork approach to jails' mental health services across the state.  We understand that without statutory change, OBH has little ability to truly enforce certain standards in county jail mental health services. Nevertheless, OBH is ultimately responsible for the quality and adequacy of interim jail mental health treatment and must use any available leverage to ensure that these defendants are receiving necessary services.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[18]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment.  If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has made further progress on the requirement to develop discharge plans for persons identified as appropriate for Community-Based Restoration Treatment (CBRT).  Progress is clear — and important work remains — in three areas:

1. *Pilot project in CMHIP:* CMHIP has identified between 5-10 patients currently treated at CMHIP that could potentially transition to CBRT in the near future.  While still unrestored, their improved clinical status and minimal public safety concerns make them more appropriate for release to CBRT, rather than staying at CMHIP.  We affirm the Department taking this initiative and fully support the transition when appropriate.  To date, however, no such transitions have occurred.  CMHIP administrators have begun actively working on these cases; we anticipate that at least a few currently incompetent defendants will transition from CMHIP to CBRT before our next quarterly report, and that this type of "step down" approach may be one way to decrease length of stay in the hospital and allow for more rapid admissions from the waitlist.

2. *Impact of the Forensic Support Team (FST):*  As detailed in our January 2019 response to the Department's plan for compliance, we envisioned multiple roles for the FST.  Primarily, the FST was meant to monitor clinical and restoration progress for incompetent defendants in county jails awaiting transfer to CMHIP.  Secondarily, three other roles were described: monitoring and coordinating cases in CBRT, facilitating transfers from jail to CBRT when appropriate, and serving as the point of contact for caseloads regardless of restoration location.

   To date, OBH has focused on the first role but has given less attention to the other roles.  FST navigators have spent most of their time working with cases either in jails or in CMHIP.  FST navigators have monitored clinical status and restoration progress for those in jails awaiting transfer to CMHIP — primarily defendants who have been categorized as Tier 2.  Navigators have also worked with CMHIP to begin facilitating transfer of incompetent defendants to CBRT, though (as detailed above) no such transfers have yet

---

[18] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

occurred.  Navigators have also reportedly been effective in securing emergency holds, emergency transfers, and engaging in other crisis responses for a handful of cases.  We affirm this important work.

However, we must also note our concerns about the FST.  First, the launch and implementation of the FST was slow.  The navigators were hired in August, yet they had not uniformly begun formal monitoring of jail-based defendants until November.  We appreciate the Department's careful on-boarding of the team; their initial two-week training was thorough, comprehensive, and reasonably paced.  However, implementation of the team since then seemed unnecessarily delayed.  The Department described barriers such as lack of computers and other resources as reasons for the slow implementation, but the reality is that many incarcerated defendants needed OBH monitoring during the implementation period.  We are pleased that the team of navigators has now begun their required frequency of contacts as mandated by the Consent Decree, and we are beginning to hear positive accounts of their work as a result.

Second, we have some concerns about the allocation of FST navigator responsibilities.  Navigators are working almost exclusively with in-jail defendants, which leaves no opportunity to attend to defendants transitioning to the community for CBRT.  We agree that the priority for navigators must be those defendants who remain in custody.  Those defendants are, as a group, most at risk for crisis.  The Consent Decree mandates that navigators monitor these in-jail defendants at least once every ten days for clinical status and restoration progress; this monitoring addresses our third overarching goal of reducing harm to those on the waitlist.  However, other goals of the Consent Decree are to reduce the number of persons on the waitlist and reduce the time spent on the waitlist.  These goals are supported by facilitating transitions to CBRT and enhancing CBRT services.  Navigators should play critical roles in both.  Navigators should identify Tier 2 defendants who have clinically stabilized while in jail and actively work with stakeholders to transition them to CBRT services.  Perhaps more importantly, navigators should be the Department's "face" of restoration in the community — a visible expert in the restoration system who serves as the OBH point of contact whenever needs are identified.  By serving as the Department's restoration experts in the community, navigators increase restoration success, troubleshoot problems, address crisis situations, enhance community tenure, and help skeptical judges trust the Department's community-based restoration services.

