FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
1:56 pm, Mar 03, 2020
JEFFREY P. COLWELL, CLERK



Groundswell Services, Inc.

---

## SPECIAL MASTER REPORT to JUDGE WANG

Submitted February 28, 2020

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director  of the Colorado
Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental
Health Institute at Pueblo, Defendants.

February 28, 2020

*Re: Civil Action No.  11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our February 28, 2020 status report mandated by the Consent Decree filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW.  As you know, the Consent Decree (following your earlier court order) requires us to monitor progress and provide recommendations for improvement to the Colorado Department of Human Services (CDHS) as they attempt to improve competency-related services to criminal defendants with psychiatric illness.  Specifically, the Consent Decree (p.24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter.  The Special Master's status report was submitted on January 28, 2019.  Dkt. 146.  The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter.  Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Since our appointment as Special Master on January 2, 2019, the parties entered into mediation, resulting in the Consent Decree filed March 15, 2019.  This Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and eventually attain compliance with all time frames and deadlines mandated in the Consent Decree.  The Department has initiated many of these steps, demonstrating meaningful progress, in ways we detail through the remainder of this report.  *In particular, this report will focus on developments since our prior quarterly report, which was submitted November 28, 2019.*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 4

    KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS ............................... 8

        KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES.................................................................. 9

        KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES............................................................... 11

        KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES ...................................... 14

CONSENT DECREE SECTION VI UPDATES...................................................................................... 16

    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION

    TREATMENT ......................................................................................................................... 16

        Wait Times for Inpatient Evaluation............................................................................. 17

        Wait Times for Inpatient Restoration ........................................................................... 19

    PERFORMANCE OF JAIL COMPETENCY EVALUATIONS ......................................................................... 21

    INTERIM JAIL MENTAL HEALTH TREATMENT .................................................................................... 24

    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT.................. 27

    TRANSPORTATION OF PRETRIAL DETAINEES .................................................................................... 31

    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ............................................................... 32

CONSENT DECREE SECTION VII UPDATES..................................................................................... 34

    CIVIL BED FREEZE ................................................................................................................... 34

    COMPREHENSIVE AND COHESIVE PLAN ......................................................................................... 35

    INCREASE COMMUNITY RESTORATION SERVICES ............................................................................. 36

CONCLUSION...................................................................................................................... 41

## INTRODUCTION

As you know, the Consent Decree filed March 15, 2019 prescribed many steps the Department must take, and timelines it must meet, to improve the competency assessment and restoration system in Colorado.  After the Consent Decree was filed in March, the Department began taking many of these steps (detailed throughout this report) in ways that we consider generally responsive, and in ways that appear to recognize the gravity and complexity of the challenges they face.

Broadly speaking, we consider three goals of the Consent Decree to be primary:
  a) Reducing the overall *number* of people on the waitlist for competence restoration services,
  b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and
  c) Reducing *harm* (by providing *care*) to people on the waitlist.

Progress on the first goal is clear; there has been a modest — but steady and meaningful — decrease in the waitlist over recent months.  Progress on the second goal has been substantial, though *only* for people with the most acute psychiatric illness; those with less urgent needs still experience excessive delays.  Likewise, progress on the third goal has been mixed.  The Department has provided prompt care by hospitalizing those who are most ill, and providing some services to those waiting longer in the jails.  This report details progress on these three primary markers as well as other key developments.

*Progress:*
The Consent Decree has now been in effect for almost one year.  Whereas the first half of the year was almost entirely planning and implementation, the last several months have witnessed the launch of several new initiatives and, most recently, the opportunity to observe the early stages of their performance.  We are now beginning to see the outcomes of those new initiatives the Consent Decree prescribed.  Specifically, the Department has:

- Maintained an innovative Triage system, a key compromise from the Consent Decree, which requires the Department to rapidly (i.e., within 7 days) admit for competence restoration the most acutely ill defendants ("Tier 1") and less rapidly admit those who less urgently need hospitalization ("Tier 2").

- Admitted these Tier 1 defendants for inpatient restoration in a prompt manner, consistent with the requirements of the Consent Decree.  This is the most significant improvement to the competency system in several years, and the Department has continued to maintain nearly perfect compliance with these strict seven-day requirements.

- Continued to refine the new Forensic Support Team (FST), another key component of the Consent Decree.  The FST monitors incompetent-to-proceed (ITP) defendants in jail awaiting hospitalization; they have intervened in several crisis and emergency situations, and transitioned some defendants to community services.  The presence of a team to monitor the defendants on the waitlist is a substantial improvement to the Colorado competency system.

- Finalized a "comprehensive and cohesive plan" for competency services in Colorado that is vastly improved over the plan they prepared in late 2018.

- Improved the Court Services unit of forensic evaluators by responding to longstanding concerns, changing structure and personnel, and re-invigorating an evaluator training program.

- Opened 39 new beds for competency restoration at CMHIP, a step that made a meaningful decrease in the waitlist.

- Finally, via the Fines Committee prescribed by the Consent Decree (p.17), the Department, Disability Law Colorado (DLC), and the Special Master collaborated with the Colorado Coalition for the Homeless to fund units in Fusion Studios, which is beginning to provide housing in the community to many homeless competency-involved individuals over the next five years.

As detailed in our last report, these developments have yielded some progress towards goals of the Consent Decree.  Specifically, the waitlist has decreased by 32 defendants over this 3-month reporting period (representing a 21% decrease).  Defendants opined to be Tier 1 continue to be admitted to CMHIP promptly, within the Consent Decree's 7-day timeframe.  However, the wait for Tier 2 defendants has increased slightly.

_Challenges:_
The Department has also experienced significant setbacks and challenges.  The greatest setback was their failure to meet timelines for many jail-based competency evaluations, though meeting those timelines had been a strength of the Department in recent years.

- For the first time in years, the Department has failed to meet timelines for jail-based competency _evaluation_ services.  As we anticipated in our last report, staffing shortages and other challenges left the Department unable to evaluate all defendants in jail within 28 days of the court order to do so.  In January, for example, 44% of these defendants were evaluated after the 28-day deadline had passed. We detail later in this report the ways the Department has responded to this challenge.

- These delays have underscored the challenges the Department faces in recruiting and developing an adequate workforce of forensic evaluators.  To be clear, the Department has taken significant steps to address the problems we previously addressed in the Court Services unit of forensic evaluators, and we have seen strong improvements in morale, leadership, and training.  But the Department will need to devote significant resources to developing an adequate workforce of Court Services evaluators and contracted forensic evaluators.

Beyond this significant setback in meeting evaluation timelines, some of the primary challenges (i.e., the areas for closest scrutiny and support) we identified in our prior quarterly report remain:

- Accelerating restoration services for defendants designated Tier 2.  The Department has shown improvements in the overall numbers of Tier 2 defendants and the average wait times for them as a group. However, the overall average wait times are still far too long and greatly exceed the maximum time frames set by the Consent Decree.  Diversion efforts, statutory reforms, enhanced community services, and increased inpatient bed space each help decrease the long wait list, but those long-term solutions do not immediately address the needs of ITP defendants currently waiting for months in county jails.

- Ensuring that sheriff's departments and county jails are better prepared to provide enhanced mental health services for defendants awaiting competency services in local county jails.  While funding and technical assistance has been available for several months, the scope and breadth of services still varies widely — such that some counties have refused the funding, and several seem to operate with inadequate in-jail mental health services.

- Monitoring both the FST and the Outpatient Competence Restoration Program (OCRP)[1] systems.  While substantial progress is apparent in both programs, both are still relatively new and continue to experience growing pains.  Neither program has an adequate system for data collection, data analysis, or program evaluation.  Further, courts and other personnel continue to express confusion about the roles and expectations of each program, so further education efforts will be necessary.

