

Groundswell Services, Inc.

SPECIAL MASTER REPORT to JUDGE WANG

Submitted June 5, 2020

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director  of the Colorado
Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental
Health Institute at Pueblo, Defendants.

Page 2

June 5, 2020

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our May 28, 2020 status report[1] mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW.  As you know, the Consent Decree (following your earlier court order) requires us to monitor progress and provide recommendations for improvement to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services to criminal defendants with psychiatric illness.  Specifically, the Consent Decree (p.24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter.  The Special Master's status report was submitted on January 28, 2019.  Dkt. 146.  The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter.  Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

As you know, the Consent Decree filed March 15, 2019 prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and eventually attain compliance with all time frames and deadlines mandated in the Consent Decree.  The Department has initiated many of these steps, demonstrating meaningful

---

[1] Per prior agreement with the court, we are submitting the May 28 report one week later, on June 5, so that we are able to further discuss an arrangement the parties were negotiating during the final days of May and initial days of June (i.e., an agreement about how to handle fines that accrue solely due to COVID-related delays).

progress, in ways we detail through the remainder of this report.  *In particular, this report will focus on developments since our prior quarterly report, which was submitted February 28, 2020.* As you know, these past three months have been remarkable for the worldwide COVID-19 pandemic, so this report focuses on the pandemic's impact on the functions prescribed in the Consent Decree, and the Department's efforts to respond to the challenges COVID-19 has brought.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................................5
    KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS..............................9
        KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES ............................................................10
        KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES............................................................12
        KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES .....................................14

CONSENT DECREE SECTION VI UPDATES ..................................................................................16
    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION
    TREATMENT ................................................................................................................................16
        Wait Times for Inpatient Evaluation ...........................................................................17
        Wait Times for Inpatient Restoration..........................................................................19
    PERFORMANCE OF JAIL COMPETENCY EVALUATIONS........................................................................21
    INTERIM JAIL MENTAL HEALTH TREATMENT...................................................................................23
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT .................26
    TRANSPORTATION OF PRETRIAL DETAINEES ...................................................................................30
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ..............................................................31

CONSENT DECREE SECTION VII UPDATES .................................................................................34
    CIVIL BED FREEZE.........................................................................................................................34
    COMPREHENSIVE AND COHESIVE PLAN.........................................................................................35
    INCREASE COMMUNITY RESTORATION SERVICES ...........................................................................36

CONCLUSION ...............................................................................................................................41

# INTRODUCTION

As you know, the Consent Decree that was filed March 15, 2019 prescribed many steps the Department must take, and timelines it must meet, to improve the competency assessment and restoration system in Colorado.  After the Consent Decree was filed in March 2019, the Department began taking many of these steps (detailed throughout this report) in ways that we consider generally responsive, and in ways that appear to recognize the gravity and complexity of the challenges they face.  The Consent Decree has now been in effect for more than one year.  Planning and implementation phases are generally complete, and we have had the opportunity to observe the launch and early stages of the new initiatives the Consent Decree prescribed.

Broadly speaking, we consider three goals of these initiatives, and the Consent Decree overall, as primary:
   a) Reducing the overall *number* of people on the waitlist for competence restoration services,
   b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and
   c) Reducing *harm* (by providing *care*) to people on the waitlist.

Progress on the first goal is clear; there has been a steady and meaningful decrease in the waitlist over the past six months.  Progress on the second goal has been substantial, though *only* for people with the most acute psychiatric illness; those with less urgent needs continue to experience delays that are decreasing, but still excessive.  Finally, progress towards the third goal has been improving.  The Department has provided prompt care by hospitalizing those who are most ill, and providing services to those waiting longer in the jails.  This report details progress on these three primary markers as well as other key developments.  However, our discussion of the past quarter will differ considerably from prior reports, because this quarter has been so greatly influenced by the global COVID-19 pandemic.

*Overview of Progress this Quarter amid the COVID-19 Pandemic:*

*Like almost everything else in the Spring of 2020, the Department's work this quarter has been dramatically altered by the COVID-19 pandemic.* When we submitted our quarterly report at the end of February, there was little appreciation in the United States for the impending impact of the COVID-19 virus.  However, by mid-March, it was clear the virus would likely cause a global pandemic with substantial impact on almost every aspect of public life, including the criminal justice system and public mental health services.  Within just a few more weeks — near the end of March — it was clear that the virus was impacting all of the Department's services, and particularly people identified in the Consent Decree (i.e., those awaiting or receiving competency services).

Indeed, competency services may have been particularly vulnerable to the impact of the COVID-19 pandemic because they lie at the intersection of multiple systems — the courts, jails, and the

Department — each of which has been attempting to reduce human contact in order to slow the spread of the COVID-19 virus.  Though the Department has control over their own services, they have less influence over the other systems in which competency-involved individuals reside, so many of the Department's functions have been fluid: for example, changing in response to the changing policies and practices of courts and jails.  Primary examples of the COVID impact on Department services include:

*Competency Evaluations*:
Many jails have forbidden all visits from external professionals, including the Department's forensic evaluators, causing delays in evaluations.  Fortunately, with some jails, the Department has established arrangements (and even provided the necessary technology) to conduct evaluations via video-conference, an approach that is sometimes less-than-optimal (under typical circumstances), but under current circumstances is far preferable to further delays.  With other jails, the Department has developed alternate procedures, sometimes involving non-contact visits and other more socially-distant, protected approaches in order to continue conducting competency evaluations.

*Mental Health Services for those Awaiting Competency-restoration Services*:
Fortunately, the Forensic Support Team (FST) and their Forensic Navigators — mandated by the Consent Decree to monitor defendants in jail awaiting competency restoration services — had fully launched a few months before the pandemic began.  These early months allowed them to develop procedures and relationships with the jails *before* many jails closed to visitors in response to COVID. Once many jails closed to visitors, the FST had little opportunity to monitor defendants face-to-face.  Instead, they quickly developed procedures to check on defendants using telephone communication with jail Mental Health staff.  The FST (and even CMHIP) worked with jail staff to respond to defendants with acute psychiatric needs, sometimes arranging for transfer to a private psychiatric hospital or to CMHIP.  The Department reports these efforts have been successful; there is little evidence to suggest severe problem or crises among defendants waiting in jails.  But we acknowledge that the reduced face-to-face contacts by FST, and the increased reliance on jail staff, leave us concerned about the potential to overlook some defendants who remain symptomatic or suffering in more subtle ways.

*Inpatient Competency Restoration Services*:
Amid the public-safety precautions that limit human contact, defendants found incompetent to stand trial and ordered to inpatient restoration services tend to move more slowly into those inpatient services.  CMHIP has begun following something like an emerging best practice, admitting defendants in cohorts that essentially separate them into groups, and monitoring them for 14 days before admitting them into broader hospital population.  They have created "safe zones" or quarantine strategies that greatly reduce the possibility of a newly-admitted defendant infecting others.  This strategy appears generally successful, in that infection rates at CMHIP have remained very low since the onset of the pandemic.  Discharges from CMHIP have also slowed, because courts are holding fewer hearings, and many jails and other facilities are declining (or delaying) to accept defendants transferring from the hospitals, as part of their own efforts to reduce infection risks.  Not surprisingly then, recent data reveal that admissions and

discharge numbers were far below typical rates.  Obviously, these decreased rates yield poorer performance on some of the key metrics prescribed in the Consent Decree, including the metrics by which the Department incurs fines.

*Fines:*

With certain Department functions greatly altered or slowed by COVID-19, the Department is incurring fines (i.e., the Consent-Decree mandated fines for exceeding prescribed time limits) to a greater degree than in prior months.  This has raised questions about how to handle these fines.  All parties (i.e., the Department, Disability Law Colorado, and Special Master) agree conceptually that the Department should not be penalized for delays caused *solely* by COVID-19.  Although COVID-19 is, conceptually, a "Special Circumstance" as defined in the Consent Decree, the Consent Decree precludes invoking Departmental Special Circumstances until a later date.  Thus, all parties have been considering a potential agreement wherein the Department commits to paying fines they would have incurred absent COVID-19, but need not pay additional fines that appear *solely* due to COVID-19.  Recently, the Department has provided DLC with an estimate (including an independent estimate by a statistician otherwise uninvolved in the Consent Decree matters) of the fines they would have incurred absent COVID (roughly $2 million), and has proposed an agreement in which they pay that fine amount and any additional fines they may incur for delays in jail-based evaluations.[2]  As we finalize this report, DLC is considering this proposal and crafting a response.  Thus, we cannot yet describe a resolution among the parties regarding fines for the coming year, but we are hopeful a negotiated resolution is forthcoming.  We have reviewed the estimated fines amount and the statistical model underlying those projected figures, and we believe both are generally reasonable.  We have also appreciated the candor and careful consideration of "checks and balances" to ensure that the Department will maintain diligent work regardless of fines.  We are optimistic that an agreement will be reached and that more formal mediation can be avoided; however, if formal mediation or proceedings become necessary, we will inform you immediately.

