

Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

Submitted May 28, 2021

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

May 28, 2021

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our May 28, 2021 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations for improvement to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services to criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree that was filed March 15, 2019 prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. As you know, the Department initiated these steps and demonstrated meaningful progress.

However, beginning in the spring of 2020—after significant progress, but well before attaining compliance with most metrics prescribed in the Consent Decree—the Department began to face new and unforeseeable challenges prompted by the worldwide COVID-19 pandemic. Thus, this report, like the four prior quarterly reports, continues to address the pandemic's impact on the functions prescribed in the Consent Decree, and the Department's efforts to respond to the challenges COVID-19 has created. As you recall from prior reports, monitoring progress and

reporting data in this era has been complicated by the Department's reasonable, continued invocation of *Individual Special Circumstances* (ISC) for the many pre-trial detainees whose movement has been constrained by COVID-19 precautions. Therefore, this report addresses the usual metrics of compliance and progress, but also acknowledges the large proportion of detainees designated ISC, because describing both are necessary to provide a full picture of the competency crisis in Colorado.

Unfortunately, during this fifth quarter of the pandemic (i.e., the period since our prior quarterly report was submitted February 28, 2021) the situation for competence-involved pre-trial detainees has reached its worst point in the past two years. The precautions to avoid the spread of COVID-19 have further slowed admissions to the state psychiatric hospital, thereby increasing the wait-list for services, and the number of people waiting. So most key metrics reflect substantial delays in inpatient restoration services. We review these metrics, and provide other updates on the functions prescribed in the Consent Decree, throughout the following report. We have also attached our recent memo to the Colorado Department of Public Health & Environment (CDPH&E), which outlines our concerns for the extended pauses in admissions to the state hospital.

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................................5
    ONGOING CAVEAT:.....................................................................................................................10
    KEY METRICS MUST ACKNOWLEDGE "INDIVIDUAL SPECIAL CIRCUMSTANCES" (ISC).........................10

KEY METRICS FOR PROGRESS: ....................................................................................................12

COMPLIANCE WITH TIME FRAME REQUIREMENTS.....................................................................12
    KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES.....................................................13
    KEY METRIC:  TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION .................................16
    KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES .........................................19

CONSENT DECREE SECTION VI UPDATES ....................................................................................21
    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION
    TREATMENT ...............................................................................................................................21
        Wait Times for Inpatient Evaluation ...........................................................................22
        Wait Times for Inpatient Restoration..........................................................................25
    PERFORMANCE OF JAIL COMPETENCY EVALUATIONS........................................................28
    INTERIM JAIL MENTAL HEALTH TREATMENT......................................................................30
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT .................32
    TRANSPORTATION OF PRETRIAL DETAINEES .....................................................................36
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ..............................................37

DECREE SECTION VII UPDATES ..................................................................................................41
    CIVIL BED FREEZE.......................................................................................................................41
    COMPREHENSIVE AND COHESIVE PLAN..............................................................................42
    INCREASE COMMUNITY RESTORATION SERVICES ...............................................................43

CONCLUSION .............................................................................................................................47

APPENDIX A: MEMO TO CDPH&E....................................................................................................48

# INTRODUCTION

As you well know, the Consent Decree that was filed March 15, 2019 prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the broader spirit of the Consent Decree. For simplicity, we summarize the overall spirit and provisions of the Consent Decree in three goals:

    a) Reducing the overall *number* of people on the waitlist for competence restoration services,

    b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and

    c) Reducing *harm* (by providing *care*) to people on the waitlist.

Progress on the first goal was fairly steady—slightly fewer people were awaiting restoration services each month—*until* the COVID-19 pandemic began. Although there was a brief *decrease* in the waitlist due to decreased arrests early in the pandemic, arrests resumed and the waitlist *increased* as competency services could not keep pace with arrests and court orders for competency services. Once COVID-19 spread to the state psychiatric hospital where inpatient restoration services occur (i.e., the Colorado Mental Health Institute in Pueblo; CMHIP), quarantine procedures slowed or stopped admissions, and list of people awaiting restoration services grew more dramatically.

Progress on the second goal was also clear—particularly for those defendants with most severe treatment needs—though delays remained for those with less acute needs. Initially, the Department was able to provide a prompt response to detainees found incompetent and identified as Tier 1 (i.e., acute need). But COVID-19 created new sources of delay, even for those with most urgent needs.

Finally, progress towards the third goal—providing care for those waiting—has continued, even amid significant barriers. Amid restrictions on face-to-face contact with detainees, the Department's Forensic Support Team makes consistent efforts to monitor detainees with help from jail staff, and provide care while these detainees await hospitalization.

As usual, this report details progress on these three primary goals, particularly the key metrics, as well as other developments. However, like the past several quarters, our discussion begins by overviewing the ongoing effects of the global COVID-19 pandemic on the work outlined in the Consent Decree. It is simply impossible to describe the status of Colorado's competency-service system without describing the effects of the COVID-19 pandemic.

*Overview of Progress this Quarter amid the COVID-19 Pandemic:*

*The Department has faced the most substantial pandemic-related challenges to date.*
As we explained in prior quarters, competency services are particularly vulnerable to the impact of the COVID-19 pandemic because they lie at the intersection of multiple systems—the courts, jails, and the Department—each of which has been attempting to minimize human contact to slow the spread of the COVID-19 virus. Although the Department has control over their own services, they have much less control over adjacent services (e.g., jails), so the Department must always adjust to the changing policies and strained resources in courts and jails. Furthermore, even the Department's own services are shaped by other entities—particularly the Colorado Department of Public Health & Environment (CDPH&E)—that guide safety and quarantine procedures. These procedures, of course, often influence whether and when people can receive inpatient restoration services. So, an increasing challenge is identifying the domains that the Department can influence, whether directly or indirectly, to address the competency crisis. Following is a brief summary of procedural changes across competency services:

*Competency Evaluations*:

Many Colorado jails—particularly "outbreak jails" with known COVID-19 cases—were restricting visits from external professionals, including the Department's forensic evaluators. Indeed, for many months, most jails prohibited face-to-face meetings. The Department responded with creativity, arranging (and even providing the necessary technology) for videoconferencing. This mitigated delays in jail-based evaluations except in Denver, where the volume of referrals (and demands on staff and videoconferencing resources) were greatest.

Fortunately, most evaluators have been vaccinated, jails have more recently been allowing more visits, and even the Denver jail began allowing greater opportunities for evaluation. With these recent developments—and persistent efforts from the Department's Court Services—jail evaluation time frames have improved substantially. Indeed, virtually all jail-based evaluations are occurring on time (i.e., within the timeline prescribed by the Consent Decree) and there are virtually no detainees designated as *Individual Special Circumstances* (i.e., exceeding timelines for reasons beyond Departmental Control) while awaiting evaluations. Amid the tremendous difficulties in other competency-related services, the competence evaluations occurring in jails and communities are the "bright spot" where services occur punctually.

*Inpatient Competency Restoration Services*:

After evaluation, however, those detainees found incompetent to stand trial (IST) and ordered to inpatient restoration services have moved much more slowly into those inpatient services. CMHIP has used a cohort-based admissions procedure to create "safe zones" or quarantine strategies that greatly reduce the possibility of a newly-admitted individual infecting others. Nevertheless, as hospital infections increased over the past two quarters, admissions stopped from mid-November to mid-December 2020. This increased the number of people waiting from 124 at the end of October 2020 to 189 at the end of December 2020. More recently, another

extended pause in admissions spanned early April to early May of 2021, such that now the number of people waiting has more than doubled, to roughly 300. Average wait times have also increased significantly, and the longest wait times have increased to more than 200 days.

Similarly, the RISE programs had periods in which admissions were substantially delayed or even stopped entirely. Although admissions have recently resumed in all locations, we have been increasingly alarmed by the delays due to hospital infections and subsequent quarantine procedures. Although some aspects of outbreaks are beyond any control, other contributing factors (e.g., low vaccination rates among hospital staff) appear potentially malleable. As described later in this report, we are increasingly urging the Department, and those that guide their safety protocols (i.e., CDPH&E), to consider further efforts to employ COVID precautions that can also support admissions (see Appendix A for our letter to CDPH&E).

*Mental Health Services for those Awaiting Competency Restoration Services*:

With more detainees waiting, and waiting longer, for restoration services, Department efforts to provide care to those detainees becomes even more important. The Forensic Support Team (FST) and their Forensic Navigators—mandated by the Consent Decree to monitor defendants in jail awaiting competency restoration services—have worked diligently and creatively to carry out their duties. The same jail restrictions that prevented face-to-face visits from evaluators also prevented visits from the FST staff who would otherwise visit detainees. Thus, the FST (and even CMHIP staff) have worked with jail staff to arrange transfers to a private psychiatric hospital or to CMHIP for acutely ill individuals, and they use remote technology (primarily phone calls to jail staff) to monitor others. Although many pandemic-related barriers remain, we are pleased to report that the FST is able to resume face-to-face contacts in many jails, that they have been thoughtful in collaborating with jail-based mental health services, and that they have prioritized the detainees who require greatest care.

*Fines and "Individual Special Circumstances"*:

Recall that once certain Department functions were greatly altered or slowed by COVID-19, the Department began incurring fines (i.e., the Consent-Decree-mandated fines for exceeding prescribed time limits) to a greater degree than they had before these COVID-19-related delays. This quickly raised questions about how to best handle these fines. All parties (i.e., the Department, Disability Law Colorado, and Special Master) agreed conceptually that the Department should not be penalized for delays caused *solely* by COVID-19. Although the COVID-19 pandemic is, conceptually, a broad "Departmental Special Circumstance" as defined in the Consent Decree, the Consent Decree precludes invoking Departmental Special Circumstances until June 2021.[1]

---

[1] See p. 33 of the Consent Decree.

Absent the option to invoke Departmental Special Circumstances, or any other wide-scale agreement,[2] the Department has been invoking ISC ("Individual Special Circumstance") on *every individual* detainee whose progress has been slowed by the COVID-19 pandemic. This includes defendants who were found incompetent but could not be promptly transitioned to the hospital because of delays necessary for safety. Perhaps not surprisingly, *the number of the competence-involved Pretrial Detainees awaiting competency restoration who are designated ISC has consistently exceeded the number who are <u>not</u> designated ISC*.

