

Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

November 28, 2023

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

November 28, 2023

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our November 2023 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW.  As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness.  Specifically, the Consent Decree (p. 24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree.  The Department initiated these steps and demonstrated meaningful progress.  Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

But, as you know, the onset of the COVID-19 pandemic in the spring of 2020, brought the Department unforeseeable challenges and their progress stalled.  COVID-related complications slowed Department progress on most metrics, and put simply, all metrics moved in the wrong direction.  The list of detainees waiting for transfer to the state hospitals for inpatient

competence restoration services, and their wait times, all increased.  Not all problems were attributable *solely* to the COVID pandemic.  Rather, the pandemic also revealed underlying system weaknesses and greatly exacerbated some longstanding challenges (e.g., hospital staffing).  Even as the pandemic has waned, many setbacks remained.  In particular, the Department has faced tremendous difficulties staffing their facilities, which left unused hospital units, and less capacity to serve the people in jail awaiting transfer and treatment in those units.

However, *this quarter has featured the first sustained pause—perhaps even the first reversal—of many of these trends*.  As staffing began to improve during the prior quarters, additional hospital units opened this quarter, moving more people from the waitlist to inpatient beds.  After years of steady increases, there has been a plateau. The number of people awaiting inpatient restoration at the end of this quarter (n=427) is *lower* than the previous quarter's average (n=456).  The Department's recent budget requests to the Governor's office (described later) will likely yield additional inpatient beds.  Perhaps more than at any other point since the pandemic, there is reason to anticipate a decreasing waitlist.

At the same time, the situation remains dire.  The patients whom the Department does admit to hospitals have experienced some of the longest wait times of any since the Consent Decree began.  And even with the Department's progress opening inpatient beds, it remains clear that Colorado's "competency crisis," is not something the Department can solve alone.  They must continue efforts with other stakeholders to enact legislation and strategies that decrease orders for competence evaluation and restoration, prioritizing mental health treatment over competence restoration.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

# TABLE OF CONTENTS

CONTEXT for QUARTERLY METRICS .................................................................................................. 5

KEY METRICS FOR PROGRESS: ................................................................................................... 10

COMPLIANCE WITH TIME FRAME REQUIREMENTS ................................................................... 10
    KEY METRIC: COMPETENCE EVALUATION TIME FRAMES ..................................................... 11
    KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION .................... 13
    KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES ............................ 16

CONSENT DECREE SECTION VI UPDATES ...................................................................................... 19
    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION
    TREATMENT ......................................................................................................................... 19
        Wait Times for Inpatient Evaluation .............................................................................. 20
        Wait Times for Inpatient Restoration ............................................................................ 22
    INTERIM JAIL MENTAL HEALTH TREATMENT ....................................................................... 26
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT .................. 28
    TRANSPORTATION OF PRETRIAL DETAINEES ....................................................................... 30
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ................................................. 31

DECREE SECTION VII UPDATES ................................................................................................... 34
    CIVIL BED FREEZE ................................................................................................................ 34
    COMPREHENSIVE AND COHESIVE PLAN ............................................................................. 36
    INCREASE COMMUNITY RESTORATION SERVICES ................................................................ 40

CONCLUSION ............................................................................................................................ 43

APPENDIX 1 .............................................................................................................................. 44

APPENDIX 2 .............................................................................................................................. 45

APPENDIX 3 .............................................................................................................................. 45

# CONTEXT for QUARTERLY METRICS

*Review of Historic Context:*

As you recall, longstanding vulnerabilities in Colorado's public mental health system set the stage for the current "competency crisis."  For many years preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have.  Colorado also had an unusual community mental health system that—unlike most other states—was able to operate selectively, routinely declining services to those involved in the criminal legal system.  Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the United States.  Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, which would inevitably be vulnerable if a larger crisis struck.

Amid these systemic vulnerabilities—and amid the escalating referrals for competence evaluation and restoration services—the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting.  The Consent Decree filed March 15, 2019 was an effort to resolve this lengthy litigation, and it prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado.  The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree.  As you know, we tend to summarize the overall spirit and provisions of the Consent Decree in three goals:

   a) Reducing the *number* of people on the waitlist for competence restoration services,
   b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and
   c) Reducing *harm* (by providing *care*) to people on the waitlist.

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020.  The number of detainees on the waitlist had finally dropped below 100.  But as the pandemic persisted, the waitlist grew as the Department could not keep pace with court orders for competency services.  At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically.  Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions.  For almost two years, over 80 beds[1] at CMHHiP remained unused because there were not sufficient staff to operate the units.  The waitlist grew to include over 460 people.[2]

---

[1] This figure has varied a bit, but for over one year, over 80 beds remained unusable.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Pretrial Detainees. Ultimately, Governor Polis (at the Department's urging) and the Joint Budget Commission approved in early 2022 approximately $30 million in emergency funding to secure 64 additional private psychiatric beds to temporarily address the record demand for restoration services. More recent legislation devoted $60 million to fund another 96 beds through 2023.  The Department continued to pay a premium for emergency treatment beds, while some of their own CMHHiP treatment beds remained unused because they lacked staff. But over the past several months, the Department has begun to open new units (at CMHHiFL) and reopen other units (at CMHHiP) that were closed for over one year.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs.  Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions.  Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—are facing waiting times that *far* exceed those permitted by the Consent Decree.  Indeed, even Tier 1 defendants wait *over four months* on average (roughly 18 times the permissible wait).

*Progress towards the third goal*—providing care for those waiting—continues even amid significant barriers.  The Department's Forensic Support Team (FST) still works to monitor detainees and provide care while these detainees await hospitalization.  The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond.  Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

*Recent Context:*

Over the past few years, the Department worked with stakeholders to pass legislation and secure funds from Colorado's portion of the American Rescue Plan Act (ARPA).  Although passed many months ago (and addressed in prior Quarterly Reports), many of initiatives have begun providing services, or are nearly ready to do so. One that has already altered the waitlist is the launch of the first Mental Health Transitional Living Home (MHTL).   Among these key initiatives are:

| *Initiatives:* | *Action:* |
| --- | --- |

---

[2] For example, the waitlist appeared to peak at 464 people at the end of May 2023, and  was still 459 at the end of July 2023.  But by the end of October 2023, the Department reported a waitlist of 427 people, and by November 23, 2023 it had decreased to 421.

| | |
|---|---|
| $65 million in ARPA funding to launch 125 beds in group homes and an additional 16 beds at CMHHIFL. | The Department reviewed proposals for group homes and has awarded some contracts. The first group home, operated by Department, has now opened to patients (and accepted many who had been hard to discharge from the hospital). |
| $62 million to support grants for early intervention, deflection, and redirection from the criminal justice system among those with psychiatric illness. | The Department has reviewed proposals and awarded grants.  None of these programs have begun operating to the degree that it would be possible to gauge their impact. |
| $61 million to improve Colorado's clinical workforce, particularly addressing the shortage of nurses. | The Department has adjusted salaries and bonuses to enhance recruitment and retention. These strategies have clearly improved staffing, with far more hires this year than last year. |
| $60 million to support contracts for 96 additional private psychiatric hospital beds through December of 2023 | These private hospitals are providing crucial inpatient services for the competency population. The contracted beds remain used to nearly their full capacity. |
| $1 million to support "pre-restoration" and psychiatric services in certain large jails | The Department has been providing these pre-restoration services for months, and we anticipate outcome data to demonstrate effects on length of stay and other metrics. |
| New legislation to limit inpatient restoration, among those with only misdemeanor charges, to those who meet emergency hospitalization criteria (those who do not must be ordered to outpatient restoration). | CRS 16-8.5-111 allows for the dismissal of a misdemeanor charge and civil commitment among ITP defendants.  Other legislation (HB22-1386) requires outpatient restoration as the default approach for defendants with only misdemeanor charges unless they meet commitment criteria. |

All these developments reflect movement towards some of the broader and more comprehensive steps that Colorado needs to take across the continuum of competency services: from diversion and deflection at the entry points to more restoration beds at the later points.

