**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*4:12 pm, Mar 01, 2024*
**JEFFREY P. COLWELL, CLERK**



Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

## February 28, 2024

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

February 27, 2023

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our February 2024 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. The Department initiated these steps and demonstrated meaningful progress. Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

Exactly one year later, in the spring of 2020, the COVID-19 pandemic brought the Department unforeseeable challenges and their progress stalled. COVID-related complications slowed progress on most metrics, and put simply, all metrics moved in the wrong direction. Even after the pandemic relented, many setbacks remained. In particular, the Department faced

tremendous difficulties staffing their facilities, which left unused hospital units, and less capacity to serve the people in jail awaiting transfer and treatment in those units. Similar difficulties have been common across the country, and states vary in the timing and degree to which they have begun to improve.

*Last quarter featured the first sustained pause in many of these negative trends, and this quarter revealed further progress.* As staffing began to improve during the prior quarters, most hospital units have reopened, moving more people from the waitlist to inpatient beds. After years of steady increases in the demand for competence services, there has been more of a plateau. The number of people awaiting inpatient restoration at the end of last quarter (n = 374) is *lower* than last quarter's average (n = 433) and the prior quarter's average (n = 456). In short, _the waitlist is slowly decreasing_. Last quarter, the Department's budget requests to the Governor's office were granted; these will sustain the available beds and provide additional beds (as described later). New Mental Health Transitional Living homes (MHTLs) are beginning to provide a crucial level of care that has long been lacking in Colorado. This quarter had more Tier 1s detainees admitted than any other quarter this year. There *are now nearly 100 fewer people on the waitlist than there were seven months ago.*[1] More than at any other point since the pandemic, there is reason to anticipate steady (though not immediate) improvement.

While we see more reason for optimism, we see no reason for decreased efforts. Even with the Department's progress in opening inpatient beds, it remains clear that Colorado's "competency crisis," is not something the Department can solve alone. They must continue efforts with other stakeholders to enact legislation and strategies that decrease orders for competence evaluation and restoration, instead prioritizing mental health treatment over competence restoration.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

---

[1] As of February 24, 2024, the waitlist has decreased to 343 people (compared to 464 at the end of May, 2023).

# TABLE OF CONTENTS

CONTEXT for QUARTERLY METRICS ................................................................................................ 5

KEY METRICS FOR PROGRESS: ..................................................................................................... 9

COMPLIANCE WITH TIME FRAME REQUIREMENTS ...................................................................... 9
    KEY METRIC: COMPETENCE EVALUATION TIME FRAMES ..................................................... 10
    KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION .................... 12
    KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES ............................. 15

CONSENT DECREE SECTION VI UPDATES .................................................................................... 18
    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION
    TREATMENT ........................................................................................................................ 18
        Wait Times for Inpatient Evaluation ............................................................................ 19
        Wait Times for Inpatient Restoration .......................................................................... 21
    INTERIM JAIL MENTAL HEALTH TREATMENT ....................................................................... 25
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT ........ 27
    TRANSPORTATION OF PRETRIAL DETAINEES ....................................................................... 29
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ................................................. 30

DECREE SECTION VII UPDATES ................................................................................................... 34
    CIVIL BED FREEZE .............................................................................................................. 34
    COMPREHENSIVE AND COHESIVE PLAN ............................................................................. 36
    INCREASE COMMUNITY RESTORATION SERVICES ............................................................... 39

CONCLUSION ............................................................................................................................. 42

APPENDIX 1 ............................................................................................................................... 43

APPENDIX 2 ............................................................................................................................... 44

APPENDIX 3 ............................................................................................................................... 46

# CONTEXT for QUARTERLY METRICS

*Historic Context:*

As all parties understand, longstanding vulnerabilities in Colorado's public mental health system set the stage for the current "competency crisis." For many years preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that—unlike most other states—was able to operate selectively, routinely declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the United States. Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree. As you know, we tend to summarize the overall spirit and provisions of the Consent Decree in three goals:

    a) Reducing the *number* of people on the waitlist for competence restoration services,

    b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and

    c) Reducing *harm* (by providing *care*) to people on the waitlist.

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the waitlist grew as the Department could not keep pace with court orders for competency services. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, over 80 beds[2] at CMHHiP remained unused because there were not sufficient staff to operate the units. The waitlist peaked at 464 people.[3]

---

[2] This figure varied a bit, but for over one year, over 80 beds remained unusable.

[3] For example, the waitlist appeared to peak at 464 people at the end of May 2023, and was still 459 at the end of July 2023. But by the end of October 2023, the Department reported a waitlist of 427 people, and by February 24, 2024 it had decreased to 343.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Pretrial Detainees. In early 2022, Governor Polis (at the Department's urging) and the Joint Budget Commission approved approximately $30 million in emergency funding to secure 64 additional private psychiatric beds to temporarily address the record demand for restoration services. More recent legislation devoted $60 million to fund another 96 beds through 2023. The Department continued to pay a premium for emergency treatment beds, while some of their own CMHHiP treatment beds remained unused because they lacked staff. But over the past several years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

*Recent Context:*
Over the past few years, the Department worked with stakeholders to pass legislation and secure funds from the American Rescue Plan Act (ARPA). Although passed many months ago (and addressed in prior Quarterly Reports), many of initiatives have begun providing services. Indeed, the first Mental Health Transitional Living home (MHTL) has already altered the waitlist.

| *Initiatives:* | *Action:* |
| --- | --- |
| $65 million in ARPA funding to launch 125 beds in group homes and an additional 16 beds at CMHHIFL. | The Department reviewed proposals for group homes and awarded all contracts. The first group home, operated by Department, has now opened to patients (and accepted many who had been hard to discharge from the hospital). |

| | |
|---|---|
| $62 million to support grants for early intervention, deflection, and redirection from the criminal justice system among those with psychiatric illness. | The Department has reviewed proposals and awarded grants. None of these programs have begun operating to the degree that it would be possible to gauge their impact. |
| $61 million to improve Colorado's clinical workforce, particularly addressing the shortage of nurses. | The Department has adjusted salaries and bonuses to enhance recruitment and retention. These strategies have clearly improved staffing, with far more applicants and hires. |
| New legislation to limit inpatient restoration, among those with only misdemeanor charges, to those who meet emergency hospitalization criteria (those who do not must be ordered to outpatient restoration). | CRS 16-8.5-111 allows for the dismissal of a misdemeanor charge and civil commitment among ITP defendants. Other legislation (HB22-1386) requires outpatient restoration as the default approach for defendants with only misdemeanor charges unless they meet commitment criteria. |

All these developments reflect movement towards the broader and more comprehensive steps that Colorado needs to take across the continuum of competency services: from diversion and deflection at the entry points to more restoration beds at the later points.

The Department has continued to cultivate collaborations with other stakeholders, because *all parties agree that the Department cannot solve the competency crisis alone.* Although certain key services (e.g., evaluation quality, inpatient beds) are solely within the Department's control, many causes of the competency crisis—such as the arrests of unhoused people with mental illness—are well outside of Department control. The Department has continued to:

- Convene the Judicial Taskforce with judges eager to help solve the competency crisis.
- Convene the multidisciplinary "Consent Decree Steering Committee" to meet with all parties (Department, DLC, and Special Master, as well as a national consultant) every other month, and address potential collaborative solutions.
- Support the Denver Competency Docket, led by two judges who are knowledgeable and motivated regarding competency matters.
- Pursue strategies to divert people with serious mental illness into community (civil) treatment rather than defaulting to the competency mechanism for forensic treatment.

Unfortunately, many of these strategies require a more robust community mental health system that, as we've emphasized before, is an historic weakness for Colorado. The Department anticipates a transition towards a Behavioral Health Administration system, a new cabinet-level agency, housed within the Department of Human Services, designed to be the single entity responsible for coordination and collaboration across state agencies to address behavioral

health needs. This transition includes many promises relevant to the competency population: a true "safety net" to ensure mental health services for all who need them, decreasing opportunities to deny services to certain populations. Indeed, this requirement has now gone into effect. A BHA *should* benefit the competency population, and even ultimately reduce the number of people entering competency services, if the BHS indeed creates significantly more access and availability of community mental health resources. But, at best, the impact of these changes is nearly two years away. Worse, this year has featured many delays and struggles within the BHA, which will almost certainly delay any potential reforms even further.

