

Groundswell Services, Inc.

---

<u>SPECIAL MASTER REPORT to JUDGE WANG</u>

May 28, 2024

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

May 28, 2024

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our May 2024 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. The Department initiated these steps and demonstrated meaningful progress. Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

Exactly one year later, in the spring of 2020, the COVID-19 pandemic brought the Department unforeseeable challenges and their progress stalled. COVID-related complications slowed progress on most metrics, and put simply, all metrics moved in the wrong direction. Even after the pandemic relented, many setbacks remained. In particular, the Department faced

tremendous difficulties staffing their facilities, which left unused hospital units, and less capacity to serve the people in jail awaiting transfer and treatment in those units. Similar difficulties have been common across the country, and states vary in the timing and degree to which they have begun to improve.

*The prior quarter (ending November 2023) featured the first sustained pause in many of these negative trends. The most recent quarter reflects continued steady progress, and the third consecutive quarter of improvements on most metrics.* After years of steady increases in the demand for competence services, there has been more of a plateau. Concurrently, most hospital units have reopened, and the Department has secured new beds, moving more people from the waitlist to inpatient beds.  Indeed, *the total number of people admitted to inpatient restoration this quarter (n=339) was the most since the onset of the Consent Decree*. Newly opened Mental Health Transitional Living homes (MHTLs) have begun providing a crucial level of care that has long been lacking in Colorado. Overall, the waitlist continued to decrease.  Less than one year ago (late June 2023) the waitlist peaked at 483 people, but by the end of this quarter, it dropped below 300 for the first time since 2021. More than at any other point since the pandemic, there is reason to anticipate continued improvement.

Across the past three quarters we perceive increasing reason for optimism, though certainly no reason for complacency or decreased efforts. Although the Department has made tremendous progress in opening inpatient beds, it remains clear that Colorado's "competency crisis" is not something the Department can solve alone. They must continue efforts with other stakeholders to enact legislation and strategies that decrease orders for competence evaluation and restoration, instead prioritizing mental health treatment over competence restoration. Indeed, this quarter featured one such example (HB 24-1355, described later) of an external, broad effort to address the competency crisis and related needs. Thus, we see important progress within and around the Department.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

# TABLE OF CONTENTS

CONTEXT for QUARTERLY METRICS ...................................................................................... 5

KEY METRICS FOR PROGRESS: ............................................................................................ 9

COMPLIANCE WITH TIME FRAME REQUIREMENTS ............................................................ 9
    KEY METRIC: COMPETENCE EVALUATION TIME FRAMES ........................................ 10
    KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION .................... 11
    KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES .............................. 14

CONSENT DECREE SECTION VI UPDATES ........................................................................... 17
    ADMISSION OF PRETRIAL DETAINEES FOR INPATIENT COMPETENCY EVALUATIONS AND
    RESTORATION TREATMENT ....................................................................................... 17
        Wait Times for Inpatient Evaluation .................................................................. 18
        Wait Times for Inpatient Restoration ................................................................. 19
    INTERIM JAIL MENTAL HEALTH TREATMENT .......................................................... 22
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT ..... 24
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES ................................................... 27

DECREE SECTION VII UPDATES ......................................................................................... 30
    CIVIL BED FREEZE .................................................................................................... 30
    COMPREHENSIVE AND COHESIVE PLAN ................................................................... 32
    INCREASE COMMUNITY RESTORATION SERVICES .................................................... 35

CONCLUSION ................................................................................................................... 38

APPENDIX 1 ...................................................................................................................... 39

APPENDIX 2 ...................................................................................................................... 40

APPENDIX 3 ...................................................................................................................... 42

# CONTEXT for QUARTERLY METRICS

*Historic Context:*
Longstanding vulnerabilities in Colorado's public mental health system set the stage for the current "competency crisis." For many years preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that—unlike most other states—was able to operate selectively, routinely declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the United States, and other states were beginning to experience a "competency crisis." Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree.  As you recall, we tend to summarize the overall spirit and provisions of the Consent Decree in three goals:
   a) Reducing the *number* of people on the waitlist for competence restoration services,
   b) Reducing the *wait times* for people on the waitlist, particularly people with the most acute psychiatric illness, and
   c) Reducing *harm* (by providing *care*) to people on the waitlist.

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the Department could not keep pace with court orders for competency services, and the waitlist grew. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, over 80 beds[1] at CMHHiP remained unused because there were not sufficient staff to operate the units. The waitlist peaked at 464 people.[2]

---

[1] This figure varied a bit, but for over one year, over 80 beds remained unusable.

[2] For example, the waitlist appeared to peak at 464 people at the end of May 2023, and was still 459 at the end of July 2023.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Pretrial Detainees. In early 2022, Governor Polis (at the Department's urging) and the Joint Budget Commission approved approximately $30 million in emergency funding to secure 64 additional private psychiatric beds to temporarily address the record demand for restoration services. Subsequent legislation devoted $60 million to fund another 96 beds through 2023. The Department continued to pay a premium for emergency treatment beds, while some of their own CMHHiP treatment beds remained unused because they lacked staff. But over the past few years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year. *As of this quarter, the Department has now reopened nearly all beds that were closed during the pandemic, and hospital capacity will match (or exceed) pre-pandemic capacity in the next quarter*.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree. These delays continue, though less severely; average wait times still exceed those mandated by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

### Recent Context:
Over the past few years, the Department worked with stakeholders to pass legislation and secure funds from the American Rescue Plan Act (ARPA). Although passed many months ago (and addressed in prior Quarterly Reports), many of initiatives have begun providing services. Indeed, the first Mental Health Transitional Living home (MHTL) has already altered the waitlist.

| Initiatives: | Action: |
|---|---|
| $65 million in ARPA funding to launch 125 beds in group homes and an additional 16 beds at CMHHIFL. | The Department has awarded all contracts, and some of the first group homes have welcomed residents, including many who have transition from CMHHiP. |

| | |
|---|---|
| $62 million to support grants for early intervention, deflection, and redirection from the criminal justice system among those with psychiatric illness. | The Department has awarded grants. None of these programs have begun operating to the degree that it would be possible to gauge their impact. |
| $61 million to improve Colorado's clinical workforce, particularly addressing the shortage of nurses. | The Department has adjusted salaries and bonuses to enhance recruitment and retention. These strategies have clearly improved staffing, with far more applicants and hires. |
| New legislation to limit inpatient restoration, among those with only misdemeanor charges, to those who meet emergency hospitalization criteria (those who do not must be ordered to outpatient restoration). | CRS 16-8.5-111 allows for the dismissal of a misdemeanor charge and civil commitment among ITP defendants. Other legislation (HB22-1386) requires outpatient restoration as the default approach for defendants with only misdemeanor charges unless they meet commitment criteria. |

These developments reflect movement towards the broader and more comprehensive steps that Colorado needs to take across the continuum of competency services: from diversion and deflection at the entry points to more restoration beds at the later points.

*All parties agree that the Department cannot solve the competency crisis alone,* so the Department has continued to cultivate collaborations with other stakeholders,. Although certain key services (e.g., evaluation quality, inpatient beds) are solely within the Department's control, many causes of the competency crisis—such as the arrests of unhoused people with mental illness—are well outside of Department control. The Department has continued to:

- Convene the Judicial Taskforce with judges eager to help solve the competency crisis.
- Convene the multidisciplinary "Consent Decree Steering Committee" to meet with all parties (Department, DLC, and Special Master, as well as a national consultant) every other month, and address potential collaborative solutions.
- Support the Denver Competency Docket, led by two judges who are knowledgeable and motivated regarding competency matters.
- Pursue strategies to divert people with serious mental illness into community (civil) treatment rather than defaulting to the competency mechanism for forensic treatment. One most recent step involved collaborating with other stakeholders who introduces HB-1355, which attempts to divert certain detainees to treatment rather than competence evaluation and restoration.

Unfortunately, many of these strategies require a more robust community mental health system that, as we've emphasized before, is an historic weakness for Colorado. The Department is

transitioning towards a Behavioral Health Administration system, a new cabinet-level agency, housed within the Department of Human Services, designed to be the single entity responsible for coordination and collaboration across state agencies to address behavioral health needs. This transition includes many promises relevant to the competency population:  a true "safety net" to ensure mental health services for all who need them, decreasing opportunities to deny services to certain populations. Indeed, this requirement has now gone into effect. A BHA *should* benefit the competency population, and reduce the number of people entering competency services, if the BHS indeed creates significantly more access and availability of community mental health resources. But again, many of the BHA changes are quite new, and it remains too soon to gauge their actual effects.

*This Quarter*

This quarter follows three prior quarters of increasing bed capacity (e.g., re-opening 39 beds at CMHHiP, opening the second new 22-bed unit at CMHHiFL, expanding the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds). They also began to transition some long-term patients into new Mental Health Transitional Living (MHTL) homes, which now serve a total of 30 patients. Once again, the Department has continued admitting more detainees than in previous quarters, and *the overall number of persons on the waitlist has generally declined for over nine months – the first time this has occurred since the beginning of the pandemic.[3]*

---

### One Year After the Waitlist Peaked

As we have mentioned many times, the waitlist—i.e., the list of people waiting for some form of inpatient competence restoration services—peaked at 464 people one year ago, at the end of May 2023.  There was little change over the summer, and the waitlist was still 459 at the end of July 2023. But by the end of October 2023, the Department reported a waitlist of 427 people, and by February 24, 2024 it had decreased to 343.  As of this week—late May of 2023, which falls one year after the peak waitlist—the waitlist has fallen to 297, which is the first time it has been below 300 in years.  To be clear, this is still a larger list than the year preceding the pandemic.  But most of the past year has featured a steady decline in the waitlist.  Much of this decline reflects *increasing capacity*: particularly more inpatient hospital beds, but also capacity in the form of MHTL homes, and transitional housing that makes it more feasible to release detainees from jail into outpatient restoration.

---

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

---

[3] As of today  (May 24, 2024), the waitlist has decreased to 297, the lowest point in the past 4 years.

# KEY METRICS FOR PROGRESS:

# COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC: COMPETENCE EVALUATION TIME FRAMES

The Department historically met evaluation time frames, even before the 2019 Consent Decree and even through most of the pandemic. After staffing shortages caused delays during some of 2020, the Department returned to almost perfect compliance with evaluation time frames. Court orders for jail-based competence evaluations had dropped to an all-time monthly low during the Spring of 2020 (e.g., 56 people in April 2020), with the onset of the COVID-19 pandemic. But arrests and orders for jail-based evaluations resumed dramatically peaking at an all-time monthly high two years after the pandemic began (i.e., 178 in March of 2022). Orders for jail-based evaluation have held steady the past year, averaging *133 defendants per month*, albeit with an unusual spike (167) last month (April 2024).

| *Average waiting time (in days) for a competence evaluation*[4] | | | | | |
|---|---|---|---|---|---|
| | Nov 23 - Jan 24 | Feb 2024 | Mar 2024 | Apr 2024 | Requirement |
| Jail-based Competency Evaluations | 11.3 | 11 | 10.7 | 10.9 | 21 days |
| Inpatient Competency Evaluations | 24.7** | n/a | n/a | n/a | 14 days |

** = most defendants waited longer than the maximum time frame for the evaluation

Even with a high volume of court orders the Department's Court Services unit has generally remained responsive and efficient, maintaining near-perfect compliance with timelines for most of the past year. This quarter, they maintained perfect performance for the seventh month in a row; *no Detainee waited more than 21 days for an evaluation in jail*.

