

Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

November 28, 2024

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

November 28, 2024

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our November 2024 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> (i) As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. The Department initiated these steps and demonstrated meaningful early progress. Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

Exactly one year later, in the spring of 2020, the COVID-19 pandemic brought the Department unforeseeable challenges and progress stalled. COVID-related complications reversed progress on most metrics. Even after the pandemic relented, many setbacks remained. In particular, the Department faced tremendous difficulties staffing their facilities, which left unused hospital

units, and less capacity to serve the people in jail awaiting transfer and treatment in those units. Similar difficulties have been common across the country, and states vary in the timing and degree to which they have begun to improve.

But for over one year, *Colorado competence-related services have been improving*. For example, the waitlist peaked at 483 detainees in June 2023 but decreased by half (to 241) by late June of 2024. *At the end of this quarter (October 31, 2024), the waitlist of 208 people is less than half the length it was exactly one year prior.* State hospital units have reopened, and the Department has secured new beds, moving more people from the waitlist to inpatient beds. Indeed, the total number of people admitted to inpatient restoration this quarter (n=308) continues a year-long trend of admitting more than 300 people to inpatient restoration every quarter—the most since the start of the Consent Decree. The Department has better prioritized Tier 1 Detainees, such that only 16 Tier 1 Detainees were waiting in county jails as of October 31, 2024 (as compared to 40 one year before). Newly opened Mental Health Transitional Living homes (MHTLs) now provide a crucial level of care that has long been lacking in Colorado. As for this quarter, *improvements have persisted for over one year*. Most metrics have steadily improved across five quarters. We anticipate continued improvement and—though we are cautious about offering precise estimates—we expect the Department will fully meet the Consent Decree's requirements before 2026.

As always, we emphasize—and the Department recognizes—that the sustained progress is no reason for complacency or decreased efforts. Most metrics still fall far short of the requirements in the Consent Decree, and even their significant progress brings new forms of challenges. Nevertheless, the Department's trajectory is one of improvement.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

# TABLE OF CONTENTS

CONTEXT for QUARTERLY METRICS.................................................................................................5

KEY METRICS FOR PROGRESS: ......................................................................................................8

COMPLIANCE WITH TIME FRAME REQUIREMENTS.........................................................................8
    KEY METRIC: COMPETENCE EVALUATION TIME FRAMES               9
    KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES        14

OTHER CONSENT DECREE UPDATES ............................................................................................17
    INTERIM JAIL MENTAL HEALTH TREATMENT                17
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT       19
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES        22

DECREE SECTION VII UPDATES .....................................................................................................26
    CIVIL BED FREEZE                26
    COMPREHENSIVE AND COHESIVE PLAN              27
    INCREASE COMMUNITY RESTORATION SERVICES           29

CONCLUSION ..............................................................................................................................32

APPENDIX 1 ...............................................................................................................................33

APPENDIX 2 ...............................................................................................................................34

APPENDIX 3 ...............................................................................................................................36

# CONTEXT for QUARTERLY METRICS

*Historic Context:*

Historic vulnerabilities in Colorado's public mental health system set the stage for the past two decades of competence-related challenges. For decades preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that was able to operate selectively, routinely declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the country, and other states were beginning to experience a "competency crisis." Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree. As you recall, we tend to summarize the overall spirit and provisions of the Consent Decree in three goals:

1. Reducing the *number* of people on the waitlist for restoration services.
2. Reducing *wait times* for people on the waitlist, particularly those with severe illness
3. Reducing *harm* (by providing *care*) to people on the waitlist

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the Department could not keep pace with court orders for competency services, and the waitlist grew. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, more than 80 beds[1] at CMHHiP remained unusable because there was not sufficient staff to operate the units. In July 2023, the waitlist peaked at 483 people.

---

[1] This figure varied at times , but for over one year, over 80 beds remained unusable.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Detainees. Over the past few years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year. *Indeed, the Department has now reopened nearly all beds that were closed during the pandemic, and hospital capacity now approximates the capacity before the pandemic*. The Department also prioritized the opening of Mental Health Transitional Living homes, creating community-based opportunities for people ordered to competence restoration as well as hospital patients who were otherwise difficult to place in previously existing community settings.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree. These delays continue, though less severely; average wait times still exceed those mandated by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

*Recent Context:*

For more than one year, the Department has been increasing bed capacity for inpatient restoration: for example, re-opening 39 beds at CMHHiP, opening the second new 22-bed unit at CMHHiFL, and expanding the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds. These changes alone significantly reduced the waitlist. The Department also transitioned some long-term patients into new Mental Health Transitional Living (MHTL) homes, and they also admitted a few others directly from jail. These MHTL now serve over 30 patients, across five newly-opened homes, with more on the way. Of course, transitioning long-term patients from the hospitals increases capacity for more patients who will require less time in the hospital, opening beds sooner. With increased capacity, the Department now admits more detainees each month than they did in prior months. The *number of persons on the waitlist has generally declined for over five quarters (i.e., well over one year). This quarter features the lowest waitlist figures in the past four years.*

The Department is transitioning towards a Behavioral Health Administration system, a new cabinet-level agency, housed within the Department of Human Services, designed to be the

single entity responsible for coordination and collaboration across state agencies to address behavioral health needs. This transition includes many promises relevant to the competency population: a true "safety net" to ensure mental health services for all who need them, decreasing opportunities to deny services to certain populations. Indeed, these significant requirements are now in effect. A BHA *should* benefit the competency population, and reduce the number of people entering competency services, as it creates much greater access to community mental health resources. These BHA changes remain quite new, and we are eager to see their effects.

We anticipate the improvements of the past year will continue. The Department's internal projection model has been improved and has performed accurately in recent months. While no projection model is perfect (or can account for unexpected impacts like a pandemic), their new, generally reliable model shows that improvements should persist, albeit at a slower pace, for at least the next year. The *Department expects full compliance with Consent Decree time frames by the end of 2025*. We do not consider this estimate infallible, but, having explored the model (including underlying data and assumptions) carefully, we consider this a reasonable, good faith estimate. For example, their progress over the past quarter—even with challenges such as medical issues that required quarantining certain hospital units and slowing admissions—was generally consistent with their projection model.

As progress continues over the next year, we will continue to shift from a primary focus on attaining compliance, to a focus on building systems and procedures to ensure ongoing compliance (and prevention of setbacks). Indeed, the two Parties have already begun a similar shift in strategy.

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

# KEY METRICS FOR PROGRESS:

# COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such **reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC: COMPETENCE EVALUATION TIME FRAMES

33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The Department historically met most evaluation time frames, even before the 2019 Consent Decree and even through most of the pandemic. Court orders for jail-based competence evaluations dropped to an all-time monthly low at the start of the pandemic (e.g., 56 people in April 2020). But arrests and orders for jail-based evaluations resumed dramatically, peaking at an all-time monthly high two years after the pandemic began (i.e., 178 in March of 2022). After staffing shortages in Court Services caused delays during some of 2020, the Department returned to almost perfect compliance with evaluation time frames.

This quarter, *we are concerned about increased orders for competence evaluations*.
For most of the year, orders for jail-based evaluation remained steady, or increased slightly, averaging in the range of 150-160 per month.  But this quarter peaked with *an all-time high of 193 people ordered to competence evaluation in October*.

| Average waiting time (in days) for a competence evaluation[2] | | | | | |
|---|---|---|---|---|---|
| | May - Jul 24 | Aug 2024 | Sep 2024 | Oct 2024 | Requirement |
| Jail-based Competency Evaluations | 10.1 | 10.7* | 10.9 | 12.6* | 21 days |
| Inpatient Competency Evaluations | 18** | 85*** | 17.8*** | 17* | 14 days |

\* = at least one defendant waited longer than the maximum time frame for the evaluation
\*\* = most defendants waited longer than the maximum time frame for the evaluation
\*\*\* = all defendants waited longer than the maximum time frame for the evaluation

For many years, even with a high volume of court orders for evaluations, the Department's Court Services unit has remained responsive and efficient, maintaining near-perfect compliance with timelines. They maintained compliance amid significant staffing shortages, making their achievements more impressive, but also more precarious. This quarter they maintained near-perfect compliance for the first two months (only one detainee waited longer than the 21-day timeline), but in October, *13 detainees waited more than 21 days for an evaluation* (far more than during the prior year combined). Clearly, the all-time-high spike in orders for evaluation was more than the team—already understaffed and stretched thin—could handle. If this spike begins to reflect a trend, it will be essential to hire more evaluators.

Regarding inpatient evaluations, there remain very few orders for inpatient competence evaluations (i.e., only seven new orders this quarter). Of the five orders resolved this quarter, *all* were resolved by admission to CMHHiP, though with most exceeding the 14-day time frame.

Orders for *jail-based* evaluations remained high, and they peaked with an all-time high (193 people) in October. This was too much for Court Services—despite their remarkable record—to manage with perfect compliance.  Though they completed *most* jail-based evaluations within the 21-day time limit, increasing orders for evaluations will definitely require the Department to hire more evaluators.

---

[2] Information retrieved from the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, pp. 31, 45.

## KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:*  Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. Defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE had waited, on average, 71 days. The Consent Decree then mandated a triage system,[3] requiring Tier 1 defendants to begin restoration services within 7 days and Tier 2 defendants within 28 days. Wait times and the number on the waitlist initially decreased *until* the onset of the COVID-19 pandemic, but greatly increased thereafter. Those wait times have continued to remain far out of compliance even after the pandemic relented, **but they have improved steadily over the past year.**

This quarter, nearly all inpatient restoration wait times remained beyond mandated time frames:

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees[4]* | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Oct 2024 | 24 | 71 | 36.1 | 84.5 | 24*** | 60** |
| Sep 2024 | 28 | 73 | 43.8 | 85.7 | 28*** | 54** |
| Aug 2024 | 21 | 91 | 40.3 | 111.3 | 19** | 73** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

** = most defendants waited longer than maximum time frame for restoration services
*** = ALL defendants waited longer than maximum time frame for restoration services

Again, the Department remained *mostly out of compliance* regarding restoration time frames. Between August - October 2024, the Department was noncompliant with the 7-day time frame for all but two Tier 1 Detainees admitted. Of the 235 Tier 2 Detainees admitted in that same

---

[3] See Consent Decree paragraph 43.

