

Groundswell Services, Inc.

## SPECIAL MASTER REPORT to JUDGE WANG

### February 28, 2025

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

February 28, 2025

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our February 2025 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

The Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. The Department initiated these steps and demonstrated meaningful early progress. Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

Exactly one year later, in the spring of 2020, the COVID-19 pandemic brought the Department unforeseeable challenges and progress stalled. COVID-related complications reversed progress on most metrics. Even after the pandemic relented, many setbacks remained. In particular, the Department faced tremendous difficulties staffing their facilities, which left unused hospital

units, and less capacity to serve the people in jail awaiting transfer and treatment in those units. Similar difficulties have been common across the country, and states vary in the timing and degree to which they have begun to improve.

In the latter half of 2023, Colorado competence-related services began improving. For example, the waitlist peaked at 483 detainees in June 2023 but decreased by half (to 241) by late June of 2024. Across the calendar year of 2024, the waitlist decreased from 383 in January to 247 in December, hitting its lowest point (208) at the end of last quarter (October 31, 2024). Across late 2023 and much of 2024, state hospital units reopened, and the Department secured new beds, moving more people from the waitlist to inpatient beds. For at least one year, the Department admitted more than 300 people to inpatient restoration every quarter—the most since the start of the Consent Decree. The Department has better prioritized Tier 1 Detainees, such that only 16 Tier 1 Detainees were waiting in county jails as of October 31, 2024 (as compared to 40 one year before). Newly opened Mental Health Transitional Living homes (MHTLs) now provide a crucial level of care that has long been lacking in Colorado. In short, *improvements were steady and consistent for over one year* (i.e., five quarters).

*This quarter was the first quarter in over one year when these improvements paused or even regressed*. As detailed later, much of this downturn appeared attributable to an unprecedented "spike" of evaluation orders in October 2024. The 221 orders for jail-based competence evaluations in October comprised 54 more orders than the prior annual record of 167 orders (an increase of roughly 33%). Of course, this led to a corresponding spike in inpatient *restoration* orders. Several additional factors exacerbated the delays attributable to the increased court orders for evaluation and restoration.

The Department certainly did not lose *all* the progress they have made. For example, the waitlist at the end of January 2025 (284) has increased beyond the record low at the end of last quarter (208 in October 2024), but it still comprises roughly 100 people fewer than the waitlist one year ago (383 in January of 2024), and 200 people fewer than the waitlist roughly 18 months ago (i.e., the record high of 483 in June 2023). Similarly, wait times have increased some this quarter over last quarter, but they have not worsened to the point they were one year ago. However, this quarter does underscore the truth that *even steady improvements are precarious, and they are vulnerable to many influences outside Department control* (i.e., increases in arrests and orders for evaluation).

In short, most metrics still fall far short of the requirements in the Consent Decree and—worse yet—reflect losses since last quarter. Nevertheless, the Department's trajectory has generally been one of improvement. We do not expect the recent loss in progress will be *immediately* corrected; indeed, projections are bleak for next quarter. But we do consider the Department's overall trajectory to remain one of improvement.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

# TABLE OF CONTENTS

CONTEXT for QUARTERLY METRICS ................................................................................................5

KEY METRICS FOR PROGRESS: .....................................................................................................8

COMPLIANCE WITH TIME FRAME REQUIREMENTS........................................................................8
    KEY METRIC: COMPETENCE EVALUATION TIME FRAMES             9
    KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES    14

OTHER CONSENT DECREE UPDATES ............................................................................................17
    INTERIM JAIL MENTAL HEALTH TREATMENT             17
    RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT    19
    NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES    22

DECREE SECTION VII UPDATES .....................................................................................................26
    CIVIL BED FREEZE             26
    COMPREHENSIVE AND COHESIVE PLAN    28
    INCREASE COMMUNITY RESTORATION SERVICES    30

CONCLUSION ...............................................................................................................................33

APPENDIX 1 .................................................................................................................................34

APPENDIX 2 .................................................................................................................................35

APPENDIX 3 .................................................................................................................................37

# CONTEXT for QUARTERLY METRICS

*(note: This section remains unchanged across reports to provide historic context for new readers)*

**Historic Context:**
Historic vulnerabilities in Colorado's public mental health system set the stage for the past two decades of competence-related challenges. For decades preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that was able to operate selectively, routinely declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the country, and other states were beginning to experience a "competency crisis." Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree. We tend to summarize the overall spirit and provisions of the Consent Decree in three goals:

1. Reducing the *number* of people on the waitlist for restoration services.
2. Reducing *wait times* for people on the waitlist, particularly those with severe illness
3. Reducing *harm* (by providing *care*) to people on the waitlist

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the Department could not keep pace with court orders for competency services, and the waitlist grew. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, more than 80 beds at CMHHiP remained unusable because there was not sufficient staff to operate the units. In July 2023, the waitlist peaked at 483 people.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Detainees. Over the past few years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year. *Indeed, the Department has now reopened nearly all beds that were closed during the pandemic, and hospital capacity now approximates the capacity before the pandemic*. The Department also prioritized the opening of Mental Health Transitional Living homes, creating community-based opportunities for people ordered to competence restoration as well as hospital patients who were otherwise difficult to place in previously existing community settings.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree. These delays continue, though less severely; average wait times still exceed those mandated by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

**Recent Context:**
Across much of 2023-2024, the Department increased capacity for inpatient restoration: they re-opened 39 beds at CMHHiP, they opened the second new 22-bed unit at CMHHiFL, and they expanded the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds. These changes alone significantly reduced the waitlist. The Department also transitioned some long-term patients into new Mental Health Transitional Living (MHTL) homes, and they also admitted a few others directly from jail. These MHTL homes now serve more than 70 patients, across five newly opened homes, with more openings scheduled for the spring of 2025. Indeed, they expect 164 beds available by the end of summer 2025. Transitioning long-term patients from the hospitals increases capacity for more patients who will require less time in the hospital, opening beds sooner. With increased capacity, the Department achieved roughly five quarters of steady improvements (i.e., decreases in the wait list and most wait times). The waitlist figure at the end of last quarter (i.e., 208 in October of 2024) was the lowest in several years.

Unfortunately, the progress that was so steady through late 2023 and most of 2024 has paused, and this quarter feature greater delays. Most appeared attributable to an unprecedented "spike" in court orders for competence evaluation during October 2024, which of course, led to

increased orders (and wait times) for competence restoration in the subsequent months. This downturn certainly does not *negate* 15 months of steady improvement, but it has certainly *paused* the steady improvement.

We anticipate some ongoing effects from the recent spike in evaluation orders, and some related changes. For example, whereas the Department tended to receive an average of roughly three orders for inpatient treatment for day, the January 2025 average was *more than six per day.* The Department has limited control over "inflow" of this sort, and increased inflow certainly slows evaluation, admission, and restoration. Additionally, discharges have slowed from a recent average of more than three per day to just over two per day. Consequently, the Department's internal projection model—which has appeared generally accurate over the past several months—now suggests (unsurprisingly) a much slower pace to compliance with the Consent Decree, though it still projects compliance in 2026.

