

Groundswell Services, Inc.

---

# SPECIAL MASTER REPORT to JUDGE WANG

*May 28, 2025*

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of
Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental
Health Institute at Pueblo, Defendants.

May 28, 2025

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our May 2025 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, the Consent Decree requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) as they attempt to improve competency-related services for criminal defendants with psychiatric illness. Specifically, the Consent Decree (p. 24) indicates,

> *(i)* As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter. The Special Master's status report was submitted on January 28, 2019. Dkt. 146. The next report shall be submitted to the Court and the Parties on March 28, 2019, and then May 28, 2019, and then quarterly thereafter. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> *(ii)* The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

As you know, the Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with time frames and deadlines mandated in the Consent Decree. The Department initiated these steps and demonstrated meaningful early progress. Both the wait list, and the time detainees spent waiting, were decreasing throughout the first year the Consent Decree was in effect.

Exactly one year later, in the spring of 2020, the COVID-19 pandemic brought the Department unforeseeable challenges and progress stalled. COVID-related

complications reversed progress on most metrics. Even after the pandemic relented, many setbacks remained. In particular, the Department faced tremendous difficulties staffing their facilities, which left unused hospital units, and less capacity to serve the people in jail awaiting transfer to those units. Similar difficulties were common across the country, and states vary in the degree to which they have begun to improve.

In the latter half of 2023, Colorado made dramatic progress towards the goals of the Consent Decree. For example, after the waitlist peaked at 483 detainees in June 2023, it then decreased by half (to 241) by late June of 2024. Across the calendar year of 2024, the waitlist decreased from 383 in January to 247 in December, hitting its lowest point (208) at the end of October, 2024. Why? Across late 2023 and much of 2024, state hospital units reopened, and the Department secured new beds, moving more people from the waitlist to inpatient beds. For at least one year, the Department admitted more than 300 people to inpatient restoration every quarter—the most since the start of the Consent Decree. The Department better prioritized Tier 1 Detainees, such that only 16 Tier 1 Detainees were waiting in county jails as of October 31, 2024 (as compared to 40 one year before). Newly opened Mental Health Transitional Living homes (MHTLs) began providing a crucial level of care that had long been lacking in Colorado. In short, *improvements were steady and consistent for over one year* (i.e., five quarters).

*However, last quarter was the first quarter in over one year when these improvements paused or even regressed.* This quarter was similar. As detailed later, much of this downturn was prompted by an unprecedented "spike" of evaluation orders in October 2024. The 221 orders for jail-based competence evaluations in October comprised 54 more orders than the prior annual record of 167 orders (an increase of roughly 33%). Of course, this led to a corresponding spike in inpatient *restoration* orders. Several additional factors exacerbated the delays attributable to the increased court orders for evaluation and restoration. The Department has slowly recovered from this spike in evaluation orders (that is, all evaluations are now completed on time). But combined with other challenges, movement from the jail to the hospital remains slower.

The Department certainly did not lose *all* the progress they have made. For example, the waitlist at the end of April 2025 (357) has increased far beyond the record low six months earlier (208 in October 2024), but it remains lower than almost two years ago (i.e., the record high of 483 in June 2023). Likewise, wait times have continued to increase this quarter over last quarter, but they have not returned to their worse point. Once again, this quarter underscores the truth that *even steady improvements are precarious, and they are vulnerable to certain influences outside Department control* (i.e., increases in arrests and orders for evaluation). The Department will need to accelerate hospital admissions and treatment.

This Quarterly Report, like all prior reports, will review key metrics as required, and provide other updates on the functions prescribed in the Consent Decree.

# **Table of Contents**

Context for Quarterly Metrics ....................................................................................... 5

Key Metrics for Progress: ............................................................................................... 8

Compliance with Time Frame Requirements ............................................................... 8
    Key Metric: Competence Evaluation Time Frames ...................................................... 9
    Key Metric: Time Frames for Admission to Competence Restoration ......................... 11
    Key Metric: The Waitlist for Competence Restoration Services ................................. 14

Other Consent Decree Updates .................................................................................... 17
    Interim Jail Mental Health Treatment ....................................................................... 17
    Release of Pretrial Detainees for Community-Based Restoration Treatment ............. 19
    Notification of Non-Compliance with Time Frames .................................................. 23

Consent Decree Section VII Updates ............................................................................ 28
    Civil Bed Freeze .......................................................................................................... 28
    Comprehensive and Cohesive Plan ............................................................................ 30
    Increase Community Restoration Services ................................................................. 33

Conclusion ................................................................................................................... 36

Appendix 1 .................................................................................................................... 37

Appendix 2 ................................................................................................................... 38

Appendix 3 ...................................................................................................................60

# Context for Quarterly Metrics

*(Note: This shaded section remains unchanged across reports to provide historic context for new readers.)*

***Historic Context:***
Historic vulnerabilities in Colorado's public mental health system set the stage for the past two decades of competence-related challenges. For decades preceding the Consent Decree and the pandemic, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that was able to operate selectively, routinely declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the country, and other states were beginning to experience a "competency crisis." Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the details and the spirit of the Consent Decree. We tend to summarize the overall spirit and provisions of the Consent Decree in three goals:

1. Reducing the *number* of people on the waitlist for restoration services.
2. Reducing *wait times* for people on the waitlist, particularly those with severe illness.
3. Reducing *harm* (by providing *care*) to people on the waitlist.

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the Department could not keep pace with court orders for competency services, and the waitlist grew. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, more than 80 beds at CMHHiP remained unusable because there was not sufficient staff to operate the units. In July 2023, the waitlist peaked at 483 people.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Detainees. Over the past few years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year. *Indeed, the Department has now reopened nearly all beds that were closed during the pandemic, and hospital capacity now approximates the capacity before the pandemic.* The Department also prioritized the opening of Mental Health Transitional Living homes, creating community-based opportunities for people ordered to competence restoration as well as hospital patients who were otherwise difficult to place in previously existing community settings.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Staffing shortages (exacerbated by COVID-19) even further limited CMHHiP admissions. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree. These delays continue, though less severely; average wait times still exceed those mandated by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, amid slow admissions, many Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

## Recent Context

Across much of 2023-2024, the Department increased capacity for inpatient restoration: they re-opened 39 beds at CMHHiP, they opened the second new 22-bed unit at CMHHiFL, and they expanded the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds. These changes alone significantly reduced the waitlist. The Department also transitioned some long-term patients into new Mental Health Transitional Living (MHTL) homes, and they also admitted a few others directly from jail. These MHTL homes now serve more than 70 patients, across five newly opened homes, with more openings scheduled for the spring of 2025. Indeed, they expect 164 beds available by the end of summer 2025. Transitioning long-term patients from the hospitals increases capacity for more patients who will require less time in the hospital, opening beds sooner. With increased capacity, the Department achieved roughly five quarters of steady improvements (i.e., decreases in the wait list and most wait times). The waitlist figure at the end of last quarter (i.e., 208 in October of 2024) was the lowest in several years.

Unfortunately, the progress that was so steady through late 2023 and most of 2024 paused last quarter, and this quarter again featured greater delays. Much of the problem began with an unprecedented "spike" in court orders for competence evaluation during October 2024 which, of course, led to increased orders (and wait times) for competence restoration in the subsequent months. This downturn certainly did not *negate* 15 months of steady improvement, but it did *pause* the steady improvement.

As we anticipated in the last quarterly report, there have been ongoing effects from the recent spike in evaluation orders, and some related changes. For example, whereas the Department tended to receive as few as three orders for inpatient treatment per day, on average, January 2025 averaged *more than six per day*. By April, this had to decreased to roughly 4.5 orders per day, but this average remains higher than the previous year, and the cumulative effect of more daily orders is greater delays in admission. The Department has limited control over "inflow" of this sort, and increased inflow certainly slows evaluation, admission, and restoration. Additionally, discharges, or hospital "outflow," slowed from a recent average of more than three per day to just over two per day. Consequently, the Department's internal projection model—which has appeared generally accurate over the past several months—now suggests a much slower pace to compliance with the Consent Decree, with no compliance until 2028. This projection can change—if orders, admissions, and discharges change—but the current estimate is bleak.

The Department continues to exert strategic efforts over every point they can control (e.g., evaluations and restoration), and attempts collaboration with other stakeholders to better influence the variables that are less under their control (i.e., court orders for evaluation and restoration). We have encouraged the Department to also renew focus on processes in the hospitals—a context over which they have greatest control—though as we have long emphasized, the solution to this crisis requires far more than the hospitals.

With this broad history and recent developments in mind, this Quarterly Report will review the key metrics that the Consent Decree requires us to monitor and report.

# Key Metrics for Progress:

## Compliance with Time Frame Requirements

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> *(i)* As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such ***reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services*** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> *(ii)* The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they are our starting point in the report, as well as a primary focus. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

# Key Metric: Competence Evaluation Time Frames

***33. (b) Performance of Jail Competency Evaluations.*** The Department shall
complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached
table (Table 1), after the Department's receipt of a Court Order directing the evaluation and
receipt of Collateral Materials. This timeframe requirement shall apply to the following
counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver,
Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo,
Teller, and Weld. Counties not specifically identified are counties that use the "Hold and
Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be
offered a meeting date within 30 days of the Department's receipt of the Court Order and
Collateral Materials, and the evaluation will be completed within 30 days of the meeting.
Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be
offered a meeting date within 30 days of the Department's receipt of the Court Order and
Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

Historically, the Department met most evaluation time frames, even before the 2019
Consent Decree and even through most of the pandemic. Court orders for jail-based
competence evaluations dropped to an all-time monthly low at the start of the pandemic
(e.g., 56 people in April 2020). But arrests and orders for jail-based evaluations
resumed dramatically, peaking at an all-time monthly high two years after the pandemic
began (i.e., 178 in March of 2022). After staffing shortages in Court Services caused
delays during some of 2020, the Department returned to almost perfect compliance
with evaluation time frames for the vast majority of the next four years.

However, in October 2024, *the Department received an unprecedented spike in orders
for jail-based competence evaluations*. At 221 orders, this far exceeded the prior 2024
average of 155 orders per month. This spike was a tremendous challenge to the
Department.  Not surprisingly, Court Services was unable to complete these evaluations
within required timelines.  Last quarter, orders for jail-based evaluation averaged 161
per month—still above average—but fewer than the unprecedented and inexplicable 221
orders in October of 2024. This quarter, they decreased further, averaging 151 per
month, a rate that remains challenging, but closer to average figures for the prior years.

| Average waiting time (in days) for a competence evaluation[1] | | | | | |
|---|---|---|---|---|---|
| | Nov 24 - Jan 25 | Feb 2025 | Mar 2025 | Apr 2025 | Requirement |
| Jail-based Competency Evaluations | 31.8** | 27.5* | 19* | 19* | 21 days |
| Inpatient Competency Evaluations | n/a | n/a | n/a | 23.3 | 14 days |

** = at least one Detainee waited longer than the maximum time frame for the evaluation

For the past several years, the Department's Court Services unit maintained near-perfect compliance with timelines even amid a high volume of court orders for evaluations. They maintained compliance amid significant staffing shortages, making their achievements more impressive, but also more precarious. In the prior quarter (November 2024-January 2025) the October 2024 all-time-high spike in orders for evaluation was more than the team—already understaffed and stretched thin—could handle. Court Services grossly exceeded the 21-day deadline, on average. For the first time in many years, average wait times for evaluation exceeded the permissible time frame, and most detainees who were evaluated waited longer than the Consent Decree permits: an average of 32 days, as detailed in the table above.   However, this quarter, Court Services has generally recovered from the surge in evaluation orders in October.

For the past few months, Court Services returned to their usual pattern of completing all evaluations within the 21-day deadline, even amid ongoing staffing challenges. Though still delayed in February, March and April featured near-perfect compliance again.

Regarding inpatient evaluations, a total of four were ordered, but two were resolved in other ways, and only two were admitted for evaluation.

*Orders for **jail-based** evaluations remained high (monthly average of 151) but Court Services has returned to their usual near-perfect compliance with evaluation timelines. Only two detainees were admitted for inpatient evaluations.*

[1] Information retrieved from the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, pp. 22, 31.

# Key Metric: Time Frames for Admission to Competence Restoration

## Historical Context

Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. Defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE had waited, on average, 71 days. The Consent Decree then mandated a triage system,[2] requiring Tier 1 defendants to begin restoration services within 7 days and Tier 2 defendants within 28 days. Wait times and the number on the waitlist initially decreased *until* the onset of the COVID-19 pandemic, but they greatly increased thereafter. Those wait times continued to remain far out of compliance even after the pandemic subsided. ***Although wait times improved steadily for over one year during 2023-2024, this is the second quarter that delays have increased.***

| *Recent Wait Times for Inpatient Restoration for Pretrial Detainees[3]* | | | | | | |
|---|---|---|---|---|---|---|
| **Month** | **Number "admitted or ended" for inpatient restoration** | | **Average days waited before "admitted or ended" on inpatient restoration order** | | **Number waiting more than the maximum days for admission to CMHHiP inpatient restoration** | |
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| Apr 2025 | 17 | 63 | 56.3 | 83.8 | 17*** | 55** |
| Mar 2025 | 14 | 86 | 51.6 | 65.9 | 12** | 64** |
| Feb 2025 | 14 | 71 | 72.0 | 65.3 | 14*** | 63** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

\*\* = most Detainees waited longer than maximum time frame for restoration services
\*\*\* = all Detainees waited longer than maximum time frame for restoration services

---

[2] See Consent Decree paragraph 43.