The Department has, in general, agreed to these broad roles for navigators, but maintains that current workloads and staffing ratios preclude much community engagement by the FST navigators.  Acknowledging that initial staff workload projections were probably inadequate, we will: 1) more explicitly describe our vision for the community role for FST navigators, and 2) work with the Department to request funding to support such a team.

We are also keenly aware that all reports of FST navigators to date have been anecdotal in nature.  There is no data dissemination system yet in place.  We have offered expertise in data collection, analysis, and dissemination given our first-hand experience with such programs and their data systems in other states, yet OBH has been slow in operationalizing such a data system for the FST.  We strongly encourage the development of a data-driven system for the FST.

Finally, we acknowledge the impact of the Pitkin County suicide on the FST.  Since that suicide, the FST was mandated to meet with every in-custody defendant statewide within three days of the announcement.  This has occurred, which we again affirm as critically important progress.  Additionally, OBH has created a decision tree for how often subsequent contacts must be face-to-face versus by telephone with treatment and/or jail providers.  Certain circumstances merit face-to-face visits; these criteria were tentatively affirmed by DLC.  A formal document outlining this drafted plan is forthcoming, the Department reports.  We will provide our feedback to OBH and report on progress in our next quarterly report; we anticipate that such a document could easily lend itself to some data collection (e.g., timeliness of monitoring of in-custody defendants by FST navigators, if such monitoring is telephonic or face-to-face, what if any outcomes result from these contacts, clinical status and restoration progress, etc.).

3.  *Coordination with the Bridges program:* The State Court began their Bridges program in 2018, using "court-liaisons" to help address the needs of persons with mental illness in criminal court settings.  While most of their cases involve competency, Bridges liaisons are not uniformly assigned to all competency cases.  But, ideally the FST and Bridges program act in a complementary manner to address the needs of persons needing competency-related services.

As mentioned in our previous quarterly report, the Bridges Program and FST must work together to facilitate discharge and share responsibilities for competency-related cases.  They both rely on similar (partially, but not entirely, overlapping) bodies of information.  Thus, the Department and the Bridges team have been actively working to coordinate services, so that they can ultimately collaborate in a way that minimizes redundancies and gaps.  We recognize that two similar, relatively new programs will inevitably face role confusion and "start up" challenges.  Overall, we are pleased with the progress thus far in this communication and collaboration.  FST and Bridges representatives have jointly produced documents that outline responsibilities of each program; while some inaccuracies and areas of confusion seem to persist, their interaction has been fruitful in both tone and outcome.  Additionally, Bridges liaisons and supervisors have identified and communicated gaps and problems to OBH and to us; this allows us to follow up on specific problems for which we may have otherwise been unaware.  Some of these situations are quite dire — suicides of persons in competency-related services — so we are quite grateful for this information from Bridges representatives, and encourage even more open communication between Bridges and OBH.

## TRANSPORTATION OF PRETRIAL DETAINEES

> 36. Transportation of Pretrial Detainees.  If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S.  § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Over the past quarter, a total of 16 defendants were admitted to CMHIP for an inpatient competency evaluation, of whom only eight met C.R.S. § 27-65-125 criteria, according to hospital staff.[19]  None of these defendants who met civil commitment criteria were returned to a local jail.[20]

As mentioned in previous quarterly reports, SB19-223 included language that allows CMHIP to keep defendants ordered for inpatient evaluation at CMHIP from the time that the evaluator opines them incompetent to proceed (rather than requiring C.R.S. § 27-65-125 criteria be met, or that the originating court adjudicates the defendant as incompetent).  This is now found in C.R.S. § 16-8.5-105 (IV-b-5) and reads as follows:

> *When the court orders an inpatient evaluation, the court shall advise the defendant that restoration services may commence immediately if the evaluation concludes that the defendant is incompetent to proceed, unless either party objects at the time of the advisement, or within 72 hours after the receipt of the written evaluation submitted to the court.*

Policies and procedures governing the decision-making in these circumstances are still in development.  At times, CMHIP may need to balance these incompetent individuals already in the hospital and in need of hospital-level care with those Tier 1 or Tier 2 defendants in county jails approaching their deadlines for admission.  To date, decisions among these individuals have been made primarily on clinical grounds, but we also understand the need to admit individuals who have been waiting in county jails for extended periods of time.  Discussions among OBH and DLC have been amiable and productive in these challenging situations.

---

[19] According to the October Special Master Compliance Report (p.24), submitted by CDHS on November 7, 2019.

[20] See the Department's monthly report (p.16) filed November 7, 2019.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes.  The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services.  The account will be managed by a court-appointed administrator.  Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master.  Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

The Department has continued to provide reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree (since June 1, 2019).  Likewise, the Department has completed a "Fines Report," as prescribed by the Consent Decree.  Finally, as prescribed by the Consent Decree, the Department has been paying these fines into a trust account (managed by Cordes & Company, LLP).

The funds from these fines are already going to good use.   A small committee comprising Department administration (Worthwein, Scofidio), a representative from the Plaintiff (i.e., Disability Law Colorado leader, Ivandick), and the Special Masters has met regularly for several months to address use of these fines.  The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to reduce Colorado's "competency crisis," by providing new services of interventions that do not already fall within the Department's responsibilities.  In other words, funds from the fines should supplement and not replace existing services.

The first opportunity to use these funds for prompt services emerged through a collaboration with the Colorado Coalition for the Homeless (CCH), which was renovating a hotel to create *Fusion Studios,* which comprise 182 single-unit residences for homeless individuals.  Because CCH has a strong record of fiscal responsibility and successful housing interventions, the Department explored a collaboration to dedicate new residences to those involved in the

competency system, particularly defendants who could be eligible for community-based competence restoration *if* they had access to housing (a lack of housing is a common barrier to outpatient restoration treatment).  Ultimately, in an arrangement finalized on October 2, 2019, the Fines Committee contributed $3.5 million to the Fusion Studio project, in exchange for 28 dedicated residences for competence-involved individuals whom the Department refers, over the next five years.  Because the project involved renovations to an existing hotel (rather than new construction) this housing will become available at a remarkably rapid pace; the Department should be able to refer occupants in December, and will target those who are ready to transition out of the hospital and continue restoration services in the community.

Though the Fines Committee has not finalized the next funding priorities, the Committee is investigating a pilot test of a "competency docket" or "competency calendar" in a Colorado District.  We have researched and consulted with other jurisdictions around the country, and it is clear competency-specific dockets offer a number of advantages to courts and defendants, and tend to expedite competency-related procedures in ways would help defendants and the Department waitlists.  Furthermore, Judges in Colorado's 18th Judicial District are highly motivated to establish a competency docket.  This initiative would use a fairly small fraction of the fines funds; the District does not anticipate any funding requests for the judges or clerks, but would like court-based clinicians to aid in the processes.  The planning is still underway; we anticipate this will be our next high priority for funding, and likely make a significant contribution to expediting competency-related services in this District (and likely beyond, to the extent this serves as a model for other Districts to replicate).

## CONSENT DECREE SECTION VII UPDATES

### CIVIL BED FREEZE

> 39. Civil Bed Freeze.  The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services.  On February 7, 2019, the Department agreed to stop this practice.  The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes.  This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department continues to report that they have removed the "civil bed freeze" as mandated by the Consent Decree.  That is, they have not re-purposed the civil beds at CMHIFL for competence restoration, as they had once proposed.  Per our request, the Department continues to provide a census report on the CMHIFL patients in their monthly report.  As of their most recent report, the CMHIFL population included a total of 94 patients, 90 of whom were civil patients.  Although four patients had a forensic status, the Department has explained these special circumstances to the Plaintiff and the Special Master, and provided reasonable justification in the monthly report.  All parties have agreed these reflect reasonable exceptions.  Most recently, all Parties agreed to allow CMHIFL to serve as a setting for certain one-day competency evaluations, provided that the defendant does not require admission.