As in our last quarterly report, we continue to affirm the Department's efforts to enact the changes prescribed in the Consent Decree.  They have demonstrated clear success in maintaining the triage system, improving Court Services (leadership, morale, and training),

---

[1] In the past, OBH has referred to these services as Community Based Restoration Treatment (CBRT), but to avoid confusion with other emerging programs, we now use the more common term, Outpatient Competence Restoration Program (OCRP).

making outpatient competency restoration (OCRP) more widely available, and launching a Forensic Support Team (FST).  But it will be crucial to adequately address the shortage of competence evaluators as well as some of the more persistent problems: long waitlists for Tier 2 individuals, poor leverage with interim jail mental health services, poor data management in certain areas, and coordination/education among the FST and Bridges programs.

As in every quarterly report, we begin by addressing the Department's compliance with time frame requirements, because this is the primary focus of the Consent Decree (and the focus that the Consent Decree prescribes for our quarterly reports).  We consider these time frames our "key metrics" — or primary markers of progress — that we review in each quarterly report. However, we then expand to address the other interventions prescribed by the Consent Decree because progress in these interventions will likely contribute to progress in achieving the overall goal of compliance with time frame requirements.

## KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of these quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p.24)

> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree.  This includes both time frames for competence *evaluation* and for competence *restoration*.  We anticipate that these will be the key metrics to demonstrate progress over the next few years, so they are our starting point in the report, as well as a primary focus.  Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES

As summarized in the table below, the Department has historically met evaluation time frames, even well before June 2019 and even through the first several months of the Consent Decree. *However,* during the past quarter, the Department began failing to meet these time frames for the first time in many, many months.

| *Average Wait Times for Competence Evaluation Services*[2] | | | | | | |
|---|---|---|---|---|---|---|
| | Aug - Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | January 2020 Requirement | July 2020 Requirement |
| Jail-based Competency Evaluations | 20.8 | 22.3* | 30.2* | 33.2* | 28 days | 21 days |
| Inpatient Competency Evaluations | 17.1* | 12.2 | 13.9 | 12.0 | 21 days | 14 days |

\* = at least one defendant waited longer than max time frame for the evaluation

Historically, timely competence evaluation has been a relative strength of the Department.  Well before the recent Consent Decree, they followed the national trend of de-centralizing evaluations, moving them from solely an inpatient service to a localized service in the community.  During recent history, their evaluations have almost always met the prescribed time frames.  Recently, however, their performance deteriorated substantially.  As anticipated in the last quarterly report, the evaluator workforce was unlikely sufficient to meet the need for timely evaluations.  In December 37% of jail-based evaluations exceeded the 28-day time frame and in January 44% did so.

As we discuss extensively later in this report (see *Performance of Jail Competency Evaluations,* p.22) this recent failure seems to reflect the confluence of several factors.  Some involved a failure to develop an adequate workforce, and some involved taking appropriate steps (which carried some short-term consequences) to improve the workforce.  The Department has made changes to the leadership of Court Services (the unit responsible for evaluations) and, although

---

[2] According to Special Master Compliance Plan report January 2020 p.17 and p.26, submitted February 7, 2020.  Average wait times for Jun-Jul 2019 reflect a reasonable approximation of the average wait times; exact sample sizes were not used to calculate a precise average.

belatedly, taken some significant steps to improve the workforce.  As detailed in later sections, we affirm many of these steps, and urge the Department to prioritize developing a strong workforce of evaluators.

Historically, the Department has performed well with respect to competence *evaluation* time frames, but this quarter witnessed a confluence of long-term developments that led to substantial delays and noncompliance.  Contributing factors include errors in planning and workforce development, but also some overdue workforce improvements.  We affirm steps the Department has taken to improve the workforce, but also urge them to devote the resources necessary to develop a strong cadre of forensic evaluators.  However, *we are urging the Department to continue aggressive efforts to recruit new full-time and contracted evaluators to meet current and future evaluation needs.*

KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES

The Department has consistently failed to provide prompt *restoration* services.  In the months before the Triage system launched, defendants in jail who were admitted for inpatient restoration treatment at CMHIP or RISE waited, on average, 71 days.[3]  Of course, this figure included all defendants referred for restoration, without distinction between those with more, versus less, acute needs.  Since then, however, the Department launched on June 1, 2019 the Consent-Decree-mandated triage system,[4] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2").  Tier 1 defendants must receive services within 7 days of the competency hearing, whereas Tier 2 defendants need not receive services for 49 - 56 days (56 days through December 2019, and 49 days beginning January 2020).

Overall, recent CDHS monthly reports describe excellent adherence to the 7-day deadline for defendants whom the court has designated as Tier 1 (i.e., average wait times well under 7 days).[5] However, wait times for Tier 2 defendants still far exceed the time frames prescribed in the Consent Decree (i.e., average wait times exceeding 97 days this quarter, well beyond the required 49 - 56 days).

| *Average Wait Times for Inpatient Competence Restoration Services[6]* | | | | | |
|---|---|---|---|---|---|
| | Aug - Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | January 2020 Requirement | July 2020 Requirement |
| Tier 1 | 2.74* | 2.5 | 2.8 | 2.3 | 7 days | 7 days |
| Tier 2 | 91.2** | 86.7** | 117.3** | 85.7** | 49 days | 42 days |

\* = at least one defendant waited longer than maximum time frame for restoration services
\*\* = most defendants waited longer than maximum time frame for restoration services

However, as in prior reports, each of these summary statistics requires clarification.  First, the figures for Tier 1 defendants reflect only Tier 1 defendants as defined in the Consent Decree; that is, *defendants whom the court has designated as Tier 1 and ordered to the hospital*.

---

[3] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p.7 of their Monthly report filed May 7, 2019).

[4] See Consent Decree paragraph 43.

[5] According to Special Master Compliance Plan report January 2020 p.11 (submitted February 7, 2020).

To date, the Department reports that a total of 128 individuals have been opined as Tier 1 by Court Services Evaluators and admitted to CMHIP via the Consent Decree criteria.  Of these, 126 were admitted within the 7-day maximum time frame.  In many respects, this summary bodes well for the triage system.  According to CDHS administrators and data management personnel, the vast majority of defendants whom evaluators designate as Tier 1 are admitted to the hospital promptly (i.e., well within seven days), and often even before the Court designates them as Tier 1 and orders admission.  For those that have not, CDHS has offered what appear to be plausible explanations.

> **A qualitative review of Tier 1:**
> An initial challenge in launching the Triage system was ensuring evaluators could reliably identify the appropriate defendants as "Tier 1."  For example, failing to identify acutely ill defendants as Tier 1 would leave some of the most ill defendants deteriorating in jail, but over-identifying defendants as Tier 1 might require more urgent admissions than necessary, thereby diluting urgent services from those who need them most.  In reviewing Tier 1 admissions over recent months, hospital staff tend to confirm that these are, indeed, defendants who warrant urgent hospitalization.  Stated differently, evaluators are not over-identifying defendants as Tier 1; those who receive urgent hospitalization need it.
>
> Of course, hospital staff would not be in a position to recognize a tendency to *under*-identify defendants as Tier 1.  These scenarios would be best identified by the Forensic Support Team (FST), who is tasked with monitoring Tier 2 defendants as they wait in jail.  Thus far, the FST has not indicated that many Tier 2 defendants are in crisis requiring hospitalization.  They follow procedures to transition them into CMHIP when defendants do appear to warrant urgent admission.  Thus, preliminary review across the first several months of the Triage and FST systems does suggest that the process has generally been triaging incompetent defendants into the appropriate level of care.  Of course, ongoing review and monitoring (particularly feedback and formal data from the FST) will be crucial to more long-term and rigorous review of the triage designations.