To be clear, the challenges of the COVID-19 pandemic could be worse.  Though the pandemic has inevitably slowed many Department functions and created new barriers, the pandemic has also slowed some of the demands on the Department.  Perhaps most obviously, law enforcement has made fewer arrests, and court operations have slowed, leaving fewer court orders for competence evaluation or restoration.  This is reflected in the current number of Pretrial Detainees on the waitlist as we finalize this report (71), far lower than any month since the Consent Decree took effect.  Of course, these decreased court orders are not enough to offset the other challenges and delays the Department faces, but all parties are grateful that

[2] The proposed agreement relates only to fines for inpatient evaluation and restoration, not jail-based evaluations.  Although the Consent Decree precludes invoking Departmental Special Circumstances at this time, the Department can invoke Individual Special Circumstances for particular defendants.  Thus, when particular defendants in jail cannot be evaluated in a timely manner because of COVID-attributable delays (e.g., when a jail forbids visits by evaluators and does not allow an option for evaluations via video) the Department can invoke Individual Special Circumstances.

there are fewer defendants entering the competency system, amid the other challenges of serving defendants in the COVID-19 era.

*Special Master Roles:*
Amid the changes prompted by COVID-19, we have had to modify the way we perform our Special Master duties as well.  Obviously, travel and on-site meetings are temporarily suspended. We hold the monthly two-party meetings via videoconference.  We increased the frequency of our meetings with the Department, adding a mid-week telephone update every week, in addition to our weekly Friday meetings with Department leadership.  Though certain strategies and initiatives had to pause or change approaches, our primary goal has been to ensure *monitoring for the most acutely-ill defendants*, and facilitating a rapid response for them.

*Looking Forward:*
As Colorado has eased some of the public safety restrictions that attempted to slow the spread of COVID-19, some of the factors that have caused delays may be changing.  For example, some jails may resume allowing face-to-face visits from evaluators (with proper safety precautions). On the other hand, certain procedures will remain as the "new normal."  For example, CMHIP will likely need to continue hospital admissions on a 14-day cohort basis to limit the impact of any infection among newly admitted patients, and this process may remain necessary for the foreseeable future.

Other challenges are clearly on the horizon: as courts resume more regular operations the volume of competency evaluation and restoration orders will substantially increase. Furthermore, some form of COVID-19 resurgence (a "second wave" or "second peak") is likely, according to many experts.  Thus, we urge the Department to prepare for the increased volume of orders for competency services, and the possibility of a COVID-19 resurgence.  For the latter, it may be easier to re-instate recently developed protocols than it was to create them the first time, but proper contingency planning will be important regardless.

As summarized above, the COVID-19 pandemic has brought broad and dramatic changes, but the Department continues to pursue the goals prescribed in the Consent Decree.  As in every quarterly report, we review next the Department's compliance with time frame requirements, because this is the primary focus of the Consent Decree (and the focus that the Consent Decree prescribes for our quarterly reports).  We consider these time frames our "key metrics" — or primary markers of progress — that we review in each quarterly report.  Obviously, many of these metrics have been directly influenced by COVID-19, and its consequent procedural changes necessary for public safety.  We discuss each of these in their respective sections below.

## KEY METRICS FOR PROGRESS: COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of these quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p.24)

> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree.  This includes both time frames for competence *evaluation* and for competence *restoration*.  These will be the key metrics to gauge progress over the next few years, so they are our starting point in the report, as well as a primary focus.  Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES

As summarized in the table below, the Department has historically met evaluation time frames, even well before June 2019 and even through the first several months of the Consent Decree. *However,* during the prior quarter (i.e., early 2019), the Department began failing to meet these time frames for the first time in many months and they continued to struggle during this quarter.

| *Average Wait Times for Competence Evaluation Services*[3] | | | | | | |
|---|---|---|---|---|---|---|
| | Nov - Jan 2019/20 | Feb 2020 | Mar 2020 | Apr 2020 | January 2020 Requirement | July 2020 Requirement |
| Jail-based Competency Evaluations | 28.6* | 28.9* | 28.4* | 24.9* | 28 days | 21 days |
| Inpatient Competency Evaluations | 12.6* | 14.7 | 12.1* | 20.2* | 21 days | 14 days |

* = at least one defendant waited longer than max time frame for the evaluation

Historically, timely competence evaluation was a relative strength of the Department.  Well before the recent Consent Decree, they followed the national trend of de-centralizing evaluations, moving them from solely an inpatient service to a localized service in the community.  During 2018, their evaluations almost always met the prescribed time frames.  In 2019, however, their performance deteriorated substantially.  Apparently due to insufficient planning, recruitment, and hiring, the evaluator workforce was insufficient to meet the need for timely evaluations.  This trend has continued into early 2020.  In February through April, 27% of jail-based evaluations exceeded the 28-day time frame.  Also, inpatient evaluations have historically been completed well within maximum time frames, but in February through April, 11% were late.

As we described in our prior report, their delays in late 2019 and early 2020 reflect the confluence of several factors.  Some involved a failure to develop an adequate workforce, and some involved taking appropriate steps (which carried some short-term consequences) to improve the workforce.  The Department has made changes to the leadership of Court Services (the unit responsible for evaluations) and, although belatedly, taken some significant steps to improve the workforce.  Indeed, this quarter witnessed some substantial improvements (i.e.,

---

[3] According to the Department's Special Master Compliance Plan report April 2020 p.15 and p.23, submitted May 7, 2020.

hiring new evaluators and contractors, increasing incentive pay) that we suspect would have demonstrated much clearer progress in this key metric, were it not for some delays attributable to COVID-19 counterbalancing those improvements.  As detailed in later sections, we affirm many of these steps, as well as the Department's (specifically Court Services) efforts to continue timely evaluations in light of COVID-19 challenges.

Historically, the Department had performed well with respect to competence *evaluation* time frames, but the past two quarters witnessed substantial delays and noncompliance.  The original delays were attributable to failures in planning and workforce development, but also some overdue workforce improvements.  This quarter has witnessed further substantial improvements (i.e., hiring new evaluators and leadership, incentive pay for conducting "overload" evaluations).  But, at the same time, delays attributable to COVID-19 have slowed evaluations and prevented the recent improvements from changing key metrics in ways we believe they otherwise would have.  Further, the drop in the number of evaluations ordered by courts was substantial, and yet the Department was still unable to complete timely evaluations in 27% of cases.  We affirm the Department's recent success in recruiting new full-time and contracted evaluators to meet evaluation needs.  We also affirm their efforts to continue evaluations amid COVID-19 challenges, and encourage continued, creative work to promptly complete these evaluations.  We urge them to continue developing robust evaluation staffing and procedures in order to be ready for the shortened timeframes that will take effect in July 2020.

## KEY METRIC:  COMPETENCE RESTORATION TIME FRAMES

The Department has consistently failed to provide prompt *restoration* services; indeed, this was a primary reason for the litigation leading to the Consent Decree.  In the months preceding the Triage system, defendants who were admitted for inpatient restoration treatment at CMHIP or RISE waited, on average, 71 days.[4]  Of course, this figure included all defendants referred for restoration, without distinction between those with more, versus less, acute needs.  Since then, the Department launched on June 1, 2019 the Consent-Decree-mandated triage system,[5] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2").  Currently, Tier 1 defendants must receive services within 7 days of the competency hearing, whereas Tier 2 defendants need not receive services for 49 days (per the January 2020 change in timeframe requirements).

Overall, the Department continues excellent adherence to the 7-day deadline for defendants designated as Tier 1.  The wait times for Tier 2 defendants still exceed the time frames prescribed in the Consent Decree (i.e., average wait times exceeding 72 days this quarter, well beyond the required 49 days), though recent data show improvements over prior quarters. Whereas April reveals longer waits than March (due to impact the COVID-19), this COVID-influenced figure is better than prior quarters.

| *Average Wait Times for Inpatient Competence Restoration Services[6]* | | | | | | |
|---|---|---|---|---|---|---|
| | Nov – Jan 2019/20 | Feb 2020 | Mar 2020 | Apr 2020 | January 2020 Requirement | July 2020 Requirement |
| Tier 1 | 2.47 | 1.6 | 3.6* | 10.3* | 7 days | 7 days |
| Tier 2 | 97.87** | 80.2** | 63.8** | 72.0** | 49 days | 42 days |

\* = at least one defendant waited longer than maximum time frame for restoration services
\*\* = most defendants waited longer than maximum time frame for restoration services

As in prior reports, each of these summary statistics requires clarification.  First, the figures for Tier 1 defendants reflect only Tier 1 defendants as defined in the Consent Decree; that is, *defendants whom the court has designated as Tier 1 and ordered to the hospital*.