There remain several challenges to such wide-scale ISC. First, invoking ISC requires considerable work by OBH staff, particularly the leaders/administrators. Second, wide-scale ISC greatly complicates data management, reporting, and monitoring, as we explain later.

As we approach the second year of pandemic-related delays, the Department has proposed an alternate approach for handling fines. Rather than continue the labor-intensive process of designating ISC for every detainee whose movement has been slowed by pandemic-attributable delays, the Department has proposed a capped, lump-sum fine. The DLC has made a counter-proposal, and at this point we are awaiting the Department's response to this counter-proposal. Generally, we strongly support this simplified lump-sum fine (versus the labor-intensive process of designating ISC in so many cases) and we are hopeful the parties can reach a satisfactory agreement. Once the parties have reached an agreement (or an impasse) we will notify the Court.

*Current Status and Foreseeable Future:*

The COVID-19 pandemic has caused increasing delays and challenges across each of the past several quarters. Last quarter, we speculated, "The only good news about these converging trends in the past quarter, it seems, is that they may have reached the 'rock bottom.'"  We were clearly incorrect. Although CMHIP's winter pause in admissions ended, and admissions had resumed, a second pause (April-May) has exacerbated the already-growing delays. We were optimistic that widespread vaccination would mitigate the pandemic effects, but vaccinations are not yet widespread among CMHIP staff (many of whom decline vaccines) or detainees. The hospital still cannot admit patients at anywhere near the pace that courts are ordering them for admission. Thus, delays have reached their worst point yet and—though there are reasons to anticipate improvement—the "backlog" in services (extended delays and waitlist) almost ensure any improvements will occur slowly.

As we look towards the next quarter, our prognosis is guarded. While we anticipate fewer

---

[2] As you recall, the Department initially proposed an agreement to DLC in which the Department would pay the fines that they estimated *would have* accrued absent COVID-19. However, DLC ultimately (around mid-June) declined this proposal from the Department, and the Department therefore proceeded to invoke Individual Special Circumstances for detainees who were delayed (i.e., for whom the Department would accrue fines for missing timelines) due to COVID-19-related precautions or constraints.

pandemic-related cautions and complications in Colorado overall, the Department will continue certain precautions (e.g., quarantine-style admissions procedures at CMHIP) for the foreseeable future. The increases to the waitlist are tremendous: not just from increasing court orders for restoration, but from delays that increased during the pauses in admission (much like compounding interest on an unpaid debt). Thus, the waitlist will require many months to clear even if pandemic-related procedures could immediately end entirely. This increased waitlist will make it even more important for the Department to continue their strong progress in outpatient restoration, and continue pursuing new strategies such as diversion programs and strategies to reduce hospital lengths of stay.

As in every quarterly report, we review next the Department's compliance with time frame requirements, because these are the primary focus of the Consent Decree (and the focus that the Consent Decree prescribes for our quarterly reports). We consider these time frames our "key metrics"—or primary markers of progress—that we review in each quarterly report. Obviously, many of these metrics have been directly influenced by the procedural changes necessary for public safety amid COVID-19. Likewise, many of these metrics require distinguishing those individuals designated ISC versus those who are not.

ONGOING CAVEAT:
KEY METRICS MUST ACKNOWLEDGE "INDIVIDUAL SPECIAL CIRCUMSTANCES" (ISC)

As you recall, the Department has—with good reason—invoked Individual Special Circumstances (ISC) for those many pretrial detainees whose progress through the competency system has been slowed by procedural changes due to COVID-19. As the pandemic has persisted, *the number of individual detainees on ISC has often exceeded the number who are not on ISC*. Per the Consent Decree, the Department does not pay daily fines for persons on ISC. Stated differently, the Department is not "out of compliance" if an individual is waiting but designated ISC, because "special circumstances" prevented compliance with timeframes. Therefore, once a detainee is designated ISC, that individual is *not* included in the metrics with which the Department has historically maintained compliance with the Consent Decree (e.g., waiting list, waiting times).

So, quite reasonably, the Department does not include these ISC-designated individuals in their compliance metrics. But of course, excluding everyone on ISC from routine reporting would yield figures that are grossly misleading with respect to the Department's progress on goals, and with respect to the general state of competency services in Colorado (aside from compliance per se). For example, the waitlist (strictly defined) included 147 people at the end of April. But this figure does not include approximately 120 people designated ISC as they await restoration (for a grand total of more than 250 people waiting; a figure that reflects an all-time high). On the one hand, it is important not to penalize the Department for pandemic-related delays in services. On the other hand, it is important not to overlook those detainees whose services are delayed due to COVID-19 precautions (and therefore designated ISC) or to provide summary figures that omit a large number of detainees.

Our approach to this dilemma has been to begin monitoring *separately* the individuals not on ISC *and* those designated ISC. We have asked the Department to present separate data on each group in their monthly reports, and (where possible) we present separate data on each group in this quarterly report. As you may recall from prior reports, this reporting (ISC vs non-ISC) has created new challenges for the Department and their data management systems. Providing *precise* details on each population is more challenging than it might seem. Following an agreement created with DLC in the spring of 2020, the Department places most pretrial detainees on ISC when they begin exceeding their maximum time frames (expect for a few cases in which COVID-19 is not the barrier for timely admission). Many pretrial detainees pass through a figurative "turnstile" at the end of their maximum time frame, moving from the narrowly defined waitlist into the ISC group. At some point, these individuals will be offered admission, and likely move back through the turnstile onto the traditional waitlist, before they are admitted to inpatient restoration services. These transitions (on and off of ISC) make data monitoring more complicated; simply reporting the number on ISC in a given month along with the number on the waitlist is misleading, in that a single person could have been in both categories. Thus, we are increasingly prioritizing point-in-time "snapshots" of data.

We have met repeatedly with the Department regarding data requests to better clarify and

communicate the overall journey of persons awaiting inpatient restoration—whether placed on ISC at some stage or not, from start to finish. The Department continues refining their procedures for monitoring and reporting, and have promised a new approach for their next monthly report. We remain convinced that the data monitoring is generally improving, and we have appreciated the Department's patience with our persistent data requests and questions. Thus, the figures we provide in this report reflect good-faith attempts to provide the most accurate data possible, albeit among a dynamic data management challenge.

Finally, we note that these distinctions—those on ISC versus those who are not—may soon come to an end. As mentioned earlier, the Department has proposed a lump-sum fine payment for the next fiscal year. This would eliminate the labor-intensive process of managing ISC designations and reporting ISC data separately. This would return us to an era in which all parties are monitoring the full population of pretrial detainees without designating ISC (a designation relevant only to fines). Depending on further negotiations around this proposal, subsequent reports may need not address these ISC distinctions. But for the moment, these designations remain, and they shape the way we report data for the past quarter.

# KEY METRICS FOR PROGRESS:

# COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC:  COMPETENCE EVALUATION TIME FRAMES

Again, many detainees are now designated by the Department as qualifying for Individual Special Circumstances (ISC) due to pandemic-related delays. We have requested that the Department report key metrics for both Pretrial Detainees on ISC and for those who are not. We report figures separately, beginning with those who are <u>not</u> on ISC.

| *Waiting time (in days) for a competence evaluation among those <u>not</u> on ISC[3]* | | | | | |
|---|---|---|---|---|---|
| | Nov 2020 – Jan 2021 | Feb 2021 | Mar 2021 | Apr 2021 | Ongoing Requirement |
| Jail-based Competency Evaluations | 12.5 | 14.9 | 15.8 | 16.4 | 21 days |
| Inpatient Competency Evaluations | 10.9* | 2.8* | 3 | N/A** | 14 days |

\* = at least one defendant waited longer than the maximum time frame for the evaluation
\*\*= this reflects that there were *no* admissions for inpatient evaluations in April

Court orders for jail-based competence evaluations had dropped to an all-time low during the Spring of 2020 (e.g., 56 people in April 2020), when the onset of the COVID-19 pandemic greatly decreased arrests. But arrests and orders for jail-based evaluations have resumed, and greatly increased, peaking at 159 in March of 2021 (a historic high).

Fortunately, the Department's Court Services unit has grown increasingly efficient and has for several months met all mandated time-frames for jail-based evaluations. Of course, this holds true *only* for those *not* on ISC; those delayed due to pandemic-related challenges are placed on ISC. The longer wait times for those on ISC awaiting evaluations are summarized below:

---

[3] Information for both tables retrieved from the April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, pp. 22-26.

| Waiting time (in days) for a competence evaluation among those on ISC | | | | | |
|---|---|---|---|---|---|
| | Nov 2020 - Jan 2021 | Feb 2021 | Mar 2021 | Apr 2021 | Ongoing Requirement |
| Jail-based Competency Evaluations | 37.3* | 47.5* | 47.2* | 30.3* | 21 days |
| Inpatient Competency Evaluations | 81.7* | 80.5* | 71.4* | 140* | 14 days |

\* = defendants waited longer than the maximum time frame for the evaluation

As revealed in the ISC table above, those on ISC certainly wait longer than those not on ISC (after all, they are on ISC because of circumstances causing delays). Indeed, wait times for those on ISC were sometimes double the maximum wait times the Consent Decree allows for jail-based evaluations. Fortunately, the wait times for jail-based evaluations have been decreasing among those on ISC. Moreover, the *number* of those awaiting evaluations on ISC has been decreasing, from 63 in January to 12 in April, 2021. More remarkably, the Department recently reported that there have been *no* detainees awaiting jail evaluations designated ISC in the past few weeks of May 2021. Thus, in this quarter, a substantial portion of pre-trial detainees who received evaluations in jail received them in compliance with established timelines. Another substantial portion—those designated ISC due to pandemic-related delays—received them much later. However, the latter group has been decreasing steadily, such that the Department reports in recent weeks *all* detainees ordered for a jail-based evaluation are evaluated in the established timeframe (i.e., 21 days).