The Department has continued to cultivate collaborations with other stakeholders, because *all*

*parties agree that the Department cannot solve the competency crisis alone.* Although certain key services (e.g., evaluation quality, inpatient beds) are solely within the Department's control, many of the primary drivers of the competency crisis—such as the arrests of unhoused people with mental illness—are well outside of Department control. The Department has continued to:

- Convene the Judicial Taskforce with judges eager to help solve the competency crisis.
- Convene the multidisciplinary "Consent Decree Steering Committee" to meet with all parties (Department, DLC, and Special Master, as well as a national consultant) every other month, and address potential collaborative solutions.
- Support the Denver Competency Docket, led by two judges who are knowledgeable and motivated regarding competency matters.
- Pursue solutions that better divert people with serious mental illness into community (civil) treatment rather than defaulting to the competency mechanism for forensic treatment.

These efforts reflect what the Department is learning from emerging, innovative practices in other states. For example, a team from the Department, Special Masters, DLC, and other Colorado stakeholders visited New York City this quarter (November) to learn from a variety of strategies, including Mayor Adams' initiative to promote treatment of unhoused persons with serious mental illness.

Of course, many of these strategies require a more robust community mental health system and, as we've emphasized before, this is an historic weakness for Colorado. The Department anticipates a transition towards a Behavioral Health Administration system, a new cabinet-level agency, housed within the Department of Human Services, designed to be the single entity responsible for coordination and collaboration across state agencies to address behavioral health needs. This transition includes many promises relevant to the competency population: a true "safety net" to ensure mental health services for all who need them, decreasing opportunities to deny services to certain populations. A BHA *should* benefit the competency population, and even ultimately reduce the number of people entering competency services, if the BHS indeed creates significantly more access and availability of community mental health resources. But, at best, the impact of these changes is likely two years away. Worse, this year has featured many departures from BHA leadership, among other struggles within the BHA, which will almost certainly delay any potential reforms even further.

### This Quarter

A highlight of the *prior* quarter was the opening of 39 previously closed beds at CMHHiP. This reflected substantial progress in addressing the staffing crisis, and it substantially decreased the overall number of unused restoration beds. This quarter, the Department continued the same trend. Specifically, they opened the second new 22-bed unit at CMHHiFL in early November. They expanded the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds. Further, they began to transition some long-term patients into a newly opened Mental Health Transitional Living (MHTL) home. Overall, the Department that long had over 80 unused beds

now has roughly 56 unused beds.  Consequently, the Department was able to admit many more detainees than in previous quarters, and *the overall number of persons on the waitlist has steadily declined for three consecutive months – the first time this has occurred since the beginning of the pandemic.*[3]

---

### Recent Budget Requests may Lead to Greater Inpatient Capacity

The Department shared their very recent (November 2023) budget request to the Governor's office.  Their ambitious request includes $58 million supplemental for FY 2023-24, $75 million and 3.4 FTE in FY 2024-25, and $70 million and 3.4 FTE in FY 2025-26.  The Department reasoned that providing the funding will allow them to make a total of 162 additional inpatient beds available by increasing restoration beds at private hospitals, and opening three additional forensic units with 82 beds at the Mental Health Hospitals (MHHs) that have been closed or delayed because of understaffing.  For FY 2023-24 this includes: maintaining the 61 beds at private hospitals and adding 19 more beds before the end of the fiscal year;  staffing and re-opening 82 beds in certain forensic units at CMHHIP, then staffing and opening the new F3 forensic unit at CMHHIFL by the end of 2023.  The request also increases staffing to comply with rigorous staffing recommendations provided to the Department.

While inpatient beds are certainly not the *only* strategy needed, they are an *essential* part of the solution.  The Department's recent budget request (if granted and executed as described) would reflect the largest increase to inpatient capacity in recent history, addressing the tremendous needs we have described over the past few years.  In short, the budget request has the potential to continue this quarter's decrease in the waitlist.

---

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

---

[3] Indeed, on the date of this writing (November 22, 2023), the waitlist has decreased to 421, the lowest point in 2023.

# KEY METRICS FOR PROGRESS:

# COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

(i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)

(ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree.  This includes both time frames for competence *evaluation* and for competence *restoration*.  These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus.  Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC: COMPETENCE EVALUATION TIME FRAMES

Historically, the Department met evaluation time frames, even before the 2019 Consent Decree and through most of the pandemic.  After staffing shortages caused delays during some of 2020, the Department returned to almost complete compliance with time frames.  Court orders for jail-based competence evaluations had dropped to an all-time monthly low during the Spring of 2020 (e.g., 56 people in April 2020), with the onset of the COVID-19 pandemic.  But arrests and orders for jail-based evaluations resumed dramatically peaking at an all-time monthly high two years after the pandemic began (i.e., 178 in March of 2022). Though court orders for evaluations decreased after that all-time-high, they have been increasing again, averaging *131 per month this past quarter*, an increase from the 119 average last quarter.

| *Average waiting time (in days) for a competence evaluation*[4] | | | | |
|---|---|---|---|---|
| | May 23 - Jul 23 | Aug 2023 | Sep 2023 | Oct 2023 | Requirement |
| Jail-based Competency Evaluations | 23.9* | 14* | 12.1 | 10.7 | 21 days |
| Inpatient Competency Evaluations | 3 | 72*** | 237*** | 5 | 14 days |

\* = at least one defendant waited longer than the maximum time frame for the evaluation
\*\* = most defendants waited longer than the maximum time frame for the evaluation
\*\*\* = all defendants waited longer than the maximum time frame for the evaluation

Even with a high volume of court orders the Department's Court Services unit has generally remained responsive and efficient, maintaining 99% compliance with timelines for most of the past year. *Last quarter (May, June, July) was an exception,* as the Department approached budget constraints, and responded by pausing their use of contracted forensic evaluators. However, with the start of the new fiscal year, the Department resumed use of contractors, and also resumed their pattern of timely evaluations for defendants waiting in jail. This quarter, they maintained their usual timely performance, aided by contracted evaluators, even amid increased court orders for these jail-based evaluations.

The situation for inpatient evaluations, however, remains similar across the past few years. There have been very few orders for inpatient competence evaluations (i.e., only 8 this quarter).