*This Quarter*

This quarter follows two prior quarters of increasing bed capacity (e.g., re-opening 39 beds at CMHHiP, opening the second new 22-bed unit at CMHHiFL, expanding the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds). They also began to transition some long-term patients into a new Mental Health Transitional Living (MHTL) home. Consequently, the Department has continued admitting more detainees than in previous quarters, and *the overall number of persons on the waitlist has generally declined for six consecutive months – the first time this has occurred since the beginning of the pandemic.*[4]

---

### Recent Budget Approvals Support Inpatient Capacity

The Department's recent (November 2023) budget request to the Governor's office—mentioned in our last quarterly report—was granted. They received $58 million supplemental for FY 2023-24, $75 million and 3.4 FTE in FY 2024-25, and $70 million and 3.4 FTE in FY 2025-26. The Department reported the funding will allow them to make a total of 162 inpatient beds available by increasing restoration beds at private hospitals and opening three additional forensic units with 82 beds at the Mental Health Hospitals (MHHs) that had been closed or delayed because of understaffing. For FY 2023-24 this includes: maintaining the 61 beds at private hospitals and adding 19 more beds before the end of the fiscal year; staffing and maintaining 82 beds in certain forensic units at CMHHIP, then staffing and opening the new F3 forensic unit at CMHHIFL. Indeed, some of these have been opened already. The request also increases staffing.

All parties agree that inpatient beds are certainly not the *only* strategy needed, but they are an *essential* part of the solution. The Department's recent budget approvals supports the largest increase to inpatient capacity in recent history, addressing the tremendous needs we have described over the past few years.

---

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

---

[4] As of today (February 24, 2024), the waitlist has decreased to 343, the lowest point in the past 4 years.

# KEY METRICS FOR PROGRESS:

# COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC: COMPETENCE EVALUATION TIME FRAMES

Historically, the Department met evaluation time frames, even before the 2019 Consent Decree and even through most of the pandemic. After staffing shortages caused delays during some of 2020, the Department returned to almost perfect compliance with evaluation time frames. Court orders for jail-based competence evaluations had dropped to an all-time monthly low during the Spring of 2020 (e.g., 56 people in April 2020), with the onset of the COVID-19 pandemic. But arrests and orders for jail-based evaluations resumed dramatically peaking at an all-time monthly high two years after the pandemic began (i.e., 178 in March of 2022). Orders for evaluation have held steady the past two quarters, averaging *132 per month for the past six months*.

| *Average waiting time (in days) for a competence evaluation[5]* | | | | | |
|---|---|---|---|---|---|
| | Aug 23 - Oct 23 | Nov 2023 | Dec 2023 | Jan 2024 | Requirement |
| Jail-based Competency Evaluations | 12.3* | 10.9 | 12.1 | 11.1 | 21 days |
| Inpatient Competency Evaluations | 125.5** | n/a | 37*** | 15** | 14 days |

\* = at least one defendant waited longer than the maximum time frame for the evaluation
\*\* = most defendants waited longer than the maximum time frame for the evaluation
\*\*\* = all defendants waited longer than the maximum time frame for the evaluation

Even with a high volume of court orders the Department's Court Services unit has generally remained responsive and efficient, maintaining near-perfect compliance with timelines for most of the past year. This quarter, they maintained perfect performance; *no detainee waited more than 21 days for an evaluation in jail*.

Regarding inpatient evaluations, performance *appeared to improve for the first time in years*. There remain very few orders for inpatient competence evaluations (i.e., only 6 this quarter). However, *five were admitted for evaluation*. For the past several years, almost all such orders were resolved in ways *other than* hospital admission and often after lengthy delays. This quarter, however, five detainees were admitted for inpatient evaluation, and waiting times decreased (though still exceeded prescribed timelines). Again, orders for inpatient evaluation remain rare (evaluations should usually be completed in jail) and often reflect severely ill detainees. This

---

[5] Information retrieved from the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, pp. 25, 37.

quarter's tendency to admit these detainees for inpatient evaluation reflects marked improvement in the Department's ability to admit to the hospitals.

Orders for *jail-based* evaluations held steady. Court Services continues to keep pace amid the challenges and completed *all* jailed-based evaluations within the 21-day time limit. For the few detainees ordered to inpatient evaluation, the Department has shown striking improvement: admitting them to hospitals rather than resolving the matter in other ways, with less wait time for the detainees.

## KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:*  Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. In the months preceding the Triage system, defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE waited, on average, 71 days.[6]  This figure included all defendants referred for restoration, without distinguishing those with more, versus less, acute needs. Then the Department launched on June 1, 2019 the Consent Decree-mandated triage system,[7] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2"). Tier 1 defendants must receive services within 7 days of the restoration order; Tier 2 defendants must receive services within 28 days. Upon initiating the Triage system, the Department initially maintained *excellent* adherence to the 7-day deadline for Tier 1 for several months. The wait times for Tier 2 defendants also improved, though still exceeding the time frames prescribed in the Consent Decree. Wait times and the number on the waitlist were decreasing *until* the onset of the COVID-19 pandemic, but greatly increased thereafter. Those wait times have continued to remain far out of compliance even after the pandemic relented. *But the past six months have revealed some improvement.*

This quarter, both Tier 1 and Tier 2 wait times for inpatient restoration again remained far beyond mandated time frames. Of those admitted, Tier 1 defendants waited an average of 92 days prior to admission while Tier 2 defendants waited 130 days, as reflected below:

| *Average Wait Times for Inpatient Competence Restoration Services[8]* | | | | |
|---|---|---|---|---|
| | Aug 2023 - Oct 2023 | Nov 2023 | Dec 2023 | Jan 2024 | July 2021 Requirement |
| Tier 1 | 122.7*** | 50.5*** | 113.6*** | 95.4** | 7 days |
| Tier 2 | 138.3** | 135.9** | 125.4** | 126.6** | 28 days |

** = most defendants waited longer than maximum time frame for restoration services
*** = ALL defendants waited longer than maximum time frame for restoration services

---

[6] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p. 7 of their April monthly report filed May 7, 2019).

[7] See Consent Decree paragraph 43.

[8] Information retrieved from the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 12.

Pretrial Detainees are all still waiting far longer than Consent-Decree time frames allow:

- Tier 1 detainees wait more than *13 times longer than allowed* by the Consent Decree (i.e., 92 days on average between November 2023 – January 2024, rather than 7 days).
- Tier 2 Detainees wait more than *4 times longer than allowed* by the Consent Decree (i.e., 130 days on average between November 2023 – January 2024, rather than 28 days).

Despite these long wait times, there is some reason for cautious optimism. The average Tier 1 wait times above reflect the shortest time frames for any quarter in nearly a year; further, the quarterly average wait time for Tier 2 admissions was the shortest in more than one year. Also, for the first time in 8 months, some *Tier 1 detainees were admitted within 7 days*. We see many Tier 1 detainees now being admitted in a matter of days to weeks, rather than in weeks to months. All of these improved metrics follow steadily improving metrics over the past several months, after the reopening of inpatient hospital units along with steadily expanding community placement options.

The following table illustrates how wait times for inpatient restoration have remained far out of compliance for the past year, with this quarter revealing recent improvement:

| *Average Wait (in days) for Inpatient Competence Restoration Services*[9] | | | | |
|---|---|---|---|---|
| | Feb – Apr 23 | May – Jul 23 | Aug – Oct 23 | Nov 23 – Jan 24 |
| Tier 1 | 84.2 | 109.1 | 128.3 | 92.0 |
| Tier 2 | 140.2 | 131.5 | 138 | 129.7 |

The Department remained *mostly out of compliance* regarding restoration time frames. Between November 2023 – January 2024, the Department was noncompliant with the 7-day time frame for *all but two* Tier 1 Detainees admitted. Of the 270 Tier 2 Detainees admitted in that same period, 240 were admitted beyond their time frame of 28 days. Overall, this reflects only a 8.9% compliance rate – like last month's 6.9% compliance rate, and still far from compliance.[10]

---

[9] Information retrieved from the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 12.

[10] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for the actual need for urgent admission.

In later report sections, we recommend systemic strategies such as diversion, deflection, and increased civil capacity for long-term compliance with time frames. Such solutions go beyond simply increasing inpatient hospital capacity to reduce the waitlist and will improve the likelihood of sustainable compliance. Still, the impact of reopening restoration beds is evident even within this one quarter. It remains to be seen if decreases in wait times continue without the addition of substantially more inpatient beds next quarter (19 private hospital restoration beds *may* be opened this quarter); we are eager to monitor trends over the next quarter.