Regarding inpatient evaluations, there remain very few orders for inpatient competence evaluations (i.e., only one this quarter). All orders were resolved in ways *other than* hospital admission. Again, orders for inpatient evaluation remain rare (evaluations should usually be completed in jail) and often reflect severely ill Detainees.

Orders for *jail-based* evaluations held steady. Court Services continues to keep pace amid the challenges and completed *all* jailed-based evaluations within the 21-day time limit. The one order for inpatient evaluation as resolved without admission.

---

[4] Information retrieved from the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 26, 40.

## KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:*  Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. In the months preceding the Triage system, defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE waited, on average, 71 days.[5]  This figure included all defendants referred for restoration, without distinguishing those with more, versus less, acute needs. Then the Department launched on June 1, 2019 the Consent Decree-mandated triage system,[6] designed to prioritize the defendants with the most acute clinical needs ("Tier 1") over those with less acute clinical needs ("Tier 2"). Tier 1 defendants must receive services within 7 days of the restoration order; Tier 2 defendants must receive services within 28 days. Upon initiating the Triage system, the Department initially maintained *excellent* adherence to the 7-day deadline for Tier 1 for several months. The wait times for Tier 2 defendants also improved, though still exceeding the time frames prescribed in the Consent Decree. Wait times and the number on the waitlist were decreasing *until* the onset of the COVID-19 pandemic, but greatly increased thereafter. Those wait times have continued to remain far out of compliance even after the pandemic relented. *But the past quarters have revealed meaningful improvement.*

This quarter, despite progress on many areas of the Consent Decree, both Tier 1 and Tier 2 wait times for inpatient restoration remained far beyond mandated time frames, as reflected below:

| *Average Wait Times for Inpatient Competence Restoration Services[7]* | | | | |
|---|---|---|---|---|
| | Nov 2023 - Jan 2024 | Feb 2024 | Mar 2024 | Apr 2024 | July 2021 Requirement |
| Tier 1 | 92.0** | 48.5** | 58.1** | 54.9** | 7 days |
| Tier 2 | 129.7** | 111.2** | 132.5** | 106.1** | 28 days |

** = most defendants waited longer than maximum time frame for restoration services
*** = ALL defendants waited longer than maximum time frame for restoration services

---

[5] Average waiting period November 2018 - April 2019, as calculated from data provided by the Department (see p. 7 of their April monthly report filed May 7, 2019).

[6] See Consent Decree paragraph 43.

[7] Information retrieved from the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, p. 9.

Pretrial Detainees are all still waiting far longer than Consent-Decree time frames allow:

- Tier 1 detainees wait nearly *8 times longer than allowed* by the Consent Decree (i.e., 54 days on average between February – April 2024, rather than 7 days).
- Tier 2 Detainees wait more than *4 times longer than allowed* by the Consent Decree (i.e., 115 days on average between February – April 2024, rather than 28 days).

The Department remained *mostly out of compliance* regarding restoration time frames. Between February – April 2024, the Department was noncompliant with the 7-day time frame for all but four Tier 1 Detainees admitted. Of the 293 Tier 2 Detainees admitted in that same period, 230 were admitted or had their waits otherwise ended beyond their time frame of 28 days. Overall, this reflects only a 7.8% compliance rate. This rate is similar to the two previous quarters, which averaged approximately 7% compliance on this metric.[8]

Despite these long wait times, there is some reason for optimism. The average Tier 1 and Tier 2 wait times above—though certainly too long—are the shortest since 2022. Also, like last quarter, some Tier 1 detainees *were* admitted within the 7-day deadline. We see many Tier 1 detainees now admitted in a matter of days to weeks, rather than in weeks to months. All these improved metrics follow steadily improving metrics over the past several months, after the reopening of inpatient hospital units along with steadily expanding community placement options:

| *Average Wait (in days) for Inpatient Competence Restoration Services[9]* | | | | |
|---|---|---|---|---|
| | May – Jul 23 | Aug – Oct 23 | Nov 23 – Jan 24 | Feb – Apr 24 |
| Tier 1 | 109.1 | 128.3 | 92.0 | 54.3 |
| Tier 2 | 131.5 | 138 | 129.7 | 115.1 |

This quarter reflects further improvements in both wait times and the number of Detainees waiting. This is certainly an encouraging pattern persisting over many months. In our last quarterly report, we estimated that those gains would continue into this past quarter, albeit at a slower pace. It appears, however, that progress is stronger than we expected, even over these many months.

---

[8] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for the actual need for urgent admission.

[9] Information retrieved from the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 11-12..

The number of people awaiting restoration, and their wait times remain far out of compliance this quarter. On average, *Detainees wait four to eight times longer than Consent Decree time frames allow*. *Only 8% were admitted within Consent Decree time frames*. However, sustained progress is evident: wait times continue to decrease, admissions of Tier 1 Detainees occurred at a stronger pace (within days to weeks), and inpatient restoration capacity finally approximates pre-pandemic levels. While wait times remain far too long, we have been encouraged that they continue to decrease.

## KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services. The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants. By June 2020, the number on the waitlist dropped below 100. The Department projected that the waitlist would be minimal by December 2020, but the pandemic changed all projections. In late May of 2023, the waitlist peaked at 464 Detainees and remained similar through last summer. The number has steadily decreased since then.

*Current realities:*  The number of court orders for competency restoration has remained generally stable for the past year. The past 12 months averaged 123 individuals ordered to inpatient restoration per month, with this past quarter averaging 120 per month. However, the number of people awaiting inpatient restoration at the end of this quarter (n = 297) continues to decrease. The waitlist has decreased in 10 of the past 12 months, with roughly 130 fewer individuals than April 2023.

| *Number of Defendants Waiting for Inpatient Restoration[10]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Nov 20 – Jan 24 | Feb 2024 | Mar 2024 | Apr 2024 |
| Combined | 157 | 384 | 329 | 324 | 297 |
| Tier 1 | N/A | 31 | 15 | 22 | 30 |
| Tier 2 | N/A | 353 | 314 | 302 | 266 |

Figures reflect the number of persons waiting for restoration services on the last day of the respective month.

Prior to the summer of 2023, the wait list had grown steadily for more than one year, reaching an all-time peak of 483 at the end of June 2023.[11] But during the past year, the Department reopened more than 70 previously closed restoration beds and began transitioning individuals into newly opened Mental Health Transitional Living (MHTL) homes. Consequently, the Department was able to admit many more detainees than in previous quarters, and the overall

---

[10] According to the Department's *Amended* Special Master Compliance Plan report for April 2024, submitted May 24, 2024, p. 9.

[11] You may notice this "all time peak" number has changed since prior reports.  We have historically described the peak wait list as 464 at the end of May 2023, but the Department recently corrected a data-reporting error, which thereby corrects figures across the past year.  We now understand the "all time peak" to be a waitlist of 483 at the end of June 2023 (the Department's *Amended* Special Master Compliance Plan report for April 2024, submitted May 24, 2024, p. 9.)

number of persons on the waitlist has declined over the past year. One point in May 2024 featured *fewer than 300 people on the waitlist, for the first time since August 2021.* This represents meaningful and sustained improvement. Further, the total number of all Detainees waiting reflects the lowest quarterly average overall in the past year. *This quarter also had more Detainees admitted than any other quarter since the onset of the Consent Decree*. In short, *there are more than 100 fewer people on the waitlist than there were one year ago, with Tier 1 Detainees once again prioritized for more prompt admission.*

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month[12]* | |
|---|---|
| April 2023 | 456 |
| May 2023 | 475 |
| June 2023 | 483 |
| July 2023 | 460 |
| August 2023 | 444 |
| September 2023 | 431 |
| October 2023 | 429 |
| November 2023 | 418 |
| December 2023 | 350 |
| January 2024 | 383 |
| February 2024 | 329 |
| March 2024 | 324 |
| April 2024 | 297 |

[12] According to the Department's *Amended* Special Master Compliance Plan report for April 2024, submitted May 24, 2024, p. 9.  Please note that these figures have changed slightly from those we have provided in prior Quarterly Reports, because the Department has recently identified a data error, and provided us with updated and corrected figures (spanning the past year) for this metric.

*Qualitative review and extraordinary cases:* The waitlist is not simply a number, but rather a group of *people* with psychiatric illness awaiting critical treatment. Each week, we review the documented updates on each person in jail who has been waiting for inpatient restoration longer than their time frames allow. In that review, we see dozens of acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability (living in cells soiled with urine or feces, neglecting hygiene, not eating, experiencing serious medical problems, and so on) or who languish with acute symptoms of inadequately managed psychosis. Several Detainees received new criminal charges while on the waitlist for behaviors that likely reflect symptoms of their illness.

At the same time, we are encouraged that the number of people whom *we* categorize as the sickest and most vulnerable Detainees – those we suspect are most in need of an immediate hospital bed – was at its lowest in more than a year, as of our most recent weekly review (May 25, 2024). While we emphasize to the Department the unacceptable plight of several Detainees who immediately need hospital-level care but who nonetheless remain housed in county jail cells, we also acknowledge that the overall number of these individuals has decreased significantly over the past quarter. This reflects the influence of the Forensic Support Team and the inpatient hospital settings have in triaging Detainees for urgent admission, and we affirm these teams, their important work, and their achievements during the past quarter.

The number of people waiting in jails for restoration services continued to decrease this quarter, down from an all-time high last summer. A record number of Detainees were admitted to hospitals this past quarter, all the while prioritizing the sickest and most vulnerable Detainees for admission. This suggests promising progress. While we affirm these improvements, we also recognize the waitlist is still much longer than it was at the start of the Consent Decree, wait times are still far out of compliance for most Detainees, and the waitlist includes many people in acute psychiatric crisis and vulnerable to self-harm, injury, violence, or suicide. There can be no decrease in effort amid this sustained progress.

# CONSENT DECREE SECTION VI UPDATES

## ADMISSION OF PRETRIAL DETAINEES[13] FOR INPATIENT COMPETENCY EVALUATIONS AND RESTORATION TREATMENT

> 33. (a) Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment. The Department shall Offer Admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to the attached table (Table 1). Compliance with this measure shall be calculated based on the number of Days Waiting for each Pretrial Detainee.

The Consent Decree prescribed the following time frames for admitting defendants to inpatient competence restoration and for performing competence evaluations.[14] Admission time frames were longer at the start of the Consent Decree (June 1, 2019), but shortened every six months, with the final reduction in July 2021, establishing the current and ongoing time frames.

| Deadlines | Tier 1: Maximum Time to Offer Admission for Inpatient Restoration | Tier 2: Maximum Time to Offer Admission for Inpatient Restoration | Maximum Time to Offer Admission for Inpatient Competency Evaluations | Maximum time to Complete Jail Competency Evaluations |
|---|---|---|---|---|
| June 1, 2019 | 7 days | 56 days | 21 days | 28 days |
| January 1, 2020 | 7 days | 49 days | 21 days | 28 days |
| July 1, 2020 | 7 days | 42 days | 14 days | 21 days |
| January 1, 2021 | 7 days | 35 days | 14 days | 21 days |
| July 1, 2021 and onward | 7 days | 28 days | 14 days | 21 days |

---

[13] "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo competence-related services (i.e., competence evaluation or restoration treatment). Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[14] Fine amounts are tied to delays beyond each of the time frames listed. However, these fines are not applied for Pretrial Detainees designated ISC.