[4] According to the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, pp. 13-14.

period, 187 were admitted or had their waits otherwise ended beyond their time frame of 28 days. Overall, across both Tier 1 and Tier 2 admissions, this reflects only a 16.2% compliance rate. Even so, this rate is substantially higher than the three previous quarters, which averaged between 7-9% compliance.[5] So while The Department was still noncompliant in the vast majority of cases, they have also demonstrated consistent improvement from quarter to quarter.

| *Average Wait (in days) for Inpatient Competence Restoration Services[6]* | | | | |
|---|---|---|---|---|
| | Nov 23 – Jan 24 | Feb 24 – Apr 24 | May – Jul 24 | Aug - Oct 24 |
| Tier 1 | 92.0 | 54.3 | 69.2 | 40.3 |
| Tier 2 | 129.7 | 115.1 | 104.1 | 95.3 |

Pretrial Detainees are all still waiting far longer than Consent-Decree time frames allow:

- Tier 1 detainees nearly *6 times longer than allowed* by the Consent Decree (i.e., 40 days on average between August – October 2024, rather than 7 days).
- Tier 2 Detainees wait more than *3 times longer than allowed* by the Consent Decree (i.e., 95 days on average between August – October 2024, rather than 28 days).

Perhaps counterintuitively, these wait times offer some encouragement. The average Tier 1 and Tier 2 wait times continue to decrease, such that *they are the shortest since 2022*, with Tier 2 average quarterly wait times reflecting a sustained decrease for more than a year. Tier 1 wait times have decreased by more than 50% in the past year. Also, many Tier 1 Detainees were admitted during this past quarter, with 73 admissions as compared to an average of 48 throughout 2023. This reflects the Department's commitment to the Consent Decree's triage system – admitting the "sickest people the quickest." Further, this quarter had fewer Tier 1 Detainees waiting for admissions beyond seven days than any quarter since the pandemic era. An average of 10 Tier 1 Detainees were waiting beyond seven days at the end of each month this past quarter, compared with averages of 12, 21, and 33 in the previous three quarters.

Again, although only 16.2% of Detainees were admitted within their mandated time frames this past quarter, this percentage is again higher than previous quarters; 50 Detainees were admitted

---

[5] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for the actual need for urgent admission.

[6] Information retrieved from the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, p. 14.

on time (the largest number in several years). These improvements from quarter to quarter suggest sustained progress, and they are very encouraging in that respect.

The total number of people admitted to inpatient restoration this quarter (308) remained high (after 306 last quarter, and a record 339 in February through April 2024), continuing a robust pace of admissions over the past year. The past year represents larger quarterly totals than any other quarter since the beginning of the Consent Decree. In short, admissions have maintained a strong, consistent pace.

Of course, despite this sustained progress, wait times remain unacceptable. On average, Detainees wait three to six times longer than the prescribed Consent Decree time frames.[7] Although the number of people waiting in jail for inpatient restoration again decreased during the past quarter, wait times for admission remain far beyond mandated time frames. Approximately 84% of Detainees who were admitted exceeded their maximum allowable wait times in jail.

The number of people awaiting restoration, and their wait times remain far out of compliance this quarter. On average, Detainees wait three to six times longer than Consent Decree time frames allow. Only 16.2% were admitted within Consent Decree time frames. Nevertheless, *these figures again reflect sustained progress throughout 2024*: wait times continue to decrease, admissions of Tier 1 Detainees maintained a strong pace (within days to weeks), Tier 2 wait times decreased for the fourth consecutive quarter, and inpatient restoration capacity remains at pre-pandemic levels. While wait times remain far too long, they continue to decrease.

---

[7] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 308 "admitted or ended" between August and October 2024, only 205 defendants were actually admitted to an inpatient facility. The other 103 people were either dismissed, vacated, or released on bond. Still, the percentage of cases "admitted or ended" via admissions remains encouraging.

## KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services. The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants. By June 2020, the number on the waitlist dropped below 100. The Department projected that the waitlist would be minimal by December 2020, but the pandemic reversed that progress and changed all projections. The waitlist grew throughout the pandemic, and even continued after the pandemic ended, amid pandemic consequences like staff shortages and closed hospital units. In June of 2023, the waitlist peaked at 483 Detainees and even remained over 400 until December 2023. But the number has steadily decreased since then.

*Current realities:*  Prior to the summer of 2023, the wait list had grown steadily for more than one year, reaching an all-time peak of 483 at the end of June 2023. But thereafter, the reopened beds at CMHHiP, increasing capacity in the Mental Health Transitional Living homes, and several fines-funded community housing and case management options created much-needed inpatient restoration capacity. Since then, the Department has been able to admit many more detainees than in previous years, and the overall number of persons on the waitlist has declined substantially over the past year.

The number of court orders for competency restoration had remained generally stable for the past year. The past 12 months averaged 117 individuals ordered to inpatient restoration per month, with this past quarter averaging 120 per month. However, the number of people awaiting inpatient restoration at the end of this quarter (208) continues to decrease. The waitlist has decreased in 11 of the past 12 months, with roughly 210 fewer individuals than this time last year. Indeed, the number of people waiting at the end of October 2024 (208) shows a 57% decrease from the all-time high from June 2023 (483).

| *Number of Defendants Waiting for Inpatient Restoration[8]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | May - Jul 24 | Aug 2024 | Sep 2024 | Oct 2024 |
| Combined | 157 | 246 | 216 | 216 | 208 |
| Tier 1 | N/A | 14.7 | 16 | 18 | 16 |
| Tier 2 | N/A | 231.3 | 200 | 198 | 192 |

Figures reflect the number of persons waiting for restoration services on the last day of the respective month.

[8] According to the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, p. 10.

page 15

Further, the total number of all Detainees waiting reflects the lowest quarterly average overall in the past year – by far. In short, *there are more than 200 fewer people on the waitlist than there were one year ago.*

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month*[9] | |
|---|---|
| March 2019 | 157 |
| June 2023 (high point) | 483 |
| October 2023 | 429 |
| November 2023 | 418 |
| December 2023 | 350 |
| January 2024 | 383 |
| February 2024 | 329 |
| March 2024 | 324 |
| April 2024 | 297 |
| May 2024 | 270 |
| June 2024 | 241 |
| July 2024 | 227 |
| Aug 2024 | 216 |
| Sep 2024 | 216 |
| Oct 2024 | 208 |

---

[9] According to the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, p. 10.

*Qualitative review and extraordinary cases:* As we emphasized in previous reports, the waitlist is not simply a metric, but rather a group of *people* with psychiatric illness awaiting crucial treatment. Each week, we review the documented updates on each person in jail who has been waiting for inpatient restoration longer than the Consent Decree allows. In that review, we see many acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability (living in cells soiled with urine or feces, neglecting hygiene, not eating, experiencing serious medical problems, and so on) or who languish with severe symptoms of untreated psychosis. These conditions leave them vulnerable to self-harm, victimization, worsening psychiatric illness, or new charges.

Over the three quarters, we have been encouraged that the number of people whom *we* categorize as the sickest and most vulnerable Detainees remained relatively few. This is certainly a reflection of the decreasing number of Detainees overall, as well as the Department's ability to admit Detainees more quickly. In any week, there are about ten people for whom we urge prompt hospitalization. This lower number of dire situations reflects the influence of the Forensic Support Team and the inpatient hospital settings have in triaging Detainees for urgent admission, and we affirm these teams and their achievements during the past quarter.

The number of people waiting in jails for restoration services continued to decrease this quarter, steadily dropping from the all-time high last summer (483) to 208. Many Detainees were admitted to hospitals this past quarter, while the Department generally continued to prioritize the sickest and most vulnerable Detainees for admission. This suggests sustained progress. While we affirm these improvements, we also recognize the waitlist is still longer than it was at the start of the Consent Decree, wait times are still far out of compliance for most Detainees, and the waitlist includes some very people in acute psychiatric crisis. Even amid this sustained progress, admissions still must increase.

# OTHER CONSENT DECREE UPDATES

## INTERIM JAIL MENTAL HEALTH TREATMENT[10]

> 34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff are dedicated to enhancing services for Pretrial Detainees awaiting restoration. However, given that they are often funded by county budgets, the scope and quality of JBBS services and staffing varies greatly across Colorado jails. The Department's drafted 2024 Comprehensive Plan details the challenges with some JBBS teams, as well as their financial commitment to addressing the inconsistencies across JBSS programs.

OCFMH's mobile competency enhancement service continues to contract with a part-time forensic psychiatrist to meet with specific Detainees and treatment providers to discuss and encourage medication administration and management. Over the past year, according to the Department's drafted 2024 Comprehensive Plan, this psychiatrist has provided 50 consultations, 50 chart reviews, 46 direct client appointments, and one training. The impact on the waitlist is difficult to calculate with precision, but we strongly support this service as one that provides additional expertise to jails that often desperately need psychiatric services.

---

[10] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

We continue to suggest that involuntary medication orders, assertive community treatment, and broader criteria for involuntary evaluation and treatment could address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who experience criminal justice involvement or worsening physical or mental health status due to their symptoms. For example, perhaps in some situations, an acutely ill inmate could be transferred to a civil hospital for administration of involuntary medication and then return to their county jail after an appropriate monitoring period in the hospital.[11] Recent legislation, now enacted into law, provides a mechanism to drop a competence evaluation or restoration order in favor of civil commitment; but we only know of two attempts to use this new mechanism since July 1, 2024. Denver County is attempting to utilize probate court to shift competence cases to the civil court system where monitoring and court involvement will continue. However, these sorts of programs and initiatives rely on a functional, accessible civil mental health system. Developing this type of robust, civil mental health system is not solely within the Department's control. The afore-mentioned BHA should provide the backbone of new civil treatment options, but realization of the full promise of the BHA is still years away. We affirm their decision to pursue conversations with leadership from other stakeholders (law enforcement, corrections, private mental health, judges, and persons with lived experience) to enhance Colorado's civil mental health options.