We witness the Department continue to exert strategic efforts over every point they can control (e.g., evaluations and restoration), and attempt collaboration with other stakeholders to better influence the variables that are less under their control (i.e., court orders for evaluation and restoration). As recent events make clear, progress is precarious, and it requires ongoing resources and ongoing collaboration with other stakeholders.

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

# KEY METRICS FOR PROGRESS:

## COMPLIANCE WITH TIME FRAME REQUIREMENTS

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> (i)  As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such **reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> (ii) The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## KEY METRIC: COMPETENCE EVALUATION TIME FRAMES

> 33. (b) Performance of Jail Competency Evaluations. The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

The Department historically met most evaluation time frames, even before the 2019 Consent Decree and even through most of the pandemic. Court orders for jail-based competence evaluations dropped to an all-time monthly low at the start of the pandemic (e.g., 56 people in April 2020). But arrests and orders for jail-based evaluations resumed dramatically, peaking at an all-time monthly high two years after the pandemic began (i.e., 178 in March of 2022). After staffing shortages in Court Services caused delays during some of 2020, the Department returned to almost perfect compliance with evaluation time frames for the vast majority of the next four years.

Last quarter, in October 2024, *the Department received an unprecedented spike in orders for jail-based competence evaluations*. At 221 orders, this far exceeded the prior 2024 average of 155 orders per month. Such an increase continues to bring significant repercussions for the Department. This quarter, orders for jail-based evaluation averaged 161 per month—still above average—but far fewer than the unprecedented and inexplicable 221 orders in October of 2024.

| *Average waiting time (in days) for a competence evaluation[1]* | | | | | |
|---|---|---|---|---|---|
| | Aug - Oct 24 | Nov 2024 | Dec 2024 | Jan 2025 | Requirement |
| Jail-based Competency Evaluations | 11.4 | 32.4** | 35** | 26.5** | 21 days |
| Inpatient Competency Evaluations | 30.9** | n/a | n/a | n/a | 14 days |

** = most defendants waited longer than the maximum time frame for the evaluation

For many years, even with a high volume of court orders for evaluations, the Department's Court Services unit has remained responsive and efficient, maintaining near-perfect compliance with timelines. They maintained compliance amid significant staffing shortages, making their achievements more impressive, but also more precarious. This quarter Court Services grossly exceeded the 21-day deadline, on average. For the first time in many years, *average* wait times for evaluation exceeded the permissible time frame, and most detainees who were evaluated waited longer than the Consent Decree permits. Clearly, the October 2024 all-time-high spike in orders for evaluation was more than the team—already understaffed and stretched thin—could handle. The last month of the quarter revealed somewhat better compliance and less delay; the Court Services unit is "catching up" after the highly unusual increase in October. But that increase was severe enough to cause evaluation delays that never occurred during the past several years of near-perfect compliance.

Regarding inpatient evaluations, there have remained very few. This quarter, there were ultimately *no* orders for inpatient competence evaluations (though initially two orders, these were quickly converted to orders for jail-based evaluations).

Orders for *jail-based* evaluations remained high (monthly average of 161) though much closer to typical rates than to the unprecedented spike of 221 orders in October. However, that spike in evaluations was too much for Court Services—despite their remarkable record—to manage with their usual near-perfect compliance. Indeed, compliance for evaluation timelines was worse than it has been in many years. Compliance is now improving, as Court Services catches up to the increased volume. But this quarter reveals that Court Services is, of course, vulnerable to such unexpected increases in workload.

---

[1] Information retrieved from the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, pp. 22, 31.

## KEY METRIC: TIME FRAMES FOR ADMISSION TO COMPETENCE RESTORATION

*Historical context:*  Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. Defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE had waited, on average, 71 days. The Consent Decree then mandated a triage system,[2] requiring Tier 1 defendants to begin restoration services within 7 days and Tier 2 defendants within 28 days. Wait times and the number on the waitlist initially decreased *until* the onset of the COVID-19 pandemic, but they greatly increased thereafter. Those wait times have continued to remain far out of compliance even after the pandemic subsided. ***Although they improved steadily for over one year, this quarter they have reversed course and once again increased.***

This quarter, inpatient restoration wait times consistently remained beyond mandated time frames:

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees[3]* | | | | | | |
|---|---|---|---|---|---|---|
| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Jan 2025 | 20 | 85 | 72.2 | 61.7 | 17** | 66** |
| Dec 2024 | 26 | 63 | 49.6 | 87.4 | 24** | 58** |
| Nov 2024 | 31 | 62 | 32.3 | 93.0 | 29** | 52** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

** = most defendants waited longer than maximum time frame for restoration services
*** = ALL defendants waited longer than maximum time frame for restoration services

---

[2] See Consent Decree paragraph 43.

[3] According to the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, p. 14.

Again, the Department remained *mostly out of compliance* regarding restoration time frames. Between November 2024 - January 2025, the Department was noncompliant with the 7-day time frame for all but three Tier 1 Detainees admitted. Of the 210 Tier 2 Detainees admitted in that same period, 176 were admitted or had their waits otherwise ended beyond their time frame of 28 days. Overall, across both Tier 1 and Tier 2 admissions, this reflects only a 14.3% compliance rate. This is lower than last quarter's 16.2% rate, but it is still much higher than the spring and summer 2024 quarters which averaged between 7-9% compliance.[4] We are hopeful that this quarter represents an aberration, not a new trend, but we will monitor it carefully as the Department continues to remain far out of compliance regarding timely admissions.

| *Average Wait (in days) for Inpatient Competence Restoration Services[5]* | | | | |
|---|---|---|---|---|
| | Feb 24 – Apr 24 | May 24 – Jul 24 | Aug – Oct 24 | Nov 24 - Jan 25 |
| Tier 1 | 54.3 | 69.2 | 40.3 | 47.5 |
| Tier 2 | 115.1 | 104.1 | 95.3 | 80.3 |

Pretrial Detainees are all waiting far longer than Consent-Decree time frames allow:
- Tier 1 detainees nearly *7 times longer than allowed* by the Consent Decree (i.e., 47.5 days on average between November 2024 – January 2025 rather than 7 days).
- Tier 2 Detainees wait nearly *3 times longer than allowed* by the Consent Decree (i.e., 80.3 days on average between November 2024 – January 2025, rather than 28 days).

These wait times are encouraging as compared to the past few years, but not when compared to very recent history. The average Tier 1 wait times increased by about a week from last quarter's average. Concurrently, Tier 2 wait times continued to decrease, such that *they are the shortest since 2022*, with Tier 2 average quarterly wait times reflecting a sustained decrease for more than a year. Also, more Tier 1 Detainees were admitted during this past quarter than in any previous quarter, with 77 admissions, compared to an average of 48 throughout 2023. Unfortunately, the number of Tier 2 admissions decreased to its lowest point in a year. Overall, this reflects the Department's commitment to the Consent Decree's triage system – admitting the "sickest people the quickest." Still, this quarter had more Tier 1 Detainees waiting for

---

[4] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for the actual need for urgent admission.