[3] According to the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, p. 14.

Again, the Department remained *mostly out of compliance* with time frames to admit defendants for restoration services. Between February - April 2025, the Department was noncompliant with the 7-day time frame for all but two Tier 1 Detainees admitted (of 45 total). Of the 220 Tier 2 Detainees admitted in that same period, 182 were admitted or had their waits otherwise ended beyond their time frame of 28 days. Overall, across both Tier 1 and Tier 2 admissions, this reflects only a 15.1% compliance rate (40 Detainees out of 265 admissions), which falls between the past two quarters' rates (14.3% and 16.8%, respectively).[4] This trend remains far below acceptable rates.

| *Average Wait (in days) for Inpatient Competence Restoration Services[5]* | | | | |
|---|---|---|---|---|
| | **May– Jul 24** | **Aug– Oct 24** | **Nov 24 – Jan 25** | **Feb - Apr 25** |
| **Tier 1** | 69.2 | 40.3 | 47.5 | 59.7 |
| **Tier 2** | 104.1 | 95.3 | 80.3 | 70.8 |

Pretrial Detainees are waiting far longer than Consent-Decree time frames allow:
- Tier 1 detainees more than *8 times longer than allowed* by the Consent Decree (i.e., 59.7 days on average between February – April 2025 rather than 7 days).
- Tier 2 Detainees wait *two and a half times longer than allowed* by the Consent Decree (i.e., 70.8 days on average between February – April 2025, rather than 28 days).

These wait times are better than those during the pandemic years, but not better than very recent history. The average Tier 1 wait times increased by about another week from recent quarters' averages. Concurrently, Tier 2 wait times continued to decrease, such that *they are the shortest since 2022*, with Tier 2 average quarterly wait times reflecting a sustained decrease for more than a year. Unfortunately, far fewer Tier 1 Detainees were admitted during this past quarter than in any other quarter for the past several years, with only 45 admissions. (In addition, the number of Tier 2 admissions remained at a relatively low point compared to the past year.) Overall, this is a troubling sign for the triage system, which has consistently been one of the bright spots of the Consent

---

[4] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for clinical status and actual need for urgent admission.

[5] Information retrieved from the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, p. 14.

Decree era. A critical component of the Consent Decree is "admitting the sickest the quickest," and although Tier 1 admission averages are shorter than Tier 2 admission averages, they are still far too long – with far fewer people admitted this quarter than any other quarter in recent memory. Consequently, *this quarter featured more Tier 1 Detainees waiting for admissions beyond seven days than any quarter in the past year*. An average of 45 Tier 1 Detainees were waiting beyond seven days at the end of each month this past quarter, compared with an average of only 15.5 across the previous three quarters.

In summary, these metrics suggest that the current quarter continued to reverse the progress that had continued so steadily for much of 2024. Consider one of the starkest metrics: the total number of people admitted to inpatient restoration this quarter (265) was the lowest in at least one year (after 287, 308 and 306 in the previous three quarters). Inevitably, admitting fewer detainees leaves the other detainees waiting longer.

In short, wait times remain unacceptable. On average, Detainees wait roughly three to eight times longer than the prescribed Consent Decree time frames.[6] As the number of people waiting in jail for inpatient restoration increased during the past quarter, so did Tier 1 wait times. Approximately 85% of Detainees who were admitted exceeded their maximum allowable wait times in jail.

*The number of people awaiting restoration, and their corresponding wait times, remain far out of compliance this quarter. On average, Detainees wait about three to eight times longer than Consent Decree time frames allow. Only 15.1% were admitted within Consent Decree time frames. Tier 1 time frames lengthened, though one bright spot among the metrics was that Tier 2 time frames decreased. Finally, the number of Tier 1 Detainees admitted was markedly lower than any previous quarter over the past year. Overall, most Detainees wait far too long in jails before they are admitted to inpatient restoration.*

---

[6] Recall that wait times are ended upon admission to CMHHiP or RISE, *or when ended for other reasons* (i.e., a case is dismissed or the court changes an order for inpatient restoration to an order for outpatient restoration when on-bond in the community). For example, among 265 "admitted or ended" between February and April 2025, only 181 defendants were actually admitted to an inpatient facility. The other 84 Detainees had charges dismissed or vacated, or they were released on bond.

# Key Metric: The Waitlist for Competence Restoration Services

**Historical Context**
The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. Of course, the size of a waitlist matters less if wait times are minimal. But to the extent that detainees are waiting for weeks or months on the waitlist, it becomes important to minimize the size of that waitlist.

Before the Triage system, the waitlist averaged around 170 defendants. By June 2020, the waitlist dropped below 100, and the Department projected that the waitlist would be minimal by December 2020. But the pandemic reversed that progress and changed all projections. The waitlist grew throughout the pandemic, and even after the pandemic ended, amid staff shortages and closed hospital units. In May of 2023, the waitlist peaked at 483 Detainees and even remained over 400 until December 2023.

**Current Realities**
Since May 2023, the reopened beds at CMHHiP, increasing capacity in the Mental Health Transitional Living homes, and several fines-funded programs created much-needed inpatient restoration capacity. Subsequently, the Department admitted many more detainees than in previous years, and the overall number of persons on the waitlist declined substantially throughout most of 2024. Unfortunately, this trend reversed in October 2024, amid a spike in orders for evaluations, and the waitlist has only increased again since then.

The number of court orders for competency restoration remained generally stable for most of 2024, but increased dramatically in October 2024. The prior 12 months averaged 128 individuals ordered to inpatient restoration per month; this past quarter averaged 141 per month. Thus, the number of people awaiting inpatient restoration increased from 208 in October 2024 to 284 in January 2025, and now 357 at the end of April 2025. Although this is still far below May 2023's high of 483, there are now 60 more people on the waitlist than at this time last year – this trend is alarming.

| *Number of Defendants Waiting for Inpatient Restoration*[7] | | | | | |
|---|---|---|---|---|---|
| | **March 2019** | **Nov 24 - Jan 25** | **Feb 2025** | **Mar 2025** | **Apr 2025** |
| **Combined** | 157 | 249 | 314 | 316 | 357 |
| **Tier 1** | N/A | 27 | 55 | 51 | 47 |
| **Tier 2** | N/A | 222.3 | 259 | 265 | 310 |

Figures reflect the number of persons waiting for restoration on the last day of the respective month.

[7] According to the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, p. 10.

The number of Detainees waiting is trending higher. It has continued to increase since a low of 208 in October 2024.  This past quarter reflects a continued reversal after what had been a sustained quarterly decrease (improvement) for more than one year.

| Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month[8] | |
| --- | --- |
| March 2019 | 157 |
| June 2023 (high point) | 483 |
| April 2024 | 297 |
| May 2024 | 270 |
| June 2024 | 241 |
| July 2024 | 227 |
| Aug 2024 | 216 |
| Sep 2024 | 216 |
| Oct 2024 | 208 |
| Nov 2024 | 217 |
| Dec 2024 | 247 |
| Jan 2025 | 284 |
| Feb 2025 | 314 |
| Mar 2025 | 316 |
| Apr 2025 | 357 |

[8] According to the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, p. 10.

*Qualitative review and extraordinary cases:* As we emphasize in each report, the waitlist is not simply a metric, but rather a group of *people* with psychiatric illness awaiting much-needed treatment. Each week, we review the Forensic Navigators' updates on each person in jail who has been waiting for inpatient restoration longer than the Consent Decree allows. In that review, we see many acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability, or who languish with severe symptoms of untreated psychosis. These conditions leave them vulnerable to self-harm, victimization, worsening psychiatric illness, or new charges.

Over most of 2024, we had been encouraged that the number of people whom *we* categorize as the sickest and most vulnerable Detainees remained relatively few. That was certainly a reflection of the decreasing number of Detainees overall, as well as the Department's ability to admit Detainees more quickly. However, as mentioned previously, the number of Tier 1 Detainees on the waitlist (those whom the competence evaluator identifies as most severely ill) has increased from a recent average of 19 up to 45 this past quarter. Consequently, the number of Detainees that we consider most in need of immediate hospitalization has also increased substantially this past quarter. In any week, there are now about 20 people for whom we urge immediate hospitalization, as compared to about 10 on average for most of 2024. We affirm the efforts of the Forensic Support Team and all relevant hospital admissions teams, but we remain concerned for these sickest and most vulnerable Detainees who desperately need inpatient care.

Although we have discussed the decreasing number of Tier 1 admissions per month, the consequences bear repeating. The Consent Decree emphasized the need to place Detainees into restoration services promptly, with more aggressive time frames for the subset of the very most acutely ill (Tier 1 Detainees). This triage system is at the heart of the Consent Decree, addressing the reality that some people are *so* sick that they simply cannot wait safely or humanely in a county jail cell. Historically, the Department has prioritized those Tier 1 admissions, and in the earliest quarters, the Department *consistently met* the seven-day Tier 1 admission time frame. However, this month marked a dramatic decrease in the number of Tier 1 Detainees admitted (45, as compared to an average of 77 across the three previous quarters). The decrease is especially worrisome given that hospital capacity has reached a reasonably high mark compared to previous years.

*After more than one year of steady progress, the number of people waiting in jails for restoration services increased again this quarter to 357 at the end of April 2025. Although many Detainees were admitted to hospitals this past quarter, many more very sick and vulnerable Detainees waited in county jails than in recent memory. The overall waitlist remains longer than it was at the start of the Consent Decree, wait times are still far out of compliance for most Detainees, and the waitlist includes many people in acute psychiatric crisis. Admissions **must** increase, with capacity for inpatient restoration as well as alternatives to hospital-based restoration. Finally, Tier 1 admissions must again be prioritized for admission.*

Other Consent Decree Updates

# Interim Jail Mental Health Treatment[9]

---

**34. *Interim Jail Mental Health Treatment.*** If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

---

## Historical Context

The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to detainees involved in competency matters until their transfer to competency restoration services.

## Current Realities

The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees, and Competency Enhancement Team (CET) staff had been dedicated to enhancing services for Pretrial Detainees awaiting restoration. However, CET funding has been eliminated by the Colorado Legislature, and all CET services will end in July. The exact impact of this change is unknown, but we anticipate it will be detrimental to Detainees as they await restoration services, amid less support. The Department has predicted that it will be more difficult for the Forensic Support Team Navigators to access critical mental health treatment and crisis information from county jails, since CET personnel have to date been the sources for that information. Timeliness and reliability of information will almost certainly suffer. Fortunately, the FST has been resilient in solving similar problems previously, and JBBS services will continue, but these new conditions are troubling.

---

[9] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

We continue to recommend involuntary medication orders, assertive community treatment, and broader criteria for involuntary evaluation and treatment to address unmet mental health needs among persons who lack the capacity to make informed choices about their care *and* who experience worsening physical or mental health status due to their symptoms. Some mechanisms are emerging to facilitate these types of approaches:

- Denver County is attempting to utilize probate court to shift certain competence cases to the civil court system where monitoring and court involvement will continue.
- HB 1355 will place Bridges liaisons in courts across Colorado to facilitate diversion in cases where diversion and deflection are viable alternatives to competence restoration. Currently this program operates without full staffing, yet even so a handful of individuals have been diverted to civil commitment rather than the competence system.  Though this approach is conceptually promising, it is still too early to gauge impact, and many stakeholders remain concern that Colorado lacks the kind of community mental health care necessary to fully support this type of diversion.
- The bi-monthly meeting of the Steering Committee (a collection of stakeholders invested in the competency-service system) is shifting towards more focused exploration of assisted outpatient treatment.

We affirm any efforts to shift people at risk for the competence system to the civil system when mental health care and support is indeed the primary mitigation against future criminal legal involvement. However, *these sorts of programs and initiatives require a well-functioning, accessible civil mental health system. Developing this type of robust, civil mental health system is not solely within OCFMH control.* The new BHA should provide the backbone of new civil treatment options, but the BHA remains quite new. We affirm the Department's conversations with leadership from other stakeholders (law enforcement, corrections, private mental health, judges, and persons with lived experience) to enhance Colorado's civil mental health options. Yet most of the best "upstream" innovations that the Department would like to implement require a more robust, effective civil mental health system than currently exists in Colorado.

# Release of Pretrial Detainees for Community-Based Restoration Treatment[10]

> **35. Release of Pretrial Detainees for Community-Based Restoration Treatment.** If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would be doubled were not for their persistent efforts to shift so many detainees into the Department's robust outpatient competency restoration program and community supports.