During monthly multi-party meetings, the Department has discussed any potential changes to the use of any CMHIFL beds (e.g., allocating a few new beds at CMHIFL to accommodate inpatient competence evaluations — not restoration — which may reduce the need to transport Denver-area defendants to CMHIP for inpatient evaluation).  Generally, the Plaintiffs and Special Masters have agreed with the minor changes they have proposed, because these tend to reflect efficient steps that better serve the Departments' consumers.

For the foreseeable future, the Department will continue to wrestle with the reality that too few civil beds exist in Colorado.  A potential, albeit indirect, benefit of the Consent Decree may be to increase civil capacity through the reduced need for forensic beds; the Department will need to continue to monitor this trend and the outcomes of Consent Decree initiatives to determine the ongoing and future needs for civil beds.

## COMPREHENSIVE AND COHESIVE PLAN

> 40. Comprehensive and Cohesive Plan.  The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan.  Dkt. 146.  By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider.  As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures.  Dkt. 146 at 42.  On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department continues to move closer to developing a comprehensive, cohesive plan.  The final plan is due to be submitted in January 2020.  As we detailed in our last quarterly report, the Department has taken substantial steps to:

1. Coordinate and align policies and services within a long-term vision for competency-related services, and

2. Ensure that their emerging plan is supported by, and integrated with, statutory improvements and efforts from other stakeholders regarding competency services.  Indeed, they have shared the preliminary plan with the Governor's Blueprint Task Force subcommittee that is addressing competence-related issues.

The Department has continued developing the plan through the efforts detailed in our previous quarterly report (i.e., various internal meetings, specific coordination initiatives, participation in the Governor's blueprint taskforce committee, etc.).  We affirm these efforts and encourage them to continue.

Along with these important accomplishments, *we see the following as important, remaining next steps towards a "Comprehensive, Cohesive Plan" for the Department to take in the near future:*

- *Write the plan*.  The final, written plan is due in January 2020, though it will be important to share drafts with us and other stakeholders before then.  The written plan should include an articulation of the larger vision for competency services in Colorado, along with specific goals.  It should also include descriptions of the components of the competency services system, policies and protocols, a glossary, desired outcomes, and visual representations of the entire system (described below) and the smaller component parts.

- *Create a visual representation of the new competency services system.*  This should be a 1-2 page representation of how the different components are integrated and interconnected.  It should be tailored to a lay audience, so that stakeholders outside the Department can see the system, see where they fit into the system, and understand the context for their functions and roles in the system.

- *Educating all stakeholders, both within and outside of the Department.*  As we have emphasized in prior reports and in discussions with the Department, it is crucial for Department employees and stakeholders to understand the changing system in which they work.  It will be important to continue educating evaluators, hospital staff, the bar, and the judiciary about recent and emerging changes.

- *Plan for 2020 legislative session.*  Inevitably, SB19-222 and SB19-223 will require adjustment as they are implemented.  The Department must collect outcome data for each bill and begin making drafted adjustments to both bills in late 2019 / early 2020.  Furthermore, the Department should continue their recent exploration of other potential legislation that may improve competency services and better address the population of individuals likely to be involved in the competency system.  To date, potential legislation includes increasing OBH oversight regarding jail-based mental health services, decreasing competency mandates for lowest-level offenders, and adjusting competency re-evaluation time frames.