Regarding Tier 2 defendants, progress has been limited.  Average wait times still far exceed the time limits in the Consent Decree, just as they did for all defendants in prior months.  Tier 2 defendants have waited 97.7 days on average between November 2019 and January 2020, when the maximum time frame for that time period was 49 - 56 days.  Thus, the Tier 1 figures suggest that the Triage System serves the purpose for which it was designed: prioritizing the most acutely ill defendants and moving them into the hospital rapidly.  However, the Tier 2 figures reveal that CDHS continues to struggle with some of the primary challenges that prompted the

---

[6] Average wait times for Tier 2 defendants reflect a reasonable approximation of the average wait times; exact sample sizes were not used to calculate a precise average.

Consent Decree: responding to the volume of defendants referred for inpatient restoration, and admitting them into the hospital within a reasonable time frame.

Overall, Tier 1 admissions occur on time, while Tier 2 admissions still far exceed maximum admission time frames.

KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

Beyond the wait times for restoration services (and progress towards the time frame
requirements of the Consent Decree), another key metric for gauging the Department's progress
is the *waiting list* for competence restoration services.  That is, the Consent Decree is designed
to reduce wait times, but also reduce the number of defendants waiting.  In the months
preceding launch of the Triage system, the waitlist averaged around 150 to 180 defendants.[7]
But again, with the initiation of the Triage system on June 1, we must consider the waitlist
according to Tier status.  Central to the Triage system is an acknowledgement that some
incompetent defendants are so acutely ill that they require treatment almost immediately (Tier
1, who require treatment within 7 days), whereas others can safely await treatment (Tier 2, who
can wait several weeks).

| *Number of Defendants on Waiting List for Inpatient Restoration[8]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 |
| Combined | 157 | | | | |
| Tier 1 | N/A | 3 | 1 | 1 | 1 |
| Tier 2 | N/A | 152 | 141 | 122 | 112 |

Over the past quarter, *the Department made meaningful progress in reducing the waitlist*.
Waitlist figures far exceeded 150 in the Summer of 2019, and they decreased below 150 during
the Fall of 2019.  Although the number of individuals on the waitlist remains high in absolute
terms (112 in January), this figure has decreased steadily over the past several months and
reached its lowest point in the past year.  The decrease cannot be explained by decreased
referrals for evaluation or restoration; these vary substantially month-to-month.  Rather, the
decrease appears directly attributable to Department interventions.  The most potent of these
interventions was the opening of 39 new inpatient beds (resulting in a net increase of 42 beds)
that comprise a new inpatient competence restoration unit at CMHIP.  A few months earlier, the
Department also opened a second RISE (jail-based, inpatient-like competence restoration
services) comprising 18 specially designated beds in the Boulder jail.  Although all parties are
aware that the Department cannot "build their way out" of the competence waitlist and wait

---

[7] At present, the Department provides waitlist data as daily figures, so the monthly figures in the table
reflect averaged daily figures.

[8] According to the Department's Special Master Compliance Plan report January 2020 p.11 (submitted
February 7, 2020).

times, developing additional capacity for inpatient restoration is a necessity in a system with so many acutely ill incompetent defendants.

Overall, there has been a meaningful decrease in the number of individuals on the waitlist for restoration services over the past quarter.  This decrease is not simply due to a decrease in referrals.  Rather, the decrease appears genuinely attributable to Department interventions: opening a new inpatient restoration unit, opening a new jail-based restoration unit, increasing *outpatient* competence restoration services, and other efforts.

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[9] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment. The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribes the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations (whether inpatient or in jail).[10] Admission time frames become progressively shorter at each six-month increment. Evaluation time frames are reduced in July 2020.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 | 7 days | 28 days | 14 days | 21 days |

As summarized earlier in this report ("Key Metrics"), *the Department meets the time frame for admitting Tier 1 defendants to restoration and for evaluating defendants in inpatient settings. But they far exceed the time frames for Tier 2 admissions to competency restoration, and for the first time in several years they exceed the time frames for jail competency evaluations.*

---

[9] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services. Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

Wait Times for Inpatient <u>Evaluation</u>

As detailed below, the Department has been quite successful in timely admission for inpatient competence *evaluations* (versus restoration):

| *Recent Wait Times for Inpatient Evaluation* | | | |
|---|---|---|---|
| Month | Number admitted to CHMIP for inpatient evaluation | Average days waited prior to admission to CMHIP or RISE | People who waited more than 28 days |
| Jan 2020 | 8 | 12.0 | 0 |
| Dec 2019 | 8 | 13.9 | 0 |
| Nov 2019 | 5 | 12.2 | 0 |
| Aug - Oct 2019 average | 5.3 | 17.1* | 3 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than max time frame for inpatient evaluation services

Over the past three months, an average of 6.3 people per month were admitted for an inpatient evaluation at CMHIP (compared to a 5.3 average for the previous quarter, and to a 14.7 average for the July - September 2019 quarter).  The average wait time for admission to CMHIP for inpatient competency evaluation was 13.2 days (about 4 days shorter than the average for the previous quarter).  This is an improvement over previous wait times, even though the number of inpatient evaluations has slightly increased.  Overall, we view this as a positive development.  In short, fewer people are being referred to CMHIP for inpatient competency evaluations than were sent prior to the Consent Decree, and the wait times to admission are substantially lower. The pattern has been steadily improving since implementation of the Consent Decree and seems to have largely plateaued.  We do not expect inpatient evaluations to decrease to zero. Inevitably, a few defendants are so acutely ill that prompt inpatient evaluation is necessary, and judges may order inpatient evaluations due to a case's high profile or other factors. Nevertheless, we are pleased that inpatient evaluations are less common and more rapid.

---

[10] Fine amounts are tied to delays beyond each of the time frames listed.  However, these fines are discussed elsewhere in this report.

Furthermore, according to CDHS reports, for the first time since the implementation of the Consent Decree, a majority of those defendants ordered for inpatient evaluation actually met the strict criteria for involuntary hospitalization (C.R.S. § 27-65-105).[11]  Specifically, CDHS reported that during the past 3 months, 71.4% of admissions for inpatient evaluation met that strict "27-65" criteria for involuntary hospitalization.[12]  This contrasts with earlier rates as low as 16% historically, and around 50% during the most recent quarter.  Indeed, rates have steadily increased since January 2019.  Again, this is a positive trend reflecting a more appropriate use of hospitalization: fewer defendants are sent for inpatient evaluation, and of that smaller group, more meet inpatient admission criteria.  That is, those ordered to the hospital were more likely to be those who met criteria for hospitalization and genuinely required this more intensive service.

*The combination of fewer defendants referred for inpatient evaluation, shorter wait times for admission, and more appropriate referrals (i.e., those meeting involuntary hospitalization criteria) reflects substantial progress for the Department, and their interaction with the Colorado courts.*

---

[11] C.R.S. § 27-65-105: (1)  Emergency procedure may be invoked under either one of the following two conditions:
(a)(I)  When any person appears to have a mental health disorder and, as a result of such mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then an intervening professional, as specified in subsection (1)(a)(II) of this section, upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation…
(b)  Upon an affidavit sworn to or affirmed before a judge that relates sufficient facts to establish that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation.

[12] From the February 7, 2020 CDHS Monthly Compliance Plan Report (p.20).