---

[4] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p.7 of their Monthly report filed May 7, 2019).

[5] See Consent Decree paragraph 43.

[6] Average wait times for Tier 2 defendants reflect a reasonable approximation of the average wait times; exact sample sizes were not used to calculate a precise average.

To date, the Department reports that a total of 164 individuals have been opined as Tier 1 by Court Services Evaluators and admitted to CMHIP via the Consent Decree criteria.  Of these, 160 were admitted within the 7-day maximum time frame.  This bodes well for the triage system. The vast majority of defendants whom evaluators designate as Tier 1 are admitted to the hospital promptly (i.e., well within seven days), and often even before the Court designates them as Tier 1 and orders admission.  For those that have not, CDHS has offered what appear to be plausible explanations.

Regarding Tier 2 defendants, progress has been much slower.  Average wait times still far exceed the time limits in the Consent Decree, just as they did for all defendants in prior months.  Tier 2 defendants have waited an average of 72 days between February and April 2020, exceeding the required 49-day limit.  Thus, the Tier 1 figures suggest that the Triage System serves the purpose for which it was designed: prioritizing the most acutely ill defendants and moving them into the hospital rapidly.  However, the Tier 2 figures reveal that CDHS continues to struggle with some of the primary challenges that prompted the Consent Decree: responding to the volume of defendants referred for inpatient restoration, and admitting them into the hospital within a reasonable time frame.  Fortunately, we see improvements in the Tier 2 metric over prior months, even with some delays attributable to COVID-19.

Overall, Tier 1 admissions occur on time.  Tier 2 admissions still far exceed maximum admission time frames, though the past quarters have witnessed some small-but-meaningful improvement. The most recent months revealed further improvements (i.e., they exceed the wait times, but to a lesser degree), even amid the COVID-19 pandemic.  Future months will reveal if these improvements reflect sustained progress, or if they are more attributable to COVID-related decreases in new persons placed on the waitlist.

## KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

Beyond the wait times for restoration services (and progress towards the time frame requirements of the Consent Decree), another key metric for gauging the Department's progress is the *wait list* for competence restoration services.  That is, the Consent Decree is designed to reduce wait times, but also reduce the number of defendants waiting.  In the months preceding launch of the Triage system, the waitlist averaged around 150 to 180 defendants.[7]  But again, with the initiation of the Triage system on June 1, we must consider the waitlist according to Tier status.  Central to the Triage system is an acknowledgement that some incompetent defendants are so acutely ill that they require treatment almost immediately (Tier 1, who require treatment within 7 days), whereas others can safely await treatment (Tier 2, who can wait several weeks).

| *Number of Defendants on Waiting List for Inpatient Restoration*[8] | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Jan 2020 | Feb 2020 | Mar 2020 | Apr 2020 |
| Combined | 157 | | | | |
| Tier 1 | N/A | 1 | 2 | 3 | 1 |
| Tier 2 | N/A | 112 | 115 | 124 | 110 |

Over the past quarters, *the Department made meaningful progress in reducing the waitlist*. Waitlist figures far exceeded 150 in the Summer of 2019, and they decreased below 150 during the Fall of 2019.  Although the number of individuals on the waitlist remains high in absolute terms (110 in April), this figure has decreased steadily over the past several months and is now 71 on the date of this report (June 4), by far the lowest point in more than one year.  Generally, the decrease cannot be explained solely by decreased referrals for evaluation or restoration (which vary substantially month-to-month), but rather appears attributable to Department efforts.  To be clear, the current low-point (71 on June 4) certainly *does* reflect the decreased arrests and court orders for competency services in light of COVID-19 slowing the justice system. It remains unclear whether the waitlist will remain this low beyond the peak impacts of COVID-19, or whether the Department will experience rapidly increased orders for restoration (potentially prompting increases in the waitlist) as COVID-19 restrictions ease.

---

[7] At present, the Department provides waitlist data as daily figures, so the monthly figures in the table reflect averaged daily figures.

[8] According to the Department's Special Master Compliance Plan report April 2020, submitted May 7, 2020.

Overall, there has been a meaningful decrease in the number of individuals on the waitlist for restoration services over the past quarter.  Overall, this decrease is not simply due to a decrease in referrals.  Rather, much of the decrease appears genuinely attributable to Department interventions.  The waitlist is currently at a historic low (i.e., below 80 defendants waiting, at the time of this report), though it may increase again depending on the ways in which courts respond to easing COVID-19-related restrictions and delays.

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[9] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment.  The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribes the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations (whether inpatient or in jail).[10]  Admission time frames shorten every six months, with the next reduction in July 2020.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 | 7 days | 28 days | 14 days | 21 days |

As summarized earlier ("Key Metrics"), *the Department meets the time frame for admitting Tier 1 defendants to restoration and for evaluating defendants in inpatient settings.  But they far exceed the time frames for Tier 2 admissions to competency restoration.  Evaluations in jail, for the first time in years, began exceeding the mandated time frames in early 2019.  Evaluations have continued to lag given COVID-19 delays, though recent improvements suggest they should soon return to schedule.*

---

[9] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services.  Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[10] Fine amounts are tied to delays beyond each of the time frames listed.  However, these fines are discussed elsewhere in this report.

## Wait Times for Inpatient <u>Evaluation</u>

As detailed below, the Department has been quite successful in timely admission for inpatient competence *evaluations* (versus restoration):

| Recent Wait Times for Inpatient Evaluation | | | |
|---|---|---|---|
| Month | Number admitted to CHMIP for inpatient evaluation | Average days waited prior to admission to CMHIP or RISE | People who waited more than 21 days |
| Apr 2020 | 1 | 28* | 1 |
| Mar 2020 | 2 | 12.1* | 1 |
| Feb 2020 | 8 | 14.7 | 0 |
| Nov 2019 - Jan 2020 average | 7.0 | 12.9 | 0 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than max time frame for inpatient evaluation services

Over the past three months, an average of 3.7 people per month were admitted for an inpatient evaluation at CMHIP (compared to an average of 7 people for the previous quarter, and a 5.3 average for the November 2019 – January 2020).  The average wait time for admission to CMHIP for inpatient competency evaluation was 15.4 days (about 2 days longer than the average for the previous quarter).  The Department remained in compliance with the 21-day maximum timeframe for most defendants, although some defendants waited longer.  Unfortunately, it appears that the length of time to be admitted for inpatient evaluation *increased* during this past quarter, even though fewer individuals were referred.  This contradicts the trend of decreasing wait times for inpatient evaluations over the past several months.  As best we can tell, this recent change results from delays in admissions (e.g., medical screenings and quarantine) due to the effects of COVID-19.

The maximum admission timeframe will decrease to 14 days in July 2020, and the Department may have difficulty meeting that standard in some cases.  While the average timeframe for admission has decreased from historical averages, we believe that delays will continue to occur in some cases due to transportation problems, medical screening delays, and the potential increase in numbers as courts seek to place defendants into inpatient care quickly (at least as the COVID-19 pandemic persists).  We will monitor this closely.

We also continue to monitor the *clinical appropriateness* of those court-ordered admissions.  That is, we track how many of the defendants ordered for inpatient evaluation actually met the strict criteria for involuntary hospitalization (C.R.S. § 27-65-105).[11]  CDHS reported that during the past 3 months, only 27.3% of admissions for inpatient evaluation met that strict "27-65" criteria for involuntary hospitalization.[12]  This contrasts with a 71% rate during the most recent quarter.  In other words, the past year showed an increase in the percentage of defendants ordered for inpatient evaluations who actually met civil commitment criteria (suggesting appropriate use of the inpatient mechanism), but this quarter showed a substantial decrease.  The reason is unclear, but results solely from the month of February (in which only one of eight admitted people met civil commitment criteria).  We will monitor this carefully over the next quarter to determine if February was an outlier from the previous 12 months, or if it indicates a burgeoning trend of "inappropriate" court-ordered referrals for admission (to the extent the latter is true, we speculate that it may reflect judges' efforts to ensure prompt admission during the COVID crisis).  We believed that solid progress had been made in this area, but February's numbers provide a potential indicator of re-emerging challenges.