Regarding inpatient evaluations, the number of monthly referrals has varied greatly during the pandemic, and ranged from five to ten this quarter. Historically, although inpatient evaluations were completed well within mandated time frames, most were substantially delayed this quarter due to COVID-19 precautions, including "cohort" admissions and a lengthy period in which CMHIP paused admissions altogether. Only six people this quarter were *ultimately admitted* for an inpatient evaluation at CMHIP. For the 8-9 detainees each month on ISC awaiting an inpatient evaluation, the wait times have increased from an average of 80 days in February to 140 days in April. In short, there are substantial delays for inpatient evaluations, for the same reasons there are substantial delays for inpatient restoration (described in later sections).

This quarter in particular, we affirm the significant improvements among the Court Services unit as they have completed timely jail-based evaluations even amid COVID-19 challenges. However, it will be crucial to respond more rapidly to the few orders for inpatient evaluation. Indeed, those referred for inpatient evaluation are often referred this route because they appear to be

the most acutely ill, high-need detainees.

Orders for *jail-based* evaluations have increased steadily, not only exceeding pre-pandemic levels, but reaching an all-time high. Fortunately, pandemic-related barriers have decreased somewhat, making it more feasible for evaluators to enter jails, or at least continue evaluations via videoconference with fewer obstacles. The Department's Court Services unit has continued to adapt and improve, such that they seem increasingly able to keep pace. Ultimately, jail-based evaluations this quarter were completed quite promptly for the slight majority *not* designated ISC, but completed more slowly for those that *are* ISC (usually those in jails with COVID-19 outbreaks or protocols that make evaluations more difficult). Beyond the data reported for this quarter, very recent data (i.e., mid-May) suggests that the Court Services unit is now entirely in compliance with time frames for jail-based evaluations, with no detainees designated ISC as they await jail-based evaluations. For the few ordered to inpatient evaluation, however, the Department will need to find more creative ways to admit more promptly. Overall, we affirm this recent evidence of significant progress in jail-based evaluations, and are hopeful that next quarter's data on jail-based evaluations will maintain the recently-reported perfect compliance.

## KEY METRIC:  TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:* Historically, the Department often failed to provide prompt restoration services; indeed, that was a primary reason for the litigation leading to the Consent Decree. In the months preceding the Triage system, defendants who were admitted for inpatient restoration treatment at CMHIP or RISE waited, on average, 71 days.[4]  Of course, this figure included all defendants referred for restoration, without distinction between those with more, versus less, acute needs. Since then, the Department launched on June 1, 2019 the Consent Decree-mandated triage system,[5] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2"). Currently, Tier 1 defendants must receive services within 7 days of the competency hearing, whereas Tier 2 defendants need not receive services for 35 days (per the January 2021 change in timeframe requirements). Upon initiating the Triage system, the Department achieved *excellent* adherence to the 7-day deadline for defendants designated as Tier 1. The wait times for Tier 2 defendants also improved, though they consistently exceeded the time frames prescribed in the Consent Decree. Still, despite persistent delays, wait times and the number on the waitlist were decreasing monthly.

*Current realities:* Wait times for inpatient restoration increased throughout 2020 and persist currently, due primarily to the pandemic and the procedures used to limit infection and spread of the COVID-19 virus. Like the previous quarter, this past quarter showed greater failures to meet the Tier 1 or Tier 2 time frames. These delays are reflected in the tables below. The non-ISC Tier 1 and Tier 2 figures regarding wait times show full or nearly-full compliance with the timelines for admission to restoration services. However, like last quarter, these figures continue to reflect increasing ISC designations more than they reflect decreasing wait times overall. In other words, detainees are placed onto the ISC list before maximum wait time frames are reached, and then removed from ISC shortly before admission. So these short wait times reflect more of a shuffling of detainees on and off the Consent Decree Waitlist rather than the actual time spent waiting for admission. For example, an individual might be placed on the Consent Decree Waitlist for 10 days, transferred to the ISC list for several weeks, and then transferred back to the Consent Decree Waitlist 3 days prior to admission. The official waitlist figure would reflect a 13 day wait for that individual, but of course the actual wait would be far longer. Again, such a procedure is proper with respect to the ISC designation (which is solely related to calculating fines), but we emphasize these details because the procedure might otherwise suggest briefer delays than detainees are actually experiencing.

---

[4] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p. 7 of their April monthly report filed May 7, 2019).

[5] See Consent Decree paragraph 43.

The first two rows of the summary table below show Tier 1 and Tier 2 wait times for persons *not* on ISC. The third row documents the far-longer wait times for persons categorized as ISC. As detailed in a later table (p. 17), the number of persons awaiting inpatient restoration designated as ISC exceeds those who are not placed on ISC. In short, those awaiting restoration comprise two populations: one for which the Department has control (non-ISC), and one for which the Department faces barriers largely beyond their control (ISC). As the pandemic has worsened, most are in the ISC category—and they face increasing delays in access to restoration services.

| *Average Wait Times for Inpatient Competence Restoration Services*[6] | | | | | | |
|---|---|---|---|---|---|---|
| | Nov 2020 - Jan 2021 | Feb 2021 | Mar 2021 | Apr 2021 | January 2021 Requirement | July 2021 Requirement |
| Tier 1 (not ISC) | 0.3 | 0* | 10.5* | 7* | 7 days | 7 days |
| Tier 2 (not ISC) | 9.9* | 10.1* | 12.3* | 14.1* | 35 days | 28 days |
| Tiers 1&2 (ISC) | 61.7** | 78.6** | 87.5** | 69.4** | n/a | n/a |

\* = at least one defendant waited longer than maximum time frame for restoration services
\*\* = most defendants waited longer than maximum time frame for restoration services

Although we are unable to distinguish outcomes for Tier 1 versus Tier 2 defendants on ISC, it is clear that wait times are increasing. Further, although most people waiting for inpatient restoration are on the ISC list (the non-ISC categories have represented a smaller proportion of people waiting), the non-ISC list has increased rapidly since mid-April. Recall that a person waiting for inpatient restoration is placed on "ISC" only if an open bed exists but the Department is unable to admit them due to COVID-19 restrictions. Once all beds are accounted for, a detainee cannot be categorized as ISC. Not surprisingly, the number waiting for competency restoration increased most dramatically after CMHIP was forced to halt all admissions in November and in April. Since April, the "non-ISC" number has jumped dramatically, as wait times and numbers of people waiting increased exponentially while the hospital was unable to admit. Scores of beds still remain unoccupied at CMHIP and the RISE programs due to restricted admissions protocols. *Compared to this time in 2020, twice as many detainees are waiting for restoration services, and they are waiting twice as long;* we attribute these delays largely to pauses in admission to CMHIP, which are largely attributable to COVID-19 outbreaks in the

[6] According to the April 2021 Department's Special Master Compliance Plan report dated May 7, 2021, pp. 9-11.

hospital and related infection-control quarantine procedures.

As the pandemic continues to slow admissions to CMHIP and RISE—even pausing them entirely for several weeks on two separate occasions—the number of people awaiting restoration, and their wait times, increased steadily. Persons designated as ISC now wait for months before admission. We anticipate that once CMHIP is allowed to admit patients again, wait times will decrease. The Department will continue to implement other strategies to reduce time and numbers for those on the waitlist, but the obvious reality is that admissions *must resume and continue without pause* in order to decrease the time detainees spend on the waitlist.

## KEY METRIC:  THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services. The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants. By June 2020, the number on the waitlist was just below 100. The decrease clearly reflected Department efforts, and the Department projected that the waitlist would be minimal by December 2020.

*Current realities:* However, the pandemic reversed this trend beginning in July 2020. Transportation, admissions, and discharges across most facilities slowed or even stopped. CMHIP was forced to stop nearly all admissions for much of November and December 2020 and between early-April through May. Meanwhile, orders for competency evaluations and restoration have resumed to the point that they now exceed pre-pandemic levels. This is the challenging context for waitlist data we present in this section.

Again, we distinguish Pretrial Detainees *not* on ISC status from those placed on ISC. Only persons who are *not* on ISC technically remain on the formal waitlist (as defined in the Consent Decree, for purposes of calculating fines). However, a larger number of defendants have been placed on ISC and, practically speaking, continue to wait for services.

| *Number of Defendants Waiting for Inpatient Restoration*[7] | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Jan 2021 | Feb 2021 | Mar 2021 | Apr 2021 |
| Combined | 157 | | | | |
| Tier 1 (no ISC) | N/A | 0 | 0 | 7 | 5 |
| Tier 2 (no ISC) | N/A | 131 | 103 | 128 | 147 |
| Tiers 1&2 (ISC) | N/A | 196 | 175 | 160 | 160 |

+ Non-ISC numbers reflect the number of persons waiting for restoration services on the last day of the respective month. ISC numbers reflect the number of persons waiting for restoration at any point within that month.

As mentioned previously, the number of people designated as ISC and awaiting inpatient restoration has remained high for each of the past three months. Because the ISC number reflects the total number of persons placed on ISC at any time during the month, the total number of people waiting at any point in time cannot be calculated perfectly from monthly

---

[7] According to the April 2021 Department's Special Master Compliance Plan report dated May 7, 2021, pp. 9-11 as well as our calculations of compiled data from non-compliance reports provided at the end of each week.

compliance report data. After accounting for the number of people removed from the ISC list in April, we estimate that at the end of April 2021, approximately 268 detainees were awaiting competency restoration services. *This reflects an all-time high*. The majority of those waiting have been placed on ISC at some stage, indicating that barriers beyond the Department's control (the pandemic) prevent them from promptly accessing inpatient restoration services at CMHIP.

Similar to our concerns about the length of *time* detainees spend on the waitlist, we see no appreciable improvement in the *number* of detainees on the waitlist until admissions can resume. As of the writing of this report, more than 100 beds remain unoccupied at CMHIP and the various jail-based competency restoration programs due to infection control protocols. Once admissions resume, and these beds can be filled, we anticipate that the waitlist number will decrease sharply within several weeks. Then, however, decreases will occur more slowly as they will depend on bed turnover (i.e., which depends on those in the hospital attaining competence and being discharged from the hospital).

Fortunately, as we review the documented updates on each person on ISC awaiting restoration weekly, we see clearly that CMHIP is prioritizing admission for persons who are either Tier 1 or who have shown acute decompensation after being classified as Tier 2. We affirm the Department's efforts in prioritizing for admission those detainees who are most acutely ill and most urgently in need of services.