---

[4] Information retrieved from the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, pp. 22-23, 37.

*None* of these were admitted for evaluation.  All were resolved in other ways, though not necessarily within the 21-day timeframe.  Given the delays in admissions to CMHHiP, these evaluations have virtually *never* occurred on time since the onset of the pandemic.  Indeed, they rarely occur at all; no one has been admitted for an inpatient evaluation in the past year.

Orders for *jail-based* evaluations gradually increased.  Court Services continues to keep pace amid the challenges, having quickly recovered from the delays that occurred during the prior quarter's budget shortfall. For the few detainees ordered to inpatient evaluation, the Department has consistently resolved the orders without admission to CMHHiP or CMHHiFL, but will need to find ways to resolve them more promptly.

## KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:*  Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree.  In the months preceding the Triage system, defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE waited, on average, 71 days.[5]  This figure included all defendants referred for restoration, without distinguishing those with more, versus less, acute needs.  Then the Department launched on June 1, 2019 the Consent Decree-mandated triage system,[6] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2").  Tier 1 defendants must receive services within 7 days of the competency hearing; Tier 2 defendants must receive services within 28 days.  Upon initiating the Triage system, the Department initially maintained *excellent* adherence to the 7-day deadline for Tier 1 for several months.  The wait times for Tier 2 defendants also improved, though still exceeding the time frames prescribed in the Consent Decree.  Wait times and the number on the waitlist were decreasing *until* the onset of the COVID-19 pandemic, but greatly increased thereafter.

*Current realities:* This quarter, both Tier 1 and Tier 2 wait times for inpatient restoration again remained far beyond mandated time frames.  Of those admitted, *Tier 1 defendants waited an average of 128 days prior to admission while Tier 2 defendants waited 138 days. Both wait times remain far beyond acceptable time frames*, as reflected in the following table:

| *Average Wait Times for Inpatient Competence Restoration Services[7]* | | | | | |
|---|---|---|---|---|---|
| | May 2023 - Jul 2023 | Aug 2023 | Sep 2023 | Oct 2023 | July 2021 Requirement |
| Tier 1 | 109.1** | 131.9*** | 103.4*** | 124.9*** | 7 days |
| Tier 2 | 131.5** | 134.9** | 121.7** | 156.6** | 28 days |

** = most defendants waited longer than maximum time frame for restoration services
*** = ALL defendants waited longer than maximum time frame for restoration services

---

[5] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p. 7 of their April monthly report filed May 7, 2019).

[6] See Consent Decree paragraph 43.

[7] Information retrieved from the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 12.

Pretrial Detainees are all still waiting far longer than Consent-Decree time frames allow:

- Tier 1 detainees wait more than *18 times longer than allowed* by the Consent Decree (i.e., 128 days on average between August – October 2023, rather than 7 days).
- Tier 2 Detainees wait nearly *5 times longer than allowed* by the Consent Decree (i.e., 138 days on average between August – October 2023, rather than 28 days).

The Tier 1 wait times *are the longest average on record* and are wildly out of compliance. Recall that Tier 1 defendants are those that the Department has indicated are the most acutely ill and/or vulnerable and need the most urgent admissions. By any measure, these defendants are typically waiting far longer than they should be. While we are pleased that more Tier 1 defendants were admitted this quarter than in the past quarter, the wait times to admission remain totally unacceptable.

We note that as more Detainees are admitted, the average length of time spent waiting may be higher as the "backlog" of persons waiting is cleared out.  Mathematically, as those longest-waiting defendants are finally admitted, the average length of time to admission (which is not calculated until the admission occurs) will increase accordingly.

More positively, *there were more admissions for both Tier 1 and Tier 2 Detainees this quarter than nearly all other quarters this past year*.  The number of Tier 1 Detainees waiting for admission at the end of October 2023 is far lower than any other month during the past year, reflecting those strong admission numbers (which reflect newly opened hospital units).  We anticipate that the average wait times will decrease as these "longest waiting Detainees" are admitted.  Still, despite these encouraging trends, current wait times remain well beyond acceptable by any measure.

The following table illustrates how wait times for inpatient restoration have remained far out of compliance for the past year, with Tier 1 wait times at an historic high and trending in the wrong direction:

| *Average Wait Times for Inpatient Competence Restoration Services[8]* | | | | |
|---|---|---|---|---|
| | Nov 22 – Jan 23 | Feb – Apr 23 | May – Jul 23 | Aug – Oct 23 |
| Tier 1 | 81.1 | 84.2 | 109.1 | 128.3 |
| Tier 2 | 131.4 | 140.2 | 131.5 | 138 |

[8] Information retrieved from the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 12.

The Department remained *almost always out of compliance* regarding restoration time frames. Between August – October 2023, the Department was noncompliant with the 7-day time frame for *all 45* Tier 1 Detainees admitted.  Of the 277 Tier 2 Detainees admitted in that same period, 242 were admitted beyond their time frame of 28 days.  Overall, this reflects a meager 8.9% compliance rate – higher than last month's 6.9% compliance rate, but still far, far out of compliance.[9]

Several factors continue to contribute to these backlogs.  Many people are ordered to inpatient restoration rather than diverted from the competency system; too few people with mental illness receive adequate treatment in the community or in jails; and civil inpatient capacity remains woefully inadequate across Colorado.  Additionally, the Department has faced staffing shortages and construction delays at CMHHiP and CMHHiFL for more than a year. Although inpatient capacity is now increasing, the Department still has several beds at CMHHiP unavailable due to staffing shortages and other limitations (though the current figure of 55 is far better than the 80 to 100 that were closed over the prior year).  Both inpatient and community mental health care treatment options must continue to expand if the waitlist is to decrease.

The number of people awaiting restoration, and their wait times, remain unacceptable this quarter.  On average, *pretrial detainees now wait nearly five to eighteen times longer than Consent Decree time frames allow.  Further, only 9% were admitted within Consent Decree time frames*. Inpatient admissions must continue to occur at a rapid pace to decrease the time detainees spend on the waitlist.  The Department must address staffing shortages and open the CMHHiP units that remain closed.  The Department must also find immediate solutions so that Tier 1 individuals are admitted more promptly.

---

[9] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission.  Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for the actual need for urgent admission.

## KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services.  The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all.  In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants.  By June 2020, the number on the waitlist dropped below 100.  The Department projected that the waitlist would be minimal by December 2020, but the pandemic changed all projections.

*Current realities:*  Court orders for competency restoration have remained generally stable for the past year.  The past 12 months averaged 127 orders for inpatient restoration per month, with this past quarter averaging 131 per month.  However, the number of people awaiting inpatient restoration at the end of this quarter (n=427) is *lower* than the previous quarter's average (n=456).  *This shift is remarkable, in that waitlist has not only plateaued but—at least for one quarter—has begun to trend in the opposite direction.*

| *Number of Defendants Waiting for Inpatient Restoration[10]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | May – Jul 23 | Aug 2023 | Sep 2023 | Oct 2023 |
| Combined | 157 | 456 | 442 | 431 | 427 |
| Tier 1 | N/A | 55 | 47 | 45 | 35 |
| Tier 2 | N/A | 401 | 395 | 386 | 392 |

Figures reflect the number of persons waiting for restoration services on the last day of the respective month.