The number of people awaiting restoration, and their wait times, remain unacceptable this quarter. On average, *pretrial detainees now wait four to thirteen times longer than Consent Decree time frames allow. Further, only 9% were admitted within Consent Decree time frames.* Inpatient admissions must continue to occur at a rapid pace to decrease the time detainees spend on the waitlist. However, progress is evident: wait times are decreasing, admissions of Tier 1 Detainees occurred at a record volume and within days to weeks, and inpatient restoration capacity finally approximates pre-pandemic levels. We will carefully monitor progress over the next quarter. We estimate that progress will continue, though likely at a more modest pace, given that hospital capacity is expected to plateau over the next quarter.

KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services. The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants. By June 2020, the number on the waitlist dropped below 100. The Department projected that the waitlist would be minimal by December 2020, but the pandemic changed all projections. In summer of 2023, the waitlist peaked at 464 Detainees. The number has steadily decreased since then.

*Current realities:*  Court orders for competency restoration have remained generally stable for the past year. The past 12 months averaged 124 orders for inpatient restoration per month, with this past quarter averaging 117 per month. However, the number of people awaiting inpatient restoration at the end of this quarter (n=374) is *lower* than the previous quarter's average (n=427). *This shift is remarkable; the waitlist trended downward for six months.*

| *Number of Defendants Waiting for Inpatient Restoration[11]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Aug – Oct 23 | Nov 2023 | Dec 2023 | Jan 2024 |
| Combined | 157 | 433 | 411 | 366 | 374 |
| Tier 1 | N/A | 42 | 39 | 31 | 23 |
| Tier 2 | N/A | 391 | 372 | 335 | 351 |

Figures reflect the number of persons waiting for restoration services on the last day of the respective month.

Prior to the summer of 2023, the wait list had grown steadily for more than one year, reaching an all-time peak of 464 in May 2023. But this quarter, the Department was able to reopen a 21-bed admissions unit at CMHHiP, and they continued to transition some long-term patients into the newly opened Mental Health Transitional Living (MHTL) homes. This increased capacity follows a 39-bed unit reopening at CMHHiP and a 22-bed unit opening at CMHHiFL in previous recent quarters. Consequently, the Department was able to admit many more detainees than in previous quarters, and *the overall number of persons on the waitlist has mostly declined for six consecutive months – the first time this has occurred since the beginning of the pandemic.*  This represents crucial progress and an apparent turning point. The number of Tier 1 Detainees waiting at the end of January (n = 24) was the lowest since July 2021 (and has further decreased to 17 as of February 24, 2024). Further, the total number of all Detainees waiting reflects the lowest quarterly average overall in the past year, and it was lower than the Department's

---

[11] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 9.

projections. In addition, 26 Tier 1 Detainees had waits ended in January 2024, which was the highest monthly number since the beginning of the consent decree. This quarter also had more Tier 1s admitted than any other quarter this year. In short, *there are more than 100 fewer people on the waitlist than there were eight months ago, with Tier 1 Detainees once again prioritized for more prompt admission.*

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month[12]* | |
|---|---|
| January 2023 | 439 |
| February 2023 | 464 |
| March 2023 | 439 |
| April 2023 | 448 |
| May 2023 | 464 |
| June 2023 | 445 |
| July 2023 | 459 |
| August 2023 | 442 |
| September 2023 | 431 |
| November 2023 | 411 |
| December 2023 | 366 |
| January 2024 | 374 |

*Qualitative review and extraordinary cases:* Of course, the waitlist is not simply a number. It is a group of *people* with psychiatric illness awaiting critical treatment. Each week, we review the documented updates on each person in jail who has been waiting for inpatient restoration

---

[12] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 9.

longer than their time frames allow. In that review, we see dozens of acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability (living in cells soiled with urine or feces, neglecting hygiene, not eating, experiencing serious medical problems, and so on) or who languish with acute symptoms of inadequately managed psychosis. One man we described in the *last* quarterly report – briefly taken to a local medical hospital with legs so deteriorated and infected that amputation was considered – still remains in a jail cell awaiting a state hospital bed. Several Detainees received new criminal charges while on the waitlist for behaviors that likely reflect symptoms of their illness. Although the Department typically prioritizes the most acutely ill individuals for admission, most admissions still occur far beyond mandated time frames.

The number of people waiting in jails for restoration services decreased this quarter, down from an all-time high last summer. The total number of people on the waitlist declined over six months, which has not occurred for more than two years. A record number of Tier 1 Detainees were admitted to hospitals in January 2024, and the number of Tier 1 Detainees on the waitlist is now half the number during most of 2023. This suggests promising progress. While we affirm these improvements, we also recognize the waitlist is still roughly twice as long as it was at the start of the Consent Decree, wait times are still far out of compliance for most Detainees, and the waitlist includes many people in acute psychiatric crisis and vulnerable to self-harm, injury, violence, or suicide. There can be no decrease in effort amid the promising progress.

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[13] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment. The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribed the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations.[14] Admission time frames were longer at the start of the Consent Decree (June 1, 2019), but shortened every six months, with the final reduction in July 2021, establishing the current and ongoing time frames.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 and onward | 7 days | 28 days | 14 days | 21 days |

---

[13] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo competence-related services (i.e., competence evaluation or restoration treatment). Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[14] Fine amounts are tied to delays beyond each of the time frames listed. However, these fines are not applied for Pretrial Detainees designated ISC.

## Wait Times for Inpatient Evaluation

Inpatient evaluations have always been quite rare compared to the common practice of evaluating a defendant in jail. Historically, judges typically ordered inpatient evaluations only when defendants appeared severely ill and in need of urgent admission (rather than waiting for an evaluation to determine whether they need admitted for restoration). The Department was generally successful in timely admission for inpatient competence evaluations *before* the pandemic, but they have exceeded timeframes since the pandemic began. The number of people *ordered* for an inpatient competence evaluation has remained quite low, and the number subsequently *admitted* upon order is even lower (often none), because the Department resolves such orders in other ways. Unlike prior quarters, however, *five* detainees were admitted to a hospital for inpatient evaluation this quarter.

| *Recent Wait Times for Inpatient Evaluations[15]* | | | |
|---|---|---|---|
| Month | People "admitted or ended" for inpatient evaluation[16] | Average days waited before "admitted or ended" | People who waited more than 14 days before "admitted or ended" |
| Nov 2023 | 0 (0 admitted) | n/a | n/a |
| Dec 2023 | 2 (2 admitted) | 37 | 2*** |
| Jan 2024 | 3 (3 admitted) | 15 | 2** |
| Aug 23 - Nov 2023 | 8 (3 admitted) | 125.6 | 7 |
| March 2019 total | 18 | 16.4 | 1 |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\*\* = ALL defendants waited longer than maximum time frame for restoration services

"Admitted or ended" is the language used in the Department's reports to designate all ways these orders are resolved. In recent years, most orders for inpatient evaluation were *not* resolved with an actual inpatient evaluation, but through other means (such as dropped charges, ending or converting the order, etc.).

---

[15] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, (p. 25).

[16] This column reflects the number of Pretrial Detainees admitted to either CMHHIP or RISE for an inpatient competency evaluation, bonded out, or had their cases dismissed. Unlike most previous months in 2023, most waits are now ended with an admission to a CDHS facility.

This quarter revealed remarkable change relative to recent history. For the first time since August 2021, most waits were ended by admission to a CDHS facility rather than "other reasons." Indeed, all "waits ended" this quarter were due to an admission. This is also the first time since November 2022 that at least one detainee was admitted for an inpatient evaluation within 14 days. While others still waited for unacceptably long times, this quarter revealed remarkable progress with respect to admissions for inpatient evaluations.

## Wait Times for Inpatient Restoration

Regarding wait times for inpatient *restoration* at CMHHiP, the Consent Decree established a two-tier triage system. Defendants with the most urgent clinical needs (Tier 1) have an admission deadline of 7 days, while those with less urgent needs (Tier 2) have a deadline of 28 days.