## Wait Times for Inpatient Evaluation

In the Consent Decree era, inpatient evaluations (those evaluations conducted at CMHHiP, CMHHiFL, or RISE) have been rare compared to the common practice of evaluating a defendant in jail. Historically, judges typically ordered inpatient evaluations only when defendants appeared severely ill and in need of urgent admission (rather than waiting for an evaluation to determine whether they need admitted for restoration). The Department was generally successful in timely admission for inpatient competence evaluations *before* the pandemic, but they have exceeded timeframes since the pandemic began. The number of people *ordered* for an inpatient competence evaluation has remained quite low, and the number subsequently *admitted* upon order is even lower (often none), because the Department resolves such orders in other ways.

| Recent Wait Times for Inpatient Evaluations[15] | | | |
|---|---|---|---|
| Month | People "admitted or ended" for inpatient evaluation[16] | Average days waited before "admitted or ended" | People who waited more than 14 days before "admitted or ended" |
| Feb 2024 | 0 (0 admitted) | n/a | n/a |
| Mar 2024 | 0 (0 admitted) | n/a | n/a |
| Apr 2024 | 0 (0 admitted) | n/a | n/a |
| Nov 23 - Jan 2024 | 6 (6 admitted) | 24.7 | 4** |
| March 2019 total | 18 | 16.4 | 1 |

** = most defendants waited longer than maximum time frame for restoration services

"Admitted or ended" designates all ways these orders are resolved. In recent years, most orders for inpatient evaluation were *not* resolved with an actual inpatient evaluation, but through other means (such as dropped charges, ending or converting the order, etc.).

While last quarter saw an increase in the number of inpatient competence evaluations conducted, this quarter revealed a return to recent historical trends. No inpatient evaluations were ordered, and so no defendants were admitted for this purpose.

---

[15] According to the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 25-26.

## Wait Times for Inpatient Restoration

Regarding wait times for inpatient *restoration* at CMHHiP, the Consent Decree established a two-tier triage system. Defendants with the most urgent clinical needs (Tier 1) have an admission deadline of 7 days, while those with less urgent needs (Tier 2) have a deadline of 28 days.

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees[17]* | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Feb 2024 | 10 | 107 | 48.5 | 111.2 | 9** | 94** |
| Mar 2024 | 12 | 79 | 58.1 | 132.5 | 11** | 73** |
| Apr 2024 | 24 | 107 | 54.9 | 106.1 | 22** | 63** |
| Nov 23 – Jan 24 (average) | 18 | 90 | 92 | 129.7 | 17.3** | 80** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

\* = at least one defendant waited longer than maximum time frame for inpatient evaluation services
\*\* = most defendants waited longer than maximum time frame for inpatient evaluation services
\*\*\* = ALL defendants waited longer than maximum time frame for restoration services

*The total number of people admitted to inpatient restoration this quarter (n=339) was the most since the onset of the Consent Decree*. The past three quarters have each represented larger quarterly totals than any other quarter since the beginning of the Consent Decree. In addition, the second-highest monthly number of Tier 1 Detainees – and the highest number of Tier 2 admissions -- were admitted to inpatient restoration in April 2024. Consequently, average wait times for both Tier 1 and Tier 2 Detainees decreased this quarter. In short, admissions have returned to a strong, consistent pace.

---

[17] According to the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 9-12.

However, despite this sustained progress, wait times remain exceedingly long, reaching four to eight times the prescribed Consent Decree time frames.[18]  Although the number of people waiting in jail for inpatient restoration again decreased during the past quarter, wait times for admission remain far beyond mandated time frames. Approximately 80% of Detainees who were admitted exceeded their maximum allowable wait times in jail.

Average wait times to admission far exceed the time frames mandated in the Consent Decree. The number of people waiting for restoration services—and the time they spend waiting—remain unacceptable. But this quarter has again shown a sustained decrease in the number of Detainees waiting, as well as shorter average time frames waiting as compared to recent quarters, revealing sustained progress. This trend of increasing admissions, fewer Detainees, and shorter wait times reflect sustained and improved change. The Department must ensure that admissions continue at this strong pace, that inpatient capacity remains steady, and that community-based options for housing and care are prioritized for this population.

---

[18] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 339 "admitted or ended" between February 2024 and April 2024, only 222 defendants were actually admitted to an inpatient facility. The other 117 people were either dismissed, vacated, or released on bond. Still, the percentage of cases "admitted or ended" because of hospital policies remains encouraging.

## PERFORMANCE OF JAIL-BASED COMPETENCY EVALUATIONS

33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

*Historical context:* Timely competence evaluations were a relative strength of the Department until around November 2019, when performance deteriorated substantially. Many jail-based evaluations then exceeded the 28-day time frame—reaching peak delays in January 2020 (46% delayed). Even through much of Spring 2020, roughly 30% of jail-based evaluations exceeded the 28-day time frame. During the summer of 2020, referrals for jail-based evaluations again began to increase towards prior levels. At the same time, the Department improved Court Services. They hired new leaders, evaluators, and contractors; they increased compensation and prioritized jail-based evaluations. In short, Court Services underwent dramatic improvements sufficient to handle the increasing court orders and challenges they have faced.

*Recent history:* As Court Services improved, far fewer Pretrial Detainees waited for evaluations beyond the required timeline. For roughly two years, the Department completed *nearly all* in-jail evaluations within the required time frames. Court Services leadership appeared to continually monitor challenges and adjust procedures accordingly, often in creative ways. Court orders for jail-based evaluations peaked at an all-time high (166) in March 2023. They then held fairly steady at high, but just-manageable, levels, before reaching a similar peak (164) recently in April of 2024.

This quarter, court orders for evaluations held steady (almost identical to the prior quarter) until April. But Court Services remained timely in all respects. *All* jail-based evaluations occurred within 21 days, as required, for the seventh month in a row.

For the past few years, Court Services has managed to meet timelines for jail-based evaluations, even amid substantial challenges, with only one brief period of significant noncompliance. Court services maintained perfect compliance with timelines this quarter, despite a spike in evaluation orders during April. Their ongoing challenge will be filling open positions sufficient to maintain a team of evaluators, particularly amid a recent increase in orders.

## INTERIM JAIL MENTAL HEALTH TREATMENT[19]

> 34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff are dedicated to enhancing services for Pretrial Detainees awaiting restoration. However, services, staffing, and quality vary greatly across Colorado jails. However, recent county budget cuts and staffing shortages have limited the size and impact of some JBBS teams.

OCFMH's mobile competency enhancement service contracts with a part-time forensic psychiatrist to meet with specific Detainees and treatment providers to discuss and encourage medication administration and management. Even as the funding for this psychiatrist has come to an end, the Department has identified a way to secure new funding for this service, which has proved valuable.

Also related to psychiatric medication in jail, we still suggest that involuntary medication orders (IMOs) can be useful in addressing mental health needs of some Detainees *when appropriate*. Of course, we share concerns that an overreliance on IMOs could shift treatment to jails that *should* occur in the hospitals. We also know that many jails do not have adequate staff or conditions to appropriately provide IMOs and monitor their effects immediately after administration. However, we also see the dramatic improvements medications can bring to those suffering in

---

[19] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

jails. We believe that Colorado could benefit from a thoughtful yet comprehensive IMO option, similar to other states that utilize IMO administration more regularly. Suitable legal and clinical safeguards, conditions, and policies must be implemented in such a system, but we believe Colorado could benefit if a viable IMO system were in place.

We continue to suggest that IMOs, assertive community treatment, and broader criteria for involuntary evaluation and treatment could address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who simultaneously are at risk for criminal justice involvement or worsening physical or mental health status. For example, perhaps in some situations, an acutely ill inmate could be transferred to a civil hospital for administration of an IMO and then return to their county jail after an appropriate monitoring period in the hospital.[20]  Additionally, these sorts of programs rely on a functional, accessible civil mental health system. Developing this type of robust, community (civil) mental health system is not solely within the Department's control. We affirm their decision to pursue conversations with leadership from other stakeholders (law enforcement, corrections, private mental health, judges, and persons with lived experience) to enhance Colorado's civil mental health options.

---

[20] As always, we emphasize that Involuntary medication is often unnecessary because empathic, collaborative care is often sufficient to engage patients in voluntary medication.  But in a small minority of cases, involuntary medication may be a necessary last resort for much-needed treatment.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[21]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would double in size were not for the persistent efforts to shift so many detainees into the Department's robust outpatient competency restoration program and related community supports. The Department has continued these sorts of efforts in two broad areas:

*Housing:* The Forensic Support Team (FST) Navigators continue to facilitate transitions from jail to community housing across the state. Most community housing options are in the Denver and Colorado Springs metro areas, but the Fines Committee has recently funded more in northern and southern Colorado. The total number of housing placements and beds funded by the Fines Committee remains high. Most of these housing options offer additional treatment and supportive services. The launch of the Mental Health Transition Living homes has generated additional community housing and services as well, and these beds are reserved exclusively for those who are discharging from a state hospital or transitioning from the waitlist to the community. These Mental Health Transitional Living beds are critically important as they provide community housing and service options for people who have traditionally been very hard to discharge. Nearly 30 people are already living in the first MHTL homes (as of late May 2024), and nearly 150 beds are scheduled to open in 2024, including beds reserved for persons with even more intense clinical and supervision needs than those who are currently housed. Please see Appendix 3 for a description of these programs.

*Forensic Support Team (FST):* The FST filled most of their open positions; however, recent well-funded job openings from the Bridges Program are likely to draw away Navigators from the FST. FST Navigators continued to monitor clinical status and restoration progress for those in jails awaiting transfer to CMHHiP. In April 2024, FST Navigators were assigned to 920 persons in county jails waiting for competence evaluations and/or inpatient restoration services. For persons awaiting evaluations in jail, the FST recorded an average monthly total of 220 face-to-face contacts and 604 contacts with care teams or other stakeholders during the past quarter. All of those numbers reflect historical highs. For individuals awaiting restoration services this

---

[21] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

quarter, Navigators logged an average monthly total of 688 face-to-face contacts with defendants in jail and 1,904 contacts with care teams or stakeholders (the highest average monthly total in more than a year).[22] These numbers meet or exceed those found in previous quarters, and they represent tremendous time and effort devoted to Detainees. To date, several thousand CMHHiP bed days have been "saved" since January 2020 through these combined efforts.

The FST also continues to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from CMHHiP or CMHHiFL to the community, placing appropriate Detainees into community-based specialty programs (such as placement in the MHTLs or Fines-funded settings), working with competency dockets to facilitate quicker hearings and community restoration options, advocating for the dismissal of charges or resolution of competency for those who have stabilized, and more. For example, the "Momentum" Program provides dedicated case management, medication assistance, and peer support to persons transitioning from jails to community settings. Since early 2020, the FST has referred 621 people to the Momentum Program, resulting in 407 active current clients—people who would have otherwise remained in jails or a state hospital. This is just one example of many community service programs with which the FST works.