---

[11] As always, we emphasize that Involuntary medication is often unnecessary because empathic, collaborative care is often sufficient to engage patients in voluntary medication. But in a small minority of cases, involuntary medication may be a necessary last resort for much-needed treatment.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[12]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would be doubled were not for the persistent efforts to shift so many detainees into the Department's robust outpatient competency restoration program and community supports.

*Housing:* The Forensic Support Team (FST) Navigators (described below) continue to facilitate transitions from jail to community housing across the state. Most community housing options are in the Denver and Colorado Springs metro areas, but the Fines Committee has now funded housing in northern, southern, and western Colorado. The total number of housing placements and beds funded by the Fines Committee remains high; a new housing initiative on the Western Slope will provide housing and care for more than 50 people in 2025. Most of these housing options offer additional treatment and supportive services. The launch of the Mental Health Transition Living (MHTL) homes provides additional community housing and services as well, and these beds are prioritized for those who are discharging from a state hospital or transitioning from the waitlist to the community. These MHTL beds are critically important as they provide community housing and service options for hospitalized people who have traditionally been very hard to discharge. More than 60 beds are already available, and a total of 154 beds are scheduled to be open in 2025. Indeed, in our view, the MHTL homes are among the Department's best strategies to improve the overall scope of public mental health services in Colorado, and their impact will certainly extend beyond the competence-services system.  Please see Appendix 3 for a description of these programs.

*Forensic Support Team (FST):* The FST used recent legislative funding to increase the size of its team substantially, including six new navigators, two case managers, and one program coordinator. Although FST Navigators continued to monitor clinical status and restoration progress for all Pretrial Detainees, they also shifted their priority to focusing heavily on Detainees awaiting restoration services (as opposed to persons awaiting evaluations or persons at risk for involvement in competence services). In October 2024, FST Navigators were assigned to 941 persons in county jails waiting for competence evaluations and/or inpatient restoration services.

---

[12] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

For persons awaiting evaluations in jail, the FST recorded an average monthly total of 76 face-to-face contacts and 228 contacts with care teams or other stakeholders during the past quarter (a slightly downward trend). For individuals awaiting restoration services this quarter, Navigators logged an average monthly total of 502 face-to-face contacts with defendants in jail and 1,437 contacts with community care teams or stakeholders.[13] All of these numbers (for both evaluation and restoration Detainees) are lower than last quarter, which likely reflects the lower number of Detainees in jails overall. Even as overall hours have decreased due to the decreased waitlist, these numbers represent tremendous time and effort devoted to Detainees.

The FST also continues to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from CMHHiP or CMHHiFL to the community, placing appropriate Detainees into community-based specialty programs (such as placement in Fines-funded settings), working with competency dockets to facilitate quicker hearings and community restoration, advocating for dismissal of charges or resolution of competency for those who have stabilized, and more. Several thousand CMHHiP bed days have been "saved" since January 2020 through these combined efforts. The FST works with many community service programs every day.

Finally, Navigators continue to work closely with many specialized judicial programs, such as the Larimer County Competency Court, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. Each of these is discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets (see Appendix 2). We continue to affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department as they collect information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Outcomes from the FST are again strong this past quarter, despite difficult conditions and high demand for their services. As the Department anticipates compliance on the horizon—and even as the waitlist will decrease in route to compliance—the Department may begin to shift FST duties. There will be fewer detainees to visit in jail, but plenty to serve and support in the community.

---

[13] According to the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, pp. 49-52.

TRANSPORTATION OF PRETRIAL DETAINEES

> 36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Five defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[14] This follows a quarter in which three Detainees were admitted to an inpatient facility for competence evaluation; indeed, this past quarter matches the largest quarterly number of Detainees admitted to a state hospital for a competence evaluation since 2021. Overall, then, very few of Colorado's competence evaluations occur in a state hospital setting – but this quarter showed more admissions than in the past three years.

The Department has not reported any other delays or barriers to transportation with jails around Colorado.

---

[14] According to the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, p. 19.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals, and to support their work after they receive funding). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not supplant, existing services. The Department has provided notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

*Current realities*: For more than four years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that complement the broad goals of the Consent Decree. Though the Department has reached the maximum amount for fines for the past several years (i.e., $10 million per year, then $12 million after adjustment for inflation), we anticipate this next year will be the first one in which the Department does not pay maximum fines. Indeed, we are preparing stakeholders that the Department may be paying few, if any fines, as of next year.

<div style="border:1px solid black; background:#e8f0f8; padding:1em;">

### Fines-Funding Impact: An Overview[15]

This quarter, the Fines Committee funding has supported 38 programs. In addition to the 38 fully operational programs, one more is in their implementation period and thus progressing to full capacity. The operational programs are serving individuals in ten separate jurisdictions, while Colorado Coalition for the Homeless, Denver FIRST, Ananeo Housing, Mile High Behavioral Healthcare, Fidelity Behavioral Health, and Solange Assisted Living serve individuals referred statewide. All together, *these programs have served 2,104 individuals this quarter*, up from 1,540 one year ago in Quarter 3 of 2023. Each of the programs has a goal to either divert individuals from the inpatient competency restoration waitlist or to support clients to make diversion from their criminal charge or from confinement feasible. As such, assuming most clients being served by these funded programs would otherwise be on the in-custody competency waitlist, Fines Committee funding continues to make an impact on the restoration waitlist. In this quarter, twelve programs provided housing to competency-involved individuals. Fines Committee funding provided housing for 179 unique clients.

</div>

*Projects funded by the Fines Committee*
The top priorities for the fines committee continue to be projects that address housing, diversion from the competency system, and specialized competency judicial programs (e.g., competency dockets and calendars).

*Housing* remains a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. Those in outpatient restoration have generally shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing arranged through fines-funded programs.

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. Often, the FST is able to arrange admission to these programs for detainees who are released or

---

[15] Summary courtesy of Kally Enright and Todd Spanier, of Strategy and Evaluation Consulting, the team that serves as a fiscal and quality monitor for fines-funded projects.

bonded from jail to complete outpatient competence restoration. This quarter, *Fines Committee funding provided housing for 179 clients.*

*Diversion* programs of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped. The adoption of HB24-1355 should provide much greater opportunity for court-directed diversion and deflection in the coming years.

*Competency Dockets and related efforts* provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, there are several "competency dockets" emerging across Colorado as more jurisdictions recognize the strengths of this model. Indeed, this quarter Colorado's State Courts Administrators Office held a two-day *Behavioral Health and Competency Convening,* largely devoted to competency dockets and related efforts. The Department and the Fines Committee were closely involved.

*Recent projects* include two particularly large-scale projects from which the Fines Committee expects substantial impact. As we mentioned in recent reports, the Fines Committee has supported Embrave with $8,902,175 to develop the Valor Program, which will support individuals needing a level of care that does not currently exist in Colorado. Specifically, the Valor Program will provide residential care to people who need intensive support and stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility will offer 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program will serve those in, or at risk of being in, the competency system, accepting referrals from the justice system and the community to support not only decreasing the waitlist but to also deflect and divert individuals from the justice and competency system. Remarkably, *this large-scale service launched on time and has begun accepting residents*.  We have made multiple site visits to Embrave, and are watching closely as they admit more residents.

Most recently, the Fines Committee recently agreed to fund ($5,400,000) Ava Health to provide a full continuum of care to individuals on the Western Slope. Ava Health will support the competency population and those who may be at risk of being in the competency system with an acute stabilization unit, residential care, partial hospitalization program, outpatient, and supported and independent housing. As part of the agreement, the Fines Committee has asked

Ava Health to introduce themselves to key stakeholders in the 21st to share the vision for care and begin to develop relationships for collaboration. Leaders of Ava Health have significant experience with the behavioral health population, and for the last 10 months they have been diligently exploring the needs of the Western Slope to develop the continuum of care Ava Health will offer.

*A full info-graphic summary of fines-funded projects comprises Appendix 3.*

### This Quarter: A Gathering for All Fines-Funded Programs

This quarter, the fines team held a gathering of staff from *all* fines-funded projects. Lynn Unger—who is funded to serve as a project cultivator and supporter—gathered them to provide opportunity for project teams to engage with one another and share best practices. A primary focus was project *sustainability*. Because fines funds will no longer be available after the Department meets the requirements of the Consent Decree, these projects—though providing crucial services in Colorado—cannot expect ongoing funding from the Fines Committee. Rather, projects will need to continue developing other means of support, ideally becoming entirely self-sustaining. Therefore, Lynn Unger arranged for presentations from a variety of agencies and funding sources, helping the programs move towards funding from Medicaid or other long-term funding mechanisms.

The gathering also furthered relationships among projects, helping them share referrals, resources, and strategies for success. As we observed the gathering, we were struck by the breadth and diversity of these fines-funded programs. Given the number and variety of persons they serve, the Department (and many Colorado citizens) would certainly suffer if their services ended. Thus, all parties recognize the need for many of these programs and services to continue their crucial services, even after the Department attains compliance and no longer pays fines.

# CONSENT DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

Since the start of the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures. The Department has opened more than 70 competence restoration beds over the past year, and it has pledged to open 154 community beds in their system of MHTLs by the end of 2024 (see below). CMHHiP is now operating at full pre-pandemic restoration capacity. Still, despite this critical increase in restoration beds, civil capacity continues to lag, offering few inpatient options for persons who might otherwise be diverted from the competence system.