[5] Information retrieved from the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, p. 14.

admissions beyond seven days than any quarter in the past year. An average of 24 Tier 1 Detainees were waiting beyond seven days at the end of each month this past quarter, compared with averages of 10, 12, and 22 in the previous three quarters (which reflected substantial improvement over prior years).

Again, although only 14.3% of Detainees were admitted within their mandated time frames this past quarter, this percentage is higher than most quarters following the pandemic; 41 Detainees were admitted on time, which is historically high compared to most previous quarters. So, when comparing this quarter to most quarters from 2020-2023, the numbers are strong; however, when comparing them to recent quarters from 2024, outcomes are weaker. Again, all of this reflects that the current quarter was a pause, or even a reversal, of the progress that had continued so steadily for over one year.

The total number of people admitted to inpatient restoration this quarter (287) was the lowest in at least one year (after 308 last quarter, and 306 and 339 in the summer and spring 2024, respectively). Vacancy bed rates increased at most hospitals this quarter, aside from CMHHIP.

In short, wait times remain unacceptable. On average, Detainees wait close to three to seven times longer than the prescribed Consent Decree time frames.[6] As the number of people waiting in jail for inpatient restoration increased during the past quarter, so did Tier 1 wait times. Approximately 86% of Detainees who were admitted exceeded their maximum allowable wait times in jail.

The number of people awaiting restoration, and their corresponding wait times, remain far out of compliance this quarter. On average, Detainees wait about three to seven times longer than Consent Decree time frames allow. Only 14.3% were admitted *within* Consent Decree time frames. Tier 1 time frames lengthened, while Tier 2 time frames decreased. Overall, most Detainees wait far too long in county jails before they are admitted to inpatient restoration.

---

[6] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 287 "admitted or ended" between November 2024 and January 2025, only 186 defendants were actually admitted to an inpatient facility. The other 101 people were either dismissed, vacated, or released on bond. Still, the percentage of cases "admitted or ended" via admissions remains encouraging.

## KEY METRIC: THE WAITLIST FOR COMPETENCE RESTORATION SERVICES

*Historical context:* One key metric for gauging the Department's progress is the waitlist for competence restoration services. The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. In the months before launch of the Triage system, the waitlist averaged around 150 to 180 defendants. By June 2020, the number on the waitlist dropped below 100. The Department projected that the waitlist would be minimal by December 2020, but the pandemic reversed that progress and changed all projections. The waitlist grew throughout the pandemic, and even continued after the pandemic ended, amid pandemic consequences like staff shortages and closed hospital units. In May of 2023, the waitlist peaked at 483 Detainees and even remained over 400 until December 2023.

*Current realities:*  Since May 2023, the reopened beds at CMHHiP, increasing capacity in the Mental Health Transitional Living homes, and several fines-funded programs created much-needed inpatient restoration capacity. Subsequently, the Department admitted many more detainees than in previous years, and the overall number of persons on the waitlist declined substantially throughout most of 2024. Unfortunately, this trend reversed in October, and the number of people on the waitlist has increased substantially since then.

The number of court orders for competency restoration had remained generally stable for most of 2024, but it increased dramatically this past quarter. The past 12 months averaged 122 individuals ordered to inpatient restoration per month, with this past quarter averaging 141 per month. Thus, the number of people awaiting inpatient restoration at the end of this quarter increased from 208 in October 2024 to 284 in January 2025. Although this is still almost 100 fewer people than this time last year, and nearly 200 below May 2023's high of 483, the trend is alarming.

| *Number of Defendants Waiting for Inpatient Restoration[7]* | | | | | |
|---|---|---|---|---|---|
| | March 2019 | Aug - Oct 24 | Nov 2024 | Dec 2024 | Jan 2025 |
| Combined | 157 | 213.3 | 217 | 247 | 284 |
| Tier 1 | N/A | 16.7 | 19 | 23 | 39 |
| Tier 2 | N/A | 196.7 | 198 | 224 | 245 |

Figures reflect the number of persons waiting for restoration services on the last day of the respective month.

---

[7] According to the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, p. 10.

The total number of all Detainees waiting this past quarter is lower than all previous quarters since 2021, aside from the most recent August – October 2024. Although historically strong, this past quarter reflects a worrisome reversal in what had been a sustained quarterly decrease.

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month[8]* | |
|---|---|
| March 2019 | 157 |
| June 2023 (high point) | 483 |
| January 2024 | 383 |
| February 2024 | 329 |
| March 2024 | 324 |
| April 2024 | 297 |
| May 2024 | 270 |
| June 2024 | 241 |
| July 2024 | 227 |
| Aug 2024 | 216 |
| Sep 2024 | 216 |
| Nov 2024 | 217 |
| Dec 2024 | 247 |
| Jan 2025 | 284 |

---

[8] According to the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, p. 10.

*Qualitative review and extraordinary cases:* As we emphasize in each report, the waitlist is not simply a metric, but rather a group of *people* with psychiatric illness awaiting crucial treatment. Each week, we review the documented updates on each person in jail who has been waiting for inpatient restoration longer than the Consent Decree allows. In that review, we see many acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability (living in cells soiled with urine or feces, neglecting hygiene, not eating, experiencing serious medical problems, and so on) or who languish with severe symptoms of untreated psychosis. These conditions leave them vulnerable to self-harm, victimization, worsening psychiatric illness, or new charges.

Over most of 2024, we had been encouraged that the number of people whom *we* categorize as the sickest and most vulnerable Detainees remained relatively few. That was certainly a reflection of the decreasing number of Detainees overall, as well as the Department's ability to admit Detainees more quickly. However, the numbers of Detainees that we view as the most in need of immediate hospitalization has increased substantially this past quarter. In any week, there are now about 20 people for whom we urge prompt hospitalization, as compared to about 10 on average for most of 2024. We affirm the efforts of the Forensic Support Team and all relevant hospital admissions teams, but we have special concern for these sickest and most vulnerable Detainees who desperately need inpatient care.

The number of people waiting in jails for restoration services increased this quarter for the first time in more than a year, increasing from 208 at the end of October 2024 to 284 at the end of January 2025. Although many Detainees were admitted to hospitals this past quarter, and although the Department generally continued to prioritize Tier 1 Detainees for admission, many more sick and vulnerable Detainees waited in county jails than in recent memory. We also note that even with the previous gains, the overall waitlist is still longer than it was at the start of the Consent Decree, wait times are still far out of compliance for most Detainees, and the waitlist includes some people in acute psychiatric crisis. Admissions must increase, with capacity for inpatient restoration as well as alternatives to hospital-based restoration.

# OTHER CONSENT DECREE UPDATES

## INTERIM JAIL MENTAL HEALTH TREATMENT[9]

> 34. Interim Jail Mental Health Treatment. If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

*Historical context:* The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to inmates involved in competency matters until their transfer to competency restoration services.

*Current realities:* The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff are dedicated to enhancing services for Pretrial Detainees awaiting restoration. However, given that they are often funded by county budgets, the scope and quality of JBBS services and staffing varies greatly across Colorado jails. The Department's 2024 Comprehensive Plan details the challenges with some JBBS teams, as well as their financial commitment to addressing the inconsistencies across JBSS programs. In particular, the Competency Enhancement Teams seem to vary in terms of quality and impact.