## Housing

The Forensic Support Team (FST) Navigators (described below) continue to facilitate transitions from jail to community housing across the state. Most community housing options are near Denver and Colorado Springs, but the Fines Committee now supports housing across most regions of Colorado. The total number of housing placements and beds funded by the Fines Committee remains high; a forthcoming site on the Western Slope will provide housing and care for more than 50 people beginning in late 2025. Most of these housing options offer additional treatment and supportive services. Mental Health Transition Living (MHTL) homes provide additional community housing and services as well; they prioritize "difficult to place" patients in the state hospitals or those who are transitioning from the waitlist to the community. These MHTL beds are critically important as they provide community housing and service options for hospitalized people who have traditionally been very hard to discharge. More than 95 beds are already occupied, and a total of 164 beds are anticipated by the end of 2025. The MHTL homes remain among the Department's best strategies to improve the overall scope of public mental health services in Colorado, and their impact will certainly extend beyond the competence-services system. This quarter, the MHTLs have expanded their "Level 2" capacity significantly; this provides housing to people with more acute mental health needs. Several other fines-funded housing initiatives provide dozens of beds for people in the competence system, such as the Ananeo, Valor, Monarch, and Fidelity programs. Please see Appendix 3 for a description of these various housing-first programs.

---

[10] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

*Forensic Support Team (FST):* FST Navigators continued contacts with Pretrial Detainees continued this quarter, but some changes in frequency require additional investigation. In April 2025, FST Navigators were assigned to 947 persons in county jails waiting for competence evaluations and/or inpatient restoration services – an increase from 889 in January.  Of course, increase is attributable to the growing number of Detainees waiting in jails for competence restoration services.

Recall that October 2024 showed a tremendous spike in the number of orders for competence evaluations; although that number has reverted to more historical averages, the numbers of contacts and services from the FST has varied since then. For persons awaiting evaluations in jail, the FST recorded an average monthly total of 84 face-to-face contacts (representing an increase from an average of 61 the past quarter) and 199 contacts with care teams or other stakeholders during the past quarter (a slightly downward trend).

Although the average monthly number of evaluations has decreased substantially, there was a rise in persons found incompetent and order to restoration waiting in jails. This is reflected in the rising number of people on the waitlist, which brings a heavier workload for the FST. For individuals awaiting restoration services this quarter, Navigators met face to face with Detainees an average of 659 times per month (a substantial increase from 447 the previous quarter) and had 2,009 contacts with community care teams or stakeholders (another massive increase from the previous quarter's average of 1,530).[11] The workload with Detainees awaiting restoration services for the FST has grown substantially this quarter. As always, these numbers represent tremendous time and effort devoted to Detainees.

The FST also continues to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from CMHHiP or CMHHiFL to the community, placing appropriate Detainees into community-based specialty programs (such as Fines-funded settings), working with competency dockets to facilitate quicker hearings and community restoration, advocating for dismissal of charges or resolution of competency for those who have stabilized, and more. Several thousand CMHHiP bed days have been "saved" through these combined efforts. The FST works with many community service programs every day; one example involved a man awaiting restoration who stabilized while in the jail and was transitioned to a fines-funded community housing initiative well before an inpatient bed would have become available. Also, a man was transferred to a specialized community facility to manage his cognitive deficits, rather than wait longer for a precious geriatric bed at the state hospital. The FST Navigators accomplish these types of outcomes daily, and their impact is truly meaningful.

Finally, Navigators continue to work closely with specialty judicial initiatives. These

---

[11] According to the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, pp. 35-38.

include (but are not limited to) the Larimer County Competency Court, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. These programs are discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets (see Appendix 2), and they continue to coordinate efforts with Bridges liaisons and other court-appointed staff within the new competence dockets. HB 1355 has expanded the role of Bridges liaisons in coordination with competence dockets, and the FST Navigators remain good partners with these other professionals. We continue to affirm the Navigators collaborations with these innovative programs.

Overall, the FST continues to be a strength within the Department, collecting information from JBBS providers, Competency Enhancement Teams, deputies, and others in the jails. Despite some decreased metrics this quarter, outcomes from the FST remain strong despite difficult conditions and high demand for their services.

## Transportation of Pretrial Detainees

> **36. Transportation of Pretrial Detainees.** If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

Two defendants were admitted to inpatient facilities for inpatient competence evaluations this past quarter.[12] This follows a quarter in which no Detainees were admitted to an inpatient facility for competence evaluation. This quarter, five court orders for inpatient evaluation occurred, but three were converted to jail-based evaluations while waiting for inpatient admission. Most Detainees waited longer than maximum time frames for these orders for inpatient evaluation to be resolved.

For the first time in years, the Department has begun to report problems with transportation of their patients to and from the state hospitals. Details are not yet clear, but we will report on this in our next Quarterly Report if the problems persist.

---

[12] According to the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, p. 21.

# Notification of Non-Compliance with Time Frames

*38. Notification of Non-Compliance with Timeframes.* The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.
(a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii) The Pretrial Detainee's location; (iii) The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;[1]
(b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.
(c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

*Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals, and to support their work after they receive funding). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not supplant, existing services. The Department has provided notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

## Current Realities

For the five years that fines have accrued, the Department has completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by

Cordes & Company, LLP), which supports additional special projects that complement the broad goals of the Consent Decree. The Department reached the maximum amount for fines for the past several years (i.e., $10 million per year, then $12 million after adjustment for inflation). Their strong progress throughout 2024 raised the possibility that they may not be paying fines much longer. Indeed, the Fines Committee briefly stopped considering new applications. But recent setbacks leave us expecting the Department to pay fines throughout 2026 and likely beyond.

### Fines-Funding Impact: An Overview[13]

This quarter, the Fines Committee funding has supported 29 programs. One more program is completing its implementation period and is thus still ramping up to full capacity. The operational programs are serving individuals in twelve separate jurisdictions (1st, 2nd, 4th, 8th, 10th, 12th 17th, 18th, 19th, 20th, 21st, and 22nd), while Colorado Coalition for the Homeless, Denver FIRST, Ananeo Housing, Mile High Behavioral Healthcare, Fidelity Behavioral Health, and Valor serve individuals referred statewide. All told, these programs have served 2,063 individuals this quarter, up from 1,904 in Quarter 4 of 2024, and lower than 2,104 in Quarter 3 of 2024. Each of the programs has a goal to either divert individuals from the inpatient competency restoration waitlist or to support clients to make diversion from their criminal charge and/or from confinement feasible. Thus, assuming most clients being served by these funded programs would otherwise be on the in-custody competency waitlist, Fines Committee funding continues to make an impact on the restoration waitlist. In this quarter, ten programs provided housing to competency-involved individuals; Fines Committee funding provided housing for 220 unique clients (down from last quarter's 256). Additionally, two programs provide training for professionals and potential clients; this quarter the training programs reached 325 individuals.

The funded programs are contributing to a potential body of knowledge on competency impact in the justice system. Given most programs have been locally and organically developed to solve problems unique to each jurisdiction, they are experimental in nature. Standout program elements are detailed for several programs evaluated in this report; the most promising elements that may be replicated elsewhere in the state or country are described. Each program is unique in terms of goals, services provided, jurisdictional nuance, and data collection capacity, so continuous data collection process improvement is an ongoing effort.

---

[13] This summary is a condensed version of the detailed summary (part of a thoroughly detailed report) prepared by Kally Enright and Todd Spanier, of Strategy and Evaluation Consulting, the team that serves as a fiscal and quality monitor for fines-funded projects.

*Projects funded by the Fines Committee*

The top priorities for the fines committee continue to be projects that address housing, diversion from the competency system, and specialized competency judicial programs (e.g., competency dockets and calendars).

**Housing** remains a priority because the lack of housing is a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-housing for those involved in outpatient restoration. Those in outpatient restoration have generally shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing arranged through fines-funded programs.

Since the initial housing projects through CCH, the Fines Committee has increasingly funded new housing such options, such as Ananeo's supportive and sober housing, which serves roughly 20 individuals at any time. Likewise, the Embark program provides sober-living housing and day-reporting center, while Monarch provides sober-living housing and wraparound services. Often, the FST is able to arrange admission to these programs for detainees who are released or bonded from jail to complete outpatient competence restoration. This quarter, *Fines Committee funding provided housing for 220 clients (a bit lower than the 256 last quarter).*

**Diversion** programs, of course, divert people out of the competency system and into treatment, which can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped. The recent HB24-1355 should provide much more opportunity for court-directed diversion and deflection, but courts have only just begun to use this option.

**Competency dockets and related efforts** provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee has funded specialized competency judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, several "competency dockets" emerged across Colorado as more jurisdictions recognize the strengths of this model. As the state has taken more initiative in launching and supporting competency dockets, there is much less need for the Fines Committee to do so.

**Recent projects** include two particularly large-scale projects from which the Fines Committee expects substantial impact. As we mentioned in recent reports, the Fines Committee has supported Embrave with $8,902,175 to develop the Valor Program. The Valor Program now provides residential care to people who need intensive support and

stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility offers 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program now serves those in, or at risk of being in, the competency system, accepting referrals from the justice system and the community to support not only decreasing the waitlist but to also deflect and divert individuals from the justice and competency system. This large-scale service launched on time and accepts residents, though they are still building up to full capacity (not all beds are yet open). *Each month, we are grateful to see people leave the waitlist for a placement at Valor.*

Most recently, in October 2024, the Fines Committee funded ($5,400,000) Ava Health to provide a full continuum of care to individuals on the Western Slope. Ava Health will support the competency population and those who may be at risk of entering the competency system with an acute stabilization unit, residential care, partial hospitalization program, outpatient, and supported and independent housing. Leaders of Ava Health have significant experience with the behavioral health population, and for one year have been diligently exploring the needs of the Western Slope to develop the continuum of care Ava Health will offer. They have now purchased property/ buildings, which they are preparing to open later this year.

*A full info-graphic summary of fines-funded projects comprises Appendix 3.*

**An Emerging Fines-Funded Program:**

Ava Health is an integrative continuum of care scheduled to open in Grand Junction in August 2025. It will serve the Grand Valley, Mesa County, and the Western Slope. The continuum of care will include a 12-bed sub-acute stabilization unit and medical detox, a 24-bed residential program, partial hospitalization program, intensive outpatient program, outpatient services, and 48-beds of mental health transitional housing. Ava Health describes part of their mission as bringing private-pay types of services and experience to everyone regardless of payment mechanism.

In the last seven months, in order to ensure they are learning to meet the community's needs, Ava Health has established relationships with Mesa County and Grand Junction governments, justice stakeholders and providers. They sought out and formed relationships with the competency stakeholders in the District Attorney's Office, Public Defenders, Bridges, Forensic Support Team, Mesa County Sheriff's Office and local providers.

Ava Health is currently under contract to purchase: a 40+-acre property with three buildings on Grand Mesa in Molina to serve as the residential component of their continuum of care and the former 23,000+sq ft Rocky Mountain Health Plans headquarters in Grand Junction to serve as Ava Health's intake and outpatient facility, with potential to expand to bring in primary and dental care. After months of exploration, Ava Health settled on leasing three residential properties in Grand Junction to serve as a Mental Health Transitional Living Home, a recovery residence, and Level 3.1 care.

Ava Health has moved with remarkable speed, and is scheduled to open in less than one year from receiving Fines funding.

# Consent Decree Section VII Updates

## Civil Bed Freeze

> **39. Civil Bed Freeze.** The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

Since the start of the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures. The Department opened more than 70 competence restoration beds in 2024, and it has pledged to open 164 community beds in their system of MHTLs by the end of summer 2025 (see below). CMHHIFL will open a new restoration unit in late 2025, although the additional bed capacity will be almost totally offset by the termination of the Denver Health restoration bed contract. CMHHiP remains at full pre-pandemic restoration capacity. Still, despite this overall increase in restoration beds, civil capacity continues to lag, offering few inpatient options for persons who might be diverted from the competence system.

*We reiterate from our previous reports: civil inpatient capacity remains too low throughout Colorado.* Additional inpatient civil and forensic beds are critical to supplement Colorado's creative outpatient efforts. Successful and sustainable solutions to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious charges. Without a strong civil system, incompetency remains the easiest route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competence services system. We continue to encourage the Department to strongly pursue both civil and forensic funding and statutory changes that support both systems, especially as compliance with the Consent Decree approaches. Long-term sustained compliance will depend on the civil mental health system in Colorado. The MHTL homes are a prime example of community based civil resources: they prioritize step-down interim housing opportunities for people who are ready for discharge at a state hospital, pretrial Detainees in county jails, or people who are at substantial risk for entering inpatient competence restoration. These homes are one of the most *critical components of a full civil service system*, and a key step forward for the Department. The BHA is designated as the safety net and primary access point for civil services across Colorado, but the implementation of the full complement of BHA services has not yet happened, making the impact of the BHA unknown.

Thus, while we support the Department's push to reduce the waitlist by prioritizing

inpatient beds for competence restoration (the Department needs more restoration capacity as well), we continue to emphasize that any long-term solution must shift inpatient priority from forensic to civil beds. We have asked the Department to plan for the transition of some inpatient restoration beds to inpatient civil beds, once they approach compliance with the Consent Decree. However, the Department cannot exercise these decisions alone. Strong community and state partners (private hospitals, the BHA) must take ownership of the problem by creating more civil options for inpatient and outpatient care.