- *Refine workloads and expectations within new programs.*  Analogously, the new Department programs (triage, CBRT, data team) will require careful monitoring of outcomes so that necessary adjustments can be made.  Adjustments might include revised workloads for Court Service evaluators, jurisdictions for FST Navigators, contracts for CBRT providers, intensity of JBBS services for defendants at various stages of the competency process, and so on.  Additional positions will almost certainly be needed over time (i.e., more Court Service evaluators and FST community navigators).  In short, the Department is launching many promising initiatives; all of these are new and complicated enough that they will inevitably require close observation and fine-tuning.

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system.  This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein.  This plan shall be approved by the Special Master.

As in our past quarterly report, the Department continues to progress in developing a wide-scale outpatient, community-based restoration treatment program (CBRT).  Their formal CBRT program began in March of 2018, and referrals for outpatient restoration have ranged from 42-46 defendants per month during the past quarter (an increase from the prior quarter).  Although we hope to see these referrals — in particular, the proportion of defendants referred for CBRT (detailed in 41(c) below) — continue to increase, we perceive the Department maintaining meaningful steps towards further CBRT:

- The Department has increasingly established contracts with the community mental health centers (nearly all of them, at this point) to provide CBRT.

- The Department increasingly considers and describes outpatient restoration the default approach for restoration, unless there is clear reason for inpatient restoration.  Simply shifting the "default setting" (particularly as evaluators and judges understand it) will help to increase community-based restoration, and decrease unnecessary inpatient admissions.

- *Pilot project in Denver County:* The Department has allocated $500,000 to Mental Health Center of Denver (MHCD) and Denver Pre-trial Services to establish a pilot program that bolsters case management, treatment, and supervision in order to expand CBRT in the Denver metro area.  Though a pilot program, this type of targeted intervention in such a high-need area may be sufficient, even by itself, to influence waiting list and wait time figures for the state.  The Department reports that the project began a "soft launch" two weeks ago with three referrals through Denver District Court.  They are waiting to see if those three referrals are accepted by the court's pre-trial services branch; more referrals are expected to begin next week and will expand to the Denver County Court.  We anticipate this pilot will be an important demonstration project for CBRT.

Along with these important accomplishments, we see the following as important, remaining next steps for the Department to take in the near future.  Unfortunately, these recommendations remain virtually unchanged from our last quarterly report, emphasizing the need for attention:

- Continue educating evaluators, the defense bar, and the courts that CBRT is available, and should be considered the default option.

- Further train evaluators, who must soon include recommendations for restoration location (inpatient or outpatient) in the conclusion of any report that opines a defendant is not competent.  Evaluators will need to better understand the CBRT system, and become reliable with one another (i.e., offering similar opinions in similar cases) in recommending CBRT versus inpatient restoration.

- Provide to the Special Masters requested data on CBRT process and outcomes.  Such data will be important for quality assurance, improving services, and further planning.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location.  The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department has contracted with a local hospital to provide five inpatient beds for short-term competency related services.  These beds are currently filled.  OBH is close to finalizing a contract with an additional private hospital in the Denver metro area for three additional beds.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care.  Dkt. 146 at 29.  The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019.  The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department.  On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

As prescribed in the Consent Decree, we established a Baseline for improvement, by calculating the most recent six-month period of available data (i.e., Nov 2018 – April 2019) prior to the June 1, 2019 deadline.  We also recommend using proportional metrics when pursuing goals that are fundamentally proportional in nature (i.e., a 10% increase in community-based restoration and a 10% decrease in inpatient restoration).  In other words, while the Department may not have full control over the actual number of referrals, they have greater control over the proportion of referrals they direct to outpatient versus inpatient restoration.  Therefore, we chose to set the baseline figures, and establish subsequent performance goals*, based on proportions instead of raw numbers*.  Thus, calculating target goals for restoration based on these *percentages of individuals* referred to inpatient versus outpatient services yields the following goals:

| | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Baseline (past 6 months) | Recent 6-month average: 69% | Recent 6-month average: 31% |
| December 1, 2019 goal | 69% reduced by 10% = 62% | 31% increased by 10% = 34% |
| June 1, 2020 goal | 62% reduced by 10% = 56% | 34% increased by 10% = 37% |
| Note: All percentages rounded to nearest 1%. | | |

Therefore, the December 1, 2019 performance goal to reduce inpatient restoration by 10% and increase outpatient restoration by 10% should yield no more than 62% of defendants referred for inpatient restoration and no less than 34% of defendants referred for outpatient (community-based) restoration.