## Wait Times for Inpatient <u>Restoration</u>

Compared to the timely inpatient evaluations, there are far more concerns regarding inpatient *restoration* at CMHIP.  Over the past few years, wait times consistently exceeded the 30-day time frames mandated by an earlier Settlement Agreement.  However, the required time frames changed as of June 1, 2019, per the Consent Decree.  The maximum time frame for many defendants (those labeled as Tier 2) waiting in jails was extended to 56 days.  But as of January 1, 2020, the Consent Decree reduced this maximum timeframe to 49 days.  The time frame for defendants with the most urgent clinical needs (those labeled Tier 1) is now only 7 days.

| *Recent Wait Times for Inpatient Restoration[13]* | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number of people admitted to CMHIP for inpatient restoration | | Average days waited for admission to CMHIP inpatient restoration | | People who waited more than the max days for admission to CMHIP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Jan 20 | 18 | 61 | 2.3 | 85.7 | 0 | * |
| Dec 19 | 16 | 63 | 2.8 | 117.3 | 0 | * |
| Nov 19 | 16 | 46 | 2.5 | 86.7 | 0 | * |
| Previous Quarter Monthly Average (Aug - Oct 19) | 19.7 | 54.7 | 2.75 | 93.2 | 1 | * |
| March 19 (before tier distinctions) | 44 | | 58.2 | | 31 | |

*\* CDHS has not provided in their monthly report the number of Tier 2 individuals who waited more than the maximum allowable days for admission to CMHIP for restoration.  We have requested these data.*

As the table reveals, most of the defendants now designated as Tier 2 wait much longer than the required 49 - 56 days before admission.  For example, in January, a total of 61 Tier 2 individuals were admitted to CMHIP and their waiting time for admission averaged 85.7 days.  However, the much smaller group of patients designated as Tier 1 were admitted rapidly, consistent with the mandates of the Consent Decree.  In January, a total of 18 Tier 1 individuals were admitted to CMHIP, with their wait prior to admission averaging 2.3 days.  To date, a total of 126 individuals designated as Tier 1 have been admitted within 7 days of being adjudicated as ITP.[14]

As noted in our last quarterly report, the Department's rapid response to those identified as Tier 1 individuals is remarkable and commendable.  In many ways, the Tier 1 individuals are the highest priority for the Consent Decree and the CDHS competency system.  Those whom CDHS categorized as Tier 1 — usually those who most need urgent treatment — were indeed admitted rapidly.

On the other hand, the progress towards meeting Tier 2 timelines remains problematic.  Tier 2 individuals are mandated to CMHIP, but with less urgency.  CMHIP has continued to nimbly create space for Tier 1 individuals, inevitably by prioritizing them over Tier 2 individuals.  However, Tier 2 individuals must also be admitted within certain time frames.  The only options for reducing their wait times is to divert defendants away from the competency process altogether (through early diversion efforts by police and courts), create space for them in CMHIP (by reducing restoration lengths of stay or creating new beds), or transfer them to community-based restoration treatment (if they are appropriate for community treatment).  The Department has made progress in some of these areas, but will need to prioritize additional steps that create space for Tier 2 defendants.  In short, while Tier 1 individuals must be prioritized for admission (thereby treating those who need it most), successful compliance with the Consent Decree must *also* reduce Tier 2 time frames; such compliance will demonstrate that the CDHS competency system has created adequate capacity for all levels of competency-restoration needs.

> *New Efforts:*
> CMHIP has initiated a "Fast Track" project to accelerate the scheduling of some competency restoration evaluations.  Although defendants are typically evaluated at 90-day intervals, defendants do not naturally gain the capacities necessary for competence at tidy 90-day intervals; many may be competent well before (or shortly after) these court-set dates.  When defendants are identified for the program, some are stabilizing far in advance of their previously-scheduled post-restoration competency evaluation.  In these cases, evaluators are notified to conduct the evaluation soon, so that if the evaluator renders an opinion that the defendant has been restored, the case can be returned to court in advance of their previously scheduled hearing (sometimes weeks to months in the future) and bed turnover can occur.  To date, 32 defendants have been opined as competent sooner than their scheduled 90-day evaluation date, returning them to jail sooner (to await their hearings) and thus sooner opening their hospital beds for other restoration patients.  This type of practical intervention has become common in some other states, and is a simple strategy to reduce unnecessary length of stay.

---

[13] According to the Department's Special Master Compliance Plan report January 2020 p.9-11 (submitted February 7, 2020).

[14] Some Tier 1 individuals admitted to CMHIP are not reflected in the table due to timing of admissions (primarily persons admitted in early February).

## PERFORMANCE OF JAIL COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations.  The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld.  Counties not specifically identified are counties that use the "Hold and Wait" court ordered process.  Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting.  Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The mandated time limit for a jail-based evaluation is now 28 days, per the Consent Decree, and will decrease to 21 days in June of 2020.  As mentioned earlier in this quarterly report (see *Key Metrics: Competence Evaluation Time Frames*, p.9) the Department has historically met this timeframe on a consistent basis, up until around their November 2019 report.

However, around November 2019 it was becoming clear that the Department's workforce of evaluators was not sufficient to meet the volume of referrals in a punctual manner.  In December 37% of jail-based evaluations exceeded the 28-day time frame and in January 44% exceeded the time frame.  Thus, this quarter reflected a tremendous setback in domain that had been a historical strength for the Department.

*Contributing Factors:*
In our view, this failure resulted from a confluence of several factors.  First, leadership in Court Services had apparently not fully anticipated workforce needs or prepared for some foreseeable changes in staffing (e.g., maternity leave, evaluator departure).  As best we can tell, recruitment, hiring, and retention efforts were not particularly vigorous, and there were many anecdotes of potential evaluators dissuaded by delays or disorganization.  Evaluation services have been spread across Court Services (a unit of full-time evaluators employed by the Department) and contracted evaluators, but leadership had developed neither workforce to the extent necessary, particularly in light of an upcoming decrease in evaluation time frames in June of 2020.  Furthermore, as detailed in prior reports, morale was low among Court Services evaluators, in part because of how leadership had handled changes prompted by the Consent Decree.  Though this low morale did not *cause* the workforce shortage, several anecdotes suggest it may have hampered recruitment of new evaluators.  Finally, November (due to holidays and mandatory training) and December (due to holidays) required reduction in evaluator quotas.  Of course, neither should jeopardize punctuality among an adequate workforce (holidays and trainings are not unforeseeable), but these routine decreases in workdays revealed the insufficiency of the workforce.

We also emphasize, however, that *some* of the factors contributing to these recent delays are, in fact, quite positive.  That is, some factors reflect long-overdue improvements to Court Services. As a primary example, the Department had long over-relied on a single contracted evaluator (who also held a significant clinical position at CMHIP) to perform a grossly disproportionate share of evaluations (many dozens) per month, for additional income beyond his primary duties. This arrangement was problematic in almost every respect— report quality was poor, costs were excessive, report quantity was impossibly high, and complaints from the bar were common — *except* that the arrangement helped the Department meet evaluation timelines.  Court Services leadership at the time seemed unaware of the extent of this over-reliance or the severe risks it posed.  We shared our grave concerns about this arrangement and the Department ultimately decreased their over-reliance on this prolific evaluator.[15]  We affirm this difficult step by the Department, and understand it carried significant short-term cost (i.e., making it harder to meet evaluation time frames in the following month or two).[16]  But their decision to sacrifice a short-term, low-quality compliance strategy to instead invest in a longer-term, high-quality compliance strategy is exactly the type of change that makes us more optimistic about the Department's prospects for developing a strong competency system and complying with the Consent Decree in the long-term.

*Interventions:*

To their credit, the Department has recently taken steps to address the workforce shortage that contributed to these evaluation delays.  They made substantial changes in the leadership of Court Services, and have re-invigorated an evaluator training and oversight process that makes use of legitimate expertise within Court Services.  The Department has pursued salary increases for evaluators and pursued other resources to support training.  In January, the Department hired three new evaluators, and enlisted three new contracted evaluators.  Most recent reports indicate that a total of six additional contractors should be conducting competency evaluations beginning in March 2020.  Although they have not been able to reduce all of the bureaucratic barriers and delays to hiring (some appear common across the Department or even across state government), they have appeared to reduce some of the egregious delays and poor communication that undermined prior efforts to recruit and hire.

---

[15] We continue to encourage the Department to enact much stronger oversight and supervision of this clinician if he does continue to perform any evaluations.  As detailed elsewhere, education and oversight are also improving in Court Services.