> *During the past quarter, wait times for inpatient evaluation admissions were longer than reported in previous months, even though the numbers of admissions decreased substantially. The proportion of persons meeting involuntary hospitalization criteria also decreased.  While COVID-19 is likely to be a primary reason for this regress, we will monitor these trends and consider potential interventions with CDHS and referral courts.*

---

[11] C.R.S. § 27-65-105: (1)  Emergency procedure may be invoked under either one of the following two conditions:

(a)(I)  When any person appears to have a mental health disorder and, as a result of such mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then an intervening professional, as specified in subsection (1)(a)(II) of this section, upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation…

(b)  Upon an affidavit sworn to or affirmed before a judge that relates sufficient facts to establish that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation.

[12] From the May 7, 2020 CDHS Monthly Compliance Plan Report (p.18).

## Wait Times for Inpatient <u>Restoration</u>

Compared to the timely inpatient evaluations, there are far more concerns regarding inpatient *restoration* at CMHIP.  Over the past few years, wait times consistently exceeded the 30-day time frames mandated by an earlier Settlement Agreement.  However, the required time frames changed as of June 1, 2019, per the Consent Decree.  As of January 1, 2020, the Consent Decree reduced this maximum timeframe to 49 days.  The time frame for defendants with the most urgent clinical needs (those labeled Tier 1) remains at 7 days.

| *Recent Wait Times for Inpatient Restoration*[13] | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number of people admitted to CMHIP for inpatient restoration | | Average days waited for admission to CMHIP inpatient restoration | | People who waited more than the max days for admission to CMHIP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Apr 20 | 3 | 27 | 10.3 | 72.0 | 1 | 77 |
| Mar 20 | 16 | 17 | 3.6 | 63.8 | 1 | 63 |
| Feb 20 | 10 | 24 | 1.6 | 80.2 | 0 | 46 |
| Previous Quarter Monthly Average (Nov 19 - Jan 20) | 17.3 | 39.7 | 2.47 | 97.9 | 0 | * |
| March 19 (before tier distinctions) | 44 | | 58.2 | | 31 | |

*\* CDHS did not provide sufficient data in their Nov 2019 – January 2020 monthly reports to allow for the calculation of the number of Tier 2 individuals who waited more than the maximum allowable days for admission to CMHIP for restoration.*

As the table reveals, most of the defendants designated as Tier 2 still wait much longer than the required 49 days before admission (though their wait times are decreasing).  More generally, this quarter is remarkable for the general decrease in inpatient restoration admissions compared to the prior quarter.  March admissions (33) and April admissions (30) were substantially lower than the average from the prior quarter (i.e., 57 in late 2019), a decrease that is almost certainly attributable to COVID-19.

As noted in our last quarterly report, the Department's continued, rapid response to those identified as Tier 1 is commendable.  In many ways, the Tier 1 individuals are the highest priority for the Consent Decree and the CDHS competency system.  Those whom CDHS categorized as Tier 1 — usually those who most need urgent treatment — continue to be admitted rapidly.

However, as previously reported, the progress towards meeting Tier 2 timelines remains slow. Tier 2 individuals are mandated to CMHIP less urgently, but still within certain time frames.  The Department reduced the number of persons on the waitlist and shortened their wait times, but needs additional steps that create space for Tier 2 defendants.  The additional inpatient space at CMHIP has helped considerably, in that each of the new beds can accommodate several defendants per year.  Increased hospital capacity is expected in late 2020 as the L2 unit opens with 24 new beds.  Departmental models estimate that the waitlist may indeed be largely manageable and in compliance before the end of 2020 (aside from COVID-19 related delays), but the L2 unit should provide an extra measure of assurance for the reduction of the waitlist.  Still, work is needed in terms of diversion and outpatient treatment to sustain these gains.  In short, while Tier 1 individuals must be prioritized for admission (thereby treating those who need it most), successful compliance with the Consent Decree must *also* reduce Tier 2 time frames; such compliance will demonstrate that the CDHS competency system has created adequate capacity for all levels of competency-restoration needs.

*Emerging Efforts:*
As we reported in the prior quarter, CMHIP initiated a "Fast Track" project to accelerate the scheduling of some competency restoration evaluations.  Although defendants are typically evaluated at 90-day intervals, defendants do not naturally gain the capacities necessary for competence at tidy 90-day intervals; many may be competent well before (or shortly after) these court-set dates.  Thus, the "Fast Track" effort seeks to identify defendants who are stabilizing in advance of their previously-scheduled post-restoration competency evaluation.  In these cases, evaluators are notified to conduct the evaluation soon, so that if the evaluator renders an opinion that the defendant has been restored, the case can be returned to court in advance of their previously scheduled hearing (sometimes weeks to months in the future) and bed turnover can occur.  To date, the Department reports that 17 of 20 defendants referred to the "Fast Track" have been opined as competent sooner than their scheduled 90-day evaluation date, returning them to jail sooner (to await their hearings) and thus sooner opening their hospital beds for other restoration patients.  The has saved CMHIP a total of 135 bed days.  This type of practical intervention has become common in some other states, and is a simple yet effective strategy to reduce unnecessary length of stay.

---

[13] According to the Department's Special Master Compliance Plan report April 2020 p.8-10 (submitted May 7, 2020).

## PERFORMANCE OF JAIL COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations.  The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld.  Counties not specifically identified are counties that use the "Hold and Wait" court ordered process.  Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting.  Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The mandated time limit for a jail-based evaluation is now 28 days, per the Consent Decree, and will decrease to 21 days during the next quarter (i.e., July 1, 2020).  As mentioned earlier in this quarterly report (see *Key Metrics: Competence Evaluation Time Frames*) the Department has historically met this timeframe on a consistent basis, until around November 2019.

*Recent Struggles:*
Despite the historic strengths of their evaluation services, around November 2019 it was becoming clear that the Department's workforce of evaluators was not sufficient to meet the volume of referrals in a punctual manner.  Many jail-based evaluations then exceeded the 28-day time frame in December (37%) and January (46%), as we described in our prior quarterly report.  Thus, the prior quarter witnessed a tremendous setback in services that had been a historical strength for the Department.  As we detailed in that report, we believe the failure resulted from a confluence of several factors.  First, leadership in Court Services had apparently failed to anticipate workforce needs or prepare for some foreseeable changes in staffing (e.g., maternity leave, evaluator departure).  Second, *some* of the factors contributing to those delays were, in fact, quite positive in that they reflected long-overdue improvements to Court Services.  For example, the Department stopped over-relying on a single contracted evaluator to perform a grossly disproportionate share of evaluations

*Recent Improvements:*
Fortunately, during the past two quarters, the Department has taken significant steps to address the workforce shortage that contributed to these evaluation delays.  The Department hired a new Court Services Director, Amanda Edwards, who began working on April 13.  She has a strong background in the state court system and is well-suited for the organizational aspects of the job. The Department has hired new evaluators — both full-time employees and contractors — so the evaluator workforce has grown substantially.  At the time of this report, Court Services has 36 full-time evaluators and 29 contract evaluators.  The Department has also increased incentive pay, such that full-time evaluators more often complete overload evaluations beyond their monthly quotas.  In short, the workforce has increased in ways that should greatly reduce delays. Indeed, our estimates suggest that the size of this workforce should be ample to reduce the

backlog of jail-based evaluations and even reduce the backlog in community-based evaluations (though we acknowledge the latter is not a focus of the Consent Decree).

Beyond numbers, the quality and morale of the workforce has improved.  The clinical leadership tasks for Court Services now fall to a forensic psychologist.  Further, she is supported by a team of clinical supervisors, now organized as a "training faculty," that makes much better use of in-house clinical expertise.  This training faculty provided a large-scale training on May 15 to all Court Services evaluators (including those newly hired).  This primarily addressed the new policies and procedures prompted by the Consent Decree and recent legislation (i.e., requirements that evaluators provide an opinion on defendant triage and placement), so these procedures are now much more solidified, such that evaluators better understand their new duties and can perform them in a more reliable manner.

*Recent Status:*
Despite substantial improvements, the Department struggled this quarter with these jail-based evaluations.  Court orders for jail-based competency evaluations decreased dramatically after February (117), into March (70) and April (61), as arrests and court proceedings slowed due to COVID-19.  But it became quite difficult, in many jurisdictions, for evaluators to meet with defendants, because most jails prohibited all visits.  The Department worked fairly rapidly to develop procedures for conducting evaluations via videoconference, and for conducting safer evaluations in person.  But adjusting to the COVID-19 safety precautions in jails nevertheless slowed evaluations for a period of time.  Indeed, a few jails still prohibit all visits and have not facilitated evaluations via video-conference, creating unavoidable evaluation delays for defendants in those jails (the Department will identify these cases as Individual Special Circumstances, per the Consent Decree).  Ultimately, the number of defendants awaiting a competency evaluation in jail ("the waitlist") has continued to decrease.  But unfortunately, roughly one-fourth of the jail-based evaluations still exceed the required wait limits (i.e., 28%, 26%, and 29% of defendants have waited longer than the required 28 days in the months of February, March, and April, respectively).