Given the substantial delays caused by pauses in admissions at CMHIP, we have increasingly urged the Department and CMHIP to consider greater flexibility in their quarantine and infection-control procedures. CMHIP, in turn, has conveyed that they essentially have no flexibility because they are bound by the directives of another agency: the Colorado Department of Public Health & Environment (CDPH&E). CMHIP leadership routinely asks CDPH&E for greater options in quarantine strategies, and CDPH&E reportedly declines, or allows only very limited and stringent options. All parties recognize the importance of adequate COVID-19 infection control and public safety procedures, but we also grow increasingly concerned about the public health problems of detainees with psychiatric illness becoming more symptomatic in jail as they await hospital services. Therefore, we (Special Masters) submitted a memo to CDPH&E asking them to consider greater flexibility in safety procedures at CMHIP to balance the competing public safety crises we face. See Appendix A for this memo.

Unfortunately, the number of people waiting in jails for restoration services has hit historic highs due to delays and barriers attributable to the pandemic. Although inpatient capacity has increased, few individuals were admitted within the time frames identified in the Consent Decree because of pandemic-related impediments to transportation, admission, and discharge. Pauses in admissions to CMHIP have been particularly disastrous for the waitlist. Without admissions resuming, and continuing steadily, the waitlist will inevitably increase. Fortunately, the number of Tier 1 (i.e., acutely ill) persons waiting for restoration services is much smaller than the number of Tier 2 individuals waiting, their wait times are shorter, and the Department continues to prioritize those Tier 1 persons for admission.

## CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[8] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment. The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribes the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations.[9] Admission time frames shorten every six months, with a recent reduction in January 2021, and the next in July 2021.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 | 7 days | 28 days | 14 days | 21 days |

As summarized earlier, *the Department has generally attained, or come close to, formal compliance with all evaluation timeframes for the past several months. But this applies only to those detainees not designated ISC; the many detainees designated as ISC tend to wait beyond the prescribed time frames.*

---

[8] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo competence-related services (i.e., competence evaluation or restoration treatment). Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[9] Fine amounts are tied to delays beyond each of the time frames listed. However, these fines are not applied for pretrial detainees designated ISC.

## Wait Times for Inpatient Evaluation

Inpatient evaluations are fairly rare, compared to the typical practice of jail-based evaluations. Judges typically order an inpatient evaluation only when the defendant appears obviously ill and in need of urgent admission (rather than waiting for an evaluation to determine whether they must be admitted for restoration). The Department was generally successful in timely admission for inpatient competence evaluations *before* the COVID-19 era, but significantly exceeded timeframes during many of the months thereafter. As detailed below, the number of pretrial detainees *not on ISC* admitted for an inpatient competence evaluation have been quite low, and yet they often still wait well beyond mandated time frames.

| *Recent Wait Times for Inpatient Evaluation for Persons <u>not</u> on ISC*[10] | | | |
|---|---|---|---|
| Month | Number "admitted or ended" for inpatient evaluation[11] | Average days waited prior to admission to CMHIP or RISE | People who waited more than 14 days |
| Apr 2021 | 2 (1 admitted)[12] | 0** | 0 |
| Mar 2021 | 6 (1 admitted) | 3 | 0 |
| Feb 2021 | 6 (4 admitted) | 2.8* | 1 |
| Nov 2020 – Jan 2021 average | 8.7 | 10.9* | 8 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\*= This 0 does not indicate the one person admitted actually waited zero days. Rather, that person was originally designated ISC, but then was designated non-ISC once admitted.

---

[10] According to the April 2021 Department's Special Master Compliance Plan report for January, dated May 7, 2021, pp. 16-17.

[11] This column reflects the number of pretrial detainees admitted to either CMHIP or RISE for an inpatient competency evaluation, bonded out, or had their cases dismissed. Recently, this figure has featured very few actually "admitted" and far more orders that were "ended" for other reasons.

[12] Actual admission figures according to the April 2021 Department's Special Master Compliance Plan report for January, dated May 7, 2021, p. 19

As mentioned previously, the Department is now separating data for Pretrial Detainees who are on ISC versus those who are not. Thus, the wait times for those who *are* on ISC is below:

| Recent Wait Times for Inpatient Evaluation for Persons on ISC[13] | | | |
|---|---|---|---|
| Month | Number "removed from ISC list for inpatient evaluation"[14] | Average days waited prior to admission to CMHIP or RISE | People who waited more than 14 days[15] |
| Apr 2021 | 1 | 140* | Not reported |
| Mar 2021 | 7 | 71.4* | Not reported |
| Feb 2021 | 2 | 80.5* | Not reported |
| Nov 2020 – Jan 2021 average | 5.3 | 81.7* | Not reported |
| March 2019 total | 18 | 16.4 | 1 |

* = at least one defendant waited longer than max time frame for inpatient evaluation services

Generally, the past quarter featured increases in referrals for inpatient competence evaluations, but far fewer actual *admissions* for those evaluations. This almost certainly occurred because CMHIP was forced to pause admissions and discharges due to a significant COVID-19 outbreak. Clearly, these delays leave detainees waiting longer for inpatient evaluations, with the most recent individual admitted having waited 140 days (far longer than wait times before the pandemic, or even during earlier months of the pandemic).

---

[13] According to the April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, pp. 16-17.

[14] This figure reflects those "removed from the list for inpatient competency evaluations" per April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, p. 17. While this figure includes actual admissions, it appears that recently, most of these individuals are "removed from the list" for reasons other than actual admission. We are working with the Department to better understand the outcomes for the large majority of this group, given their account of only one inpatient competency evaluation this month.

[15] The Department has not provided this data.

We also continue to monitor the *clinical appropriateness* of those court-ordered admissions. That is, we track how many of the defendants ordered for inpatient evaluation actually met the strict criteria for involuntary hospitalization (C.R.S. § 27-65-105).[16] The Department reported that during the past 3 months, *five* of the six admission for inpatient evaluation did indeed meet the strict "27-65" criteria for involuntary hospitalization.[17]  This 83% rate of evaluation admissions that met criteria for involuntary admission is generally a good (albeit crude) metric for the appropriateness of inpatient evaluation. That is, almost all of the six individuals admitted for inpatient evaluation required *urgent* hospitalization. The concern, of course, is that some of those urgently needing hospitalization waited weeks or months to receive it. This is precisely the problem the Consent Decree was designed to address, but pandemic-related complications have undermined progress.

Generally, the past quarter featured somewhat fewer *referrals* for inpatient competence evaluations, and far fewer *admissions* for those evaluations. Wait times are especially long for persons on ISC status, peaking at 140 days in April. The same pandemic-related delays that interfere with hospital admissions for restoration have also interfered with hospital admissions for inpatient evaluation. These have caused a regression after meaningful progress in pre-pandemic quarters.

---

[16] C.R.S. § 27-65-105: (1)  Emergency procedure may be invoked under either one of the following two conditions:

(a)(I)  When any person appears to have a mental health disorder and, as a result of such mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then an intervening professional, as specified in subsection (1)(a)(II) of this section, upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation…

(b)  Upon an affidavit sworn to or affirmed before a judge that relates sufficient facts to establish that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, the court may order the person described in the affidavit to be taken into custody and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation.

[17] From the CDHS Monthly Compliance Plan Report dated February 8, 2021, p. 21.

## Wait Times for Inpatient Restoration

Regarding wait times for inpatient *restoration* at CMHIP, the Consent Decree established a two-tier triage system that prioritizes defendants with the most urgent clinical needs (Tier 1) with an admission deadline of 7 days. The maximum timeframe for those with less urgent needs (Tier 2) decreased to 35 days as of January 1, 2021. It will decrease to 28 days on July 1, 2021.

As in previous sections, we separate data for persons *not* on ISC status versus those persons on ISC.

| *Recent Wait Times for Inpatient Restoration for Persons not on ISC list* [18] | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | People who waited more than the max days for admission to CMHIP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Apr 2021 | 3 | 53 | 5.7 | 14.1 | 1 | 51 |
| Mar 2021 | 15 | 55 | 11.9 | 12.3 | 11 | 30 |
| Feb 2021 | 12 | 65 | 2.5 | 10.1 | 2 | 0 |
| Previous Quarter Monthly Average (Nov 20 – Jan 21) | 11 | 51 | 1.8 | 9.9 | 0 | 2 |
| March 19 (before tier distinctions) | 44 | | 58.2 | | 31 | |

Again, the above table data includes *only* that minority of pretrial detainees *not* on ISC, a small subset of the total population awaiting inpatient restoration services. Wait times appear to be reasonable, but these figures represent only the amount of time spent on the waitlist – not the time spent on ISC (which is substantial, as reflected in the next table). There is some overlap in the detainees represented in the two tables. Further, recall that wait times are ended at

---

[18] According to the April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, 2021, pp. 9-11 and corrected data provided via email from OBH dated May 27, 2021.

admission to CMHIP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 56 "admitted or ended" in April 2021, *only 3 defendants were actually admitted to an inpatient facility*. The others were either dismissed, vacated, or placed on bond.[19] Actual admissions to CMHIP remained nearly paused, and may remain slow until pandemic-related admission protocols change.

The following table describes persons <u>on ISC</u> status:

| *Recent Wait Times for Inpatient Restoration for Persons <u>on</u> ISC list*[20] | | |
|---|---|---|
| Month | Number of people waiting for admission to inpatient restoration (Tiers 1&2) | Average days waited before "admitted or ended" |
| Apr 2021 | 160 | 69.4 |
| Mar 2021 | 160 | 87.5 |
| Feb 2021 | 176 | 78.6 |
| Previous Quarter Monthly Average (Nov 20 – Jan 21) | 175 | 60.4 |

Recall that the Department began placing many defendants on the ISC list in Summer 2020 as a result of delays caused by the pandemic. Overall, the number of people waiting on ISC has risen from a quarterly average of 40 (May – July 2020) to 160 at the end of April 2021. Wait times for those on ISC have also increased, from 46 days to a current average of 69 days. These large numbers coincide with the pause admissions at CMHIP and RISE in November-December 2020 and in April-May 2021. The numbers also increased as a result of the record number of orders for competency evaluation and restoration in March and April of 2021.