Indeed, prior to this quarter, the wait list had grown steadily for over one year, reaching an all-time peak of 467 as of August 2023.  However, during this past quarter the Department was able to reopen a 39-bed unit at CMHHiP, and they began to transition some long-term patients into the newly opened Mental Health Transitional Living (MHTL) homes. Consequently, the Department was able to admit many more detainees than in previous quarters, and *the overall number of persons on the waitlist has steadily declined for three consecutive months – the first time this has occurred since the beginning of the pandemic.[11]  This is crucial progress, and may reflect a much-needed turning point.*

---

[10] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 9.

[11] Indeed, on the date of this writing (November 22, 2023), the waitlist has decreased to 421. This represents the smallest number to date in 2023.

 Also for the first time in over one year, some acutely ill individuals have been admitted to a state hospital fairly rapidly – still beyond compliance, but far closer to compliance than in many months.  These are all encouraging signs of progress, after years of worsening delays.

The Department projects that the waitlist should continue to decrease as more hospital beds are expected to reopen in December, jail-based restoration programs increase their bed utilization, and more MHTL homes and beds become available.  Indeed, they project that the waitlist will drop below 400 in early 2024, representing a decrease in more than 70 people over a 4-5 month period.  We are cautiously optimistic, given the progress this past quarter.

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month[12]* | |
|---|---|
| November 2022 | 431 |
| December 2022 | 412 |
| January 2023 | 439 |
| February 2023 | 464 |
| March 2023 | 439 |
| April 2023 | 448 |
| May 2023 | 464 |
| June 2023 | 445 |
| July 2023 | 459 |
| August 2023 | 442 |
| September 2023 | 431 |
| October 2023 | 427 |

---

[12] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 9.

*Qualitative review and extraordinary cases:* Of course, the waitlist is not simply a number.  It is a group of *people* with psychiatric illness awaiting critical treatment.  Each week, we review the documented updates on each person in jail who has been waiting for inpatient restoration longer than their time frames allow.  In that review, we see dozens of acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability (living in cells soiled with urine or feces, neglecting hygiene, not eating, experiencing serious medical conditions, and so on) or who languish with acute symptoms of inadequately managed psychosis.  One man was admitted to a local medical hospital after a prolonged period of negligence regarding his diabetes; his legs were so deteriorated and infected upon admission that amputation was considered.  Several Detainees were assaulted by other inmates or received new criminal charges while on the waitlist. Although the Department typically prioritizes the most acutely ill individuals for admission, most admissions occur far beyond mandated time frames.  Most psychiatrically ill people have waited months for admission, and only a fraction have been placed into the state hospitals for restoration and emergency intervention.

The number of people waiting in jails for restoration services decreased this quarter, down from an all-time high at the end of last quarter.  This quarter, the total number of people on the waitlist declined for three consecutive months, which has not occurred for more than two years. This suggests promising progress.  At the same time, the waitlist is still more than twice as long as compared to the start of the Consent Decree, and it includes many people in acute psychiatric crisis and vulnerable to self-harm, injury, violence, or suicide.  As we mention each quarter, without inpatient admissions resuming fully and continuing steadily, the waitlist cannot decrease, and those with severe psychiatric illness will continue waiting far longer than appropriate.

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[13] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment. The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribed the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations.[14] Admission time frames were longer at the start of the Consent Decree (June 1, 2019), but shortened every six months, with the final reduction in July 2021, establishing the current and ongoing time frames.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 and onward | 7 days | 28 days | 14 days | 21 days |

---

[13] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo competence-related services (i.e., competence evaluation or restoration treatment). Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[14] Fine amounts are tied to delays beyond each of the time frames listed. However, these fines are not applied for Pretrial Detainees designated ISC.

## Wait Times for Inpatient Evaluation

Inpatient evaluations have always been quite rare compared to the common practice of evaluating a defendant in jail.  Historically, judges typically ordered inpatient evaluation only when defendants appeared severely ill and in need of urgent admission (rather than waiting for an evaluation to determine whether they need admitted for restoration).  The Department was generally successful in timely admission for inpatient competence evaluations *before* the pandemic, but they have exceeded timeframes since the pandemic began.  The number of people *ordered* for an inpatient competence evaluation has remained quite low, and the number subsequently *admitted* upon order is even lower.  As in prior quarters, *none* were actually admitted to a hospital for inpatient evaluation; the orders for evaluation were always resolved in other ways.

| *Recent Wait Times for Inpatient Evaluations*[15] | | | |
|---|---|---|---|
| Month | People "admitted or ended" for inpatient evaluation[16] | Average days waited before "admitted or ended" | People who waited more than 14 days before "admitted or ended" |
| Aug 2023 | 4 (0 admitted) | 72 | 4*** |
| Sep 2023 | 3 (3 admitted) | 237.3 | 3*** |
| Oct 2023 | 1 (0 admitted) | 5 | 0 |
| May 23 - Jul 2023 | 1 (0 admitted) | n/a | 0 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\*\* = ALL defendants waited longer than maximum time frame for restoration services

"Admitted or ended" is the language used in the Department's reports to designate all ways these orders are resolved.  As the table shows, most orders for inpatient evaluation are *not* resolved with an actual inpatient evaluation, but through other means (such as dropped charges, ending or converting the order, etc.).

---

[15] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, (p. 22-23) as well as previous monthly Compliance Reports.

[16] This column reflects the number of Pretrial Detainees admitted to either CMHHIP or RISE for an inpatient competency evaluation, bonded out, or had their cases dismissed.  Recently, this figure has featured very few actually "admitted" and far more orders that were "ended" for other reasons.

Once again, the past quarter featured *no admissions* for inpatient evaluations.  Indeed, there were only two orders for inpatient evaluation all quarter, and all pending orders were resolved without admission.  This reflects the broader delays in CMHHiP admissions, discussed throughout this report.  These delays leave detainees waiting longer for inpatient evaluations than they did before the pandemic, so the Department often finds other ways to resolve inpatient evaluation orders (some are converted to outpatient orders; in other instances charges are dropped, or orders are resolved in other ways).

## Wait Times for Inpatient Restoration

Regarding wait times for inpatient *restoration* at CMHHiP, the Consent Decree established a two-tier triage system.  Defendants with the most urgent clinical needs (Tier 1) have an admission deadline of 7 days, while those with less urgent needs (Tier 2) have a deadline of 28 days.

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees*[17] | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Aug 2023 | 19 | 97 | 131.9 | 134.9 | 19*** | 82** |
| Sep 2023 | 11 | 87 | 103.4 | 121.7 | 11*** | 77** |
| Oct 2023 | 15 | 93 | 124.9 | 156.6 | 15*** | 83** |
| May 23 – Jul 23 (average) | 12 | 77.3 | 109.1 | 131.5 | 11.3** | 72.3** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\* = most defendants waited longer than maximum time frame for inpatient evaluation services
\*\*\* = ALL defendants waited longer than maximum time frame for restoration services

The waitlist remained well over 300 in 2022, nearly doubled from when the Consent Decree began, and has exceeded 400 for one year.  The number of Pretrial Detainees on the waitlist for inpatient restoration services reached an all-time high at the end of last quarter (467 as of August 2023) but is now at its lowest point of calendar year 2023 (i.e., 421 in November 2023).  With this substantial decrease, and a reasonable expectation that similar trends will continue, the Department estimates that the waitlist will be below 400 in January, for the first time in well over one year.