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees*[17] | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Nov 2023 | 11 | 103 | 50.5 | 135.9 | 11*** | 91** |
| Dec 2023 | 17 | 96 | 113.6 | 125.4 | 17*** | 84** |
| Jan 2024 | 26 | 71 | 95.4 | 126.6 | 24*** | 65** |
| Aug 23 – Oct 23 (average) | 15 | 92.3 | 128 | 138.3 | 15** | 80.7** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\* = most defendants waited longer than maximum time frame for inpatient evaluation services
\*\*\* = ALL defendants waited longer than maximum time frame for restoration services

The total number of people admitted to inpatient restoration this quarter (n=270) was similar to last quarter (n=277). Both of these quarters represented a larger quarterly total than any other quarter since the beginning of the Consent Decree. In addition, a record number of Tier 1 Detainees were admitted to inpatient restoration in January 2024, and average wait times for both Tier 1 and Tier 2 Detainees decreased this quarter.

However, wait times remain exceedingly long, reaching four to thirteen times the prescribed

---

[17] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 12.

Consent Decree time frames, as described in the earlier "Key Metrics" section.[18]  Although the number of people waiting in jail for inpatient restoration decreased during the past quarter, wait times for admission remain far beyond mandated time frames. Approximately 91% of Detainees who were admitted exceeded their maximum allowable wait times in jail.

Average wait times to admission far exceed the time frames mandated in the Consent Decree. The number of people waiting for restoration services—and the time they spend waiting—remain unacceptable. But this quarter has shown a sustained decrease in the number of Detainees waiting, as well as shorter average time frames waiting as compared to recent quarters, revealing sustained progress. The Department must continue efforts to fully staff CMHHiP to lower the length of stay and maximize occupancy rates, continue robust jail-based restoration programs and privately contracted hospital restoration, and fill community MHTL housing beds.

---

[18] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 270 "admitted or ended" between November 2023 and January 2024, only 212 defendants were actually admitted to an inpatient facility. The other 58 people were either dismissed, vacated, or released on bond. Still, the percentage of cases "admitted or ended" because of hospital admission is the highest since the onset of the pandemic.

## PERFORMANCE OF JAIL-BASED COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

*Historical context:* Timely competence evaluations were a relative strength of the Department until around November 2019, when performance deteriorated substantially. Many jail-based evaluations then exceeded the 28-day time frame—reaching peak delays in January 2020 (46% delayed). Even through much of Spring 2020, roughly 30% of jail-based evaluations exceeded the 28-day time frame. During the summer of 2020, referrals for jail-based evaluations again began to increase towards prior levels. At the same time, the Department improved Court Services. They hired new leaders, evaluators, and contractors; they increased compensation and prioritized jail-based evaluations. In short, Court Services underwent dramatic improvements sufficient to handle the increasing court orders and challenges they have faced.

*Recent history:* As Court Services improved, far fewer Pretrial Detainees waited for evaluations beyond the required timeline. For roughly two years, the Department completed *nearly all* in-jail evaluations within the required time frames. Court Services leadership appeared to continually monitor challenges and adjust procedures accordingly, often in creative ways. Although court orders for jail-based evaluations peaked at an all-time high in March 2023, they have otherwise held fairly steady at high, but just-manageable, levels.

July 2023 featured the first significant failures to meet evaluation time frames, as the Department encountered budget constraints and paused their use of contracted forensic evaluators. However, with the new fiscal year, the Department resumed use of contractors, and quickly resumed their pattern of timely evaluations for defendants waiting in jail.

This quarter, court orders for evaluations held steady (almost identical to the prior quarter), and Court Services was timely in all respects. *All* jail-based evaluations occurred within 21 days, as required. Their reliability was particularly remarkable amid internal challenges. The unit has lost several full-time evaluators in recent months and has had several open positions. This has made their compliance with time frames more difficult—and perhaps more tenuous these past two quarters—but they nevertheless met these time frames.

For the past few years, Court Services has managed to meet timelines for jail-based evaluations, even amid substantial challenges, with only one brief period of significant noncompliance. Court services maintained perfect compliance with timelines this quarter, following near-perfect compliance last quarter. Their ongoing challenge will be filling open positions sufficient to maintain an adequate team of evaluators.

## INTERIM JAIL MENTAL HEALTH TREATMENT[19]

> 34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff are dedicated to enhancing services for Pretrial Detainees awaiting restoration. However, services, staffing, and quality vary greatly across Colorado jails.

OCFMH's mobile competency enhancement service contracts with a part-time forensic psychiatrist to meet with specific Detainees and treatment providers to discuss and encourage medication administration and management. In fiscal year 2023, this psychiatrist provided 42 consultations and held three stakeholder trainings; we see in our weekly review several instances of Detainees benefitting from these additional psychiatric services.

The Department has also offered a statewide "Jail-Based Pre-Restoration Educator Program," in which several pre-restoration educators provide selected Detainees with education and services to "jumpstart" restoration. This is not a jail-based substitute for inpatient restoration; rather it is intended to provide some services (medication and education) that may accelerate the restoration process. In January 2024, a total of 37 Detainees were participating in the program. To date, 8% of JBPEP participants have been found competent while on the waitlist, 4% have had their cases dismissed, and 36% have been re-directed to outpatient restoration. These numbers

---

[19] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

have remained steady for several months. This one-year pilot program has ended, with the end of the fiscal year. However, the Department will continue to fund the part-time forensic psychiatrist who meets with certain Detainees and treatment providers to discuss and encourage medication.

We still encourage the Department to vigorously explore using involuntary medication orders (IMOs) *when appropriate*. Like many advocates, we are concerned that overreliance on IMOs could shift treatment to jails that *should* occur in the hospitals. We also understand many jails have inadequate staff or conditions to appropriately provide IMOs and monitor their effects immediately after administration. On the other hand, we see the dramatic improvements medications can bring to those suffering in jails. We have seen the benefits of more assertive IMO policies on waitlisted Detainees in several other states, and we believe similar benefits are feasible in Colorado *if* suitable legal and clinical safeguards, conditions, and policies are implemented. Of course, such approaches would be feasible only in certain well-resourced jails with appropriate clinical expertise.

We continue to suggest that IMOs, assertive community treatment, and broader criteria for involuntary evaluation and treatment could address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who simultaneously are at risk for criminal justice involvement or worsening physical or mental health status. Such initiatives should only occur after all other options have been exhausted; collaboration and voluntary care should be prioritized in all cases before involuntary treatment is pursued. Additionally, these sorts of programs rely most heavily on the presence of a functional, accessible civil mental health system. Developing this type of robust, community (civil) mental health system is not solely within the Department's control. We affirm their decision to pursue conversations with leadership from other stakeholders (law enforcement, corrections, private mental health, judges, and persons with lived experience).

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[20]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would likely be double its size were not for the persistent efforts to shift so many detainees into the Department's robust outpatient competency restoration program and related community supports. The Department continued their efforts in two broad areas:

*Housing:* The Forensic Support Team (FST) Navigators continue to facilitate transitions from jail to community housing across the state. Most community housing options are in the Denver and Colorado Springs metro areas, and they are funded through the Fines Committee. The total number of housing placements and beds funded by the Fines Committee remains high. Most of these housing options offer additional treatment and supportive services. The launch of the Mental Health Transition Living homes has created a critical new level of community housing and services as well.[21]  Please see Appendix 3 for a description of these programs.

*Forensic Support Team (FST):* The FST expanded and filled most of their open positions; as of January 2024, only two vacant positions out of 34 remain. Despite persistent vacancies and time required to recruit new personnel, FST Navigators continued to monitor clinical status and restoration progress for those in jails awaiting transfer to CMHHiP at a remarkable rate. In January 2024, FST Navigators were assigned to 716 persons and coordinated care for a total of 980 people in county jails waiting for inpatient restoration services. For individuals awaiting restoration services this quarter, Navigators logged an average monthly total of 617 face-to-face

---

[20] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

[21] Unfortunately, this quarter saw the unexpected closing of an organization that utilized fines-funded housing and clinical services (Integrated Insights in Delta, described later in this report). The closing followed allegations of financial impropriety, among other issues. Although only a few OCRP clients were housed there, the decreased capacity for clinical care and outpatient restoration in a rural location is significant.

contacts with defendants in jail and 1,591 contacts with care teams or stakeholders.[22]  For persons awaiting evaluations in jail, the FST recorded an average monthly total of 171 face-to-face contacts and 451 contacts with care teams or other stakeholders during the past quarter. These numbers are similar to the past quarter and represent tremendous time and effort devoted to Detainees. To date, several thousand CMHHiP bed days have been "saved" since January 2020 through these combined efforts.