Finally, Navigators continue to work closely with many specialized judicial programs, such as the Larimer County Competency Court, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. Each of these is discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets (see Appendix 2). We continue to affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department as they collect information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Outcomes from the FST are again strong this past quarter, despite difficult conditions and overwhelming demand for their services.

---

[22] According to the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 43-46.

TRANSPORTATION OF PRETRIAL DETAINEES

> 36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

No defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[23] This follows a quarter in which the *most* Detainees (though only 5) were admitted to an inpatient facility for competence evaluation since 2021. Overall, very few of Colorado's competence evaluations occur in a state hospital setting.

The Department has not reported any other delays or barriers to transportation with jails around Colorado.

---

[23] According to the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 25-26.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers; [1] SEP

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not supplant, existing services. The Department has provided reliable notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

*Current realities*: Throughout the past four years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that complement the broad goals of the Consent Decree.

*Projects funded by the Fines Committee*
Currently, the top priorities for the fines committee are projects that address housing, diversion from the competency system, and specialized competency judicial programs (competency dockets and calendars).

*Housing* is a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. The fines-funded Restoration Housing initiative continues to provide community placement options for some Pretrial Detainees. These individuals have shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing contracted through the Colorado Coalition for the Homeless (CCH). At the time of this writing, the Forensic Support Team has coordinated 241 completed referrals and placed 82 individuals in CCH housing units. To date, 40 people have had their cases either dismissed or resolved after moving into CCH Housing.[24]  These figures have held steady for months, because those admitted to CCH Housing have remained there, consistent with CCH's priority on sustainable, permanent housing.

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. *Please see Appendix 3 for all the fines-funded housing projects.*

The Committee has continued investigating a significant loss we mentioned in our last Quarterly Report.  On January 11, 2024, the Fines Committee was devastated to learn that Joel Watts, owner of Integrated Insights Therapy in Delta, CO, whom the committee had funded for $1,178,000 over two years, had likely misappropriated the last $375,000 in funds the committee had approved to house and treat competency clients.  The Committee promptly terminated future payments to this program, and hired an attorney to pursue legal means to recuperate the funds. The attorney's investigation into this matter discovered that Mr. Watts had likely also misappropriated over $2,000,000 from other funders. To prevent such incidents in the future, the Committee has implemented several additional measures, such as requiring organizations to produce financial information upon application submission, requesting detailed financial records on a quarterly basis, and the Committee has engaged a forensic accountant to perform audits on funded programs.

---

[24] According to the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 45-46.

*Diversion* programs of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped.

*Competency Dockets and related efforts* provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, there are several "competency dockets" emerging across Colorado as more jurisdictions recognize the strengths of this model; Colorado's Court Services is beginning to study and support these, even aside from Department efforts. This quarter, an average of 336 people were actively participating in one of the 9 competency dockets statewide at any one point in time.

Finally, this quarter featured further progress in the largest addition to the fines portfolio of projects.  The Fines Committee has supported Embrave with $8,902,175 to develop the Valor Program, which will support individuals needing a level of care that does not currently exist in Colorado. Specifically, the Valor Program will provide residential care to people who need intensive support and stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility will offer 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program will serve any individual in Colorado who is in or at risk of being in the competency system, accepting referrals from the justice system and the community to support not only decreasing the waitlist but to also deflect and divert individuals from the justice and competency system.  This large-scale service is scheduled to launch in June 2024, and our regular contact—and particularly regular contact from our Fines Committee project development liaison Lynn Unger—suggests they are progressing well and on track to open on schedule.

*A full info-graphic summary of fines-funded projects comprises Appendix 3.*

# DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

Since the start of the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures. Concurrently, the Department has opened more than 70 competence restoration beds over the past year, and it has pledged to open approximately 150 community beds in their system of MHTLs by the end of 2024 (see below). CMHHiP has just opened a third admissions unit and expects to be at full pre-pandemic restoration capacity by mid-June 2024. Finally, an additional 19 restoration beds are expected when the pending contract with Aurora Mental Health is finalized. Still, despite this critical increase in restoration beds, civil capacity continues to lag, offering few inpatient options for persons who might otherwise be deflected or diverted from the competence system.

Thus, *civil inpatient capacity remains precariously low throughout Colorado.* Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts. The few states with reasonable wait times for forensic services all have strong inpatient and outpatient civil capacity. Successful and sustainable solutions to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges. This broad strategy aligns with our other long-standing recommendations: diversion and deflection programs, long-acting injectable medications, assisted outpatient treatment, peer supports, robust case management, judicial supervision and monitoring, and involuntary medication orders. Without a strong civil system, incompetency remains the easiest route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competence services system. We continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems. We support the Department's current short-term push to reduce the waitlist by prioritizing inpatient beds for competence restoration, but we continue to emphasize that any long-term solution must shift inpatient priority from forensic to civil beds.

This quarter, the Department continued to open Mental Health Transitional Living (MHTL) homes, which serve as a critically important addition to Colorado's civil service array. The Department originally funded 125 MHTL beds allocated to various providers around the state,

but cost savings should allow for the opening of nearly 150 beds by December 2024. To date, three of the contracted homes are open, with a total of 30 people either residing, enrolled, or pending admission in the homes. Two additional homes are scheduled to open soon, on June 4, 2024.  These homes prioritize step-down interim housing opportunities for people who are ready for discharge at a state hospital, pretrial Detainees in county jails, or people who are at substantial risk for entering inpatient competence restoration. These homes are one of the most *critical components of a full civil service system*, and a key step forward for the Department.

## COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies that can reduce the competency-involved population.

As the pandemic continued, and as the competency crisis grew more dire, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, as we encouraged "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* in this type of comprehensive approach. In April of 2022, the Department pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. The Department organized their efforts according to six key strategies or "levers:"

1. Number of inpatient beds;
2. Inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reduce the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and wait times. But we also appreciated the efforts to expand the scope of their focus to beds and services *in the community*, for a much more comprehensive approach to the crisis. Indeed, addressing the first several (inpatient) variables will be crucial to decrease the current waitlist,

but vigorously addressing the last few (community) variables will be crucial for minimizing future additions to the waitlist.

During the 2023 legislative session, the Department supported two competency bills. Though the first primarily addresses juvenile proceedings, the second (effective July 2024), HB 23-1138, improves the path to civil treatment for those involved in the competency system. However, this is tightly tied to the anticipated (but delayed) BHA system.

*2023 Comprehensive Plan and Budget Requests:*
The Department submitted their latest Comprehensive Plan in September 2023. The Department memorialized their efforts over the past year, including much greater collaboration with other stakeholders across various workgroups. The Department also memorialized their plans to:
- Expand their use of community (private) hospital beds for the restoration population,
- Continue to reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Better use existing inpatient beds, with increasing efficiencies, re-evaluations, and related measures

In line with the goals detailed in this Comprehensive Plan, the Department requested from the Governor's office $57,967,379  in supplemental funds for FY 2023-24 to:

1. *Maintain the 61 beds at private hospitals and add 19 more beds;*
2. *Staff and re-open 82 beds at the E2 and RNRU forensic units at CMHHIP, and staff and open the new F3 forensic unit at CMHHIFL by the end of 2023;*
3. *Add 6.8 temporary RNs and 17.2 temporary MHCs to ensure adequate staffing of the F2 and F3 forensic units at CMHHIFL, open F3 in December 2023, and comply with Chartis' recommendations; and*
4. *Fill direct care FTE vacancies by 12.5% while reducing agency direct care staff by 12.5%.*

*Last quarter, the Governor granted this budget request. We consider the recently funded inpatient beds absolutely necessary*; they are a primary reason for recent improvements. Of course, the Department understands that *inpatient beds should also prioritize civil, not just forensic, treatment.*  Further, the Department understands that *inpatient beds are necessary, but not sufficient, to resolve the current crisis.*  They recognize the need for broad, collaborative solutions across the continuum of care, which remain crucial no matter how many inpatient beds open. Many defendants do not require this inpatient treatment and can be adequately served through outpatient restoration. Others only require inpatient treatment until they can "step down" to other types of facilities or housing (such as the recent Mental Health Transitional Living Homes). Thus, increases in inpatient beds should occur *alongside* improvements across the continuum of care.

We are pleased to see the Department continue pursuing these other strategies, including collaboration with other stakeholders. For example, this quarter witnessed the passing of HB 24-

1355 to establish a statewide mental health diversion program. Though the Department played a supportive—not leadership—role in this effort, it is a prime example of the type of collaborative "beyond the Department" initiative that will intervene "upstream" to reduce the demand on the competency system.

---

### New Legislation: HB 24-1355

The recently passed HB 24-1355 establishes a statewide mental health diversion program called "Bridges Wraparound Care" for individuals with behavioral health disorders or neurocognitive disorders who have been charged with low-level offenses. The key aspects of the bill:

- Requires each judicial district to establish a referral process through a memorandum of understanding between judges, district attorneys, public defenders, and other stakeholders to divert eligible individuals from competency proceedings and the criminal justice system into the Bridges program.
- Eligible individuals would be those charged with misdemeanors or lower-level felonies who are found incompetent to stand trial due to a mental health condition.
- If referred to Bridges, the defendant would be released on a personal recognizance bond and assigned a care coordinator to create a treatment plan tailored to their needs, including services like housing, insurance, therapy, and medication management.
- The judge would review progress and could dismiss the case if the treatment plan is followed.
- The program aims to reduce the backlog of defendants awaiting competency restoration, decrease recidivism rates, and provide comprehensive community-based care instead of incarceration for those with mental illnesses.

---

Amid these developments, we see more reason for cautious optimism for the third consecutive quarter. The Department has opened more beds, prompting the first sustained decrease in waitlist since the pandemic. Recent budget gains have created more available beds, and further decreased the waitlist, addressing a dire need. *At the same time,* we continue to encourage the broad and comprehensive changes—e.g., more diversion from the competence system, greater use of civil psychiatric treatment, etc.—that are crucial to help *sustain* any decrease in the waitlist. As the Department knows, this multi-causal, complex crisis requires multiple strategies for solution.

*Earlier this year, Department efforts targeted the pressing needs for staff and additional inpatient beds. This quarter revealed more progress in the form of MHTL homes, and collaborative legislation to divert people with mental illness into community care.  We affirm all these efforts, which are necessary to address such a daunting challenge. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment.*

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's formal competency restoration program (OCRP) began in March of 2018, and has grown steadily since then. Referrals for outpatient restoration were steady this quarter, ranging from 64 to 85 defendants per month, similar to prior quarters this year.[25]  More than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. As always, we affirm the Department's success in building the largest, most robust statewide OCRP program in the country (only one other state offers statewide OCR). Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. In the past quarter, 219 people were placed in OCR (a minimal decrease from the past quarter).

*OCRP outcomes*
Data from February through April 2024 reveals a 29.5% restoration rate in the OCRP re-evaluation reports that the Department reviewed (49 of 166 total opinions). An additional 16.9% were opined as unrestorable (28 out of 166). The remaining 37.5% were opined as remaining incompetent. This reflects a slightly lower but still reasonably steady OCRP restoration rate, which was 24% and 39% the past two quarters. Data from the same period shows that courts found 40.6% of defendants restored to competence (52 of 128 total adjudications), lower than last quarter's 47.7% rate. The court dismissed charges and/or otherwise terminated restoration services in an additional 27.3% of these re-evaluation cases. The Department again surmised that less positive may be attributable to increasingly ill defendants (i.e., more severe psychiatric symptoms) ordered to outpatient restoration.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds, and Peakview Hospital for 72 beds; beds were filled on average at more than 90% capacity over the past quarter. A pending contract with Aurora Medical Center *should allow for the opening of 19 more beds*. There will be some reduction in Front Range beds as some capacity is shifted to the Western Slope over the next few months; but total capacity will not change.