*Civil inpatient capacity remains too low throughout Colorado.* Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts. Successful and sustainable solutions to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges. Without a strong civil system, incompetency remains the easiest route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competence services system. We continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems, especially as compliance with the Consent Decree approaches. Long-term sustained compliance will depend on the civil mental health system in Colorado. The MHTL homes are a prime example of community based civil resources: they prioritize step-down interim housing opportunities for people who are ready for discharge at a state hospital, pretrial Detainees in county jails, or people who are at substantial risk for entering inpatient competence restoration. These homes are one of the most *critical components of a full civil service system*, and a key step forward for the Department.

Thus, while we support the Department's current push to reduce the waitlist by prioritizing inpatient beds for competence restoration, we continue to emphasize that any long-term solution must shift inpatient priority from forensic to civil beds. We have asked the Department to plan for the transition of some inpatient restoration beds to inpatient civil beds, even before attaining compliance.

## COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

*Historical context:* The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies that can reduce the competency-involved population.

As the pandemic continued, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* on this type of comprehensive approach. In April of 2022, they pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. The Department organized their efforts according to six key strategies or "levers:"
1. Increasing inpatient beds;
2. Improving inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reducing the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and wait times. But we also appreciated the efforts to expand the scope of their focus to beds and services *in the community*, for a much more comprehensive approach to the crisis. Indeed, addressing the first several (inpatient) variables is crucial to decrease the current waitlist, but vigorously addressing the last few (community) variables is crucial for minimizing future additions to the waitlist.

In their 2023 Comprehensive Plan, the Department memorialized their plans to:

- Expand their use of community (private) hospital beds for the restoration population,
- Reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Re-open and better use existing inpatient beds

In line with the goals detailed in this Comprehensive Plan, the Department received from the Governor's office $57,967,379 in supplemental funds for FY 2023-24 to maintain private beds, then re-open and staff state hospital beds. These steps certainly decreased the waitlist.

*Current realities:* This Quarter, the Department submitted their 2024 Comprehensive Plan. In it, they reviewed key successes, such as opening all closed inpatient beds and operating with full hospital capacity. They described contracting for 130 Mental Health Transitional Living (MHTL) beds, a tremendous improvement to their continuum of care (remarkably, financial efficiency will actually allow for the opening of 154 MHTL beds altogether). The Department's plan reflected their increased emphasis on data-informed planning. In particular, they formally shared their projection model, which can provide generally reliable estimates of wait list figures and eventual compliance dates, based on key metrics such as bed capacity, bed utilization, length of stay, and court orders for restoration. We have generally been impressed with the reliability of this simple model, and we encourage the Department to continue using it for planning. Also, related to data, the Department described improved data infrastructure for all competence services, allowing for better tracking, and reporting of outcomes.

In other efforts, the Department has improved collaborations and partnerships with the other state agencies that ultimately influence the demand for competence-related services. They described Colorado's efforts to reform behavioral health, particularly among closely aligned state agencies: the Behavioral Health Administration (BHA) and the Department of Healthcare Policy and Financing (HCPF), all of whom aim to establish a better "safety net system" to provide behavioral health services to vulnerable persons. We notice the Department efforts (even our routine meetings) are increasingly in conversation with these adjacent agencies, which will be important for systematic change.

We appreciate the efforts and plans documented in the 2024 Comprehensive Plan. We note again that much for their future planning will need to focus not only on *attaining* compliance (which may happen within 2025) but *maintaining* compliance thereafter.

*In recent years, Department efforts targeted the pressing needs for adequate staff and inpatient beds. More recently, they progressed with MHTL homes, and collaborative legislation to divert people with mental illness into community care. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment. With their latest plan, we see even more coordination with the emerging BHA services, recent mechanisms to support court-based diversion and civil certification, and the use of reliable data projections to inform progress.*

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's outpatient competency restoration program (OCRP) began in March of 2018, and has grown steadily since then. Referrals for outpatient restoration were steady this quarter, ranging from 47 to 83 defendants per month, similar to prior quarters this year but with a larger range.[16] More than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. As always, we affirm the Department's success in building the largest, most robust statewide community-based OCRP program in the country. Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. In this past quarter, 204 people were placed in OCR (just below the average number of referrals each quarter of this year).

*OCRP outcomes*
Data from August through October 2024 reveals a 26.4% restoration rate in the OCRP re-evaluation reports that the Department reviewed (66 of 250 total opinions). An additional 20% were opined as unrestorable (50 out of 250). The remaining 53.6% were opined as remaining incompetent. This reflects a slightly lower OCRP restoration rate, compared to 30.3% and 29% in the two prior quarters. Data from the same period shows that courts found 28.2% of defendants restored to competence (62 of 220 total adjudications), similar to last quarter's 27.4% rate. The court dismissed charges and/or otherwise terminated restoration services in an additional 47.7% of these re-evaluation cases. The Department again surmised that less positive outcomes may be attributable to increasingly ill defendants (i.e., more severe psychiatric symptoms) ordered to outpatient restoration.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds, and Peakview Hospital for 85 beds; beds were filled on average at more than 90% capacity over the past quarter.

There is no doubt that this increase in inpatient restoration capacity (along with a concurrent increase in the availability of state hospital restoration beds) has led directly to a substantial

---

[16] All data in this section retrieved from the Department's Special Master Compliance Plan report for October 2024, submitted November 15, 2024, pp. 53-60.

decrease in the number of people on the waitlist as well as the decreased average time to placement. Of course, inpatient restoration capacity cannot be the exclusive solution to Colorado's competence crisis. Indeed, the 100 private beds currently "rented" are short-term solutions. To reiterate our earlier concerns, while we affirm the Department securing these inpatient restoration beds at this critical time, *civil* inpatient capacity remains insufficient. The Department must ultimately prioritize civil inpatient capacity; this will help sustain the improvements in the waitlist as individuals receive civil (rather than forensic) treatment. As compliance improves, we encourage the Department to continue to transition some restoration beds to civil beds in order to promote sustained compliance after the Consent Decree ends.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*
As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| November 1, 2021 goal | 60% maximum | 40% minimum |
| Recent progress (past 6 months) | May 1 – Oct 1, 2024: 64.5% | May 1 – Oct 1, 2024: 35.5% |

For the past six months (May through October 2024), a total of 35.5% of all restoration orders were to outpatient restoration. In previous quarters (indeed, for several years), the Department has remained in compliance or very near compliance. However, this quarter's rate is the lowest in several years, and it reflects the first time that the Department has been substantially below their goal in that same time frame. Reasons for this unexpected dip are unknown. Certainly, they could reflect a random effect, or they might reflect changing evaluator attitudes regarding OCRP (perhaps the larger number of out-of-state contracted evaluators caused this unintended effect). It is too early to draw conclusions, and we will monitor these rates to see if they increase over the next quarter.

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

The current figure, reflecting six months' worth of data between January— June 2024 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 34.4% OCR referral rate among all evaluations conducted in jails. Month-to-month averages have fluctuated substantially, dipping as low as 24% in July 2024 but also exceeding the 30% threshold multiple times. The 34.4% rate reflects an all-time high, with previous six-months figures of 33% and 25%. Although unprecedented in previous years, these rates reflect consistent adherence to the 20% base rate goal. Interestingly, this rate is moving up while the overall OCRP recommendation rate is moving down (35.5%; see above). These trends seem contradictory and are difficult to understand, so we are asking the Department to verify their data and help us understand how these opposite trends can co-exist.

Even with these unexpected trends, the reality remains: the Department operates the largest community-based OCRP in the nation, with some of the highest rates of placement in that system. Colorado's OCRP is the focus of national attention, as the OCRP staff has hosted various representatives from several states over the past quarter to learn about the system here. The OCRP provides crucial protection against an even greater "competence crisis" in Colorado, because so many incompetent defendants who are currently released to OCRP might otherwise be detained in a county jail, awaiting inpatient competence restoration.

In summary, we continue to affirm the tremendous impact that OCRP has on the waitlist. The combination of persons ordered to OCRP overall (35.5% of all persons adjudicated ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (34.4%) suggests a very robust OCRP program, even if overall numbers are slightly lower this quarter than compared with most previous quarters. A total of 204 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist. The CDHS OCRP continues to divert and deflect hundreds of defendants from county jails and inpatient hospitals into community settings. Although this quarter's rates merit close investigation going forward, the CDHS OCRP continues to be a critical component in Colorado's competence services system.

# CONCLUSION

This is the fifth consecutive quarter that reflects sustained progress, such as decreases in the wait list and wait times. Of course, like every quarter for the past four years, wait times far exceed the required timelines. But the waitlist has been decreasing for over one year—to half the length it was one year ago—with other metrics improving as well. There have been more admissions this year than ever before, and there are fewer Tier 1 defendants awaiting restoration.

The progress is substantial, but there are also ways in which some of the progress is fragile. We are particularly concerned by a spike in orders for evaluation, which may become a significant challenge if it reflects an emerging trend. But we are also pleased the Department has developed a variety of complementary strategies, necessary to address a variety of potential challenges. They have also developed a much better method (i.e., a straightforward projection model) to gauge the impact of these challenges and setbacks, and then adjust according.

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# APPENDIX 1

## Summary of Inpatient Restoration Service Capacity

*Summary of Inpatient Restoration Service Capacity*

| Setting | Restoration beds through 12/24 | Funding Source |
|---|---|---|
| CMHHiP* | 218 | CDHS |
| CMHHiFL* | 44 | CDHS |
| Arapahoe RISE | 60 | CDHS |
| Boulder RISE | 0 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | CDHS |
| Denver Health | 15 | CDHS |
| Peakview Hospital | 80 | CDHS |
| **Total** | **435** | |

* All restoration beds at CMHHiP are now available. The Department has received preliminary approval for funding to maintain these beds throughout the next two fiscal years and to continue contracts with private hospitals (Peakview and Denver Health).