OCFMH's mobile competency enhancement service continues to contract with a part-time forensic psychiatrist to meet with specific Detainees and treatment providers to discuss and encourage medication administration and management. According to the Department's drafted 2024 Comprehensive Plan, this psychiatrist has provided more than 50 consultations, 50 chart reviews, 46 direct client appointments, and one training during 2024. The impact on the waitlist is difficult to calculate with precision, but we strongly support this service as one that provides

---

[9] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

additional expertise to jails that often desperately need psychiatric services.

We continue to suggest that involuntary medication orders, assertive community treatment, and broader criteria for involuntary evaluation and treatment could address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who experience criminal justice involvement or worsening physical or mental health status due to their symptoms. Of course, we know that empathic, collaborative, motivational care is often sufficient to engage patients in voluntary medication. But in a small minority of cases, involuntary medication may be a necessary last resort for much-needed treatment. Recent legislation, now enacted into law, provides a mechanism to drop a competence evaluation or restoration order in favor of civil commitment; we know of four attempts to use this new mechanism since July 1, 2024, two of which have yielded poor results (unexpectedly, two involved defendants facing serious charges, who were thus not welcome in private hospitals). Denver County is attempting to utilize probate court to shift competence cases to the civil court system where monitoring and court involvement will continue.

We affirm any efforts to shift people at risk for the competence system to the civil system in those cases in which mental health care and support is indeed the primary mitigation against future criminal behavior. However, *these sorts of programs and initiatives require a functional, accessible civil mental health system. Developing this type of robust, civil mental health system is not solely within the Department's control*. The new BHA should provide the backbone of new civil treatment options, but the impact of this new BHA is still unknown. We affirm the Department's conversations with leadership from other stakeholders (law enforcement, corrections, private mental health, judges, and persons with lived experience) to enhance Colorado's civil mental health options. Yet most of the innovations that the Department would like to implement are almost totally reliant on a more robust, effective civil mental health system than currently exists in Colorado.

## RELEASE OF PRETRIAL DETAINEES FOR COMMUNITY-BASED RESTORATION TREATMENT[10]

> 35. Release of Pretrial Detainees for Community-Based Restoration Treatment. If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would be doubled were not for the persistent efforts to shift so many detainees into the Department's robust outpatient competency restoration program and community supports.

*Housing:* The Forensic Support Team (FST) Navigators (described below) continue to facilitate transitions from jail to community housing across the state. Most community housing options are in the Denver and Colorado Springs metro areas, but the Fines Committee supports housing across most regions of Colorado. The total number of housing placements and beds funded by the Fines Committee remains high; a forthcoming initiative on the Western Slope will provide housing and care for more than 50 people in late 2025. Most of these housing options offer additional treatment and supportive services. Mental Health Transition Living (MHTL) homes provide additional community housing and services as well, as they are prioritized for "difficult to place" patients in the state hospitals or those who are transitioning from the waitlist to the community. These MHTL beds are critically important as they provide community housing and service options for hospitalized people who have traditionally been very hard to discharge. More than 70 beds are already occupied, and a total of 164 beds are scheduled to be open by the end of 2025. The MHTL homes remain among the Department's best strategies to improve the overall scope of public mental health services in Colorado, and their impact will certainly extend beyond the competence-services system. Please see Appendix 3 for a description of these various housing-first programs.

*Forensic Support Team (FST):* FST Navigator contacts with Pretrial Detainees continued to be strong this quarter, but some changes in frequency require additional investigation. In January 2025, FST Navigators were assigned to 889 persons in county jails waiting for competence evaluations and/or inpatient restoration services – a decrease from October 2024 (n = 941). For persons awaiting evaluations in jail, the FST recorded an average monthly total of 61 face-to-face contacts (representing another slightly downward trend) and 299 contacts with care teams or other stakeholders during the past quarter (a slightly upward trend). For individuals awaiting

---

[10] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

restoration services this quarter, Navigators logged an average monthly total of 447 face-to-face contacts with defendants in jail (a slight decrease) and 1,530 contacts with community care teams or stakeholders (a slight increase).[11] These numbers seem to reflect a change toward collateral contacts and less face-to-face contacts with Detainees. However, the FST staff has increased in size, including several new Navigators and supervisors. Concurrently, acuity of Pretrial Detainees has increased. The decrease in face-to-face contacts is therefore unexpected. We will investigate and encourage as much face-to-face contact as possible, especially as wait times increase. As always, however, these numbers represent tremendous time and effort devoted to Detainees.

The FST also continues to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from CMHHiP or CMHHiFL to the community, placing appropriate Detainees into community-based specialty programs (such as Fines-funded settings), working with competency dockets to facilitate quicker hearings and community restoration, advocating for dismissal of charges or resolution of competency for those who have stabilized, and more. Several thousand CMHHiP bed days have been "saved" since January 2020 through these combined efforts. The FST works with many community service programs every day.

Finally, Navigators continue to work closely with specialty judicial initiatives. These include (but are not limited to) the Larimer County Competency Court, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. These programs are discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets (see Appendix 2), and they continue to coordinate efforts with Bridges liaisons and other court-appointed staff within the new competence dockets. We continue to affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department, collecting information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Despite some decreased metrics this quarter, outcomes from the FST remain strong despite difficult conditions and high demand for their services.

---

[11] According to the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, pp. 35-38.

## TRANSPORTATION OF PRETRIAL DETAINEES

36. Transportation of Pretrial Detainees. If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

No defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[12] This follows a quarter in which five Detainees were admitted to an inpatient facility for competence evaluation, which had matched the largest quarterly number of Detainees admitted to a state hospital for a competence evaluation since 2021. This quarter, only two court orders for inpatient evaluation occurred, and both were quickly converted to orders for jail-based evaluation.

The Department has not reported any other delays or barriers to transportation with jails around Colorado.

---

[12] According to the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, p. 21.

## NOTIFICATION OF NON-COMPLIANCE WITH TIME FRAMES

38. Notification of Non-Compliance with Timeframes. The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.

(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;

(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals, and to support their work after they receive funding). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not supplant, existing services. The Department has provided notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

*Current realities*: For the five years that fines have accrued, the Department has routinely completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which is used to support additional special projects that complement the broad goals of the Consent Decree. The Department reached the maximum amount for fines for the past several years (i.e., $10 million per year, then $12 million after adjustment for inflation). The Department's strong progress throughout 2024 raised the possibility that they may not be paying fines by late 2025 or 2026. But recent downturns leave us expecting the Department to pay fines throughout 2025.