## Comprehensive and Cohesive Plan

> ***40. Comprehensive and Cohesive Plan.*** The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

### Historical Context

The Department first submitted a comprehensive, cohesive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. The latter report reviewed much of the progress the Department made and identified some broader vision of adjacent and "upstream" strategies that can reduce the competency-involved population.

As the pandemic continued, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, "a Comprehensive Plan for the competency system should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." *The Department made significant progress* on this type of comprehensive approach. In April of 2022, they pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these substantial developments in legislation and funding, along with other key plans. The Department organized their efforts according to six key strategies or "levers:"
1. Increasing inpatient beds;
2. Improving inpatient bed utilization (reducing waste);
3. Right sizing inpatient restoration beds;
4. Reducing the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed with the Department that these are the primary variables influencing the waitlist and wait times. But we also appreciated the efforts to expand the scope of their

focus to beds and services *in the community,* for a much more comprehensive approach to the crisis. Indeed, addressing the first several (inpatient) variables is crucial to decrease the current waitlist, but vigorously addressing the last few (community) variables is crucial for minimizing future additions to the waitlist.

In their 2023 Comprehensive Plan, the Department memorialized their plans to:
- Expand their use of community (private) hospital beds for the restoration population,
- Reduce the proportion of misdemeanor charges that lead to inpatient restoration
- Re-open and better use existing inpatient beds

In line with the goals detailed in this Comprehensive Plan, the Department received from the  Governor's office $57,967,379  in supplemental funds for FY 2023-24 to maintain private beds, then re-open and staff state hospital beds. These steps certainly decreased the waitlist.

**Current Realities**

In the Fall of 2024, the Department submitted their 2024 Comprehensive Plan. In it, they reviewed key successes, such as opening all closed inpatient beds and operating with full hospital capacity. They described contracting for 130 Mental Health Transitional Living (MHTL) beds, a tremendous improvement to their continuum of care (remarkably, financial efficiency will actually allow for the opening of 164 MHTL beds altogether). The Department's plan reflected their increased emphasis on data-informed planning. They formally shared their projection model, which can provide generally reliable estimates of wait list figures and eventual compliance dates, based on key metrics such as bed capacity, bed utilization, length of stay, and court orders for restoration. We have generally been impressed with the reliability of this simple model, and we encourage the Department to continue using it for planning. Also, related to data, the Department described improved data infrastructure for all competence services, allowing for better tracking, and reporting of outcomes.

In other efforts, the Department has improved collaborations and partnerships with the other state agencies that ultimately influence the demand for competence-related services. They described Colorado's efforts to reform behavioral health, particularly among closely aligned state agencies: the Behavioral Health Administration (BHA) and the Department of Healthcare Policy and Financing (HCPF), all of whom aim to establish a better "safety net system" to provide behavioral health services to vulnerable persons. We notice the Department efforts (even our routine meetings) are increasingly in conversation with these adjacent agencies, which will be important for systematic change.

We appreciate the strategies documented in the 2024 Comprehensive Plan. During this quarter, there remained (appropriately) little discussion of the next plan, which is not due until the Fall. But recent pauses in progress may need to prompt even broader strategies for the 2025 Plan.

*In recent years, Department efforts targeted the pressing needs for adequate staff and inpatient beds. More recently, they progressed with MHTL homes, and collaborative legislation to divert people with mental illness into community care. The state certainly needs more inpatient beds, along with coordinated efforts that steer people with mental illness away from jails and forensic hospitals, and into regular community treatment or civil commitments. With their latest plan, we see more attempted coordination with the emerging BHA services, recent mechanisms to support court-based diversion and civil certification, and the reliable data projections to inform progress.*

## Increase Community Restoration Services

> **41. (a)** Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's outpatient competency restoration program (OCRP) began in March of 2018, and has grown steadily since then. Referrals for outpatient restoration were strong this quarter, averaging 88.3 per month, more than any other quarter this year.[14] More than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. As always, we affirm the Department's success in building the largest, most robust statewide community-based OCRP program in the country. Of course, high OCR capacity ultimately reduces the restoration service demand on Colorado's two state hospitals. A total of 265 people were placed in OCR this past quarter, an increase from last quarter's total of 238.

### OCRP Outcomes

Data from February 2025 through April 2025 reveals a 39.7% restoration rate in the OCRP re-evaluation reports that the Department reviewed (46 of 116 total opinions). An additional 6.0% were opined as unrestorable (7 out of 116). The remaining 54.3% were opined as remaining incompetent. This reflects a higher OCRP restoration rate, compared to 30% and 31% in the two prior quarters. Data from the same period shows that courts found 28.1% of defendants restored to competence (57 of 203 total adjudications), lower than previous quarterly rates of 22% and 28%. The court dismissed charges and/or otherwise terminated restoration services in an additional 31.5% of these re-evaluation cases. The Department again surmised that less positive outcomes may be attributable to increasingly ill defendants (i.e., more severe psychiatric symptoms) ordered to outpatient restoration.

> **41. (b)** The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency-related services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). Currently, the Department contracts with Denver Health Hospital for 15 beds and Peakview Hospital for 80 beds; those contracted beds were filled on average at more than 95% capacity over the past

---

[14] All data in this section retrieved from the Department's Special Master Compliance Plan report for April 2025, submitted May 15, 2025, pp. 39-46.

quarter. However, Denver Health has notified the Department that they will not be renewing their contract with the Department after June 30, 2025, resulting in a loss of 15 critical inpatient beds.

There is no doubt that this inpatient restoration capacity (along with a concurrent increase in the availability of state hospital restoration beds) led to a substantial decrease in the number of people on the waitlist as well as the decreased average time to placement throughout much of 2024. Of course, inpatient restoration capacity cannot be the exclusive solution to Colorado's competence crisis. Indeed, the 95 private beds currently "rented" are short-term solutions – and that capacity will be reduced to 80 beginning July 1, 2025, without any concurrent increase in civil commitment beds. To reiterate our earlier concerns, while we affirm the Department securing these inpatient restoration beds at this critical time, *civil* inpatient capacity remains insufficient. The Department must ultimately prioritize civil inpatient capacity, with the goal that many individuals receive civil (rather than forensic) treatment. When compliance improves, we encourage the Department to continue to transition some restoration beds to civil beds in order to promote sustained compliance after the Consent Decree ends.

> **41. (c)** The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

## OCRP Baselines

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

| | **Inpatient Restorations** | **Outpatient Restorations** |
|---|---|---|
| **Initial baseline** | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| **November 1, 2021 goal** | 60% maximum | 40% minimum |
| **Recent progress (past 6 months)** | Nov 1, 2024 – Apr 1, 2025: 63.7% | Nov 1, 2024 – Apr 1, 2025: 36.3% |

For the past six months (November 2024 through April 2025), a total of 36.3% of all restoration orders were to outpatient restoration. This rate is similar to the past two quarters' rates of 35.5% each, and together they represent the lowest rate of outpatient orders in several years. Previously, the Department consistently met the 40% expectation for several consecutive quarters. The reason for this decrease is unknown, but it does correspond with a period of great challenges for Court Services over the past 9 months – delays in conducting timely competence evaluations, higher ITP rates than ever, and fewer recommendations for OCR. April 2025 saw rates increasing, and we will monitor the trend going forward.

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

The current figure, reflecting six months' worth of data between October 2024 — March 2025 (a lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 37.2% OCR referral rate among all evaluations conducted in jails. Month-to-month averages have fluctuated substantially, dipping as low as 24% in November 2024 but otherwise exceeding the 30% threshold in all other months. The 37.2% rate reflects an all-time high, with previous six-months figures of 36% and 24%. Although unprecedented in previous years, these rates consistently exceed the 20% goal.

Despite some mixed outcomes, the Department still operates the largest community-based OCRP in the nation. The OCRP provides crucial protection against an even greater "competence crisis" in Colorado, because so many incompetent defendants who are currently released to OCRP might otherwise be detained in a county jail, awaiting inpatient competence restoration.

*In summary, we continue to affirm the tremendous impact that OCRP has on the waitlist. The combination of persons ordered to OCRP overall (36.3% of all persons adjudicated ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (37.2%) suggests a robust OCRP program, even if overall numbers are slightly lower this quarter than compared with most quarters. A total of 265 individuals were placed in OCRP this past quarter, many of whom would have otherwise been placed on the waitlist, and remained longer in jail. The CDHS OCRP continues to divert and move hundreds of defendants from county jails and inpatient hospitals into community settings. The CDHS OCRP continues to be a critical asset in Colorado's competence services system.*

# Conclusion

This quarter was the second quarter in which most metrics worsened.  After five consecutive quarters (1.25 years) of sustained progress—including decreases in the wait list and wait times—the past six months have featured continued regress.  The problem seemed to begin with an unforeseeable (and now resolved) "spike" in court orders for competence evaluation, followed by some more subtle factors that contribute to delays. The Department has received more orders for inpatient restoration, but CMHHiP in particular has admitted fewer patients. With demand for services remaining high, it becomes increasingly difficult for the Department to provide services as rapidly as those services are ordered.

Neither this quarter nor the prior quarter have negated all the substantial progress of the preceding year. But it is a significant setback, which underscores just how precarious progress can be, particularly when OCFMH does not control the main contributors to competency-service demand (e.g., arrests, and orders for evaluation).

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# Appendix 1

## Summary of Inpatient Restoration Service Capacity

| Summary of Inpatient Restoration Service Capacity | | |
|---|---|---|
| **Setting** | **Restoration beds through 12/24** | **Funding Source** |
| CMHHiP | 218 | CDHS |
| CMHHiFL | 44* | CDHS |
| Arapahoe RISE | 60 | CDHS |
| Boulder RISE | 0 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | CDHS |
| Denver Health | 15* | CDHS |
| Peakview Hospital | 80 | CDHS |
| **Total** | **435** | |

* Denver Health has announced that they will terminate their current contract for all restoration beds, effective July 1, 2025. CMHII-FL will be opening a new restoration unit in the fall of 2025, which is expected to include 18 restoration beds – a net increase, but obviously mitigated substantially by the closure of the Denver Health beds.

# Appendix 2

## Summary of Colorado's Competency Dockets
## (compiled by the Department's Forensic Support Team)

| Judicial District | Judicial Office Assigned | Population Served |
|---|---|---|
| 1st Judicial District | Judge Klein & Judge Miloud | Low-level felony |
| 2nd Judicial District | Judge Lisa Arnolds (1H) | F6-F4 Cases (and higher w/ DA approval) |
| Denver County Court Comp Docket (Misdemeanor Charges) | Judge Cherry | Misdemeanor Cases Only |
| 4th Judicial District - El Paso | Magistrate Gurney | F5&F6 Non-VRA cases (and case-by-case approval from DDA) |
| 5th Judicial District | Judge Shamis | Will eventually take all competency cases in the district |
| 8th Judicial District - Larimer | Judge Blanco | Low-Level Felony and Misdemeanor |
| 10th Judicial District - Pueblo | Judge Ernst | <F3 non-violent, judges make "referrals" |
| 12th Judicial District - Alamosa Only | Judge Cortez-Rodriguez | >F2 clients that need "support" |
| 16th - Otero, Bent, Crowley | Magistrate Fouracre (Otero) | Low Level Charges (in-custody cases) |
| 17th Judicial District - Adams | Judge Jimenez | TBD |
| 18th Judicial District - Arapahoe | Judge Volz | No crimes of violence,(assault vs peace officer case by case), both in and out of custody (capped at 10) |

| | | |
|---|---|---|
| **19th Judicial District - Weld** | TBD | TBD |
| | | |
| **Other** | | |
| **Denver County Competency Diversion Program** | Jail Magistrate (rotating) | Pre-Comp Clients in Denver |