As of this quarter (i.e., preceding November 28, 2019), *the portion of defendants referred to CBRT has averaged 32.2%, which was an improvement over the last quarter*.[21]  Indeed, the Department has met (or nearly met) the 34% proportion for several individual months.  The goal is to reach 34% as a six-month average by December 2019.  We anticipate they will meet, or come quite close to meeting, this goal if their current trend continues.

We are hopeful that the Department will be very close to compliance with Paragraph 41 of the Consent Decree by increasing outpatient restoration to 34%, on average, for the period spanning June 1, 2019 through December 1, 2019.  Aside from a few months of lower referral percentages, most months were well within the 34% mark.  We continue to view this aspirational goal as largely reasonable.  However, we must mention a caveat to this goal in light of recent events.  We were alerted to two completed suicides and at least two successful interventions of suicidal individuals, all of whom were involved in CBRT services within the past several months.  Clearly these situations must be taken seriously.  We have requested all relevant records and documentation for each of these situations so that we can properly investigate and understand the context for each.  In addition, we have requested death and suicide rates for CBRT participants overall, so we can compare these rates against normative rates for all OBH clients.

Regardless of normative rates, however, no suicide is ever tolerable.  OBH must ensure that referrals for the CBRT system are appropriate and well-informed; court services evaluators, FST navigators, and CMHIP discharge planners must all be thoroughly informed about the CBRT system, its resources, and the persons best served by it.  Additionally, CBRT services must be robust and nimble enough to identify persons in crisis and manage their emergency needs quickly and effectively.  Without the aforementioned requested records, we cannot comment on

---

[21] This has increased from the 28.8% six-month average at the time of our prior quarterly report.

either of these two components in this report.  We will have more information for our next quarterly report.

However, at a minimum, we strongly encourage the Department to self-assess which participants are appropriately positioned for success in the CBRT system, and only refer those types of persons to the program.  If that referral rate is ultimately less than 34% of the total number found ITP, we support lowering the aspirational goal accordingly.  We aim to place the maximum number of appropriate persons in CBRT, but are not wedded to a predetermined rate if that rate cannot safely manage all persons within it.

Also, we reinforce the need for OBH to provide outcome data on CBRT.  We have requested this outcome data for several months and have met with CBRT administrators multiple times during the past six months to develop outcome variables.  Although OBH has many concurrent data requests, we continue to strongly request empirical outcome data for CBRT (and the FST, as mentioned earlier).

## CONCLUSION

As detailed throughout this report, we perceive the Department has made significant and meaningful progress in enacting changes prescribed in the Consent Decree.  Indeed, several key interventions prescribed by the Consent Decree (e.g., the triage system, the Forensic Support Team) have become fully operational during this reporting period.  These have begun to significantly change the overall key metrics, in that the Department is generally responding promptly to those identified as Tier 1.  Put simply, the most acutely ill defendants — those whose welfare was a primary focus in the current legislation and Consent Decree — do *seem to be receiving more prompt treatment upon launch of the Triage System*.  More subtle improvements are also clear, as the overall wait list has decreased slightly in the past quarter.  On the other hand, it remains for the Department to begin accelerating inpatient restoration treatment for Tier 2 defendants, whose needs may be less urgent, but nevertheless important.  And of course, recent suicides raise serious questions about services and quality assurance mechanisms in certain areas.  We will continue to work with the Department on these and related matters, and we encourage you to contact us with any questions or requests.  We appreciate the opportunity to serve the court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.


Daniel Murrie, Ph.D.