[16] Indeed, the Department's decision to reduce the low-quality, high-quantity evaluations from a prolific evaluator reflects exactly the kind of long-term approach we encouraged when we reviewed their original plan in late 2018.  Rather than prioritizing a low-quality strategy for hasty compliance that risks exacerbating problems, the Department has sacrificed some degree of compliance in the short-term to prioritize better-quality services that are far more conducive to long-term compliance with the Consent Decree and with best practices.

Thus, the recent failure to meet evaluation time frames reflects at least two broad themes.  The first is unambiguously negative: a combination of poor workforce development and failure to anticipate foreseeable needs.  In our view, this reflects a failure, but the Department has changed leadership in Court Services and seems much more responsive to these clear needs and challenges.  The second contributing theme is unambiguously positive.  Improving the evaluator workforce carried some short-term costs with respect to timely evaluations.  While it would have been ideal to enact these improvements long ago, we consider these improvements "better late than never" and we have no criticism for whatever portion of the delays was prompted by reducing poor-quality evaluations and improving the evaluator workforce.

To be clear, the delays are not resolved and *the Department must move aggressively to continue developing an adequate workforce of evaluators*.  The recent improvements in salaries, incentive pay for additional evaluations, contractor pay, and recruitment efforts should continue, as should the recent improvements in leadership, training, and oversight.  Though disappointed that some of these interventions were long overdue, we affirm these recent improvements and urge the Department to continue similar interventions.  We will remain supportive of continued aggressive efforts to incentivize contracted and full-time well-qualified evaluators as the next best step for addressing current workforce gaps, and we will vigilantly monitor the effectiveness of these approaches.

## INTERIM JAIL MENTAL HEALTH TREATMENT[17]

34.  Interim Jail Mental Health Treatment.  If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S.  §§ 27-60-105 *et seq.*  to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible.  This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment.  Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment.  A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

As we have discussed in prior reports, the Department is required to partner with county jails to develop a program of coordinated services for individuals receiving competency-related services. These services are currently managed statewide through the Jail-Based Behavioral Services program (JBBS) and are funded approximately $2.5 million per year by the recently appropriated by SB19-223.  Essentially, the Department utilizes JBBS as a hub for coordinating subcontracted services across Colorado.  These subcontracted providers are now asked to provide adequate mental health services to inmates involved with competency-related services.  Interim mental health treatment is critical to screen, monitor, assess, and treat those receiving competency-related services in county jails so that they remain physically safe and clinically stable until their transfer to competency restoration services.

However, the structure of JBBS creates some challenges.  Because the JBBS-subcontracted providers differ across counties and jurisdictions, their services differ.  Some providers have strong connections with local and private inpatient hospitalization facilities, while others have weaker ties.  Workforce and qualifications also differ among providers.  This poses some challenges for the Department; while individualized services are enhanced by the local nature of the providers within JBBS, uniformity and leverage across providers are more difficult.

Since our last quarterly report, most counties have either accepted this enhanced funding or are in the process of pursuing it.  However, a few urban and rural counties have rejected the funding.  Primary reasons for rejecting funding, according to Ms. Shah and Dr. Werthwein (OBH Director), are that the funding comes with too many reporting requirements or that the sheriffs already perceive they have adequate jail mental health resources in place.  Ms. Shah and Dr.

---

[17] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree.  It is NOT a proxy or substitute for competency restoration services.

Werthwein have continued outreach efforts to the few remaining sheriff's offices, with some progress in encouraging some reluctant sheriffs to access the extra funding.

In addition, OBH's Office of Community Services, in conjunction with a large multi-million dollar grant and in collaboration with the University of Colorado's Department of Family Medicine, has begun offering technical assistance and education to jails statewide regarding this enhanced funding.  This technical assistance has focused on a number of areas, including intake screenings, formularies, care management during transition back to the community, and identifying community providers for aftercare.  We have encouraged this Office to prioritize and encourage sheriffs to utilize the enhanced JBBS funding for expanding psychiatric medication formularies and to secure additional psychiatry services.  Psychiatric service is the strongest contributor to early competency restoration and would likely provide the largest return on investment from the enhanced JBBS funding.

The Office of Community Services and OBH administration are also pursuing statewide tele-health services.  Tele-health could be a helpful addition for competency evaluations and ongoing assessment of Pretrial Detainees; we support an assertive exploration of tele-health strategies.

Although outreach efforts continue, it may be that OBH has reached the maximum number of sheriff's departments willing to utilize this enhanced JBBS funding.  This, of course, leads to questions about how effective mental health services will be for Pretrial Detainees in those jails that have rejected the enhanced funding, and what alternate strategies the Department may pursue.

However, even within the jails that *will* utilize this enhanced funding, significant challenges remain.  Contracts with county jails vary greatly in depth and breadth of services.  Moreover, OBH has very little leverage over these services aside from the contract.  Quality of services, frequency of communication, and fidelity to expectations are rather loosely assured without a stringent contracting and quality management oversight.  Unfortunately, OBH has few resources to provide this oversight, so in reality the actual mental health services available in county jails *could* be inadequate.  OBH proposed to develop an "inter-agency agreement" by March 2020 which would allow for more oversight and more flexibility in service changes, rather than utilizing individual contracts.  However, we have not received updates about this inter-agency agreement and are not optimistic that it will be effective in rectifying the above challenges.  There is just too much variability across jails for OBH to monitor services effectively.

Two potential solutions are under consideration.  The first involves data collection.  We have encouraged OBH to use existing data from county jails about their mental health service provision.  OBH has stated that approximately ten jails use a shared data system.  Their data could be analyzed to determine how frequently competency-involved individuals are treated versus other inmates with mental health needs, what medications are prescribed, what programs or services are provided, how often crisis services are required, and so on.  This type of analysis would (for those ten jails) help OBH better understand how JBBS funding is used and what outcomes are being realized.  As an adjunct to this data analysis, the Forensic Services

Team Navigators are beginning to collect data on their Pretrial Detainees.  Although data focuses primarily on clinical status and progress to restoration (per Consent Decree requirements), some information can be gathered to address the quantity and quality of services among different jails.

Secondly, we are exploring the possibility of using funding from the Consent Decree fines to fund a DLC-contracted auditor to review cases and services in jails that have accepted the enhanced JBBS funding.  This effort is within the purview of DLC and would harness that agency's expertise in monitoring and verifying contractual obligations.  The "fines committee" is unanimously supportive of this idea and will begin practical steps to creating a scope of work within the coming months.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[18]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment.  If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has made further progress on the requirement to develop discharge plans for persons identified as appropriate for Outpatient Competence Restoration programming (OCRP). Progress is clear — and important work remains — in four areas:

1. *Transition efforts at CMHIP:*  CMHIP has identified 10 patients currently treated at CMHIP that could potentially transition to OCRP in the near future. CHMIP is planning to transition them to Restoration Housing (formerly labeled Fusion Studios), though Restoration Housing is opening behind schedule and may not accept admissions until mid-March .  While still unrestored, their improved clinical status and minimal public safety concerns make them more appropriate for release to OCRP, rather than remaining at CMHIP.  We affirm the Department taking this initiative and fully support the transition when appropriate.  Still, however, no such transitions have occurred.  We anticipated that some incompetent defendants at CMHIP would have been transitioned by now, as CMHIP administrators began actively working on these cases before our last quarterly report.  This type of "step down" approach would help decrease length of stay in the hospital and allow for more rapid admissions from the waitlist.  We encourage CMHIP to be more assertive in their efforts to make discharges actually occur.