We perceive that these continued delays reflect some lingering impact of the prior delays and backlog (attributable largely to an insufficient workforce, which the Department could have controlled), and reflect some impact of recent COVID-19 challenges (which the Department cannot control).  We affirm the Department's success in increasing their workforce and their recent efforts to rapidly develop alternate approaches to jail-based evaluations (particularly via video-conference).  We anticipate that both of these will reduce delays in jail-based evaluations.  But we also emphasize that the delays are not yet resolved, and the timelines will reduce further (in July 2020), requiring continued, vigorous approaches to timely evaluations.

## INTERIM JAIL MENTAL HEALTH TREATMENT[14]

> 34.  Interim Jail Mental Health Treatment.  If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S.  §§ 27-60-105 *et seq.*  to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible.  This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment.  Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment.  A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

As we have discussed in prior reports, the Department is required to partner with county jails to develop a program of coordinated services for individuals involved in competency matters.  These services are currently managed statewide through the Jail-Based Behavioral Services program (JBBS) and are funded approximately $2.5 million per year by the recently appropriated by SB19-223.  Essentially, the Department utilizes JBBS as a hub for coordinating subcontracted services across Colorado.  These subcontracted providers are now asked to provide adequate mental health services to inmates involved in competency matters.  Interim mental health treatment is critical to screen, monitor, assess, and treat those receiving competency-related services in county jails so that they remain physically safe and clinically stable until their transfer to competency restoration services.

Our previous quarterly reports have described the intermittent success that the Department has had in securing and enhancing JBBS services in various county jails across the state.  They made progress in most jurisdictions, though some jurisdictions were not receptive to additional funding (usually because they were not receptive to the additional reporting requirements and oversight).  All parties were aware of these challenges and planned additional steps, such as a new data collection strategy and an audit of JBBS mental health services with support from DLC.

However, these plans were set aside amid the COVID-19 pandemic response during this past quarter.  No real progress was made on previous plans for data collection or the fines-supported audit.  Instead, interim jail mental health services were focused on mitigating the impact of COVID-19 in local jails.

The Department worked with jail mental health staff in a number of ways to manage the impact of COVID-19 during the past quarter.  Admissions to CMHIP slowed considerably as courts halted

---

[14] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree.  It is NOT a proxy or substitute for competency restoration services.

many competency-related hearings and as transportation of defendants became increasingly difficult.  In addition, enhanced medical screenings became necessary to avoid bringing persons infected with the virus to CMHIP; however, many incompetent defendants refused the screenings due to their symptoms of acute mental illness (e.g., paranoia).  Additionally, capacity for new admissions became increasingly difficult because discharges were often untenable when local jails refused return admissions.  All in all, many people on the waitlist remained in local jails as options for admission decreased amid the many consequences of COVID-19.  Of course, this increased the strain on JBBS services, especially as face-to-face patient access for JBBS mental health providers diminished as the pandemic response intensified.

The Department responded to this challenge in several ways.  First, the Forensic Support Team (FST) navigators continued to meet and communicate with pretrial detainees and their multi-disciplinary teams throughout the pandemic crisis.  Eventually, communication was limited to phone and video-conferencing.  However, throughout the crisis, the available evidence suggested that the FST was identifying persons in most acute need and working with CMHIP and JBBS to enhance mental health services and facilitate discharges to hospitals when necessary.  The true impact of COVID-19 on pretrial detainees will not be known until regular face-to-face access resumes, but we are tentatively satisfied that crises were identified and mitigated even in the midst of the COVID-related restrictions.

Second, CMHIP created a consultation team to work with JBBS staff in managing acute crises and facilitating discharges when possible.  This included extending involuntary medication order authority to CMHIP psychiatry in those cases where JBBS staff was unavailable to handle involuntary medications.

To be sure, admissions and discharges slowed significantly during the height of the crisis (mid-March through early May).  However, with stronger safety protocols now in place throughout many systems and locations, admissions and discharges are beginning to increase to pre-COVID levels.  FST Navigators are still prevented from face-to-face access with pretrial detainees as of this writing, but we predict they will resume face-to-face access within the coming next few weeks (barring an increase in COVID-19 infections).  Access will likely be determined on a jail-by-jail basis.  Nonetheless, we believe that JBBS services will begin to slowly return to pre-COVID levels, such that more and more treatment options and individual contacts will resume over time.  In short, although the impact of COVID-19 on JBBS services was substantial, it appears that for the most part that the Department worked effectively with JBBS providers to address the most critical and acute needs while preventing the most serious types of mental health tragedies.  Still, the impact of COVID-19, and true ability of the Department and JBBS to mitigate its impacts, will not be entirely clear until access to jails resumes and patient care returns to pre-COVID levels.

*Efforts to mitigate the effects of COVID-19 from CMHIP*
Beyond CMHIP's work with jails, the Department has taken substantial steps to mitigate the spread and impact of the COVID-19 pandemic.  First, CMHIP and CMHIFL implemented strict precautions to prevent and mitigate the spread of the virus; CMHIP was especially vigilant given

the historically high volume of traffic from daily admissions and discharges.  Specifically, we affirm Jill Marshall's successful efforts to mitigate COVID-19 at CMHIP.  Many other forensic hospitals around the country were not so successful.

In addition, the Department repurposed units and buildings at CMHIP to allow for the quarantine of new admissions.  This mitigated potential spread of COVID-19 for new admissions.  Admissions occurred via weekly cohorts of new patients; eventually as the virus became more manageable, cohorts were brought in more frequently.  This innovative and flexible approach allowed for the admission of the sickest individuals without compromising the safety of the hospital population; we again affirm these impressive efforts.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[15]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment.  If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has made further progress on the requirement to develop discharge plans for persons identified as appropriate for Outpatient Competence Restoration programming (OCRP), even in the midst of the COVID-19 pandemic.  Of course, priorities shifted during this last quarter, and discharges from CMHIP and jails were greatly reduced as movement across the system slowed to a halt.  However, work continued in four main areas:

1. *Transition efforts at CMHIP:*  CMHIP continued to target Restoration Housing (formerly labeled Fusion Studios) and the "fast-track" program as primary outlets for some patients.  In short, while still unrestored, these patients have shown clinical improvements and minimal public safety concerns, making them appropriate for transition from CMHIP to Outpatient Competence Restoration programming (OCRP).  After a slow start, referrals and placements at Restoration Housing are increasing.  At the time of this writing, the Forensic Support Team (FST) has coordinated 69 completed referrals for Restoration Housing, and 15 individuals have been placed there.  A total of 13 slots still remain; FST is optimistic that those beds will be filled within the next several weeks.  Although fiscal agreements were reached in December, the opening of the housing placement was not fully executed until early March — hence the delay in filling those slots.

2. *Impact of the Forensic Support Team (FST):*  The FST team has historically focused on addressing cases involving incompetent defendants either in jails or in CMHIP.  FST Navigators have monitored clinical status and restoration progress for those in jails awaiting transfer to CMHIP — primarily defendants who have been categorized as Tier 2.  Navigators have also worked with CMHIP to begin facilitating transfer of incompetent defendants to OCRP.  Navigators have also been effective in securing emergency holds, emergency transfers, and engaging in other crisis responses for a handful of cases.  We affirm this important work.  Since January, the FST has logged more than 7800 contacts, coordinated 153 referrals to outpatient settings, and intervened in 144 crisis situations, according to FST records.  They are currently assigned to 128 individuals in jails across

---

[15] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

Colorado, and monitor 368 additional clients in hospitals and community settings around the state.

However, COVID-19 changed the work of the FST Navigators in stark ways.  County jails eventually stopped allowing Navigators to enter their facilities, making face-to-face visits impossible.  Navigators were forced to rely upon telephone and video-conferencing to check in with the Pretrial Detainees and their multi-disciplinary teams at those jails.  Of course, this limited the quality of available information in many cases.