---

[19] To be clear, these latter outcomes are often good outcomes. In many cases, they reflect FST efforts to arrange robust outpatient services for detainees whom may not need intensive inpatient services. This tends to decrease wait times, and preserve inpatient resources, for the detainees who need them most. But we emphasize this distinction to make it clear that the Department's "admitted or ended" designation has recently included far more "ended" than "admitted."

[20] According to the April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, pp. 9-11.

So, while the first table shows significant compliance with Consent Decree time frames, the overall population of persons waiting for inpatient restoration *also* includes persons on ISC—and the ISC population is not only substantially larger than the former population, but is also experiencing significant delays. In short, the actual number of people waiting in jail for inpatient restoration services continued to climb, with most persons placed on ISC status. We do not anticipate a change in this trajectory unless robust admissions resume at CMHIP.

As mentioned previously, we attribute most of these increasing delays and waitlist numbers to the extended pauses in admission at CMHIP, mostly required by CDPH&E. Please see the memo to CDPH&E in Appendix A outlining our concern and recommendations regarding this issue.

The numbers of people ordered to inpatient restoration have grown over the past several months, and their average time to admission far exceeds Consent Decree time frames. Both the number of people waiting for restoration services—and the time they spend waiting—have increased substantially this past quarter. Extended pauses in admissions to CMHIP and the jail-based restoration settings are largely responsible for these increases, though March and April of 2021 also saw record numbers of orders for both evaluations and restorations, which increases the demand on an already-slowed system.

## PERFORMANCE OF JAIL COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The mandated time limit for jail-based evaluation decreased from 28 days to 21 days on July 21, 2020, per the Consent Decree.

*Historical context:* Recall that timely competence evaluation was a relative strength of the Department until around November 2019, when performance deteriorated substantially. Many jail-based evaluations then exceeded the 28-day time frame—reaching a peak of delays in January 2020 (46%)—as we have described in prior reports. Even through much of Spring 2020, roughly 30% of jail-based evaluations exceeded the 28-day time frame, peaking again at 39% in May of 2020.

During the summer of 2020, referrals for jail-based evaluations began to increase towards typical levels, setting the stage for what could have been a severe backlog. To their credit, however, the Department continued to make steady improvements to Court Services over the past year. The new Court Services Director, Amanda Edwards, overhauled case assignment procedures and other administrative steps in ways that increase efficiency. The Department has hired new evaluators and contractors, increasing compensation for both. The new workforce was, in our view, sufficient to complete incoming jail-based evaluations and even reduce the backlog *under routine circumstances.* Of course, the COVID-19 pandemic has posed a new and unexpected challenge to timely evaluations.

*Current realities:* As Court Services improved, far fewer pretrial detainees waited in jail for evaluations beyond the required timeline (less than 10% in the Fall of 2020), and for the past two quarters delays were limited to those designated ISC. Of course, jail-based evaluations this quarter have remained greatly constrained by the pandemic. The perfect compliance in the past two quarters does *not* include individuals designated ISC, of course. The vast majority of those on ISC have been waiting longer than the required 21 days for their evaluations. The average wait time for this group increased for most of the past two quarters, from 34 days in November to 47 days in March, then decreasing to 30 in April. *However, very recent developments suggest greater improvements*.

First, in our view, the greatest factor in the many ISC designations for jail-based evaluations was the Denver County Jail. Although other "outbreak" jails that still prohibited all visits, Denver is the largest (i.e., the site with more competency-involved defendants than any other) and the most challenging. For months, Denver Jail allowed only one evaluation per day, ensuring the backlog continued. Ultimately, the Department continued efforts to persuade the jail to change policy, and/or identify alternate creative solutions, until they were successful. Denver Jail eventually allowed for more evaluations, and the delays decreased.

 Second, perhaps due largely to the changes at the Denver Jail, the past several weeks (data more recent than the February – April data covered in this report) reveal virtually *no* detainees designated ISC as they await evaluations in jail. Furthermore, the Department reports that they have very recently been accomplishing all evaluations within the designated time frames. That is, there are no detainees designated ISC and waiting longer than allowed. The Department's progress on jail-based evaluations is particularly remarkable given the rate at which court orders for evaluation have been increasing steadily, and peaked this quarter at historic highs (i.e., up to 159 defendants referred in March).

*Current Status and Foreseeable Future:* The Department's Court Services unit may well be able to maintain their very recent progress (i.e., compliance with time frames, even without ISC designations), even amid increasing orders for evaluation. The concern, of course, is that each aspect of the competency system is interconnected; their improved progress on jail-based evaluations will inevitably lead to more defendants referred for restoration services and further strain on inpatient admissions.

Amid increasing challenges due to the pandemic, the Department's Court Services unit has generally improved and pursued creative solutions to pandemic-related barriers to evaluations. Though many detainees were at times designated ISC and waited longer than timelines allow, services appear to be improving, largely because barriers in the large Denver Jail have been resolved. Indeed, recent weeks have witnessed timely evaluations and *no* ISC designations. Thus, we anticipate this quarter will feature timely responses even to the increasing court orders for jail-based evaluations.

## INTERIM JAIL MENTAL HEALTH TREATMENT[21]

> 34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* As detailed in prior reports, the Department is required to partner with county jails to develop a program of coordinated services for incarcerated individuals involved in competency matters. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The pandemic continues to highlight the importance of the JBBS teams around the state. Although services can differ substantially among JBBS teams in different jails, those teams remain the primary frontline mental health workforce for pretrial detainees. FST Navigators provide extra layers of verification, assurance, and collaboration, but most direct services are provided by JBBS staff. In addition, in the jails on outbreak status, the JBBS teams provide information to the FST Navigators because Navigators are prohibited from entering most jails on outbreak status.

This quarter, the Department has attempted to respond to pandemic-related challenges in several ways. First, the FST Navigators continued to meet and communicate with pretrial detainees and their multi-disciplinary teams remotely. The FST continued to identify persons in most acute need, and they worked with CMHIP and JBBS to enhance mental health services and facilitate discharges to hospitals when necessary.

Private hospital contracts increased inpatient restoration options in the Denver metro area, but those beds are fines-funded and are better suited for acute crisis management than longer-term restoration. Unfortunately, transferring individuals in acute crisis to inpatient care continued to be unusually difficult during this past quarter, largely due to pandemic-related barriers. Primarily,

---

[21] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

CMHIP was unable to admit any patients during most of April and well into May. Additionally, emergency mental health holds in local jails continued to be challenging, with barriers regarding payment and transportation preventing most attempted admissions. FST Navigators worked with JBBS teams to find alternative solutions to inpatient care where possible.

We (the Special Masters) continued to review the weekly list of notes pertaining to each person on the on the ISC list awaiting inpatient restoration services. The list has expanded to more than 200 detainees due to the delays described earlier in this report. Still, we remain generally satisfied with the Department's attention to those who appear to be most vulnerable. We highlight individuals that appear particularly vulnerable as well as systemic issues that affect larger groups of people awaiting competency services; we then provide these highlights to OBH Forensic Services, DLC, and the fines-retained Legal Advocate as warranted. We have been pleased with the responses from OBH. Still, regardless of our efforts and those of the FST, the substantially limited options for treatment and transfer cannot be considered adequate for necessary services over the long term.

The Department continues to explore avenues for both reducing wait times and reducing risks for those on the waitlist. The Forensic Support Team continues to work with existing programs (CBER, Restoration Housing, CREST Housing, Momentum, OCRP) to accept detainees from the inpatient restoration waitlist who may actually be more suitable for outpatient restoration and supportive services. In addition, the FST continues to work with several fines-funded efforts designed specifically to mitigate the impact of COVID-19 in local jails. These include Restoration Housing, new contracts with Denver Health to provide inpatient hospital beds, the CREST program, and an interim jail-based restoration program within Denver County Jails (the latter two programs are described later in this report).

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[22]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to pursue the requirement to develop discharge plans for persons identified as appropriate for Outpatient Competence Restoration programming (OCRP) even amid the COVID-19 pandemic. While discharges from jails and hospitals were limited during this past quarter due to pandemic-related barriers, the Department continued their efforts in four main areas:[23]

1. *Housing Initiatives:*  The fines-funded Restoration Housing (formerly labeled Fusion Studios) continues to serve as a primary outlet for some defendants. In short, while still unrestored, these individuals have shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHIP to Outpatient Competence Restoration programming (OCRP) with dedicated residences at the Restoration Housing facility. At the time of this writing, the Forensic Support Team (FST) has coordinated 130 completed referrals for Restoration Housing, and 35 individuals have been placed there. Restoration Housing is finally full, and the project is described later in this report.

   Additionally, the CREST Housing initiative launched in December 2020. This fines-funded project provides an additional 25 housing beds in various locations across the Denver metro area for the persons adjudicated as incompetent to stand trial. It also provides intensive case management and crisis services for persons housed in the program. As with other new programs, this has launched more slowly than we hoped, but it has admitted at least a dozen individuals to date, and we anticipate it will reach full capacity.

---

[22] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

[23] In previous reports w have reported on an effort sometimes labeled "Fast Track," an effort to more rapidly identify those who were receiving restoration in CMHIP and may have restored to competence before their next scheduled evaluation. The program was temporarily sidelined during this past quarter due to the prioritization of pandemic mitigation efforts at CMHIP. The primary benefit of Fast Track is opening beds otherwise taken by persons who appear to have restored to competence. At the time of this writing, more than 80 beds remain open at CMHIP (due to delays attributable to quarantine procedures), and so we certainly understand CMHIP postponing rigorous implementation and monitoring of the Fast Track program until their census is again full.