---

[17] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 12.

However, wait times remain exceedingly long, reaching five to eighteen times the prescribed Consent Decree time frames, as described in the earlier "Key Metrics" section.[18]  Although the number of people waiting in jail for inpatient restoration decreased during the past quarter, wait times for admission remain far beyond mandated time frames.  Approximately 91% of Detainees who were admitted exceeded their maximum allowable wait times in jail.  About 56 beds remain empty at CMHHiP (an improvement from the 80 to 100 unusable beds over the past year).  The three Jail-Based Restoration Programs and the contracted private hospital beds provide additional capacity, but they have been underutilized at times.

Average waiting times to admission far exceed the time frames mandated in the Consent Decree.  The number of people waiting for restoration services—and the time they spend waiting—are also unacceptable.  This quarter has shown a sustained decrease in the number of Detainees waiting, revealing the potential progress when units open (again).  The Department must continue efforts  to fully staff CMHHiP to make use of the empty restoration beds, increase utilization of the three jail-based restoration programs, fill community housing beds, and otherwise admit detainees more promptly.

---

[18] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community).  For example, among 322 "admitted or ended" between August and October 2023, only 216 defendants were actually admitted to an inpatient facility.  The other 106 people were either dismissed, vacated, or released on bond.

## PERFORMANCE OF JAIL-BASED COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

*Historical context:* Timely competence evaluations were a relative strength of the Department until around November 2019, when performance deteriorated substantially. Many jail-based evaluations then exceeded the 28-day time frame—reaching peak delays in January 2020 (46% delayed). Even through much of Spring 2020, roughly 30% of jail-based evaluations exceeded the 28-day time frame. During the summer of 2020, referrals for jail-based evaluations again began to increase towards prior levels. At the same time, the Department improved Court Services. They hired new leaders, evaluators, and contractors, increased compensation, and prioritized jail-based evaluations. In short, Court Services underwent dramatic improvements sufficient to handle the increasing court orders and challenges they have faced.

*Recent history:* As Court Services improved, far fewer Pretrial Detainees waited for evaluations beyond the required timeline. For roughly two years, the Department completed *nearly all* in-jail evaluations within the required time frames. Court Services leadership appeared to continually monitor challenges and adjust procedures accordingly, often in creative ways. Although court orders for jail-based evaluations peaked at an all-time high in March 2023, they have otherwise held fairly steady at high, but just-manageable, levels.

Recently (i.e., in the prior quarter) July featured the first significant failures to meet evaluation time frames. As the Department approached the end of the fiscal year and encountered budget constraints, they responded by pausing their use of contracted forensic evaluators, instead relying solely on their full-time employee evaluators. This caused significant delays in competence evaluations, exceeding the Consent Decree timeframes for the first time since the pandemic. Specifically, evaluation times in July averaged over 30 days, which falls beyond the 21-day timeline specified in the Consent Decree.

However, with the new fiscal year, the Department resumed use of contractors, and quickly resumed their pattern of timely evaluations for defendants waiting in jail. This month featured a gradual increase in court orders for evaluations, but Court Services was timely in all respects. Their reliability is particularly remarkable amid internal challenges. The unit has lost several full-

time evaluators in recent months, and has a record number of open positions.  This has made their compliance with time frames more difficult—and perhaps more tenuous—but they nevertheless meet these time frames.

For the past few years, Court Services has managed to meet timelines for jail-based evaluations, even amid substantial challenges.  After a brief-but-significant exception in the prior quarter (i.e., delays in July 2023),  Court Services quickly recovered and resumed their pattern of timely jail-based competence evaluations.  Their next challenge will be filling open positions sufficient to build an adequate team of evaluators.

## INTERIM JAIL MENTAL HEALTH TREATMENT[19]

34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees.  The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado.  These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The JBBS teams provide critical services across the state.  They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff are dedicated to enhancing services for Pretrial Detainees awaiting restoration.  However, services, staffing, and quality vary greatly across Colorado jails.

OCFMH's mobile competency enhancement service provides a contracted part-time forensic psychiatrist to meet with specific Detainees and treatment providers to discuss and encourage medication administration and management.  Since July 2023, this psychiatrist has provided nearly 30 consultations; we see in our weekly review several instances of Detainees benefitting from these additional psychiatric services.

The Department offers a statewide "Jail-Based Pre-Restoration Educator Program," in which several pre-restoration educators provide selected Detainees with education and services to "jumpstart" restoration.  This is not a jail-based substitute for inpatient restoration; rather it is intended to provide some services (medication and education) that may accelerate the restoration process.  This October, a total of 47 Detainees were participating in the program.  To date, nearly 10% of JBPEP participants have been found competent while on the waitlist, 5% have had their cases dismissed, and 36% have been re-directed to outpatient restoration. These

---

[19] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree.  It is not a substitute for competency restoration services.

numbers have remained steady for several months. *We strongly affirm the Department's initiative in developing and collaborating on each of these innovative programs*.

We still encourage the Department to vigorously explore using involuntary medication orders (IMOs) *when appropriate*.  We share concerns from advocates that overreliance on IMOs could shift treatment to jails that *should* occur in the hospitals.  We also understand many jails have inadequate staff or conditions to appropriately provide IMOs and monitor their effects immediately after administration. On the other hand, we see the dramatic improvements medications can bring to those suffering in jails.  We have seen the benefits of more assertive IMO policies on waitlisted Detainees in several other states, and we believe similar benefits are feasible in Colorado *if* suitable safeguards, conditions, and policies could be developed.

We continue to suggest that IMOs, assertive community treatment, and broader criteria for involuntary evaluation and treatment could address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who simultaneously are at risk for criminal justice involvement or worsening physical or mental health status.  Such initiatives should only occur after all other options have been exhausted; collaboration and voluntary care should be prioritized in all cases before involuntary treatment is pursued. Additionally, these sorts of programs rely most heavily on the presence of a functional, accessible civil mental health system.  Developing this type of robust, community (civil) mental health system is not solely within the Department's control.  We affirm their decision to pursue stakeholder conversation and leadership from other relevant disciplines (law enforcement, corrections, private mental health, judiciary, and peers with lived experience).

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[20]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP).  As has been typical for many quarters, jail discharges to the community outnumbered admissions to hospital beds this quarter, and we affirm the Department's work on these community transitions.  Indeed, the waitlist would likely be double its size were not for the persistent efforts to shift so many detainees into outpatient competency restoration and related community supports.  The Department continued their efforts in two broad areas:

*Housing:* The Forensic Support Team (FST) Navigators continue to facilitate transitions from jail to community housing across the state. Most community housing options are in the Denver and Colorado Springs metro areas, and they are funded through the Fines Committee. The total number of housing placements and beds funded by the Fines Committee remains at an all-time high, and these have continued to increase since our last report.  Most of these housing options offer additional treatment and supportive services.  The launch of the Mental Health Transition Living homes has created a critical new interim level of community housing and services as well. Please see Appendix 3 for a description of these programs and their impact on the waitlist.