The core responsibilities of the FST are identifying and mitigating acute mental health crises of Pretrial Detainees. This quarter, 127 Pretrial Detainees were identified as "high acuity," similar to last quarter (122). As you know, because so few acutely ill detainees are admitted promptly, statewide monitoring of these vulnerable Detainees is critical; the FST performs this task well.

The FST also facilitates community transitions for those Detainees who no longer warrant hospital-level restoration. They continue to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from CMHHiP or CMHHiFL to the community, placing appropriate Detainees into community-based specialty programs, working with competency dockets to facilitate quicker hearings and community restoration options, advocating for the dismissal of charges or resolution of competency for those who have stabilized, and more.

For example, the "Momentum" Program provides dedicated case management, medication assistance, and peer support to persons transitioning from jails to community settings. Since early 2020, the FST has referred 544 people to the Momentum Program, resulting in 345 active current clients—people who would have otherwise remained in jails or a state hospital. In addition, the FST works to secure additional releases and community supports for veteran Detainees: 44 clients have been linked with V.A. services to date.

Finally, Navigators work closely with many specialized judicial programs, such as the Larimer County Competency Court, the Aurora Judiciary's "Sustained" program, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. Each of these is discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets (see Appendix 2). We affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department as they collect information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Outcomes from the FST are again strong this past quarter, despite difficult conditions and overwhelming demand for their services.

---

[22] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, pp. 44-48.

TRANSPORTATION OF PRETRIAL DETAINEES

> 36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Five defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[23]  This is the most Detainees admitted to an inpatient facility for competence evaluation since 2021. Indeed, there were *only 3* other admissions for inpatient evaluation throughout the rest of 2023.

The Department has not reported any other delays or barriers to transportation with jails around Colorado.

---

[23] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, pp. 25.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers; [1] SEP

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not supplant, existing services. The Department has provided reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

*Current realities*: Throughout the past four years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that complement the broad goals of the Consent Decree.

*Projects funded by the Fines Committee*
Currently, the top priorities for the fines committee are projects that address housing, diversion from the competency system, and specialized competency judicial programs (competency dockets and calendars).

*Housing* is a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. The fines-funded Restoration Housing initiative continues to provide community placement options for some Pretrial Detainees. These individuals have shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing contracted through the Colorado Coalition for the Homeless (CCH). At the time of this writing, the Forensic Support Team has coordinated 241 completed referrals and placed 82 individuals in CCH housing units. To date, 40 people have had their cases either dismissed or resolved after moving into CCH Housing.[24]  These figures have held steady for months, because those admitted to CCH Housing have remained there, consistent with CCH's priority on sustainable, permanent housing.

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. *Please see Appendix 3 for all the fines-funded housing projects.*

*This quarter featured a significant loss in fines-funded projects*. We had funded Integrated Insights, near Delta Colorado, to provide supportive housing to those in the competency system. They were compliant with all reporting, received very positive reviews from local stakeholders (judges, prosecutors, defense attorneys, law enforcement, and even consumers of their resources), and all parties were impressed with them during our direct site visits. However, this quarter, credible allegations of fraud and other maleficence emerged. The agency is now under investigation by regulatory agencies. Thus, the Fines Committee has already suspended future funding allocations. No fines-funded clients are at this program as the investigations move forward. The Committee is terminating its agreement in light of these serious allegations, and it has ensured the competency-involved clients are receiving services elsewhere. In addition, the Committee has also secured a contract with Cordes and Company to provide external financial auditing on an as-needed basis; some of the larger projects will received routine audits, while smaller ones may be reviewed at longer intervals or upon any concern.

---

[24] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, pp. 46-47.

*Significant New Programming:*

This quarter also featured the largest addition to the fines portfolio of projects: The Fines Committee has supported Embrace with $8,902,175 to develop the Valor Program, which will support individuals needing a level of care that does not currently exist in Colorado. Specifically, the Valor Program will provide residential care to people who need intensive support and stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility will offer 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program will serve any individual in Colorado who is in or at risk of being in the competency system, accepting referrals from the justice system and the community to support not only decreasing the waitlist but to also deflect and divert individuals from the justice and competency system.  This large-scale service is scheduled to launch in June, 2024.

*Diversion* programs of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped.

*Competency Dockets and related efforts* provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, there are several "competency dockets" emerging across Colorado as more jurisdictions recognize the strengths of this model; Colorado's Court Services is beginning to study and support these, even aside from Department efforts. This quarter, an average of 336 people were actively participating in one of the 9 competency dockets statewide at any one point in time.

*A full info-graphic summary of fines-funded projects comprises Appendix 3.*

Finally, the fines support three professionals who provide support and oversight to the many fines-funded projects. As you know, we rely on a program auditor (a team of two experienced program supervisors), who regularly monitor the fines-funded programs, helping them track their outcomes and improve services. These consultants also help monitor the overall fines-project "portfolio," i.e., the group of funded projects, their funding period, and remaining funds. Information from these reports is integrated into this quarterly report (see Appendix 3). We also

rely on a community-based program-development specialist who now works with jurisdictions or localities to cultivate or formalize some of their promising local approaches. While the Department works on broader (often state-wide) efforts, we increasingly see the value of smaller projects developed among local partners. When funding appears to be a barrier, our specialist helps the projects pursue funding from the fines committee or other sources. Our community-based program-development specialist—who has extensive experience developing and overseeing innovative programs—now helps them cultivate strong programs and links them with other programs or experts across the state, to help foster success.

# DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

> 39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

The Department removed the "civil bed freeze" as mandated by the Consent Decree. That is, they have *not* re-purposed the civil beds at CMHHiFL for competence restoration, as they had proposed in 2018. Indeed, since the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures, and the Department recognizes that increasing civil capacity is one key to solving the competency crisis. However, the Department has renovated two previously closed civil units into units for competence restoration. As of their most recent report, the CMHHiFL population included a total of 88 civil patients and 41 restoration patients.[25]

In January 2024, the Department was able to reopen a previously closed 21-bed admissions unit at CMHHiP, which allows for more individuals to be admitted to the hospital.

Of course, *civil inpatient capacity remains precariously low throughout Colorado.* As we have continually emphasized, the Department must also increase civil bed capacity. No amount of diversion, community programs, or other outpatient alternatives will ever meet the needs of *all* Colorado's mentally ill population. Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts. The few states with reasonable wait times for forensic services all have strong civil capacity, both inpatient and in the community. We reiterate that any successful long-term solution to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges. This broad strategy aligns with our other long-standing recommendations: diversion and deflection programs, long-acting injectable medications, assisted outpatient treatment, peer supports, robust case management, judicial supervision and monitoring, and involuntary medication orders. Without a strong civil system (inpatient and outpatient), competency remains the most accessible (albeit least efficient) route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competency services system. We

---

[25] According to the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, p. 27.

continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems. We support the Department's current short-term push to reduce the waitlist by prioritizing inpatient beds for competence restoration, but we continue to emphasize that any long-term sustainable solution must shift inpatient priority from forensic to civil beds.

Responsive to these needs, this quarter expanded the number of open Mental Health Transitional Living (MHTL) homes, which serve as a critically important addition to Colorado's civil service array. The Department funded 125 MHTL beds allocated to various providers around the state, with 24 beds across three homes operated by CDHS and the others (96 beds across five homes) by private contractors. Remarkably, the Department estimates that the initial funding for the 125 homes will actually allow for nearly 150 beds to be funded, due to cost savings across the system. To date, three of the contracted homes are open, with a total of 24 people either residing, enrolled, or pending admission in the homes. These homes provide step-down interim housing opportunities for people who have spent more time than necessary at the state hospital (perhaps due to difficulties finding an appropriate place to discharge) or who are at substantial risk for entering inpatient competence restoration. We view these homes as one of the most *critical components of a full civil service system*, and we affirm the Department for addressing this long-standing gap in service and housing. We also believe more transitional housing is critical.

## COMPREHENSIVE AND COHESIVE PLAN

> 40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies that can reduce the competency-involved population.

As the pandemic continued, and as the competency crisis grew more dire, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, as we encouraged "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* in this type of comprehensive approach. In April of 2022, the Department pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. The Department organized their efforts according to six key strategies or "levers:"

1. Number of inpatient beds;
2. Inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reduce the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and wait times. But we also appreciated the efforts to expand the scope of their focus to beds and services *in the community*, for a much more comprehensive approach to the crisis. Indeed, addressing the first several (inpatient) variables will be crucial to decrease the current waitlist,

but vigorously addressing the last few (community) variables will be crucial for minimizing future additions to the waitlist.