---

[25] All data in this section retrieved from the Department's Special Master Compliance Plan report for April 2024, submitted May 15, 2024, pp. 46-54.

There is no doubt that this increase in inpatient restoration capacity (along with a concurrent increase in the availability of state hospital restoration beds) has led directly to a substantial decrease in the number of people on the waitlist as well as the decreased average time to placement. Of course, inpatient restoration capacity cannot be the exclusive solution to Colorado's competence crisis. Indeed, the 106 private beds currently "rented" are by definition short-term fixes. To reiterate our earlier concerns, while we affirm the Department securing these inpatient restoration beds at this critical time, *civil* inpatient capacity remains insufficient. The Department must ultimately prioritize civil inpatient capacity; this will help sustain the improvements in the waitlist as individuals receive civil (rather than forensic) treatment. We encourage the Department to continue to devote beds to civil patients, diversion programs, or similar programs designed to provide inpatient mental health services in lieu of restoration services.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
| --- | --- | --- |
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| November 1, 2021 goal | 60% maximum | 40% minimum |
| Recent progress (past 6 months) | Nov 1, 2023 – Apr 1, 2024: 61.4% | Nov 1, 2023 – Apr 1, 2024: 38.6% |

For the past six months (November 2023 through April 2024), a total of 38.6% of all restoration orders were to outpatient restoration. This rate has remained at compliance or very near compliance for the past several quarters. Directing such a large portion of defendants towards outpatient restoration is a tremendous strength of the Colorado system—this is the highest rate in the Unites States—and a crucial protection against an even greater "competence crisis."

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

The current figure, reflecting six months' worth of data between October 2023 — March 2024 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 24.7% OCR referral rate among all evaluations conducted in jails. Month-to-month averages have fluctuated substantially, dipping as low as 15% in January 2024 but also exceeding the 30% threshold multiple times. The 24.7% rate reflects an all-time high, with previous six-months figures of 19% and 13%. Given the large fluctuations, we are exploring the accuracy of the data. But even if 24.7% is incorrect, the rates do seem to be trending closer to the 20% base rate goal (or perhaps beyond it).

In summary, we continue to affirm the tremendous impact that OCRP has on the waitlist. The combination of persons ordered to OCRP overall (38.6% of all persons adjudicated as ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (24.7%) suggests a very robust OCRP program. A total of 219 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist. Quarterly numbers of admissions to OCR have remained fairly steady across the past 12 months, diverting and deflecting hundreds of defendants from county jails and inpatient hospitals into community settings. Overall, the OCRP continues to be a critical component in Colorado's competence services system.

# CONCLUSION

Like every quarter for the past two years, this quarter revealed wait times that far exceed the required timelines. *However, the waitlist has decreased for the third consecutive quarter, and we see other metrics improving as well.* With new units opened at the hospitals, there were more admissions this quarter than ever before. Of course, a backlog remains, and detainees continue to wait too long. But for another consecutive quarter, several key metrics trended in the right direction, for the first time in two years, *revealing the best progress we have seen since the pandemic*. We are increasingly optimistic that the Department can comply with the Consent Decree within the next two years.

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# APPENDIX 1

## Summary of Inpatient Restoration Service Capacity

| Summary of Inpatient Restoration Service Capacity | | |
|---|---|---|
| Setting | Total future restoration beds through 12/24 | Funding Source |
| CMHHiP* | 218 | CDHS |
| CMHHiFL* | 44 | CDHS |
| Arapahoe RISE | 78 | CDHS |
| Boulder RISE | 0 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | CDHS |
| Denver Health | 15 | CDHS |
| Peakview Hospital | 72 | CDHS |
| Medical Center of Aurora | 19 | CDHS |
| Total | 464 | |

\* All restoration beds at CMHHiP are now available. The Department has received preliminary approval for funding to maintain these beds throughout the next two fiscal years, continue privately contracted beds, and acquire 19 new contracted beds in the next fiscal year. Boulder RISE is expected to end their contract on June 30, and Arapahoe RISE is considering expanding their program to accommodate those extra beds. Also, the Department will be transferring some bed capacity (approximately 10-15 beds total) from Front Range settings to Western Colorado in 2024. Specifics are as yet unknown.

# APPENDIX 2

## Summary of Colorado's Competency Dockets
### (compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served |
|---|---|---|
| 1st Judicial District | Judge Klein & Judge Miloud | Low-level felony |
| 2nd Judicial District | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DA approval) |
| Denver County Court Comp Docket (Misdemeanor Charges) | Judge Cherry | Misdemeanor Cases Only |
| 4th Judicial District - El Paso | Magistrate Gurney | F5&F6 Non-VRA cases (and case-by-case approval from DDA) |
| 5th Judicial District | Judge Shamis | Will eventually take all competency cases in the district |
| 8th Judicial District - Larimer | Judge Blanco | Low-Level Felony and Misdemeanor |
| 10th Judicial District - Pueblo | Judge Ernst | <F3 non-violent, judges make "referrals" |
| 12th Judicial District - Alamosa Only | Judge Cortez-Rodriguez | >F2 clients that need "support" |

| | | |
|---|---|---|
| **16th - Otero, Bent, Crowley** | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) |
| **17th Judicial District - Adams** | Judge Jimenez | TBD |
| **18th Judicial District Court - Arapahoe** | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out of custody (capped at 10) |
| **19th Judicial District - Weld** | TBD | TBD |
| **Other** | | |
| **2nd Judicial District (Pre-Comp Mini-Screener)** | Judge Arnolds | Pre-Comp Cases |
| **Denver County Competency Diversion Program** | Jail Magistrate (rotating) | Pre-Comp Clients in Denver |

APPENDIX 3

# Fines Committee Funded Program Master List

Updated March 31, 2024

| NAME/ORGANIZATION | PROGRAM SUMMARY |
|---|---|
| 1st Judicial District Competency Docket | In June 2023, the Fines Committee approved $220,000 for two years of funding to the 1st Judicial District Court. Funding provides for a Docket Coordinator (1.0 FTE) to manage the competency docket, which provides a judicial venue for a multidisciplinary team to help acquire resources and monitor the progress of competency clients.  The docket model enables clients to be released from custody during competency evaluation and restoration and enables clients to potentially be diverted to treatment and supportive housing, in lieu of prosecution.  The MOU was fully executed in October 2023, and the Docket Coordinator started in January 2024.  Also in January, the competency docket began accepting clients.  The docket is also available to clients referred from Gilpin County, the officials of whom were engaged with by the Docket Coordinator.  In Quarter 1, 2024, the 1st Judicial District Docket received 21 referrals, all from the Jefferson County Public Defender's Office.  It onboarded and began serving 17 clients.  No client outcomes are yet available. |

| 2nd Judicial District REACH Docket | In March 2023, the Fines Committee approved $220,000 for two years of funding to the 2nd Judicial District Court.  The 2nd Judicial District operates a competency docket known as REACH (Review, Evaluate and Assist, Community-based behavioral Health).  REACH hears cases for defendants who have charges in Denver District Court that are equal to or less serious than F3s or DF2s, with some exceptions, and have had competency raised in their case.  The court works collaboratively with the Public Defender's Office, the District Attorney's Office, the Office of Civil and Forensic Mental Health, and numerous treatment agencies in the community to help defendants navigate the competency system and resolve cases in an effective manner.  Funding provides for a Docket Coordinator to manage the competency docket, enabling clients to be released from custody during competency evaluation and restoration and potentially diverting clients to treatment and supportive housing, in lieu of prosecution.  The Docket Coordinator position was filled during the 4th Quarter of 2023.   The Coordinator has been working with the judge and stakeholders to establish best practices and procedures in the REACH docket.  Since its inception, 604 defendants have been referred to the REACH docket, for a total of 897 cases.  The Docket Coordinator currently manages 376 cases; 380 of the 897 cases have been dismissed, and 141 were returned to the trial courtroom after a competent to proceed finding. |
|---|---|
| 2nd Judicial District Psychology Screener | One-time funding in the amount of $17,850 was approved for Psychological Insight & Assessment to help clients in the 2nd Judicial District acquire competency evaluation screening in custody, with the work taking place in Quarter 2 of 2023.  This program was approved to meet a specifically-identified need for screening at a time when state-funded screening was suspended.  The suspension caused a backlog for the 2nd Judicial District, and this program was funded to relieve the backlog.  The target population included pre-release incarcerated clients ordered for competency evaluation.  Psychological Insight & Assessment received 62 referrals and completed 52 evaluations.  Of the 52 individuals, 25 met the threshold, 16 required further evaluation, and 11 individuals did not meet the threshold. |

| | |
|---|---|
| 12th Judicial District Competency Docket | In October 2023, the Fines Committee approved $69,555 for two years of funding to the 12th Judicial District. Funding provides for a Docket Coordinator to manage the competency docket, a judicial venue for a multidisciplinary team to help acquire resources and monitor the progress of competency-involved clients.  The docket model enables clients to be released from custody for competency evaluation and restoration and enables clients to potentially be diverted to treatment and supportive housing, in lieu of prosecution.  In January 2024, the program held its inaugural meeting.  This quarter the program onboarded nine clients and had zero terminations.  Additionally, in its service to its rural, mountain community, this program establishes a regularly meeting venue through which continued development of a community mental health system potentially may coalesce.  A stakeholder MOU has been endorsed by the stakeholder parties.  The program reports that the district attorney is currently considering a diversionary disposition for one case; this is notable because diversion was not a disposition the district attorney had been willing to take when first entering into the agreement to participate in the competency docket. |
| AllHealth Network Bridges to Care | In May 2023, the Fines Committee approved $134,000 for one year of funding to AllHealth Network.  In March 2024, a no-cost extension was granted to AllHealth Network to continue operating the Bridges program through June 2024.  The program expands the capacity of the Bridges program in Arapahoe County to accommodate additional clients participating in that county's competency docket.  Funding supports two case managers (Bridges Liaisons) and equipment for both case managers, including laptops, phones, monitors, and docking stations.  The Liaisons help clients acquire resources to support their needs and be successfully restored in the community.  The Arapahoe County competency docket meets once a month, with two different, rotating attorneys representing the District Attorney's Office and the Public Defender's Office.  In Quarter 1, 2024, the competency docket approved three individuals to the Bridges program, for a total of 15 individuals. As of the end of the quarter, no client had been terminated.  Each Liaison can carry a maximum caseload of up to 30 individuals; as such, the capacity of this program is 60. |