# APPENDIX 2

## Summary of Colorado's Competency Dockets
(compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served |
|---|---|---|
| **1st Judicial District** | Judge Klein & Judge Miloud | Low-level felony |
| **2nd Judicial District** | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DA approval) |
| **Denver County Court Comp Docket (Misdemeanor Charges)** | Judge Cherry | Misdemeanor Cases Only |
| **4th Judicial District - El Paso** | Magistrate Gurney | F5&F6 Non-VRA cases (and case-by-case approval from DDA) |
| **5th Judicial District** | Judge Shamis | Will eventually take all competency cases in the district |
| **8th Judicial District - Larimer** | Judge Blanco | Low-Level Felony and Misdemeanor |
| **10th Judicial District - Pueblo** | Judge Ernst | <F3 non-violent, judges make "referrals" |
| **12th Judicial District - Alamosa Only** | Judge Cortez-Rodriguez | >F2 clients that need "support" |
| **16th - Otero, Bent, Crowley** | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) |
| **17th Judicial District - Adams** | Judge Jimenez | TBD |

| | | |
|---|---|---|
| **18th Judicial District - Arapahoe** | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out of custody (capped at 10) |
| **19th Judicial District - Weld** | TBD | TBD |
| | | |
| **Other** | | |
| **Denver County Competency Diversion Program** | Jail Magistrate (rotating) | Pre-Comp Clients in Denver |

# APPENDIX 3

Fines Committee Funded Program Master List Updated September 30, 2024

| NAME/ORGANIZATION | PROGRAM SUMMARY |
|---|---|
| 1st Judicial District Competency Docket | In June 2023, the Fines Committee approved $220,000 for two years of funding to the 1st Judicial District Court. Funding provides for a Docket Coordinator (1.0 FTE) to manage the competency docket, which provides a judicial venue for a multidisciplinary team to help acquire resources and monitor the progress of competency clients in Jefferson and Gilpin Counties. The docket model enables clients to be released from custody during competency evaluation and restoration, and clients may be diverted to treatment and supportive housing, in lieu of prosecution. The MOU was fully executed in October 2023, and the Docket Coordinator started in January 2024. The docket has received 45 referrals and has completed intakes for 37 individuals. Fifteen individuals have been released into the community for outpatient restoration. Five participants have been found competent to proceed, and one of those individuals had their charges dismissed. The 1st Judicial District Competency Docket has had five clients terminated: two were successful, one was unsuccessful due to lack of engagement, and two were neutral terminations. |

| | |
|---|---|
| 2nd Judicial District REACH Docket | In March 2023, the Fines Committee approved $220,000 for two years of funding to the 2nd Judicial District Court. The 2nd Judicial District operates a competency docket known as REACH (Review, Evaluate and Assist, Community-based behavioral Health). REACH hears cases for defendants who have charges in Denver District Court that are equal to or less serious than F3s or DF2s, with some exceptions, and have had competency raised in their case. The court works collaboratively with the Public Defender's Office, the District Attorney's Office, the Office of Civil and Forensic Mental Health, and numerous treatment agencies in the community to help defendants navigate the competency system and resolve cases in an effective manner. Funding provides for a Docket Coordinator to manage the competency docket, enabling clients to be released from custody during competency evaluation and restoration and potentially diverting clients to treatment and supportive housing, in lieu of prosecution. The Docket Coordinator position was filled during the 4th Quarter of 2023. The Coordinator has been working with the judge and stakeholders to establish best practices and procedures in the REACH docket. Since its inception, 786 defendants have been referred to the REACH docket, for a total of 1,117 cases. The Docket Coordinator currently manages 354 cases; 436 of the 1,117 cases have been dismissed, and 199 were returned to the trial courtroom after a competent to proceed finding. |
| 2nd Judicial District Psychology Screener | One-time funding in the amount of $17,850 was approved for Psychological Insight & Assessment to help clients in the 2nd Judicial District acquire competency evaluation screening in custody, with the work taking place in Quarter 2 of 2023. This program was approved to meet a specifically-identified need for screening at a time when state-funded screening was suspended. The suspension caused a backlog for the 2nd Judicial District, and this program was funded to relieve the backlog. The target population included pre-release incarcerated clients ordered for competency evaluation. Psychological Insight & Assessment received 62 referrals and completed 52 evaluations. Of the 52 individuals, 25 met the threshold, 16 required further evaluation, and 11 individuals did not meet the threshold. |

| | |
|---|---|
| 12th Judicial District Competency Docket | In October 2023, the Fines Committee approved $69,555 for two years of funding to the 12th Judicial District. Funding provides for a Docket Coordinator to manage the competency docket, a judicial venue for a multidisciplinary team to help acquire resources and monitor the progress of competency-involved clients. The docket model enables clients to be released from custody for competency evaluation and restoration, and clients may be diverted to treatment and supportive housing, in lieu of prosecution. Additionally, in its service to its rural, mountain community, this program establishes a regular meeting venue through which continued development of a community mental health system potentially may coalesce. In January 2024, the program held its inaugural meeting, and dockets are held bimonthly. At the end of Quarter 3, 2024, there were twelve participants in the program. Five individuals have successfully completed the program, four had neutral terminations, and one passed away. |
| AllHealth Network Bridges to Care | AllHealth Network was funded $134,000 from May 2023 through June 2024 to expand the capacity of the Bridges program in Arapahoe County to support the county's competency docket. Two Bridges Liaisons were funded, as well as equipment for both, including laptops, phones, monitors, and docking stations. The Liaisons helped clients acquire resources to be successfully restored in the community. Each Liaison had the capacity to serve 30 individuals at a time for a total of 60 individuals; however, throughout the course of the year, only 18 individuals were served with a program total spent of $56,729. The program is now operated by the State-funded Bridges of Colorado office, established by Senate Bill 23-229. |

| Ananeo Housing | Funding ($387,480) was approved for Ananeo Housing in November 2022, with the formal launch in December 2022. Additional funding in the amount of $156,870 was approved by the Fines Committee in February 2023 for five female units; $60,000 of the additional funding was awarded as capital investment to make improvements to the Ananeo property. In September 2023, Ananeo received $290,610 for a 15-bed expansion to serve an additional ten males and five females. The MOUs between the Fines Committee and Ananeo Housing were renewed and consolidated in December of 2023 totaling $1,847,630 to serve 40 competency-involved individuals; this amount includes $242,175 which had been previously awarded but not yet funded. The goal of this program is to provide housing and services associated with supportive monitored sober housing to clients referred by the Office of Civil and Forensic Mental Health for out-of-custody competency restoration. The Fines Committee funds two case managers, a mental health clinician, a psychiatric nurse practitioner (0.5 FTE), a clinical supervisor (40 hours a year), rent, utilities, referral management, urinalysis administration, and basic housing supplies for each client. Of the 40 beds that were contracted in December 2023, 39 are now occupied due to one client having just been discharged. In Quarter 3 of 2024, this program served 55 unique individuals; six individuals absconded, two individuals were removed due to policy violations, and another three were successful. An additional two individuals were terminated neutrally. Since the program began, 165 referrals have been screened; 72 clients have terminated from the program, and of those 37 have absconded, mostly due to substance use and medication management issues. |
|---|---|
| Arapahoe County Sheriff's Office Mental Health Data Diversion Project | In June 2024, the Fines Committee approved $347,000 for 12 months of funding to the Arapahoe County Sheriff's Office (ACSO). Funding provides for the implementation of a data-driven program, ForceMetrics, to enable the 911 emergency system of the county to connect callers with behavioral health resources more rapidly, with the overall goal of reducing the number of individuals who become involved in the competency system. ForceMetrics pulls data from the CAD and RMS systems providing a detailed summary of prior calls for service for deputies responding to crises, as well as access to CAD notes and report narratives. Additionally, Arapahoe County's hopes to gather more data through ForceMetrics to better inform county agencies and partners on future resource development. ACSO launched ForceMetrics during the second quarter of 2024. Training was rolled out to the Public Safety Bureau, Communications, and the Co-responder Team. |

| Assisted Living of Aurora Transitional Housing | In March 2023, the Fines Committee approved $822,000 for one year of funding to Assisted Living of Aurora (ALA) Transitional Housing in Arapahoe County, within the 18th Judicial District. The MOU between the Fines Committee and ALA expired on May 31, 2024, and ALA returned $551,312 in unspent funds to the Fines Committee. ALA provided bridge housing so that competency-involved individuals could be released from custody to receive out-of-custody restoration. ALA also assisted clients with acquiring public benefits, enabling longer-term community housing placements. Ultimately, ALA served eight clients, a fraction of the number of clients it intended to serve. |
|---|---|
| Aurora Sustained | Aurora Sustained is operated by the Aurora Public Defender's Office in partnership with Aurora Mental Health and Recovery. Funding, in the amount of $104,751, was approved for this program in October 2021, and supplemental funding in the amount of $18,600 was awarded in April 2022. Continuity of funding was subsequently approved in July 2022 in the amount of $372,433 to fund the program for the remainder of 2022 and 2023. In July of 2023, the Fines Committee approved Aurora Sustained's funding request of $223,500 to continue to operate through December 31, 2024. The goal of this program is to screen individuals booked in the municipal jail and to assess appropriate individuals for competency. The program attempts to connect clients to treatment out of custody and work toward prosecutorial diversion. Clients are referred to Aurora Mental Health and Recovery for homeless services, outpatient mental health and substance abuse treatment, and psychiatric medication. The Fines Committee funds a program administrator, pays for competency evaluations, and historically, provided cell phones for clients who had no other ability to stay connected with the program. In Quarter 3 of 2024, this program completed 359 behavioral health screens and 39 competency evaluations. Of the 39 competency evaluations that were completed, 9 individuals were deemed competent to proceed, 17 incompetent, and 13 did not appear for their evaluation. |
| Ava Health | In October 2024, the Fines Committee approved $5,409,084 to Ava Health to develop and operate a vertically-integrated residential treatment organization serving Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, partial hospitalization, and intensive outpatient treatment. Funding also provides for five years of service to the competency population. The program is currently acquiring land and facilities. It has made progress in developing partnerships with Mesa County stakeholders. It is anticipated that Ava Health, once operational, will serve several counties in western Colorado. |