### Fines-Funding Impact: An Overview[13]

This quarter, the Fines Committee funding has supported 34 programs (see Appendix 3). In addition to the 34 fully operational programs, one program is completing its implementation period and progressing to full capacity. The operational programs are serving individuals in twelve separate jurisdictions, while Colorado Coalition for the Homeless, Denver FIRST, Ananeo Housing, Mile High Behavioral Healthcare, Fidelity Behavioral Health, and Valor serve individuals referred statewide. All told, these programs have served 1,904 individuals this quarter, down from 2,104 in Quarter 3, and higher than 1,710 in Quarter 2 of 2024. Each of the programs has a goal to either divert individuals from the inpatient competency restoration waitlist or to support clients to make diversion from their criminal charge or from confinement feasible. Thus, assuming most clients being served by these funded programs would otherwise be on the in-custody competency waitlist, Fines Committee funding continues to make an impact on the restoration waitlist. In this quarter, eleven programs provided housing to competency-involved individuals; Fines Committee funding provided housing for 256 unique clients (up from last quarter's 179). Additionally, two programs provide training for professionals and potential clients; this quarter the training programs reached 252 individuals.

The funded programs are contributing to a potential body of knowledge on competency impact in the justice system. Given most programs have been locally and organically developed to solve problems unique to each jurisdiction, they are experimental in nature. Each program is unique in terms of goals, services, jurisdictional nuance, and data collection capacity, so continuous data collection process improvement is an ongoing effort. The primary focus of evaluation remains measuring the impact on the competency restoration waitlist. A secondary focus is to ensure that programs have sufficient technical support and other resources to maximize effectiveness and impact. To this end, the evaluation process has included a survey of Forensic Support Team and Outpatient Restoration Program staff.

Utilizing information derived from the quarterly evaluation, the evaluators are working with the Competency Projects Cultivator to ensure that jurisdictional gaps are addressed, that clients' needs are addressed along the entire sequential intercept model, and that programs are identifying pathways to sustainability beyond funding from the Fines Committee.

---

[13] This summary is a condensed version of the detailed summary (part of a thoroughly detailed report) prepared by Kally Enright and Todd Spanier, of Strategy and Evaluation Consulting, the team that serves as a fiscal and quality monitor for fines-funded projects.

*Projects funded by the Fines Committee*
The top priorities for the fines committee continue to be projects that address housing, diversion from the competency system, and specialized competency judicial programs (e.g., competency dockets and calendars).

*Housing* remains a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. Those in outpatient restoration have generally shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing arranged through fines-funded programs.

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. Often, the FST is able to arrange admission to these programs for detainees who are released or bonded from jail to complete outpatient competence restoration. This quarter, *Fines Committee funding provided housing for 256 clients.*

*Diversion* programs of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped. The recent HB24-1355 should provide more opportunity for court-directed diversion and deflection in the future.

*Competency Dockets and related efforts* provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, several "competency dockets" emerged across Colorado as more jurisdictions recognize the strengths of this model.

*Recent projects* include two particularly large-scale projects from which the Fines Committee expects substantial impact. As we mentioned in recent reports, the Fines Committee has supported Embrave with $8,902,175 to develop the Valor Program. The Valor Program now provides residential care to people who need intensive support and stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility offers 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer

support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program will serve those in, or at risk of being in, the competency system, accepting referrals from the justice system and the community to support not only decreasing the waitlist but to also deflect and divert individuals from the justice and competency system. This large-scale service launched on time accepts residents, though they are still building up to full capacity (not all beds are available). *Each month, we are grateful to see people leave the waitlist for a placement at Valor*.

Most recently, in October 2024, the Fines Committee funded ($5,400,000) Ava Health to provide a full continuum of care to individuals on the Western Slope. Ava Health will support the competency population and those who may be at risk of being in the competency system with an acute stabilization unit, residential care, partial hospitalization program, outpatient, and supported and independent housing. Leaders of Ava Health have significant experience with the behavioral health population, and for one year have been diligently exploring the needs of the Western Slope to develop the continuum of care Ava Health will offer. They have now purchased a property/ facility, which they are preparing for opening.

*A full info-graphic summary of fines-funded projects comprises Appendix 3.*

### Collaboration among  Fines-Funded Programs

Last quarter, the fines team held a gathering of staff from *all* fines-funded projects. Lynn Unger—who is funded to serve as a project cultivator and supporter—gathered them to provide opportunity for project teams to engage with one another and share best practices. A primary focus was project *sustainability*. A variety of agencies and funding sources provided presentations to help the programs move towards funding from Medicaid or other long-term funding mechanisms (rather than relying primarily on Fines funds). Furthermore, staff from many fines-funded programs had contact with each other for the first time and began collaborative and supportive relationships with one another.

Lynn Unger has followed this large gathering with monthly "collaboration calls," i.e., videoconference meetings for all funded programs. Staff from funded programs gather by videoconference to hear from speakers (usually other agencies or stakeholders) who can help the programs better collaborate, secure funding or services, or navigate systems. We notice these meetings also prompt valuable informal collaboration and consultation among programs.

# CONSENT DECREE SECTION VII UPDATES

## CIVIL BED FREEZE

39. Civil Bed Freeze. The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

Since the start of the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures. The Department opened more than 70 competence restoration beds in 2024, and it has pledged to open 164 community beds in their system of MHTLs by the end of summer 2025 (see below). CMHHiP remains at full pre-pandemic restoration capacity. Still, despite this critical increase in restoration beds, civil capacity continues to lag, offering few inpatient options for persons who might otherwise be diverted from the competence system.

*We reiterate from our previous reports: civil inpatient capacity remains too low throughout Colorado.* Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts. Successful and sustainable solutions to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges. Without a strong civil system, incompetency remains the easiest route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competence services system. We continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems, especially as compliance with the Consent Decree approaches. Long-term sustained compliance will depend on the civil mental health system in Colorado. The MHTL homes are a prime example of community based civil resources: they prioritize step-down interim housing opportunities for people who are ready for discharge at a state hospital, pretrial Detainees in county jails, or people who are at substantial risk for entering inpatient competence restoration. These homes are one of the most *critical components of a full civil service system*, and a key step forward for the Department.

A timely example is represented by the recent closing of West Springs Hospital in Grand Junction and Johnstown Hospital in Longmont. Collectively, these two facilities provided more than 60 psychiatric inpatient beds for civil patients. However, operating costs exceeded financial resources, and the two hospitals closed during this past quarter. This leaves Colorado with even fewer options for civil inpatient treatment, at a time when capacity was already too low for Colorado's population. This will undoubtedly have a negative effect on the Consent Decree, in

that many of the individuals that would've previously been admitted to those civil inpatient options will now be directed to the forensic system and its inpatient capacity.

Thus, while we support the Department's current push to reduce the waitlist by prioritizing inpatient beds for competence restoration, we continue to emphasize that any long-term solution must shift inpatient priority from forensic to civil beds. We have asked the Department to plan for the transition of some inpatient restoration beds to inpatient civil beds, even before attaining compliance. However, the Department cannon exercise these decisions alone. Strong community and state partners (private hospitals, the BHA) must take ownership of the problem by creating more civil options for inpatient and outpatient care.

COMPREHENSIVE AND COHESIVE PLAN

40. Comprehensive and Cohesive Plan. The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

*Historical context:* The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies that can reduce the competency-involved population.