# Appendix 3
Updated March 31, 2025

| Name/Organization | Program Summary |
|---|---|
| **1st Judicial District Competency Docket** | In June 2023, the Fines Committee approved $220,000 for two years of funding to the 1st Judicial District Court. Funding provided for a Docket Coordinator (1.0 FTE) to manage the competency docket in Jefferson and Gilpin Counties. The MOU was fully executed in October 2023, and the Docket Coordinator started in January 2024. The 1st Judicial District was allocated FTEs to support its competency docket through the passing of HB24-1355; as such, Fines Committee funding was not required to support the docket beyond 2024. The 1st Judicial District spent $95,127 of the total award and returned the remainder. The docket received 52 referrals and completed intakes for 45 individuals. Twenty individuals were released into the community for outpatient restoration. Five participants were found competent to proceed, and one of those individuals had their charges dismissed. The 1st Judicial District Competency Docket had eleven clients terminate; four were successful, one was unsuccessful due to lack of engagement, and six were neutral terminations. |
| **2nd Judicial District REACH Docket** | In March 2023, the Fines Committee approved $220,000 for two years of funding to the 2nd Judicial District Court. The 2nd Judicial District operates a competency docket known as REACH (Review, Evaluate and Assist, Community-based behavioral Health). REACH hears cases for defendants who have charges in Denver District Court that are equal to or less serious than F3s or DF2s, with some exceptions, and have had competency raised in their case. The court works collaboratively with the Public Defender's Office, the District Attorney's Office, the Office of Civil and Forensic Mental Health, and numerous treatment agencies in the community to help defendants navigate the competency system and resolve cases in an effective manner. Funding provides for a Docket Coordinator to manage the competency docket, enabling clients to be released from custody during competency evaluation and restoration and potentially diverting clients to treatment and supportive housing, in lieu of prosecution. The Docket Coordinator position was filled during the 4th Quarter of 2023. The Coordinator has been working with the judge and stakeholders to establish best practices and procedures in the REACH docket. Since its inception, 1,064 defendants have been referred to the REACH docket, for a total of 1,447 cases. The Docket Coordinator currently manages 511 cases; 783 of the 1,447 cases have been dismissed or closed, and 305 have been returned to the trial courtroom after a competent to proceed finding. |

| | |
|---|---|
| **2nd Judicial District Psychology Screener** | One-time funding in the amount of $17,850 was approved for Psychological Insight & Assessment to help clients in the 2nd Judicial District acquire competency evaluation screening in custody, with the work taking place in Quarter 2 of 2023. This program was approved to meet a specifically-identified need for screening at a time when state-funded screening was suspended. The suspension caused a backlog for the 2nd Judicial District, and this program was funded to relieve the backlog. The target population included pre-release incarcerated clients ordered for competency evaluation. Psychological Insight & Assessment received 62 referrals and completed 52 evaluations. Of the 52 individuals, 25 met the threshold, 16 required further evaluation, and 11 individuals did not meet the threshold. |
| **12th Judicial District Competency Docket** | In October 2023, the Fines Committee approved $69,555 for two years of funding to the 12th Judicial District. Funding provides for a Docket Coordinator to manage the competency docket, a judicial venue for a multidisciplinary team to help acquire resources and monitor the progress of competency-involved clients. The docket model enables clients to be released from custody for competency evaluation and restoration, and clients may be diverted to treatment and supportive housing, in lieu of prosecution. Additionally, in its service to its rural, mountain community, this program establishes a regular meeting venue through which continued development of a community mental health system potentially may coalesce. In January 2024, the program held its inaugural meeting, and dockets are now held bimonthly. By the end of Quarter 1, 2025, the competency docket served 33 individuals. Nine individuals have successfully completed the program, and eight had neutral terminations. |
| **AllHealth Network Bridges to Care** | AllHealth Network was funded $134,000 from May 2023 through June 2024 to expand the capacity of the Bridges program in Arapahoe County to support the county's competency docket. Two Bridges Liaisons were funded, as well as equipment for both, including laptops, phones, monitors, and docking stations. The Liaisons helped clients acquire resources to be successfully restored in the community. Each Liaison had the capacity to serve 30 individuals at a time for a total of 60 individuals; however, throughout the course of the year, only 18 individuals were served with a program total spent of $56,729. The program is now operated by the State-funded Bridges of Colorado office, established by Senate Bill 23-229. |

| | |
|---|---|
| **Ananeo Housing** | Funding ($387,480) was approved for Ananeo Housing in November 2022, with the formal launch in December 2022.  Additional funding in the amount of $156,870 was approved by the Fines Committee in February 2023 for five female units; $60,000 of the additional funding was awarded as capital investment to make improvements to the Ananeo property.  In September 2023, Ananeo received $290,610 for a 15-bed expansion to serve an additional ten males and five females.  The MOUs between the Fines Committee and Ananeo Housing were renewed and consolidated in December 2023 totaling $1,847,630 to serve 40 competency-involved individuals; this amount includes $242,175 that had been previously awarded but not yet funded.  The goal of this program is to provide housing and services associated with supportive monitored sober housing to clients referred by the Office of Civil and Forensic Mental Health for out-of-custody competency restoration.  The Fines Committee funds two case managers, a mental health clinician, a psychiatric nurse practitioner (0.5 FTE), a clinical supervisor (40 hours a year), rent, utilities, referral management, urinalysis administration, and basic housing supplies for each client.  In Quarter 1 of 2025, this program served 54 unique individuals; one individual absconded, and three individuals were removed due to policy violations.  Since the program began, 201 referrals have been screened; 101 clients have been terminated from the program, and of those 50 absconded, mostly due to substance use and medication management issues.  There is currently a waitlist of 46 individuals referred to the program awaiting a bed. |
| **Arapahoe County Sheriff's Office Mental Health Data Diversion Project** | In June 2024, the Fines Committee approved $347,000 for 12 months of funding to the Arapahoe County Sheriff's Office (ACSO).  Funding provides for the implementation of a data-driven program, ForceMetrics, to enable the 911 emergency system of the county to connect callers with behavioral health resources more rapidly, with the overall goal of reducing the number of individuals who become involved in the competency system.  ForceMetrics pulls data from the CAD and RMS systems providing a detailed summary of prior calls for service for deputies responding to crises, as well as access to CAD notes and report narratives.  Additionally, Arapahoe County hopes to gather more data through ForceMetrics to better inform county agencies and partners on future resource development.  ACSO launched ForceMetrics during the second quarter of 2024.  Training was rolled out to the Public Safety Bureau, Communications, and the Co-responder Team.  Of the 1,863 behavioral health-related calls received, only 36 (2%) have resulted in individuals booked into the jail. |

| Assisted Living of Aurora Transitional Housing | In March 2023, the Fines Committee approved $822,000 for one year of funding to Assisted Living of Aurora (ALA) Transitional Housing in Arapahoe County, within the 18th Judicial District. The MOU between the Fines Committee and ALA expired on May 31, 2024, and ALA returned $551,312 in unspent funds to the Fines Committee. ALA provided bridge housing so that competency-involved individuals could be released from custody to receive out-of-custody restoration. ALA also assisted clients with acquiring public benefits, enabling longer-term community housing placements. Ultimately, ALA served eight clients, a fraction of the number of clients it intended to serve. |
|---|---|
| Aurora Sustained | Aurora Sustained was operated by the Aurora Public Defender's Office in partnership with Aurora Mental Health and Recovery. Funding, in the amount of $104,751, was approved for this program in October 2021, and supplemental funding in the amount of $18,600 was awarded in April 2022. Continuity of funding was subsequently approved in July 2022 in the amount of $372,433 to fund the program for the remainder of 2022 and 2023. In July of 2023, the Fines Committee approved Aurora Sustained's funding request of $223,500 to continue to operate through December 31, 2024. This program screened individuals booked in the municipal jail, assessed individuals for competency, and connected clients to treatment out of custody while working toward prosecutorial diversion. The Fines Committee funded a program administrator, paid for competency evaluations, and provided cell phones for clients who had no other ability to stay connected with the program. In total, 2,330 behavioral health screens were completed, as well as 374 competency evaluations. |

| | |
|---|---|
| **Ava Health** | In October 2024, the Fines Committee approved $5,409,084 to Ava Health to develop and operate a vertically-integrated residential treatment organization serving Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, partial hospitalization, and intensive outpatient treatment.  Funding also provides for five years of service to the competency population.  The program is currently acquiring land and facilities.  It has also made substantial progress in developing partnerships with Mesa County stakeholders.  It is anticipated that Ava Health, once operational, will serve several counties in western Colorado.  Ava Health is now under contract with The Molina Center as a location for the Stabilization and Residential Treatment site.  It is also under contract with the Crossroads building for an Outpatient Care site.  Ava Health is negotiating a lease for its Mental Health Transitional Living space and is making progress in licensing and regulatory approval, including working through various processes with the BHA, local fire marshal, and becoming a national recognized provider.  Ava Health has made some key hires, including a Clinical Director and Director of Nursing.  It is working with the Mesa County Workforce Center to fill other positions as they become available. |
| **Behavioral Treatment Services Forensic Day Reporting** | In June 2023, the Fines Committee approved $265,814 for one year of funding to Behavioral Treatment Services (BTS) to establish a day reporting center.  The program provided, or coordinated to provide, psychotropic medication, medication-assisted treatment, case management, peer support, and a warm, welcoming location for clients to receive competency-related services.  Fines Committee funds provided for direct client services, including transportation, training manuals, housing support, drug screens, and MAT.  It also supported an office administrator (0.25 FTE), restoration clinical supervisor (0.25 FTE), day reporting clinical case manager (1.0 FTE), peer support specialist (1.0 FTE), and Master's level therapists (1.5 FTEs).  Due to startup delay, the Fines Committee agreed to a no-cost extension, continuing funding through January 31, 2025.  The program intended to serve at least 40 clients referred in Boulder County; however, only five clients were served in total.  All five individuals who were referred to the program since its inception have terminated; one was successful, two transferred to an inpatient facility, and two were unsuccessful.  Initially, BTS indicated unused funds in the amount of $183,693.30 would be returned; however, after acquiring a new CFO, BTS believes it has expended the entire award and indicated it would not be returning funds.  Cordes & Company will be conducting an audit of this program's finances in Quarter 2, 2025. |

| | |
|---|---|
| **Boulder County Community Justice Services** | Funding in the amount of $220,000 was approved for Boulder County Community Justice Services in October 2022.  The original MOU between the Fines Committee and Boulder County expired on September 30, 2023; a renewal was approved for additional funding in the amount of $285,842 through December 31, 2024, and a no-cost extension was signed in December 2024 which extends the program until June 30, 2025.  This program expanded the Bridges program in the county to serve more individuals whom the Bridges Liaisons can work with to acquire services out-of-custody.  The objective was to improve access to Bridges Liaisons, as well as increase the capacity for appointments with the Liaisons. With Bridges of Colorado centralizing operations statewide, this program has been approved to continue county services to clients while Bridges hires and trains staff.  The funds cover two FTE positions and costs related to clients' treatment needs (e.g. treatment, assessments, neuropsychological evaluations, and medication), as well as basic needs for clients, including cell phones, clothing, emergency supplies, and hotel vouchers.  Funds have also been used for the completion of court-ordered neuropsychological evaluations and toward the purchase of a fleet vehicle for transporting clients.  In Quarter 1 of 2025, this program received ten new referrals and conducted intakes for all ten individuals.  Six individuals terminated the program in the first quarter, each of whom were successful. |
| **Boulder County Sheriff's Office Jail Competency Program** | In June 2023, the Fines Committee approved $130,000 for one year of funding to the Boulder County Sheriff's Office (BCSO) to provide clients with long-acting injectable medication ($120,000) and assistance with housing support ($10,000).  Additional funding in the amount of $130,000 was awarded to continue program operations through June 30, 2025.  The medication serves clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication.  Temporary housing support in the form of rent and ancillary items are provided to clients transitioning from jail to the community.  Over the course of a year, the program expects to provide medication and/or housing support to at least 38 individuals.  In Quarter 1, 2025, the program received thirteen referrals and provided a total of twelve long-acting injectables to its clients. |

| | |
|---|---|
| **City of Greeley Homeless Solutions** | In October 2023, the Fines Committee approved $111,835 for one year of funding to the City of Greeley Homeless Solutions to provide permanent supportive housing, employment support, education, job skills training, and benefits acquisition to three individuals involved in the competency system in Weld County.  The Fines Committee extended funding through September 30, 2025 to continue program operations.  The program provides three permanent housing vouchers and will continue to support clients on a 24-hour, 7-day-a-week basis for as long as the clients wish to maintain the vouchers.  Funding supports a case manager (0.5 FTE), usage of a fleet vehicle, bridge housing, wraparound services including transportation, tuition, iPads and other client needs, as well as technology for staff.  As of the end of Quarter 1, 2025, the program is meeting its goal in serving three clients. |
| **Colorado Coalition for the Homeless** | Colorado Coalition for the Homeless (CCH) was approved for funding in the amount of $1,500,000 in November 2020.  The MOU between the Fines Committee and CCH expired in October 2022 for the Crest program; however, the Fines Committee extended the MOU with CCH through March of 2025 for the Restoration program, and CCH has continued to report outcomes for that program until the MOU expires.  The goal of the Restoration program is to provide modified Assertive Community Treatment (ACT) to clients who are referred through OCFMH's Forensic Support Team as appropriate for outpatient restoration.  At the end of Quarter 1 of 2025, this program had 29 active clients (same as last quarter).  During the 1st Quarter, no client was involved in Restoration Education and no one ended a court involvement.  This program has been upholding its mission of providing long-term stable housing for its clients. |
| **Community Based Enhanced Restoration (CBER)** | CBER was operated by WellPower from January 2022 through December 2023.   Funding in the amount of $400,000 enabled WellPower to provide Assertive Community Treatment to individuals released on bond and being restored to competency out-of-custody.  Short-term housing options were also funded for CBER clients who would have otherwise been homeless.  The program served 68 individuals in the funding term; 27 were restored to competency or had their case dismissed, 39 were terminated unsuccessfully due to absconding, violating program policies, or acquiring a new charge, and two were transferred to other programs. |