2. *Impact of the Forensic Support Team (FST):*  As detailed in our January 2019 response to the Department's plan for compliance, we envisioned multiple roles for the FST. Primarily, the FST was meant to monitor clinical and restoration progress for incompetent defendants in county jails awaiting transfer to CMHIP.  Secondarily, three other roles were described: monitoring and coordinating cases in OCRP, facilitating transfers from jail to OCRP when appropriate, and serving as the point of contact for caseloads regardless of restoration location.

   To date, OBH has focused on the first role but has given less attention to the other roles. FST Navigators have spent most of their time working with cases either in jails or in CMHIP.  FST Navigators have monitored clinical status and restoration progress for those

---

[18] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

in jails awaiting transfer to CMHIP — primarily defendants who have been categorized as Tier 2.  Navigators have also worked with CMHIP to begin facilitating transfer of incompetent defendants to OCRP, though (as detailed above) no such transfers have yet occurred.  Navigators have also reportedly been effective in securing emergency holds, emergency transfers, and engaging in other crisis responses for a handful of cases.  We affirm this important work.

However, we have continued to express concerns about the allocation of FST Navigator responsibilities.  Navigators are working almost exclusively with in-jail defendants, which leaves no opportunity to assist defendants transitioning to the community for OCRP.  We agree that the priority for Navigators must be those defendants who remain in custody.  Those defendants are, as a group, most at risk for crisis.  The Consent Decree mandates that Navigators monitor these in-jail defendants at least once every ten days for clinical status and restoration progress; this monitoring addresses our third overarching goal of reducing harm (by providing care) to those on the waitlist.  However, other goals of the Consent Decree are to reduce the number of persons on the waitlist and reduce the time spent on the waitlist.  These goals are supported by facilitating transitions to OCRP and enhancing OCRP services.  Navigators should play critical roles in both.

As a potential solution to this gap, we are pleased with OBH efforts to coordinate restoration and crisis services contracts with CMHCs around the state, as well as the State of Colorado's Transition Specialist Program, to provide crisis support and psychosocial services to all OCRP participants.  While these contracts will take months to become viable, we support the Department's efforts to identify and pursue alternative crisis services for OCRP participants.

It appears that Navigators have begun identifying Tier 2 defendants who have clinically stabilized while in jail and are actively working with stakeholders to transition them to OCRP services.  As of January 30, Navigators identified approximately 31 individuals statewide who could be eligible for the dedication OCRP housing at Fusion Studios, and they have begun to plan for their community transition.  Similar efforts are underway with veterans who are ITP as well as individuals eligible for Denver's Community-Based Enhanced Restoration program.  This is encouraging progress, and we affirm those efforts.  However, to date no individuals have actually been moved from Tier 2 to the community.  It will be important to see transfers occur within the next quarter.

Regarding the Navigators' roles as enhancing OCRP services, little progress has been made.  OBH administration has been clear that the 15 Navigators are stretched thin, leaving no time for work in the community.  This unfortunate scenario probably reflects some failure to determine an adequate workforce during the earlier budget appropriation phase.  We have submitted a response to OBH that outlines the vision and rationale for a community-based network of Navigators.  While OBH administration has stated philosophical agreement, they maintain that Pretrial Detainees require most (if not all) of their time.  Two new Navigators (temporary positions) have been added within

the past quarter to provide backup and overflow.  However, their time is also dedicated almost exclusively to Pretrial Detainees.

While we understand the realities of Navigator capacity, we maintain that Navigators should be the Department's "face" of restoration in the community — visible experts in the restoration system who serve as the OBH point of contact whenever needs are identified.  By serving as the Department's restoration experts in the community, Navigators increase restoration success, troubleshoot problems, address crisis situations, enhance community tenure, and help skeptical judges trust the Department's outpatient restoration services.  The necessity of these roles is highlighted by the lack of a statewide Bridges liaison workforce (discussed later in this section).

We are also keenly aware that all reports of FST Navigators to date have been anecdotal in nature.  There is no data dissemination system yet in place.  The FST Director has begun to implement some basic data collection and analysis with the FST.  We support these efforts.  However, much work remains as to regular, consistent, uniform data collection at an agency level.  In early January, we provided several examples of data management in similar forensic programs in other states.  As of the writing of this report, no FST outcomes are regularly reported or analyzed to ensure fidelity and effectiveness.  Preliminary numbers and qualitative anecdotes are reasonable expectations shortly after the launch of a program, but due to FST's long planning history and employee orientation, we anticipate the Department can provide far more FST data than is currently being reported or discussed.

Finally, the FST Director recently provided a draft of FST expectations regarding documentation, crisis intervention, and face-to-face contact with all Pretrial Detainees.  In short, the document requires that FST Navigators see each Pretrial Detainee face to face once every two weeks.  In intervening weeks, the Navigator will communicate with the jail's mental health multidisciplinary team, except when certain circumstances arise (e.g., reports of suicidal ideation, etc.) that will necessitate weekly face-to-face contact.  This is a significant step forward in formalizing the FST's policies and procedures regarding the cornerstone of the FST: ensuring that persons on the waitlist are being adequately monitored for clinical status and acuity, and facilitating transfers to different levels of care when appropriate.  The document is being reviewed by DLC and we anticipate that it will be finalized by all parties within the next two weeks.

3.  *Coordination with the Bridges program:*  As mentioned in previous quarterly reports, the Bridges Program and FST must work together to facilitate discharge and share responsibilities for competency-related cases.  They both rely on similar (partially, but not entirely, overlapping) bodies of information.  Thus, the Department and the Bridges team have been actively working to coordinate services, so that they can ultimately collaborate in a way that minimizes redundancies and gaps.

Overall, we are pleased with the progress thus far in this communication and collaboration.  The Memorandum of Agreement between the two agencies has been close to final for many weeks; once signed, it will allow data and information sharing to occur between Navigators and liaisons.  Ultimately that will greatly improve the ability of both agencies to facilitate discharges and/or transitions of Tier 2 individuals out of jails and into community placements when appropriate.  The FST Director reports, however, that because liaisons are most often *not* assigned to incompetent defendants, expediating discharges and holding necessary court hearings is often difficult.  FST Navigators have begun attempting to schedule hearings and bring relevant information to court, but that process is difficult because Navigators are not court personnel.  So although the two programs appear to have made progress in sharing information and understanding roles and expectations of each other, the lack of liaisons assigned to incompetent defendants has caused a barrier in transitioning Tier 2 individuals to the community.

4.  *CBER (Community-Based Enhanced Restoration):*  The CBER program is a pilot program based in Denver that provides enhanced mental health and case management services to a community-based restoration program.  OBH is funding the program and has contracted Mental Health Center of Denver to provide the wraparound and restoration services.  Participants will be drawn from metro-area county jails; Tier 2 individuals are targeted for inclusion.  To date, six individuals have been placed into the program, and six more individuals have been identified as clinically eligible and legally suitable.  OBH administrators have dedicated enough funding for a total of around 25 participants at any one time.

## TRANSPORTATION OF PRETRIAL DETAINEES

36. Transportation of Pretrial Detainees.  If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S.  § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Over the past quarter, a total of 21 defendants were admitted to CMHIP for an inpatient competency evaluation, of who 13 met C.R.S. § 27-65-125 criteria, according to hospital staff.[19] None of these defendants who met civil commitment criteria were returned to a local jail.[20]

As mentioned in previous quarterly reports, SB19-223 included language that allows CMHIP to keep defendants ordered for inpatient evaluation at CMHIP from the time that the evaluator opines them incompetent to proceed (rather than requiring C.R.S. § 27-65-125 criteria be met, or that the originating court adjudicates the defendant as incompetent).  This is now found in C.R.S. § 16-8.5-105 (IV-b-5) and reads as follows:

*When the court orders an inpatient evaluation, the court shall advise the defendant that restoration services may commence immediately if the evaluation concludes that the defendant is incompetent to proceed, unless either party objects at the time of the advisement, or within 72 hours after the receipt of the written evaluation submitted to the court.*

Policies and procedures governing the decision-making in these circumstances are still in development.  At times, CMHIP may need to balance these incompetent individuals already in the hospital and in need of hospital-level care with those Tier 1 or Tier 2 defendants in county jails approaching their deadlines for admission.  To date, decisions among these individuals have been made primarily on clinical grounds, but we also understand the need to admit individuals who have been waiting in county jails for extended periods of time.  Discussions between OBH and DLC have been amiable and productive in these challenging situations.