We affirm the FST in finding alternative ways to communicate critical information.  In many ways, the FST became the primary "eyes and ears" of the Department for Pretrial Detainees who would have otherwise had little to no contact with the outside world amid the COVID-19 pandemic.  The work of the Navigators shifted to primarily crisis work: identifying and mitigating the most acute mental health crises.  In April 2020 alone, the FST reported coordinating care for 146 clients in jails across Colorado.  They reported 72 direct contacts with Pretrial Detainees by telephone, and an additional 1,136 collateral contacts with their jail-based treatment teams.  Further, FST Navigators coordinated crisis responses and/or transfers to CMHIP for 24 defendants in April.  Essentially, the FST became the primary source of information and intervention with these detainees, and we believe they were responsible for identifying and mitigating the most acute mental health crises faced by Pretrial Detainees statewide.  The FST Director reports this important work was possible due to building trusted relationships among FST Navigators and other stakeholders (Bridges Liaisons, jail mental health staff, CMHIP personnel) during the past six months, and we affirm the positive outcomes these relationships yielded.

FST's work was not limited to crisis mitigation for Pretrial Detainees.  In addition, Navigators worked to facilitate transfers and placements to various settings affiliated with OBH's outpatient competency restoration program (OCRP).  Although we maintain that the FST would ideally include some Navigators placed in the community (to provide support and crisis management for persons in the OCRP), we understand that the priority for the entire team must currently be working with Pretrial Detainees in local county jails.[16]  In response to our repeated calls for more community support for OCRP participants, the Department has coordinated crisis and case management services with the State of Colorado's Transition Specialist Program and the "Momentum" Program.  To date, FST has referred a total of 62 persons to the Momentum Program.  Referrals are

---

[16] While we understand the realities of Navigator capacity, we maintain that Navigators should be the Department's "face" of restoration in the community — visible experts in the restoration system who serve as the OBH point of contact whenever needs are identified.  By serving as the Department's restoration experts in the community, Navigators increase restoration success, troubleshoot problems, address crisis situations, enhance community tenure, and help skeptical judges trust the Department's outpatient restoration services.  We will advocate for this change further as the waitlist decreases and the relative demand for services shifts from jails to communities.

about evenly split between defendants in jail and defendants at CMHIP who are ready for community transition to OCRP.  Only twelve people have been accepted and assigned to the program so far; the others are in some stage of review.

As mentioned previously, FST Navigators also coordinated the transition of 18 Pretrial Detainees into Restoration Housing.  In addition, the FST is working with a local Colorado veteran's program to secure additional releases and community supports for veteran Pretrial Detainees, and work continues in transitioning appropriate Denver Pretrial Detainees to the Community-Based Enhanced Restoration program (to be discussed below).  The FST reports that these combined efforts have resulted in "saving" 1097 jail bed days since January 1, 2020.  This is a remarkable change as compared to the time before the implementation of the Consent Decree, and we affirm those efforts.  However, to our knowledge no Tier 2 individuals have actually been moved from Tier 2 to the community.  This was an important role envisioned by the Consent Decree; we look forward to seeing those transfers beginning within the next quarter.

A significant improvement this quarter involves the FST's data collection and dissemination capabilities.  Data is reported monthly across a number of metrics: in-person contacts, multi-disciplinary contacts, housing and other outpatient referrals (including the stages for each referral), and the number of jail bed days "saved" through early discharge.  We are encouraged by this data collection, analysis, and dissemination.

Finally, the Parties agreed to the FST policy and protocol document that oversees the frequency of contact expected by FST Navigators.  In general, the schedule (pre-COVID) is to see Detainees in person every other week, with alternating weeks requiring a remote check-in with the jail mental health staff.  Certain conditions will increase the frequency to weekly in-person contact (i.e., situations that could put the Detainee in more acute crisis).  We are encouraged by the development of this document and the collaborative spirit between the Parties in revising and ultimately adopting it.[17]

3. *Coordination with the Bridges program:*  As mentioned in previous quarterly reports, the Bridges Program and FST must work together to facilitate discharge and share responsibilities for competency-related cases.  They both rely on similar (partially, but not entirely, overlapping) bodies of information.  Thus, the Department and the Bridges team have been actively working to coordinate services, so that they can ultimately collaborate in a way that minimizes redundancies and gaps.

The primary development was the adoption of the long-awaited signed Memorandum of Agreement (MoA) between the two agencies; it allows for data and information sharing to occur between FST Navigators and Bridges Liaisons.  The MoA has already improved

---

[17] Of course, COVID-19 prevented the FST Navigators from performing in-person visits in March.  Those visits are just now resuming at the time of this writing.

the ability of both agencies to facilitate discharges and/or transitions of Tier 2 individuals out of jails and into community placements when appropriate, as well as to coordinate court hearings and "behind-the-scenes" linkages that are critical to moving defendants more nimbly to appropriate options for care and service.  We are also encouraged by the increased trust and accountability between FST and Bridges.  In reviewing the six-month anniversary of the launch of the FST, it is clear that both programs have clarified their unique roles, shared expectations, communication, and collaboration.

Still, the FST Director reports that because liaisons are most often *not* assigned to incompetent defendants, expediating discharges and holding necessary court hearings is often difficult.  So although the two programs appear to have made progress in sharing information and understanding roles and expectations of each other, the lack of Bridges liaisons assigned to incompetent defendants has caused a barrier in transitioning Tier 2 individuals to the community.  The FST reports that liaisons are assigned to 35% more competency-related cases since January 1 as a result of this coordination and referral system, but many defendants remain without an assigned liaison.  Budget cuts to the Bridges program seem inevitable in this legislative session, which will only exacerbate these gaps.

4.  *CBER (Community-Based Enhanced Restoration):*  The CBER program is a pilot program based in Denver that provides enhanced mental health and case management services to a community-based restoration program.  OBH is funding the program and has contracted Mental Health Center of Denver to provide the wraparound and restoration services.  Participants are drawn from metro-area county jails; Tier 2 individuals are targeted for inclusion.  To date, ten individuals have been placed into the program, with more individuals identified as clinically eligible and legally suitable.  OBH administrators have dedicated enough funding for a total of 30 participants at any one time.  COVID-19 slowed referrals to the program, but we have urged OBH to address the low numbers of participants in the program.  While we value the good attempts at filling the available slots, if the program is not close to capacity by the time the current contract ends in November 2020, we may encourage the Department to reallocate funds to other populations.

## TRANSPORTATION OF PRETRIAL DETAINEES

36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Over the past quarter, a total of 11 defendants were admitted to CMHIP for an inpatient competency evaluation, of whom 3 met C.R.S. § 27-65-125 criteria, according to hospital staff.[18] None of these defendants who met civil commitment criteria were returned to a local jail.[19]

As mentioned in previous quarterly reports, SB19-223 included language that allows CMHIP to keep defendants ordered for inpatient evaluation at CMHIP from the time that the evaluator opines them incompetent to proceed (rather than requiring C.R.S. § 27-65-125 criteria be met, or that the originating court adjudicates the defendant as incompetent). This is now found in C.R.S. § 16-8.5-105 (IV-b-5) and reads as follows:

*When the court orders an inpatient evaluation, the court shall advise the defendant that restoration services may commence immediately if the evaluation concludes that the defendant is incompetent to proceed, unless either party objects at the time of the advisement, or within 72 hours after the receipt of the written evaluation submitted to the court.*

Policies and procedures governing the decision-making in these circumstances are still in development. At times, CMHIP may need to balance these incompetent individuals already in the hospital and in need of hospital-level care with those Tier 1 or Tier 2 defendants in county jails approaching their deadlines for admission. To date, decisions among these individuals have been made primarily on clinical grounds, but we also understand the need to admit individuals who have been waiting in county jails for extended periods of time. Discussions between OBH and DLC have been amiable and productive in these challenging situations.

---

[18] According to the April Special Master Compliance Report (p.28), submitted by CDHS on May 7, 2020.

[19] According to the April Special Master Compliance Report (p.28), submitted by CDHS on May 7, 2020.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes.  The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services.  The account will be managed by a court-appointed administrator.  Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master.  Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

The Department has continued to provide reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree (since June 1, 2019).  Likewise, the Department has completed a "Fines Report," as prescribed by the Consent Decree.  Finally, as prescribed by the Consent Decree, the Department has been paying these fines into a trust account (managed by Cordes & Company, LLP).

The funds from these fines are already going to good use.  A small committee comprising Department administration (Werthwein, Shah), a representative from the Plaintiff (i.e., Disability Law Colorado leader, Ivandick), and the Special Master, have all met regularly for the past year to address use of these fines.  The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to reduce Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities.  In other words, funds from the fines should supplement and not replace existing services.

As previously reported, the first opportunity to use these funds for prompt services emerged when the Colorado Coalition for the Homeless (CCH) renovated a hotel to create *Fusion Studios,* which comprise 182 single-unit residences for homeless individuals.  In October 2019, the Fines Committee contributed $3.5 million to the "Restoration Housing" project (within Fusion Studios), in exchange for 28 dedicated residences for competence-involved individuals whom the Department refers, over the next five years.  Currently, 18 of those units have been filled by

persons receiving competency services (the Department has made 69 referrals in total). The Department's FST continues to identify and refer potential candidates for the Restoration Housing project.  Despite a slow start, we expect the Housing should be approaching capacity in the near future (though COVID-19 has furthered delays).