2.  *Forensic Support Team (FST):*  The FST team has historically focused on incompetent defendants either in jails or in CMHIP. FST Navigators have monitored clinical status and restoration progress for those in jails awaiting transfer to CMHIP—primarily defendants who have been categorized as Tier 2 and therefore waiting longer for admission. Their day-to-day efforts include, for example, securing emergency mental health holds and transfers for detainees who are decompensating, or coordinating discharge and OCRP plans for detainees that have stabilized while in jail. They also trigger re-evaluations of competency (for defendants who appear to have become less symptomatic while waiting in jail), provide updates to attorneys and courts, and identify detainees who might be eligible for the many specialized programs (e.g., community housing and services). We affirm this important work. FST Navigators are currently assigned to 836 individuals across Colorado, including 297 persons in jails, and the remainder in hospitals and community settings. For individuals awaiting restoration services this quarter, the FST has logged a total 135 face-to-face contacts with defendants in jail, 5,978 contacts with care teams or stakeholders, coordinated more than 100 referrals to outpatient settings, and intervened with 90 individuals in crisis situations.[24]  For persons awaiting competency evaluations, the FST recorded a total of 67 face-to-face contacts and 2,019 contacts with care teams or other stakeholders. The FST director estimates that 790 bed days at CMHIP have been "saved" through the efforts of the FST during this quarter, through diversion, early release from CMHIP, advancing court dates, advocating for dismissal of minor charges, and so on. The FST director also estimates that 3,958 CMHIP bed days have been saved since January 2020.

After an extended period of restricted access, about half of Colorado's county jails have reopened their doors to allow FST Navigators to meet with detainees in person. Through a combination of face-to-face visits, telephone calls, and video updates, Navigators continue to identify and mitigate the most acute mental health crises. Between February and April 2021, for example, 90 Pretrial Detainees were identified as decompensating and in need of urgent, intensive mental health care; these defendants received enhanced clinical services and monitoring, with some transferred to CMHIP and others referred for additional supports. A total of 23 Pretrial Detainees were transferred to a hospital setting for acute care—either CMHIP or local hospitals. Of course, the tight restrictions on CMHIP admissions have made transfers to CMHIP extremely difficult since mid-April. The FST has become the primary source of information and intervention for these detainees, and we believe they identify and mitigate the most acute mental health crises among pretrial detainees statewide. Navigators also continue to facilitate transfers and placements to various settings affiliated with OBH's outpatient competency restoration program (OCRP).

---

[24] According to the Department's April 2021 Special Master Compliance Plan report dated May 7, 2021, pp. 47-49 and analogous sections in previous monthly compliance reports.

The Department also continues to coordinate crisis and case management services with the State of Colorado's Transition Specialist Program and the "Momentum" Program. Since early 2020, FST has referred a total of 200 persons to the Momentum Program. A total of 110 clients have been accepted into the program and assigned a case manager, with 56 active current clients—persons who would have otherwise likely remained in county jails or CMHIP.

As mentioned previously, FST Navigators also coordinated the transition of at least 35 Pretrial Detainees into Housing Initiatives. In addition, the FST is working with a local Colorado veteran's program to secure additional releases and community supports for veteran Pretrial Detainees (22 clients have been linked with V.A. services to date), and work continues in transitioning appropriate Denver Pretrial Detainees to the Community-Based Enhanced Restoration program (CBER; discussed below).

Finally, FST Navigators have begun identifying persons on the waitlist who may have restored to competency during their waits in jail. As the wait times increase, some detainees receiving medication and other services may have indeed stabilized to the point of being restored to competency, even without accessing formal restoration services such as education on court proceedings. We agree with the Department and DLC that these individuals should be formally re-evaluated by Court Services to determine their updated competency status. As a result, FST Navigators have begun identifying and referring those detainees that appear to have demonstrated extended stability for re-evaluation, after coordinating with defense attorneys, JBBS staff, and others. To date, two individuals have been re-evaluated while in jail and opined as restored; approximately one dozen others appear to be ready for similar re-evaluations.

3.   *Coordination with the Bridges program:*  As mentioned in previous quarterly reports, the Bridges Court Liaison Program and FST must work together to facilitate discharges and share responsibilities for competency-related cases. They both rely on similar (partially, but not entirely, overlapping) bodies of information. Thus, the Department and the Bridges team have been actively working to coordinate services, so that they can collaborate in a way that minimizes redundancies and gaps. The percentage of OBH competency cases assigned to a Bridges liaison has increased to 44%—the largest percentage reported to date. Generally, the two programs have collaborated efficiently, though there are occasionally instances of confusion or disagreement, including recently. Generally, we have been pleased with the Department's response to challenges and their ongoing efforts to collaborate.

4.   *CBER (Community-Based Enhanced Restoration):*  The CBER program is a pilot program based in Denver that provides enhanced mental health and case management services to a community-based restoration program. OBH is funding the program and has contracted Mental Health Center of Denver to provide the wraparound and restoration services. Participants are drawn from metro-area county jails; Tier 2 individuals are targeted for inclusion. To date, 26 individuals have been placed into the program, with approximately

7-12 individuals in the program at any one time. Funding exists for a total of 30 concurrent participants, so all parties have been concerned that the program is underutilized.

We requested that the fines-funded Legal Advocate (see p. 39 for more information about this position) research some of the barriers that CBER has encountered at the judiciary to help determine viability of the program. She reported, after a thorough review, that barriers appeared to be related to lack of housing options, lack of visibility and knowledge of the program, a restriction in eligible charges, and an inefficient referral process. Among judges and attorneys who had made use of the program, she reported, reviews were quite positive. The Department reported that low referrals may be attributable to the short length of time the program has been in operation (less than one year) and the impact of COVID-19 on referrals and community resources. Given the Department's continued optimism for the program's viability, and their interest in responding to the barriers reported by the Judiciary, all parties agreed to continue the project well into 2021.

Since then, the Department worked with stakeholders to make some detainees with more serious (though still lower-level) charges eligible for the program, and authorized FST Navigators to make referrals directly to the program, rather than rely solely on defense counsel to make referrals. These changes appear to have prompted increased referrals to CBER already. Though the program is still not at full capacity, it has experienced greater referrals and admissions than at any prior point. We will continue to monitor the effect of these changes on CBER enrollment and outcomes, but we are optimistic this marks a shift towards greater utilization of a potentially valuable program.

## TRANSPORTATION OF PRETRIAL DETAINEES

36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Over the past quarter, six defendants were admitted to CMHIP for inpatient competency evaluations, with five of those meeting C.R.S. § 27-65-125 criteria, according to hospital staff.[25] This number of admissions aligns with totals from prior quarters (1, 6, and 8 for prior quarters). Most admissions occurred in February and March, before inpatient admissions were halted at CMHIP. Even so, wait times for inpatient competency evaluations far exceeded Consent Decree time frames, with most admissions taking more than three months to occur. The Department has not indicated any other delays or barriers to transportation with jails around Colorado.

---

[25] According to the April 2021 Special Master Compliance Report dated May 7, 2021, pp. 17-19.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating* fines: The Department has continued to provide reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019. Of course, the past several quarters have featured significant changes with respect to fines, due to the increasing number of people designated Individual Special Circumstances (ISC), the mechanism that absolves the Department from fines in situations beyond their control. As you recall, after negotiation with DLC, the Department utilizes an approach in which they invoke ISC on every individual case whose progress has been slowed by the COVID-19 pandemic response. This includes, for example, defendants who cannot be evaluated promptly because jails forbade external evaluators and did not allow for video-conferenced evaluations, and defendants who were found incompetent but could not be promptly transitioned to the hospital because of delays necessary for safety. As you recall, the ISC approach is advantageous to the Department in that it drastically reduces the fines they would otherwise pay. But the process of designating ISC, and monitoring data with respect to ISC, has required tremendous time and labor from the Department.

*Current realities*: As we approach the second anniversary of the June 1, 2019 starting date for fines, the Department has proposed an alternate approach for handling fines. Rather than continue the labor-intensive process of designating ISC for every detainee whose movement has been slowed by pandemic-attributable delays, the Department has proposed a capped, lump-sum fine. You may recall the Department made a similar proposal last year, but DLC declined the proposal, conveying they would prefer individual-level attention and documentation required by ISC.

This year, however, both parties seem to perceive the lump-sum approach as preferable. In response to the Department's offer, DLC has made a counter-proposal. At this point we are awaiting the Department's response to this counter-proposal. Generally, we strongly support this simplified lump-sum fine (versus the labor-intensive process of designating ISC in so many cases) and we are hopeful the parties can reach a satisfactory agreement. Once the parties have reached an agreement (or an impasse) we will notify the Court. Until then, the Department will continue to invoke ISC for most detainees, and fewer fines accrue.

Throughout the past two years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that support the broad goals of the Consent Decree. In this era of widespread ISC, the Department has paid very little in fines for the past two quarters, though this has increased in the past two months as the number of people waiting for admission now far exceeds available inpatient capacity.

*Projects funded by the Fines Committee*
The funds from these fines have been used to benefit the population in the competency service system. A small committee comprising Department administration, DLC representatives, and the Special Master, have all met regularly for the past year to address use of these fines. The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to reduce Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not replace, existing services.

As previously reported, the first opportunity to use these funds for prompt services emerged when the Colorado Coalition for the Homeless (CCH) renovated a hotel to create "Fusion Studios," which comprises 182 single-unit residences for homeless individuals. In October 2019, the Fines Committee contributed $3.5 million to the "Restoration Housing" project (within Fusion Studios), in exchange for 28 dedicated residences for competence-involved individuals whom the Department refers, over the next five years. Currently, all of those units are filled by persons receiving competency services (or the few whose competency was resolved shortly after they moved in). The Department's FST continues to identify and refer potential candidates for the Restoration Housing project, which has become an important resource for those in the competency service system.

Other proposals for potential fines-funded projects—a competency court, diversion projects, an audit of jail-based behavioral services, a detailed data analysis of OBH competency services, improved OCRP competency curriculum, and a case manager for Restoration Housing—were paused in light of the COVID-19 pandemic. Although we will likely return to some of these projects within the next quarter (particularly competency court/docket and diversion proposals), our priorities for the past several quarters shifted to more time-sensitive projects focused on

alleviating the impact of the pandemic on competency-involved individuals.