*Forensic Support Team (FST):* The FST Navigators continue to monitor clinical status and restoration progress for those in jails awaiting transfer to CMHHiP.  In October 2023, FST Navigators coordinated care for a total of 957 people, and Navigators were assigned to 775 persons in jails waiting for inpatient restoration services.  For individuals awaiting restoration services this quarter, Navigators logged an average monthly total of 665 face-to-face contacts with defendants in jail and 1,695 contacts with care teams or stakeholders.[21]  For persons awaiting evaluations in jail, the FST recorded an average monthly total of 198 face-to-face contacts and 467 contacts with care teams or other stakeholders during the past quarter.  These numbers are similar to the past quarter and represent tremendous time and effort devoted to

---

[20] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

[21] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, pp. 40-44.

Detainees.  To date, several thousand CMHHiP bed days have been "saved" since January 2020 through these combined efforts.

The core responsibilities of the FST are identifying and mitigating acute mental health crises of Pretrial Detainees.  This quarter, 122 Pretrial Detainees were identified as "high acuity."  This number falls between last quarter (143) and the previous quarter (101). Furthermore, as reported in earlier sections, very few of the acutely ill detainees are admitted promptly. Consequently, the FST continues to perform critical work monitoring the most vulnerable.[22]

The FST also facilitates community transitions for those Detainees who no longer warrant hospital-level restoration.  They continue to facilitate discharges and community transitions for many people on the waitlist.  FST actions include changing the restoration setting from CMHHiP to the community, placing appropriate Detainees into community-based specialty programs, working with competency dockets to facilitate quicker hearings and community restoration options, advocating for the dismissal of charges or resolution of competency for those who have stabilized, and more.

For example, the "Momentum" Program provides dedicated case management, medication assistance, and peer support to persons transitioning from jails to community settings.  Since early 2020, the FST has referred 496 people to the Momentum Program, resulting in 300 active current clients—a record number of people who would have otherwise remained in jails or a state hospital.  In addition, the FST works to secure additional releases and community supports for veteran Pretrial Detainees: 44 clients have been linked with V.A. services to date.

Finally, Navigators work closely with many specialized judicial programs, such as the Larimer County Competency Court, the Aurora Judiciary's "Sustained" program, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties.  Each of these is discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3.  The FST is also partnering with many new competency dockets (see Appendix 2).  We affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department as they collect information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Outcomes from the FST are again strong this past quarter, despite the difficult conditions and overwhelming demand for their services.

---

[22] Ordinarily we can include data regarding the admissions and other outcomes for high acuity clients. This quarter, the Department's data is incomplete due to a change in data collection and analysis.  We will address these data in our next report.

## TRANSPORTATION OF PRETRIAL DETAINEES

> 36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

No defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[23]  Indeed, there have been *no* admissions for inpatient evaluation for more than a year.

The Department has not reported any other delays or barriers to transportation with jails around Colorado.

---

[23] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, pp. 22-23.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers; SEP

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system.  A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities.  In other words, funds from the fines should supplement, but not supplant, existing services.  The Department has provided reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

*Current realities*: Throughout the past four years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree.  Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that complement the broad goals of the Consent Decree.

*Projects funded by the Fines Committee*
Currently, the top priorities for the fines committee are projects that address housing, diversion from the competency system, and specialized competency judicial programs (competency dockets and calendars).

*Housing* is a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. The fines-funded Restoration Housing initiative continues to provide community placement options for some Pretrial Detainees. These individuals have shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing contracted through the Colorado Coalition for the Homeless (CCH). At the time of this writing, the Forensic Support Team has coordinated 241 completed referrals and placed 82 individuals in CCH housing units. To date, 40 people have had their cases either dismissed or resolved after moving into CCH Housing.[24]

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. *Please see Appendix 3 for all the fines-funded housing projects.*

*Diversion* programs of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded innovative court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped.

*Competency Dockets and related efforts* provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, there are several "competency dockets" emerging across Colorado, as more jurisdictions recognize the strengths of this model. We have observed these dockets in action, and the judges and attorneys understand the competency population (and procedures) much better than those in criminal courts that encounter competence matters less often.

---

[24] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 43.

Fines have also funded enhanced case management services for persons in several different judicial districts across Colorado, emergency psychiatric beds in private hospitals, technology supports for persons released to community services, a legal advocate, and initial support for the Denver Restoration Treatment Unit in Denver County Jail. *A full info-graphic summary of fines-funded projects comprises Appendix 3.*

Finally, the fines support three professionals who provide support and oversight to the many fines -funded projects. First, we hired a program auditor (a team of two experienced program supervisors), who regularly monitor the fines-funded programs, helping them track their outcomes and improve services. These consultants also help monitor the overall fines-project "portfolio," i.e., the group of funded projects, their funding period, and remaining funds. Information from these reports is integrated into this quarterly report (see Appendix 3).

As we realized the value of these fines-funded projects—particularly the ways in which local partnerships can implement jurisdiction-specific improvements more rapidly and nimbly than state-wide efforts—we hired a community-based program-development specialist who now works with jurisdictions or localities to cultivate or formalize some of their promising local approaches. These tend to address competency cases, divert defendants from the competency system, and provide housing that allows the competency population to receive services in the community. While the Department works on broader (often state-wide) efforts, we increasingly see the value of smaller projects developed among local partners. When funding appears to be a barrier, our specialist helps the projects pursue funding from the fines committee. Our community-based program-development specialist—who has extensive experience developing and overseeing innovative programs—now helps them cultivate strong programs, and link them with other programs or experts across the state, to help foster success.

# DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

> 39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department removed the "civil bed freeze" as mandated by the Consent Decree.  That is, they have *not* re-purposed the civil beds at CMHHiFL for competence restoration, as they had proposed in 2018.  Indeed, since the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures, and the Department recognizes that increasing civil capacity is one key to solving the competency crisis.  However, the Department has renovated two previously closed civil units into units for competence restoration.  As of their most recent report, the CMHHiFL population included a total of 81 civil patients and 20 restoration patients.[25]

The Department was able to open both newly renovated CMHHiFL units, one in December 2022 and one in November 2023. Each has 22 forensic beds.

Of course, *civil inpatient capacity remains precariously low throughout Colorado.*  As we have emphasized for years, the Department must also increase civil bed capacity.  No amount of diversion, community programs, or other outpatient alternatives will ever meet the needs of *all* Colorado's mentally ill population.  Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts.  States that appear to have more reasonable wait times for forensic services all have strong civil capacity, both inpatient and community-based.  Ultimately, the long-term solution to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges.  This broad strategy aligns with our other long-standing recommendations: diversion and deflection programs, long-acting injectable medications, assisted outpatient treatment, peer supports, robust case management, judicial supervision and monitoring, and involuntary medication orders.  Without a strong civil system (inpatient and outpatient), competency remains the most accessible (albeit least efficient) route to mental health treatment among people without housing or resources— ultimately increasing the numbers of people ordered to the competency services system.  We

---

[25] According to the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, p. 25.

continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems.