During the 2023 legislative session, the Department supported two competency bills. Though the first primarily addresses juvenile proceedings, the second (effective July 2024), HB 23-1138, improves the path to civil treatment for those involved in the competency system. However, this is tightly tied to the anticipated (but delayed) BHA system.

*2023 Comprehensive Plan and Budget Requests:*
During the prior quarter, the Department submitted their latest Comprehensive Plan (September 2023). The Department memorialized their efforts over the past year, including much greater collaboration with other stakeholders across various workgroups. The Department also memorialized their plans to:
- Expand their use of community (private) hospital beds for the restoration population,
- Continue to reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Better use existing inpatient beds, with increasing efficiencies, re-evaluations, and related measures

In line with the goals detailed in this Comprehensive Plan, the Department requested from the Governor's office: "$57,967,379 supplemental for FY 2023-24, $75,245,671 and 3.4 FTE in FY 2024-25, and $70,143,328 and 3.4 FTE in FY 2025-26."  The Department's reasoned that,
> *"Providing this funding will allow the Office to make a total of 162 additional beds available in FY 2023-24, FY 2024-25, and FY 2025-26 which includes increasing inpatient restoration beds at private hospitals, opening three additional forensic units with 82 beds at the Mental Health Hospitals (MHHs) that have been closed or delayed because of understaffing, and complying with staffing levels recommended by Chartis [external consultants]…"*

Specifically, the requested $57,967,379  in supplemental funds for FY 2023-24 will, according to the Department, serve to:

1. *Maintain the 61 beds at private hospitals and add 19 more beds before the end of the fiscal year;*
2. *Staff and re-open 82 beds at the E2 and RNRU forensic units at CMHHIP, and staff and open the new F3 forensic unit at CMHHIFL by the end of 2023;*
3. *Add 6.8 temporary RNs and 17.2 temporary MHCs to ensure adequate staffing of the F2 and F3 forensic units at CMHHIFL, open F3 in December 2023, and comply with Chartis' recommendations; and*
4. *Fill direct care FTE vacancies by 12.5% at the MHHs while reducing agency direct care staff by 12.5%. (p.8)*

*This quarter, the Governor granted this budget request*. As we emphasized in the prior quarterly report, there is much to affirm in the budget request and the underlying plan. Much is consistent

with our strategic discussions over the past few years, and much should meaningfully improve the services addressed in the Consent Decree. Indeed, the decreased waitlist we describe throughout this report is largely attributable to increasing beds. *These inpatient beds are absolutely necessary*. The Department has long had far too few inpatient beds, relative to the state population and need. Likewise, *more staffing is essential.* Without decreasing these compensation gaps, it will be impossible to adequately staff CMHHiP or CMHHiFL.

Along with our affirmation and enthusiasm for these ambitious budget requests, **we have also offered the Department several suggestions.** *First, over the coming months and years, inpatient beds should also prioritize civil, not just forensic, treatment*. The Department recognizes the challenging hydraulics of public mental health treatment: the cycle of increasing forensic demand continues until there is adequate community and civil psychiatric treatment available.

Second, *inpatient beds are necessary, but not sufficient, to resolve the current crisis*. OCFMH recognizes the need for broad, collaborative solutions across the continuum of care. These strategies remain crucial no matter how many inpatient beds open. Many defendants do not require this inpatient treatment and can be adequately served through Colorado's outpatient restoration program. Others only require inpatient treatment until they can "step down" to other types of facilities or housing (such as the recently emerging Mental Health Transitional Living Homes). Thus, increases in inpatient beds should occur *alongside* improvements across the continuum of care. We are pleased to see the Department continue pursuing these other strategies, including collaboration with other stakeholders.

For the second consecutive quarter, there is more reason for cautious optimism. The Department has opened more beds, prompting the first sustained decrease in waitlist since the pandemic. Recent budget gains will create more available beds. This is likely to further decrease the waitlist, addressing a dire need. *At the same time,* we continue to encourage the broad and comprehensive changes—e.g., more diversion from the competence system, greater use of civil psychiatric treatment, etc.—that are crucial to help *sustain* any decrease in the waitlist. As the Department knows, this multi-causal, complex crisis requires multiple strategies for solution.

*Prior quarters revealed substantial progress for the Department in collaborating with others and securing significant funding to prioritize more comprehensive, long-term, and "upstream" approaches to the competency crisis. More recent efforts are targeting the pressing needs for staff and additional inpatient beds. We affirm all these efforts, which are necessary to address such a daunting challenge. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment.*

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's formal competency restoration program (OCRP) began in March of 2018, and has grown steadily since then. Referrals for outpatient restoration were steady this quarter, ranging from 74 to 77 defendants per month, similar to other quarters this year.[26]  More than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. We continue to affirm the Department's success in building the largest, most robust statewide OCRP program in the country (only one other state offers statewide OCR). Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. In the past quarter, 227 people were placed in OCR.

*OCRP outcomes*
Data from November 2023 – January 2024 reveals a 33.6% restoration rate in the OCRP re-evaluation reports that the Department reviewed (51 of 152 total opinions). An additional 28.9% were opined as unrestorable (44 out of 152). The remaining 37.5% were opined as remaining incompetent. This reflects a slightly lower but still reasonably steady OCRP restoration rate, which was 39% and 41% the past two quarters. Data from the same period shows that courts found 47.7% of defendants restored to competence (72 of 152 total adjudications), similar to last quarter's 47.7% rate. The court dismissed charges and/or otherwise terminated restoration services in an additional 34.2% of these re-evaluation cases. The Department reported that positive outcomes may be declining due to enrolling a more acutely ill population; at the onset of the OCRP, about 20% were defined as having "high needs," but this quarter showed a "high needs" rate of 35%.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds, and Peakview Hospital for 54 beds; beds were filled to more than 90% capacity over the past quarter. A pending contract with Aurora Medical Center should allow for the opening of 19 more beds. These overflow beds have proven critical amid the pauses in admission to CMHHiP, and we encourage the Department to maintain this capacity at least until CMHHiP reopens all their previously closed units. Additionally, while we affirm the Department

---

[26] All data in this section retrieved from the Department's Special Master Compliance Plan report for January 2024, submitted February 15, 2024, pp. 49-56.

securing these inpatient restoration beds, we reiterate that *civil* inpatient capacity remains too meager. The Department must prioritize civil inpatient capacity in addition to building its forensic capacity; this will help sustain the improvements in the waitlist as individuals receive civil (rather than forensic) treatment. We encourage the Department to continue to devote reopening beds to civil patients, diversion programs, or similar programs designed to provide inpatient mental health services in lieu of restoration services. See Appendix 2 for more details on these privately contracted beds.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| November 1, 2021 goal | 60% maximum | 40% minimum |
| Recent progress (past 6 months) | May 1, 2023 – Oct 1, 2023: 62.1% | May 1, 2023 – Oct 1, 2023: 37.9% |

For the past six months (July 2023 through January 2024), a total of 37.9% of all restoration orders were to outpatient restoration. This rate has remained at compliance or very near compliance for the past several quarters. Directing such a large portion of defendants towards outpatient restoration is a tremendous strength of the Colorado system, and a crucial protection against an even greater "competence crisis."

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

This metric decreased substantially over the past six months as compared to the previous six-month period. The current figure, reflecting six months' worth of data between July 2023 — January 2024 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 19% OCR referral rate among all evaluations conducted in jails. Monthly averages dipped as low as 12% in July 2023, and exceeded the 20% threshold only once. The 19% rate is higher than the earlier six-month figures of 13% (2023) and 13% (2022-23). The December 2023 rate of 37.2 is clearly an exceptional outlier; without it, the average for the other five months over the past two quarters was 15.3%. While this 15.3% rate still represents an increase over the figures from the previous year, it also still remains below the ideal rate.

Still, given the combination of persons ordered to OCRP overall (37.9% of all persons adjudicated as ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (15.3% or 19%, depending on the inclusion of December 2023's incredibly high rate), we continue to affirm the tremendous impact that OCRP has on the waitlist. A total of 227 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist. Although benchmarks remained unmet this quarter, the OCRP continues to be a critical component in Colorado's competence services system.