| Ananeo Housing | Funding ($387,480) was approved for Ananeo Housing in November 2022, with the formal launch in December 2022.  Additional funding in the amount of $156,870 was approved by the Fines Committee in February 2023 for five female units; $60,000 of the additional funding was awarded as capital investment to make improvements to the Ananeo property.  In September 2023, Ananeo received $290,610 for a 15-bed expansion to serve an additional ten males and five females.  The MOUs between the Fines Committee and Ananeo Housing were renewed and consolidated in December of 2023 totaling $1,847,630 to serve 40 competency-involved individuals; this amount includes $242,175 which had been previously awarded but not yet funded.  The goal of this program is to provide housing and services associated with supportive monitored sober housing to clients referred by the Office of Civil and Forensic Mental Health for out-of-custody competency restoration.  The Fines Committee funds two case managers, a mental health clinician, a psychiatric nurse practitioner (0.5 FTE), a clinical supervisor (40 hours a year), rent, utilities, referral management, urinalysis administration, and basic housing supplies for each client.  Of the 40 beds that were contracted in December 2023, 38 are now occupied with two additional clients who have been approved for beds but are awaiting jail release.  Five individuals who were originally funded by Fines Committee funding have stabilized and are no longer occupying a Fines-funded bed but are in residence at Ananeo for additional support and continued sobriety.  Ananeo is in the process of expanding the staffing of its Wellness Hub.  A psychiatric nurse practitioner and a clinical therapist have been hired.  With the oversight of the psychiatric nurse practitioner, Ananeo's QMAP program has allowed for all Ananeo house managers to dispense and record medications.  In Quarter 1 of 2024, this program served 57 unique individuals; three individuals absconded, one individual was removed due to a policy violation, and another was moved to independent housing.  An additional five individuals successfully completed programing and were discharged.  Since the program began, 114 referrals have been screened; 47 clients have terminated from the program, of those 26 have absconded, mostly due to substance use and medication management issues. |
|---|---|

| Assisted Living of Aurora Transitional Housing | In March 2023, the Fines Committee approved $822,000 for one year of funding to Assisted Living of Aurora (ALA) Transitional Housing in Arapahoe County, within the 18th Judicial District.  The MOU between the Fines Committee and ALA expires on May 31, 2024.  ALA has informed the Fines Committee of its desire to terminate the program and will revert unspent funds back to the Fines Committee.  ALA provides bridge housing so that competency-involved individuals can be released from custody and begin receiving out-of-custody restoration, while the program helps them acquire public benefits which will enable longer-term community housing placement.  Funding supports monitored housing for ten dedicated beds reserved for individuals ordered competency restoration, referred by Bridges and the Forensic Support Team.  This program includes a fund that will pay for Medicaid Home and Community Based Services to start immediately, which is reimbursed once the client is enrolled in Medicaid.  The anticipated length of stay for clients to remain in ALA Transitional Housing is 120 days.  In Quarter 3, 2023, ALA began receiving referrals and conducting intakes.  In that quarter, seven individuals were referred to ALA by the Forensic Support Team, and ALA conducted intakes for all seven referrals.  In Quarter 4, 2023, ALA placed a hold on reviewing additional residents in order to focus on service provision to the seven residents with severe mental health and substance use needs.  In Quarter 1, 2024, ALA onboarded one additional client.  Two individuals have terminated the program; one was transferred to a higher level of care, and the other individual absconded.  Transition planning for the remaining six clients is in place with the help of OCFMH and other Fines Committee-funded programs. |
|---|---|
| Aurora Sustained | Aurora Sustained is operated by the Aurora Public Defender's Office in partnership with Aurora Mental Health and Recovery.  Funding, in the amount of $104,751, was approved for this program in October 2021, and supplemental funding in the amount of $18,600 was awarded in April 2022.  Continuity of funding was subsequently approved in July 2022 in the amount of $372,433 to fund the program for the remainder of 2022 and 2023.  In July of 2023, the Fines Committee approved Aurora Sustained's funding request of $223,500 to continue to operate through December 31, 2024.  The goal of this program is to screen individuals booked in the municipal jail and to assess appropriate individuals for competency.  The program attempts to connect clients to treatment out of custody and work toward prosecutorial diversion.  Clients are referred to Aurora Mental Health and Recovery for homeless services, outpatient mental health and substance abuse treatment, and psychiatric medication.  The Fines Committee funds a program administrator, pays for competency evaluations, and historically, provided cell phones for clients who had no other ability to stay connected with the program.  In Quarter 1 of 2024, this program completed 417 behavioral health screens and 27 competency evaluations.  Of the 27 competency evaluations that were completed, 5 individuals were deemed competent to proceed, 10 incompetent, and 12 did not appear for their evaluation. |

| | |
|---|---|
| Behavioral Treatment Services Forensic Day Reporting | In June 2023, the Fines Committee approved $265,814 for one year of funding to Behavioral Treatment Services (BTS) to establish a day reporting center.  The program provides, or coordinates to provide, psychotropic medication, medication-assisted treatment, case management, peer support, and a warm, welcoming location for clients to receive competency-related services.  Due to startup delay, the Fines Committee agreed to a no-cost extension, continuing funding until the end of 2024.  The program intends to serve at least 40 clients referred in Boulder County.  Having formally began in the 4th Quarter of 2023, this program is now fully operational.  Fines Committee funds provide for direct client services, including transportation, training manuals, housing support, drug screens, and MAT.  It also provides for the following staff: office administrator (0.25 FTE), restoration clinical supervisor (0.25 FTE), clinical case manager (1.0 FTE), peer support specialist (1.0 FTE), and Master's level therapists (1.5 FTE).  In Quarter 1 of 2024, BTS received two referrals and onboarded both.  At the end of the quarter, it reports three new referrals pending.  The program also had one unsuccessful termination.  The program has acknowledged that it is not operating at capacity and is working to recruit more referrals. |
| Boulder County Community Justice Services | Funding in the amount of $220,000 was approved for Boulder County Community Justice Services in October 2022.  The original MOU between the Fines Committee and Boulder County expired on September 30, 2023, and a renewal was approved for additional funding in the amount of $285,842 through December 31, 2024.  This program expands the Bridges program in the county to serve more individuals whom the Bridges Liaisons can work with to acquire services out-of-custody.  The objective is to improve access to Bridges Liaisons, as well as increase the capacity for appointments with the Liaisons.  The funds cover two FTE positions and costs related to clients' treatment needs (e.g. treatment, assessments, neuropsychological evaluations, and medication), as well as basic needs for clients, including cell phones, clothing, emergency supplies, and hotel vouchers.  Funds have also been used for the completion of court-ordered neuropsychological evaluations and toward the purchase of a fleet vehicle for transporting clients.  The Office of the State Court Administrator funds an additional FTE in Boulder County, and in the middle of Quarter 3, 2023, all three Bridges Liaisons had been hired.  The Liaisons served 110 individuals in 2023 (an estimated 97% of the incompetent to proceed population in Boulder County, including both in-custody and out-of-custody).  In Quarter 1 of 2024, this program received 29 new referrals and conducted intakes for 11 individuals.  Eighteen individuals terminated the program in the first quarter; six were successful, one refused services, and the remaining eleven terminated for neutral or other reasons.  Two court-ordered neuropsychological evaluations were completed in Quarter 1. |

| | |
|---|---|
| Boulder County Sheriff's Office Jail Competency Program | In June 2023, the Fines Committee approved $130,000 for one year of funding to the Boulder County Sheriff's Office (BCSO) to provide clients with long-acting injectable medication ($120,000) and assistance with housing support ($10,000).  The medication serves clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication.  Temporary housing support in the form of rent and ancillary items are provided to clients transitioning from jail to the community.  Over the course of a year, the program expects to provide medication and/or housing support to at least 38 individuals.  In Quarter 1, 2024, the program received five referrals and provided a total of seven long-acting injectables to those five clients. |
| City of Greeley Homeless Solutions | In October 2023, the Fines Committee approved $111,835 for one year of funding to the City of Greeley Homeless Solutions to provide permanent supportive housing, employment support, education, job skills training, and benefits acquisition to three individuals involved in the competency system in Weld County.  The program provides three permanent housing vouchers and will continue to support clients on a 24-hour, 7-day-a-week basis for as long as the clients wish to maintain the vouchers.  Funding supports a case manager (0.5 FTE), usage of a fleet vehicle, bridge housing, wraparound services including transportation, tuition, iPads and other client needs, as well as technology for staff.  In Quarter 4, 2023, the City of Greeley received all three referrals within the first few weeks of the case manager's employment.  Two of the referrals are now active in the program, while one terminated unsuccessfully due to failing to appear and not meeting his restoration requirements.  The City of Greeley has accepted another client to fill the vacancy with an anticipated start date by the end of April 2024. |
| Colorado Coalition for the Homeless | Colorado Coalition for the Homeless (CCH) was approved for funding in the amount of $1,500,000 in November 2020.  The MOU between the Fines Committee and CCH expired in October 2022 for the Crest program; however, the Fines Committee extended the MOU with CCH through March of 2025 for the Restoration program, and CCH will continue to report outcomes for that program.  The goal of the Restoration program is to provide modified Assertive Community Treatment to clients who are referred through OCFMH's Forensic Support Team as appropriate for outpatient restoration.  In Quarter 1 of 2024, this program continued to serve 46 individuals with the goal of discharging clients who meet appropriate criteria for exit.  Of these 46 clients, none ended their court involvement during the last quarter; one individual continues to be involved in restoration education.  When the program was receiving new referrals and conducting intakes, the reported capacity of the program was 54. |

| Community Based Enhanced Restoration (CBER) | CBER was operated by WellPower from January 2022 through December 2023.  Funding in the amount of $400,000 enabled WellPower to provide Assertive Community Treatment to individuals released on bond and being restored to competency out-of-custody.  Short-term housing options were also funded for CBER clients who would have otherwise been homeless.  The program served 68 individuals in the funding term; 27 were restored to competency or had their case dismissed, 39 were terminated unsuccessfully due to absconding, violating program policies, or acquiring a new charge, and two were transferred to other programs. |
|---|---|
| Denver Competency Diversion and WellPower | The Denver Competency Diversion program is operated by the Denver County Court.  Funding ($1,029,996) was approved for this program in December 2021, with the formal launch on April 4, 2022.  The MOU between the Fines Committee and the Denver Competency Diversion program expired in December of 2022, and the Fines Committee agreed to extend the terms of the MOU until February 22, 2024.  The Fines Committee awarded $587,342 in September 2023 to WellPower to continue supporting the Denver Competency Diversion program through September 2024.  In December 2023, the Fines Committee approved an additional $541,870 to continue operations through 2024.  The goal of this program is to divert from prosecution those defendants who are likely to be found incompetent to proceed.  The Fines Committee funds a program administrator, a program coordinator (screening and release planner), a Denver district attorney, a Colorado public defender, six clinical case managers, one peer navigator, a clinical program manager (0.6 FTE), and a district attorney competency diversion officer.  Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.  In Quarter 1 of 2024, this program received 76 referrals and completed 30 intakes.  The reported capacity of the program is 60, when all six case manager positions are filled.  The Competency Diversion program continues to make progress in diverting individuals from the waitlist in Denver.  By the end of this quarter, 69% of all individuals who have completed the Competency Diversion program have been successfully diverted; 15% have been unsuccessful due to new charges; 10% have been unsuccessful due to lack of engagement; and 6% had their case(s) closed. |
| Denver County Court Competency Support Docket | In March 2024, the Fines Committee approved $358,609 for 12 months of funding to the Denver County Court to operate a competency support docket.  For cases that cannot be diverted from prosecution in the County Court Diversion Program, this docket will provide a second opportunity for clients to be diverted from confinement during the restoration process.  The docket will serve as a forum where community resources may be brought in to help meet clients' out-of-custody needs. |