| Behavioral Treatment Services Forensic Day Reporting | In June 2023, the Fines Committee approved $265,814 for one year of funding to Behavioral Treatment Services (BTS) to establish a day reporting center. The program provides, or coordinates to provide, psychotropic medication, medication-assisted treatment, case management, peer support, and a warm, welcoming location for clients to receive competency-related services. Due to startup delay, the Fines Committee agreed to a no-cost extension, continuing funding until the end of 2024. The program intends to serve at least 40 clients referred in Boulder County. Fines Committee funds provide for direct client services, including transportation, training manuals, housing support, drug screens, and MAT. It also provides for the following staff: office administrator (0.25 FTE), restoration clinical supervisor (0.25 FTE), day reporting clinical case manager (1.0 FTE), peer support specialist (1.0 FTE), and Master's level therapists (1.5 FTEs). In Quarter 3 of 2024, BTS did not receive any new referrals. All five individuals who have been referred to the program since its inception have terminated. Two have been transferred to inpatient treatment, two terminated successfully, and one individual no longer wished to be in the program. Having formally begun in the 4th Quarter of 2023, this program continues to acknowledge that it is not operating at capacity and is working to recruit more referrals to achieve their goal of eight active clients at a time. |
| Boulder County Community Justice Services | Funding in the amount of $220,000 was approved for Boulder County Community Justice Services in October 2022. The original MOU between the Fines Committee and Boulder County expired on September 30, 2023, and a renewal was approved for additional funding in the amount of $285,842 through December 31, 2024. This program expanded the Bridges program in the county to serve more individuals whom the Bridges Liaisons can work with to acquire services out-of-custody. The objective was to improve access to Bridges Liaisons, as well as increase the capacity for appointments with the Liaisons. With Bridges of Colorado centralizing operations statewide, this program has been approved to continue county services to clients while Bridges hires and trains staff. The funds cover two FTE positions and costs related to clients' treatment needs (e.g. treatment, assessments, neuropsychological evaluations, and medication), as well as basic needs for clients, including cell phones, clothing, emergency supplies, and hotel vouchers. Funds have also been used for the completion of court-ordered neuropsychological evaluations and toward the purchase of a fleet vehicle for transporting clients. In Quarter 3 of 2024, this program received four new referrals and conducted intakes for all four individuals. One individual successfully terminated the program in the third quarter. |

| | |
|---|---|
| Boulder County Sheriff's Office Jail Competency Program | In June 2023, the Fines Committee approved $130,000 for one year of funding to the Boulder County Sheriff's Office (BCSO) to provide clients with long-acting injectable medication ($120,000) and assistance with housing support ($10,000). Additional funding in the amount of $130,000 was awarded to continue program operations through June 30, 2025. The medication serves clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication. Temporary housing support in the form of rent and ancillary items are provided to clients transitioning from jail to the community. Over the course of a year, the program expects to provide medication and/or housing support to at least 38 individuals. In Quarter 3, 2024, the program received eight referrals and provided a total of eleven long-acting injectables to those eight clients. |
| City of Greeley Homeless Solutions | In October 2023, the Fines Committee approved $111,835 for one year of funding to the City of Greeley Homeless Solutions to provide permanent supportive housing, employment support, education, job skills training, and benefits acquisition to three individuals involved in the competency system in Weld County. The Fines Committee extended funding through September 30, 2025 to continue program operations. The program provides three permanent housing vouchers and will continue to support clients on a 24-hour, 7-day-a-week basis for as long as the clients wish to maintain the vouchers. Funding supports a case manager (0.5 FTE), usage of a fleet vehicle, bridge housing, wraparound services including transportation, tuition, iPads and other client needs, as well as technology for staff. As of the end of Quarter 3, 2024, the program is meeting its goal in serving three clients. |
| Colorado Coalition for the Homeless | Colorado Coalition for the Homeless (CCH) was approved for funding in the amount of $1,500,000 in November 2020. The MOU between the Fines Committee and CCH expired in October 2022 for the Crest program; however, the Fines Committee extended the MOU with CCH through March of 2025 for the Restoration program, and CCH will continue to report outcomes for that program until the MOU expires. The goal of the Restoration program is to provide modified Assertive Community Treatment (ACT) to clients who are referred through OCFMH's Forensic Support Team as appropriate for outpatient restoration. In Quarter 3 of 2024, this program served 45 individuals with the goal of discharging clients who meet appropriate criteria for exit. Of these 45 clients, six individuals terminated unsuccessfully, while two were transition to the mental health hospital. When the program was receiving new referrals and conducting intakes, the reported capacity of the program was 54. |

| | |
|---|---|
| Community Based Enhanced Restoration (CBER) | CBER was operated by WellPower from January 2022 through December 2023.  Funding in the amount of $400,000 enabled WellPower to provide Assertive Community Treatment to individuals released on bond and being restored to competency out-of-custody.  Short-term housing options were also funded for CBER clients who would have otherwise been homeless.  The program served 68 individuals in the funding term; 27 were restored to competency or had their case dismissed, 39 were terminated unsuccessfully due to absconding, violating program policies, or acquiring a new charge, and two were transferred to other programs. |
| Denver Competency Diversion and WellPower | The Denver Competency Diversion program is operated by the Denver County Court.  Funding ($1,029,996) was approved for this program in December 2021, with the formal launch on April 4, 2022.  The MOU between the Fines Committee and the Denver Competency Diversion program expired in December of 2022, and the Fines Committee agreed to extend the terms of the MOU until February 22, 2024.  The Fines Committee awarded $587,342 in September 2023 to WellPower to continue supporting the Denver Competency Diversion program through September 2024.  In December 2023, the Fines Committee approved an additional $541,870 to continue operations through 2024.  The goal of this program is to divert from prosecution those defendants who are likely to be found incompetent to proceed.  The Fines Committee funds a program administrator, a program coordinator (screening and release planner), a Denver district attorney, a Colorado public defender, six clinical case managers, a clinical program manager (0.6 FTE), and a district attorney competency diversion officer.  Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.  In Quarter 3 of 2024, this program received 68 referrals and completed 21 intakes.  The reported capacity of the program is 60, when all six case manager positions are filled.  The Competency Diversion program continues to make progress in diverting individuals from the waitlist in Denver.  By the end of this quarter, 71% of all individuals who have completed the Competency Diversion program have been successfully diverted; 15% have been unsuccessful due to new charges; 9% have been unsuccessful due to lack of engagement; and 5% had their case(s) closed. |

| | |
|---|---|
| Denver County Court Competency Support Docket | In March 2024, the Fines Committee approved $280,609 for 12 months of funding to the Denver County Court to operate a competency support docket. For cases that cannot be diverted from prosecution in the County Court Diversion Program, this docket provides an opportunity for clients to be diverted from confinement during the restoration process. The docket serves as a forum where community resources may be brought in to help meet clients' out-of-custody needs. Funding supports a clinical screener (0.5 FTE), district attorney (0.5 FTE), public defender (0.5 FTE), emergency housing, transportation assistance, cell phones, and food and clothing for clients. Denver County Court had predicted the number of misdemeanor cases to be served in this docket at approximately 150 a year, and in the first quarter of inception, the competency support docket has already received 224 cases, with 35 of those being dismissed and 4 being successfully diverted. As processes and workflows are further developed, the competency support docket is confident that they will increase the number of cases being diverted to Competency Diversion and deflected to dismissal with services. |
| Douglas County Sheriff's Office Mental Health Data Diversion Project | In December 2023, the Fines Committee approved $683,300 for 18 months of funding to the Douglas County Sheriff's Office (DCSO). Funding provided for the implementation of a data-driven program, ForceMetrics, to enable the 911 emergency system of Douglas County to connect callers with behavioral health resources more rapidly. Fines Committee funding also supports the salary of a temporary project manager, overtime pay and fringe for deputies, supplies, and behavioral health treatment. In Quarter 2 of 2024, a project manager was hired and onboarded, and in Quarter 3, DCSO began using ForceMetrics to track calls. One-hundred sixty-two behavioral health-related calls were received in Quarter 3, and only twelve individuals were booked into the jail related to a behavioral health call. Throughout the next quarter, DCSO will work with the Douglas County Mental Health Division to provide resources to individuals involved in behavioral health-related calls. |

| Embark Assisted Living Residence – Renaissance | In May 2023, the Fines Committee approved $380,820 for one year of funding to the Embark Peer Coach Academy to open a Level 1 Mental Health Transitional Living (MHTL) facility, Embark Assisted Living Residence–Renaissance.  In March 2024, the Fines Committee approved an additional $40,000 to continue operations until MHTL funding through the State began.  Throughout the funding term, Renaissance provided licensed transitional assisted living to sixteen mid- to high-acuity individuals in the competency system referred from the 4th Judicial District.  Intensive case management, connection to physical and mental health community resources and competency restoration services, daily medication management, meals, benefit acquisition, transportation, peer support, life skills training, and scheduled social and recreational activities were also provided.  As of the end of Quarter 2, 2024, when State funding took over, seven individuals continue to be housed, with an average length of stay of 138 days.  The additional nine individuals were discharged with only one terminating unsuccessfully. |