As the pandemic continued, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* on this type of comprehensive approach. In April of 2022, they pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. The Department organized their efforts according to six key strategies or "levers:"
1. Increasing inpatient beds;
2. Improving inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reducing the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and wait times. But we also appreciated the efforts to expand the scope of their focus to beds and services *in the community,* for a much more comprehensive approach to the crisis. Indeed, addressing the first several (inpatient) variables is crucial to decrease the current waitlist, but vigorously addressing the last few (community) variables is crucial for minimizing future additions to the waitlist.

In their 2023 Comprehensive Plan, the Department memorialized their plans to:
- Expand their use of community (private) hospital beds for the restoration population,
- Reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Re-open and better use existing inpatient beds

In line with the goals detailed in this Comprehensive Plan, the Department received from the Governor's office $57,967,379 in supplemental funds for FY 2023-24 to maintain private beds, then re-open and staff state hospital beds. These steps certainly decreased the waitlist.

*Current realities:* Last Quarter, the Department submitted their 2024 Comprehensive Plan. In it, they reviewed key successes, such as opening all closed inpatient beds and operating with full hospital capacity. They described contracting for 130 Mental Health Transitional Living (MHTL) beds, a tremendous improvement to their continuum of care (remarkably, financial efficiency will actually allow for the opening of 164 MHTL beds altogether). The Department's plan reflected their increased emphasis on data-informed planning. They formally shared their projection model, which can provide generally reliable estimates of wait list figures and eventual compliance dates, based on key metrics such as bed capacity, bed utilization, length of stay, and court orders for restoration. We have generally been impressed with the reliability of this simple model, and we encourage the Department to continue using it for planning. Also, related to data, the Department described improved data infrastructure for all competence services, allowing for better tracking, and reporting of outcomes.

In other efforts, the Department has improved collaborations and partnerships with the other state agencies that ultimately influence the demand for competence-related services. They described Colorado's efforts to reform behavioral health, particularly among closely aligned state agencies: the Behavioral Health Administration (BHA) and the Department of Healthcare Policy and Financing (HCPF), all of whom aim to establish a better "safety net system" to provide behavioral health services to vulnerable persons. We notice the Department efforts (even our routine meetings) are increasingly in conversation with these adjacent agencies, which will be important for systematic change.

We appreciate the strategies documented in the 2024 Comprehensive Plan. During this quarter, there was (appropriately) little discussion of the next plan, which is not due until the Fall. But recent pauses in progress may need to prompt even broader strategies for the 2025 Plan.

*In recent years, Department efforts targeted the pressing needs for adequate staff and inpatient beds. More recently, they progressed with MHTL homes, and collaborative legislation to divert people with mental illness into community care. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment. With their latest plan, we see more attempted coordination with the emerging BHA services, recent mechanisms to support court-based diversion and civil certification, and the use of reliable data projections to inform progress.*

## INCREASE COMMUNITY RESTORATION SERVICES

> 41. (a) Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's outpatient competency restoration program (OCRP) began in March of 2018, and has grown steadily since then. Referrals for outpatient restoration were strong this quarter, averaging 79 per month, more than any other quarter this year.[14] More than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. As always, we affirm the Department's success in building the largest, most robust statewide community-based OCRP program in the country. Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. A total of 236 people were placed in OCR this past quarter.

*OCRP outcomes*
Data from November 2024 through January 2025 reveals a 31.9% restoration rate in the OCRP re-evaluation reports that the Department reviewed (53 of 166 total opinions). An additional 15.7% were opined as unrestorable (26 out of 166). The remaining 52.4% were opined as remaining incompetent. This reflects a slightly higher OCRP restoration rate, compared to 26% and 30% in the two prior quarters. Data from the same period shows that courts found 21.7% of defendants restored to competence (46 of 212 total adjudications), lower than previous quarterly rates of 28% and 27%. The court dismissed charges and/or otherwise terminated restoration services in an additional 43.4% of these re-evaluation cases. The Department again surmised that less positive outcomes may be attributable to increasingly ill defendants (i.e., more severe psychiatric symptoms) ordered to outpatient restoration.

> 41. (b) The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds and Peakview Hospital for 80 beds; those contracted beds were filled on average at more than 95% capacity over the past quarter.

There is no doubt that this inpatient restoration capacity (along with a concurrent increase in the availability of state hospital restoration beds) led to a substantial decrease in the number of people on the waitlist as well as the decreased average time to placement over much of 2024. Of

---

[14] All data in this section retrieved from the Department's Special Master Compliance Plan report for January 2025, submitted February 15, 2025, pp. 39-46.

course, inpatient restoration capacity cannot be the exclusive solution to Colorado's competence crisis. Indeed, the 95 private beds currently "rented" are short-term solutions. To reiterate our earlier concerns, while we affirm the Department securing these inpatient restoration beds at this critical time, *civil* inpatient capacity remains insufficient. The Department must ultimately prioritize civil inpatient capacity; this will help sustain the improvements in the waitlist as individuals receive civil (rather than forensic) treatment. When compliance improves, we encourage the Department to continue to transition some restoration beds to civil beds in order to promote sustained compliance after the Consent Decree ends.

> 41. (c) The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

*OCRP baselines*

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| Initial baseline | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| November 1, 2021 goal | 60% maximum | 40% minimum |
| Recent progress (past 6 months) | Aug 1 – Jan 1, 2024: 64.7% | May 1 – Oct 1, 2024: 35.3% |

For the past six months (August 2024 through January 2025), a total of 35.3% of all restoration orders were to outpatient restoration. In previous quarters (indeed, for several years), the Department has remained in compliance or very near compliance. This rate is similar to last quarter's rate of 35.5%, and together they represent the lowest rate of outpatient orders in several years. Previously, the Department had consistently met the 40% expectation for several consecutive quarters. The reason for this decrease is unknown, but it does correspond with a period of great upheaval and other anomalous data from Court Services – delays in conducting timely competence evaluations, higher ITP rates than ever, and fewer recommendations for OCR. We are working with Court Services to better understand these trends and, if appropriate, return them back to historical averages. January 2025 saw rates increasing, and we will monitor

the trend going forward.

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

The current figure, reflecting six months' worth of data between July — December 2024 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 36.5% OCR referral rate among all evaluations conducted in jails. Month-to-month averages have fluctuated substantially, dipping as low as 21% in July 2024 but also exceeding the 30% threshold multiple times. The 36.5% rate reflects an all-time high, with previous six-months figures of 34% and 33%. Although unprecedented in previous years, these rates consistently exceed the 20% base rate goal. Interestingly, this rate is moving up while the overall OCRP recommendation rate is moving down (35.5%; see above). These trends seem contradictory and are difficult to understand, so we are asking the Department to verify their data and help us understand how these opposite trends can co-exist.

Even with these unexpected trends, the reality remains: the Department operates the largest community-based OCRP in the nation, with some of the highest rates of placement in that system. The OCRP provides crucial protection against an even greater "competence crisis" in Colorado, because so many incompetent defendants who are currently released to OCRP might otherwise be detained in a county jail, awaiting inpatient competence restoration.