| | |
|---|---|
| **Denver Competency Diversion and WellPower** | The Denver Competency Diversion program is operated by the Denver County Court.  Funding ($1,029,996) was approved for this program in December 2021, with the formal launch on April 4, 2022.  The MOU between the Fines Committee and the Denver Competency Diversion program expired in December of 2022, and the Fines Committee agreed to extend the terms of the MOU until February 22, 2024.  The Fines Committee awarded $587,342 in September 2023 to WellPower to continue supporting the Denver Competency Diversion program through September 2024.  In December 2023, the Fines Committee approved an additional $541,870 to continue operations through 2024.  In November of 2024, a reallocation of funding, including a return of $285,290, and no-cost extension was granted through December 2025.  The goal of this program is to divert from prosecution those defendants who are likely to be found incompetent to proceed.  The Fines Committee initially funded a program administrator, a program coordinator (screening and release planner), a Denver district attorney, a Colorado public defender, six clinical case managers, a clinical program manager (0.6 FTE), and a district attorney competency diversion officer.  Funding now supports a Competency Support Specialist who focuses on data collection and administrative program support, including program tracking and supporting ongoing program efficiency.  Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.  In Quarter 1 of 2025, this program received 54 referrals and completed 15 intakes.  The capacity of the program is 60, when all six case manager positions are filled.  The program continues to make progress in diverting individuals from the waitlist in Denver.  By the end of this quarter, 73% of all individuals who have completed the Competency Diversion program have been successfully diverted; 12% have been unsuccessful due to new charges; 10% have been unsuccessful due to lack of engagement; and 5% had their case(s) closed. |

| | |
|---|---|
| **Denver County Court Competency Support Docket** | In March 2024, the Fines Committee approved $280,609 for 12 months of funding to the Denver County Court to operate a competency support docket. A six-month no-cost extension has been granted to continue program operations through September 2025. For cases that cannot be diverted from prosecution in the County Court Diversion Program, this docket provides an opportunity for clients to be diverted from confinement during the restoration process. The docket serves as a forum where community resources may be brought in to help meet clients' out-of-custody needs. Funding supports a clinical screener (0.5 FTE), district attorney (0.5 FTE), public defender (0.5 FTE), emergency housing, transportation assistance, cell phones, and food and clothing for clients. The competency support docket has received 708 cases involving 476 individuals, with 132 of those being dismissed with services, 163 being successfully diverted, and 50 being sent back to the trial courtroom due to a "competent to proceed" finding. |
| **Douglas County Sheriff's Office Mental Health Data Diversion Project** | In December 2023, the Fines Committee approved $683,300 for 18 months of funding to the Douglas County Sheriff's Office (DCSO). Funding provided for the implementation of a data-driven program, ForceMetrics, to enable the 911 emergency system of Douglas County to connect callers with behavioral health resources more rapidly. Fines Committee funding also supports the salary of a temporary project manager, overtime pay and fringe for deputies, supplies, and behavioral health treatment. In Quarter 2 of 2024, a project manager was hired and onboarded, and in Quarter 3, DCSO began using ForceMetrics to track calls. One-hundred ninety-eight behavioral health-related calls were received in Quarter 1, 2025, and twenty-two individuals were booked into the jail related to a behavioral health call. DCSO submitted approximately 500 Community Response Team referrals for follow up. |
| **Embark Assisted Living Residence – Renaissance** | In May 2023, the Fines Committee approved $380,820 for one year of funding to the Embark Peer Coach Academy to open a Level 1 Mental Health Transitional Living (MHTL) facility, Embark Assisted Living Residence–Renaissance. In March 2024, the Fines Committee approved an additional $40,000 to continue operations until MHTL funding through the State began. Throughout the funding term, Renaissance provided licensed transitional assisted living to sixteen mid- to high-acuity individuals in the competency system referred from the 4th Judicial District. Intensive case management, connection to physical and mental health community resources and competency restoration services, daily medication management, meals, benefit acquisition, transportation, peer support, life skills training, and scheduled social and recreational activities were also provided. As of the end of Quarter 2, 2024, when State funding took over, seven individuals continue to be housed, with an average length of stay of 138 days. The additional nine individuals were discharged with only one terminating unsuccessfully. |

| | |
|---|---|
| **Embark Peer Coach Academy Recovery Residences** | In November 2022, the Fines Committee approved $306,150 for Embark Peer Coach Academy (Embark) to operate a Day Reporting Center and sober-living forensic housing (Embark Recovery Residences).  In 2023, Embark received renewal funding for Embark Recovery Residences (ERR) in the amount of $335,550 through November 30, 2024 and chose not to seek additional funding for its Day Reporting Center due to a lack of referrals and ability to fund components of those services through Medicaid.  The goal of the Day Reporting Center was to provide outpatient restoration clients with treatment, classes, peer support, and case management.  In December of 2024, the Fines Committee awarded an additional $199,720 to ERR through October 2025.  ERR serves individuals released from confinement who are participating in competency restoration.  The Fines Committee funds partial salaries for a certified addiction specialist, licensed addiction counselor, two peer coaches, receptionist, and housing managers.  Funding also covers individual assessment and treatment planning, medication management, psychiatric services, daily classes, substance use monitoring, support groups, peer mentoring, vocational support, public benefit acquisition, transportation assistance, and competency restoration services.  ERR provides sober-living housing with the capacity to house 15 clients at a time, with 24-hour management, transportation, and food and support services are available on site.  In Quarter 1 of 2025, ERR received 13 referrals and completed 12 intakes. This quarter the program served eighteen individuals.  Since the program's inception, 52 unique individuals have been served (two have been admitted twice), 30 clients have been restored to competency, and 42 individuals have terminated: five were transferred to a higher level of care (including Embark's Assisted Living Residence: Renaissance), seven were discharged due to the judge remanding them into custody, eleven abandoned the program, nine were transferred to a sober-living facility, six were transferred to independent housing, and four moved in with family. |

| | |
|---|---|
| **Fidelity Behavioral Health** | Funding, in the amount of $1,272,559 was approved for this program in February 2024, with formal launch in that same month. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded three houses for clients to live in, each housing ten clients, a van to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, three house managers for 24/7 supervision, and partial salaries of the personnel to operate the program. In December of 2024, an additional $411,348 was awarded to Fidelity Behavioral Health for two case managers, one LCSW, one peer specialist, salary increases for all staff, and for the clinical director to move from part-time to full-time. This quarter, the program received thirty-four referrals and completed ten intakes. Twenty-two clients in total have terminated the program; ten have been successful. |
| **Gateway to Success – Pueblo** | In December 2022, the Fines Committee approved $275,000 for one year of funding for Gateway to Success to provide a Forensic Day Reporting (FDR) program in Pueblo. The original MOU between the Fines Committee and Gateway to Success was set to expire on December 4, 2023; however, a no-cost extension was granted to Gateway extending the MOU and service provision through the end of February 2024. The Fines Committee awarded renewal funding in the amount of $235,000 through February 2025 and then approved a no-cost extension to continue operations through May 2025. The goals for the FDR program are to support formerly-incarcerated individuals who are involved in the competency system, to provide a center at which services can be delivered to out-of-custody competency individuals, and to reduce the number of defendants with behavioral health disorders incarcerated in the Pueblo County Jail. The award provides partial funding for full-time employees including a Restoration/Day Reporting Administrator, Lead Case Manager, Case Manager, Peer Support Specialist, Coach, Receptionist, Prescriber, and LPC/CAS. The funding also covers transportation, participant manuals, medications, food/beverages, medication compliance incentives, and prosocial activities. The program began fully operating toward the end of Quarter 1, 2023 and has received thirty-six total referrals. As of the end of Quarter 1, 2025, the program has thirteen active clients. Throughout the funding term, the FDR program intends to serve 70 clients who have transitioned from the Pueblo County Jail and have been found to have a moderate to severe substance use disorder and/or co-occurring mental illness. |

| | |
|---|---|
| **Homeward Alliance** | Funding, in the amount of $217,800 was approved for Homeward Alliance in February 2024, with formal launch in March 2024. In December 2024, a no-cost extension was granted to Homeward Alliance to continue services through December 31, 2025. The goal of this program is to provide housing navigation and case management services to individuals who are competency-involved in Larimer County. The program partners with the Larimer County Competency Docket and SummitStone Health Partners to receive referrals. Homeward Alliance connects clients with resources provided by partners of the State Division of Housing and completes intakes for clients to enter that system. Funded staff include a housing specialist (1 FTE) and a program manager (0.5 FTE). Direct client expenses are also provided, which include moving facilitation, tenant rights education, life skills education, and landlord/tenant communication and mediation. In Quarter 1, 2025, Homeward Alliance received 17 new referrals from the Competency Docket and Larimer County's Community Justice Alternatives Department and completed intakes on those 17 clients. Twelve clients have been terminated since the program began: six were transferred to more permanent housing, and six disengaged. This program partially fills the housing gap in a jurisdiction already replete with Fines Committee-supported competency resources. |
| **Integrated Insight Therapy IMPACT** | IMPACT (Intensive Monitored Preventative and Acute Competency Treatment) was operated by Integrated Insight Therapy, a behavioral health treatment provider serving the 7th, 21st, and 22nd Judicial Districts. The Fines Committee allocated $1,178,000 in total to the program. IMPACT housed clients in two residential houses, providing treatment and wraparound care. The program operated from February 2022 until January 2024 and served 22 clients. |

| Larimer County Competency Docket and the Larimer County Public Defender's Office | The Larimer County Competency Docket is operated by the Larimer County Community Justice Alternatives Department.  Funding ($533,242) was approved for this program in December 2021, with formal launch of funded program elements in January 2022.  In January 2023, funding in the amount of $262,000 was approved for the Larimer County Public Defender's Office to support the Larimer County Competency Docket with one dedicated public defender through January 2025.  The original MOU between the Fines Committee and the Larimer County Competency Docket was set to expire in February of 2024; however, a no-cost extension was granted allowing the provision of services to continue through the end of September 2024.  In May of 2024, the Fines Committee approved additional funding in the amount of $654,170 through June 30, 2025 to continue program operations and fund transitional housing in the Larimer County Alternative Sentencing Department.  The goal of this program is to divert individuals involved in the competency process from custody while coordinating necessary care in the community.  The Fines Committee funds a Competency Services Team Lead and two Competency Intensive Case Specialists, as well as client expenses, client transportation, employee training opportunities, office supplies, and ten beds in its work release facility.   In Quarter 1 of 2025, the program served 35 total active participants in the Competency Docket, and 13 individuals were terminated.  Twelve were found competent to proceed, and one had their case dismissed. |
|---|---|
| Mesa County Pretrial Community Alternative Placement (Pre-CAP) | The Pretrial Community Alternative Placement (Pre-CAP) program operated by the Mesa County Community Justice Services Department (CJS) was funded to divert individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment.  Fines Committee funding, in the amount of $27,900, provided inpatient treatment for clients diverted from confinement.  This program augmented the capacity of an existing county pretrial mental health program, specifically to serve competency-involved individuals.  Mesa County CJS declined to request renewal funding, so it was only funded for one year of service.  Inpatient treatment was provided for three clients referred for out-of-custody competency restoration.  All three clients successfully transitioned from inpatient treatment; two were then ultimately unsuccessfully discharged from Pre-CAP, and the other individual successfully completed Pre-CAP and transitioned to the community.  Mesa County was selected as a National Association of Counties (NACo) Justice Initiative site in 2023, and as NACo works with Mesa County to identify needs and gaps, there may be an interest in future funding to serve competency-involved individuals. |

| | |
|---|---|
| **Mesa County Sheriff's Office – Long-acting Injectables Program** | In May 2023, the Fines Committee approved $360,000 for one year of funding to the Mesa County Sheriff's Office (MCSO) to provide clients with long-acting injectable medication.  In March 2024, the Fines Committee signed a no-cost extension agreement with MCSO to allow for continued operations through May of 2025.  In Quarter 1 of 2025, the no-cost extension was granted through May of 2026.  The medication treats clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication.  Over the course of a year, NaphCare, MCSO's medical contractor, expects to provide medication to up to ten individuals per month.  Since the program began operating in the 3rd Quarter of 2023, seventy long-acting injectables have been administered to sixteen individuals in the Mesa County Detention Facility. |
| **Mile High Behavioral Healthcare** | Funding ($137,494) was approved for the Mile High Behavioral Healthcare (MHBHC) program in December 2021, with formal launch taking place in Quarter 2 of 2022.  The MOU between the Fines Committee and MHBHC expired in January of 2023; however, given the entire awarded funding had not been spent, a no-cost extension was approved for funding to be spent through September 30, 2023.  In October 2023, the Fines Committee agreed to renew funding to the program through September 30, 2024, with additional funding of $149,251.  In October 2024, the Special Masters agreed to a no-cost extension allowing MHBHC to continue utilizing the funds through September 30, 2025.  The goal of this program is to help clients acquire treatment and wraparound services out of custody.  Its target population includes pre-release incarcerated clients with mental health and substance use disorders.  The Fines Committee funds two clinical case managers, and Signal Behavioral Healthcare funds two additional case managers.  As of the end of Quarter 3, 2024, all program positions are filled.  In Quarter 1, 2025, the program received 34 referrals and completed 34 intakes.  Sixty-one individuals terminated the program this quarter; fifty-five were successful, while four were unsuccessful (90% success rate).  The reported capacity of the program is 80. |