---

[19] According to the January Special Master Compliance Report (p.20), submitted by CDHS on February 7, 2020.

[20] See the Department's monthly report (p.30) filed February 7, 2020.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes.  The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;[1]

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services.  The account will be managed by a court-appointed administrator.  Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master.  Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

The Department has continued to provide reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree (since June 1, 2019).  Likewise, the Department has completed a "Fines Report," as prescribed by the Consent Decree.  Finally, as prescribed by the Consent Decree, the Department has been paying these fines into a trust account (managed by Cordes & Company, LLP).

The funds from these fines are already going to good use.  A small committee comprising Department administration (Worthwein, Shah), a representative from the Plaintiff (i.e., Disability Law Colorado leader, Ivandick), and the Special Masters has met regularly for several months to address use of these fines.  The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to reduce Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities.  In other words, funds from the fines should supplement and not replace existing services.

The first opportunity to use these funds for prompt services emerged when the Colorado Coalition for the Homeless (CCH) was renovating a hotel to create *Fusion Studios,* which comprise 182 single-unit residences for homeless individuals.  Because CCH has a strong record of fiscal responsibility and successful housing interventions, the Department explored a collaboration to dedicate new residences to those involved in the competency system, particularly defendants who could be eligible for community-based competence restoration *if*

they had access to housing (a lack of housing is a common barrier to outpatient restoration treatment).  Ultimately, in an arrangement finalized on October 2, 2019, the Fines Committee contributed $3.5 million to the "Fusion Studios" project (now labeled Restoration Housing), in exchange for 28 dedicated residences for competence-involved individuals whom the Department refers, over the next five years.  Fusion Studios opened on January 21, 2020 and began taking referrals days afterward.  The Forensic Support Team and CMHIP are both identifying defendants who could transition to the housing project.  They are targeting defendants who are ready to transition out of the hospital or jail and continue restoration services in the community.  First placements should occur in March 2020, which is somewhat later than anticipated.

Though the Fines Committee has not finalized the next funding priorities, the Committee is investigating a pilot test of a "competency docket" or "competency calendar" in a Colorado District.  We have researched and consulted with other jurisdictions around the country, and it is clear competency-specific dockets offer a number of advantages to courts and defendants, and tend to expedite competency-related procedures in ways would help defendants and the Department waitlists.  Furthermore, Judges in Colorado's 18th Judicial District are highly motivated to establish a competency docket.  They have been given support from the Chief Justice and have expanded the pilot to include both Arapahoe and Douglas County courts.  They have asked for little in terms of funding, aside from a court-based evaluator position to provide quick turnaround competency evaluations and provide advice as to the eligibility for community-based restoration treatment.  The planning is still underway; we anticipate this will be our next high priority for funding, and likely make a significant contribution to expediting competency-related services in this District (and likely beyond, to the extent this serves as a model for other Districts to replicate).

Additional ideas for funding include a case manager for the Fusion Studios ITP population, an audit of enhanced JBBS funding across the state, in-depth data analysis of forensic data trends within OBH, and development of specialized curriculum for OCRP providers and participants.  We will continue to pursue these ideas as each are both relatively short-term and affordable.

# CONSENT DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

> 39. Civil Bed Freeze.  The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services.  On February 7, 2019, the Department agreed to stop this practice.  The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes.  This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department continues to report that they have removed the "civil bed freeze" as mandated by the Consent Decree.  That is, they have not re-purposed the civil beds at CMHIFL for competence restoration, as they had once proposed.  Per our request, the Department continues to provide a census report on the CMHIFL patients in their monthly report.  As of their most recent report, the CMHIFL population included a total of 90 patients, 89 of whom were civil patients.

During monthly multi-party meetings, the Department has discussed any potential changes to the use of any CMHIFL beds (e.g., allocating a few new beds at CMHIFL to accommodate inpatient competence evaluations — not restoration — which may reduce the need to transport Denver-area defendants to CMHIP for inpatient evaluation).  Generally, the Plaintiffs and Special Masters have agreed with the minor changes they have proposed, because these tend to reflect efficient steps that better serve the Departments' consumers.

For the foreseeable future, the Department will continue to wrestle with the reality that too few civil beds exist in Colorado.  A potential, albeit indirect, benefit of the Consent Decree may be to increase civil capacity through the reduced need for forensic beds; the Department will need to continue to monitor this trend and the outcomes of Consent Decree initiatives to determine the ongoing and future needs for civil beds.

COMPREHENSIVE AND COHESIVE PLAN

> 40. Comprehensive and Cohesive Plan.  The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan.  Dkt. 146.  By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider.  As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures.  Dkt. 146 at 42.  On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department has finalized a comprehensive, cohesive plan as of February 27, 2020.  As we detailed in prior quarterly reports, the Department met routinely with stakeholders, and coordinated their work with the Governor's Blueprint Task Force subcommittee that is addressing competence-related issues.  Crucially, the Department has conceptualized competency-related services in a far broader way than they had in their December 2018 report.  They detailed much of their progress to date, and remaining goals, all of which reflect a much more comprehensive, multi-faceted approached to the competency crisis, as compared to their earlier efforts.

Related to the Comprehensive plan, we encourage the Department to continue *planning for the 2020 legislative session.*  They have been exploring potential legislation that may improve competency services and better address the population of individuals likely to be involved in the competency system.  Importantly, they have done some of this in collaboration with DLC and other stakeholders.  To date, potential legislation includes increasing OBH oversight regarding jail-based mental health services, decreasing competency mandates for lowest-level offenders, and adjusting competency re-evaluation time frames.  Other legislation the Department is considering would expand the pool of competence evaluators to include licensed clinicians with Master's-level degrees (versus only doctoral degrees).  While this approach may ultimately prove necessary to develop the workforce needed for increasing competency evaluations (particularly community-based competency evaluations), we are not convinced it is necessary at this time.  Rather, we have encouraged  the Department to vigorously pursue several strategies to expand the workforce of doctoral-level evaluators.  They have agreed to do so, but are also simultaneously pursuing this legislation should expanding to Master's-level evaluators eventually become necessary.

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system.  This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein.  This plan shall be approved by the Special Master.

As reflected in past quarterly reports, the Department continues developing a wide-scale outpatient competence restoration treatment program (OCRP).  Their formal OCRP program began in March of 2018, and referrals for outpatient restoration ranged from 26 - 46 defendants per month during the past quarter (a wider range, and a smaller number, than the prior quarter).

At this point, OCRP is nearing its two-year anniversary.  As such, most counties and community mental health centers (CMHCs) across Colorado now offer some form of OCRP.  There are 53 contracts in place around the state.  This statewide system is fairly unique in the US; very few other states have such a robust statewide OCRP presence.  Only one CMHC is refusing to offer OCRP in Colorado, and only four counties remain without viable OCRP options (see graphic below, copied from the January 2020 Monthly Compliance Report):



The Department continues to pursue contracts and services for those areas in which services are not yet available.  However, we recommend a shift in efforts for OCRP at this two-year anniversary.  While soliciting services in unserved areas, we encourage OBH to begin shifting focus to ensuring quality among their current providers.  This is accomplished by first developing and utilizing a robust data collection and analysis plan.  OCRP administrators have produced the first iteration of data; however, the data is spare and fairly general.  We encourage more detailed data amenable to further analysis; we also request that the data be provided in the Monthly Compliance Report.  We have provided the Department with more than a dozen variables we recommend for data collection and reporting; these variables are common metrics across other states' outpatient restoration programs.