Progress was continuing on other fines-funded projects — a competency court, an audit of jail-based behavioral services, a detailed data analysis of OBH competency services, improved OCRP competency curriculum, and a case manager for Restoration Housing — but the COVID-19 pandemic decreased the prioritization of these projects in lieu of other more time-sensitive ones focused on alleviating the impact of the pandemic on competency-involved individuals.  These projects will likely resume once the effects of the pandemic decrease.  We remain most keenly interested in the competency court project; focused stakeholder meetings had occurred in February and March to begin early visioning and planning for the competency court, but upon the start of the COVID-19 pandemic, all involved judges decided to pause their efforts.

However, other projects have been approved for funding by the Fines Committee. These include:

- CREST program (COVID-19 Response Services Taskforce): This project provides $1.5 million dollars to the Colorado Coalition for the Homeless to provide emergency and interim housing for 25 incarcerated individuals in the competency system.  Housing will be provided for up to two years, and assertive case management and other services will be afforded to participants.  A CREST advocate position will also be created to advocate for the release of these individuals at court and to monitor their progress in both transition and in the community.  This position will likely be based in Mental Health Colorado.  The project is slated to start as soon as the Advocate position is hired; tentatively we project an early July start for the program.

- Private hospital contracts: A total of $830,000 will add 21 beds at two local private hospitals for competency-involved individuals in need of emergency services.  These will be short-term beds.  As discussed earlier, CMHIP operates on a cohort-based admissions system due to the pandemic, and this funding will allow for more flexibility for people who need urgent, inpatient mental health care.

- Technology for ITP defendants: Cell phones and other required devices will be provided to persons in need of competency evaluations or restoration in the community.  To date, COVID-19 has precluded in-person evaluations and restoration sessions, yet many defendants do not have adequate access to video-enabled technology.  Therefore, participation from some defendants has been difficult, if not impossible.  A total of $24,500 will be used to purchase phones and 3-month service packages to allow these individuals to more easily participate in evaluation and restoration services (thereby avoiding further delays).

- Bridges Liaison program: As discussed earlier, the Bridges Liaison program will almost certainly receive significant cuts to staff and services in the next fiscal year.  They have requested consideration for fines-funding to supplement the expected budget shortfalls attributable to the effects of COVID.  These requests are preliminary and informal at this time, and certain provisions may preclude fines money from being used in this manner. However, given the mission of the Bridges Liaison program and their positive impact on competency-related individuals across Colorado, the Fines Committee will give due consideration to any formal request from the Bridges program.

## CONSENT DECREE SECTION VII UPDATES

### CIVIL BED FREEZE

> 39. Civil Bed Freeze.  The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services.  On February 7, 2019, the Department agreed to stop this practice.  The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes.  This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department continues to report that they have removed the "civil bed freeze" as mandated by the Consent Decree.  That is, they have not re-purposed the civil beds at CMHIFL for competence restoration, as they had once proposed.  Per our request, the Department continues to provide a census report on the CMHIFL patients in their monthly report.  As of their most recent report, the CMHIFL population included a total of 78 patients, 73 of whom were civil patients.

During monthly multi-party meetings, the Department has discussed any potential changes to the use of any CMHIFL beds (e.g., allocating a few new beds at CMHIFL to accommodate inpatient competence evaluations — not restoration — which may reduce the need to transport Denver-area defendants to CMHIP for inpatient evaluation).  Generally, the Plaintiffs and Special Masters have agreed with the minor changes they have proposed, because these tend to reflect efficient steps that better serve the Departments' consumers.

For the foreseeable future, the Department will continue to wrestle with the reality that too few civil beds exist in Colorado.  A potential, albeit indirect, benefit of the Consent Decree may be to increase civil capacity through the reduced need for forensic beds; the Department will need to continue to monitor this trend and the outcomes of Consent Decree initiatives to determine the ongoing and future needs for civil beds.

Unfortunately, the fiscal impact of COVID-19 may result in significant cuts to the Department's civil inpatient bed capacity. Though budget negotiations continue at the time of this writing, it appears that some CMHIFL civil units may be closed. This would reduce the already insufficient inpatient civil capacity (fewer than 100 beds for a state population of more than 6 million people), which will likely indirectly lead to more forensic admissions.  As often happens, persons in need of hospitalization will come into contact with the court if civil capacity is insufficient.  We will work with OBH to monitor this, and will work with both parties to mitigate and manage the impact of reduced civil capacity should the proposed budget cuts materialize.

COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan.  The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan.  Dkt. 146.  By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider.  As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures.  Dkt. 146 at 42.  On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department finalized a comprehensive, cohesive plan on February 27, 2020.  As we detailed in prior quarterly reports, the Department met routinely with stakeholders, and coordinated their work with the Governor's Blueprint Task Force subcommittee that is addressing competence-related issues.  Crucially, the Department has conceptualized competency-related services in a far broader way than they had in their December 2018 report. They detailed much of their progress to date, and remaining goals, all of which reflect a much more comprehensive, multi-faceted approached to the competency crisis, as compared to their earlier efforts.

Parties were progressing on legislation for the 2020 legislative session prior to the COVID-19 pandemic outbreak.  The primary piece of legislation from CDHS proposed to lower some time frames regarding restoration evaluations, ultimately making it easier to find a defendant permanently incompetent to proceed ("unrestorable").  We found this change to be minor but important, and we believed it would make the restoration process clearer and more efficient. The legislation had support from a broad array of stakeholders.  Other draft legislation (increasing the pool of qualified evaluators, decreasing competency mandates for misdemeanants, increasing OBH oversight over jail-based mental health services, among others) was tabled for this session.

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

As reflected in past quarterly reports, the Department continues developing a wide-scale outpatient competence restoration treatment program (OCRP). Their formal OCRP program began in March of 2018, and referrals for outpatient restoration ranged from 28 to 37 defendants per month during the past quarter (a smaller range, and a smaller number, than the prior quarter). A total of 433 individuals are currently participating in OCRP, and we are pleased to report *there is no waitlist for OCRP services*. We commend the Department on its ability to build sufficient outpatient restoration capacity.

At this point, OCRP has reached its two-year anniversary, and Colorado has one of only two states offering state-wide OCRP services. Almost all counties and community mental health centers (CMHCs) across Colorado now offer some form of OCRP. There are 54 contracts in place around the state. Only one CMHC is refusing to offer OCRP in Colorado, and only two counties remain without viable OCRP options (Gilpin and Clear Creek counties; see graphic below, copied from the April 2020 Monthly Compliance Report):



The Department continues to pursue contracts and services for those few areas in which services are not yet available.  Additionally, we recommend that OBH begin shifting focus to ensuring quality among their current providers.  As was mentioned in our previous quarterly report, this is accomplished by first developing and utilizing a robust data collection and analysis plan.  The Department to date has only released aggregate data covering July 2019 – May 2020.  Ultimately, we would strongly prefer to receive outcomes and data in the Monthly Compliance Report as monthly data allows for more robust analysis and intervention.

Still, we appreciate receiving the aggregate data, and we are encouraged that the data shows generally encouraging outcomes.  Although restoration rates are low (28%), we believe that other data provides important and encouraging context for those restoration rates.  In addition to facilitating restoration, OCR also provides a release valve for stretched inpatient beds, lowers costs, and enhances recovery and community linkages.  Speaking more broadly, if an incompetent defendant is diverted from inpatient restoration and maintains successful community tenure, lower restoration rates may indeed be more palatable to the host of stakeholders involved (including public citizens).  In this spirit, we have included two categories reported to date (death and revocation / return to CMHIP) as "negative" outcomes.[20]  These two categories account for 20% of all outcomes.  Alternatively, "positive" outcomes include being restored, having the case dismissed (typically due to *Jackson*-determined timeframes), being found unrestorable, and having services stopped for other mutually agreeable reasons; in the aggregate data reported so far, these account for 80% of outcomes.  These initial outcomes are promising, though restoration rates are undeniably low.  We look forward to working with the Department to refine programming and service delivery to increase restoration rates.