Recent projects funded by the Fines Committee include:

- *CREST (COVID-19 Response Services Taskforce) housing:* This project provides $1.5 million dollars to the Colorado Coalition for the Homeless to provide emergency and interim housing for 25 individuals in the competency system, transferring from jails or CMHIP. Housing will be provided for up to two years, and assertive case management and other services will be afforded to participants. Given that most stakeholders identify the lack of housing as the most significant barrier to both community release and sustained community tenure, the Fines Committee has prioritized housing-related projects. Through Restoration Housing and CREST, fines funds have paid for 53 beds for the next several years, all dedicated to the Pretrial Detainee population. At this point, these are not filled to capacity, but we anticipate they will be within the next quarter.

- *A CREST (COVID-19 Response Services Taskforce) "Legal Advocate" position* has also been created and filled with an experienced attorney, who has now been working for almost five months. She advocates for the release of appropriate candidates at court and monitors their progress in both transition and in the community. She also explores systemic problems or challenges that can benefit from a legal expert, and helps other attorneys navigate the competency system in ways consistent with the goals of the Consent Decree. This position is based in Mental Health Colorado, so that the advocate is distinct from the Department. Since her start on October 1, 2020 she has assisted in many cases, helping avoid unnecessary inpatient hospitalization for restoration.

- *Private hospital contracts:* More than $3,000,000 in fines-generated funding has added 15 short-term beds at two local private hospitals for competency-involved individuals in need of emergency services (we anticipate an eventual total of $4,000,000 spending for this service as the pandemic continues). There was some recent revision to these contracts as Peakview Hospital was less able to provide services than originally promised, but Denver Health was able to increase capacity, and the project has fully launched. These emergency hospital beds allow more flexibility for people who need urgent, inpatient mental health care, and allow for much more nimble movement between community, jails, and hospitals, particularly amid pandemic-related logistical challenges.

- *Technology for ITP defendants:* Cell phones have been provided to persons in need of competency evaluations or restoration in the community. When COVID-19 precluded in-person evaluations and restoration sessions, many defendants did not have adequate access to video-enabled technology. Therefore, participation from some defendants was difficult, if not impossible. More than $50,000 has been used to purchase phones and the subsequent service packages to allow these individuals to more easily participate in evaluation and restoration services (thereby avoiding further delays). Fines continue to support some monthly service expenses to continue these.

- *Jail-based Restoration pilot program*:  The Denver Jail's mental health unit has developed a small pilot program to begin providing restoration services for defendants awaiting hospitalization at CMHIP. The DCJ has the largest segment of the competency-involved population, and the state's most robust jail-based mental health unit; it is the only jail that can authorize the use of involuntary medication. Mental health staff at the DCJ have documented the competency-related progress of several Pretrial Detainees, and they have created a proposal to offer enhanced restoration services to these individuals. Although the pilot program will not replicate the RISE program's approach of dedicated competency restoration staff, and we do not support a broader move towards full "jail-based restoration" we believe that this interim model of restoration services will benefit individuals who face lengthy waits for CMHIP, by initiating intensive treatment.

  The pilot restoration program launched this month (May) and as of May 21, nine of the twelve beds were full, providing psychiatric services to those awaiting transfer to CMHIP. It is likely that some of these individuals will be restored to competence, or greatly stabilized, by the time they would be transferred to CMHIP.

Several additional projects have been proposed for fines funding, and we anticipate awarding funding to some in the next quarter. The most promising, in our view, are diversion programs that propose to provide treatment and services to those with low-level charges even *before* competence is raised, ultimately diverting them from the competency system (and the criminal justice system more generally). We will provide updates on any funded programs in the next quarterly report.

## DECREE SECTION VII UPDATES

### CIVIL BED FREEZE

> 39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department removed the "civil bed freeze" as mandated by the Consent Decree. That is, they have *not* re-purposed the civil beds at CMHIFL for competence restoration, as they had proposed in 2018. Indeed, since the Consent Decree, the Department has been resolute in protecting civil beds, even amid forensic pressures. A small number of beds are occasionally used for competency services, when all parties agree doing so will improve efficiency and prompt or local care for detainees. As of their most recent report, the CMHIFL population included a total of 79 patients, 75 of whom were civil patients.[26]

The Department continues to renovate two CMHIFL units, which will add 44 forensic beds at the end of 2021. In addition, the new L2 unit at CMHIP opened in May 2021, which added 22 additional inpatient beds to CMHIP capacity. Moreover, these beds will likely provide immediate admission options, even with other units unable to accept admissions due to COVID-related protocols. Because it is a brand-new unit, there has been limited risk of outbreak or spread of the COVID-19 virus – thereby providing some admission capability at an especially critical time.

Civil inpatient capacity remains precariously low throughout Colorado. The Department must begin advocating for additional civil bed capacity in the near future. We (Special Masters) have partnered with the Department in exploring options for harnessing pandemic stimulus-type state funds to acquire and renovate existing facilities, fund capital construction, and contract with smaller properties throughout Colorado to expand civil inpatient capacity.

---

[26] According to the Department's April 2021 Special Master Compliance Plan report dated May 7, 2021 p. 36.

## COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department finalized a comprehensive, cohesive plan on February 27, 2020, in keeping with the Consent Decree. As we detailed in prior quarterly reports, the Department met routinely with stakeholders, and coordinated their work with the Governor's Blueprint Task Force subcommittee that is addressing competence-related issues. Crucially, the Department conceptualized competency-related services in a far broader way than they had in their December 2018 report. They detailed much of their progress to date, and remaining goals, all of which reflect a much more comprehensive, multi-faceted approach to the competency crisis, as compared to their earlier efforts. Unfortunately, certain aspects of the plan were paused when the pandemic began.

Regarding the required 2021 revision of the plan, you may recall our dilemma: a wholesale revision of the Comprehensive Plan seemed impractical in light of the current focus on a pandemic response. Therefore, as memorialized in our December 26, 2020 letter to the Court (and your subsequent approval of the plan), all parties agreed on a procedure in which the Department would prepare an interim plan that is more specific to the pandemic-related challenges in the immediate future. As you know, they formally submitted on March 1 that interim plan that detailed their plans for competency-related services amid the pandemic. We considered the plan reasonable and detailed, particularly in light of current circumstances.

The Department's next step, per the revised agreement, is to prepare the prescribed annual revision of the Comprehensive Plan and submit it by September of 2021, when we anticipate the harshest impact of the pandemic will have subsided, allowing for a broader focus to the Comprehensive Plan. At this point, we anticipate much of that Comprehensive Plan may need to address ways to ameliorate the damage the pandemic has done to competency services; for example, the document will likely address plans to reduce the wait list (and wait times) that have grown during the pandemic. But the Comprehensive Plan will also need to take a broad vision of adjacent and "upstream" strategies (such as diversion) that can reduce the overall competency-involved population. Though these have always been an aspect of the Department's planning, they were (understandably) de-prioritized during the pandemic, and will need to take higher priority.

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's formal outpatient competency restoration program (OCRP) began in March of 2018. Referrals for outpatient restoration ranged from 55 to 61 defendants per month during this past quarter.[27]  This figure represents a consistently high number of referrals, relative to most previous quarters. Approximately 450 individuals participate in Colorado OCRP at any one point, and we are pleased to continue to report *there remains no waitlist for OCRP services*. We commend the Department on building sufficient outpatient restoration capacity. Colorado's OCRP continues to be the largest, most robust statewide OCRP program in the country.

*OCRP data systems*
As we always emphasize, data collection and analysis for OCRP is critical. It identifies markers for success and failure, provides areas for improvement, and allows for quality control with individual providers. The Department is tracking and reporting more robust and comprehensive data than ever before. There are a few gaps in data that persist, and we continue to discuss those areas with the Department and outside consultants.

The Department reports OCRP outcomes on a rolling annual basis. Data from May 2020 – April 2021 reveal a 25.2% restoration rate. This is lower than most OCRP restoration rates in other programs around the country. But case dismissals occur for 35.6% of cases, and an additional 14.7% have either had services stopped by the court for undefined reasons or have been found permanently incompetent (with charges dismissed). We consider the combination of these outcomes (restored, case dismissals, etc.) as largely positive, and are pleased that they comprise 75% of all outcomes. On the other hand, approximately 23.5% of participants have been hospitalized. Arrest rates and rates of total non-compliance or missing participants are not reported. We consider the 23.5% hospitalization rate as a "negative" outcome in the sense that the OCRP was not able to divert a potential patient away from CMHIP. Nevertheless, the 23.5% rate is not substantially different than rates in other states' programs; some defendants with psychiatric illness will inevitably require hospitalization. Most recently, however, hospitalization rates have increased substantially (52% of all outcomes reported in April 2021), suggesting that community treatment may be increasingly difficult amid the pandemic. We will monitor these changing rates to determine if they reflect a short-term anomaly or a longer-term trend, and will work with the Department to investigate root causes and solutions.

*Other OCRP developments*
OBH has continued to work with the 17 CMHCs around Colorado to provide most OCR services

---

[27] All data in this section retrieved from the April 2021 Department's Special Master Compliance Plan report, dated May 7, 2021, pp. 40-46.

(though they retain contracts with some private providers). As previously reported, this move allows OBH to guarantee capacity for defendants, provide uniform restoration efforts, and provide defendants with one location for competency, mental health, and psychosocial services. OBH continues to train CMHC staff about OCRP practices and related case management strategies. The Department anticipates that most OCR participants will be served by the CMHCs by summer 2021.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide 15 inpatient beds for short-term competency-related services. These beds are currently filled. The Department contracts with two providers, Peak View Behavioral Health in Colorado Springs (5 beds) and Denver Health (10 beds). These overflow beds have proven especially critical in light of long pauses in admission to CMHIP.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period of available data (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. That is, we identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration. We remain satisfied with the benchmark of 40% of all competency restoration orders, and we consider it a natural ceiling for referrals appropriate to OCR. Although this ceiling cannot be determined with certainty, we believe that 40% is a reasonable figure—certainly higher than any other state of which we are aware—and that other benchmarks may indeed be more relevant going forward. Still, we report progress towards that 40% OCR rate below:

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| May 1, 2021 goal | 60% maximum | 40% minimum |
| Recent progress (past 6 months) | Nov 1, 2020 – May 1, 2021: 62% | Nov 1, 2020 – May 1, 2021: 38% |
| Note: All percentages rounded to nearest 1%. | | |

The Department has largely maintained the progress attained between November 2020 and May 2021 and generally met benchmark goals. A total of 38% of all restoration orders were to outpatient restoration between November 2020 and May 2021, with recent decreases in March and April.