Relevant to these needs, this quarter featured the first of the recently-funded Mental Health Transitional Living (MHTL) homes open, which will serve as an important addition to Colorado's civil service array. The Department has funded 125 MHTL beds allocated to various providers around the state. These homes will provide step-down interim housing opportunities for people who have spent more time than necessary at the state hospital (perhaps due to difficulties finding an appropriate place to discharge) or who are at substantial risk for entering inpatient competence restoration.  We view these homes as one of the most critical components of a full civil service system, and we affirm the Department for addressing this long-standing gap in service and housing.  We also believe more transitional housing is critical.

## COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies (such as diversion) that can reduce the competency-involved population.

As the pandemic continued, and as the competency crisis grew more dire, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, as we encouraged "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* in this type of comprehensive approach. In April of 2022, the Department pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding that will support new resources. Although some of their legislation and funding necessarily continued to support what we have described as short-term crisis management efforts (e.g., renting more beds at private psychiatric hospitals), others may create fundamentally new resources (e.g., grants to support diversion).

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. That is, beyond the legislative highlights above, the Department has organized their efforts according to six key strategies or "levers," which they phrase as follows:

1. Number of inpatient beds;
2. Inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reduce the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and

wait times.  But we also appreciated the efforts to expand the scope of their focus to beds and services *in the community*, for a much more comprehensive approach to the crisis.  Indeed, addressing the first several (inpatient) variables will be crucial to decrease the current waitlist, but vigorously addressing the last few (community) variables will be crucial for minimizing future additions to the waitlist.

We have long encouraged the Department to use a data-driven projection model that will incorporate the impact of these various initiatives on estimated competency service supply and demand. Over the past few years, the Department's data management has improved, and within the past year, the Department was allotted over $2 million in response to their budget request to enhance information systems and modernize databases for forensic services. These efforts began via contractors, effective July 2023.

During the 2023 legislative session, the Department supported two competency bills. Though the first primarily addresses juvenile proceedings, the second (effective July 2024), HB 23-1138, improves the path to civil treatment for those involved in the competency system. However, this is tightly tied to the anticipated BHA system, which is experiencing delays.

*2023 Comprehensive Plan and Budget Requests:*

During this part quarter, the Department submitted their latest Comprehensive Plan (September 2023).  The Department memorialized their efforts over the past year, including much greater collaboration with other stakeholders across various workgroups.  The Department also memorialized their plans to:
- Expand their use of community (private) hospital beds for the restoration population,
- Continue to reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Better use existing inpatient beds, with increasing efficiencies, re-evaluations, and related measures

In line with the goals detailed in this Comprehensive Plan, the Department recently shared their budget request to the Governor's office.  This ambitious request was for "$57,967,379 supplemental for FY 2023-24, $75,245,671 and 3.4 FTE in FY 2024-25, and $70,143,328 and 3.4 FTE in FY 2025-26."  The Department's reasoned that,

> *"Providing this funding will allow the Office to make a total of 162 additional beds available in FY 2023-24, FY 2024-25, and FY 2025-26 which includes increasing inpatient restoration beds at private hospitals, opening three additional forensic units with 82 beds at the Mental Health Hospitals (MHHs) that have been closed or delayed because of understaffing, and complying with staffing levels recommended by Chartis [external consultants]…"*

Specifically, the requested $57,967,379  in supplemental funds for FY 2023-24 will, according to the Department, serve to:

1. *Maintain the 61 beds at private hospitals and add 19 more beds before the end of the fiscal year;*
2. *Staff and re-open 82 beds at the E2 and RNRU forensic units at CMHHiP, and staff and open the new F3 forensic unit at CMHHiFL by the end of 2023;*
3. *Add 6.8 temporary RNs and 17.2 temporary MHCs to ensure adequate staffing of the F2 and F3 forensic units at CMHHiFL, open F3 in December 2023, and comply with Chartis' recommendations; and*
4. *Fill direct care FTE vacancies by 12.5% at the MHHs while reducing agency direct care staff by 12.5%. (p.8)*

In our view, there is much to affirm in the budget request and the underlying plan.  Much is consistent with our strategic discussions over the past few years, and much (if funded) should meaningfully improve the services addressed in the Consent Decree.  *First, more inpatient beds are absolutely necessary.*  The Department has long had far too few inpatient beds, relative to the state population and need.  Second, *more staffing is essential.* Their effort to "close gaps between compensation of direct care staff at the MHHs and private healthcare employers" (p. 11) is necessary to address the staffing crisis we have been discussing for the past few years. Without decreasing these compensation gaps, it will be impossible to adequately staff CMHHiP or CMHHiFL.  Indeed, you will recall our refrain across past quarterly reports: the Department (and ultimately the state) must invest more to staff the inpatient facilities that already exist, let alone launch new inpatient beds.

Along with our affirmation and enthusiasm for these ambitious budget requests, **we have also offered the Department several cautions.** *First, inpatient beds should also prioritize civil, not just forensic, treatment.*  We appreciate that the Department recognizes the challenging hydraulics of public mental health treatment: Forensic treatment often feels like such a pressing need that states de-prioritize civil treatment to address the crisis of forensic treatment needs. Yet decreasing civil treatment options only serve to increase the portion of people with serious mental illness who come to the attention of law enforcement and then enter the forensic system. Thus, the cycle of increasing forensic demand continues, until there is adequate community and civil psychiatric treatment available.

Second, *inpatient beds are necessary, but not sufficient, to resolve the current crisis*.
Again, we have been impressed that OCFMH recognizes the need for broad, collaborative solutions across the continuum of care.  These strategies remain crucial no matter how many inpatient beds become operational.  Many defendants do not require this inpatient treatment, and can be adequately served through Colorado's outpatient restoration.  Others only require inpatient treatment until they can "step down" to other types of facilities or housing (such as the recently emerging Mental Health Transitional Living Homes).  Thus, increases in inpatient beds should occur *alongside* improvements across the continuum of care.

Overall, there is more reason for cautious optimism this Quarter.  The Department has opened more beds, prompting the first decrease in waitlist growth in the past several years.  Their

recent, ambitious budget request—if granted—will likely lead to many more available beds. This is likely to further decrease the waitlist, addressing a dire need. *At the same time,* we continue to encourage the broad and comprehensive changes—e.g., more diversion from the competence system, greater use of civil psychiatric treatment, etc.—that are crucial to help *sustain* any decrease in the waitlist. As the Department knows, this multi-causal, complex crisis requires multiple strategies for solution.