# CONCLUSION

Like every quarter for the past two years, this quarter revealed wait times that far exceed the required timelines. *However, the waitlist has decreased for the second consecutive quarter.* With new units opened at the hospitals, there have been more admissions this quarter than any in recent history. Of course, the backlog is extreme, and detainees continue to wait too long. But for the second consecutive quarter, several key metrics trended in the right direction, for the first time in two years, *revealing the best progress we have seen since the pandemic*.

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# APPENDIX 1

## Summary of Inpatient Restoration Service Capacity

| *Summary of Inpatient Restoration Service Capacity* | | | | |
|---|---|---|---|---|
| Setting | Total currently active restoration beds | Total future restoration beds through 12/24 | Total future restoration beds (anticipated full capacity) | Funding Source |
| CMHHiP* | 218 | 218 | 218 | CDHS |
| CMHHiFL* | 44 | 44 | 44 | CDHS |
| Arapahoe RISE | 60 | 60 | 60 | CDHS |
| Boulder RISE | 18 | 0 | 0 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | 18 | 18 | CDHS |
| Denver Health | 15 | 15 | 15 | CDHS / Emergency |
| Peakview Hospital | 54 | 54 | 54 | CDHS / Emergency |
| Medical Center of Aurora | 0 | 19 | 19 | Emergency |
| Total | 427 | 428 | 428 | |

* All restoration beds at CMHHiP are now available. The Department has received preliminary approval for funding to maintain these beds throughout the next two fiscal years, continue privately contracted beds, and acquire 19 new contracted beds in the next fiscal year. Boulder RISE is expected to end their contract on June 30, and Arapahoe RISE is considering expanding their program to accommodate those extra beds. We have not included those 18 potential Arapahoe RISE beds here.

# APPENDIX 2

Summary of Colorado's Competency Dockets
(compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served | Comments | Schedule | Navigator |
|---|---|---|---|---|---|
| **1st Judicial District** | Judge Klein & Judge Miloud | Low-level felony | Operational in January 2024 | EO Wednesday | Taciana |
| **2nd Judicial District** | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DA approval) | Also incorporates a pre-comp "screener" | Tuesdays starting at 9AM | |
| **Denver County Court Comp Docket (Misdemeanor Charges)** | Judge Cherry | Misdemeanor Cases Only | March 2024 Launch / Diversion Oriented | | |
| **4th Judicial District - El Paso** | Magistrate Gurney | F5&F6 Non-VRA cases (and case-by-case approval from DDA) | | Staffing Every Tuesday 9AM, Hearing every Thursday 9AM | Charity, Sunset |
| **5th Judicial District** | Judge Shamis | Will eventually take all competency cases in the district | Launched in November 2023 | Friday afternoon 2x/mo 1x in Eagle 1x in Breckenridge | |
| **8th Judicial District - Larimer** | Judge Blanco | Low-Level Felony and Misdemeanor | | Thursday mornings at 9AM | Denise |
| **10th Judicial District - Pueblo** | Judge Ernst | <F3 non-violent, judges make "referrals" | Focuses on clients that need support for re-entry/transition | EOWednesday staffing at 2, hearing at 3 | Kimberly |
| **12th Judicial District - Alamosa Only** | Judge Cortez-Rodriguez | >F2 clients that need "support" | Launching February 2024 | 1x/month | Charlie |

| | | | | | |
|---|---|---|---|---|---|
| **16th - Otero, Bent, Crowley** | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) | Virtual appearances approved for Bent & Crowley cases (either jail or courthouse). | 3rd Friday of the Month | Kimberly |
| **17th Judicial District - Adams** | Judge Jimenez | TBD | CJCC taking over Comp Docket Planning Meetings | | |
| **18th Judicial District Court - Arapahoe** | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out of custody (capped at 10) | Pre-ITP Referral from Division 302 (preliminary division), 100% will have Bridges Liaison assigned. | Monthly on 3rd Thursday at 1 (staffing at 1, hearing at 2) | Nick, Brittany |
| **19th Judicial District - Weld** | TBD | TBD | Launch Spring 2024? | | Staci |
| | | | | | |
| **Other** | | | | | |
| **2nd Judicial District (Pre-Comp Mini-Screener)** | Judge Arnolds | Pre-Comp Cases | Pre-ITP cases screened for initial direction (need full eval, likely competent, etc.) | EOTuesday 1:30 in Division 1H | n/a |
| **Denver County Competency Diversion Program** | Jail Magistrate (rotating) | Pre-Comp Clients in Denver | Denver County Court's Competency Diversion - they serve felony and misdemeanor cases. Magistrate Beckman has presided over courtroom 2300 (DDC) where most of the action takes place but that may be changing with rotation. | PRN | n/a |

Case No. 1:11-cv-02285-NYW   Document 284   filed 03/01/24   USDC Colorado   pg 46 of 51



# FINES COMMITTEE Allocated Funds Summary

The Competency Waitlist Fines Fund was created by a federal court consent decree in litigation addressing Colorado's Competency to Stand Trial system. The Fines Committee was established to oversee the Fines Fund; its purpose is to support programs that have potential to reduce the State's competency restoration waitlist.



### Colorado Coalition for the Homeless (CCH)

**$4,964,964** - Providing modified Assertive Community Treatment level services to clients who are referred through the Office of Behavioral Health's Forensic Support Team as appropriate for Outpatient Restoration. Additionally, start-up funding was provided in 2019 to enable the program to purchase a 182-unit housing facility, out of which this, and other Colorado Coalition for the Homeless programs are operated.



### Denver Competency Diversion & WellPower

**$2,159,208** - Diverting from prosecution those defendants who are likely to be found incompetent to proceed. The Fines Committee funds a program administrator, behavioral health navigators, and salaries for prosecutors and public defenders who work with clients in the program. Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.



### Larimer County Competency Docket

**$533,242** - Diverting individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a competency services case manager and a competency services team lead.



### University of Denver's Denver FIRST Program

**$948,729** - Identifying and assessing clients ordered to outpatient competency restoration programs for traumatic brain injury and acquired brain injury, to enhance appropriate interventions for those identified clients, and to provide training to jail staff and providers.



### Aurora Municipal Court Sustained

**$719,284** - Screening individuals booked in the municipal jail and assessing appropriate individuals for competency. The program connects clients to treatment out of custody and works toward prosecutorial diversion. The Fines Committee funds a program administrator, pays for competency evaluations, and provides cell phones for clients.



### Fidelity Behavioral Health

**$1,272,559** - Providing housing, treatment, wraparound services, and outpatient restoration to competency-involved individuals and those at risk of becoming competency-involved in Adams, Jefferson, Arapahoe, Douglas, and Weld Counties for three years.



### SummitStone Competency Hub

**$3,029,283** - Increasing psychiatric services in the Larimer County Jail and establishing a community-based competency hub that enables clients' medication management and provision of services.



## Assisted Living of Aurora

**$822,000** - Providing ten supportive temporary beds to enable client benefits enrollment to fund longer-term out-of-custody placement during restoration.



## Embark Recovery Residences

**$641,700** - Providing sober-living housing to serve individuals released from confinement who are receiving competency restoration, as well as supporting outpatient restoration clients with case management, treatment, peer specialists, and classes.



## Mesa County Sheriff's Office Long-Acting Injectables Program

**$360,000** - Providing in-custody clients with long-acting injectable medications to support mental health outcomes for those returning from the State hospital following competency restoration, and for newly booked inmates for whom the intervention is medically indicated.



## Monarch Competency Housing

**$953,074** - Providing sober-living housing and supportive wraparound services . Twenty-four dedicated beds are reserved for clients deemed appropriate to be released from custody for the restoration process and referred by the Forensic Support Team or Bridges.



## San Luis Valley Recovery Housing

**$313,762** - Providing five beds in a sober-living facility to serve individuals referred for out-of-custody competency restoration in the 12th Judicial District. This program will also connect clients to medically-assisted recovery treatment and other services to support competency recovery.



## Ananeo Competency Housing

**$1,847,630** - Providing housing and services associated with supportive monitored sober housing. Forty dedicated beds are reserved for individuals, suitable for diversion from confinement, who are receiving outpatient competency restoration and treatment, referred by the Forensic Support Team or Bridges.



## AllHealth Network Bridges to Care

**$134,000** - Supporting the implementation of an Arapahoe County Competency Docket by doubling the capacity of the existing State Court Bridges Program which is providing client case management and treatment support.



## SAFER Opportunities Colorado

**$2,007,500** - Offering safe, continuous hotel sheltering in Arapahoe County with a continuum of community-based, client-centered safety net services. The Fines Committee funds numerous positions and wraparound services.