| | |
|---|---|
| Douglas County Sheriff's Office Mental Health Data Diversion Project | In December 2023, the Fines Committee approved $683,300 for 18 months of funding to the Douglas County Sheriff's Office.  Funding provides for the implementation of a data-driven program to enable the 911 emergency system of the county to connect callers with behavioral health resources more rapidly.  The program will also generate data to better inform county agencies and partners on future resource development.  This quarter the program acquired the software licensing and staff is currently undergoing training.  A project manager was hired but is not expected to start until May. |
| Embark Assisted Living Residence – Renaissance | In May 2023, the Fines Committee approved $380,820 for one year of funding to the Embark Peer Coach Academy to open a Level 1 Mental Health Transitional Living facility, Embark Assisted Living Residence – Renaissance.  Throughout the funding year, Renaissance has promised to provide services to a total of 24 mid-to high-acuity individuals who are in the competency system referred from the 4th Judicial District.  Renaissance also received funding from the State's Mental Health Transitional Living (MHTL) grant program; in the upcoming months, Renaissance will receive $421,000 as a result of this award.  In March 2024, the Fines Committee approved an additional $40,000 to continue operations until MHTL funding begins.  Renaissance offers licensed transitional assisted living for up to eight individuals at a time with 24-hour staffing supervision for individuals requiring continuous care.  Intensive case management, connection to physical and mental health community resources and competency restoration services, daily medication management, meals, benefit acquisition, transportation, peer support, life skills training, and scheduled social and recreational activities are also provided.  A nurse practitioner provides medication prescriptions as necessary.  Since opening in the third quarter of 2023, Renaissance has provided 24/7 housing and services to thirteen individuals.  As of the end of Quarter 1, 2024, seven individuals continue to be housed, with an average length of stay of 138 days.  The additional six individuals have been successfully discharged and transferred to long-term care assisted living residences. |

| | |
|---|---|
| Embark Peer Coach Academy Recovery Residences | In November 2022, the Fines Committee approved $306,150 for Embark Peer Coach Academy (Embark) to operate a Day Reporting Center and sober-living forensic housing (Embark Recovery Residences).  In 2023, Embark received renewal funding for Embark Recovery Residences (ERR) in the amount of $335,550 through November 30, 2024 and chose not to seek additional funding for its Day Reporting Center due to a lack of referrals and ability to fund components of those services through Medicaid.  The goal of the Day Reporting Center was to provide outpatient restoration clients with treatment, classes, peer support, and case management.  ERR serves individuals released from confinement who are participating in competency restoration.  The Fines Committee funds partial salaries for a certified addiction specialist, licensed addiction counselor, two peer coaches, receptionist, and housing managers.  Funding also covers individual assessment and treatment planning, medication management, psychiatric services, daily classes, substance use monitoring, support groups, peer mentoring, vocational support, public benefit acquisition, transportation assistance, and competency restoration services.  ERR provides sober-living housing with the capacity to house 15 clients at a time, with 24-hour management, transportation, and food and support services are available on site.  In Quarter 1 of 2024, ERR received 9 referrals, completed 5 intakes, and served 20 individuals.  Since the program's inception, 26 clients have been restored to competency, and sixteen individuals have terminated; four were transferred to a higher level of care (including Embark's Assisted Living Residence: Renaissance), two were discharged due to threatening behavior, two were remanded into custody, and eight abandoned the program. |
| Fidelity Behavioral Health | Funding, in the amount of $1,272,559 was approved for this program in February 2024, with formal launch in that same month.  The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services.  The Fines Committee funded three houses for clients to live in each housing ten clients, a van to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, three house managers for 24/7 supervision, and partial salaries of the personnel to operate the program.  In Quarter 1, 2024, the first house began operating.  The program received nine referrals and completed three intakes, with two more scheduled for April.  Referrals came from the 1st, 2nd, 8th, 12th and 18th Judicial Districts.  In addition to taking clients, the program acquired a van to transport clients, initiated the process to receive BHA licensing, hired a clinical director, and obtained commercial space for clinical operations.  It is notable that this program was funded and began operating in the same quarter. |

| Gateway to Success – Pueblo | In December 2022, the Fines Committee approved $275,000 for one year of funding for Gateway to Success to provide a Forensic Day Reporting (FDR) program in Pueblo.  The original MOU between the Fines Committee and Gateway to Success was set to expire on December 4, 2023; however, a no-cost extension was granted to Gateway extending the MOU and service provision through the end of February 2024.  The Fines Committee awarded renewal funding in the amount of $235,000 through February 2025.  The goals for the FDR program are to support formerly-incarcerated individuals who are involved in the competency system, to provide a center at which services can be delivered to out-of-custody competency individuals, and to reduce the number of defendants with behavioral health disorders incarcerated in the Pueblo County Jail.  The award provides partial funding for full-time employees including a Restoration/Day Reporting Administrator, Lead Case Manager, Case Manager, Peer Support Specialist, Coach, Receptionist, Prescriber, and LPC/CAS.  The funding also covers transportation, participant manuals, medications, food/beverages, medication compliance incentives, and prosocial activities.  The program began fully operating toward the end of Quarter 1, 2023 and has received fifteen total referrals.  As of the end of Quarter 1, 2024, the program has seven active clients.  Throughout the funding term, the FDR program intends to serve 70 clients who have transitioned from the Pueblo County Jail and have been found to have a moderate to severe substance use disorder and/or co-occurring mental illness. |
|---|---|
| Homeward Alliance | Funding, in the amount of $217,800 was approved for this program in February 2024, with formal launch in March 2024.  The goal of this program is to provide housing navigation and case management services to individuals who are competency-involved in Larimer County.  The program partners with the Larimer County Competency Docket and SummitStone Health Partners to receive referrals.  Homeward Alliance connects clients with resources provided by partners of the State Division of Housing and completes intakes for clients to enter that system.  Funded staff include a housing specialist (1 FTE) and a program manager (0.5 FTE).  Direct client expenses are also provided, which include moving facilitation, tenant rights education, life skills education, and landlord/tenant communication and mediation.  In Quarter 1, 2024, Homeward Alliance received two new referrals from the Larimer Competency Docket and completed intakes on both clients.  This program partially fills the housing gap in a jurisdiction already replete with Fines- Committee supported competency resources. |

| Integrated Insight Therapy IMPACT | IMPACT (Intensive Monitored Preventative and Acute Competency Treatment) was operated by Integrated Insight Therapy, a behavioral health treatment provider serving the 7th, 21st, and 22nd Judicial Districts. The Fines Committee allocated $1,178,000 in total to the program.  IMPACT housed clients in two residential houses, providing treatment and wraparound care.  The program operated from February 2022 until January 2024 and served 22 clients. |
|---|---|
| Larimer County Competency Docket and the Larimer County Public Defender's Office | The Larimer County Competency Docket is operated by the Larimer County Community Justice Alternatives Department.  Funding ($533,242) was approved for this program in December 2021, with formal launch of funded program elements in January 2022.  The original MOU between the Fines Committee and the Larimer County Competency Docket was set to expire in February of 2024; however, a no-cost extension was granted allowing the provision of services to continue through the end of September 2024.  The goal of this program is to divert individuals involved in the competency process from custody while coordinating necessary care in the community.  The Fines Committee funds a Competency Services Case Manager and a Competency Services Team Lead.  In January 2023, funding in the amount of $262,000 was approved for the Larimer County Public Defender's Office to support the Larimer County Competency Docket through January 2025.  As a result of the approved funding for the Public Defender's Office, the Fines Committee also supports one dedicated Public Defender to staff the docket.  Throughout Quarter 4, 2023, the team collaborated with the Larimer County Court to bring in all county court cases where competency has been raised (individuals with misdemeanor charges) into the Competency Docket that traditionally only handled felony cases.  By the end of Quarter 1 of 2024, there were 112 total active participants in the Competency Docket.  There were 55 terminations in Quarter 1; of those, 23 were found competent to proceed at the initial evaluation, 19 were found incompetent to proceed, and were then restored, 11 were dismissed or their case(s) timed out, and 2 passed away.  In Quarter 1 of 2024, a total of 51 cases were dismissed; 18 were felonies and 33 were misdemeanors. |

| | |
|---|---|
| Mesa County Pretrial Community Alternative Placement (Pre-CAP) | The Pretrial Community Alternative Placement (Pre-CAP) program operated by the Mesa County Community Justice Services Department (CJS) was funded to divert individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment.  Fines Committee funding, in the amount of $27,900, provided inpatient treatment for clients diverted from confinement.  This program augmented the capacity of an existing county pretrial mental health program, specifically to serve competency-involved individuals.  Mesa County CJS declined to request renewal funding, so it was only funded for one year of service.  Inpatient treatment was provided for three clients referred for out-of-custody competency restoration.  All three clients successfully transitioned from inpatient treatment; two were then ultimately unsuccessfully discharged from Pre-CAP, and the other individual successfully completed Pre-CAP and transitioned to the community.  Mesa County was selected as a National Association of Counties (NACo) Justice Initiative site in 2023, and as NACo works with Mesa County to identify needs and gaps, there may be an interest in future funding to serve competency-involved individuals. |
| Mesa County Sheriff's Office – Long-acting Injectables Program | In May 2023, the Fines Committee approved $360,000 for one year of funding to the Mesa County Sheriff's Office (MCSO) to provide clients with long-acting injectable medication.  In March 2024, the Fines Committee signed a no-cost extension agreement with MCSO to allow for continued operations through May of 2025.  The medication treats clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication.  Over the course of a year, NaphCare, MCSO's medical contractor, expects to provide medication to up to ten individuals per month.  Since the program began operating in the 3rd Quarter of 2023, eleven long-acting injectables have been administered to ten individuals in the Mesa County Detention Facility. |

| Mile High Behavioral Healthcare | Funding ($137,494) was approved for the Mile High Behavioral Healthcare (MHBHC) program in December 2021, with formal launch taking place in Quarter 2 of 2022.  The MOU between the Fines Committee and MHBHC expired in January of 2023; however, given the entire awarded funding had not been spent, a no-cost extension was approved for funding to be spent through September 30, 2023.  In October 2023, the Fines Committee agreed to renew funding to the program through September 30, 2024, with additional funding of $149,251.  The goal of this program is to help clients acquire treatment and wraparound services out of custody.  Its target population includes pre-release incarcerated clients with mental health and substance use disorders.  The Fines Committee funds two clinical case managers, and Signal Behavioral Healthcare funds two additional case managers.  As of the end of Quarter 1, 2024, one of the two positions funded by the Fines Committee continues to be vacant, despite MHBHC's continued attempts to keep both positions filled.  In Quarter 1, 2024, the program received 25 referrals and completed 24 intakes.  Thirty-one individuals terminated the program this quarter; twenty-nine of which were successful, while two were unsuccessful.  The reported capacity of the program is 80, when all four positions are filled. |
| --- | --- |
| Monarch Competency Housing | Funding ($953,074) was approved for Monarch Competency Housing in April 2023, with formal launch taking place in June of 2023.  The goal of this program is to provide supportive monitored sober housing.  Its target population includes clients ordered to have competency evaluations or outpatient restoration services.  The Fines Committee funds two case managers, two peer support specialists, a director of operations, an executive director, as well as all costs directly related to clients including transportation, case management, groceries, clothes, toiletries, and housing supplies.  In Quarter 1, 2024, the program received 33 referrals, completed eleven intakes, and had eleven terminations, five of which were successful.  As of the end of Quarter 1, 2024, the twelve active clients are progressing in connecting with psychiatric services, restoration, recovery support groups, therapy, employment, and independently using public transportation.  An additional six clients are pending an intake upon release from the jail.  The program is expected to provide 24 beds, 12 female and 12 male, to serve clients referred by the Forensic Support Team and Bridges. |