| Embark Peer Coach Academy Recovery Residences | In November 2022, the Fines Committee approved $306,150 for Embark Peer Coach Academy (Embark) to operate a Day Reporting Center and sober-living forensic housing (Embark Recovery Residences). In 2023, Embark received renewal funding for Embark Recovery Residences (ERR) in the amount of $335,550 through November 30, 2024 and chose not to seek additional funding for its Day Reporting Center due to a lack of referrals and ability to fund components of those services through Medicaid. The goal of the Day Reporting Center was to provide outpatient restoration clients with treatment, classes, peer support, and case management. ERR serves individuals released from confinement who are participating in competency restoration. The Fines Committee funds partial salaries for a certified addiction specialist, licensed addiction counselor, two peer coaches, receptionist, and housing managers. Funding also covers individual assessment and treatment planning, medication management, psychiatric services, daily classes, substance use monitoring, support groups, peer mentoring, vocational support, public benefit acquisition, transportation assistance, and competency restoration services. ERR provides sober-living housing with the capacity to house 15 clients at a time, with 24-hour management, transportation, and food and support services are available on site. In Quarter 3 of 2024, ERR received 8 referrals, completed 8 intakes, and served 12 individuals. Since the program's inception, 48 unique individuals have been served (two have been admitted twice), 24 clients have been restored to competency, and forty-one individuals have terminated; five were transferred to a higher level of care (including Embark's Assisted Living Residence: Renaissance), seven were discharged due to the judge remanding them into custody, ten abandoned the program, nine were transferred to a sober-living facility, six were transferred to independent housing, and four moved in with family. |
| --- | --- |
| Fidelity Behavioral Health | Funding, in the amount of $1,272,559 was approved for this program in February 2024, with formal launch in that same month. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded three houses for clients to live in each housing ten clients, a van to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, three house managers for 24/7 supervision, and partial salaries of the personnel to operate the program. This quarter, the program received 20 referrals and completed 9 intakes. Three clients in total have terminated the program, each unsuccessful. |

| | |
|---|---|
| Gateway to Success – Pueblo | In December 2022, the Fines Committee approved $275,000 for one year of funding for Gateway to Success to provide a Forensic Day Reporting (FDR) program in Pueblo.  The original MOU between the Fines Committee and Gateway to Success was set to expire on December 4, 2023; however, a no-cost extension was granted to Gateway extending the MOU and service provision through the end of February 2024.  The Fines Committee awarded renewal funding in the amount of $235,000 through February 2025.  The goals for the FDR program are to support formerly-incarcerated individuals who are involved in the competency system, to provide a center at which services can be delivered to out-of-custody competency individuals, and to reduce the number of defendants with behavioral health disorders incarcerated in the Pueblo County Jail.  The award provides partial funding for full-time employees including a Restoration/Day Reporting Administrator, Lead Case Manager, Case Manager, Peer Support Specialist, Coach, Receptionist, Prescriber, and LPC/CAS.  The funding also covers transportation, participant manuals, medications, food/beverages, medication compliance incentives, and prosocial activities.  The program began fully operating toward the end of Quarter 1, 2023 and has received twenty-five total referrals.  As of the end of Quarter 3, 2024, the program has twenty active clients.  Throughout the funding term, the FDR program intends to serve 70 clients who have transitioned from the Pueblo County Jail and have been found to have a moderate to severe substance use disorder and/or co-occurring mental illness. |
| Homeward Alliance | Funding, in the amount of $217,800 was approved for Homeward Alliance in February 2024, with formal launch in March 2024.  The goal of this program is to provide housing navigation and case management services to individuals who are competency-involved in Larimer County.  The program partners with the Larimer County Competency Docket and SummitStone Health Partners to receive referrals.  Homeward Alliance connects clients with resources provided by partners of the State Division of Housing and completes intakes for clients to enter that system.  Funded staff include a housing specialist (1 FTE) and a program manager (0.5 FTE).  Direct client expenses are also provided, which include moving facilitation, tenant rights education, life skills education, and landlord/tenant communication and mediation.  In Quarter 3, 2024, Homeward Alliance received 28 new referrals from the Competency Docket and Larimer County's Community Justice Alternatives Department and completed intakes on 28 clients.  Twelve clients have been terminated: six were transferred to more permanent housing, six disengaged.  This program partially fills the housing gap in a jurisdiction already replete with Fines Committee-supported competency resources. |

| | |
|---|---|
| Integrated Insight Therapy IMPACT | IMPACT (Intensive Monitored Preventative and Acute Competency Treatment) was operated by Integrated Insight Therapy, a behavioral health treatment provider serving the 7th, 21st, and 22nd Judicial Districts. The Fines Committee allocated $1,178,000 in total to the program. IMPACT housed clients in two residential houses, providing treatment and wraparound care. The program operated from February 2022 until January 2024 and served 22 clients. |
| Larimer County Competency Docket and the Larimer County Public Defender's Office | The Larimer County Competency Docket is operated by the Larimer County Community Justice Alternatives Department. Funding ($533,242) was approved for this program in December 2021, with formal launch of funded program elements in January 2022. In January 2023, funding in the amount of $262,000 was approved for the Larimer County Public Defender's Office to support the Larimer County Competency Docket with one dedicated public defender through January 2025. The original MOU between the Fines Committee and the Larimer County Competency Docket was set to expire in February of 2024; however, a no-cost extension was granted allowing the provision of services to continue through the end of September 2024. In May of 2024, the Fines Committee approved additional funding in the amount of $654,170 through June 30, 2025 to continue program operations and fund transitional housing in the Larimer County Alternative Sentencing Department. The goal of this program is to divert individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a Competency Services Team Lead and two Competency Intensive Case Specialists, as well as client expenses, client transportation, employee training opportunities, office supplies, and ten beds in its work release facility. By the end of Quarter 3 of 2024, there were 89 total active participants in the Competency Docket. There were 64 terminations in Quarter 3; of those, 28 were found competent to proceed at the initial evaluation, 17 were found incompetent to proceed, and were then restored, and 19 were dismissed or their case(s) timed out. In Quarter 3 of 2024, a total of 70 cases were dismissed; 12 were felonies and 58 were misdemeanors. |

| | |
|---|---|
| Mesa County Pretrial Community Alternative Placement (Pre-CAP) | The Pretrial Community Alternative Placement (Pre-CAP) program operated by the Mesa County Community Justice Services Department (CJS) was funded to divert individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. Fines Committee funding, in the amount of $27,900, provided inpatient treatment for clients diverted from confinement. This program augmented the capacity of an existing county pretrial mental health program, specifically to serve competency-involved individuals. Mesa County CJS declined to request renewal funding, so it was only funded for one year of service. Inpatient treatment was provided for three clients referred for out-of-custody competency restoration. All three clients successfully transitioned from inpatient treatment; two were then ultimately unsuccessfully discharged from Pre-CAP, and the other individual successfully completed Pre-CAP and transitioned to the community. Mesa County was selected as a National Association of Counties (NACo) Justice Initiative site in 2023, and as NACo works with Mesa County to identify needs and gaps, there may be an interest in future funding to serve competency-involved individuals. |
| Mesa County Sheriff's Office – Long-acting Injectables Program | In May 2023, the Fines Committee approved $360,000 for one year of funding to the Mesa County Sheriff's Office (MCSO) to provide clients with long-acting injectable medication. In March 2024, the Fines Committee signed a no-cost extension agreement with MCSO to allow for continued operations through May of 2025. The medication treats clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication. Over the course of a year, NaphCare, MCSO's medical contractor, expects to provide medication to up to ten individuals per month. Since the program began operating in the 3rd Quarter of 2023, twenty long-acting injectables have been administered to sixteen individuals in the Mesa County Detention Facility. |

| Mile High Behavioral Healthcare | Funding ($137,494) was approved for the Mile High Behavioral Healthcare (MHBHC) program in December 2021, with formal launch taking place in Quarter 2 of 2022. The MOU between the Fines Committee and MHBHC expired in January of 2023; however, given the entire awarded funding had not been spent, a no-cost extension was approved for funding to be spent through September 30, 2023. In October 2023, the Fines Committee agreed to renew funding to the program through September 30, 2024, with additional funding of $149,251. In October 2024, the Special Masters agreed to a no-cost extension allowing MHBHC to continue utilizing the funds through September 30, 2025. The goal of this program is to help clients acquire treatment and wraparound services out of custody. Its target population includes pre-release incarcerated clients with mental health and substance use disorders. The Fines Committee funds two clinical case managers, and Signal Behavioral Healthcare funds two additional case managers. As of the end of Quarter 3, 2024, all program positions are filled. In Quarter 3, 2024, the program received 28 referrals and completed 6 intakes. Twenty-one individuals terminated the program this quarter; sixteen were successful, while five were unsuccessful. The reported capacity of the program is 80. |
|---|---|
| Monarch Competency Housing | Funding ($953,074) was approved for Monarch Competency Housing in April 2023, with formal launch taking place in June of 2023. Additional funding of $2,353,199 was approved in May 2024. The latest installment enabled Monarch to purchase the housing facility it was renting, and the program committed to continue serving competency clients for five years. The goal of this program is to provide supportive monitored sober housing. Its target population includes clients ordered to have competency evaluations or outpatient restoration services. The Fines Committee funds two case managers, two peer support specialists, a director of operations, an executive director, as well as all costs directly related to clients including transportation, case management, groceries, clothes, toiletries, and housing supplies. In Quarter 3, 2024, the program received 30 referrals, completed 14 intakes, and had 14 terminations, 8 of which were successful. Twenty-eight unique individuals were served during the 3rd Quarter. The program is expected to provide 24 beds, 12 female and 12 male, to serve clients referred by the Forensic Support Team and Bridges of Colorado. |