In summary, we continue to affirm the tremendous impact that OCRP has on the waitlist. The combination of persons ordered to OCRP overall (35.5% of all persons adjudicated ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (36.5%) suggests a very robust OCRP program, even if overall numbers are slightly lower this quarter than compared with most previous quarters. A total of 236 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist. The CDHS OCRP continues to divert and deflect hundreds of defendants from county jails and inpatient hospitals into community settings. Although the past two quarters' rates merit close investigation going forward, the CDHS OCRP continues to be a critical component in Colorado's competence services system.

# CONCLUSION

After five consecutive quarters (1.25 years) of sustained progress—including decreases in the wait list and wait times—this was the first quarter of regression, or worsening metrics. Much of the problem resulted from an unforeseeable (and now resolved) "spike" in court orders for competence evaluation, followed by some more subtle factors that contribute to delays. All parties are investigating these changes, attempting to distinguish fluke variability from emerging trends. All parties are continuing to investigate the demand for competency services, and they are considering the possibility that certain well-designed resources and interventions for the competency population may have paradoxically *increased* orders for competency services in some jurisdictions.

This quarter certainly did not negate all the substantial progress of the preceding year. But it is a significant setback, which underscores just how precarious progress can be, particularly when OCFMH does not control the main contributors to competency-service demand (e.g., arrests, and orders for evaluation).

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.

Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# APPENDIX 1

## Summary of Inpatient Restoration Service Capacity

*Summary of Inpatient Restoration Service Capacity*

| Setting | Restoration beds through 12/24 | Funding Source |
|---|---|---|
| CMHHiP* | 218 | CDHS |
| CMHHiFL* | 44 | CDHS |
| Arapahoe RISE | 60 | CDHS |
| Boulder RISE | 0 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | CDHS |
| Denver Health | 15 | CDHS |
| Peakview Hospital | 80 | CDHS |
| **Total** | **435** | |

\* All restoration beds at CMHHiP are now available. The Department has received preliminary approval for funding to maintain these beds throughout the next two fiscal years and to continue contracts with private hospitals (Peakview and Denver Health).

# APPENDIX 2

## Summary of Colorado's Competency Dockets
### (compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served |
|---|---|---|
| **1st Judicial District** | Judge Klein & Judge Miloud | Low-level felony |
| **2nd Judicial District** | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DA approval) |
| **Denver County Court Comp Docket (Misdemeanor Charges)** | Judge Cherry | Misdemeanor Cases Only |
| **4th Judicial District - El Paso** | Magistrate Gurney | F5&F6 Non-VRA cases (and case-by-case approval from DDA) |
| **5th Judicial District** | Judge Shamis | Will eventually take all competency cases in the district |
| **8th Judicial District - Larimer** | Judge Blanco | Low-Level Felony and Misdemeanor |
| **10th Judicial District - Pueblo** | Judge Ernst | <F3 non-violent, judges make "referrals" |
| **12th Judicial District - Alamosa Only** | Judge Cortez-Rodriguez | >F2 clients that need "support" |
| **16th - Otero, Bent, Crowley** | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) |
| **17th Judicial District - Adams** | Judge Jimenez | TBD |

| | | |
|---|---|---|
| **18th Judicial District - Arapahoe** | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out of custody (capped at 10) |
| **19th Judicial District - Weld** | TBD | TBD |
| | | |
| **Other** | | |
| **Denver County Competency Diversion Program** | Jail Magistrate (rotating) | Pre-Comp Clients in Denver |

# APPENDIX 3

## Summary of Fines Funded Programs



# FINES COMMITTEE Allocated Funds Summary

*Updated February 10, 2025*

The Competency Waitlist Fines Fund was created by a federal court consent decree in litigation addressing Colorado's Competency to Stand Trial system. The Fines Committee was established to oversee the Fines Fund; its purpose is to support programs that have potential to reduce the State's competency restoration waitlist.


## Denver Competency Diversion & WellPower

**$1,873,918** - Diverting from prosecution those defendants who are likely to be found incompetent to proceed. The Fines Committee funds a program administrator, behavioral health navigators, and salaries for prosecutors and public defenders who work with clients in the program. Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.


## University of Denver's Denver FIRST Program

**$948,729** - Identifying and assessing clients ordered to outpatient competency restoration programs for traumatic brain injury and acquired brain injury, to enhance appropriate interventions for those identified clients, and to provide training to jail staff and providers.


## Fidelity Behavioral Health

**$1,683,559** - Providing housing, treatment, wraparound services, and outpatient restoration to competency-involved individuals and those at risk of becoming competency-involved in Adams, Jefferson, Arapahoe, Douglas, and Weld Counties for three years.


## Colorado Coalition for the Homeless (CCH)

**$4,964,964** - Providing modified Assertive Community Treatment level services to clients who are referred through the Office of Behavioral Health's Forensic Support Team as appropriate for Outpatient Restoration. Additionally, start-up funding was provided in 2019 to enable the program to purchase a 182-unit housing facility, out of which this, and other Colorado Coalition for the Homeless programs are operated.


## Larimer County Competency Docket

**$1,187,412** - Diverting individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a competency services case manager, team lead, case specialist, training for staff, as well as ten short-term supportive beds for competency-involved individuals.


## Aurora Municipal Court Sustained

**$719,284** - Screening individuals booked in the municipal jail and assessing appropriate individuals for competency. The program connects clients to treatment out of custody and works toward prosecutorial diversion. The Fines Committee funds a program administrator, pays for competency evaluations, and provides cell phones for clients.


## SummitStone Competency Hub

**$3,029,283** - Increasing psychiatric services in the Larimer County Jail and establishing a community-based competency hub that enables clients' medication management and provision of services.



## Arapahoe County Sheriff's Office Data Diversion

**$347,000** - Utilizing ForceMetrics to better identify behavioral health calls and individuals with behavioral health needs to more efficiently and effectively connect to the most supportive response, treatment, and resources; funding supports the cost of the ForceMetrics software.



## San Luis Valley Recovery Housing

**$313,762** - Providing five beds in a sober-living facility to serve individuals referred for out-of-custody competency restoration in the 12th Judicial District. This program will also connect clients to medically-assisted recovery treatment and other services to support competency recovery.



## Mesa County Sheriff's Office Long–Acting Injectables Program

**$360,000** - Providing in-custody clients with long-acting injectable medications to support mental health outcomes for those returning from the State hospital following competency restoration, and for newly booked inmates for whom the intervention is medically indicated.



## Larimer County Public Defender's Office

**$262,000** - Establishing a dedicated Senior Public Defender position for two years to support the Larimer County Competency Docket.



## Dirt Road to Recovery

**$162,120** - Providing three supportive recovery residence beds for males in Weld County, as well as wraparound services for individuals in or at risk of being in the competency system; funding covers salaries and benefits, wraparound services, housing, and transportation.



## 2nd Judicial District REACH Docket

**$220,000** - Establishing a Docket Coordinator position for two years to support the 2nd Judicial District Competency Docket (REACH).



## Valor Program at Embrace

**$8,902,175** - Allowing for the acquisition and renovation of a former hotel in Colorado Springs to provide 60 beds for supportive monitored housing for individuals involved in the competency system or at risk of becoming involved in the competency system.