| | |
|---|---|
| **Monarch Competency Housing** | Funding ($953,074) was approved for Monarch Competency Housing in April 2023, with formal launch taking place in June of 2023. Additional funding of $2,353,199 was approved in May 2024. The latest installment enabled Monarch to purchase the housing facility it was renting, and the program committed to continue serving competency clients for five years. The goal of this program is to provide supportive monitored sober housing. Its target population includes clients ordered to have competency evaluations or outpatient restoration services. The Fines Committee funds two full-time mental health technicians, two full-time case managers, one director of operations, one executive director, one admissions/outreach coordinator, three full-time peer support specialists, two part-time peer support specialists, one full-time transport driver, as well as all costs directly related to clients including transportation, case management, groceries, clothes, toiletries, and housing supplies. Monarch also contracts with clinical supervisors to oversee peer support and with a psychiatric nurse practitioner to assist with prescriptions; however, these positions are not funded by the Fines Committee. In Quarter 1, 2025, the program received 52 referrals, completed 18 intakes, and had 15 terminations, 5 of which were successful. Thirty-one unique individuals were served during the 1st Quarter. The program is expected to provide 24 beds, 5 female and 19 male, to serve clients referred by the Forensic Support Team, Bridges of Colorado, and other system stakeholders. |
| **NAMI Colorado** | In February 2024, $91,030 was approved for this program. The goal was to provide evidence-based peer programming for patients and staff of the State Mental Health Hospitals in Pueblo and Fort Logan. Funding supported experiential-based training for patients, a recovery-based support group program, and staff education, through partial salaries of six positions. In total, the program held four training sessions, reaching 142 patients and 23 staff. |

| | |
|---|---|
| **Pulse Line Collaborative Training** | In October 2023, the Fines Committee approved $1,058,270 for two years of funding to Pulse Line Collaborative Training, LLC.  In April of 2025, a no-cost extension was approved for program continuity through January 2026.  Funding provides for training to be administered to law enforcement, first responders, clients, and family members of clients and potential clients, to help reduce unwarranted use of force incidents.  Many individuals who ultimately become involved with the competency system acquire serious criminal charges stemming from unnecessary altercations with law enforcement or first responders, owing mainly to symptoms of mental health disorder, rather than intentional criminal behavior.  Funding provides for a director of development and training (1 FTE), a mental health lead and program coordinator (1 FTE), and administrative support (0.75 FTE), as well as operational expenses.  In Quarter 1, 2025, the program completed 86 training sessions, each 8 hours in duration, with first responders and four additional sessions for self-advocates/caregivers, for a total of 90 training sessions held.  The program has gained momentum to achieve its ultimate goal of holding 462 sessions over the MOU term.  As part of this program's evaluation plan, it has agreed to survey training participants.  The survey shows highly-positive response rates to questions asking about the value of the skills and knowledge in their jobs or daily lives. |
| **SAFER Opportunities** | In March 2023, the Fines Committee approved $2,007,500 for SAFER in Arapahoe County, within the 18th Judicial District.  This program provided housing and supportive services to individuals transitioning from custody to support out-of-custody competency restoration, with a goal of increasing the number of individuals released from custody who otherwise would be released homeless.  As of the end of Quarter 4, 2024, a total of 9,491 bed days were provided thus satisfying the MOU conditions.  Throughout the MOU term, reviewed 81 referrals and served 29 individuals.  SAFER acquired several grants to support operations outside of Fines Committee funding, including grants from DOLA Emergency Solutions, Colorado Health Foundation, Arapahoe County, Caring for Denver, BHA Behavioral Health Safety Net, BHA Workforce Recruitment and Retention, and ARPA Peer Support.  Ultimately, Mental Health Colorado acquired the property, allowing SAFER to become sustainable. |

| | |
|---|---|
| **San Luis Valley Recovery Housing** | In May 2023, the Fines Committee approved $313,762 for two years of funding to San Luis Valley Recovery Housing, which is used to provide supportive, sober-living housing to clients released from custody for competency evaluations or restoration. The program can serve up to twenty individuals at a time; five beds are reserved for those involved in the competency system, referred from the 12th Judicial District. Renovations and construction on the 432 7th Street property in Alamosa took nearly a year to complete, placements for residential services began in May of 2024, and as of Quarter 2, 2024, SLV Recovery Housing is CARR-certified. SLV Recovery Housing has collaborated with Bridges Liaisons and FST Navigators, as well as the 12th Judicial District Competency Docket. In Quarter 1, 2025, the program received two referrals and onboarded two new clients. |
| **Second Chance Center in the City** | In July 2023, the Fines Committee approved $488,125 for one year of funding to Second Chance Center in the City (SCCIC) to provide onsite case management, peer mentoring, employment services, and housing navigation to individuals in or at-risk of being in the competency system. In August of 2024, the Fines Committee renewed funding in the amount of $476,877 to serve at least 75 unique clients through July 2025. SCCIC assesses each client's needs, specifically related to mental health, substance use, intellectual and developmental disabilities, and traumatic brain injury for appropriate treatment. Fines Committee funding covers care managers, a behavioral health navigator, peer navigator, and partial salaries for the director (0.5 FTE) and an assistant director (0.5 FTE). Costs directly related to clients' basic needs, assistance with leasing office space, and funding for ReShape Minds to provide community navigation directly to clients are also covered. In Quarter 3, 2023, SCCIC began receiving referrals and conducting intakes. Since that time, SCCIC has received 117 referrals and has successfully enrolled 111 of those referred. As of the end of Quarter 1, 2025, thirty-eight clients have been terminated: seven were unsuccessful, twelve dropped out of contact, two terminated due to refusal to engage in services, and seventeen were successful. |

| | |
|---|---|
| **Servicios de la Raza** | In May 2024, the Fines Committee approved $466,720 for 24 months of funding to Servicios de la Raza to provide recovery support services to help clients achieve long-term stability. This program emphasizes peer support and focuses on clients who are Spanish speaking, with the goal of serving 60 unique individuals each year. Funding covers salaries and benefits for a behavioral health co-director (0.1 FTE), client services manager (0.15 FTE), peer services coordinator (0.15 FTE), peer specialists (2 FTE), and a bilingual case manager (1 FTE), as well as indirect costs, client supportive services, professional development, employee mileage, computers and telecommunications for employees, and supplies. In Quarter 1 of 2025, Servicios de la Raza received 16 referrals and completed 18 intakes (two were referred in the previous quarter). Servicios provided peer support, services, and resources to over 40 individuals who were incarcerated, hospitalized, and in the community throughout the quarter. Twenty-two individuals have terminated the program; fifteen have been successful, and seven were unsuccessful. |
| **Solange Assisted Living** | Funding, in the amount of $600,000, was approved for this program in January 2024, with formal launch in that same month. The goal of this program was to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with wraparound services and partnering for treatment services. The Fines Committee funded 20 beds in assisted living facilities in El Paso and Pueblo Counties, a van to transport clients, furniture, entertainment equipment, and supplies. Solange served 18 individuals throughout the MOU term. |
| **State Court Administrator's Office Competency Programs Analyst** | In August 2023, the Fines Committee approved $222,664 for two years of funding to the Office of the State Court Administrator (SCAO) for a competency programs analyst. The analyst supported judicial districts operating special programs in the competency system. Training, awareness of resources, data collection, and evaluation support were also provided by the analyst. SCAO filled the position in December 2023, and the competency programs analyst focused on several key initiatives: 1) implementing HB24-1355, 2) Securing additional grant funding, 3) Rolling out a competency data system, 4) Onboarding competency docket coordinators, awareness, and 5) general administrative assistance. The Fines-funded competency programs analyst was officially hired by SCAO on 11/18/24, and as such, SCAO no longer required $84,280 of the Fines Committee funding that was awarded for the creation and implementation of his position. |

| | |
|---|---|
| **SummitStone Health Partners Competency Hub** | In October 2022, the Fines Committee approved $3,029,283 for three years of funding to SummitStone Health Partners (SummitStone) in Larimer County within the 8th Judicial District. This program consists of two elements: The first is to provide psychiatric care, including prescriptions for medications, to clients in custody on whom competency has been raised with the goal of increasing the quantity of clients who may be released from custody during the competency evaluation and restoration process. The second element of this program is the establishment of a competency services hub at which clinical services, case management, and peer support are provided to out-of-custody clients. The hub enables clients to receive a range of services from one location, including competency restoration education, medication management, and other collaboration with system providers. In Quarter 1, 2025, the program served 99 unique clients. The reported capacity of the program is 80 for in-custody and outpatient services. |
| **The Dirt Road to Recovery** | In May 2024, the Fines Committee approved $162,120 for 12 months of funding to The Dirt Road to Recovery (TDDR) to provide three beds to male clients in a CARR-certified Level II sober-living home. The program is located in Johnstown, Colorado and is the first funded program to serve the 13th Judicial District; the program will also accept clients from the 8th and 19th Judicial Districts. Clients are expected to remain in the program for six months; as such, the program expects to serve six individuals during the funding term. Funding provides for partial salaries and benefits for a director of operations (0.33 FTE), peer support specialist (0.33 FTE), client housing, transitional client expenses, and a vehicle for client transportation. In Quarter 1, the Dirt Road to Recovery received one referral from the 8th and 19th Judicial Districts and onboarded two clients. One individual has terminated the program, none this quarter. |
| **United Way of Weld County Rapid Rehousing Opportunity** | In August 2023, the Fines Committee approved $1,421,440 for two years of funding to United Way of Weld County Rapid Rehousing Opportunity (UWWC) to transition fifty competency-involved individuals from the Weld County Jail to the community by providing housing, case management, assistance with benefit acquisition, and wraparound services. Funding covers two case manager FTEs, bridge housing, cold weather shelter space, Rapid Rehousing for 50 participants, and maintaining and supporting the operations of the Housing Navigation Center services. UWWC began to receive referrals in Quarter 4, 2023, and by the end of Quarter 1, 2025, UWWC screened 40 referrals and completed 29 intakes since the program began. Five individuals have terminated, all unsuccessfully. |

| | |
|---|---|
| **University of Denver, Denver FIRST, Brain Injuries Screening Program** | In September 2022, the Fines Committee approved $948,729 for two years of funding to Denver FIRST, a regional hub for forensic mental health expertise within the Graduate School of Professional Psychology at the University of Denver.  In January 2024, a no-cost extension was granted to continue the program through September 30, 2025.  This program focuses on competency clients suspected of having brain injuries and provides cognitive screenings, full neuropsychological evaluations, and referral for treatment by professional students to clients referred by the Forensic Support Team.  Its target population includes incarcerated and out-of-custody clients with a history of and/or symptoms of potential brain injury.  The Fines Committee funds student and professional staff time to complete cognitive screenings and neuropsychological evaluations.  The program became operational and began receiving referrals in Quarter 2 of 2023.  This quarter, the program received thirty-seven (up from twenty-two last quarter) referrals and completed eight intakes (up from six last quarter).  Of those assessed, 86% have been positive for a brain injury, and 90% have presented with cognitive and functional-related deficits.  The program continues to see severe comorbid mental health and medical issues complicating individuals' presentation.  The reported capacity of the program is 20. |
| **Valor Program at Embrave** | Funding, in the amount of $8,902,175 was approved for Embrave's Valor program in March 2024, with formal launch following a lengthy facility acquisition and renovation process.  This is the largest funded Fines Committee program to date.  The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services.  The Fines Committee funded capital to purchase a hotel and renovate it to make 60 units available, vehicles to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, house managers for 24/7 supervision, and partial salaries of the personnel to operate the program.  Quarter 1, 2025, is the third quarter in which this program has served clients.  This quarter, the program received 86 referrals and completed 19 intakes.  Valor has terminated seven clients; three were successful and four unsuccessful. |



# FINES COMMITTEE Allocated Funds Summary

The Competency Waitlist Fines Fund was created by a federal court consent decree in litigation addressing Colorado's Competency to Stand Trial system. The Fines Committee was established to oversee the Fines Fund; its purpose is to support programs that have potential to reduce the State's competency restoration waitlist.


## Colorado Coalition for the Homeless (CCH)

**$4,964,964** - Providing modified Assertive Community Treatment level services to clients who are referred through the Office of Behavioral Health's Forensic Support Team as appropriate for Outpatient Restoration. Additionally, start-up funding was provided in 2019 to enable the program to purchase a 182-unit housing facility, out of which this, and other Colorado Coalition for the Homeless programs are operated.


## Denver Competency Diversion & WellPower

**$1,873,918** - Diverting from prosecution those defendants who are likely to be found incompetent to proceed. The Fines Committee funds a program administrator, behavioral health navigators, and salaries for prosecutors and public defenders who work with clients in the program. Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.