Secondly, we encourage the Department to develop some specialized OCRP programs — "centers of restoration excellence."  While there are some commonalities across defendants, there are also distinct groups with similar barriers to competence.  Special populations (defendants with intellectual disabilities, traumatic brain injuries or other cognitive disabilities, sexual offense charges, or juvenile defendants) have needs that differentiate them from other groups.  Some providers may wish to specialize in one or more of these specialty areas (and some may be more or less skilled with certain groups of defendants), which would optimize restoration efforts in much the same way specialty courts address specific niches in criminal law.  Such specialized providers would also make referrals and communication more efficient.

To date, OBH has focused on training providers to fidelity to the "CompKit" model of restoration; while this is a normative developmental process, at this stage, Colorado's OCRP should begin to shift away from initial uniform training and into more sophisticated, nuanced models of restoration.  We affirm efforts that OCRP administrators and partnered organizations have worked to enhance wrap-around and psychosocial services for OCRP participants (e.g., housing, case management, among others).  We encourage the development of this "expanded view" of OCRP in Colorado — beyond uniform restoration classes and required numbers of visits and into a more individually-tailored approach that addresses both restoration and broader mental health needs.

Another positive development has been the convening of the "Placement Committee," a team of expert advisors mandated by SB19-223.  This committee will help define clinical criteria that Court Services evaluators will use to determine if an incompetent defendant merits inpatient or community-based restoration treatment.  Beginning in July 2020, statute will require evaluators to offer these placement opinions.  The committee is soliciting input from Court Services evaluators to develop placement criteria and decision points; once finalized, this should help reduce the number of people on the waitlist since evaluators will be required to make those differential recommendations (community-based vs. inpatient restoration).  Our previous review of the triage sections of evaluator reports was encouraging in that several evaluators have been addressing the placement decision already; moreover, their rationale and criteria used have generally been solid.  We look forward to working with the Placement Committee to further refine these criteria.

Relatedly, some stakeholders are drafting legislation that would make community-based restoration the default setting for restoration, such that evaluators would need to "make the case" for inpatient restoration. Several states have adopted this approach without problem. We support this legislative initiative.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department has contracted with a local hospital to provide ten inpatient beds for short-term competency related services. These beds are currently filled. OBH is close to finalizing a contract with an additional private hospital in the Denver metro area for 3-5 additional beds, and another contract is under initial discussion for 6-10 beds at a private hospital on the Western Slope. We facilitated a discussion with OBH and DLC to confirm that this increase is warranted and reasonable; all parties agreed in theory to the increase in private hospital beds. The Department has responded well to our January 2019 recommendation to assertively develop community options rather than rely on simply procuring more inpatient beds. Because of this progress, the rise in privately-contracted beds seems appropriate (and can be an essential resource in some cases). Private hospital beds may be an especially viable resource for female Pretrial Detainees, because females tend to face longer waits for inpatient services at CMHIP.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

As prescribed in the Consent Decree, we established a Baseline for improvement by calculating a six-month period of available data (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We also recommended using proportional metrics when pursuing goals that are fundamentally proportional in nature (i.e., a 10% increase in community-based restoration and a 10% decrease in inpatient restoration). In other words, while the Department may not have full control over the actual number of referrals, they have greater control over the proportion of referrals they direct to outpatient versus inpatient restoration. Therefore, we chose to set the baseline figures, and establish subsequent performance goals, *based on proportions instead of raw numbers*. Thus, calculating target goals for restoration based on these *percentages of individuals* referred to inpatient versus outpatient services yields the following goals:

| | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| December 1, 2019 goal | 69% reduced by 10% = 62% | 31% increased by 10% = 34% |
| December 1, 2019 numbers | June 1 – Dec 1, 2019 = 62% | June 1 – Dec 1, 2019 = 34% |
| June 1, 2020 goal | 62% reduced by 10% = 56% | 34% increased by 10% = 37% |
| Recent progress (past 6 months) | Aug 1, 2019 – Feb 1, 2020: 66% | Aug 1, 2019 – Feb 1, 2020: 34% |

Note: All percentages rounded to nearest 1%.

The Department met their goal to increase OCRP referrals by 10% in the six months after May 2019.  The portion of defendants referred to OCRP between June and December averaged 34%.  The Consent Decree now mandates another 10% shift in referrals between inpatient and outpatient restoration, so that by June 1, 2020 a total of 37% of all restoration orders should be referred to OCRP.  The most recent six months (Aug 2019 - Jan 2020) show an average of 34% of restoration cases ordered to OCRP.  Unfortunately, after steady gains from June through November 2019, the Department has seen a drastic decline in the percentage of adults referred to OCRP in the past two months.

Due to these recent dips in OCRP orders, we doubt that the Department will be able to attain compliance with Paragraph 41 of the Consent Decree by increasing outpatient restoration to 37%, on average, for the period spanning December 1, 2019 through June 1, 2020.  While we continue to view the 37% aspirational goal as largely reasonable, it seems unlikely that the Department will reach it unless dramatic increases occur soon — and are maintained consistently.  However, even with the recent dips, the Department is still maintaining a 34% rate of adults ordered to OCRP during the past six months.  This is a substantial increase as compared to the rate in the six months surrounding implementation of the Consent Decree (28%).

Additionally, we have encouraged the Department to carefully assess which participants are appropriately positioned for success in the OCRP system, and only refer those types of persons to the program.  If that referral rate is ultimately less than 37% of the total number found ITP, we support lowering the aspirational goal accordingly.  We aim to place the maximum number of *appropriate* persons in OCRP, but are not wedded to a predetermined rate if it exceeds the actual number of defendants appropriate for OCRP.  We have broached this subject with both parties, and both are amenable to a marginally smaller percentage goal if indeed all appropriate OCRP referrals are made.  We will continue to monitor the rate; we believe it can certainly increase with continued judicial education, coordination with the Bridges program, onboarding of new OCRP providers, and clearer guidelines for Court Services evaluators.  Of course, if

drafted 2020 legislation passes, OCRP referral rates may increase even further if statutes define OCRP as the default setting for restoration, or if low level charges are statutorily excluded from inpatient restoration in most cases.

Again, we reinforce the need for OBH to provide outcome data on OCRP.  We have received one basic report of OCRP outcomes to date.  While helpful, more regular reporting and more sophisticated data analyses are critically needed.  We have sent a request of OCRP data elements to OBH; we will discuss these requests in mid-February 2020.  Although OBH has many concurrent data requests, we continue to strongly request empirical outcome data for OCRP (and the FST, as mentioned earlier).

## CONCLUSION

As detailed throughout this report, we perceive the Department has made significant and meaningful progress in enacting changes prescribed in the Consent Decree.  Indeed, several key interventions prescribed by the Consent Decree (e.g., the triage system, the Forensic Support Team) have become fully operational during this reporting period.  These have begun to significantly change the overall key metrics, in that the Department is generally responding promptly to those identified as Tier 1.  Put simply, the most acutely ill defendants — those whose welfare was a primary focus in the current legislation and Consent Decree — do *seem to be receiving more prompt treatment upon launch of the Triage System*.  Other improvements are also clear, as the overall wait list has decreased meaningfully in the past quarter, and is lower than at any point in recent history.  On the other hand, it remains for the Department to begin accelerating inpatient restoration treatment for Tier 2 defendants, whose needs may be less urgent, but nevertheless important.  Finally, the Department must work aggressively to develop an adequate workforce of forensic evaluators, and overcome the recent, significant setback in meeting evaluation deadlines.  We will continue to work with the Department on these and related matters, and we encourage you to contact us with any questions or requests.  We appreciate the opportunity to serve the court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.

Daniel Murrie, Ph.D.