Secondly, as mentioned in our previous quarterly report, we encourage the Department to develop specialized OCRP programs — "centers of restoration excellence."  While there are some commonalities across defendants, there are also distinct groups with similar barriers to competence.  Special populations (defendants with intellectual disabilities, traumatic brain injuries or other cognitive disabilities, sexual offense charges, or juvenile defendants) have needs that differentiate them from other groups.  Some providers may specialize in one or more of these specialty areas (and some may be more or less skilled with certain groups of defendants), which would optimize restoration efforts in much the same way specialty courts address specific niches in criminal law.  Such specialized providers would also make referrals and communication more efficient.  In the wake of COVID-19, such specialization of services understandably became a lower priority.  However, we encourage the Department to revisit this as the impact of COVID-19 becomes more manageable.

---

[20] These two components are not the *only* negative outcomes possible. Arrest rates, termination, absconding, and other outcomes could reasonable be considered as negative outcomes. However, the Department to date has not reported these outcomes.  We will continue to press for these variables (and potentially others) to be tracked and reported.

Another positive development this quarter involves the "Placement Committee," a team of expert advisors mandated by SB19-223.  This committee defined clinical criteria that Court Services evaluators will use to determine if an incompetent defendant merits inpatient or community-based restoration treatment.  Beginning in July 2020, statute will require evaluators to offer these placement opinions.  The committee solicited input from Court Services evaluators and other experts from mental health, the judiciary, and other professions to develop placement criteria and decision points.  Overall, the most encouraging outcome of the Placement Committee was agreement that community-based restoration should be viewed as the default option for restoration.  Stakeholders, and the resultant placement policy, identified special criteria and thresholds that would merit inpatient placement; however, defendants who do not meet these criteria or thresholds will be recommended for outpatient restoration.  We affirm the work of OBH's Dr. Torres and Ms. Shah for their leadership in this committee, and final placement policy.  We are also encouraged that the placement criteria were highlighted for dedicated training to all evaluators at the Court Services May 2020 evaluator training session.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location.  The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department has now contracted with local hospitals to provide 13 inpatient beds for short-term competency-related services.  These beds are currently filled.  New contracts are being developed with two metro-area hospitals (Peakview and Denver Health) for an additional 21 short-term psychiatric beds.  These beds will be prioritized for competency-related services and funded by Consent Decree fines.  All parties agreed to the increase in private hospital beds.  The Department has responded well to our January 2019 recommendation to assertively develop community options rather than rely on simply procuring more inpatient beds.  Because of this progress, the rise in privately-contracted beds seems appropriate (and can be an essential resource in some cases).  Private hospital beds may be an especially viable resource for female Pretrial Detainees, because females tend to face longer waits for inpatient services at CMHIP.  In addition, if budget cuts to OBH include cutting civil units or capacity, these beds may become necessary to manage the already-stretched inpatient civil capacity for the state.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care.  Dkt. 146 at 29.  The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019.  The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department.  On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

As prescribed in the Consent Decree, we established a Baseline for improvement by calculating a six-month period of available data (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline.  We also recommended using proportional metrics when pursuing goals that are fundamentally proportional in nature (i.e., a 10% increase in community-based restoration and a 10% decrease in inpatient restoration).  In other words, while the Department may not have full control over

the actual number of referrals, they have greater control over the proportion of referrals they direct to outpatient versus inpatient restoration. Therefore, we chose to set the baseline figures, and establish subsequent performance goals, *based on proportions instead of raw numbers*. The following proportional goals were generated as a result of this approach:

|  | Inpatient Restorations | Outpatient Restorations |
| --- | --- | --- |
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| December 1, 2019 goal | 69% reduced by 10% = 62% | 31% increased by 10% = 34% |
| December 1, 2019 numbers | June 1 – Dec 1, 2019 = 62% | June 1 – Dec 1, 2019 = 34% |
| June 1, 2020 goal | 62% reduced by 10% = 56% | 34% increased by 10% = 37% |
| Recent progress (past 6 months) | Aug 1, 2019 – Feb 1, 2020: 66% | Aug 1, 2019 – Feb 1, 2020: 34% |

Note: All percentages rounded to nearest 1%.

Although the Department met their goal to increase OCRP referrals by 10% in the six months after May 2019, increasing the OCRP proportion from 31% to 34%, those gains have stagnated. The Department will almost certainly NOT meet the Consent Decree mandate of an additional 10% shift in referrals between inpatient and outpatient restoration by June 1, 2020 (in which a total of 37% of all restoration orders should be referred to OCRP). The Department's past five months show a total of 32.1% of restoration orders being referred to OCRP.

Four of the most recent five months show OCRP referral rates of lower than 32%. Due to these recent dips in OCRP orders, we doubt that the Department will be able to attain compliance with Paragraph 41 of the Consent Decree by increasing outpatient restoration to 37%, on average, for the period spanning December 1, 2019 through June 1, 2020. However, even with the recent dips, the 33% rate of adults ordered to OCRP during the past twelve months is higher than the rate in the six months surrounding implementation of the Consent Decree (28%).

We continue to view the 37% aspirational goal as largely reasonable. However, we believe the goal is worth revisiting for two reasons. First, as we discussed in our February 2020 report, it is more important to maximize the number of appropriate referrals than it is to hit an artificially-driven number. In other words, we aim to place the maximum number of *appropriate* persons in OCRP, but are not wedded to a predetermined rate if it exceeds the actual number of defendants appropriate for OCRP. We have broached this subject with both parties, and both are amenable to a marginally smaller percentage goal if indeed all appropriate OCRP referrals are made. We will continue to monitor the rate; we believe it can certainly increase with continued judicial education, coordination with the Bridges program, onboarding of new OCRP

providers, and clearer guidelines for Court Services evaluators.

Second, we have begun to realize a conceptual weakness in how both referral rates and the subsequent aspirational goals are determined.  As it currently stands, the rates are calculated by dividing the number of OCRP referrals by the total number of persons ordered to restoration, regardless of where that evaluation occurred.  However, the resultant referral rate is likely composed largely of persons ordered to OCRP whose competency evaluations were completed while on bond.  In other words, persons ordered to OCRP are most likely pulled from the pool of persons already living in the community — not those in jails.  Likewise, these individuals are typically not recommended for inpatient restoration.  In sum, the overall rate of OCRP restoration referrals appears to include people who would likely never have been referred to the state hospital in the first place.  Of course, this is not what this section of the Consent Decree was meant to address.  We consider this an oversight in mediation, which failed to consider this nuance.

Fortunately, the Consent Decree requires a modification of the base rates around June 1, 2020:

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care.  Dkt. 146 at 29.  The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019.  The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department.  On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

We have asked OBH to provide us with the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations).  We believe this is the population that the Consent Decree was designed to address, and that a revision of the calculation of OCRP referrals rates (and concordant calculation of inpatient referral rates) is likely necessary.  All parties have agreed that, given the demands caused by the current pandemic, these revised calculations can occur shortly *after* the June 1 prescribed deadlines.

Finally, we again reinforce the need for OBH to provide outcome data on OCRP.  We have received one basic report of OCRP outcomes to date.  While helpful, more regular reporting and more sophisticated data analyses are critically needed.  We sent a request of OCRP data elements to OBH and discussed them in mid-February 2020.  COVID-19 pre-empted OBH's ability to pull this data in the midst of other priorities.  However, as the impact of COVID-19 becomes more manageable, we have again requested this data.  Although OBH has many concurrent data requests, we continue to strongly request empirical outcome data for OCRP.

## CONCLUSION

As detailed throughout this report, we perceive the Department has made significant and meaningful progress in enacting changes prescribed in the Consent Decree.  Indeed, several key interventions prescribed by the Consent Decree (e.g., the triage system, the Forensic Support Team) have become fully operational during this reporting period.  These have begun to significantly change the overall key metrics, in that the Department is generally responding promptly to those identified as Tier 1.  Put simply, the most acutely ill defendants — those whose welfare was a primary focus in the current legislation and Consent Decree — do *seem to be receiving more prompt treatment upon launch of the Triage System*.  Other improvements are also clear, as the overall wait list has decreased meaningfully in the past quarter, and is lower than at any point in recent history.  Amid the challenges posed by the COVID-19 pandemic, the Department has generally responded rapidly and well, minimizing infections in their facilities, and seeking ways to provide care for defendants in jail.

Looking forward, we anticipate continuing challenges attributable to COVID-19 (e.g., careful cohort admissions will need to continue at CMHIP), including the potential for a resurgence of COVID-19 infections.  We also anticipate increased orders for competency-related services as courts resume more normal operations, and as jail-based evaluations can increase.  Even facing these challenges, it remains important for the Department to further accelerate inpatient restoration treatment for Tier 2 defendants, and further the reductions to the waitlist.  We will continue to work with the Department on these and related matters, and we encourage you to contact us with any questions or requests.  We appreciate the opportunity to serve the court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.


Daniel Murrie, Ph.D.