As mentioned in our previous quarterly report, we have requested that the Department provide a secondary analysis of OCR referrals. In the summer of 2020, we began specifically monitoring the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations). This is the population that the Consent Decree addresses. We used initial data to calculate a six-month baseline of referral rates specific to this population: i.e., defendants evaluated in jail and ordered to OCR. That baseline was 20%. Following the original model of the Consent Decree, we expect a quarterly 10% increase for the subsequent six-month period (January 2021 – June 2021) resulting in a goal of 24%, on average, for that period.

Unfortunately, the Department has consistently reported much lower monthly proportions than was estimated based on the 6-month historical figure of 20%. The current figure, reflecting six months' worth of data between October 2020 – March 2021 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates an 11.9% OCR rate from all evaluations conducted in jails. Monthly averages dipped as low as 6.6% in November 2020 and 7.9% in February 2021. Clearly this falls well below the goal.

We caution that this data is still preliminary and may be unduly influenced by the pandemic. Evaluators have conducted far more evaluations via video, and may be hesitant to recommend OCR for these cases. Still, we ask the Department to maintain this database so that we can see longer-term trends into 2021 and as the pandemic begins to subside. Any proportion of defendants in jail that are diverted to the community saves a bed at CMHIP, and we remain keenly interested in this proportion. If the 20+% figure seems unrealistic as more normal post-pandemic evaluation procedures resume, we may adjust the expected base rates. Still, we

believe that the Department should maintain a healthy proportion of pretrial detainees ordered to OCR, and we believe that with good assessment (and continued success of OCR services) that proportion can increase over time.

## CONCLUSION

For the first year following the Consent Decree, the Department made significant and meaningful progress in enacting changes. There has now been ample time to see several key interventions prescribed by the Consent Decree (e.g., the triage system, the Forensic Support Team) substantially improve competency services and reduce harm among pretrial detainees in Colorado. However, the COVID-19 pandemic has halted some of that progress, and it has created new challenges. As the pandemic has persisted, wait times and the number of persons on the waitlist has grown considerably, and the number of pretrial detainees designated as *Individual Special Circumstances* often exceeds those who are not. This quarter (like last one) appeared to feature the pandemic's harshest impact on competency services yet, pausing CMHIP admissions again, after an earlier pause during winter. Both of these substantially increased wait times for restoration services.

At the same time, there appears to be some very recent progress: the Denver Jail now allows for more access, and the Department's Court Services have just recently been able to accomplish timely evaluations without designating anyone ISC. Efforts by the Forensic Services Team and the Outpatient Competency Restoration Program have remained robust.

Of course, the pandemic will continue to slow progress for many more months, particularly given the frequent, ongoing COVID-19 infections at CMHIP, which prompt quarantine procedures that delay admissions. We will continue to work with the Department on the Consent Decree goals and efforts to mitigate the challenges from the pandemic, and we encourage you to contact us with any questions or requests. As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW


Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

APPENDIX A



Groundswell Services, Inc.

May 24, 2021

Velton Showell IV, MPH
Charles Howsare, MD, MPH
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246

We are writing in our role as the Special Masters in the Case No 1:11 cv-02285-NYW, appointed by the Honorable Judge Nina Y. Wang from the United States District Court for the District of Colorado.  As court-appointed Special Masters in this case, we operate with court-authorized discretion to oversee the transformation of the competency to proceed ("CTP") service system in Colorado.

Competency to proceed is a legal concept, codified in statute, that ensures that all persons accused of a crime can understand, and assist their attorney in, the criminal proceedings against them. In short, if a defendant cannot understand legal proceedings due to severe mental illness, the defendant will be adjudicated as incompetent to proceed ("ITP") and ordered to competency restoration services. Historically, competency restoration services were offered solely at the Colorado Mental Health Institute – Pueblo ("CMHIP"); even today most defendants are ordered to competency restoration at CMHIP when alternative options are not appropriate. Unfortunately, due to limited capacity at CMHIP, many defendants ordered to inpatient restoration faced long waits in county jails prior to admission.  Some of them endured severe physical and mental injuries while waiting, because untreated psychiatric illness can lead to them refusing to eat or attend to basic self-care, committing serious self-injury or suicide, or even harming to others due to their psychiatric symptoms.

In April 2019, both parties named in the case (Disability Law Center or "DLC" and the Colorado Department of Human Services or "CDHS") agreed through mediation to a signed Consent

Decree to address the problem of severely mentally ill individuals waiting too long for admission to CMHIP. In short, the Consent Decree outlined new expectations and mandates for individuals in Colorado's competency services system. The intent of the Consent Decree is essentially to: 1) reduce the *number* of pretrial detainees who are waiting in county jails pending admission to CMHIP, 2) reduce the *time* that pretrial detainees wait before admission to CMHIP, and 3) reduce the *suffering or harm* pretrial detainees endure while awaiting admission.

From April 2019 to June 2020, there was substantial progress in meeting the goals of the Consent Decree. The numbers of people waiting in jails for inpatient restoration decreased, the average time spent waiting decreased, and suffering was greatly reduced. However, the onset and impact of the COVID-19 pandemic in 2020 shifted priorities and options for CDHS and CMHIP.  Infection rates and infection-mitigation efforts slowed CMHIP admissions drastically, leading to a complete stop in admissions from mid-November to mid-December 2020. This increased the number of people waiting from 124 at the end of October 2020 to 189 at the end of December 2020. Most recently, another extended pause in admissions has lasted from early April 2021 to present, such that now the number of people waiting has more than doubled, to 308. Average wait times have also increased significantly, and the longest wait times have increased to more than 200 days and counting. Because inpatient restoration requires an average turnaround time of around 90-120 days, and because the number of defendants ordered for inpatient restoration has hit record highs for several months running, we see wait lists and wait times increasing exponentially throughout 2021, even if pandemic-related restrictions ended immediately. In short, due to the restricted admissions to CMHIP from October 2020 to the present, the waitlist has more than doubled, as have wait times. *Twice as many people with severe mental illness in jails are awaiting admission to CMHIP, and they are waiting twice as long.*

We recognize the challenge in balancing different public health priorities, and we fully support Colorado's efforts to mitigate the impact of COVID-19. We have *no* doubt that stringent public health protocols are necessary, and we are grateful for your work in mandating these.

At the same time, we are also keenly aware of the simultaneous public health crisis among pretrial detainees with serious psychiatric illness in jails across Colorado. These pretrial detainees have been repeatedly evaluated by psychologists and psychiatrists, identified as needing urgent inpatient hospital care, and ordered by courts to be admitted within 35 days.  But wait times for many of them now exceed six months, as CMHIP quarantine procedures have led to reduced admissions or lengthy halts in admissions. These acutely, severely psychiatrically ill individuals are left in jails without access to the care they need and that judges have ordered them to receive promptly.

Consider the practical consequences of these delays: some individuals have such severe psychiatric illness that, acting on acute symptoms, they have covered themselves with urine and/or feces, eaten feces, cut or mutilated themselves, refused to shower for weeks, refused to eat for days, attempted suicide, and at times been victimized or injured by staff or other

inmates. Some have also attacked staff or other inmates, when acting on paranoid delusions or hallucinations that are symptoms of their untreated psychotic illness.

Please understand that untreated psychosis is life-threatening illness with mortality rates around 7%. Even the majority that survive untreated psychosis face serious cognitive damage and become increasingly refractory to treatment (when it is eventually received) the longer they wait for treatment via antipsychotic medication. This, too, is a grave public health crisis.

Many of these individuals need *urgent* inpatient mental health care. With CMHIP unable to admit, safe and reasonable options are virtually non-existent. Forced medications are not allowed in most county jails. Private hospital beds (contracted by CDHS at extra expense) are all full; other private hospitals refuse to admit these individuals citing safety concerns for staff and other patients. In-jail mental health resources are wholly inadequate, hence the court orders for inpatient treatment. In short, untreated psychosis is a serious public health crisis in Colorado jails, exacerbated by the lengthy delays in admission to CMHIP.

We acknowledge and affirm the efforts that CDHS has made to try to monitor and intervene with those suffering while they await inpatient admission. We believe these efforts and proposals for altered admission protocols are reasonable responses to COVID-related challenges. However, without inpatient admissions, these mitigation efforts are simply insufficient for those with severe psychotic symptoms. Of course, Colorado is not the only state facing hospital-admission delays due to COVID-infection-mitigation precautions. But we have also spoken with many state hospitals that are able to strike a balance between COVID-infection-prevention efforts and the need for urgent admissions; these hospitals have not paused admissions.

We urge CDPH&E to reconsider policies and protocols for admissions to CMHIP so that admissions can resume. Again, we recognize that public safety precautions are absolutely essential, and certainly do not suggest ending precautions. But we do urge greater flexibility or creativity in how some of these are mandated. Perhaps CMHIP admissions might occur directly to treatment units, cohort sizes increase, quarantine times reduce, or greater vaccination for pretrial detainees occur. Perhaps CDHS medical staff could administer vaccines within county jails, or vaccinations of CMHIP staff could become mandatory. We suspect there are *many* potential strategies—and that your team understands them better than we do. *But, regardless of the specific mechanisms or changes employed, we recommend safety precautions that allow CMHIP admissions to resume*. Without substantial admissions to CMHIP, we foresee serious injury and/or death occurring within this population of severely, acutely ill people who have been court-ordered to treatment at CMHIP. We affirm CMHIP's efforts to admit patients in stringent COVID-related restrictions, but we also beg you to consider restrictions that respect safety but allow for greater opportunity for admissions.  In short, we ask that along with your very important efforts to limit the spread of COVID-19, you also prioritize the very real public health crisis among pretrial detainees with untreated psychosis, who are facing real harm as they await admission to CMHIP.

Thank you for your attention and consideration of these issues.  If we can provide any further information or clarification, we would be happy to discuss this with you further at your convenience.

Neil Gowensmith, PhD

Daniel Murrie, Ph.D.

Special Masters, Case No. 1:11 cv-02885-NYW