*Prior quarters revealed substantial progress for the Department in collaborating with others and securing significant funding to prioritize more comprehensive, long-term, and "upstream" approaches to the competency crisis. More recent efforts are targeting the pressing needs for staff and additional inpatient beds. We affirm all these efforts, which are necessary to address such a daunting challenge. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment.*

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's formal competency restoration program (OCRP) began in March of 2018, and it has grown steadily since then. Referrals for outpatient restoration ranged from 58 to 76 defendants per month this quarter; although impressive, these totals are the lowest of the past year.[26] More than 500 individuals participate in Colorado OCRP, and there is no waitlist for OCRP services. We continue to affirm the Department's success in building sufficient outpatient restoration capacity for the largest, most robust statewide OCRP program in the country (only one other state offers statewide OCR). Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. In the past quarter, 209 people were placed in OCR.

*OCRP outcomes*
Data from August – November 2023 reveals a 39.5% restoration rate in the OCRP re-evaluation reports that the Department reviewed (66 of 167 total opinions). An additional 8.4% were opined as unrestorable (14 out of 167). The remaining 52.1% were opined as remaining incompetent. This reflects a steady OCRP restoration rate, which was 39% and 41%% the past two quarters. Data from the same period shows that courts found 47.7% of defendants restored to competence (72 of 152 total adjudications), similar to last quarter. The court dismissed charges and/or otherwise terminated restoration services in an additional 34.2% of these re-evaluation cases.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds, and Peakview Hospital for 54 beds; beds were filled to more than 90% capacity over the past quarter. The contract with Aurora Medical Center remains in limbo, but the budget appropriation expected from the legislature should allow for the opening of these beds. These overflow beds have proven critical amid the pauses in admission to CMHHiP, and we encourage the Department to maintain this capacity at least until CMHHiP reopens all their previously closed units. Additionally, while we affirm the Department securing these inpatient restoration beds, we reiterate that *civil* inpatient capacity remains too meager. The

---

[26] All data in this section retrieved from the Department's Special Master Compliance Plan report for October 2023, submitted November 15, 2023, pp. 31, 45-52.

Department must prioritize civil inpatient capacity in addition to building its forensic capacity; otherwise, the gains made regarding the waitlist may be short-lived.  We encourage the Department to continue to devote reopening beds to civil patients, diversion programs, or similar programs designed to provide inpatient mental health services in lieu of forensic services.

Importantly, two 22-bed units at CMHHiFL were renovated in 2022, and both have now opened. In addition, CMHHiP reopened a 39-bed unit last quarter, as improved salaries and bonuses helped recruit and retain necessary staff, and another 20+ bed unit has reopened this quarter. As mentioned in previous reports, when fully opened, the total number of inpatient beds (including both state-operated and privately contracted beds) will represent the largest number in recent years.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline.  We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| **Initial baseline** | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| **November 1, 2021 goal** | 60% maximum | 40% minimum |
| **Recent progress (past 6 months)** | May 1, 2023 – Oct 1, 2023: 63.3% | May 1, 2023 – Oct 1, 2023: 36.7% |

For the past six months (May 2023 through October 2023), a total of 36.7% of all restoration orders were to outpatient restoration. This rate is virtually identical to last quarter's rate, and it has remained at compliance or very near compliance for the past several quarters. Directing such a large portion of defendants towards outpatient restoration is a strength of the Colorado system, and a crucial protection against an even greater "competence crisis."

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

This metric decreased substantially over the past six months as compared to the previous six-month period. The current figure, reflecting six months' worth of data between April — September 2023 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 12.9% OCR referral rate among all evaluations conducted in jails. Monthly averages dipped as low as 10% in June 2023, and never exceeded the 20% threshold. The 12.9% rate is lower than the earlier six-month figures of 13% (2022-23) and 18% (2022).

Still, given the combination of persons ordered to OCRP overall (36.7% of all persons adjudicated as ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (12.9%), we continue to affirm and appreciate the tremendous impact that OCRP has on the waitlist. A total of 223 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist. Of course, the waitlist would be impacted much more directly and significantly if persons evaluated in jails were recommended for outpatient restoration more frequently. Although benchmarks remained unmet this quarter, the OCRP continues to be a critical component in Colorado's competence services system.

# CONCLUSION

Just like every quarter for the past two years, this quarter revealed certain markers of the competency crisis growing even more dire. Specifically, wait times for inpatient restoration are longer than ever. *Unlike the prior quarters, however, the waitlist has decreased.* With new units opened at the hospitals, there have been more admissions this quarter than any in recent history. Of course, the backlog is extreme, and even if the latest budget requests are approved, there is no quick fix. But for the first time in two years, the quarter featured three months of several key metrics trending in the right direction.

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# APPENDIX 1

## Summary of Inpatient Restoration Service Capacity

| *Summary of Inpatient Restoration Service Capacity* | | | | |
|---|---|---|---|---|
| Setting | Total currently active restoration beds | Total future restoration beds through 12/23 | Total future restoration beds (anticipated full capacity) | Funding Source |
| CMHHiP* | 204 (out of 250) | 226 | 250 | CDHS |
| CMHHiFL* | 44 (out of 44) | 44 | 44 | CDHS |
| Arapahoe RISE | 60 | 60 | 60 | CDHS |
| Boulder RISE | 18 | 18 | 18 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | 18 | 18 | CDHS |
| Denver Health | 15 | 15 | 15 | CDHS / Emergency |
| Peakview Hospital | 54 | 54 | 54 | CDHS / Emergency |
| Additional private hospitals (e.g., West Springs, etc.) | 0 | 0 | 19 | Emergency |
| **Total** | **413** | **413** | **478** | |

* 46 beds at CMHHiP remain unavailable due to staffing shortages and other limitations. The Department has received preliminary approval for funding to reopen remaining units and CMHHiP, continue privately contracted beds, and acquire 19 new contracted beds in the next fiscal year.

# APPENDIX 2

## Summary of Colorado's Competency Dockets
### (compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served / Status |
|---|---|---|
| 1st Judicial District | Judge Klein & Judge Miloud | Low level felony / Launch January 2024 |
| 2nd Judicial District | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DDA approval) |
| Denver County Court Comp Docket (Misdemeanor Charges) | Judge Cherry | Misdemeanor Cases Only |
| 4th Judicial District - El Paso | Magistrate Gurney | F5&F6 Non-VRA cases (and case by case approval from DDA) / Launch early 2024 |
| 5th Judicial District | Judge Shamis | TBD / Launch early 2024 |
| 8th Judicial District - Larimer | Judge Blanco | Low-Level Felony and Misdemeanor |
| 10th Judicial District - Pueblo | Judge Ernst | <F3 non-violent, Judge's make "referrals" |
| 12th Judicial District - Alamosa Only | Judge Cortez-Rodriguez | >F2 clients that need "support" / Launch early 2024 |
| 16th - Otero, Bent, Crowley | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) |
| 17th Judicial District - Adams | Judge Jimenez | TBD / Launch end of 2023 |
| 18th Judicial District Court - Arapahoe | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out custody (capped at 10) |
| 19th Judicial District - Weld | TBD | TBD / Launch spring 2024 |
| OTHER | | |
| 2nd Judicial District (Pre-Comp Mini-Screener) | Judge Arnolds | Pre-Comp Cases |
| Denver County Competency Diversion Program | Jail Magistrate (rotating) | Pre-Comp Clients in Denver |