## Larimer County Public Defender's Office

**$262,000** - Establishing a dedicated Senior Public Defender position for two years to support the Larimer County Competency Docket.



## 2nd Judicial District REACH Docket

**$220,000** - Establishing a Docket Coordinator position for two years to support the 2nd Judicial District Competency Docket (REACH).



## Mile High Behavioral Healthcare

**$286,745** - Assisting clients with acquiring treatment and wraparound services out of custody. The Fines Committee funds two clinical case managers to support pre-release incarcerated clients with mental health and substance use disorders.



## Behavioral Treatment Services Day Reporting

**$265,814** - Establishing a Day Reporting Center with treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## Boulder County Sheriff's Office

**$130,000** - Providing in-custody clients with long-acting injectables to support mental health for those returning from the State hospital following restoration, and for newly-booked inmates, as well as supporting clients transitioning to the community through temporary housing and ancillary items.



## SCAO Competency Docket Analyst

**$222,664** - Creating an analyst position to support judicial districts operating special programs in the competency system; the analyst provides training, awareness of resources, data collection, and evaluation support for competency dockets and judicial programs.



## Gateway to Success Day Reporting Center

**$275,000** - Establishing a Day Reporting Center with treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## Second Chance Center in the City

**$488,125** - Providing onsite case management, peer mentoring, employment services, housing navigation, mental health services, and substance misuse services to individuals in or at risk of being in the competency system. The Fines Committee funds a care manager, behavioral health navigator, and partial salaries for the director and assistant director, as well as costs directly related to clients' basic needs, emergency housing, community navigation, and leasing an office space.



## United Way of Weld County

**$1,421,440** - Transitioning competency-involved individuals from the Weld County Jail to the community by providing rapid rehousing and emergency housing services, case management, assistance with benefit acquisition, and wraparound services.



## 1st Judicial District Competency Docket

**$220,000** - Establishing a docket coordinator position to support the 1st Judicial District Competency Docket.



## Pulse Line Collaborative Training

**$1,058,270** - Providing training and resources to law enforcement, first responders, and caregivers to reduce unwarranted use of force incidences and the number of individuals with behavioral health disorders and disabilities being arrested and confined.



## City of Greeley Homeless Solutions

**$111,835** - Serving individuals in Weld County who are competency-involved by providing benefit acquisition, employment support, permanent housing vouchers, bridge housing, and wraparound services; funding also supports a .25 FTE case manager and .25 FTE peer specialist.



## Douglas County Sheriff's Office Data Diversion Project

**$683,300** - Establishing a data-driven program to enable the 911 emergency system of Douglas County to rapidly connect callers with behavioral health resources to reduce the number of individuals who become involved with the state competency restoration system; funding supports software licensing fees, staff overtime, a project manager, treatment services, equipment, and supplies.



## Solange Assisted Living

**$600,000** - Offering assisted living residences, in-house outpatient restoration, treatment, case management, peer support, medication management, transportation, and other supportive services to competency-involved clients in Mesa County and throughout the Denver Metro area.



## 12th Judicial District Competency Docket

**$69,555** - Establishing a Docket Coordinator position to support the 12th Judicial District Competency Docket.



## National Alliance on Mental Illness (NAMI) Colorado

**$91,030** - Providing evidence-based peer programming for patients and staff of the Colorado Mental Health Hospitals in Pueblo and Fort Logan



## Embark Assisted Living – Renaissance

**$380,820** - Providing eight licensed transitional assisted living beds, called Renaissance, in El Paso County to competency-involved individuals.  24-hour staffing supervision and programming geared toward participants' health optimization, reinteigration into the community, and assistance with long-term placement will also be provided.



## Boulder County Community Justice Services

**$505,842** - Supporting aspects of the State Court Bridges Program, including the provision of access to services to enable the release from custody for competency clients.

# Previously-funded Programs
## *Funded between 2018 and 2023*

 **Denver Health**

**$3,270,000** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.

 **Mesa County Pretrial Community Alternative Placement**

**$27,900** - Diverted individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. The Fines Committee funded inpatient treatment for clients in the PreCAP program.

 **IMPACT Integrated Insight Therapy**

**$1,178,000** - Diverted 22 individuals on whom competency was raised by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded case managers, house managers, peer support professionals, monitoring services, and houses in rural Colorado.

 **Peak View Behavioral Health**

**$440,800** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.

 **Denver Sheriff Department**

**$663,114** - Supported the Denver Restoration Treatment Unit, a jail-based initiative that provides programming focused on competency restoration, general mental health needs, and enhancing life skills.

 **REACH Docket Competency Screener**

**$17,850** - Provided additional screening and evaluation capacity to the 2nd Judicial District REACH Docket.

 **Colorado Mental Health Institute**

**$669,850** - Purchased and provided cellular phones, access (minutes), and transportation for competency-involved individuals during the pandemic, as well as laptops and related expenses for providers and local jails to allow pandemic-era competency services to continue.

 **Community Based Enhanced Restoration**

**$400,000** - Provided Assertive Community Treatment to individuals so that they could be released on bond and restored to competency out-of-custody. The Fines Committee also funded housing options for clients who would otherwise be homeless.

| Total Fines Received | Total Funds Allocated | Total Funds Spent by Programs |
|---|---|---|
| $ 41,255,506 | $ 34,666,889 | $ 17,323,868 |
| As of 02/10/24 | As of 02/10/24 | As of 12/31/23 |



| Program | Allocated | Spent |
|---|---|---|
| 1st JD Competency Docket | $220,000 | $0 |
| 2nd JD REACH Docket | $220,000 | $27,500 |
| 12th JD Competency Docket | $69,555 | $0 |
| AllHealth Network Bridges to Care | $134,000 | $18,628 |
| Ananeo Housing | $1,847,630 | $594,156 |
| Assisted Living of Aurora | $822,000 | $158,213 |
| Aurora Sustained | $719,284 | $512,659 |
| Boulder County Justice Services | $505,842 | $146,519 |
| Boulder County Sheriff's Office | $130,000 | $56,242 |
| BTS Forensic Day Reporting | $265,814 | $0 |
| City of Greeley Homeless Solutions | $111,835 | $7,382 |
| Colorado CCH (CREST) | $1,500,000 | $1,500,000 |
| Colorado CCH (Restoration Housing) | $3,464,964 | $3,464,964 |
| Colorado Mental Health Institute | $669,850 | $669,850 |
| Community Based Enhanced Restoration | $400,000 | $400,000 |
| Denver Comp. Diversion & WellPower | $2,159,208 | $903,793 |
| Denver Health | $3,270,000 | $3,270,000 |
| Denver Sheriff Department | $663,114 | $663,114 |
| Douglas County Sheriff's Office | $683,300 | $0 |
| Embark Assisted Living - Renaissance | $380,820 | $303,227 |
| Embark Recovery Residences | $641,700 | $262,420 |
| Fidelity Behavioral Health | $1,272,559 | $0 |
| Gateway to Success-Pueblo | $275,000 | $192,419 |
| IMPACT Integrated Insight Therapy | $1,178,000 | $564,079 |
| Larimer County Competency Docket | $533,242 | $387,374 |
| Larimer County Public Defender's Office | $262,000 | $262,000 |
| Mesa County LAI Program | $360,000 | $64,882 |
| Mesa County Pretrial CAP | $27,900 | $27,900 |
| Mile High Behavioral Healthcare | $286,745 | $104,090 |
| Monarch Competency Housing | $953,074 | $533,250 |
| NAMI Colorado | $91,030 | $0 |
| Peak View Behavioral Health | $440,800 | $440,800 |
| Pulse Line Collaborative Training | $1,058,270 | $0 |
| REACH Docket Competency Screener | $17,850 | $17,850 |
| SAFER Opportunities | $2,007,500 | $750,000 |
| San Luis Valley Recovery Housing | $313,762 | $0 |
| SCAO Competency Docket Analyst | $222,664 | $17,091 |
| Second Chance Center in the City | $488,125 | $115,511 |
| Solange Assisted Living | $600,000 | $0 |
| SummitStone Competency Hub | $3,029,283 | $614,740 |
| United Way of Weld County | $1,421,440 | $77,892 |
| University of Denver's Denver FIRST | $948,729 | $195,323 |

■ Allocated   ■ Spent

This document is updated quarterly; as such, it does not reflect up-to-the-minute expenditures and funded projects.