| NAMI Colorado | Funding, in the amount of $91,030, was approved for this program in February 2024, with formal launch in that same month.  The goal of this program is to provide evidence-based peer programming for patients and staff of the State Mental Health Hospitals in Pueblo and Fort Logan.  Specifically, the training consists of peer-to-peer experiential learning for people with serious mental illness, a recovery peer-based support group program, a training module designed to educate staff on attitudes and assumptions about people with mental health conditions, and with an overall focus on underserved populations.  Funded staff include partial salaries of the program director (0.2 FTE), assistant program director (0.5 FTE), executive director (0.1 FTE), operations director (0.2 FTE), special projects director (0.2 FTE), and a community outreach coordinator (0.3 FTE).  Funding also supports mileage for facilitators and peer specialists, travel expenses for NAMI, and printing of class, session, workshop, and group materials.  In Quarter 1, 2024, NAMI Colorado engaged in outreach activities with leadership of the State Mental Health Hospitals and are planning additional activities based on that outreach.  One training session, In Our Own Voice, was held during the quarter at Fort Logan, involving 31 patients, 7 staff, and 5 nursing students.  Upcoming training modalities being scheduled include peer-to-peer, NAMI Connections, In Our Own Voice, NAMI Train the Trainer, and Hearts and Minds. |
|---|---|
| Pulse Line Collaborative Training | In October 2023, the Fines Committee approved $1,058,270 for two years of funding to Pulse Line Collaborative Training, LLC.  Funding provides for training to be administered to law enforcement, first responders, clients, and family members of clients and potential clients, to help reduce unwarranted use of force incidents.  Many individuals who ultimately become involved with the competency system acquire serious criminal charges stemming from unnecessary altercations with law enforcement or first responders, owing mainly to symptoms of mental health disorder, rather than intentional criminal behavior.  Funding provides for a director of development and training (1 FTE), a mental health lead and program coordinator (1 FTE), and administrative support (0.75 FTE), as well as operational expenses.  In Quarter 1, 2024, the program onboarded 11 contract trainers and completed the train-the-trainer curriculum with each.  Additionally, the program completed 10 training sessions, each 8 hours in duration, with first responders and self-advocates/caregivers.  Although it appears to be a slow start for this program which agreed to hold 462 sessions over its two-year funding period, the program is gaining momentum towards its ultimate goal.  As part of this program's evaluation plan, it has agreed to survey training participants.  The survey shows highly positive response rates to questions asking about the value of the skills and knowledge in their jobs or daily lives. |

| SAFER Opportunities | In March 2023, the Fines Committee approved $2,007,500 for SAFER in Arapahoe County, within the 18th Judicial District.  This program provides housing and supportive services to individuals transitioning from custody to support out-of-custody competency restoration, with a goal of increasing the number of individuals released from custody who otherwise would be released homeless.  Per the MOU, SAFER promises to provide 9,125 bed days, and as of the end of Quarter 1, 2024, a total of 3,725 bed days have been provided.  In Quarter 1, 2024, the program received 28 referrals and completed 5 intakes.  One client voluntarily left the program this quarter.  The capacity of the program is 25. |
|---|---|
| San Luis Valley Recovery Housing | In May 2023, the Fines Committee approved $313,762 for two years of funding to San Luis Valley Recovery Housing, which is used to provide supportive, sober-living housing to clients released from custody for competency evaluation or restoration.  The program can serve up to five clients at a time, referred from the 12th Judicial District.  Although the program is still renovating the facility it purchased for this program, it has begun taking referrals and placing clients at other facilities.  The renovation has been plagued with multiple delays.  SLV Recovery Housing continues the process toward becoming CARR (Colorado Association of Recovery Residences)-certified. Further, the program has collaborated with Bridges and with Navigators, such that the referral process is ready to implement once the facility is operational. |
| Second Chance Center in the City | In July 2023, the Fines Committee approved $488,125 for one year of funding to Second Chance Center in the City (SCCIC) to provide onsite case management, peer mentoring, employment services, and housing navigation to at least 50 unique individuals in or at-risk of being in the competency system.  SCCIC assesses each client's needs, specifically related to mental health, substance use, intellectual and developmental disabilities, and traumatic brain injury for appropriate treatment.  SCCIC also connects clients to ReShape Minds Care Managers for transportation and appointment-appearance support. Fines Committee funding covers a care manager, a behavioral health navigator, and partial salaries for the director (0.5 FTE) and an assistant director (0.5 FTE). Costs directly related to clients' basic needs, assistance with leasing office space, and funding for ReShape Minds to provide community navigation directly to clients are also covered.  In Quarter 5, 2023, SCCIC began receiving referrals and conducting intakes.  Since that time SCCIC has received 47 referrals and has successfully enrolled 39 of those referred.  As of the end of Quarter 1, 2024, eight clients have been terminated: five due to an inability to contact the individual, one due to refusal to engage in services, one left the state, and one individual was found incompetent to proceed. |

| Solange Assisted Living | Funding, in the amount of $600,000, was approved for this program in January 2024, with formal launch in that same month.  The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with wraparound services and partnering for treatment services.  The Fines Committee funded 20 beds in assisted living facilities, a van to transport clients, furniture, entertainment equipment, and supplies.  In Quarter 1, 2024, Solange received fourteen new referrals from Embark Recovery Residences, Peak View, Rocky Mountain Human Services, CDHS, and the Pueblo County Jail.  As of the end of Quarter 1, 2024, there were nine active clients in the program (five males, four females).  Solange had agreed to provide five beds in Mesa County; however, that became impracticable shortly after the MOU was signed.  Solange will continue to receive referrals from Mesa County, but it is unable to operate a facility there at this time. |
|---|---|

| | |
|---|---|
| State Court Administrator's Office Competency Programs Analyst | In August 2023, the Fines Committee approved $222,664 for two years of funding to the Office of the State Court Administrator (SCAO) for a competency programs analyst.  The analyst supports judicial districts operating special programs in the competency system.  Training, awareness of resources, data collection, and evaluation support is also provided by the analyst.  SCAO filled the position in December 2023.  SCAO is focused on several key initiatives: 1) data-driven advocacy, 2) National Center for State Courts (NCSC) grant proposals, 3) Judicial Department JBC analyst request, 4) training, awareness, and support, and 5) general administrative assistance.  The competency programs analyst has made significant progress in establishing and advancing competency dockets across Colorado.<br><br>1. Needs Assessment and Program Development: Conducted meetings with all judicial districts to understand existing and upcoming dockets; Established a data management system (DIMS) launching in May 2024; Finalized roles and responsibilities for court coordinators (documentation: finalized document).<br>2. Data Collection and Analysis: Leveraged data to inform stakeholders through presentations and discussions, leading to docket and process improvements.<br>3. Training and Resource Development: Partnered with the OCFMH Judicial Liaison for ongoing training; Created and maintained a communication hub for competency docket teams.<br>4. Collaboration and Advocacy: Worked towards funding through partnerships with the legislature and Joint Budget Committee; Collaborated with Bridges of Colorado and Office of State Public Defender on HB-24-1355; Advocated for judicial district needs and funding opportunities.<br>5. Federal Grant Applications: Bureau of Justice Assistance-Statewide Competency Court Docket Evaluation and Creation of Key Principles, Best Practices, Implementation Guide, Competency Diversion Analyst; Justice Assistance Grant-Statewide Competency Court Docket Evaluation and Creation of Key Principles, Best Practices, Implementation Guide. |

| SummitStone Health Partners Competency Hub | In October 2022, the Fines Committee approved $3,029,283 for three years of funding to SummitStone Health Partners (SummitStone) in Larimer County within the 8th Judicial District.  This program consists of two elements: The first is to provide psychiatric care, including prescriptions for medications, to clients in custody on whom competency has been raised with the goal of increasing the quantity of clients who may be released from custody during the competency evaluation and restoration process.  The second element of this program is the establishment of a competency services hub at which clinical services, case management, and peer support are provided to out-of-custody clients.  The hub enables clients to receive a range of services from one location, including competency restoration education, medication management, and other collaboration with system providers.  In Quarter 1, 2024, the Medical Services Team served 66 unique individuals, while the Competency Supportive Services team served 86 unique clients.  The reported capacity of the program is 80 for in-custody and outpatient services. |
|---|---|
| United Way of Weld County Rapid Rehousing Opportunity | In August 2023, the Fines Committee approved $1,421,440 for two years of funding to United Way of Weld County Rapid Rehousing Opportunity (UWWC) to transition fifty competency-involved individuals from the Weld County Jail to the community by providing housing, case management, assistance with benefit acquisition, and wraparound services.  Funding covers two case manager FTEs, bridge housing, cold weather shelter space, Rapid Rehousing for 50 participants, and maintaining and supporting the operations of the Housing Navigation Center services.  UWWC began to receive referrals in Quarter 4, 2023, and by the end of Quarter 1, 2024, UWWC screened 13 referrals and completed 11 intakes since the program began.  Four individuals have terminated, all unsuccessfully. |

| University of Denver, Denver FIRST, Brain Injuries Screening Program | In September 2022, the Fines Committee approved $948,729 for two years of funding to Denver FIRST, a regional hub for forensic mental health expertise within the Graduate School of Professional Psychology at the University of Denver.  In January 2024, a no-cost extension was granted to continue the program through September 30, 2025.  This program focuses on competency clients suspected of having brain injuries and provides cognitive screenings, full neuropsychological evaluations, and referral for treatment by professional students to clients referred by the Forensic Support Team.  Its target population includes incarcerated and out-of-custody clients with a history of and/or symptoms of potential brain injury.  The Fines Committee funds student and professional staff time to complete cognitive screenings and neuropsychological evaluations.  The program became operational and began receiving referrals in Quarter 2 of 2023.  This quarter, the program received 15 referrals and completed 6 intakes.  Of the 21 individuals who have terminated the program, 7 were restored to competency, 7 individuals had their case(s) dismissed or closed, and 4 were ordered outpatient restoration.  Of those assessed, 91% have been positive for a brain injury, and 100% have presented with cognitive and functional-related deficits.  The program continues to see severe comorbid mental health and medical issues complicating individuals' presentation.  The reported capacity of the program is 20. |
| --- | --- |
| Valor Program at Embrave | In March 2024, the Fines Committee approved $8,902,175 to Embrave for acquisition and renovation of a former hotel out of which the program will operate, serving 72 clients at a time.  Funding also provides for nine months of program operation after start up.  The sale of the building closed in April, and it is expected to be ready for operation by June.  The program has hired staff and has held several stakeholder coordination meetings so that the referral pipeline is established once the program opens. The facility is based in El Paso County, but leadership has been making connections with stakeholders who will refer clients to it statewide.  Valor is the largest program funded to date by both dollar amount and clients anticipated to be served. |