| NAMI Colorado | Funding, in the amount of $91,030, was approved for this program in February 2024, with formal launch in that same month. The goal of this program is to provide evidence-based peer programming for patients and staff of the State Mental Health Hospitals in Pueblo and Fort Logan. Specifically, the training consists of peer-to-peer experiential learning for people with serious mental illness, a recovery peer-based support group program, a training module designed to educate staff on attitudes and assumptions about people with mental health conditions, and with an overall focus on underserved populations. Funded staff include partial salaries of the program director (0.2 FTE), assistant program director (0.5 FTE), executive director (0.1 FTE), operations director (0.2 FTE), special projects director (0.2 FTE), and a community outreach coordinator (0.3 FTE). Funding also supports mileage for facilitators and peer specialists, travel expenses for NAMI, and printing of class, session, workshop, and group materials. NAMI Colorado has provided training to 72 individuals at Fort Logan who were able to have direct interaction with peers in recovery. As of the end of Quarter 3, 2024, 21 staff members have also been trained, and NAMI hopes to grow these numbers as they continue to focus on outreach, recruitment, and preparation for Peer-2-Peer classes in Fort Logan and Pueblo throughout the summer. |
| --- | --- |
| Pulse Line Collaborative Training | In October 2023, the Fines Committee approved $1,058,270 for two years of funding to Pulse Line Collaborative Training, LLC. Funding provides for training to be administered to law enforcement, first responders, clients, and family members of clients and potential clients, to help reduce unwarranted use of force incidents. Many individuals who ultimately become involved with the competency system acquire serious criminal charges stemming from unnecessary altercations with law enforcement or first responders, owing mainly to symptoms of mental health disorder, rather than intentional criminal behavior. Funding provides for a director of development and training (1 FTE), a mental health lead and program coordinator (1 FTE), and administrative support (0.75 FTE), as well as operational expenses. In Quarter 3, 2024, the program completed 31 training sessions, each 8 hours in duration, with first responders and five additional sessions for self-advocates/caregivers, for a total of 36 training sessions held. Although it appears to be a slow start for this program which agreed to hold 462 sessions over its two-year funding period, the program is gaining momentum towards its ultimate goal. As part of this program's evaluation plan, it has agreed to survey training participants. The survey shows highly-positive response rates to questions asking about the value of the skills and knowledge in their jobs or daily lives. |

| | |
|---|---|
| SAFER Opportunities | In March 2023, the Fines Committee approved $2,007,500 for SAFER in Arapahoe County, within the 18th Judicial District. This program provides housing and supportive services to individuals transitioning from custody to support out-of-custody competency restoration, with a goal of increasing the number of individuals released from custody who otherwise would be released homeless. Per the MOU, SAFER promises to provide 9,125 bed days, and as of the end of Quarter 3, 2024, a total of 7,971 bed days have been provided. In Quarter 3, 2024, the program received seven referrals and completed one intake. One client was transferred out of the program, requiring a higher level of care. The capacity of the program is 25. |
| San Luis Valley Recovery Housing | In May 2023, the Fines Committee approved $313,762 for two years of funding to San Luis Valley Recovery Housing, which is used to provide supportive, sober-living housing to clients released from custody for competency evaluations or restoration. The program can serve up to twenty individuals at a time; five beds are reserved for those involved in the competency system, referred from the 12th Judicial District. Renovations and construction on the 432 7th Street property in Alamosa took nearly a year to complete, placements for residential services began in May of 2024, and as of Quarter 2, 2024, SLV Recovery Housing is CARR-certified. SLV Recovery Housing has collaborated with Bridges and FST Navigators, as well as the 12th Judicial District Competency docket. Two individuals have been placed into housing, and additional referrals are waiting to be screened. |
| Second Chance Center in the City | In July 2023, the Fines Committee approved $488,125 for one year of funding to Second Chance Center in the City (SCCIC) to provide onsite case management, peer mentoring, employment services, and housing navigation to individuals in or at-risk of being in the competency system. In August of 2024, the Fines Committee renewed funding in the amount of $476,877 to serve at least 75 unique clients through July 2025. SCCIC assesses each client's needs, specifically related to mental health, substance use, intellectual and developmental disabilities, and traumatic brain injury for appropriate treatment. Fines Committee funding covers care managers, a behavioral health navigator, peer navigator, and partial salaries for the director (0.5 FTE) and an assistant director (0.5 FTE). Costs directly related to clients' basic needs, assistance with leasing office space, and funding for ReShape Minds to provide community navigation directly to clients are also covered. In Quarter 3, 2023, SCCIC began receiving referrals and conducting intakes. Since that time, SCCIC has received 70 referrals and has successfully enrolled 53 of those referred. As of the end of Quarter 3, 2024, twenty clients have been terminated: seven unsuccessful, seven dropped out of contact, one due to refusal to engage in services, and five were successful. |

| | |
|---|---|
| Servicios de la Raza | In May 2024, the Fines Committee approved $466,720 for 24 months of funding to Servicios de la Raza to provide recovery support services to help clients achieve long-term stability. This program emphasizes peer support and focuses on clients who are Spanish speaking, with the goal of serving 60 unique individuals each year. Funding covers salaries and benefits for a behavioral health co-director (0.1 FTE), client services manager (0.15 FTE), peer services coordinator (0.15 FTE), peer specialists (2 FTE), and a bilingual case manager (1 FTE), as well as indirect costs, client supportive services, professional development, employee mileage, computers and telecommunications for employees, and supplies. In Quarter 3 of 2024, Servicios de la Raza provided peer support, services, and resources to 15 individuals who were incarcerated, hospitalized, and in the community. Six of the referrals were in Denver's Competency Diversion program, another six were still incarcerated awaiting competency evaluations or restoration services, one was restored to competency and released on a PR bond after sober-living housing was acquired by Servicios, and two were hospitalized for restoration. For those who were either hospitalized or in custody, relationships were established and peer support continued to be provided despite the individuals not being in the community. |
| Solange Assisted Living | Funding, in the amount of $600,000, was approved for this program in January 2024, with formal launch in that same month. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with wraparound services and partnering for treatment services. The Fines Committee funded 20 beds in assisted living facilities in El Paso and Pueblo Counties, a van to transport clients, furniture, entertainment equipment, and supplies. In Quarter 3, 2024, Solange received no new referrals. Three individuals terminated the program, all of whom were unsuccessful. During this quarter, Solange was informed that it would not receive future funding. |
| State Court Administrator's Office Competency Programs Analyst | In August 2023, the Fines Committee approved $222,664 for two years of funding to the Office of the State Court Administrator (SCAO) for a competency programs analyst. The analyst supports judicial districts operating special programs in the competency system. Training, awareness of resources, data collection, and evaluation support is also provided by the analyst. SCAO filled the position in December 2023. SCAO is focused on several key initiatives: 1) data-driven advocacy, 2) National Center for State Courts (NCSC) grant proposals, 3) Judicial Department JBC analyst request, 4) training, awareness, and support, and 5) general administrative assistance. |

| SummitStone Health Partners Competency Hub | In October 2022, the Fines Committee approved $3,029,283 for three years of funding to SummitStone Health Partners (SummitStone) in Larimer County within the 8th Judicial District. This program consists of two elements: The first is to provide psychiatric care, including prescriptions for medications, to clients in custody on whom competency has been raised with the goal of increasing the quantity of clients who may be released from custody during the competency evaluation and restoration process. The second element of this program is the establishment of a competency services hub at which clinical services, case management, and peer support are provided to out-of-custody clients. The hub enables clients to receive a range of services from one location, including competency restoration education, medication management, and other collaboration with system providers. In Quarter 3, 2024, the Medical Services Team served 67 unique individuals, while the Competency Supportive Services Team served 92 unique clients. The reported capacity of the program is 80 for in-custody and outpatient services. |
| The Dirt Road to Recovery | In May 2024, the Fines Committee approved $162,120 for 12 months of funding to the Dirt Road to Recovery program to provide three beds to male clients in a CARR-certified Level II sober-living home. The program is located in Johnstown, Colorado and will be the first funded program to serve the 13th Judicial District; the program will also accept clients from the 19th Judicial District. Clients are expected to remain in the program for six months; as such, the program expects to serve six individuals during the funding term. Funding provides for partial salaries and benefits for a director of operations (0.33 FTE), peer support specialist (0.33 FTE), client housing, transitional client expenses, and a vehicle for client transportation. In Quarter 3, the Dirt Road to Recovery received two referrals through the Forensic Support Team from the 19th Judicial District and approved both clients. |
| United Way of Weld County Rapid Rehousing Opportunity | In August 2023, the Fines Committee approved $1,421,440 for two years of funding to United Way of Weld County Rapid Rehousing Opportunity (UWWC) to transition fifty competency-involved individuals from the Weld County Jail to the community by providing housing, case management, assistance with benefit acquisition, and wraparound services. Funding covers two case manager FTEs, bridge housing, cold weather shelter space, Rapid Rehousing for 50 participants, and maintaining and supporting the operations of the Housing Navigation Center services. UWWC began to receive referrals in Quarter 4, 2023, and by the end of Quarter 3, 2024, UWWC screened 27 referrals and completed 20 intakes since the program began. Five individuals have terminated, all unsuccessfully. |

| | |
|---|---|
| University of Denver, Denver FIRST, Brain Injuries Screening Program | In September 2022, the Fines Committee approved $948,729 for two years of funding to Denver FIRST, a regional hub for forensic mental health expertise within the Graduate School of Professional Psychology at the University of Denver. In January 2024, a no-cost extension was granted to continue the program through September 30, 2025. This program focuses on competency clients suspected of having brain injuries and provides cognitive screenings, full neuropsychological evaluations, and referral for treatment by professional students to clients referred by the Forensic Support Team. Its target population includes incarcerated and out-of-custody clients with a history of and/or symptoms of potential brain injury. The Fines Committee funds student and professional staff time to complete cognitive screenings and neuropsychological evaluations. The program became operational and began receiving referrals in Quarter 2 of 2023. This quarter, the program received 21 referrals and completed 9 intakes. Of those assessed, 87% have been positive for a brain injury, and 90% have presented with cognitive and functional-related deficits. The program continues to see severe comorbid mental health and medical issues complicating individuals' presentation. The reported capacity of the program is 20. |
| Valor Program at Embrave | Funding, in the amount of $8,902,175 was approved for this program in March 2024, with formal launch following a lengthy facility acquisition and renovation process. This is the largest funded Fines Committee program to date. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded capital to purchase a hotel and renovate it to make 60 units available, vehicles to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, house managers for 24/7 supervision, and partial salaries of the personnel to operate the program. Quarter 3, 2024 is the first in which this program has served clients. This quarter, the program received 27 referrals and completed 11 intakes. The program has yet to terminate any clients. |