## Embark Recovery Residences

**$841,420** - Providing sober-living housing to serve individuals released from confinement who are receiving competency restoration, as well as supporting outpatient restoration clients with case management, treatment, peer specialists, and classes.



## Monarch Competency Housing

**$3,306,273** - Providing sober-living housing and supportive wraparound services . The Fines Committee funding allowed for the purchase of a twenty-four bed facility reserved for clients deemed appropriate to be released from custody for the restoration process and referred by the Forensic Support Team or Bridges; Monarch has guaranteed to serve the population for ten years with no additional Fines Committee funding.



## Ananeo Competency Housing

**$1,847,630** - Providing housing and services associated with supportive monitored sober housing. Forty dedicated beds are reserved for individuals, suitable for diversion from confinement, who are receiving outpatient competency restoration and treatment, referred by the Forensic Support Team or Bridges.



## SAFER Opportunities Colorado

**$2,007,500** - Offering safe, continuous hotel sheltering in Arapahoe County with a continuum of community-based, client-centered safety net services. The Fines Committee funds numerous positions and wraparound services.



## Mile High Behavioral Healthcare

**$286,745** - Assisting clients with acquiring treatment and wraparound services out of custody. The Fines Committee funds two clinical case managers to support pre-release incarcerated clients with mental health and substance use disorders.



## Behavioral Treatment Services Day Reporting

**$265,814** - Establishing a Day Reporting Center with treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## Boulder County Sheriff's Office

**$260,000** - Providing in-custody clients with long-acting injectables to support mental health for those returning from the State hospital following restoration, and for newly-booked inmates, as well as supporting clients transitioning to the community through temporary housing and ancillary items.



## SCAO Competency Docket Analyst

**$138,384** - Creating an analyst position to support judicial districts operating special programs in the competency system; the analyst provides training, awareness of resources, data collection, and evaluation support for competency dockets and judicial programs.



## Gateway to Success Day Reporting Center

**$510,000** - Establishing a Day Reporting Center with access to emergency housing, treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## Second Chance Center in the City

**$965,002** - Providing onsite case management, peer mentoring, employment services, housing navigation, mental health services, and substance misuse services to individuals in or at risk of being in the competency system. The Fines Committee funds care managers, a behavioral health navigator and peer navigator, and partial salaries for the director and assistant director, as well as costs directly related to clients' basic needs, emergency housing, community navigation, and leasing an office space.



## United Way of Weld County

**$1,421,440** - Transitioning competency-involved individuals from the Weld County Jail to the community by providing rapid rehousing and emergency housing services, case management, assistance with benefit acquisition, and wraparound services.



## 1st Judicial District Competency Docket

**$95,127** - Establishing a docket coordinator position to support the 1st Judicial District Competency Docket.



## Pulse Line Collaborative Training

**$1,058,270** - Providing training and resources to law enforcement, first responders, and caregivers to reduce unwarranted use of force incidences and the number of individuals with behavioral health disorders and disabilities being arrested and confined.



## City of Greeley Homeless Solutions

**$111,835** - Serving individuals in Weld County who are competency-involved by providing benefit acquisition, employment support, permanent housing vouchers, bridge housing, and wraparound services; funding also supports a .25 FTE case manager and .25 FTE peer specialist.



## 12th Judicial District Competency Docket

**$69,555** - Establishing a Docket Coordinator to support the 12th Judicial District Competency Docket.



## National Alliance on Mental Illness (NAMI) Colorado

**$91,030** - Providing evidence-based peer programming for patients and staff of the Colorado Mental Health Hospitals in Pueblo and Fort Logan



## Servicios de la Raza Peer Support

**$466,750** - Supporting a peer-led model to provide culturally and linguistically responsive recovery support services to individuals involved in or at risk of being involved in the competency system; funding provides for personnel, client support, supplies, and equipment.

## Douglas County Sheriff's Office Data Diversion Project

**$683,300** - Establishing a data-driven program to enable the 911 emergency system of Douglas County to rapidly connect callers with behavioral health resources to reduce the number of individuals who become involved with the state competency restoration system; funding supports software licensing fees, staff overtime, a project manager, treatment services, equipment, and supplies.



## Denver County Court Competency Support Docket

**$280,609** - Establishing a support docket for all misdemeanor cases in which competency has been raised to redirect cases from the State competency process; funding supports a coordinator, clinical screener, and supportive wraparound services for clients, including emergency housing.



## Homeward Alliance Larimer County

**$217,800** - Coordinating case management, wraparound services, and housing navigation for 25 clients.



## Boulder County Community Justice Services

**$505,842** - Supporting aspects of the State Court Bridges Program, including the provision of access to services to enable the release from custody for competency clients.



## Ava Health

**$5,409,084** - Developing and operating a vertically-integrated treatment organization in Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, intensive outpatient treatment, and partial hospitalization.

# Previously-funded Programs
### *Funded between 2018 and 2023*



### Denver Health

**$3,270,000** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.



### Mesa County Pretrial Community Alternative Placement

**$27,900** - Diverted individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. The Fines Committee funded inpatient treatment for clients in the PreCAP program.



### IMPACT Integrated Insight Therapy

**$1,178,000** - Diverted 22 individuals on whom competency was raised by providing dedicated program housing with treatment and wraparound services.  The Fines Committee funded case managers, house managers, peer support professionals, monitoring services, and houses in rural Colorado.



### AllHealth Network Bridges to Care

**$56,729** - Supported the implementation of the Arapahoe County Competency Docket by doubling the capacity of Bridges of Colorado, providing client case management and treatment support.



### Assisted Living of Aurora

**$270,688** - Provided supportive temporary beds to enable client benefits enrollment to fund longer-term out-of-custody placement during restoration.



### Solange Assisted Living

**$600,000** - Offered assisted living residences, in-house outpatient restoration, treatment, case management, peer support, medication management, transportation, and other supportive services to competency-involved clients in Mesa County and throughout the Denver Metro area.



### Denver Sheriff Department

**$663,114** - Supported the Denver Restoration Treatment Unit, a jail-based initiative that provides programming focused on competency restoration, general mental health needs, and enhancing life skills.



### REACH Docket Competency Screener

**$17,850** - Provided additional screening and evaluation capacity to the 2nd Judicial District REACH Docket.



### Colorado Mental Health Institute

**$669,850** - Purchased and provided cellular phones, access (minutes), and transportation for competency-involved individuals during the pandemic, as well as laptops and related expenses for providers and local jails to allow pandemic-era competency services to continue.



### Community Based Enhanced Restoration

**$400,000** - Provided Assertive Community Treatment to individuals so that they could be released on bond and restored to competency out-of-custody. The Fines Committee also funded housing options for clients who would otherwise be homeless.



### Embark Assisted Living - Renaissance

**$420,820** - Provided eight licensed transitional assisted living beds, called Renaissance, in El Paso County to competency-involved individuals.  24-hour staffing supervision and programming geared toward participants' health optimization, reinteigration into the community, and assistance with long-term placement were also provided.



### Peak View Behavioral Health

**$440,800** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.



This document is updated quarterly; as such, it does not reflect up-to-the-minute expenditures and funded projects.