## Larimer County Competency Docket

**$1,187,412** - Diverting individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a competency services case manager, team lead, case specialist, training for staff, as well as ten short-term supportive beds for competency-involved individuals.


## University of Denver's Denver FIRST Program

**$948,729** - Identifying and assessing clients ordered to outpatient competency restoration programs for traumatic brain injury and acquired brain injury, to enhance appropriate interventions for those identified clients, and to provide training to jail staff and providers.


## Ananeo Competency Housing

**$1,847,630** - Providing housing and services associated with supportive monitored sober housing. Forty dedicated beds are reserved for individuals, suitable for diversion from confinement, who are receiving outpatient competency restoration and treatment, referred by the Forensic Support Team or Bridges.


## Fidelity Behavioral Health

**$1,683,559** - Providing housing, treatment, wraparound services, and outpatient restoration to competency-involved individuals and those at risk of becoming competency-involved in Adams, Jefferson, Arapahoe, Douglas, and Weld Counties for three years.


## SummitStone Competency Hub

**$3,029,283** - Increasing psychiatric services in the Larimer County Jail and establishing a community-based competency hub that enables clients' medication management and provision of services.


## Arapahoe County Sheriff's Office Data Diversion

**$347,000** - Utilizing ForceMetrics to better identify behavioral health calls and individuals with behavioral health needs to more efficiently and effectively connect to the most supportive response, treatment, and resources; funding supports the cost of the ForceMetrics software.


## San Luis Valley Recovery Housing

**$313,762** - Providing five beds in a sober-living facility to serve individuals referred for out-of-custody competency restoration in the 12th Judicial District. This program will also connect clients to medically-assisted recovery treatment and other services to support competency recovery.


## Mesa County Sheriff's Office Long-Acting Injectables Program

**$360,000** - Providing in-custody clients with long-acting injectable medications to support mental health outcomes for those returning from the State hospital following competency restoration, and for newly booked inmates for whom the intervention is medically indicated.


## Larimer County Public Defender's Office

**$262,000** - Establishing a dedicated Senior Public Defender position for two years to support the Larimer County Competency Docket.


## Dirt Road to Recovery

**$162,120** - Providing three supportive recovery residence beds for males in Weld County, as well as wraparound services for individuals in or at risk of being in the competency system; funding covers salaries and benefits, wraparound services, housing, and transportation.


## Valor Program at Embrace

**$8,902,175** - Allowing for the acquisition and renovation of a former hotel in Colorado Springs to provide 60 beds for supportive monitored housing for individuals involved in the competency system or at risk of becoming involved in the competency system.


## Embark Recovery Residences

**$841,420** - Providing sober-living housing to serve individuals released from confinement who are receiving competency restoration, as well as supporting outpatient restoration clients with case management, treatment, peer specialists, and classes.


## Monarch Competency Housing

**$3,306,273** - Providing sober-living housing and supportive wraparound services . The Fines Committee funding allowed for the purchase of a twenty-four bed facility reserved for clients deemed appropriate to be released from custody for the restoration process and referred by the Forensic Support Team, Bridges, and other partners; Monarch has guaranteed to serve the population for five years with no additional Fines Committee funding.


## 2nd Judicial District REACH Docket

**$220,000** - Establishing a Docket Coordinator position for two years to support the 2nd Judicial District Competency Docket (REACH).


## Mile High Behavioral Healthcare

**$286,745** - Assisting clients with acquiring treatment and wraparound services out of custody. The Fines Committee funds two clinical case managers to support pre-release incarcerated clients with mental health and substance use disorders.


## Boulder County Sheriff's Office

**$260,000** - Providing in-custody clients with long-acting injectables to support mental health for those returning from the State hospital following restoration, and for newly-booked inmates, as well as supporting clients transitioning to the community through temporary housing and ancillary items.


## Gateway to Success Day Reporting Center

**$510,000** - Establishing a Day Reporting Center with access to emergency housing, treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.


## United Way of Weld County

**$710,720** - Transitioning competency-involved individuals from the Weld County Jail to the community by providing rapid rehousing and emergency housing services, case management, assistance with benefit acquisition, and wraparound services.


## Pulse Line Collaborative Training

**$1,058,270** - Providing training and resources to law enforcement, first responders, and caregivers to reduce unwarranted use of force incidences and the number of individuals with behavioral health disorders and disabilities being arrested and confined.


## Servicios de la Raza Peer Support

**$466,750** - Supporting a peer-led model to provide culturally and linguistically responsive recovery support services to individuals involved in or at risk of being involved in the competency system; funding provides for personnel, client support, supplies, and equipment.


## 12th Judicial District Competency Docket

**$69,555** - Establishing a Docket Coordinator to support the 12th Judicial District Competency Docket.


## Boulder County Community Justice Services

**$505,842** - Supporting aspects of the State Court Bridges Program, including the provision of access to services to enable the release from custody for competency clients.


## Second Chance Center in the City

**$965,002** - Providing onsite case management, peer mentoring, employment services, housing navigation, mental health services, and substance misuse services to individuals in or at risk of being in the competency system. The Fines Committee funds care managers, a behavioral health navigator and peer navigator, and partial salaries for the director and assistant director, as well as costs directly related to clients' basic needs, emergency housing, community navigation, and leasing an office space.


## Douglas County Sheriff's Office Data Diversion Project

**$683,300** - Establishing a data-driven program to enable the 911 emergency system of Douglas County to rapidly connect callers with behavioral health resources to reduce the number of individuals who become involved with the state competency restoration system; funding supports software licensing fees, staff overtime, a project manager, treatment services, equipment, and supplies.


## City of Greeley Homeless Solutions

**$111,835** - Serving individuals in Weld County who are competency-involved by providing benefit acquisition, employment support, permanent housing vouchers, bridge housing, and wraparound services; funding also supports a .25 FTE case manager and .25 FTE peer specialist.


## Ava Health

**$5,409,084** - Developing and operating a vertically-integrated treatment organization in Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, intensive outpatient treatment, and partial hospitalization.


## Homeward Alliance Larimer County

**$217,800** - Coordinating case management, wraparound services, and housing navigation for 25 clients.


## Denver County Court Competency Support Docket

**$280,609** - Establishing a support docket for all misdemeanor cases in which competency has been raised to redirect cases from the State competency process; funding supports a coordinator, clinical screener, and supportive wraparound services for clients, including emergency housing.

# Previously–funded Programs
*Funded between 2018 and 2025*

 **Denver Health**

**$3,270,000** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.

 **Mesa County Pretrial Community Alternative Placement**

**$27,900** - Diverted individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. The Fines Committee funded inpatient treatment for clients in the PreCAP program.

 **IMPACT Integrated Insight Therapy**

**$1,178,000** - Diverted 22 individuals on whom competency was raised by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded case managers, house managers, peer support professionals, monitoring services, and houses in rural Colorado.

 **AllHealth Network Bridges to Care**

**$56,729** - Supported the implementation of the Arapahoe County Competency Docket by doubling the capacity of Bridges of Colorado, providing client case management and treatment support.

 **Assisted Living of Aurora**

**$270,688** - Provided supportive temporary beds to enable client benefits enrollment to fund longer-term out-of-custody placement during restoration.

 **Solange Assisted Living**

**$600,000** - Offered assisted living residences, in-house outpatient restoration, treatment, case management, peer support, medication management, transportation, and other supportive services to competency-involved clients in Mesa County and throughout the Denver Metro area.

 **SCAO Competency Docket Analyst**

**$138,384** - Creating an analyst position to support judicial districts operating special programs in the competency system; the analyst provides training, awareness of resources, data collection, and evaluation support for competency dockets and judicial programs.

 **National Alliance on Mental Illness (NAMI) Colorado**

**$91,030** - Providing evidence-based peer programming for patients and staff of the Colorado Mental Health Hospitals in Pueblo and Fort Logan.

 **SAFER Opportunities Colorado**

**$2,007,500** - Offering safe, continuous hotel sheltering in Arapahoe County with a continuum of community-based, client-centered safety net services. The Fines Committee funds numerous positions and wraparound services.

 **Denver Sheriff Department**

**$663,114** - Supported the Denver Restoration Treatment Unit, a jail-based initiative that provides programming focused on competency restoration, general mental health needs, and enhancing life skills.

 **REACH Docket Competency Screener**

**$17,850** - Provided additional screening and evaluation capacity to the 2nd Judicial District REACH Docket.

 **Colorado Mental Health Institute**

**$669,850** - Purchased and provided cellular phones, access (minutes), and transportation for competency-involved individuals during the pandemic, as well as laptops and related expenses for providers and local jails to allow pandemic-era competency services to continue.

 **Community Based Enhanced Restoration**

**$400,000** - Provided Assertive Community Treatment to individuals so that they could be released on bond and restored to competency out-of-custody. The Fines Committee also funded housing options for clients who would otherwise be homeless.

 **Embark Assisted Living – Renaissance**

**$420,820** - Provided eight licensed transitional assisted living beds, called Renaissance, in El Paso County to competency-involved individuals. 24-hour staffing supervision and programming geared toward participants' health optimization, reintegration into the community, and assistance with long-term placement were also provided.

 **Peak View Behavioral Health**

**$440,800** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.

 **1st Judicial District Competency Docket**

**$95,127** - Establishing a docket coordinator position to support the 1st Judicial District Competency Docket.

 **Behavioral Treatment Services Day Reporting**

**$265,814** - Establishing a Day Reporting Center with treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.

 **Aurora Municipal Court Sustained**

**$719,284** - Screening individuals booked in the municipal jail and assessing appropriate individuals for competency. The program connects clients to treatment out of custody and works toward prosecutorial diversion. The Fines Committee funds a program administrator, pays for competency evaluations, and provides cell phones for clients.

| Program | Allocated | Spent |
| --- | --- | --- |
| 1st JD Competency Docket | $95,127 | $95,127 |
| 2nd JD REACH Docket | $220,000 | $220,000 |
| 12th JD Competency Docket | $69,555 | $43,027 |
| AllHealth Network Bridges to Care | $56,729 | $56,729 |
| Ananeo Housing | $1,847,630 | $1,810,556 |
| Arapahoe County Sheriff's Office | $347,000 | $347,000 |
| Assisted Living of Aurora | $270,688 | $270,688 |
| Aurora Sustained | $719,284 | $719,284 |
| Ava Health | $5,409,084 | $500,654 |
| Boulder County Justice Services | $505,842 | $436,212 |
| Boulder County Sheriff's Office | $260,000 | $195,201 |
| BTS Forensic Day Reporting | $265,814 | $97,120 |
| City of Greeley Homeless Solutions | $111,835 | $71,936 |
| Colorado CCH (CREST) | $1,500,000 | $1,500,000 |
| Colorado CCH (Restoration Housing) | $3,464,964 | $3,464,964 |
| Colorado Mental Health Institute | $669,850 | $669,850 |
| Community Based Enhanced Restoration | $400,000 | $400,000 |
| Denver Comp. Diversion & WellPower | $1,873,918 | $1,353,783 |
| DCC Competency Support Docket | $280,609 | $215,680 |
| Denver Health | $3,270,000 | $3,270,000 |
| Denver Sheriff Department | $663,114 | $663,114 |
| Dirt Road to Recovery | $162,120 | $152,500 |
| Douglas County Sheriff's Office | $683,300 | $530,508 |
| Embark Assisted Living - Renaissance | $420,820 | $420,820 |
| Embark Recovery Residences | $841,420 | $639,139 |
| Fidelity Behavioral Health | $1,683,559 | $1,444,695 |
| Gateway to Success-Pueblo | $510,000 | $486,079 |
| Homeward Alliance | $217,800 | $113,493 |
| IMPACT Integrated Insight Therapy | $1,178,000 | $1,178,000 |
| Larimer County Competency Docket | $1,187,412 | $986,366 |
| Larimer County Public Defender's Office | $262,000 | $262,000 |
| Mesa County LAI Program | $360,000 | $178,845 |
| Mesa County Pretrial CAP | $27,900 | $27,900 |
| Mile High Behavioral Healthcare | $286,745 | $224,860 |
| Monarch Competency Housing | $3,306,273 | $3,291,473 |
| NAMI Colorado | $91,030 | $91,030 |
| Peak View Behavioral Health | $440,800 | $440,800 |
| Pulse Line Collaborative Training | $1,058,270 | $637,692 |
| REACH Docket Competency Screener | $17,850 | $17,850 |
| SAFER Opportunities | $2,007,500 | $2,007,500 |
| San Luis Valley Recovery Housing | $313,762 | $283,619 |
| SCAO Competency Docket Analyst | $138,384 | $138,384 |
| Second Chance Center in the City | $965,002 | $787,994 |
| Servicios de la Raza Peer Support | $466,720 | $217,938 |
| Solange Assisted Living | $600,000 | $600,000 |
| SummitStone Health Partners | $3,029,283 | $1,536,249 |
| United Way of Weld County | $710,720 | $331,044 |
| University of Denver's Denver FIRST | $948,729 | $408,672 |
| Valor Program at Embrace | $8,902,175 | $6,992,032 |

■ Allocated  ■ Spent