

Groundswell Services, Inc.

# SPECIAL MASTER REPORT to JUDGE WANG

*Status as of May 28, 2026*

CENTER FOR LEGAL ADVOCACY, d/b/a

DISABILITY LAW COLORADO,

Plaintiff,

v.

MICHELLE BARNES,

in her official capacity as Executive Director of the Colorado Department of Human Services, and

JILL MARSHALL,

in her official capacity as Chief Executive Officer of the Colorado Mental Health Institute at Pueblo, Defendants.

Page 2

May 28, 2026

*Re: Civil Action No. 11-cv-02285-NYW*

The Honorable Judge Nina Wang
United States Magistrate Judge
District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Judge Wang,

This report serves as our May 2026 quarterly status report mandated by the Consent Decree that was filed March 15, 2019 pursuant to Case No. 1:11-cv-02285-NYW. As you know, *the past two quarters have featured drastic changes*, but the Consent Decree still requires us to monitor progress and provide recommendations to the Colorado Department of Human Services (CDHS; hereafter the Department) and the Court. Specifically, the Consent Decree (p. 24) indicates,

> *(i)* As part of the duties, the Special Master shall provide the Court and the Parties with status reports every other month for the first six months, and then quarterly thereafter…. Such reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services.
>
> *(ii)* The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

As you know, the Consent Decree prescribed a variety of steps the Department must take to improve the competency assessment and restoration system in Colorado, and to comply with mandated time frames and deadlines. The Department initiated these steps and demonstrated significant early progress until the COVID-19 pandemic brought the Department unforeseeable challenges and progress stalled. Since then, the Department has struggled: making substantial improvements to services and capacity, but also failing for years to meet the timelines prescribed in the Consent Decree.

Last quarter, Disability Law Colorado (DLC) alleged material violations of the Consent Decree. The parties began the dispute resolution procedures prescribed in the Consent Decree with an informal mediation on February 26. Additional mediation is scheduled to begin in August 2026, with the judge who mediated the Consent Decree in 2019.

# Current Status:

## New Funding, Pending Mediation, and Pending Challenges

***Recent Context:***
Following the tremendous setbacks during and after the pandemic, the Department made significant recovery in the latter half of 2023. The waitlist dropped by half (to 241) between June 2023 and June 2024 after the Department increased bed capacity and admitted more detainees to inpatient restoration than ever before. Improvements were steady for over one year. However, restoration orders spiked in late 2024 and have remained at record highs since then. The metrics in 2025 grew worse than those of 2024, but they remained better than those of 2023. Most recently, for over one year, the waitlist has remained between 320 and 380 people. The metrics that reflect treatment—inpatient admissions and discharges, and community release for outpatient restoration—have all remained far higher than in prior years. These have been sufficient to hold the waitlist roughly *steady* for more than one year—suggesting that capacity is roughly adequate for restoration orders—but admissions have not outpaced demand in the manner necessary to *reduce* the waitlist.

***Dispute Resolution:***
With the Consent Decree scheduled to end in late 2027, Disability Law Colorado, in a December 15, 2025 letter from counsel, alleged material violations of the Consent Decree, which triggered the dispute resolution procedures prescribed in the Consent Decree. On February 26, the parties met for an initial and informal mediation, facilitated by the Special Master, per the dispute resolution procedures prescribed in the Consent Decree. Parties engaged in the informal mediation process, but they did not reach agreements or resolution. Rather, the session ended with agreement only on the need to plan further mediation. Therefore, the parties have scheduled formal mediation sessions for August and September, with Judge Hagerty (who mediated the Consent Decree in March 2019).

***Funding***:
The pending mediation and potential litigation—both of which would certainly bring new fines and expenses—provided strong reason and leverage for the Department to seek emergency state funding, even in a year marked by severe budget constraints. In late April, the Joint Budget Committee agreed to approve nearly $30 million to fund the Department's plan to secure additional inpatient beds. The funding designates roughly $10 million for contracted inpatient beds in private psychiatric hospitals for restoration, another $16 million for contracted civil psychiatric beds,  roughly $600,000 for an additional restoration unit in the state hospital in Pueblo (which requires moving an adolescent unit from Pueblo to the Ft. Logan hospital). The remaining nearly $3 million in funds will be support beds in MHTL homes.

The use of recent funds is another point of significant disagreement between the parties. At the risk of oversimplifying two thoughtful perspectives, our understanding is that:

- DLC and plaintiffs view funding beds in private psychiatric hospital beds as an expensive and short-term strategy that may indeed serve many people currently on the waitlist; but the strategy leaves the state with *no new long-term resources* (i.e., beds in hospitals, MHTLs, or community placements) to serve those who will need services later, or who could have accessed housing and services to avoid entry into the competence system. Further, those receiving services in the future should, ideally, receive these in the community, with adequate housing, and without relying on competence restoration as the mechanism for treatment. In short, the funding is a costly strategy to "do more of the same" rather than support broader system transformation.

- The Department, in contrast, argues that they are bound by the Consent Decree to prioritize reducing the waitlist and wait times promptly; contracting beds is the fastest way to provide court-ordered inpatient restoration to those on the waitlist. Further, promptly contracting for dozens of beds should move many persons from the waitlist, so that current bed capacity (which has been sufficient to *maintain* the waitlist at roughly the same size for over one year) many be roughly sufficient to handle restoration orders through 2027. While acknowledging the need for ongoing funding to support inpatient and outpatient capacity, and agreeing on the broader needs for adequate community treatment, the Department maintains that their primary responsibility (per the Consent Decree) is to reduce the waitlist enough to provide prompt restoration services, per Consent Decree metrics. Broader system changes, though valuable, will not rapidly decrease the waitlist and wait times.

Of course, we see both parties as correct in important ways. We have long urged the Department to secure more funding to expand inpatient bed capacity, which is the strategy that has the most significant impact on the wait list and wait times (see the 7-year review in our prior Quarterly Report, now Appendix 2 of this report). Even in a year when the waitlist "held steady," a rapid surge in capacity is necessary to admit those on the waitlist, which would stabilize at a much smaller size that allows for brief wait times. Contracting for existing beds is far more rapid than building new beds. Though painfully expensive, contracting also avoids the delays and staffing challenges inherent in constructing, modifying, or launching new facilities. Contract beds are adaptable; forensic beds should shift to serving civil patients as the waitlist decreases. Like the Department, we tend to prioritize strategies that most rapidly reduce the waitlist, provided those strategies do *not* have counterproductive effects in the long term. We do not believe that surging inpatient capacity poses counterproductive effects in the long-term, but we emphasize that a variety of strategies (inpatient and community) must continue for long-term.

*Like the plaintiffs,* we emphasize there is no "quick fix" to Colorado's competence crisis. No stakeholder should consider this expensive investment a final *solution,* because this

problem will require sustained, strategic investments. Like the plaintiffs, we believe these investments should span the continuum of care: adequate inpatient beds (both forensic and civil), adequate community beds, and diversion strategies that move people with mental illness directly into treatment, without relying on the competence mechanism to do so.

*Recent developments threaten this crucial continuum of care. All parties* are concerned about the community placements for the competence-involved population have emerged with funding from the Fines Committee (i.e., the fines the Department pays for failing to meet Consent Decree metrics). These programs are not currently part of the state infrastructure, but they provide tremendous benefit to the competence-involved population (and others) via housing and treatment (see the section on Fines later in this report). Many of these programs planned their sustainability around future Medicaid funding for their valuable services. That is, many were well-designed to continue services *without* fines-funding. However, these now face *severe setbacks amid cuts to Medicaid funding*. The Federal government has slashed funding and Colorado's Regional Accountable Entities (RAE) have slashed their reimbursement for crucial services. The fines-funded programs have allowed Colorado to maintain the highest portion (i.e., greater than any other U.S. state) of defendants released to outpatient restoration in the community. The state will need these programs, and similar programs that offer housing as part of their treatment, as part of any strategy to provide prompt services, across a continuum of care, in the coming years. But these *state and federal cuts are a severe blow to the fines-supported programs that provide crucial services.* Any putative savings from cuts to these crucial community services will inevitably prove *more costly* to the state in many other ways, including demands on the inpatient services and competency-related services most relevant to the Consent Decree.

A second significant development with long-term implications is Senate Bill 149. As we described last quarter, state leadership became quite concerned amid a few highly publicized cases of persons found *permanently incompetent to proceed,* and called for rapid legislation to address this small, but challenging, population. Senate Bill 149 brings changes to civil commitment proceedings, including mechanisms for "emergency protective placements" for persons with intellectual and developmental disabilities or neurocognitive disorders who have not historically been eligible for civil commitment. The bill reflected one laudable goal of addressing certain gaps in the system (i.e., people with certain conditions were not eligible for civil commitment), but the bill is likely to place tremendous strain on the Department's inpatient capacity, and at tremendous expense. The Department estimates that the bill may lead to roughly 40 new patients committed each year, for periods averaging at least five years, which would drastically strain inpatient bed capacity and progress towards the goals of the Consent Decree.

In short, the Department secured funding to support rapid, dramatic improvements in inpatient capacity—likely the fastest route towards compliance with the Consent Decree. At the same time, the Department will soon face a surge in demand resulting from new legislation, and from devastating state and Federal budget cuts.

# **Table of Contents**

Context for Quarterly Metrics ............................................................................................. 7

Key Metrics for Progress: ................................................................................................... 9

Compliance with Time Frame Requirements ..................................................................... 9

    Key Metric*:* Competence Evaluation Time Frames ......................................................... 10
    Key Metric: Time Frames for Admission to Competence Restoration ......................... 12
    Key Metric: The Waitlist for Competence Restoration Services ................................. 16

Other Consent Decree Updates ........................................................................................ 21

    Interim Jail Mental Health Treatment ......................................................................... 21
    Release of Pretrial Detainees for Community-Based Restoration Treatment ............. 25
    Notification of Non-Compliance with Time Frames ................................................... 28

Consent Decree Section VII Updates ................................................................................ 35

    Civil Bed Freeze ........................................................................................................... 35
    Comprehensive and Cohesive Plan .............................................................................. 37
    Increase Community Restoration Services ................................................................... 39

Conclusion ....................................................................................................................... 42

Appendix 1 Inpatient Capacity ......................................................................................... 43

Appendix 2 Special Masters' March 2026 Data Review and Projections ......................... 44

Appendix 3 Fines-funded projects ................................................................................... 59

Appendix 4 Fines Committee Impact Report ................................................................... 81

# Context for Quarterly Metrics

*This shaded section remains similar across reports to provide historic context for new readers. Regular readers will not need this context.*

*Historic Context:*
Historic vulnerabilities in Colorado's public mental health system set the stage for the past two decades of competence-related challenges. For decades before the Consent Decree, Colorado had far too little inpatient hospital capacity for a state of its size, and it struggled to staff the largest inpatient hospital it did have. Colorado also had an unusual community mental health system that was able to operate selectively, declining services to those involved in the criminal legal system. Finally, Colorado could anticipate that orders for competence evaluation and restoration would rise, just as they were rising across the country, and other states were beginning to experience a "competency crisis." Put simply, *longstanding structural and contextual factors left Colorado with a precarious mental health system*, vulnerable to any further strain.

Amid these longstanding vulnerabilities and escalating referrals for competence services, the parties (i.e., Disability Law Colorado and the Department) engaged in years of litigation to address the increasing number of detainees waiting for competency services, and the increasing time these detainees spent waiting. The litigation culminated in the 2019 Consent Decree that prescribed many steps the Department must take, and the timelines it must meet, to improve competency services in Colorado. The Department initiated these steps in ways that were faithful to the Consent Decree. We tend to summarize the spirit and provisions of the Consent Decree in three goals:

1. Reducing the *number* of people on the waitlist for restoration services.
2. Reducing *wait times* for people on the waitlist, particularly those with severe illness.
3. Reducing *harm* (by providing care) to people on the waitlist.

*Progress on the first goal* was significant *until* the COVID-19 pandemic began in March 2020. The number of detainees on the waitlist had finally dropped below 100. But as the pandemic persisted, the Department could not keep pace with court orders for competency services, and the waitlist grew. At the Colorado Mental Health Hospital in Pueblo (CMHHiP) where inpatient restoration services occur, quarantine procedures slowed or stopped admissions, and the waitlist grew dramatically. Furthermore, CMHHiP became so short-staffed that it could not operate at full capacity, which further slowed admissions. For almost two years, more than 80 beds at CMHHiP remained unusable because there were insufficient staff to operate the units. In July 2023, the waitlist peaked at 483 people.

The Department made great efforts to address this crisis. For example, they established contracts with private hospitals to accept Detainees. Over the past few years, the Department opened new units at CMHHiFL and reopened other units (at CMHHiP) that were closed for over one year. *Indeed, the Department has reopened all beds that were closed during the pandemic, and hospital capacity substantially exceeds the capacity before the pandemic.* The Department also launched Mental Health Transitional Living homes, creating community-based opportunities for people ordered to competence restoration as well as hospital patients who were otherwise difficult to place in previously existing community settings.

*Progress on the second goal* was also clear in the first year following the Consent Decree. Defendants with most severe treatment needs (i.e., "Tier 1") were consistently admitted within the prescribed 7-day timeline, though delays remained for those with less acute needs ("Tier 2"). But COVID-19 created new sources of delay, even for those with most urgent needs. Therefore, almost all competency-involved Pretrial Detainees—whether designated Tier 1 or Tier 2—faced wait times that *far* exceeded those permitted by the Consent Decree. *These delays continue*, though less severely; average wait times still exceed those mandated by the Consent Decree.

*Progress towards the third goal*—providing care for those waiting—continued even amid significant barriers. The Department's Forensic Support Team (FST) works to monitor detainees and provide care while these detainees await hospitalization. The FST has also worked to transition many of the less acutely ill detainees to restoration services in the community when judges allow bond. Still, some Detainees experience serious and severe distress in jails that are ill-prepared to treat severe psychiatric illness.

Through 2023 and 2024, the Department increased capacity for inpatient restoration: they re-opened 39 beds at CMHHiP, they opened another 22-bed unit at CMHHiFL, and they expanded the Restoration Treatment Unit in the Denver Jail (DRTU) from 12 to 18 beds. *These changes significantly reduced the waitlist.* The Department also transitioned some long-term patients into new Mental Health Transitional Living (MHTL) homes. These MHTL homes are serving over 150 people across a dozen locations. Transitioning long-term patients from the hospitals opens beds for patients who will require less time in the hospital. With increased capacity, the Department achieved roughly five quarters of steady improvements (i.e., decreases in the wait list and most wait times).

The progress that was steady through late 2023 and most of 2024 was reversed with an unprecedented spike in court orders for competence evaluations during October 2024. This led to increased orders (and wait times) for competence restoration. Orders for competency services remain high, and the Department has limited control over this "inflow." The Department has been able to maintain the waitlist at roughly the same level for over one year. They have not fallen further behind, but current capacity has been sufficient only for maintaining (constraining) the waitlist, rather than reducing it.

# Key Metrics for Progress:

## Compliance with Time Frame Requirements

As prescribed in the Consent Decree, a primary focus of our quarterly reports must be the Department's compliance with time frame requirements:

> *(i)* As part of the duties, the Special Master shall provide the Court and the Parties with status reports ... Such **reports shall address the Department's compliance with the timeframe requirements of the Consent Decree concerning Competency Services** and shall provide a detailed summary of information and recommendations the Special Master believes the Court and Parties should consider relating to the Department's compliance with the Consent Decree timeframes concerning Competency Services. (Consent Decree p. 24)
>
> *(ii)* The Special Master's report shall include, but is not limited to, reporting on the number of Pretrial Detainees ordered to receive Competency Services, an assessment of the Department's operations, systems, and admissions practices and policies relating to the Department's ability to comply with the Consent Decree timeframes, and guidance to the Department for improvement and increasing efficiencies in these areas.

Therefore, a primary focus of our review is the Department's progress in meeting the time frames delineated in the Consent Decree. This includes both time frames for competence *evaluation* and for competence *restoration*. These will be the key metrics to gauge progress, so they provide our starting point and represent a primary focus throughout the report. Of course, performance in meeting these time frames depends greatly on enacting the other steps prescribed in the Consent Decree, so subsequent sections of the report review those steps in greater detail.

## Key Metric: Competence Evaluation Time Frames

> ***33. (b) Performance of Jail Competency Evaluations.*** The Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to the attached table (Table 1), after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. This timeframe requirement shall apply to the following counties: Adams, Alamosa, Arapahoe, Boulder, Broomfield, Crowley, Custer, Denver, Douglas, El Paso, Elbert, Fremont, Huerfano, Jefferson, Larimer, Mesa, Otero, Pueblo, Teller, and Weld. Counties not specifically identified are counties that use the "Hold and Wait" court ordered process. Counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 30 days of the meeting. Beginning January 1, 2020, counties utilizing the Hold and Wait Evaluation process will be offered a meeting date within 30 days of the Department's receipt of the Court Order and Collateral Materials, and the evaluation will be completed within 14 days of the meeting.

### Background

Historically, the Department met most evaluation time frames, even before the 2019 Consent Decree and even through most of the pandemic. Court orders for jail-based competence evaluations dropped to an all-time monthly low at the start of the pandemic (e.g., 56 people in April 2020). But arrests and orders for jail-based evaluations resumed dramatically, peaking at a new record two years after the pandemic began (i.e., 178 in March of 2022). Still, the Department returned to almost perfect compliance with evaluation time frames, nearly every month.

However, in October 2024, *the Department received an unprecedented spike in orders for jail-based competence evaluations.* These 221 orders far exceeded the prior 2024 average of 155 orders per month. Court Services was unable to complete these evaluations within required timelines, and they have struggled as orders for evaluations remained high into 2026. Last quarter, they averaged 180 per month, *the highest quarterly average on record.* This quarter remained similar, with an average of 179 per month.

This demand inevitably creates challenges for timely competence evaluations. Staffing problems (i.e., many vacancies in salaried and contracted evaluator positions) still constrain the Department's ability to promptly complete the increasing orders for evaluations.

| Average waiting time (in days) for a competence evaluation[1] | | | | | |
|---|---|---|---|---|---|
| | Nov 25 - Jan 26 | Feb 2026 | Mar 2016 | Apr 2026 | Requirement |
| Jail-based Competency Evaluations | 30.3** | 27** | 23** | 22** | 21 days |
| Inpatient Competency Evaluations | 30* | n/a | n/a | n/a | 14 days |

\* = at least one Detainee waited longer than the maximum time frame for the evaluation
\*\* = most Detainees waited longer than maximum time frame for restoration services

Given the record-high evaluation orders (amid staffing shortages) Court Services failed to match their historic pattern of completing all evaluations within the 21-day deadline. The average wait times (22-27 days) exceeded the 21-day time limit. But with each month since last quarter, they have moved much closer to meeting the timelines.

Currently, the Department has nearly two dozen vacant salaried positions, so they are handling more evaluations with fewer evaluators. Altogether, they have performed surprisingly well amid longstanding strains and limitations, but several quarters of record-high evaluation orders have kept them stretched to their limits, failing to meet the timelines last quarters, and coming much closer this quarter, albeit with many detainees still waiting slightly longer than required.

Regarding inpatient evaluations, only two were ordered, and one was resolved by admission for evaluation.

*Orders for **jail-based** evaluations remained at record high levels, with a monthly average of 179, such that Court Services—amid staffing shortages—has been struggling to maintain their historic compliance with evaluation timelines. Although not in compliance, they moved much closer to compliance  this quarter.*

---

[1] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, pp. 21, 30.

Page 12

## Key Metric:

## Time Frames for Admission to Competence Restoration

### Historical Context

Historically, the Department failed to provide timely restoration services, prompting the litigation that led to the Consent Decree. Defendants who were admitted for inpatient restoration treatment at CMHHiP or RISE had waited, on average, 71 days. The Consent Decree then mandated a triage system,[2] requiring Tier 1 defendants to begin restoration services within 7 days and Tier 2 defendants within 28 days. Wait times and the number on the waitlist initially decreased *until* the onset of the COVID-19 pandemic, but they greatly increased thereafter. Wait times have remained far out of compliance even after the pandemic subsided. They improved steadily between 2023-2024 but delays subsequently increased and remained high throughout 2025, then held fairly stable through most of 2025 and into 2026.

*Recent Wait Times for Inpatient Restoration for Pretrial Detainees*[3]

| Month | Number "admitted or ended" for inpatient restoration | | Average days waited before "admitted or ended" on inpatient restoration order | | Number waiting more than the maximum days for admission to CMHHiP inpatient restoration | |
|---|---|---|---|---|---|---|
| | Tier 1 | Tier 2 | Tier 1 | Tier 2 | Tier 1 | Tier 2 |
| February 2026 | 17 | 95 | 35 | 81 | 15** | 77** |
| March 2026 | 16 | 112 | 27 | 82 | 16*** | 93** |
| April 2026 | 22 | 104 | 30 | 84 | 19** | 77** |
| March 2019 (before tiers) | 44 | | 58.2 | | 31 | |

** = most Detainees waited longer than maximum time frame for restoration services
*** = all Detainees waited longer than maximum time frame for restoration services

---

[2] See Consent Decree paragraph 43.

[3] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, pp. p. 14.

While the number of defendants admitted to inpatient restoration has drastically increased—*nearly triple the 2019 monthly admission rates, such that the Department is serving far more people*—the speed of these admissions has certainly not increased as rapidly as the volume has.

Thus, the Department remains out of compliance with deadlines to admit defendants for restoration services. Between February and April 2026, the Department was noncompliant with the 7-day time frame for all but 5 (of 55 total) Tier 1 Detainees admitted. Of the 311 Tier 2 Detainees admitted in that same period, 256 were admitted or had their waits otherwise ended beyond their time frame of 28 days.

*However, these rates reflect improving timing.* Overall, across both Tier 1 and Tier 2 admissions, the Department recorded a 16.4% compliance rate (60 Detainees out of 366 admissions), which is the highest rate in the past year (7.3%, 13.9%, and 14.1% for the past three respective quarters). The average days waited for Tier 1 Detainees (30.7 days), while still far out of compliance, was the lowest in more than a year. The Tier 2 average wait time was also at its lowest point in the past year (82.4 days).[4]

| *Average Wait (in days) for Inpatient Competence Restoration Services*[5] | | | | |
|---|---|---|---|---|
| | **May – July 25** | **Aug - Oct 25** | **Nov 25 – Jan 26** | **Feb - Apr 26** |
| **Tier 1** | 61.5 | 33.2 | 65.0 | 30.7 |
| **Tier 2** | 92.2 | 92.7 | 89.4 | 82.4 |

Still, pretrial Detainees are waiting longer than Consent-Decree time frames allow:
- Tier 1 detainees wait *more than four times longer than allowed* by the Consent Decree (i.e., an average of 30.7 days rather than 7 days).
- Tier 2 Detainees wait *nearly three times longer than allowed* by the Consent Decree (i.e., an average of 82.4 days rather than 28 days).

---

[4] To be clear, some detainees originally designated as Tier 2 decompensate into severe illness, such that FST urges them for priority admission. Conversely, a few detainees originally designated as Tier 1 may stabilize, and need admission less urgently than originally anticipated, and less urgently than some Tier 2 detainees. In this regard, tier designations are an imperfect (though generally helpful) proxy for clinical status and actual need for urgent admission.

[5] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, p. 14.

Page 14

The number of admissions across tiers shows improvement, even while remaining far from compliance. Tier 1 admissions rebounded strongly this past quarter with 55 admissions (second most admissions in the past year). Tier 2 admission numbers reached the highest quarterly number in more than a year (311 vs.3 272, 286, and 284, respectively). And, like last quarter, there were fewer Tier 1 Detainees remaining in jail at the end of this quarter than in most quarters for more than a year (an average of 15 as compared to 15, 17, 30, and 45 in previous quarters), reflecting the sustained prioritization of Tier 1 Detainees for admission.

Overall, this these data reveal improvement, but certainly not compliance. More Detainees were admitted this quarter than in previous quarters this past year (366 vs. 313, 331, and 365 for previous quarters). Additionally, average wait times decreased, and they were at their lowest in more than a year. The overall compliance rate hit its highest number in more than a year. *More people were admitted, and more quickly, than at any quarter in more than a year.* Still, the Department was far out of compliance for both Tier 1 and Tier 2 Detainees, admitting only 16.4% of Detainees within mandated time frames. It appears that current restoration capacity (both inpatient and outpatient) may be just minimally adequate for some decrease in both wait times and the number on the waitlist, but additional capacity is necessary for greater decrease.

## "Rapid Inpatient Stabilization" for Faster Community Transition

The Department initiated a Rapid Stabilization Unit at the Ft. Logan state hospital in late 2025. The program is designed to admit and discharge a small, select subset of Detainees: those with a history of responding quickly to antipsychotic medication, who likely meet involuntary civil commitment criteria, and who are assigned to a Bridges liaison. The goal of the unit is quick stabilization and discharge, so stakeholders must be assured that either a PR bond or a dismissal of charges will occur once the person is stabilized at the hospital (hence the need for a Bridges liaison). Thus, all participants are moved relatively quickly from a jail setting to CMMHI-FL and then to the community. We appreciate this creative and specialized initiative, which essentially operates as a second triage pathway for those that can likely be treated and discharged quickly. To date, ten Detainees have been admitted into the program, and four have been discharged.

## Substantial Funding will Increase Inpatient Capacity

This quarter, the Colorado legislature appropriated nearly $30,000,000 to support the Department's FY27 response to the Consent Decree. The funding was approved even amid a state budget shortfall, recognizing the impending expiration of the Consent Decree and the potential for further litigation. Most of this new funding will expand inpatient restoration and civil bed capacity across three basic areas: Increasing contracted restoration beds at Peakview Hospital (32 beds); new contracted civil beds at Peakview (24 beds), and re-purposing an existing CMMHIP unit to serve restoration patients (22 beds). Remaining funding will increase MHTL capacity, which will also reduce the waitlist, albeit less directly.

*This funding surge should meaningfully reduce the waitlist*, as each bed serves 3 to 4 Detainees per year. Indeed, the Department based their budget request on an analysis of beds necessary to substantially reduce the waitlist over the next two years. As we illustrated in last quarter's data analysis (provided in Appendix 3 of this report), the number of inpatient restoration beds has historically had the most direct impact on the waitlist. Of course, community and civil capacity remain crucial, and we affirm that the funding surge will substantially increase civil bed capacity and somewhat increase MHTL capacity. But the addition of more than 50 restoration beds should have the most immediate, direct impact overall.

Indeed, the 32 additional restoration beds at Peakview beds have already been contracted and they have begun to accept patients, as the Department was able to move funding and expenses to accommodate an earlier start than expected. So we have already seen a positive impact on the waitlist. We anticipate increased impact as the restoration and civil beds become increasingly available. The increased MHTL capacity and the renovation of the CMHHIP unit will have a more delayed impact, as those efforts are scheduled to span the next 12 months.

## Key Metric: The Waitlist for Competence Restoration Services

**Historical Context**
The Consent Decree aims not only to reduce wait *times* for defendants, but also to reduce the *number* of defendants waiting at all. When admissions are prompt, fewer people must wait.

Before the Triage system, the waitlist averaged around 170 defendants. By June 2020, the waitlist dropped to nearly 100, and the Department projected that the waitlist would be minimal by December 2020. But the pandemic reversed that progress, and eventually, in June of 2023, the waitlist peaked at 483.

Since June 2023, the reopened beds at CMHHiP, increased capacity in the Mental Health Transitional Living homes, and several fines-funded housing programs greatly improved capacity. Subsequently, the Department admitted many more detainees than in previous years, and the waitlist decreased substantially throughout most of 2024 (as low as 208 in October 2024). Unfortunately, this trend reversed in October 2024, amid the aforementioned spike in orders for evaluations, and the waitlist increased again.

**Current Realities**
Restoration orders increased this quarter. An average of 141 individuals have been ordered to inpatient restoration per month since May 2025; this past quarter averaged 155 per month. The average number of individuals on the waitlist over the past 12 months was 346 with a standard deviation of 18, representing a fairly steady waitlist. Numbers from this past quarter are higher than the yearly average. A total of 364 Detainees remained on the waitlist as of April 30, 2026.

| *Number of Defendants Waiting for Inpatient Restoration*[6] | | | | | |
|---|---|---|---|---|---|
| | **March 2019** | **Nov 25 – Jan 26** | **Feb 2026** | **Mar 2026** | **Apr 2026** |
| **Combined** | 157 | 340 | 372 | 376 | 364 |
| **Tier 1** | N/A | 15 | 17 | 17 | 10 |
| **Tier 2** | N/A | 324 | 355 | 359 | 354 |

Figures reflect the number of persons waiting for restoration on the last day of the respective month.

The number of Detainees on the waitlist varied widely across 2023-2025. Although the April 2026 number of 364 remains high compared to the low of 208 in October 2024, it is still far lower than the high of 483 in June 2023. Overall, the number of people on the

---

[6] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, pp. 6, 10.

waitlist today is similar to the number one year ago (364 vs. 357). Still, the list remains too long to comply with time frames given current inpatient capacity.

| *Number of Detainees Waiting for Inpatient Competence Restoration Services at the end of the month*[7] | |
|---|---|
| March 2019 | 157 |
| June 2023 (peak) | 483 |
| Apr 2025 | 357 |
| May 2025 | 354 |
| June 2025 | 350 |
| July 2025 | 330 |
| Aug 2025 | 342 |
| Sep 2025 | 322 |
| Oct 2025 | 327 |
| Nov 2025 | 348 |
| Dec 2025 | 331 |
| Jan 2026 | 340 |
| Feb 2026 | 372 |
| Mar 2026 | 376 |
| Apr 2026 | 364 |

---

[7] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, p. 10.

*Qualitative review and extraordinary cases:* The waitlist is not simply a metric, but rather a group of *people* with psychiatric illness awaiting much-needed treatment. Each week, we review the Forensic Navigators' updates on each person in jail who has been waiting for inpatient restoration longer than the Consent Decree allows. In that review, we see many acutely ill people remaining in jails awaiting admission who might otherwise meet criteria for an involuntary mental health hold due to grave disability, or who languish with severe symptoms of untreated psychosis. These conditions leave them vulnerable to self-harm, victimization, worsening symptoms, or new charges.

Over most of the year, we have been encouraged that the number of people whom *we* categorize as the sickest and most vulnerable Detainees has remained relatively limited (about 10 people per month out of 364 on the waitlist). Additionally, 10 Tier 1 Detainees (those whom the competence evaluator identified as most severely ill) remained on the waitlist at the end of January 2026; *this is the lowest number of Tier 1 Detainees in more than a year.* This is encouraging.

One of our primary concerns remains the difficulty transferring Detainees with medical problems out of jails and into hospitals and/or community placements. This is particularly difficult for geriatric Detainees. The geriatric unit at CMHHiP is chronically full, with little turnover. Few community placements welcome these detainees with special needs. The MHTLs created some additional community capacity, but those beds are now filled with long-term patients. Often the Forensic Support Team has difficulty finding community placements due to the combination of pending criminal charges and challenging medical conditions. We affirm the Department's interest in expanding options for the geriatric and medically vulnerable population, though we acknowledge that other Departmental priorities – housing, civil commitment, case management, long-acting injectable medications – are also important.

Despite some monthly variation across 2025, the number of people waiting in jails for restoration services (364) is similar to the number on the waitlist one year ago (357). Although more Detainees were admitted to hospitals this past quarter than in the past year, too many sick and vulnerable Detainees waited in county jails. Although the number of Tier 1 Detainees is at its lowest quarterly average in years, the overall waitlist remains substantially longer than it was at the start of the Consent Decree, and it has stubbornly remained in the mid-300s since April 2025. This suggests that the pace of admissions and discharges is likely appropriate to *match* demand, but that the number of inpatient and outpatient beds are not sufficient to significantly *decrease* the waitlist. Stated differently, capacity is sufficient to maintain (or constrain) the waitlist and prevent significant growth. But current capacity is insufficient to "catch up" and reduce the waitlist by admitting more detainees, more rapidly, than are ordered to restoration.

### Senate Bill 149:

### New legislation poses tremendous challenges to Consent Decree progress

We described in the last quarterly report the increasing attention to defendants found *permanently incompetent to proceed* (PITP). Recall that roughly 80% of defendants ordered to competence restoration services are ultimately "restored to competence" and proceed with adjudication. The few defendants who cannot be restored to competence typically fall into one of two clinical categories: 1. They have severe and treatment-resistant psychotic illness; 2. They have a longstanding and severe intellectual disability (often related to a developmental disability) or other severe cognitive deficits, such as those attributable to a traumatic brain injury (TBI) or dementia. In all jurisdictions, this small population poses a challenge. Restoration efforts cannot continue indefinitely (per *Jackson v. Indiana*). At that point, for most defendants found permanently incompetent to proceed (PITP), courts opt to pursue civil commitment. Often these defendants with severe symptoms—particularly those with persistent psychiatric illness—meet civil commitment criteria because they are unable to care for themselves, and a small minority even pose a danger to themselves or others due to their symptoms. However, Colorado statute has *not* allowed for civil commitment on the basis of an intellectual or developmental disability without a concurrent psychiatric illness.

The dilemma of managing PITP defendants in Colorado recently received intense media attention—particularly to some unusually tragic cases—creating tremendous public pressure. Governor Polis and many stakeholders urged legislation, ultimately culminating in Senate Bill 149, passed this month.

SB-149 is lengthy (223 pages) and complicated, reflecting many compromises, and addressing many aspects of public mental health services, including procedures around adjudicative competence system and the civil commitment. A full review is beyond the scope of this report, but primary features included: Changing the burdens and presumptions underlying competence cases (particularly those that may be *permanently* ITP); Changing civil commitment procedures; and Adding an Enhanced Protective Placement option similar to civil commitment for those found PITP based on a neurocognitive condition.

We are sympathetic to the challenges underlying this legislation; a very few cases were unusually vexing and not adequately addressed by the existing law and policy. Legislators faced no simple solutions, and they diligently tried to address certain gaps in Colorado services, seeking input from stakeholders. Colorado certainly needs more treatment settings for people with intellectual disability and neurocognitive conditions, including those found PITP. We hope an eventual result of the legislation is more appropriate treatment options for this unique population.

At the same time,  we lament that this legislation is almost certain to harm progress towards the goals of the Consent Decree. For example, long-term inpatient hospitalization of persons found PITP is a long-term commitment that will decrease inpatient bed capacity for restoration services. The Department estimates there may be as many as 40 people per year who may be hospitalized, with lengths of stay that are likely to exceed five years. If these estimates are accurate, the bill places a devastating strain on inpatient capacity, beginning just as the state has finally funded a surge in inpatient capacity that would be roughly sufficient to drastically decrease the waitlist.

Defendants who are PITP on the basis of intellectual or developmental disabilities usually do not *need* inpatient psychiatric hospitalization for clinical reasons, and once admitted they tend to remain for years, because their symptoms cannot be resolved with hospitalization and medication alone, as is true for most other patients in these settings. But to the extent that appropriate placements are lacking, state psychiatric hospitals (sometimes described as "a bed of last resort") will become the default placement for this population of PITP defendants. In our view, appropriate placements—already much needed—will become even more crucial. However, SB-149 went into effect immediately, and long before new, appropriate placements are available.

# Other Consent Decree Updates

## Interim Jail Mental Health Treatment[8]

> **34. Interim Jail Mental Health Treatment.** If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. §§ 27-60-105 *et seq.* to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. This paragraph does not toll or otherwise modify the Department's obligation to Offer Admission to the Pretrial Detainees for Inpatient Restoration Treatment. Interim Jail Mental Health Treatment shall not replace or be used as a substitute for Inpatient Restoration Treatment but does not preclude the Department from providing Restoration Treatment. A member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee.

### Historical Context

The Department is required to partner with county jails to develop a program of coordinated services for competency-involved detainees. The Department utilizes Jail-Based Behavioral Services (JBBS) as a hub for coordinating these subcontracted services across Colorado. These providers are tasked with providing adequate mental health services to detainees involved in competency matters until their transfer to competency restoration services.

### Current Realities

The JBBS teams provide critical services across the state. They remain the primary frontline mental health workforce for Pretrial Detainees. Since the elimination of the Competency Enhancement Teams in July 2025, Forensic Support Team (FST) Navigators have more difficulty accessing critical mental health treatment and crisis information from county jails, because CET personnel had been primary sources for that information. Fortunately, the FST has been resilient in solving similar problems previously, and the expansion of Bridges personnel has been helpful in mitigating those challenges.

---

[8] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the time frames in the Consent Decree. It is not a substitute for competency restoration services.

Page 22

## Expanding the Continuum of Care:

## The Department Develops an Outpatient Clinic

The Department is developing a multi-purpose outpatient clinic that will provide more comprehensive treatment for persons at risk for entry into the competence restoration system. The Department describes the clinic in this way:

> The Outpatient Clinic is a single-location treatment clinic to be opened on the Fort Logan Campus. The Clinic will offer a continuum of care including Partial Hospitalization (PHP), Intensive Outpatient (IOP), and Assertive Community Treatment (ACT). In the PHP, considered the best alternative to inpatient treatment, patients will receive more than 20 hours per week of mental health treatment, including therapy, medications, life skills training, and case management. IOP, a step-down from PHP, includes more than 9 hours of mental health treatment per week. Finally, ACT is the step down from IOP, with services delivered in the patient's community and home, including bringing them onsite for psychiatry appointments. This continuum is designed to stabilize patients while they live in their communities and help them move from higher levels of dependence to increasing independence.

> Our timeline is to open the clinic in a graduated fashion, starting with fewer staff and patients in October 2026, then increasing staff and patients until reaching full capacity in February 2027. At full capacity, the Clinic expects to see more than 40 patients daily across its continuum and will actively transfer patients to community safety net providers once they have gained sufficient stability in their mental illness symptoms."

The Outpatient Clinic is designed to work alongside HB 1355, which allows for persons who have been found incompetent to instead have their charges dismissed and placed into treatment. To date, options for community treatment and placement have been too limited for courts to exercise this new judicial option. Though promising in theory, the SB-1185 has been too rarely used. However, the Department's Outpatient Clinic is designed to provide a continuum of treatment services while simultaneously coordinating housing and other resources with the Bridges program. This model has been successful in other jurisdictions (often referred to as the "Miami model" given its genesis in Miami-Dade County, but which has now been replicated elsewhere). We are pleased to see the Department developing these innovative initiatives that focus on community placement, dismissal of charges, and deflection from the competence restoration system. Indeed, over the course of the Consent Decree, all parties have consistently agreed on the goal of greater diversion from the competence system into robust community treatments like this one underway.

**Alternative Restoration Settings**

The Consent Decree is clear that Jail-Based Competency Restoration (JBCR) should only be used as limited stopgap for Pretrial Detainees. It should not be considered a permanent solution for Pretrial Detainees, nor should it ever be the primary setting for inpatient restoration. Currently, the two JBCR programs in Colorado provide a total of 78 treatment beds (60 at RISE, and 18 at DRTU). This is the fewest JBCR beds in several years.

The Consent Decree prioritizes community settings and resources, and it encourages a limited role for privately contracted restoration beds. Recent legislative appropriations have allowed the Department to expand the capacity at Peakview Hospital from 84 to a total of 110 restoration beds over the past few months.

While we emphasize neither jail-based restoration nor contracted beds should ever be the primary strategy for maintaining adequate capacity, we also note the important role that all of these beds play in serving a subpopulation of Colorado's restoration Detainees.

First, the outcomes for each alternative restoration program are strong, even compared to the state hospitals. RISE has a median length of stay of 119 days, operating at 98.3% capacity. DRTU operates at 99.1% capacity, and it has a median length of stay of 84 days. Privately contracted beds at Peak View Hospital also show strong outcomes (112 median days at a 98.1% census). These outcomes compare favorably to Colorado's two state hospitals: the Pueblo hospital had a median length of stay of 134 days and an operating census of 90.9% across the past 12 months, while the Fort Logan hospital had a median length of stay of 129 days and an average census of roughly 91.7%.

| Facility | Length of Stay (median days, 12 months) | Census percentage (12 months) |
|---|---|---|
| CMHHIP | 134 | 90.9% |
| CMHHIFL | 129 | 91.7% |
| RISE (60 beds) | 119 | 98.3% |
| DRTU (18 beds) | 84 | 99.1% |
| Peak View (110 beds) | 112 | 98.1% |

To be clear, *all* of these outcomes are strong. Direct comparison is inappropriate, because each site treats a slightly different patient population (with CMHHIP usually treating patients with the most severe and challenging symptoms, who are difficult to place in community settings). Even so, each of these five inpatient facilities are nearly full, all with reasonable restoration time frames. The high census and generally reasonable length of stay have certainly contributed to the relatively stable waitlist figures since April 2025.

Page 24

These figures also underscore the importance of the three alternative restoration programs (RISE, DRTU, and Peakview). They fill more of their beds, and they restore their patients more quickly. Again, these settings serve a qualitatively different population than the two state hospitals; Pueblo and Fort Logan are often required to admit more challenging, longer-term patients. Additionally, the Pueblo census figures are impacted by civil conversions after a person has been found permanently incompetent.

Still, the JBCR programs and privately contracted beds remain crucial to addressing the competency restoration demand in Colorado. Until CDHS increases their bed capacity to replace the 188 currently contracted beds, those alternative settings remain crucial. Indeed, given the impact that increasing inpatient beds have had on the waitlist since 2021, we expect the recent increase in Peakview beds will have a demonstrable effect on the waitlist.

# Release of Pretrial Detainees for Community-Based Restoration Treatment[9]

> **35. Release of Pretrial Detainees for Community-Based Restoration Treatment.** If the court releases the Pretrial Detainee on bond to commence Community-Based Restoration Treatment, the Department shall coordinate with the Court Liaison to develop a discharge plan (in a format approved by the Special Master) within seven days of the order to all parties involved in the Community-Based Services Recipient's case, and the Court Liaison and community-based provider.

The Department has continued to meet the requirement to develop discharge plans for people identified as appropriate for Outpatient Competence Restoration programming (OCRP). Indeed, the waitlist would be *far* higher without their persistent efforts to shift so many detainees into the Department's state-wide outpatient competency restoration program and community supports.

### Housing

The Forensic Support Team (FST) Navigators (described below) continue to facilitate transitions from jail to community housing across the state. Most community housing options are near Denver and Colorado Springs, but the Fines Committee now supports housing across many other regions of Colorado. The total number of housing placements and beds funded by the Fines Committee remains high. Valor, an agency in Colorado Springs, has maintained their 60 beds since September 2025. Ava Health, a provider on the Western Slope, continues to work hard to overcome barriers in fully opening their 70-bed facility across several levels of care. Most of these housing options offer additional treatment and supportive services. Mental Health Transition Living (MHTL) homes provide additional community housing and services as well; they prioritize "difficult to place" patients in the state hospitals or those who are transitioning from the waitlist to the community. These MHTL beds continue to provide community housing and service options for people who have traditionally been very hard to discharge from CMHHiP. As of April 30, 2026, 153 of 164 beds across all MHTL locations were filled. The MHTL homes are among the Department's best strategies to improve public mental health services in Colorado, and their impact has certainly extended beyond the competence-services system. Several other fines-funded housing initiatives provide dozens of beds for people in the competence system, such as the Ananeo, Monarch, and Fidelity programs. Recent barriers to Medicaid reimbursement have created unexpected financial challenges for all of these programs, making their futures more tenuous. Please see Appendix 3 for a description of these housing-first programs.

---

[9] "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

Page 26

*Forensic Support Team (FST):* FST Navigators continued their contact with Pretrial Detainees this quarter. FST Navigators were assigned to a monthly average of 1,022 persons in county jails waiting for (or engaged in) competence evaluations or inpatient restoration services this past quarter – higher than previous quarter's averages.

For individuals awaiting competency-related services this quarter, Forensic Navigators met face-to-face with Detainees an average of 906 times per month (an increase from the previous three quarters), and they had a monthly average of 1,405 contacts with community care teams or stakeholders (about average for the three previous quarters).[10] Despite fewer opportunities for contact with JBBS members, these numbers represent tremendous FST time and attention devoted to Detainees. Before the Consent Decree began, Detainees would wait for competence-related services with no monitoring from the Department.

The FST also continues to facilitate discharges and community transitions for many people on the waitlist. FST actions include changing the restoration setting from state hospitals to the community, placing appropriate Detainees into community-based specialty programs (such as Fines-funded settings), working with competency dockets to facilitate quicker hearings and community restoration, advocating for dismissal of charges or resolution of competency for those who have stabilized, and more. Several thousand CMHHiP bed days have been "saved" through these combined efforts.

Finally, Navigators continue to work closely with specialty judicial initiatives. These include (but are not limited to) the Larimer County Competency Court, the Denver Competency Diversion program, the REACH docket in Denver County, and day reporting services in El Paso and Pueblo counties. These programs are discussed in the "Notification of Non-compliance with Time Frames" section and Appendix 3. The FST is also partnering with many new competency dockets, and they continue to coordinate efforts with Bridges liaisons, Bridges Care Coordinators, and other court-appointed staff within the new competence dockets. HB 1355 expanded the role of Bridges liaisons in coordination with competence dockets, and the FST Navigators remain good partners with these other professionals. We continue to affirm the Navigators collaborations with these innovative programs. Overall, the FST continues to be a strength within the Department, collecting information from JBBS providers, Bridges personnel, deputies, and others in the jails. As we convey in each quarterly report: the impact of the FST is critical, consistent, and difficult to overstate.

---

[10] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, pp. 33-35.

## Transportation of Pretrial Detainees

> ***36. Transportation of Pretrial Detainees.*** If a Pretrial Detainee is transported to the Hospital for an Inpatient Competency Evaluation and the Department or a medical professional opines that the Pretrial Detainee is incompetent and the provisions of C.R.S. § 27-65-125 have been met, the Department shall not transport the Pretrial Detainee back to his/her originating jail.

No new Detainees were admitted to Departmental inpatient facilities for competence evaluations this past quarter.[11] This follows two quarters in which two total Detainees were admitted for competence evaluation.

---

[11] Information retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026, p. 21.

## Notification of Non-Compliance with Time Frames

> ***38. Notification of Non-Compliance with Timeframes.*** The Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes.
> (a) Only one notice per Pretrial Detainee shall be provided and should include: (i) The name of the Pretrial Detainee; (ii)  The Pretrial Detainee's location; (iii)  The Pretrial Detainee's charges based on information available to the Department; (iv) The Pretrial Detainee's bond amount based on information available to the Department; (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate; (vi) Whether the Pretrial Detainee has previously been found incompetent; (vii) What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers;
> (b) The Department shall accompany its Monthly Data Report (see Paragraph 52) with a separate "Fines Report" which will include the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.
> (c) The Department shall pay the total fines owed on the date the Fines Report is submitted to the Special Master to be deposited in a trust account created for the purpose of funding non-Department mental health services. The account will be managed by a court-appointed administrator. Decisions concerning payments out of the account will be made by a committee consisting of a representative from the Plaintiff, a representative from the Department, and the Special Master. Any disputes regarding the fines shall be handled through the dispute resolution process identified in Paragraph 59.

> *Historical context for calculating fines*: The funds from fines should benefit the population served by the competency system. A small committee comprising Department administration, a DLC representative, and the Special Master meet regularly to address use of these fines. This committee has also added a team of two auditors (to review and support fines-funded programs), and a program-developer (to consult with potential programs submitting proposals, and to support their work after they receive funding). The broad goal is to use the funds in ways that help those involved in the mental health and criminal justice systems (i.e., those who are, or are likely to become, involved in competency-related services), and to address Colorado's "competency crisis," by providing new services or interventions that do *not* already fall within the Department's responsibilities. In other words, funds from the fines should supplement, but not replace, existing services. The Department has provided notification of non-compliance of time frames on a weekly basis, as required by the Consent Decree since June 1, 2019.

**Current Context**
The Department has consistently completed the "Fines Report," as prescribed by the Consent Decree. Also, as prescribed by the Consent Decree, the Department continues to pay these fines into a trust account (managed by Cordes & Company, LLP), which supports additional special projects that complement the broad goals of the Consent

Decree. The Department reached the maximum amount for fines for the past several years (i.e., $10 million per year, then $12 million after adjustment for inflation). Their strong progress throughout 2024 raised the possibility that they may not be paying fines much longer. Indeed, the Fines Committee briefly stopped considering new applications. But recent setbacks leave us expecting the Department to pay fines throughout 2026 and likely beyond.

> ### Fines-Funding Impact: Quarterly Overview[12]
>
> This quarter, the Fines Committee funding has supported 20 programs. The operational programs are serving individuals in eleven separate jurisdictions, while Denver FIRST, Ananeo Housing, Monarch, Fidelity Behavioral Health, and Valor serve individuals referred statewide. Overall, these programs have served 1,885 people this quarter, a substantial increase from 1,711 in Quarter 4 of 2025. This quarter, according to the Office of Civil and Forensic Mental Health (OCFMH), the number of new orders for in-custody restoration entered was 505. Each of the programs has a goal to either divert individuals from the inpatient competency restoration waitlist or to support clients to make diversion from their criminal charge or from confinement feasible. So assuming most clients served by these funded programs would *otherwise* be on the in-custody competency waitlist, Fines Committee funding continues to make an impact on the restoration waitlist. In this quarter, nine programs provided housing to competency-involved individuals; Fines Committee funding provided housing for 406 unique clients (up from last quarter's 304).

The top priorities for the fines committee remain housing and/or diversion from the competency system. Previously, we also prioritized specialized judicial programs (e.g., competence dockets and calendars), but the State Court Administrative Office has increasingly recognized the value of these dockets and begun to support and coordinate them, so the Fines Committee need not prioritize them in the same way.

***Housing*** remains a priority because the lack of housing remains a persistent barrier to community restoration; judges often remark that they would release a detainee for outpatient restoration *if only* the detainee had stable housing. Therefore, the Fines Committee continues to fund a variety of community-based housing for those involved in outpatient restoration. Those in outpatient restoration have generally shown clinical improvements and minimal public safety risk, making them appropriate for transition from jails or CMHHiP to Outpatient Competence Restoration programming (OCRP) with housing arranged through fines-funded programs.

---

[12] This reflects an adapted version of executive summary drawn from the detailed quarterly report prepared by Kally Enright and Todd Spanier, of Strategy and Evaluation Consulting, the team that serves as a fiscal and quality monitor for fines-funded projects.

Page 30

Since funding the initial housing project through CCH, the Fines Committee has increasingly funded new housing options, such as Ananeo's supportive and sober housing, which continues to serve 40 individuals at any time. Likewise, the Embark program provides sober-living housing and a day-reporting center, while Monarch provides sober-living housing and wraparound services. Often, the FST is able to arrange admission to these programs for detainees who are released or bonded from jail to complete outpatient competence restoration. This quarter, *Fines Committee funding* ***provided housing for 406 unique clients*** *(up from last quarter's 304, and a continued increase from prior quarters).*

***Diversion*** programs, of course, divert people out of the competency system and into treatment that can be provided outside the slow competence restoration system. Therefore, the Fines Committee has funded court-based diversion programs in Denver and Aurora counties. For example, the Denver "Competency Diversion Docket" diverts into community treatment defendants with less serious charges who would likely otherwise enter the competency system; if they successfully complete community treatment their charges are dropped. HB24-1355 and the Department's new Outpatient Clinic should provide more opportunity for court-directed diversion and deflection, because they should allow for more viable community-based treatment options than have existed previously.

***Competency dockets and related efforts*** provide greater efficiency and better service to detainees because they centralize expertise among court personnel. The Fines Committee previously funded specialized judicial programs including the competency court in Larimer County and the Denver competency docket. Indeed, several "competency dockets" emerged across Colorado as more jurisdictions recognized the strengths of this model. As the state has taken more initiative in launching and supporting competency dockets, there is much less need for the Fines Committee to do so, though the committee remains in close contact with many competency dockets and the state court administrative office that oversees them.

***Recent investments*** include two large-scale projects from which the Fines Committee expects substantial impact. As we mentioned in recent reports—because their full launch spans many months—the  Fines Committee has supported Embrave with $8,902,175 to develop the Valor Program. The Valor Program now provides residential care to people who need intensive support and stabilization, including medication, which will address the gap between inpatient hospitalization and supportive and/or recovery housing. The 72-bed facility offers 24/7 care for individuals with moderately to highly acute psychiatric symptoms, who are not a danger to themselves or others but need 3 to 6 months of care to stabilize symptoms, receive case management, restoration education, peer support, and connect to the services and resources that will support their successful reintegration into their community. The Valor Program now serves those in, or at risk of being in, the competence system, accepting statewide referrals from the justice system and the community. They not only decrease the waitlist but also divert people from the competency system. This large-scale service launched on time and is now serving dozens of residents at any moment. During site visits, we hear from residents grateful for the services. The site continues to expand their staffing, and increasingly serve patients with

different levels of need, across three floors that provide different levels of service). *Each month, we are grateful to see people leave the waitlist for a placement at Valor, including some with significant treatment needs.*

The second major fine-funded project that we have described in prior quarterly reports, Ava Health, was originally on schedule to be providing services this Spring. We had anticipated Ava Health would be providing services to many in the competence population by now, but their launch has been thwarted by what—as best we can tell—seems to reflect regional business politics. Please see the call-out box below:

> ## A Colorado Regional Accountability Entity (RAE) has blocked a fines-funded housing provider, preventing much-needed services for the competency population and others
>
> *Background:*
> In October 2024, the Fines Committee funded ($5,400,000) to Ava Health to provide a full continuum of care to individuals on the Western Slope. Leaders of Ava Health have significant experience with the behavioral health population, and for over two years carefully studied the needs of the Western Slope to develop a continuum of care. Indeed, they worked closely with the Fines Committee, community partners, law enforcement, hospitals, courts, and county agencies. Ava Health built programs to directly answer what these parties said was needed most: access, coordination, accountability, and relief for overwhelmed systems. Subsequently, Ava Health developed an acute stabilization unit, residential care, partial hospitalization program, outpatient treatment, supportive housing, and independent housing.
>
> Ava Health secured leases and zoned property for 48 beds of transitional housing, which will feature a blend of MHTL and ASAM 3.1 level beds. Ava Health zoned property for 50 beds of transitional housing (a blend of ASAM 3.1 level beds and recovery residence beds) and made progress in licensing and regulatory approval, including working through various processes with the BHA, local fire marshal, and becoming a nationally recognized provider. Ava Health made key hires, including a Clinical Director and Director of Nursing. With a substantial waitlist even before opening, they anticipated growing to a total of 82 beds. In our view, this was an important investment that would address the treatment needs on the Western Slope, for the competence-involved population and beyond.
>
> *Update*:
> Mesa County and another 34 counties on the Western Slope and beyond are covered by one Regional Accountability Entity (RAE), Rocky Mountain Health Plans (RMHP; a wholly owned subsidiary of United Healthcare). RAEs are tasked with coordinating both physical and behavioral healthcare for Colorado's Medicaid program. Days before Ava Health opened, despite being nationally accredited and credentialled, *RMHP denied Ava Health a contract to serve the Medicaid population*. Their denial is devastating to Ava Health's ability to serve the competency population, and the broader Western Slope community with mental health treatment needs.

To keep their doors open, Ava Health has shifted its priority from serving competence-involved clients and others who are covered by Medicaid to serving private-pay clientele. Tragically, a provider eager to serve those who cannot pay will now need to prioritize those who can pay privately. Many stakeholders have attempted to engage RMHP, including Colorado's Health Care Policy and Financing (HCPF) department, legislators, community stakeholders, and others. Stakeholders are eager for Ava Health to provide treatment and services to the Medicaid and competency populations on the Western Slope, but this now depends on RMHP to recognize the needs of Western Slope residents who cannot pay privately. If RMHP continues to deny Ava Health a contract to serve the Medicaid population, Ava Health will be able to serve only a very limited number of individuals in the competency system (which they plan to do by providing scholarships from the revenues generated from private-pay clientele).

Meanwhile, the Fines Committee that carefully vetted a series of proposals from Ava Health, and who chose to strategically invest in Ava Health to meet needs on the Western Slope, remains deeply disappointed and frustrated that RMHP continues to prevent an eager and well-qualified provider from delivering much needed services.

The barriers to Ava Health have been baffling and deeply disappointing. They are particularly painful because Ava Health is an exemplar of the type of fines-funding that yields the greatest benefit. Generally, directing fines funds to housing and specialized services is a powerful investment. A recent, retrospective evaluation from our fines-funded program auditors and monitors underscores the value of fines funding, particularly capital investments that support housing with treatment services (see Appendix 4).

## A Retrospective Review of Fines-funded Program Impact

Overall, Fines-fund investments focus on four priority areas: housing, case management, judicial supports, and treatment, along with select statewide capacity-building initiatives. As of December 31, 2025, the Committee has funded 49 programs and allocated a total of $49,036,497. Of this amount, $34,538,900 has been dedicated to expenses related to housing clients; $16,144,000 within the housing category has been used to expand treatment-based residential housing through capital investments. Collectively, these programs have served 8,550 clients, supporting their ability to access out-of-custody restoration services and treatment.

Fines Committee-funded programs generally fall into four primary categories of intervention for competency-involved clients: judicial forum, case management, housing, and treatment. When a jurisdiction implements all four components, the necessary infrastructure is in place to effectively identify and assess individuals, divert them from confinement when appropriate, and  support their treatment and restoration out of custody.

Page 33

**Highest Impact Investments:**

Across Colorado's competency system, housing remains the most significant and persistent gap. Many competency-involved individuals enter the criminal justice system experiencing homelessness or housing that is unstable, unsafe, or clinically inappropriate. For judicial officers and prosecutors, who must balance public safety, clinical needs, and constitutional requirements, the absence of suitable housing is the primary barrier to approving out-of-custody competency restoration. Moreover, the capacity built by the Fines Committee is also suitable to house and treat the same population through diversion or deflection as a preventative measure.

While Colorado has now assumed responsibility for the judicial and case management components of the system, housing capacity has not kept pace with need. The State's Division of Housing provides rental supports and vouchers, but competency clients are largely unable to access them due to ongoing legal involvement, landlord restrictions, and the mismatch between typical voucher-eligible housing and the clinical requirements of competency restoration.

As a result, the most consequential and durable impact of Fines Committee funding has been the expansion of housing capacity specifically designed for competency clients. This specialized housing is: transitional, clinically appropriate, supportive of intensive treatment, low-barrier, and willing to accept individuals with active or recent criminal justice involvement. This Fines-funded expansion has meaningfully changed the system's ability to divert clients from custody and support safe and sustainable restoration pathways

See Appendix 4 to review the full, comprehensive review from our fines-program auditors.

Page 34

### Recent Medicaid Cuts Threaten Fines-funded Programs:

Colorado's budget deficit and the federal House of Representative Bill 1 (HR 1) have caused substantial cuts to Medicaid, harming treatment providers and the people they serve. Regional Accountability Entities (RAEs) have significantly reduced reimbursement rates for the treatment and services necessary for the vulnerable competency-involved population. RAEs have dropped levels of care from current contracts, which creates barriers to accessing the right level of care and services. RAEs have also implemented additional administrative requirements on specific billing codes, which have led treatment providers to hire more staff—not for treatment, but to meet the additional administrative burden.

The Fines-funded programs have worked hard to develop treatment, services, and programming specific to the competency population. Most have been quite successful in implementing inclusive, accessible, robust, person-centered care that did not exist prior to the development of the programs. Fines-supported beds are often flexible. People with varying needs can be in a Fines supported bed as they access various levels of treatment and services at the program. The Fines-funded programs are largely sustained by Medicaid reimbursement for the treatment and services they provide to people in their program. There is no funding mechanism to pay for the "rent" of the bed itself nor the staff necessary to ensure the well-being of residents. Thus, Fines-funded programs relied on Fines funding to secure facilities and hire staff, and they built sustainability plans that would rely on Medicaid to reimburse the vital services they provide.

Before the Medicaid cuts to reimbursement, cuts to contracts, and increased administrative burden, *almost every Fines funded program was on a path to sustainability*. But now, many Fines-funded programs are at substantial risk of closing-not for lack of desire or expertise to serve the competency population, but because of severe cuts to the longstanding funding mechanism that supported appropriate treatment and services. The closure of Fines programs and providers specializing in this population will increase the use of emergency rooms, jails, and hospitals – all options that come with a far higher financial and human cost.

# Consent Decree Section VII Updates

## Civil Bed Freeze

> **39. Civil Bed Freeze.** The Department's 2018 Plan included an effort to freeze civil admissions to its beds to devote Hospital beds to perform Inpatient Restoration Treatment services. On February 7, 2019, the Department agreed to stop this practice. The Department will continue to leave the state's civil and juvenile beds allocated as of the execution of this Consent Decree for civil and juvenile psychiatric admissions and will not freeze or convert those beds to provide competency services for Pretrial Detainees, unless the Department receives prior agreement from the Special Master to use unutilized beds for such purposes. This strategy to facilitate compliance with the Consent Decree shall only be re-implemented in the future upon agreement of the Special Master.

Since the start of the Consent Decree, the Department has largely protected civil beds, even amid forensic pressures. The Department opened more than 70 competence restoration beds in 2024 while also opening 164 community beds in their system of MHTLs. The two state hospitals are operating at nearly full capacity, with both facilities filling more than 90% of beds on average this quarter. In addition, the relatively stable waitlist number since April 2025 suggests that inpatient admissions and discharges are keeping pace with referrals. Still, despite this overall increase in restoration beds, civil inpatient capacity continues to lag, offering few inpatient options for persons who might be diverted from the competence system.

As we have emphasized in every report, *civil inpatient capacity has long remained too low throughout Colorado*. Additional inpatient forensic *and* civil beds are critical to supplement Colorado's tremendous outpatient efforts. This quarter, the Colorado legislature appropriated nearly $30,000,000 to support the Department's FY27 response to the Consent Decree. Most of this new funding will expand inpatient restoration and civil bed capacity by: increasing contracted restoration beds at Peakview Hospital (32 beds); contracting civil beds at Peakview (24 beds), and re-purposing an existing CMMHIP unit to serve restoration patients (22 beds). Remaining funding will increase MHTL capacity. Obviously, this does not reflect a permanent change in civil capacity unless the Department maintains these contracts through future years. But a surge in capacity should meaningfully reduce the waitlist. As illustrated in last quarter's data analysis (provided in Appendix 2 of this report), the number of inpatient restoration beds has historically had the most direct impact on the waitlist. We continue to recommend shifting forensic to civil beds as the waitlist decreases.

Successful and sustainable solutions to Colorado's competency crisis will require a strong civil system that can manage the mental health needs of people with minor charges, reserving the criminal court competency system for defendants with serious

Page 36

charges. Without a strong civil system, incompetency remains the easiest route to mental health treatment among people without housing or resources—ultimately increasing the numbers of people ordered to the competence services system. We continue to encourage the Department to strongly support *both* civil and forensic services.

The MHTL homes are a prime example of community-based civil resources: they prioritize step-down interim housing opportunities for people who are ready for discharge at a state hospital, pretrial Detainees in county jails, or people who are at substantial risk for entering inpatient competence restoration. These homes are one of the most *critical components of a full civil service system*, and a key step forward for the Department.

Again, we applaud the Department for expanding inpatient beds for competence restoration while also emphasizing that any long-term solution must shift inpatient priority from forensic to civil beds. However, the Department cannot exercise these decisions alone. Strong community and state partners (private hospitals, the BHA) must take ownership of the problem by creating more civil options for outpatient care.

It has become clear that that largest impact on the waitlist has been the availability of placement options: more inpatient beds are the primary driver, but the fines-funded housing options, MHTLs, and Bridges-supported opportunities also have a significant impact. In some ways, the persons with low-level charges placed on the waitlist who are then transitioned into the community into one of these supportive housing and case management options may not have needed restoration in the first place; they underscore the need for community-based options that operate in the civil system.

## Comprehensive and Cohesive Plan

> ***40. Comprehensive and Cohesive Plan.*** The Special Master's first recommendation was to revise the Department's 2018 Plan into a more comprehensive and cohesive plan. Dkt. 146. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate disparate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. As referenced in the Special Master's Recommendation Number 7, the 2020 Plan will highlight the methods to prioritize quality amid quantity and time pressures. Dkt. 146 at 42. On an annual basis thereafter, the Department will review and revise the plan as appropriate based upon data provided by the Department.

### Historical Context

The Department first submitted a comprehensive plan on February 27, 2020, as mandated by the Consent Decree. Given the unexpected challenges of the pandemic, they submitted subsequent plans in March 2021 and September 2021. As the pandemic continued, we increasingly advised the Department that emergency, crisis-management strategies, though necessary, were not sufficient. Rather, "a Comprehensive Plan … should include broad planning that diverts many people with mental illness *away from* the competency system before they enter it." The Department made significant progress on this type of comprehensive approach. In April of 2022, they pushed forward new legislation, ultimately passing several bills designed to divert people from the competency system or limit their time in the competency system. Much of their progress involved securing millions of dollars in ARPA [American Rescue Plan Act] emergency funding to sustain existing services and support new resources.

In the Fall of 2022, the Department submitted another Comprehensive Plan, which addressed these developments in legislation and funding, according to six key strategies or "levers:"
1. Increasing inpatient beds;
2. Improving inpatient bed utilization;
3. Right sizing inpatient restoration beds;
4. Reducing the number of individual inpatient court orders;
5. Securing more beds in the community; and
6. Providing more services in the community.

We agreed that these are the primary variables influencing the waitlist and wait times. We also appreciated the efforts to expand the scope of their focus to beds and services *in the community*, for a much more comprehensive approach to the crisis.

In their 2023 Comprehensive Plan, the Department updated their plans to:
- Expand their use of community (private) hospital beds for restoration;
- Reduce the proportion of misdemeanor charges that lead to inpatient restoration;
- Re-open and better use existing inpatient beds.

The Department received $57,967,379 in supplemental funds for FY 2023-24 to maintain private beds, then re-open and staff state hospital beds. These steps certainly decreased the waitlist.

In the Fall of 2024, the Department submitted their 2024 Comprehensive Plan. In it, they reviewed key successes, such as re-opening all inpatient beds and operating with full hospital capacity. They described contracting for Mental Health Transitional Living (MHTL) beds, a tremendous improvement to their continuum of care. They formally shared their projection model, which can provide generally reliable estimates of wait list figures and eventual compliance dates, based on a variety of key variables. We have been impressed with the reliability of this simple model. Also, related to data, the Department described improved data infrastructure for all competence services, allowing for better tracking, and reporting of outcomes.

## Current Context

In their 2025 comprehensive plan, the Department memorialized plans from adjacent agencies whose work influences the competence system. We affirmed more formally integrates the other players who also have a tremendous (though less direct) influence on the need for competency-related services: i.e., the agencies that most influence public mental health services and housing assistance. In particular, the BHA oversees services that have tremendous potential to support people involved in the competency system; they have the authority to help ensure that community providers better serve this population. *The Department's long-term success in serving the competency-population will depend, in significant part, on the BHAs commitment to this population.*

Regarding efforts for which OCFMH is most directly responsible, they presented a broader plan for supporting diversion efforts, and they have made much progress in their goal of developing an OCFMH outpatient clinic. More recently, their budget request prioritizes inpatient beds for restoration and for civil patients. The Colorado legislature appropriated nearly $30 million to support the Department's FY27 response to the Consent Decree. Most of this new funding will expand inpatient restoration and civil bed capacity by: increasing contracted restoration beds at Peakview Hospital (32 beds); contracting civil beds at Peakview (24 beds), and re-purposing an existing CMMHIP unit to serve restoration patients (22 beds). Remaining funding will increase MHTL capacity.

In recent years, the Department has progressed with MHTL homes and collaborative legislation to divert people with mental illness into community care. The state still needs more inpatient beds, and the recent funding surge will greatly improve inpatient capacity for the next few years. Of course, the Department will also need to continue coordinated efforts that steer people with mental illness away from jails and forensic hospitals and into regular community treatment or civil commitments.

Page 39

## Increase Community Restoration Services

> *41. (b)* The Department may utilize private hospital beds to meet the needs of Pretrial Detainees meeting C.R.S. § 27-65-105(a) civil commitment criteria and with prioritization to Pretrial Detainees already residing within the same geographic location. The Department shall create a plan to implement this subsection (b) to be approved by the Special Master.

The Department continues to contract with local hospitals to provide inpatient beds for short-term competency restoration services. We provide a summary of these beds and programs as an appendix to this report (see Appendix 1). The Department now contracts with Peakview Hospital for 110 beds; those contracted beds were filled on average at 98% for the past 12 months. Please see p. 38 for more information on these new beds.

> *41. (a)* Implement a coordinated wide-scale outpatient (community-based) competency restoration (OCR) system. This system shall be integrated and submitted with the "Comprehensive and Cohesive Plan" referenced in Paragraph 40 herein. This plan shall be approved by the Special Master.

The Department's outpatient competency restoration program (OCRP) began in March of 2018, and it has grown steadily since then. Referrals for outpatient restoration were strong this quarter, averaging 108 people per month, more than all other quarters over the past year.[13]  At any given moment, more than 600 individuals participate in Colorado OCRP, and there still is no waitlist for OCRP services. As always, we affirm the Department's success in building the largest, most robust statewide community-based OCRP program in the country. OCR reduces the restoration service demand on Colorado's two state hospitals. This quarter, 324 people were placed in OCR, more than last quarter's 291 and higher than any other quarter in more than a year.

### OCRP Outcomes

Data from February through April 2026 revealed a 41.1% restoration rate in the OCRP *re-evaluation reports* that the Department reviewed (39 of 95 total opinions). An additional 15.8% were opined as unrestorable (10 of 95). The remaining 43.2% were opined as remaining incompetent. This OCRP restoration rate is similar to the 37.6%, 37.9%, and 43.1% rates found in the three prior quarters.

Data from the same period shows that *courts* found 25.8% of defendants restored to competence (58 of 225 total adjudications), similar to the previous three quarters (34.3%, 24.5%, and 27.8%, respectively). The court dismissed charges and/or otherwise terminated restoration services in an additional 36.4% of these re-evaluation cases, which was again similar to last quarter. The Department reports that termination of

---

[13] All data in this section retrieved from the Department's Special Master Compliance Plan report for April 2026, submitted May 15, 2026,  pp. 36-43.

outpatient orders and re-ordering the defendant to inpatient restoration is likely attributable to increasingly ill defendants (i.e., more severe psychiatric symptoms) ordered to outpatient restoration. Some defendants decompensate or do not cooperate with outpatient restoration requirements as anticipated, and those individuals are then remanded back to inpatient restoration. However, some outpatient restoration orders are terminated because the case is dismissed –the defendant has "served their time" according to the court. Unfortunately, the data provided by the Department does not differentiate between these two outcomes, instead listing them as "case dismissed or services stopped by court."

> **41. (c)** The Department currently estimates that 10-20% of Pretrial Detainees admitted for inpatient restoration do not need hospital-level care. Dkt. 146 at 29. The Department will make best efforts to reduce inpatient restoration hospitalizations by 10% and increase community restorations by 10% in six-month increments beginning June 1, 2019. The baseline for the preceding sentence will be determined by the Special Master by June 1, 2019, utilizing data provided by the Department. On June 1, 2020, the Special Master will establish a modification of this guideline based upon a survey of the data collection and implementation of the Department's Plan.

**OCRP Baselines**

As prescribed in the Consent Decree, we established a baseline for improvement by calculating a six-month period (i.e., Nov 2018 - April 2019) prior to the June 1, 2019 deadline. We identified 40% as an optimal proportion of defendants referred for outpatient (versus inpatient) restoration and we report progress towards that 40% OCR rate in the following table.

|  | Inpatient Restorations | Outpatient Restorations |
|---|---|---|
| **Initial baseline** | Nov 2018 – April 2019: 69% | Nov 2018 – April 2019: 31% |
| **November 1, 2021 goal** | 60% maximum | 40% minimum |
| **Recent progress (past 6 months)** | Nov 1, 2025 – Apr 1, 2026: 60.2% | Nov 1, 2025 – Apr 1, 2026: 39.8% |

For the past six months (November 2025 through April 2026), a total of 39.8% of all restoration opinions were recommended for outpatient restoration. This rate is similar to the past three quarters' rates of 39.6, 39.5%, and 37.2%, and it very nearly meets the Consent Decree goal. It also represents an increase over lower percentages in early 2025. Previously, the Department consistently met the 40% expectation for several consecutive quarters, and we are pleased to see the rate increase back to this level. *Again, this reflects the highest portion of OCRP orders of any state in the U.S.* Only one

Page 41

other state (Virginia) has truly state-wide OCRP, and their courts tend to order a slightly lower portion, on average. This high rate of OCRP is certainly consistent with the Consent Decree goals of prioritizing treatment in the community when possible.

We also monitor the numbers of persons found ITP *in jails* who are referred to OCRP (i.e., excluding those referred to OCRP after on-bond evaluations), because this is the population that the Consent Decree specifically addresses. Based on a similar historic review, we calculated a baseline of 20% and expected an increase of 10% for each subsequent 6-month period.

The current figure, reflecting six months' worth of data between October 2025 - March 2026 (a month's lag in data is unavoidable, as restoration orders are not always received within the month that the restoration hearing occurs), indicates a 44.4% OCR referral rate among all evaluations conducted in jails. Month-to-month averages continued to fluctuate, dipping as low as 22% in November 2025 but otherwise exceeding the 30% threshold in all other months. The 44.4% rate reflects an all-time high, with previous six-months figures of 32.7%, 36.2%, and 34.1%. It is encouraging to see evaluators "diverting" a substantial proportion of Detainees to community-based options.

The OCRP provides crucial protection against an even greater "competence crisis" in Colorado, because so many incompetent defendants who are currently released to OCRP might otherwise be detained in a county jail, awaiting inpatient competence restoration.

Once again, we affirm the tremendous impact that OCRP has on the competence system, including the waitlist. The combination of persons ordered to OCRP overall (39.8% of all persons adjudicated ITP) and the proportion of persons ordered to OCRP after an in-custody evaluation (44.4%) suggests a robust OCRP program. A total of 324 individuals were placed in OCRP this past quarter – potentially an all-time high – and most of whom would have otherwise been placed on the waitlist and remained longer in jail. These strong numbers indicate that the Department's OCRP continues to divert hundreds of defendants from county jails and inpatient hospitals and into community settings. The CDHS OCRP continues to be a critical asset in Colorado's competence services system.

Page 42

# Conclusion

In a dramatic development this quarter, the state allocated roughly $30 million to support contracted civil beds, contracted restoration beds, and additional MHTL beds. We anticipate this funding will substantially accelerate admission of those on the waitlist. Recent capacity has appeared roughly sufficient to *maintain* the waitlist for over one year, but this surge in capacity is necessary to *reduce* the waitlist. These additional beds will almost certainly do so.

At the same time, two problematic barriers have appeared on the horizon. First, recent legislation (SB-149) will almost certainly lead to more orders for inpatient hospitalization, particularly for the small-but-significant population of persons found *permanently incompetent to proceed* due to intellectual or neurocognitive deficits. Specialized placements for this population are necessary, but until these are more widely available, they will place greater strain on inpatient admissions – especially since they will likely remain in those beds for years at a time. Second, recent federal and state budget measures that cut Medicaid reimbursement will harm the people involved (or at risk of being involved) in the competence system. Inevitably, drastic cuts to necessary housing and treatment tend to prompt greater needs for more significant treatment, and greater expenses, in the long term.

Thus, as the parties approach mediation this quarter, we expect to see some significant improvements in the waitlist. We also see significant challenges on the horizon due to recent state legislation and broader budget cuts to Medicaid services.

As always, we appreciate the opportunity to serve the Court, and the state of Colorado, in these important efforts.


Neil Gowensmith, Ph.D.
President, Groundswell Services Inc.
Special Master, Civil Case 11-cv-02285-NYW

Daniel Murrie, Ph.D.
Special Master, Civil Case 11-cv-02285-NYW

# Appendix 1

## Summary of Inpatient Restoration Service Capacity

| Summary of Inpatient Restoration Service Capacity | | |
|---|---|---|
| **Setting** | **Restoration beds** | **Funding Source** |
| CMHHiP | 218 | CDHS |
| CMHHiFL | 44 | CDHS |
| Arapahoe RISE | 60 | CDHS |
| Denver County Restoration Treatment Unit (DRTU) | 18 | CDHS |
| Peakview Hospital | 110 | CDHS |
| **Total** | **450** | |

# Appendix 2

*Originally presented in the Quarterly Report Submitted February 28, 2026*

## Retrospective:
## Context and Capacity over 7 years of the Consent Decree

For two reasons, we begin this quarterly report with a broader retrospective review than typical. First, this quarter marks the 7-year anniversary of the Consent Decree and includes the date that the Consent Decree was originally set to expire.[14]  Second, this quarter marks the first allegation of material breaches in the Consent Decree and the first formal dispute resolution efforts since the Consent Decree began. To the extent that substantial changes are on the horizon—whether through mediated revisions to the Consent Decree or through renewed litigation—we consider it crucial to carefully review progress and failures, as well as the broader context for these, as reflected in empirical data.

Analysis of past progress and failure should be rooted in data, as should any future plans. Even recognizing that parties may draw different conclusions from the data, we consider it important to root future efforts in specific data, rather than general impressions. Moreover, we recognize that reasonable people of good faith may have substantive disagreements over the best strategies to achieve their goals; indeed, they may have substantive disagreements on *which* goals are most important and relevant to resolving the delays in Colorado's competency services. However, our hope is that the parties can address their important disagreements with a shared understanding of some basic data that we consider most relevant to Colorado's competence-related services.

Put simply, Colorado's competence-related services have changed drastically over the past seven years. The broader contexts for these services have also changed in important ways. In the sections below, we reflect on the status of competence-related services in 2019, as the Consent Decree went into effect.

---

[14] According to the original Consent Decree filed in March 2019, the duration was scheduled to end on December 1, 2025. However, in April of 2023 the Parties filed a joint motion requesting that the terms of the Consent Decree be extended two years, to end on December 1, 2027.

Page 45

**Figure 1: 2019 Overview**



As detailed in this Figure 1, the year 2019 featured a total of 1,080 defendants in jail ordered to undergo competence evaluations (courts also order evaluations of defendants released on bond to the community, but these are not a focus of the Consent Decree). The same year, Colorado courts issued 750 individuals to inpatient restoration services; the vast majority of these services occurred in CMHHiP, and there were 642 inpatient admissions.

By 2019, Colorado had recently begun outpatient restoration services, so outpatient restoration services were already an option. Courts issued 373 individuals to outpatient restoration in the community, reflecting roughly 37% of the 1,015 restoration orders that year.

Stated differently, roughly two-thirds of people ordered to restoration was ordered to inpatient settings, and one-third was ordered to the community. Note that one person can receive different orders over time, so these figures may reflect some people originally ordered to inpatient settings but who are later ordered to the community. The reverse also occurs, when it becomes clear that a defendant is not engaged in outpatient restoration, or may have clinical needs that require inpatient treatment after all.

From March to December 2019, the average waitlist at the end of each month for restoration services was 157 people.

*Although the various chart labels throughout this data review section refer to "orders," data is taken from the number of actual individuals ordered to the various services (one defendant

may have multiple orders stemming from multiple charges or jurisdictions). The data reported here reflects the number of *people*, not *orders*.

### Figure 2:    Comparing Court Orders and Admissions: 2019 vs. 2025

***The demand for competence services increased drastically 2019 through 2025.***

As detailed in the chart, the number of defendants in jail ordered to evaluation almost doubled, with an 83% increase. Likewise, ***the number of defendants ordered to inpatient restoration services more than doubled***: from 750 in 2019 to 1,696 in 2026, an increase of 126%.

How did the capacity to provide evaluations and restoration services change over those same years?  Inpatient admissions increased by 28%, an increase that was eventually feasible due to added inpatient capacity (described later). Outpatient restoration services almost tripled, growing 190% from 373 in 2019 to 1,082 in 2025. The combination of inpatient and outpatient treatment admissions (1,015 in 2019 to 1,902 in 2025) nearly doubled (87% increase), but also reflected a **significant shift in location**, from a minority (37%) in the community in 2019 to a majority (57%) in the community in 2025.

Page 47

The average number of people on the waitlist in 2019 (157)  grew to an average of 331 in 2025, representing 112% growth.

Comparing the volume of people ordered to services from 2019 and 2025 is informative, and it reveals some of the substantial differences between the first year and the most recent year of the Consent Decree. However, the change was not linear or steady. The waitlist, in particular, varied greatly over those years. As all parties are aware, the waitlist grew dramatically during the Covid-19 pandemic, and through some of the Covid-related complications that followed.[15] Thus, the waitlist peaked at 483 people in June 2023. It then decreased by half (to 241) by late June of 2024 and reached its lowest point (208) at the end of October, 2024. However, it rose again in late 2024 and early 2025—particularly after a sharp increase in orders in late 2024— and has remained fairly steady in the range of 300-350 for roughly one year. In fact, 2025 has shown the least waitlist variability since the beginning of the Consent Decree.

**Figure 3:**   *The waitlist for restoration has increased overall, but varied over time*



---

[15] Our graphs have omitted the Covid-era figures, which were extreme outliers (court orders were unusually low).

Page 48



**Figure 4:** *The Waitlist Increased at a Rate Slightly Less than Court Orders for Restoration*

Overall, the waitlist for restoration services grew longer as court orders for those restoration services increased. Over the course of 2019-2025, the number of people ordered to restoration increased by 126%, whereas the waitlist increased at a slightly lower rate of 112%.

***Figure 5:***
***Increasing Inpatient Bed Capacity Appears to Reduce the Waitlist for Restoration***



Not surprisingly, adding inpatient beds appeared to reduce the waitlist. Considering the waitlist alongside inpatient bed capacity strongly suggests that adding inpatient bed capacity reduced the waitlist, particularly through late 2023 and most of 2024. Across this period, any closed state hospital units reopened, and the Department secured other new beds, including contracted beds at private hospitals. As the chart illustrates, the waitlist began dropping markedly as inpatient capacity began peaking in late 2023. Given the delayed impact of inpatient restoration beds (restoration beds generally turn over every 3-4 months), the largest decreases in the waitlist were found a few months after the number of inpatient beds had peaked.

Of course, none of these trends happen in isolation (as prior and subsequent graphs illustrate), but examining major variables like inpatient bed capacity alongside the waitlist can shed some light on the relation between the two. For the same reason, we next consider the community bed capacity for those receiving outpatient restoration services.

*Figure 6:*
*Increasing the Community Bed Capacity Appears to Reduce the Waitlist for Restoration*



Not surprisingly, adding community beds *also* appeared to reduce the waitlist. For several years, Colorado had very few community beds for the defendants who judges release to the community to participate in outpatient restoration. Yet the guarantee of placement in such a bed is precisely what many judges require before releasing a defendant to outpatient restoration services in the community. Over the past several years, community bed options have increased greatly as a) the Department opened Mental Health Transitional Living Homes (MHTL) that provide a total of 164 beds, and b) the Fines Committee funded a variety of community-based providers to devote community beds, and related services, to people released from jail to participate in outpatient competence restoration.

As the graph illustrates, the waitlist grew drastically in the years when there were fewest community bed options. Conversely, the waitlist declined as the number of community beds increased greatly through 2024. Around late 2024, the relation between inpatient beds and the waitlist becomes less clear: the waitlist grew even as the number of community beds grew, and the waitlist appears to have plateaued in 2025 as the number of community beds decreased and then recently increased again.

Again, none of these trends happen in isolation (as prior and subsequent graphs illustrate), so we next consider the combination of both inpatient and outpatient bed capacity as compared to the waitlist.

*Figure 7:*
*Increasing Inpatient and Community Bed Capacity Reduced, then Plateaued, the Waitlist*



Simultaneously considering both inpatient and outpatient bed capacity provides a more comprehensive picture of changes in capacity as related to the waitlist. Generally, it appears that the waitlist increased *until* bed capacity (both inpatient and community beds) increased at a greater rate. This period of sharp growth in bed capacity (through much of 2023) preceded the significant drop in the waitlist that occurred through much of 2024. This period also likely benefitted from slightly reduced court orders for restoration in 2024 relative to 2023 (see Figure 4); but restoration orders then increased sharply again in 2025.

In late 2024, the waitlist rose again as court orders increased and the inpatient bed capacity plateaued. The number of beds in the community began to increase again in early 2025, which may have helped hold the waitlist roughly steady, rather than growing. But the increase in community beds does not appear (at this point) to have prompted another significant decrease in the waitlist. Overall, the available data strongly suggests that a combination of inpatient *and* community beds are necessary to reduce the waitlist. We discuss this inference further in a subsequent section.

### What might the waitlist have been without increased bed capacity?

Obviously, the increasing number of people ordered to inpatient restoration across 2019-2025 increased the growth of the waitlist, while the increasing inpatient and community bed capacity decreased (or constrained) the growth of the waitlist. But with the waitlist remaining high, it is difficult to appreciate any impact of increasing bed capacity. So another way to consider the

influence of bed capacity (community and inpatient) is to consider a counterfactual scenario: *how would the waitlist have grown if bed capacity had **not** increased?*

In 2019, Colorado had fewer than 300 inpatient beds available for restoration (Figures 5 and 7), and ranked below the national average in inpatient psychiatric hospital capacity per capita.[16] This may be one reason the waitlist already included 157 people at the end of 2019. Inpatient bed capacity remained at these low levels from 2019-2021, hovering around 300 inpatient beds, with only a few community beds. Around 2022, bed capacity began to increase. One way to consider the impact of this increased capacity is to *consider an alternate scenario in which inpatient bed capacity did not increase*.

Therefore, we mathematically modeled a scenario in which bed capacity remained at 2021 levels—without the additional inpatient (CMHHiFL, CMHHiP, or contracted beds) *or* community beds (MHTL and Fines-funded projects) that were actually launched. For this counter-factual scenario, we assumed the same number of court orders for restoration (roughly 1,250 to 1,700 per year, over these years). *In this counter-factual scenario, in which inpatient bed capacity remained unchanged since 2021, the waitlist would have grown to over 1,500 people waiting in 2025.*

As detailed in Figure 8, had the parties[17] taken a course of action that did *not* open more inpatient and community beds, the waitlist would have grown by roughly 300 people per year. ***This would have culminated in a waitlist of around 1,565 at the end of 2025, rather than the actual waitlist of 331***.

Recall from Figure 4 that from 2019-2025, the number of people ordered to restoration increased by 126%, whereas the waitlist increased at a slightly lower rate of 112%. This might seem to suggest that waitlist growth was constrained only slightly (112% vs 126%) relative to growth in those ordered to restoration. But because the waitlist does not have a linear

---

[16] Though figures specific to 2019 are not available, figures published by the Treatment Advocacy Center in 2016 ranked Colorado 35th (i.e., below average) of 50 states (and Washington DC), with respect to inpatient state psychiatric hospital capacity. Their 2023 rankings placed Colorado 34th (see below). Finally, at the risk of oversimplification, we note that while *many* states have delays in competence restoration services, most of the states that do *not* have delays in competence restoration services rank higher than Colorado in inpatient state psychiatric hospital beds per capita.

        Fuller, D. A., Sinclair, E., Geller, J., et al. (2016). *Going, going, gone. Trends and consequences of eliminating state hospital beds*. Treatment Advocacy Center.

        Silver, S. & Hancq, E.S. (2024). *Prevention over Punishment: Finding the right balance of forensic and civil state psychiatric hospital beds.* Treatment Advocacy Center.

[17] We reference "the parties" as decision-makers, recognizing that the Department opened the inpatient beds and community MHTL homes, but also recognizing that some community bed growth is attributable to the fines-funded projects, for which decision-making was shared among the fines committee that included the Department and DLC.

relationship with court orders, waitlist growth would not have been only 126% absent action. Rather, the increase in court ordered restoration cases would have increased the waitlist by 372% (1,565 vs 331) had bed capacity *not* increased after 2021.

*Figure 8:*
*If Bed Capacity Remained at 2021 Levels, Rather than Increasing: A Counter-factual Illustration*



We emphasize that counter-factual examples have important limitations,[18] but they can also illustrate important lessons. First, this illustration clearly shows that increasing bed capacity after 2021 averted the disastrous scenario of a 1,565-person waitlist. But we can easily imagine another counter-factual example to illustrate that the recent waitlist of 331 could be lower in a *different* counterfactual example wherein bed capacity had increased more and/or earlier.

Finally, any illustration of this sort underscores the importance of further action: The number of people ordered to restoration continues to increase at a rate (roughly 126%) that far exceeds Colorado population growth (roughly 5%), and insufficient action may allow the demand for restoration services to, once again, outpace the growth in capacity. For this reason, we next consider what inferences we can draw from these data graphs to inform next steps.

---

[18] There are various ways to model alternate scenarios, and we chose the most conservative. That is, we made few assumptions, and we chose a model that revealed the *least* growth in the waitlist (a "best case scenario" for this counterfactual scenario in which bed capacity did not increase). Other ways of modeling this counterfactual scenario show a waitlist figure that could be much larger than 1,565.

## Inferences from a 7-year Review:[19]

1. **The demand for competence-related services has steadily increased; all parties should plan for continued increases, while strategizing to minimize them.**

   - Generally, the number of defendants in jail ordered to competence evaluations have nearly *doubled* over the course of the Consent Decree. The increases have accelerated more recently; evaluation orders reached a record high in October of 2024 and remained unusually high through 2025.

   - Relatedly, the number of people ordered to competence restoration services have also increased dramatically, *more than doubling* from 2019 to 2025.

   - Positively, restoration orders have shifted significantly towards the community, consistent with the goals of the Consent Decree. The number of people ordered to outpatient restoration services has tripled over the years, and state-funded community beds that welcome persons participating in outpatient restoration services have increased by roughly ten-fold.

   - The drastically increased demand for competence-related services cannot be explained alone by population growth, increased arrests, increased arrests for misdemeanors, or any other demographic or criminal-processing trends that we can identify.

   - There have always been concerns that attorneys request, and courts order, competence evaluations and restoration because these may be the most efficient way to link a defendant with much-needed treatment. In more recent versions of this concern, several anecdotal accounts suggest that some stakeholders may see competence as the pathway to help defendants access some of the excellent community housing and services in programs funded by the Fines Committee.

   - These persistent increases in demand for services suggest that all parties should continue and expand their vigorous efforts to reduce demand. These efforts (detailed in prior reports) include judicial education, diversion strategies and, of course, more accessible community mental health treatment that does not depend on arrest or competency involvement.

---

[19] Although these inferences derive primarily from the data reviewed on the primary pages, we included commentary informed by other data in our Quarterly Reports, the Department's Monthly Compliance Reports, and other sources. We can provide any specifics upon request.

- At the same time, the persistent increases in demand for services suggest the parties should continue to expand inpatient bed capacity – both forensic *and* civil – which has long been inadequate for the need in Colorado.

**2. Expanding inpatient bed capacity is crucial to reducing the waitlist and wait times.**

- We conclude that increasing inpatient bed capacity has the greatest and most direct influence on the waitlist. As detailed in the data graphs (see Figures 5 and 7), increasing inpatient bed capacity prompts decreases in the waitlist. This occurs nearly immediately (with new admissions) but also repeatedly (as one patient discharges from a new bed and another is admitted). This is most clear as inpatient beds peaked in 2024 and the waitlist dropped significantly in the following months.

- State-to-state comparisons are difficult, because so many variables may differ across states. But generally speaking, we notice that the few states that do *not* have delays in competency services tend to be the states that have more state psychiatric hospital beds per capita (e.g., California, Connecticut, Virginia). Some have increased inpatient capacity, and reduced waitlists, only after years of litigation (e.g., Oregon, Washington). States that struggle with lengthy waitlists or delays (e.g., Texas, Oklahoma) tend to have fewer inpatient psychiatric beds per capita.

- Of course, community beds are also crucial (see below), but there must be *continued* increases in inpatient capacity, because a substantial portion of defendants will always be ordered to *inpatient* restoration.

- For example, over the course of the Consent Decree, the Department has progressed to the point that courts order outpatient restoration for roughly 40% of the defendants found incompetent (and roughly 30% of those evaluated in jail and found incompetent). *This is the highest portion of outpatient restoration orders relative to any state in the country*. But even with this near-maximal use of outpatient restoration, roughly 60% of defendants ordered to restoration services will be ordered inpatient, at least initially.[20]  To the extent that Colorado already has inadequate inpatient capacity, and inpatient restoration orders continue to increase annually, it is clear that *greater inpatient capacity is necessary for any ongoing improvements to the waitlist*.

---

[20] These percentages may appear to contradict the trends found in Figure 2. However, recall that there is no waitlist for outpatient restoration in Colorado, unlike inpatient restoration. Admissions to outpatient restoration therefore can easily outpace admissions to inpatient restoration. Also recall that many people move between the two systems as compliance and progress is either met or unmet; the numbers in Figure 2 may thus "double count" some of those individuals found in both systems.

Page 56

- We emphasize that additional inpatient beds may be civil or forensic. There is no reason to assume that all new beds must be (or remain) forensic. Some people with serious mental illness who require inpatient psychiatric hospitalization may be best treated under civil mechanisms. Furthermore, even if many beds are devoted to competence restoration (which will inevitably remain the case for those facing serious criminal charges), beds may shift from forensic to civil as the waitlist decreases and other reforms prioritize civil over forensic pathways. Whether forensic or civil, Colorado's longstanding lack of sufficient inpatient state psychiatric beds requires improvement in any further efforts to successfully address the Consent Decree or related litigation.

3. **Expanding community bed capacity is crucial to reducing the waitlist, but details matter.**

- As illustrated in Figure 6, the number of community beds has increased nearly ten-fold, from under 50 to almost 500. The greatest increases began around the start of 2024 and continued thereafter. Over the same time, the waitlist decreased, and then held fairly stable, over the course of 2025.

- Throughout 2025, the waitlist largely held steady, even as the number of community beds increased sharply. Roughly 70 more community beds will be available soon through the fines-funded Ava Health sites.

- A waitlist that has recently stabilized, rather than decreased, in response to increasing community beds leaves us cautiously offering the following hypothesis: *There is an eventual limit to the impact of community beds* (generally speaking) for two reasons: First, a large portion of defendants will always be ordered to inpatient restoration services due to their clinical needs (see prior discussion). Second, not everyone eligible for release to restoration in the community has the same placement needs. Rather, some community placement needs are more specialized or complex.

- The most general and typical type of community placement—suitable for people who have reached a particular level of stability and have more basic clinical needs—can only serve a *portion* of the people on the waitlist. These beds may be "easy to fill" because so many people can benefit from them. But, after there are enough of these to accommodate the portion of people on the waitlist who are an appropriate fit, additional "general" community beds may have less and less impact on the waitlist.

- Going forward, increasing the number of specialized community placements may be more valuable in reducing the wait list and wait times. Many detainees who are otherwise suitable for community-based restoration are not released because they

require a particular *type* of community facility. Many require a skilled nursing facility, a nursing home, a facility with more specialized medical care, or a facility with expertise in intellectual and developmental disabilities. Detainees with these special needs may wait far longer for an appropriate community placement, or they may receive inpatient restoration (even if an inpatient psychiatric hospital is not necessary) solely because there was no appropriate community placement. Indeed, they may be difficult to discharge from the hospital because there is no community placement available.

- Certain emerging developments lead us to expect an even greater need for these specialized community placements. For example, there has been much recent attention in Colorado to the dilemma of defendants found "permanently incompetent to proceed"—often based on intellectual or developmental disabilities. Anticipated statutory and/or policy changes lead us to expect more forensic and civil commitment procedures for this narrow population, who tend *not* to require traditional inpatient psychiatric beds (for clinical reasons) but tend to require *other*, *more specialized* kinds of placements.

- While the tremendous increase in community bed capacity has been a great improvement, it will be increasingly important to consider "community bed capacity" in more precise terms. Stakeholders will need to strategically develop a portfolio of community placements that match the varied needs of persons found incompetent and potentially appropriate for community-based restoration.

**4. Inpatient and community beds must continue to increase, with strategic planning.**

- To summarize, a review of the past 7 years under the Consent Decree leaves us certain that Colorado continues to require greater bed capacity.

- This capacity must include more traditional inpatient civil and forensic psychiatric beds—even acknowledging that these tend to be the costliest type of bed capacity—because there remains a significant portion of defendants with serious psychiatric symptoms who will *only* be ordered to inpatient restoration services (or for whom the only viable alternative to inpatient restoration might be inpatient civil commitment). Of course, this need is tightly intertwined with Colorado's longstanding shortfalls (i.e., insufficient beds per capita) in state psychiatric hospital beds, whether civil or forensic.

- The increasing bed capacity must also include more placements in the community. "General" community beds—the type that can serve the most stable defendants in outpatient restoration who do not have more specialized treatment needs—remain valuable, but they are not *sufficient*. It will grow even more important to develop specialized community beds for those with greater psychiatric and/or medical

Page 58

treatment needs, as well beds for those with intellectual and developmental disabilities.

- As all parties are aware, the Department's MHTL homes (now providing 164 beds) have been a tremendous step towards filling a gap in community placements options. Other options have become available through funding from the fines prescribed in the Consent Decree. Though fines-funded programs have varied in their impact, some fines-funded programs have proven extremely reliable and valuable to the goals of the Consent Decree. Any future planning should strategize ways to support and/or replicate some of the best programs, while also working to minimize the risk that stakeholders perceive these as incentives to ordering competence evaluation or restoration more than necessary.

- As we emphasize the need for increased bed capacity (inpatient and community), we do not intend to de-emphasize or negate the many other important strategies that the parties have pursued and we have addressed in prior reports. Upstream strategies, particularly diversion from the competency system, remain crucial. As we have emphasized for seven years, Colorado cannot *only* "build their way out of a competency crisis," but adequate inpatient and community capacity remain crucial for adequate treatment of the Colorado citizens who tend to become involved in the competency service system.

# Appendix 3

## Fines Committee Funded Program Master List

Updated March 31, 2026

| Name/Organization | Program Summary |
|---|---|
| 1st Judicial District Competency Docket | In June 2023, the Fines Committee approved $220,000 for two years of funding to the 1st Judicial District Court. Funding provided for a Docket Coordinator (1.0 FTE) to manage the competency docket in Jefferson and Gilpin Counties. The MOU was fully executed in October 2023, and the Docket Coordinator started in January 2024. The 1st Judicial District was allocated FTEs to support its competency docket through the passing of HB24-1355; as such, Fines Committee funding was not required to support the docket beyond 2024. The 1st Judicial District spent $95,127 of the total award and returned the remainder. The docket received 52 referrals and completed intakes for 45 individuals. Twenty individuals were released into the community for outpatient restoration. Five participants were found competent to proceed, and one of those individuals had their charges dismissed. The Competency Docket had eleven clients terminate; four were successful, one was unsuccessful due to lack of engagement, and six were neutral terminations. |

| 2nd Judicial District REACH Docket | In March 2023, the Fines Committee approved $220,000 for two years of funding to the 2nd Judicial District Court competency docket known as REACH (Review, Evaluate and Assist, Community-based behavioral Health). REACH hears cases for defendants who have charges in Denver District Court that are equal to or less serious than F3s or DF2s, with some exceptions, and have had competency raised in their case. The court works collaboratively with the Public Defender's Office, the District Attorney's Office, the Office of Civil and Forensic Mental Health, and numerous treatment agencies in the community to help defendants navigate the competency system and resolve cases in an effective manner. Funding provided for a Docket Coordinator to manage the competency docket, enabling clients to be released from custody during competency evaluation and restoration and potentially diverting clients to treatment and supportive housing, in lieu of prosecution. The Docket Coordinator position was filled during the 4th Quarter of 2023, and with the passing of HB-1355, funding for this position transferred to SCAO in June of 2025. Since its inception, 1,223 defendants were referred to the REACH docket, for a total of 1,726 cases; 67% of the cases ($n$ = 1,159) were dismissed or closed. |
|---|---|
| 2nd Judicial District Psychology Screener | One-time funding in the amount of $17,850 was approved for Psychological Insight & Assessment to help clients in the 2nd Judicial District acquire competency evaluation screening in custody, with the work taking place in Quarter 2 of 2023. This program was approved to meet a specifically-identified need for screening at a time when state-funded screening was suspended. The suspension caused a backlog for the 2nd Judicial District, and this program was funded to relieve the backlog. The target population included pre-release incarcerated clients ordered for competency evaluation. Psychological Insight & Assessment received 62 referrals and completed 52 evaluations. Of the 52 individuals, 25 met the threshold, 16 required further evaluation, and 11 individuals did not meet the threshold. |

| 12th Judicial District Competency Docket | In October 2023, the Fines Committee approved $61,466 for two years of funding to the 12th Judicial District. Funding provided for a Docket Coordinator to manage the competency docket, enabling clients to be released from custody for competency evaluation and restoration. Clients were then diverted to treatment and supportive housing, in lieu of prosecution. Additionally, in its service to its rural, mountain community, this program established a bi-monthly meeting venue through which continued development of a community mental health system coalesced. By the end of Quarter 4, 2025, the competency docket had served a total of 47 individuals since its inception. Nineteen individuals successfully completed the program; four participants were unsuccessful, eight had neutral terminations, and one passed away. By its number served, this program had a significant impact relative to the competency population in its jurisdiction. Combined with Aspen Haven Foundation, this program showed that small scale programs can have a major impact on the competency system in rural areas. The 12th Judicial District received an allocation for a 0.5 Docket Coordinator position from the Office of the State Court Administrator to manage the competency docket as part of the requirements of HB24-1355; as such, Fines Committee funding was no longer necessary to support this program. |
|---|---|
| AllHealth Network Bridges to Care | AllHealth Network was funded $134,000 from May 2023 through June 2024 to expand the capacity of the Bridges program in Arapahoe County to support the county's competency docket. Two Bridges Liaisons were funded, as well as equipment for both, including laptops, phones, monitors, and docking stations. The Liaisons helped clients acquire resources to be successfully restored in the community. Each Liaison had the capacity to serve 30 individuals at a time for a total of 60 individuals; however, throughout the course of the year, only 18 individuals were served with a program total spent of $56,729. The program is now operated by the State-funded Bridges of Colorado office, established by Senate Bill 23-229. |

| | |
|---|---|
| Ananeo Housing | Funding ($387,480) was approved for Ananeo Housing in November 2022, with the formal launch in December 2022. Additional funding in the amount of $156,870 was approved by the Fines Committee in February 2023 for five female units; $60,000 of the additional funding was awarded as capital investment to make improvements to the Ananeo property. In September 2023, Ananeo received $290,610 for a 15-bed expansion to serve an additional ten males and five females. The MOUs were renewed and consolidated in December of 2023 totaling $1,847,630 to serve 40 competency-involved individuals; this amount includes $242,175 that had been previously awarded but not yet funded. An additional $1,160,700 was awarded to Ananeo for an expansion to 60 beds and continued programming through December 31, 2026. The goal of this program is to provide housing and services associated with supportive monitored sober housing to clients referred by OCFMH for out-of-custody competency restoration. The Fines Committee funds two case managers, a mental health clinician, a psychiatric nurse practitioner (0.5 FTE), a clinical supervisor (40 hours a year), rent, utilities, referral management, urinalysis administration, and basic housing supplies for each client. In Quarter 1 of 2026, this program served 73 unique individuals; four individuals absconded, one individual self-discharged, and two completed the program. Since the program began, 290 referrals have been screened; 152 clients have been terminated from the program, and of those 70 have absconded, mostly due to substance use and medication management issues. There is currently a waitlist of three individuals referred to the program awaiting a bed. |
| Arapahoe County Sheriff's Office Mental Health Data Diversion Project | In June 2024, the Fines Committee approved $347,000 for 12 months of funding to the Arapahoe County Sheriff's Office (ACSO) to implement ForceMetrics, enabling the 911 emergency system of the county to connect callers with behavioral health resources more rapidly. ForceMetrics pulled data from the CAD and RMS systems providing a detailed summary of prior calls for service for deputies responding to crises, as well as access to CAD notes and report narratives. Of the 2,441 behavioral health-related calls received, only 45 (2%) resulted in individuals booked into the jail. |

| Aspen Haven Foundation (Formerly San Luis Valley Recovery Housing) | In May 2023, the Fines Committee approved $313,762 for two years of funding to Aspen Haven Foundation (Formerly San Luis Valley Recovery Housing), which is used to provide supportive, sober-living housing to clients released from custody for competency evaluations or restoration. In July of 2025, $127,502 was approved to continue program operations through June 30, 2026. The program can serve up to twenty individuals at a time; six beds are reserved for those involved in the competency system, referred from the 12th Judicial District. Renovations and construction on the 432 Seventh Street property in Alamosa took nearly a year to complete, and placements for residential services began in May of 2024. As of Quarter 2, 2024, Aspen Haven Foundation is CARR-certified. Aspen Haven has collaborated with Bridges Liaisons and FST Navigators, as well as the 12th Judicial District Competency Docket. In Quarter 1, 2026, the program received three referrals and continued serving five active clients. All three clients who have terminated the program have successfully graduated, one of whom had their charges dismissed. |
|---|---|
| Assisted Living of Aurora Transitional Housing | In March 2023, the Fines Committee approved $822,000 for one year of funding to Assisted Living of Aurora (ALA) Transitional Housing in Arapahoe County, within the 18th Judicial District. The MOU between the Fines Committee and ALA expired on May 31, 2024, and ALA returned $551,312 in unspent funds to the Fines Committee. ALA provided bridge housing so that competency-involved individuals could be released from custody to receive out-of-custody restoration. ALA also assisted clients with acquiring public benefits, enabling longer-term community housing placements. ALA served eight clients, a fraction of the number of clients it intended to serve. |
| Aurora Sustained | Aurora Sustained was operated by the Aurora Public Defender's Office in partnership with Aurora Mental Health and Recovery. Funding, in the amount of $104,751, was approved for this program in October 2021, and supplemental funding in the amount of $18,600 was awarded in April 2022. Continuity of funding was subsequently approved in July 2022 in the amount of $372,433 to fund the program for the remainder of 2022 and 2023. In July of 2023, the Fines Committee approved Aurora Sustained's funding request of $223,500 to continue to operate through December 31, 2024. This program screened individuals booked in the municipal jail, assessed individuals for competency, and connected clients to treatment out of custody while working toward prosecutorial diversion. The Fines Committee funded a program administrator, paid for competency evaluations, and provided cell phones for clients who had no other ability to stay connected with the program. In total, 2,330 behavioral health screens were completed, as well as 374 competency evaluations. |

| Ava Health | In October 2024, the Fines Committee approved $5,409,084 to Ava Health to develop and operate a vertically-integrated residential treatment organization serving Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, partial hospitalization, and intensive outpatient treatment. In December 2025, an additional $365,850 was awarded to accept clients from competency diversion programs and competency dockets as in-network Medicaid contracts are being finalized with Rocky Mountain Health Plans. The total funding award provides for five years of service to the competency population, serving several counties in western Colorado. Ava Health is under contract with The Molina Center as a location for the Stabilization and Residential Treatment site. It is also under contract with the Crossroads building for an Outpatient Care site. Ava Health has secured leases and zoned property for 48 beds of transitional housing, which will be comprised of a blend of MHTL and ASAM 3.1 level beds. Ava Health is negotiating a lease for its Mental Health Transitional Living space and is making progress in licensing and regulatory approval, including working through various processes with the BHA, local fire marshal, and becoming a national recognized provider. Ava Health has made some key hires, including a Clinical Director and Director of Nursing. It is working with the Mesa County Workforce Center to fill other positions as they become available. Ava Health opened its doors in February of 2026, with a substantial waitlist at opening. This quarter, the program received 170 referrals and brought in 25 clients. |
|---|---|
| Behavioral Treatment Services Forensic Day Reporting | In June 2023, the Fines Committee approved $265,814 for one year of funding to Behavioral Treatment Services (BTS) to establish a day reporting center. The program provided, or coordinated to provide, psychotropic medication, medication-assisted treatment, case management, peer support, and a warm, welcoming location for clients to receive competency-related services. Fines Committee funds provided for direct client services, including transportation, training manuals, housing support, drug screens, and MAT. It also supported an office administrator (0.25 FTE), restoration clinical supervisor (0.25 FTE), day reporting clinical case manager, peer support specialist, and Master's level therapists (1.5 FTEs). Due to startup delay, the Fines Committee agreed to a no-cost extension, continuing funding through January 2025. The program intended to serve at least 40 clients referred in Boulder County; however, only five clients were served in total. All five individuals who were referred to the program since its inception have terminated; one was successful, two transferred to an inpatient facility, and two were unsuccessful. BTS returned unspent funds of $169,236 in Quarter 1, 2026; the total funds spent was $96,578. |

| Boulder County Community Justice Services | Funding in the amount of $220,000 was approved for Boulder County Community Justice Services in October 2022. The original MOU between the Fines Committee and Boulder County expired on September 30, 2023; a renewal was approved for additional funding in the amount of $285,842 through December 31, 2024, and a no-cost extension was signed in December 2024 which extended the program until June 30, 2025. An additional no-cost extension was signed to further extend the program through June 30, 2026. This program expands the Bridges program in the county to serve more individuals whom the Bridges Liaisons can work with to acquire services out-of-custody. The objective is to improve access to Bridges Liaisons, as well as increase the capacity for appointments with the Liaisons. With Bridges of Colorado centralizing operations statewide, this program has been approved to continue county services to clients while Bridges hires and trains staff. The funds cover two FTE positions and costs related to clients' treatment needs (e.g. treatment, assessments, neuropsychological evaluations, and medication), as well as basic needs for clients, including cell phones, clothing, emergency supplies, and hotel vouchers. Funds have also been used for the completion of court-ordered neuropsychological evaluations and toward the purchase of a fleet vehicle for transporting clients. In Quarter 1 of 2026, this program received eight new referrals and conducted intakes for thirteen individuals. Since the program began, 97 individuals have terminated, 57 of whom were successful, 14 unsuccessful, and 26 had a neutral termination. |
|---|---|
| Boulder County Sheriff's Office Jail Competency Program | In June 2023, the Fines Committee approved $130,000 for one year of funding to the Boulder County Sheriff's Office (BCSO) to provide clients long-acting injectables. Since that initial approval, the program has been awarded an additional $360,000, taking its operation through November 30, 2026. The long-acting injectables are administered to clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication. In Quarter 1, 2026, the program received twenty-four referrals and provided a total of twenty-four long-acting injectables to its clients. |

| City of Greeley Homeless Solutions | In October 2023, the Fines Committee approved $111,835 for one year of funding to the City of Greeley Homeless Solutions to provide permanent supportive housing, employment support, education, job skills training, and benefits acquisition to three individuals involved in the competency system in Weld County. The Fines Committee extended funding through September 30, 2025 to continue program operations. Throughout the MOU term, the program provided three permanent housing vouchers and supported clients on a 24-hour, 7-day-a-week basis. Funding also supported a case manager (0.5 FTE), usage of a fleet vehicle, bridge housing, wraparound services including transportation, tuition, iPads and other client needs, as well as technology for staff. An additional $75,240 was awarded to provide rapid rehousing, shelter, and navigation services through September 30, 2026. As of the end of Quarter 1, 2026, the program met its previous goal of serving three clients and is finalizing programming to provide navigation services, shelter, and rapid rehousing starting in the second quarter. |
|---|---|
| Colorado Coalition for the Homeless | Colorado Coalition for the Homeless (CCH) was approved for funding in the amount of $1,500,000 in November 2020. The MOU between the Fines Committee and CCH expired in October 2022 for the Crest program; however, the Fines Committee extended the MOU with CCH through March of 2025 for the Restoration program, and CCH continued to report outcomes for that program until the MOU expired. The goal of the Restoration program was to provide modified Assertive Community Treatment (ACT) to clients who were referred through OCFMH's Forensic Support Team as appropriate for outpatient restoration. CCH provided long-term stable housing for 80 clients, and at the end of the MOU term, 48 individuals had terminated. Thirty-one of those individuals were unsuccessful (65%), two were successful (4%), and the remaining had neutral termination types ($n$ = 15, 31%). |
| Community Based Enhanced Restoration (CBER) | CBER was operated by WellPower from January 2022 through December 2023. Funding in the amount of $400,000 enabled WellPower to provide Assertive Community Treatment to individuals released on bond and being restored to competency out-of-custody. Short-term housing options were also funded for CBER clients who would have otherwise been homeless. The program served 68 individuals in the funding term; 27 were restored to competency or had their case dismissed, 39 were terminated unsuccessfully due to absconding, violating program policies, or acquiring a new charge, and two were transferred to other programs. |

| Denver Competency Diversion and WellPower | The Denver Competency Diversion program, operated by the Denver County Court, was funded $1,029,996 in December of 2021, with formal launch on April 4, 2022. The Fines Committee awarded $587,342 in September 2023 to WellPower to continue supporting the Denver Competency Diversion program through September 2024. In December 2023, the Fines Committee approved an additional $541,870 to continue operations through 2024, and in November of 2024, a reallocation of funding, including a return of $285,290, and a no-cost extension was granted through December 2025. The goal of this program was to divert from prosecution those defendants who are likely to be found incompetent to proceed. The Fines Committee initially funded a program administrator, a program coordinator (screening and release planner), a Denver district attorney, a Colorado public defender, six clinical case managers, a clinical program manager (0.6 FTE), and a district attorney competency diversion officer. Funding after the reallocation supported a Competency Support Specialist who focused on data collection and administrative program support, including program tracking and supporting ongoing program efficiency. Funding also provided for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance. The capacity of the program was 60 when all six case manager positions were filled. In 2025, the program transitioned to operating under the mandates set forth in HB24-1355 for diverting individuals from the waitlist in Denver. By the end of December 2025, 65% of all individuals who had completed the Competency Diversion program were successfully diverted; 13% were unsuccessful due to new charges; 13% were unsuccessful due to lack of engagement; and 8% had their case(s) closed for other reasons. Given the program's goal was diversion, thus precluding clients from ever joining the waitlist, the program had a significant impact by suppressing the number of new clients added to the waitlist. Of note, the cross-referencing of newly-charged/booked individuals against a database of prior individuals found incompetent to proceed in the jurisdiction (previous three years) was an innovative practice. This could be an example to be implemented in each district to identify clients who should be further screened and considered for diversion. Additionally, with agreement from the Office of the State Court Administrator (SCAO) and OCFMH, the creation of a statewide cross-reference database would allow for providing local officials a list of newly-charged individuals who match – thus automating this process and with a larger statewide dataset. |
|---|---|

| Denver County Court Competency Support Docket | In March 2024, the Fines Committee approved $280,609 for 12 months of funding to the Denver County Court to operate a competency support docket. A six-month no-cost extension was granted to continue program operations through September 2025. For cases that cannot be diverted from prosecution in the County Court Diversion Program, this docket provides an opportunity for clients to be diverted from confinement during the restoration process. The docket serves as a forum where community resources may be brought in to help meet clients' out-of-custody needs. Funding supports a clinical screener (0.5 FTE), district attorney (0.5 FTE), public defender (0.5 FTE), emergency housing, transportation assistance, cell phones, and food and clothing for clients. In September 2025, the Fines Committee approved Denver County Court's request for an additional six-month no-cost extension and reallocation of $37,648 from prosecutor salary and Denver Health screener to wraparound services and supports for individuals served by the Competency Support Docket. The competency support docket has received 1,176 cases involving 887 individuals, with 285 of those being dismissed with services; 176 dismissed under C.R.S. 16-8.5-111(1.6); 238 being successfully diverted; and 144 being sent back to the trial courtroom due to a "competent to proceed" finding. |
|---|---|
| Douglas County Sheriff's Office Mental Health Data Diversion Project | In December 2023, the Fines Committee approved $679,300 for 18 months of funding to the Douglas County Sheriff's Office (DCSO), and a no-cost extension was approved for DCSO to continue operations through October 31, 2025. Funding provided for the implementation of a data-driven program, ForceMetrics, to enable the 911 emergency system of Douglas County to connect callers with behavioral health resources more rapidly. Fines Committee funding also supported the salary of a temporary project manager, overtime pay and fringe for deputies, supplies, and behavioral health treatment. Eight hundred eighty-five behavioral health-related calls were received, and sixty individuals were booked into the jail related to a behavioral health call (7%). |

| Embark Assisted Living Residence – Renaissance | In May 2023, the Fines Committee approved $380,820 for one year of funding to the Embark Peer Coach Academy to open a Level 1 Mental Health Transitional Living (MHTL) facility, Embark Assisted Living Residence–Renaissance. In March 2024, the Fines Committee approved an additional $40,000 to continue operations until MHTL funding through the State began. Throughout the funding term, Renaissance provided licensed transitional assisted living to sixteen mid- to high-acuity individuals in the competency system referred from the 4th Judicial District. Intensive case management, connection to physical and mental health community resources and competency restoration services, daily medication management, meals, benefit acquisition, transportation, peer support, life skills training, and scheduled social and recreational activities were also provided. As of the end of Quarter 2, 2024, when State funding took over, seven individuals continue to be housed, with an average length of stay of 138 days. The additional nine individuals were discharged with only one terminating unsuccessfully. |
|---|---|
| Embark Peer Coach Academy Recovery Residences | In November 2022, the Fines Committee approved $306,150 for Embark Peer Coach Academy (Embark) to operate a Day Reporting Center and sober-living forensic housing (Embark Recovery Residences). In 2023, Embark received renewal funding for Embark Recovery Residences (ERR) in the amount of $335,550 through November 30, 2024 and chose not to seek additional funding for its Day Reporting Center due to a lack of referrals and ability to fund components of those services through Medicaid. The goal of the Day Reporting Center was to provide outpatient restoration clients with treatment, classes, peer support, and case management. In December of 2024, the Fines Committee awarded an additional $199,720 to ERR through October 2025. An additional $286,800 was provided through October 2026 to renew services and expand from twelve beds to seventeen total beds. ERR serves individuals released from confinement who are participating in competency restoration. The Fines Committee funds partial salaries for a certified addiction specialist, licensed addiction counselor, two peer coaches, receptionist, and housing managers. Funding also covers individual assessment and treatment planning, medication management, psychiatric services, daily classes, substance use monitoring, support groups, peer mentoring, vocational support, public benefit acquisition, transportation assistance, and competency restoration services. ERR provides sober-living housing with the capacity to house 17 clients at a time, with 24-hour management, transportation, and food and support services are available on site. In Quarter 1 of 2026, ERR received fifteen referrals and completed seven intakes. The beds remained full throughout the quarter as Embark continues to house most residents for six to nine months. Since the program's inception, 90 unique individuals have been served (two have been admitted twice). |

| Fidelity Behavioral Health | Funding, in the amount of $1,272,559 was approved for this program in February 2024, with formal launch in that same month. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded three houses for clients to live in, each housing ten clients, a van to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, three house managers for 24/7 supervision, and partial salaries of the personnel to operate the program. In December of 2024, an additional $411,348 was awarded to Fidelity Behavioral Health for two case managers, one LCSW, one peer specialist, salary increases for all staff, and for the clinical director to move from part-time to full-time. In Quarter 4 of 2025, Fidelity opened another home, expanding the bed capacity to 48. In December of 2025, the Fines Committee awarded $370,000 to Fidelity Behavioral Health for three months of supplemental payroll support during the first quarter of 2026. The program received forty-six referrals and completed seventeen intakes. Fifty clients in total have terminated the program; twenty-four have been successful. |
|---|---|
| Gateway to Success – Pueblo | In December 2022, the Fines Committee approved $275,000 for one year of funding for Gateway to Success to provide a Forensic Day Reporting (FDR) program in Pueblo. The original MOU between the Fines Committee and Gateway to Success was set to expire on December 4, 2023; however, a no-cost extension was granted to Gateway extending the MOU and service provision through the end of February 2024. The Fines Committee awarded renewal funding in the amount of $235,000 through February 2025 and then approved a no-cost extension to continue operations through May 2025. The goals for the FDR program were to support formerly-incarcerated individuals who are involved in the competency system, to provide a center at which services can be delivered to out-of-custody competency individuals, and to reduce the number of defendants with behavioral health disorders incarcerated in the Pueblo County Jail. The award provided partial funding for six employees, and Gateway to Success was able to retain all employees supported by the Fines Committee funding. The funding also covered transportation, participant manuals, medications, food/beverages, medication compliance incentives, and prosocial activities. The FDR program began fully operating toward the end of Quarter 1, 2023 and served 36 clients by the end of the MOU term. |

| | |
|---|---|
| Homeward Alliance | Funding, in the amount of $217,800 was approved for Homeward Alliance in February 2024, with formal launch in March 2024. In December 2024, a no-cost extension was granted to Homeward Alliance to continue services through December 31, 2025. Renewal funding was awarded in the amount of $145,000 to continue operations through December 31, 2026. The goal of this program is to provide housing navigation and case management services to individuals who are competency-involved in Larimer County. The program partners with the Larimer County Competency Docket and SummitStone Health Partners to receive referrals. Homeward Alliance connects clients with resources provided by partners of the State Division of Housing and completes intakes for clients to enter that system. Funded staff include a housing specialist (1 FTE) and a program manager (0.5 FTE). Direct client expenses are also provided, which include moving facilitation, tenant rights education, life skills education, and landlord/tenant communication and mediation. In Quarter 1, 2026, Homeward Alliance received 8 new referrals from Bridges and completed intakes for 19 clients. Twelve clients have been terminated since the program began: six were transferred to more permanent housing, and six disengaged. |
| Integrated Insight Therapy IMPACT | IMPACT (Intensive Monitored Preventative and Acute Competency Treatment) was operated by Integrated Insight Therapy, a behavioral health treatment provider serving the 7th, 21st, and 22nd Judicial Districts. The Fines Committee allocated $1,178,000 in total to the program. IMPACT housed clients in two residential houses, providing treatment and wraparound care. The program operated from February 2022 until January 2024 and served 22 clients. |

| Larimer County Competency Docket and the Larimer County Public Defender's Office | The Larimer County Competency Docket is operated by the Larimer County Community Justice Alternatives Department. Funding ($533,242) was approved for this program in December 2021, with formal launch of funded program elements in January 2022. In January 2023, funding in the amount of $262,000 was approved for the Larimer County Public Defender's Office to support the Competency Docket with one dedicated public defender through January 2025. The original MOU between the Fines Committee and the Competency Docket was set to expire in February of 2024; however, a no-cost extension was granted allowing the provision of services to continue through the end of September 2024. In May of 2024, the Fines Committee approved additional funding in the amount of $654,170 through June 30, 2025 to continue program operations and fund transitional housing in the Larimer County Alternative Sentencing Department. A no-cost extension was granted through July 31, 2025. Additional funding in the amount of $355,440 was awarded to continue services and housing through July 31, 2026. The goal of this program is to divert individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a Competency Services Team Lead and two Competency Intensive Case Specialists, as well as client expenses, client transportation, employee training opportunities, office supplies, and ten beds in its work release facility.  In Quarter 1 of 2026, the program served 65 total active participants in the Competency Docket, and six individuals were terminated, none having been found permanently incompetent to proceed. |
|---|---|
| Mesa County Pretrial Community Alternative Placement (Pre-CAP) | The Pretrial Community Alternative Placement (Pre-CAP) program operated by the Mesa County Community Justice Services Department (CJS) was funded to divert individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. Fines Committee funding, in the amount of $27,900, provided inpatient treatment for clients diverted from confinement. This program augmented the capacity of an existing county pretrial mental health program, specifically to serve competency-involved individuals. Mesa County CJS declined to request renewal funding, so it was only funded for one year of service. Inpatient treatment was provided for three clients referred for out-of-custody competency restoration. All three clients successfully transitioned from inpatient treatment; two were then ultimately unsuccessfully discharged from Pre-CAP, and the other individual successfully completed Pre-CAP and transitioned to the community. Mesa County was selected as a National Association of Counties (NACo) Justice Initiative site in 2023, and as NACo works with Mesa County to identify needs and gaps, there may be an interest in future funding to serve competency-involved individuals. |

Page 73

| Mesa County Sheriff's Office – Long-acting Injectables Program | In May 2023, the Fines Committee approved $360,000 for one year of funding to the Mesa County Sheriff's Office (MCSO) to provide clients with long-acting injectable medication. In March 2024, the Fines Committee signed a no-cost extension with MCSO to allow for continued operations through May of 2025. In Quarter 1 of 2025, the no-cost extension was granted through May of 2026. The medication treats clients who return to jail from the state mental health hospital, or who upon initial charge and booking, will likely end up in the competency system without the medication. Over the course of a year, NaphCare, MCSO's medical contractor, expects to provide medication to up to ten individuals per month. Since the program began operating in the 3rd Quarter of 2023, ninety-nine long-acting injectables have been administered to twenty-one individuals in the Mesa County Detention Facility. |
|---|---|
| Mile High Behavioral Healthcare | Funding ($137,494) was approved for the Mile High Behavioral Healthcare (MHBHC) program in December 2021, with formal launch taking place in Quarter 2 of 2022. The MOU between the Fines Committee and MHBHC expired in January of 2023; however, given the entire awarded funding had not been spent, a no-cost extension was approved for funding to be spent through September 30, 2023. In October 2023, the Fines Committee agreed to renew the program through September 30, 2024, with additional funding of $149,251. In October 2024, the Special Masters agreed to a no-cost extension allowing MHBHC to continue utilizing the funds through September 30, 2025. The goal of this program was to help clients acquire treatment and wraparound services out of custody. Its target population included pre-release incarcerated clients with mental health and substance use disorders. The Fines Committee funded two clinical case managers, and Signal Behavioral Healthcare funded two additional case managers. The program received 283 referrals and completed 273 intakes. Two hundred and thirty-five individuals terminated the program; 197 were successful, while 38 were unsuccessful (84% success rate). To sustain its work, MHBHC created a robust development plan with a diversified funding portfolio. In 2025, MHBHC received funding support from federal, state, county and local grants; federal contracts; foundations; business; and earned income to sustain operations annually. Additionally, all therapeutic interventions once in the community including group, one-to-one, case management and peer support are reimbursable through Medicaid, so MHBHC will continue to leverage this funding to sustain those services beyond Fines Committee funding. |

| Monarch Competency Housing | Funding ($953,074) was approved for Monarch Competency Housing in April 2023, with formal launch taking place in June of 2023. Additional funding of $2,353,199 was approved in May 2024 to purchase the housing facility it was renting, and at that time, the program committed to continue serving competency clients for five years. In September 2025, the Committee approved an additional $284,842 enabling the program to deliver IOP and PHP to clients. Monarch recently expanded from 24 to 48 supportive monitored sober beds. The program is expected to provide 60 beds to serve clients referred by the Forensic Support Team, Bridges of Colorado, and other system stakeholders starting July of 2026. Its target population includes clients ordered to have competency evaluations or outpatient restoration services. The Fines Committee funds two full-time mental health technicians, two full-time case managers, one director of operations, one executive director, one admissions/outreach coordinator, three full-time peer support specialists, two part-time peer support specialists, one full-time transport driver, as well as all costs directly related to clients including transportation, case management, groceries, clothes, toiletries, and housing supplies. Monarch also contracts with clinical supervisors to oversee peer support and with a psychiatric nurse practitioner to assist with prescriptions; however, these positions are not funded by the Fines Committee. In Quarter 1, 2026, the program received 73 referrals, completed 23 intakes, and had 31 terminations, 13 (42%) of which were successful. Seventy-nine unique individuals were served during the 1st Quarter of 2026. |
| NAMI Colorado | In February 2024, $91,030 was approved for this program. The goal was to provide evidence-based peer programming for patients and staff of the State Mental Health Hospitals in Pueblo and Fort Logan. Funding supported experiential-based training for patients, a recovery-based support group program, and staff education, through partial salaries of six positions. In total, the program held four training sessions, reaching 142 patients and 23 staff. |

| Pulse Line Collaborative Training | In October 2023, the Fines Committee approved $1,058,270 for two years of funding to Pulse Line Collaborative Training, LLC. In April of 2025, a no-cost extension was approved for program continuity through January 2026. In December 2025, the Special Masters approved an additional no-cost extension through June 2026. Funding provides for training to be administered to law enforcement, first responders, clients, and family members of clients and potential clients, to help reduce unwarranted use of force incidents. Many individuals who ultimately become involved with the competency system acquire serious criminal charges stemming from unnecessary altercations with law enforcement or first responders, owing mainly to symptoms of mental health disorder, rather than intentional criminal behavior. Funding provides for a director of development and training (1 FTE), a mental health lead and program coordinator (1 FTE), and administrative support (0.75 FTE), as well as operational expenses. In Quarter 1, 2026, the program completed 64 training sessions, each 8 hours in duration, with first responders and fourteen additional sessions for self-advocates/caregivers, for a total of 78 training sessions held. As part of this program's evaluation plan, it has agreed to survey training participants. The survey continues to show highly-positive response rates to questions asking about the value of the skills and knowledge in their jobs or daily lives. |
|---|---|
| SAFER Opportunities | In March 2023, the Fines Committee approved $2,007,500 for SAFER in Arapahoe County, within the 18th Judicial District. This program provided housing and supportive services to individuals transitioning from custody to support out-of-custody competency restoration, with a goal of increasing the number of individuals released from custody who otherwise would be released homeless. As of the end of Quarter 4, 2024, a total of 9,491 bed days were provided thus satisfying the MOU conditions. Throughout the MOU term, reviewed 81 referrals and served 29 individuals. SAFER acquired several grants to support operations outside of Fines Committee funding, including grants from DOLA Emergency Solutions, Colorado Health Foundation, Arapahoe County, Caring for Denver, BHA Behavioral Health Safety Net, BHA Workforce Recruitment and Retention, and ARPA Peer Support. Mental Health Colorado (MHC) acquired the property; however, in July of 2025, the program closed due to sustainability concerns expressed by MHC. |

| Second Chance Center in the City | In July 2023, the Fines Committee approved $488,125 for one year of funding to Second Chance Center in the City (SCCIC) to provide onsite case management, peer mentoring, employment services, and housing navigation to individuals in or at-risk of being in the competency system. In August of 2024, the Fines Committee renewed funding in the amount of $476,877 to serve at least 75 unique clients through July 2025. An additional $407,500 was awarded to continue program operations through July 31, 2026. SCCIC assesses each client's needs, specifically related to mental health, substance use, intellectual and developmental disabilities, and traumatic brain injury for appropriate treatment. Fines Committee funding covers care managers, a behavioral health navigator, peer navigator, program manager, and partial salaries for the director (0.5 FTE) and an assistant director (0.5 FTE). Costs directly related to clients' basic needs, assistance with leasing office space, and funding for ReShape Minds to provide community navigation directly to clients are also covered. In Quarter 3, 2023, SCCIC began receiving referrals and conducting intakes. Since that time, SCCIC has received 217 referrals and has successfully enrolled 215 of those referred. As of the end of the first quarter, 102 clients have been terminated: 37 were unsuccessful, 50 were successful, and 15 have had a neutral termination. |
|---|---|
| Servicios de la Raza | In May 2024, the Fines Committee approved $466,720 for 24 months of funding to Servicios de la Raza to provide recovery support services to help clients achieve long-term stability. An additional $544,910 was awarded in December of 2025 to continue programing through June 30, 2027. This program emphasizes peer support and focuses on clients who are Spanish speaking, with the goal of serving 60 unique individuals each year from 2024-2026, and with the additional funding, 120 unique individuals between 2026 and 2027. Funding initially covered salaries and benefits for a behavioral health co-director (0.1 FTE), client services manager (0.15 FTE), peer services coordinator (0.15 FTE), peer specialists (2 FTE), and a bilingual case manager (1 FTE), as well as indirect costs, client supportive services, professional development, employee mileage, computers and telecommunications for employees, and supplies. When the program was renewed in December of 2025, an additional 0.5 FTE for a therapist and 1.0 FTE for a peer support specialist was supported, while funding for the client services manager, peer coordinator, and 0.5 case manager was eliminated. In Quarter 3 of 2025, Servicios de la Raza had to temporarily pause the acceptance of new referrals due to capacity limitations. Increased funding provided in January 2026 permitted the program to expand. Throughout Quarter 1 of 2026, Servicios provided peer support, services, and resources to 69 individuals who were incarcerated, hospitalized, and in the community throughout the quarter. Sixty-two individuals have terminated the program; fifty-two have been successful (84%), and ten were unsuccessful. |

| Solange Assisted Living | Funding, in the amount of $600,000, was approved for this program in January 2024, with formal launch in that same month. The goal of this program was to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with wraparound services and partnering for treatment services. The Fines Committee funded 20 beds in assisted living facilities in El Paso and Pueblo Counties, a van to transport clients, furniture, entertainment equipment, and supplies. Solange served 18 individuals throughout the MOU term. |
|---|---|
| State Court Administrator's Office Competency Programs Analyst | In August 2023, the Fines Committee approved $222,664 for two years of funding to the Office of the State Court Administrator (SCAO) for a competency programs analyst. The analyst supported judicial districts operating special programs in the competency system. SCAO filled the position in December 2023, and the competency programs analyst focused on several key initiatives: 1) implementing HB24-1355, 2) Securing additional grant funding, 3) Rolling out a competency data system, 4) Onboarding competency docket coordinators, awareness, and 5) General administrative assistance. The competency programs analyst was officially hired by SCAO in November of 2024, and as such, SCAO no longer required $84,280 of the Fines Committee funding that was awarded for the creation and implementation of his position. |
| SummitStone Health Partners Competency Hub | In October 2022, the Fines Committee approved $3,029,283 for three years of funding to SummitStone Health Partners (SummitStone) in Larimer County within the 8th Judicial District. A no-cost extension was approved through June 30, 2027 to continue program operations. SummitStone discontinued its jail psychiatric in-reach program due to the sheriff hiring a new medical vendor. This program operates a competency services hub at which clinical services, case management, and peer support are provided to out-of-custody clients. The hub enables clients to receive a range of services from one location, including competency restoration education, medication management, and other collaboration with system providers. In Quarter 1, 2026, the program served 46 unique clients. The reported capacity of the program is 80 for in-custody and outpatient services. |

| The Dirt Road to Recovery | In May 2024, the Fines Committee approved $162,120 for 12 months of funding to The Dirt Road to Recovery (TDRTR) to provide three beds to male clients in a CARR-certified Level II sober-living home. An additional $167,124 was awarded in July 2025 to continue program operations through June 30, 2026. The program is located in Johnstown, Colorado and is the first funded program to serve the 13th Judicial District; the program also accepts clients from the 8th and 19th Judicial Districts. Clients remain in the program for an average of six months; as such, the program serves six individuals each year. Funding provides for partial salaries and benefits for a director of operations (0.33 FTE), peer support specialist (0.33 FTE), client housing, transitional client expenses, and a vehicle for client transportation. In Quarter 1 of 2026, the Dirt Road to Recovery served three clients. Six individuals have terminated the program, five successfully, while one was remanded to jail due to violating a restraining order. |
|---|---|
| United Way of Weld County Rapid Rehousing Opportunity | In August 2023, the Fines Committee approved $1,421,440 for two years of funding to United Way of Weld County Rapid Rehousing Opportunity (UWWC) to transition fifty competency-involved individuals from the Weld County Jail to the community by providing housing, case management, assistance with benefit acquisition, and wraparound services. Funding covered two case manager FTEs, bridge housing, cold weather shelter space, Rapid Rehousing for 50 participants, and maintaining and supporting the operations of the Housing Navigation Center services. UWWC began to receive referrals in Quarter 4, 2023, and by the end of Quarter 2, 2025, UWWC screened 47 referrals and completed 28 intakes since the program began. All 28 individuals terminated the program, 12 unsuccessfully (43%), 10 successfully (36%) and 6 had neutral terminations (21%). After several quarters of performance, the Committee reduced the funding amount to $710,720, and ultimately, $200,000 was returned by United Way of Weld County, for a total funding award of $510,720. |

| University of Denver, Denver FIRST, Brain Injuries Screening Program | In September 2022, the Fines Committee approved $948,729 for two years of funding to Denver FIRST, a regional hub for forensic mental health expertise within the Graduate School of Professional Psychology at the University of Denver. In January 2024, a no-cost extension was granted to continue the program through September 30, 2025. The Brain Injuries Screening (BIS) program focuses on competency clients suspected of having brain injuries and provides cognitive screenings, full neuropsychological evaluations, and referral for treatment by professional students to clients referred by the Forensic Support Team. Its target population includes incarcerated and out-of-custody clients with a history of and/or symptoms of potential brain injury. The Fines Committee funds student and professional staff time to complete cognitive screenings and neuropsychological evaluations. In September 2025, the program agreed to refocus its efforts to provide Cognitive Remedial Therapy (CRT) to clients over a year implementation timeframe. This quarter, the program received ten (down from twenty-two last quarter) referrals and completed ten intake (up from one last quarter). Historically, of those assessed, 86% have been positive for a brain injury, and 90% have presented with cognitive and functional-related deficits. The program continues to see severe comorbid mental health and medical issues complicating individuals' presentation. The reported capacity of the program is 20. |
|---|---|
| Valor Program at Embrave | Funding, in the amount of $8,902,175 was approved for Embrave's Valor program in March 2024, with formal launch following a lengthy facility acquisition and renovation process. In September 2025, the Committee approved an additional $2,250,000 for this program to continue operating through 2028. This quarter, the Committee approved an additional $1,125,000 to make up for a lack of alternative cashflow. The goal of this program is to divert individuals on whom competency is raised, from confinement, by providing dedicated program housing with treatment and wraparound services. The Fines Committee funded capital to purchase a hotel and renovate it to make 72 units available, vehicles to transport clients, utilities, furnishings, food, toiletries, phones, operating costs, house managers for 24/7 supervision, and partial salaries of the personnel to operate the program. Quarter 1, 2026, is the seventh quarter in which this program has served clients. This quarter, the program received 78 referrals and completed 31 intakes. Valor terminated 35 clients; sixteen were successful, and nineteen unsuccessful. |

| Vital Healthcare Capital | In July 2025, Vital Healthcare Capital (V-Cap) was awarded $50,000 to provide direct technical assistance to two Fines Committee-funded programs with the goal of identifying and strengthening sustainability and preparing for future growth. This initiative, jointly funded with $50,000 from V-Cap and $50,000 from the Fines Committee, will support financial modeling; business planning; revenue strategy; legal, accounting, and compliance guidance; and strategic positioning for public and philanthropic funding opportunities. In September, V-Cap distributed the initiative announcement to funded programs, in addition to connecting to four consulting organizations to explore potential alignment: Technical Assistance Collaborative (TAC), Health Management Associates (HMA), Steadman Group, and Consultex. In Quarter 4, 2025, V-Cap selected its two Fines Committee-funded programs after a rigorous application and review process: Valor at Embrave and Aspen Haven Foundation. V-Cap has finalized MOUs with each and has begun the technical assistance process. |
|---|---|

WWW.COLORADOCOMPETENCYSOLUTIONS.COM

# COLORADO FINES COMMITTEE

## 2026

FUNDED PROGRAMS
IMPACT REPORT

PREPARED BY:
Fines Committee Special Masters

# EXECUTIVE SUMMARY

This report provides an overview of the reach and impact of programs supported by the Colorado Fines Committee.  The Committee administers the Competency Waitlist Fines Fund, which invests in initiatives designed to reduce the competency-related backlog while avoiding the supplanting of existing Colorado Department of Human Services (CDHS) responsibilities.

Fund investments focus on four priority areas: housing, case management, judicial supports, and treatment, along with select statewide capacity-building initiatives.  As of December 31, 2025, the Committee has funded 49 programs and allocated a total of $49,036,497.  Of this amount, $34,538,900 has been dedicated to expenses related to housing clients; $16,144,000 within the housing category has been used to expand treatment-based residential housing through capital investments.  Collectively, these programs have served 8,550 clients, supporting their ability to access out-of-custody restoration services and treatment.

The sections that follow detail the impact of each investment area and describe the fund's contribution to reducing the statewide competency waitlist. The report concludes with policy recommendations to further advance progress on this critical issue.

# COLORADO FINES COMMITTEE

THE FINES COMMITTEE IS A SMALL BOARD ESTABLISHED TO OVERSEE THE COMPETENCY WAITLIST FINES FUND.  THE FINES FUND WAS ESTABLISHED BY THE CONSENT DECREE THAT RESULTED FROM THE LITIGATION ADDRESSING COLORADO'S COMPETENCY TO STAND TRIAL SYSTEM (CASE NO. 1:11-CV-02285-NYW).  THE FINES COMMITTEE INCLUDES A REPRESENTATIVE FROM DISABILITY LAW COLORADO (DLC), THE COLORADO DEPARTMENT OF HUMAN SERVICES (CDHS), AND THE SPECIAL MASTERS (APPOINTED IN THE CONSENT DECREE).  THE COMMITTEE ENSURES THAT FUNDS ARE ALLOCATED ACCORDING TO THE CONSENT DECREE, IN A MANNER THAT DOES NOT REPLACE EXISTING CDHS FUNCTIONS, BUT NEVERTHELESS SERVES PEOPLE INVOLVED (OR LIKELY TO BE INVOLVED) IN COMPETENCY SERVICES.

Fines Committee-funded programs generally fall into four primary categories of intervention for competency-involved clients: **judicial forum**, **case management**, **housing**, and **treatment**.  When a jurisdiction implements all four components, the necessary infrastructure is in place to effectively identify and assess individuals, divert them from confinement when appropriate, and support their treatment and restoration out of custody.

For individuals at risk of entering the competency system, success depends on effective treatment, strong case management support, and access to appropriate housing.  A small number of funded programs do not fit neatly within this framework, such as those offering specialized training, competency evaluations, or neuropsychosocial assessments. Additionally, several programs operate across multiple intervention types; for example, pairing housing with case management or combining a judicial forum with case management services.

2

# FOUR LEGS OF THE STOOL

**1. Judicial Forum**
A judicial forum centralizes expertise in competency restoration, systems of care, and behavioral health treatment.  This often takes the form of specialized courts or docket structures dedicated to cases placed on competency status during the restoration process.  These judicial forums ensure consistent oversight, coordinated decision-making, and timely case progression.

**2. Case Management**
Case management serves as a critical navigational function, guiding clients through legal processes, treatment systems, and public benefits.  Because these activities extend beyond attorney responsibilities and often require broad system familiarity, they are well-suited to non-attorney case managers.  Both county governments and local treatment providers are typical hosts for this intervention.

**3. Housing**
Specialized, treatment-linked housing is essential to safely support individuals during the restoration phase once they are released from custody.  These settings provide stability, ensure safety, and create the conditions necessary for clinical and legal progress.

**4. Treatment**
For many jurisdictions, access to specialized behavioral health and medical services, particularly those tailored to the competency population, is limited both in and out of custody.  Funding targeted treatment services where none otherwise exist can significantly improve restoration outcomes and reduce reliance on confinement-based care.

# FINES COMMITTEE FUNDING PROCESS

**1 INITIAL CONTACT**

Organizations contact the Cultivator to discuss potential projects.

**2 PROGRAM DEVELOPMENT**

The Cultivator explains objectives and helps shape a program aligned with at least one of the legs.

**3 SPECIAL MASTERS REVIEW**

The Cultivator presents the plan to the Special Masters and Evaluators for review and revision.

**4 COMMITTEE DECISION**

The Cultivator submits the plan to the Committee for approval, denial, or further revision.

**5 DRAFT MOU**

Upon approval, the Evaluators draft an MOU reflecting expectations and program commitments.

**6 FUNDING AND COMPLIANCE**

After execution, funding is released in installments pending compliance with the MOU.

4

**Miscellaneous**
**18%**

**Case Management**
**28%**

**Treatment**
**4%**

**Judicial Forum**
**14%**

**Housing**
**36%**

**Distribution of funded programs, showing Housing and Case Management as the largest portions of overall funding.**

Since 2019, the Committee has approved funding for 49 programs.  The total funding allocated to these programs as of December 31, 2025 is $49,036,497.  Programs have operated in the following judicial districts: 1st, 2nd, 4th, 8th, 10th, 12th, 17th, 18th, 19th, 20th, 21st, 22nd, and 23rd. Programs are split as between serving a single jurisdiction, a region, or the entire state.



CASE MANAGEMENT — $6,926,668

HOUSING — $34,538,900

JUDICIAL FORUM — $4,120,737

TREATMENT — $627,420

MISCELLANEOUS — $3,422,772

5

# FUNDED PROGRAMS BY EACH STOOL LEG
## A DESCRIPTION OF EACH PROGRAM IS PRESENTED IN APPENDIX A.

| Case Management | Judicial Forum | Housing | Treatment |
|---|---|---|---|
| AllHealth Network Bridges to Care | 1st Judicial District | Assisted Living of Aurora | Boulder County Sheriff's Office |
| Aurora Sustained | 2nd Judicial District REACH Docket | Ananeo | Mesa County Sheriff's Office |
| Behavioral Treatment Services | 12th Judicial District | Aspen Haven Foundation | |
| Boulder County Justice Services | Denver Competency Diversion | Ava Health | |
| Community Based Enhanced Restoration | Denver Competency Support Docket | Colorado Coalition for the Homeless | |
| Denver Sheriff's Office | Larimer County Competency Docket | Denver Health | |
| Gateway to Success | Larimer Public Defender's Office | Dirt Road to Recovery | |
| Homeward Alliance | | Embark Assisted Living | |
| Mesa County PreCap | | Fidelity Behavioral Health | |
| Mile High Behavioral Health | | City of Greeley Homeless Solutions | |
| Second Chance Center in the City | | Impact Integrated Insight Therapy | |
| Servicios de la Raza | | Monarch Competency Housing | |
| SummitStone Health Partners | | Peak View Behavioral Health | |
| United Way of Weld County | | Embark Recovery Residences | |
| | | SAFER Opportunities Colorado | |
| | | Solange Assisted Living | |
| | | Valor Program at Embrave | |

6

## MISCELLANEOUS PROGRAMS

| Programs | Description | Dollars Approved |
|---|---|---|
| Arapahoe County Sheriff's Office | Software to direct dispatch calls | $347,000 |
| Colorado Mental Health Hospital | Equipment and transportation to aid transfer to CMHH during the pandemic | $669,850 |
| Competency Screener | Supplement budget-limited competency evaluations in the 2nd Judicial District | $17,850 |
| Douglas County Sheriff's Office | Software to direct dispatch calls | $679,300 |
| University of Denver, Denver FIRST | Neuropsychosocial assessments | $534,310 |
| National Association of Mental Illness (NAMI) - Colorado | CMHH staff training | $91,030 |
| Pulse Line Collaborative Training | Law enforcement, first responder, and family training | $895,048 |
| State Courts Analyst | Coordinate competency capacity-building in the judicial branch | $138,384 |
| Vital Healthcare Capital | Consulting to build program financial sustainability | $50,000 |
| **Total** | | **$3,422,772** |

7

# SYSTEM IMPACT & REACH

Since its inception, and excluding training programs, Fines Committee–supported initiatives have served 8,550 clients through December 31, 2025. A simple average of total funds allocated per client served is $5,911. This figure, however, does not represent true program costs. Services vary substantially from single-session assessments to long-term housing with treatment and case management, and therefore, cannot be meaningfully averaged. Detailed cost information for each program component ("leg of the stool") is provided below.

An assessment of impact also requires understanding the scale of the statewide competency challenge. This graph compares quarterly outcomes from Fines Committee–funded programs with the number of inpatient incompetent-to-proceed (ITP) orders issued in Colorado since January 1, 2024.



Since 2024, Fines Committee–funded programs have served a population four times larger than the total number of individuals subject to inpatient ITP orders. Housing interventions alone have reached the equivalent of 53% of the statewide ITP population. These outcomes demonstrate that targeted investments are not only addressing the immediate competency-related backlog but are also expanding upstream diversion, stabilization, and support services that relieve long-term system pressure.

8

# INVESTMENT IMPACT ANALYSIS

The Fines Committee has invested in four core program areas: housing, case management, judicial fora, and treatment, along with several targeted miscellaneous initiatives that support system capacity.  The following section summarizes the financial commitments, cost-efficiency, and system impact of each investment category.

## HOUSING

Housing represents the largest and most resource-intensive area of investment by the Fines Committee. Since inception, 69% of all approved funds, $34,538,900, have been dedicated to expenses related to housing clients.  Among programs where client-level data is available (excluding Ava Health, Peak View Behavioral Health, and Denver Health), $29,969,326 in housing expenditures corresponds to a cost of $36,371 per client.  The estimated cost per bed day is $259, which includes both fixed and variable expenses such as capital construction, acquisition, and facility renovation.  This figure assumes each client spends an average of 141 nights in a given housing program.  Once programs move beyond the startup phase, ongoing operational costs stabilize at $125-$150 per bed day, reflecting typical costs when capital investments are no longer required.  Ananeo serves clients at an ongoing rate of $53/bed day, while the Valor program at Embrave is closer to $250/bed day.  For comparison, Mental Health Transitional Living programs funded by the Office of Civil and Forensic Mental Health (OCFMH) cost $400-$600 per day, depending on service intensity.  Housing investments have been essential to expanding statewide capacity to stabilize competency-involved individuals safely and effectively in the community, reducing reliance on inpatient competency restoration and traditional custody settings.  Elements of residential programs leading to client success include case management, providing or coordinating treatment (e.g. outpatient treatment, intensive outpatient treatment, partial hospitalization program), wraparound care, competency restoration, medicine management, prosocial habilitation, community engagement, and peer support.

## CASE MANAGEMENT

Case management is the second largest area of investment.  The Committee has allocated 13% of approved funds, $6,926,668, to case management programs.  The cost per client served is $1,590.  Case management funding played a critical early role in expanding Colorado's ability to safely manage competency-involved clients in community settings.  As the State assumed direct responsibility for this function, providing FTEs through OCFMH and Bridges of Colorado, case management is no longer a primary funding priority for the Fines Committee, except in limited high-need areas (e.g., programs serving clients with limited English proficiency).

## JUDICIAL FORA

Investments supporting specialized judicial fora constitute the third largest category.  The Committee has allocated 8% of approved funds, $4,120,737, to enhance the Courts' capacity to hear competency matters through dedicated dockets.  The cost per client served is $1,357. As with case management, this investment was instrumental in demonstrating the value of specialized competency dockets.  Early funding in pioneering judicial districts and county courts (such as 8th Judicial District and the Denver County Court) helped establish an effective model that informed statewide expansion.  With the legislature now funding specialized judicial fora through the State Court Administrator's Office, this area is no longer a primary funding category for the Fines Committee.

## TREATMENT

Treatment represents the smallest of the four foundational investment areas.  The Committee has allocated 4% of approved funds, $627,420, to support long-acting injectable medications administered in county jails in Boulder and Mesa Counties. The cost per treatment episode (per injection plus associated administrative costs) is $2,988.  These medications are clinically important for stabilizing individuals who struggle to adhere to daily oral medication or who experience adverse side effects from those formulations.  Long-acting injectables are frequently a more effective approach for supporting medication-dependent clients, reducing decompensation, and promoting continuity of care.

## MISCELLANEOUS

Several initiatives funded by the Fines Committee do not fit neatly into the four-leg framework but provide important system support.  These investments fall into three broad areas: training, neuropsychosocial assessment, and targeted operational support.

### *Training*

The Fines Committee has allocated $986,078 to two training programs, serving a combined 3,398 participants at a cost of $287 per training.
Key training initiatives include:

- NAMI Colorado, provided training to 165 staff at the Colorado Mental Health Institutes, focused on improving interactions with competency-involved individuals.
- Pulse Line Collaborative Training, trained 2,799 law enforcement officers and 470 family members of individuals with mental health conditions or disabilities.

These trainings promoted understanding and empathy toward people whose behaviors may stem from untreated mental health conditions or disabilities, conditions that, when misunderstood, can lead to unnecessary criminalization. By improving recognition and response, these trainings help redirect individuals toward treatment rather than prosecution.

***Neuropsychosocial Assessment***

The Committee funded Denver FIRST at the University of Denver to conduct neuropsychosocial assessments, an area that historically receives less attention despite its critical importance.

These assessments target conditions that are highly prevalent but frequently undiagnosed in the competency population:

- Intellectual and Developmental Disabilities (IDD)
- Traumatic Brain Injury (TBI)
- Dementia

Denver FIRST conducted assessments primarily in metro-area jails, helping identify individuals whose competency challenges stem from cognitive or neurodevelopmental conditions. The program also facilitated referrals to appropriate treatment and supportive services. This early-identification approach represents an important and often overlooked intervention point.

***Other Targeted Programs***

Additional miscellaneous investments include:

- Pandemic-related interventions to help state and local agencies safely manage competency-involved clients under emergency conditions.
- A one-time allocation to stabilize the 2023 competency evaluation budget at the end of the fiscal year.
- Consulting and technical assistance to help programs achieve financial sustainability, which is critical because Fines Committee funding is temporary, and Medicaid resources are strained.

These targeted supports ensured continuity of services, preserved system function during periods of elevated stress, and strengthened long-term sustainability.



**COST PER CLIENT IN DOLLARS**

| Category | Cost |
|---|---|
| Housing | 36,371 |
| Treatment | 2,988 |
| Case Management | 1,590 |
| Judicial Fora | 1,357 |

The investments made by the Committee in the successful provision of the four legs of the stool tell only part of the story. The out-of-custody placements permitted by these programs has avoided other costs which would have been incurred by the state and county governments. The cost of housing a defendant in a county jail in Colorado ranges from $126 per day (Arapahoe County) to $240 per day (Denver). Clients on the waitlist are typically housed in county jails until they can be admitted to a CMHH. Once admitted to CMHH, it costs over $1,000 per day to treat competency clients (HB22-1303 allocated $6.2M to operate 16 beds for a year). Residential Fines Committee-funded programs are avoiding these costs entirely, for those clients who can be safely restored out-of-custody, and the living environments are far superior in terms of being trauma-informed and therapeutically supportive.

11

# HIGHEST IMPACT INVESTMENT

Across Colorado's competency system, housing remains the most significant and persistent gap. Many competency-involved individuals enter the criminal justice system experiencing homelessness or unstable, unsafe, or clinically-inappropriate housing. For judicial officers and prosecutors, who must balance public safety, clinical needs, and constitutional requirements, the absence of suitable housing is the primary barrier to approving out-of-custody competency restoration. Moreover, the capacity built by the Fines Committee is also suitable to house and treat the same population through diversion or deflection as a preventative measure.

While Colorado has now assumed responsibility for the judicial and case management components of the system, housing capacity has not kept pace with need. The State's Division of Housing provides rental supports and vouchers, but competency clients are largely unable to access them due to ongoing legal involvement, landlord restrictions, and the mismatch between typical voucher-eligible housing and the clinical requirements of competency restoration.

As a result, the most consequential and durable impact of Fines Committee funding has been the expansion of housing capacity specifically designed for competency clients. This specialized housing is:

- Transitional
- Clinically appropriate
- Supportive of daily/weekly behavioral health engagement
- Low-barrier
- Willing to accept individuals with active or recent criminal justice involvement

This expansion has meaningfully changed the system's ability to divert clients from custody and support safe and sustainable restoration pathways.

# WHY CAPITAL INVESTMENT MATTERS MOST

| Program | Capital Investment |
|---|---|
| Embark PCA | $10,000 |
| Ananeo | $60,000 |
| Monarch Competency Housing | $2,200,000 |
| Fidelity Behavioral Health | $130,000 |
| Aspen Haven Foundation | $234,000 |
| CO Coalition for the Homeless | $3,500,000 |
| Dirt Road to Recovery | $10,000 |
| Valor at Embrave | $5,000,000 |
| Ava Health | $5,000,000 |
| **Rounded Total** | **$16,144,000** |

Fines Committee analyses highlight a key structural issue: the system faces less challenge in covering ongoing (variable) costs, such as rent, services, and staffing, and more challenge in developing the underlying capacity (fixed asset development).

- Variable costs can be supported through existing funding streams (e.g., the State, Bridges of Colorado).
- Fixed capital costs, however, require one-time, substantial investment, funding which programs would otherwise need to borrow through development financing, limiting their ability to serve competency clients.

By investing in fixed capital costs, the Fines Committee effectively:

- Created new transitional housing capacity that did not exist previously
- Reduced long-term operational costs for providers
- Secured multi-year commitments from programs to prioritize competency clients
- Established durable infrastructure that persists well beyond the lifespan of the consent decree

This is precisely the type of system change that traditional state appropriations cannot rapidly accomplish.

The $16,144,000 in capital investments represents the single most transformative category of Fines Committee spending.  These investments addressed a system-defining bottleneck: the lack of transitional, clinically-appropriate, justice-informed housing; enabled the safe release of individuals from custody for restoration or diversion; created long-term capacity that will operate for years beyond the consent decree; lowered unit costs by removing the need for programs to carry significant development debt; and will continue delivering measurable system relief long after temporary funding streams end.

No other investment category provides comparable structural impact, durability, or irreplaceability.

13



## FINES COMMITTEE PROGRAMS EASED THE COMPETENCY CRISIS, UNTIL RISING DEMAND OUTPACED A LIMITED RESTORATION SYSTEM.

From March 2023 through June 2024, the implementation of Fines Committee–funded programs, especially those expanding access to housing, was likely a key factor in reducing the competency waitlist.  By providing stable placements, these housing programs helped alleviate pressure on the limited inpatient restoration resources at the Colorado Mental Health Institutes.

# PROGRAM IMPACT & THE WAITLIST

Fines Committee program data alone, however, does not account for the sharp increase in the waitlist after November 2024.  During this period, funded programs continued to grow in both scale and capacity, yet the waitlist rose substantially.  One possible explanation is that the availability of low-barrier housing options created new pathways into the competency system for individuals who had previously remained unhoused and untreated.  For the first time in many years, statewide resources existed that did not require high thresholds for entry, potentially drawing individuals into competency processes as a means of accessing basic services.

A more plausible explanation is structural.  Colorado's inpatient and out-of-custody restoration systems are extremely small relative to the number of people who might enter the competency system at any point.  Even with the added support of Fines Committee-funded programs, the overall restoration infrastructure remains insufficient to absorb fluctuations in referrals or increases in underlying need. The figure below illustrates the scale mismatch between system capacity and potential competency-related demand.

14



# THE RESERVOIR POPULATION

A useful way to understand the competency system is to view it as a flow of water moving from a large reservoir through a limited number of channels.  The "reservoir" represents the broad population at risk of entering the competency process, individuals living with combinations of serious and persistent mental illness, intellectual and developmental disabilities, traumatic brain injuries, dementia, and homelessness.  Although difficult to measure precisely, this reservoir likely numbers in the hundreds of thousands.

The competency waitlist grows when the inflow from this reservoir exceeds the system's ability to move people through assessment, restoration, and placement.  Several factors can accelerate inflow: changes in socioeconomic conditions, shifts in law enforcement practices, and expanding perceptions of what constitutes a competency concern.  Each of these can increase the rate at which individuals are arrested and subsequently evaluated for competency.  In such circumstances, even small increases in inflow can overwhelm the waitlist.

Historically, the only significant pathways out of the competency waitlist were the Colorado Mental Health Institutes and jail-based restoration programs such as RISE.  These channels are too small to accommodate the volume of individuals who may enter the system at any point in time.  The introduction of Fines Committee–funded programs created a second release channel by offering additional community-based services and housing.  These programs have meaningfully expanded system capacity and reduced reliance on inpatient restoration alone.

Long-term placement remains the final and essential drainage point for both the CMHHs and Fines Committee-funded programs.  Without adequate long-term placement options, individuals cycle back into the reservoir population, returning to unstable environments and becoming at risk of re-entering the competency system.  The optimal system would allow individuals to move directly from the reservoir into long-term placement and care when needed, bypassing the competency process entirely.  Colorado currently lacks sufficient long-term placement capacity to achieve this ideal state, represented above in white arrows.

15

# INCOMPETENT-TO-PROCEED POPULATION AT A GLANCE

Data on the incompetent to proceed population from the Office of Civil and Forensic Mental between January 1, 2020 and May 13, 2026, indicate the following ($n$ = 4,593 individuals totaling 29,753 charges):

- The maximum wait time for inpatient restoration was 592 days, while the minimum was 0 days, with an average of 89 days and median wait of 71 days.
- 46% ($n$ = 2,108) of all individuals in the dataset returned to the criminal justice system on a subsequent date after their first incident.
- 11% ($n$ = 2,665) of all charges involved an official (e.g. assault on an officer, jail deputy, or first responder).
- Top 5 diagnoses, of those that were included in the dataset (40% of all individuals): 32% schizoaffective, 28% schizophrenia, 24% psychosis, 9% bipolar, and 3% personality.
- A small group of high utilizers drives a large share of system contact; 20% of the individuals account for over 50% of all charges.  Targeted interventions for this cohort could produce outsized systemwide impact.

| Charge Level | Count | % |
|---|---|---|
| **Felony** | 12,432 | 42% |
| **Misdemeanor** | 11,585 | 39% |
| **Petty** | 2,650 | 9% |
| **Traffic** | 1,351 | 5% |
| **Uncategorized** | 1,188 | 4% |
| **Drug Felony** | 367 | 1% |





TOP 10 COUNTIES

16

# REGULATORY HURDLES

Establishing behavioral health housing and treatment programs in Colorado requires navigating one of the most complicated regulatory landscapes in the country; these regulatory hurdles are detailed in Appendices B-D.  The Fines Committee's investment in the Competency Programs Cultivator is therefore not only valuable, but essential, because providers face a long sequence of licensure, inspection, accreditation, zoning, and state-level procedural requirements, each with associated fees, timelines, and professional prerequisites.

Across all levels of care, organizations must comply with Behavioral Health Administration (BHA) rules, Division of Fire Prevention and Control (DFPC) rules, Colorado Department of Public Health and Environment (CDPHE) health facility regulations, local zoning codes, and federal/insurance-based credentialing requirements.  The cumulative regulatory burden extends over months or years, and delays at any step can freeze a project entirely.

**FOUNDATIONAL REQUIREMENTS**
All programs must begin by establishing themselves as legal business entities.  This includes registration with the Colorado Secretary of State (approximately $150), obtaining an Employer Identification Number (EIN), and applying for a National Provider Identifier (NPI).  Background checks and fingerprinting are required for all owners and principals, at $39.50 per person, and organizations must secure professional liability insurance ranging from $1,000 to $10,000 annually.  These steps must be completed before a licensing application can be submitted.

**BHA LICENSING**
The BHA requires organizations to complete a Letter of Intent and create a provider profile in its LADDERS system.  The provisional license carries a $500 base fee, with additional endorsements costing $300 each, and residential endorsements costing $600.  Provisional licenses are valid for 90 days and may be extended for another 90 days or converted to a six-month license depending on compliance reviews.  Recovery residences have an annual BHA fees of approximately $1,691.

**FIRE CODE AND LIFE SAFETY COMPLIANCE**
Fire protection requirements represent one of the most costly and time-intensive components of facility development.  Under DFPC rules and the Life Safety Code, facilities serving more than eight residents must install fully automatic sprinkler systems, including sprinklers in closet areas.  These upgrades can cost between $38,000 and $42,000 per building.  Standalone units may require fire-alarm pull stations within 100 feet of exits, adding an additional $17,000–$20,000 per building.  DFPC also requires site drawings (approximately $100 per site), architectural plans with fire-rating specifications, Life Safety Code materials (approximately $175 per codebook), and walkthrough inspections.  A DFPC Certificate of Compliance costs approximately $1,500 per property and must be issued before a BHA license can be granted.

**LOCAL ZONING AND PERMITTING**
City and county zoning and building reviews are required for all facilities and often must occur before or alongside fire safety approvals.  Zoning reviews address building classifications, occupancy limits, safety requirements, and compatibility with community standards.  These steps vary significantly across jurisdictions and can introduce unpredictable delays.

**ACCREDITATION AND MEDICAID ENROLLMENT**
Many organizations pursue accreditation through the Joint Commission or CARF, which involves fees ranging from $1,000 to over $4,000 annually.  Accreditation typically requires comprehensive policies and procedures, fully-trained staff, and evidence of operational readiness.  Once foundational licensing and fire code compliance are complete, organizations must enroll with Department of Healthcare Policy and Financing (HCPF) and, in many cases, complete Regional Accountability Entity (RAE) credentialing.  HCPF enrollment and RAE contracting can take between one and five months, depending on complexity and review timelines.

**COMPOUNDING BARRIERS AND THE NEED FOR FLEXIBLE FUNDING**
These regulatory requirements create a system in which organizations must invest heavily in facility upgrades, inspections, licensing fees, documentation, and staffing before they can receive reimbursement or operational funding.  This introduces a "chicken-and-egg" dilemma: programs cannot hire the staff required for licensure without funding, but they cannot secure most funding without licensure.  The Fines Committee's flexible funding helps fill this critical gap by covering administrative and compliance costs that other funding streams cannot support.

# RECOMMENDATIONS

The Fines Committee's investments have demonstrated that flexible, strategically targeted resources can meaningfully reduce waitlist pressures, expand community-based alternatives, and create new pathways out of the competency system. To maintain momentum, Colorado should adopt a set of coordinated policy actions that strengthen diversion, expand housing and treatment capacity, reduce regulatory barriers, and modernize statewide decision-making infrastructure.

**Expand State Investment in Dual-Use Housing Capacity**
Fines Committee-funded housing programs have shown that the State can rapidly increase capacity for competency-involved individuals.  Unlike traditional supportive housing, which often requires 3–7 years to develop, Fines Committee programs brought new beds online in under 18 months.  These units function as dual-use assets:
- Upstream: diverting clients from the competency waitlist,
- Downstream: serving as transitional or long-term placements for individuals recovering from the conditions that place them at risk of entering the competency system.

State investment should:
- Sustain and expand these housing models;
- Build capacity for specialized populations underserved by current programs, including individuals with sexual-offense histories, high-acuity behavioral-health needs, and complex medical-psychiatric conditions;
- Develop pathways that allow individuals to access placement without entering the competency process at all.

**Create a Sustainable Funding Mechanism for Long-Acting Injectable (LAI) Medications**
LAIs are critical for stabilizing individuals with serious mental illness and reducing the risk of re-entry into the competency cycle. Many out-of-custody clients depend on medication continuity to remain stable in the community, but LAIs currently lack a permanent funding structure.  The State should:
- Establish ongoing funding for LAI procurement, administration, and follow-up;
- Support mobile and community-based LAI delivery models;
- Ensure continuity of medication across jails, CMHH settings, and funded programs.

**Address Persistent Gaps in Levels of Care and Hard-to-Place Populations**
Even with Fines Committee investments, substantial gaps remain in the behavioral health continuum.  These gaps often prevent outflow from CMHH, clog Fines Committee programs, and push individuals back into the reservoir population.

Under-served populations include:
- People with sexual offense histories
- Individuals with IDD, TBI, dementia, or complex cognitive challenges
- People requiring high-acuity, secure, or locked therapeutic environments
- Individuals with severe medical-psychiatric comorbidity
- People who cannot meet sobriety requirements in abstinence-based housing models

Under-served levels of care include:
- High-acuity residential treatment
- Specialized step-up/step-down placements
- Long-term, clinically supported housing
- Facilities capable of managing individuals with behavioral challenges who are denied placement elsewhere

Addressing these gaps will increase outflow from the competency system and reduce unnecessary CMHH utilization.

18

**Reduce Regulatory Barriers that Discourage Provider Participation**

Organizations seeking to serve competency-involved populations face significant regulatory obstacles.  These include complex and overlapping requirements across BHA, DFPC, CDPHE, zoning authorities, Medicaid enrollment, and RAE credentialing.  Providers have reported building out facilities and staffing them only to face credentialing denials without explanations or appeal pathways.  Regulatory hurdles raise the cost of building programs through excessive building and licensing requirements, approval bottlenecks, and it is fraught with unexpected failure points.  For instance, a program might build and staff an entire facility, and then be denied access to the state Medicaid billing network by a Regional Accountability Entity with no explanation, and no ability to appeal the decision.  These barriers make it exceedingly difficult to attract providers and stimulate growth.

Policy makers should:
- Convene a Regulatory Reform Working Group to streamline licensing and approval processes;
- Create an expedited approval track for programs serving the competency population;
- Establish an appeal mechanism for RAE credentialing decisions;
- Reduce duplicative inspections and documentation requirements;
- Prioritize low-barrier, harm-reduction-aligned residential models.

**Strengthen Diversion Pipelines to Reduce New Entries into the Competency System**

The most effective way to suppress waitlist growth is to prevent unnecessary entries into the system. Diversion programs have demonstrated that early engagement, clinical stabilization, and structured case management can significantly reduce the number of individuals who proceed into competency proceedings.  Policy makers should consider funding pre-waitlist stabilization teams capable of engaging high-risk individuals before competency is raised.

**Reinforce Docket and Hub Ecosystems Where They Are Demonstrated to Outperform Orders**

Local docket and hub ecosystems have shown that coordinated court-provider partnerships can serve more individuals than the number of inpatient restoration orders in their district. These ecosystems lower waitlist pressure by:
- Quickly identifying cases vulnerable to competency filings;
- Providing real-time clinical support;
- Creating a structured alternative pathway aligned with the client's needs.

**Expand Public Safety Responses that Reduce Symptom-Driven Felony Filings**

A substantial proportion of competency cases begin with behavioral health-driven interactions involving law enforcement, jail staff, or emergency responders.  Individuals who would otherwise face misdemeanor charges, or no charges at all, may accumulate felony assault charges when symptoms escalate.

To address this, policy makers should:
- Expand specialized behavioral health response training statewide;
- Provide deputies working in county jails with clear education about the procedures that follow assaults on officers, as it is important for officers to understand that the competency evaluation process can be lengthy and complex;
- Establish a victim compensation fund so responders can pursue financial remedies without generating felony filings;
- Create statutory clarity distinguishing symptom-driven behavior from intentional harm.

# DEVELOPING THE CCRNP SYSTEM

Colorado currently lacks an integrated system that can identify who is at risk of entering the competency system, determine what services they need, and direct them to the most appropriate placement.  The result is a system that reacts to crises rather than preventing them.  A Coordinated Competency Risk, Needs, and Placement (CCRNP) system should include:

**A. Centralized Risk Screening**
A standardized statewide screening tool used at key intercept points:
- Law-enforcement interactions
- Jail booking
- First court appearance
- Pretrial supervision

This tool would identify individuals at risk of competency involvement and flag immediate stabilization needs.

**B. Dynamic Needs and Placement Matching**
Expanding BHA's real-time Client Care Search platform to integrate:
- Available beds across Fines Committee programs, CMHHs, and community providers
- Clinical criteria, security requirements, and staffing capacity
- Specialized filters for hard-to-place populations

This would ensure clients are placed in the least restrictive, most clinically-appropriate setting.

**C. Predictive Analytics to Prevent Waitlist Spikes**
A statewide system could forecast increases in competency referrals based on:
- Jail booking trends
- Law enforcement contact data
- Community behavioral health indicators
- Seasonal or economic patterns

This would enable early surge planning and targeted resource deployment.

**D. Integrated Case Coordination**
CCRNP should facilitate:
- Warm handoffs between systems
- Shared care planning
- Tracking of outcomes across agencies

**E. Alignment with Diversion, Dockets, and Hubs**
CCRNP would unify the various "front end" initiatives, including diversion programs, docket ecosystems, and law enforcement behavioral health teams, into a single statewide logic model.

In short, CCRNP would transform the current fragmented process into a coordinated, data-driven network capable of preventing entries, accelerating outflow, and reducing recidivism.

# FY 2027 PROPOSED FUNDING PRIORITIES

―――

Drawing on the system-level lessons and performance outcomes detailed throughout this report, proposed funding priorities for Fiscal Year 2027 are detailed below.  These priorities are designed to strengthen the statewide competency system, reduce waitlist growth, and support durable, upstream, and downstream capacity aligned with the Consent Decree.

## 1. Preserve High-Performing Programs at Risk

What the data say: Multiple Fiscal Year 2026-funded programs will require ongoing support due to RAE reductions and Medicaid changes; some have no viable sustainability path this upcoming fiscal year.

Programs needing continued or stewardship-level support:
- Ananeo Competency Housing – highest collapse risk without continued rent/monitoring underwriting
- Aspen Haven Foundation – rural bed loss would create a regional service desert
- Fidelity Behavioral Health, Embark, Dirt Road to Recovery, Ava Health, and Valor – not yet fully sustainable and may need some support
- Servicios de la Raza – protects linguistically/culturally-responsive services for Spanish-speaking and mixed-status clients
- LAI programs (e.g. Boulder County Sheriff's Office, Mesa County Sheriff's Office) – continuity prevents destabilization and recidivism

Risks if funding lapses:
- Immediate loss of specialized housing (notably Ananeo, Aspen Haven).
- Loss of non-billable monitoring capacity and culturally responsive programming.
- LAI interruptions, increasing decompensation and competency cycling.

## 2. Expand Clinically Appropriate, Justice-Informed Housing

What the data say:
- Last year, the Forensic Support Team (FST) identified ~170 individuals (currently in jail or inpatient restoration) who may require ASL/SNF-level care; ~25% (≈43) could likely be stepped down if appropriate placements existed.
- Historical program reporting confirms continued demand and consistent occupancy for rural and regionally-scarce beds (e.g., San Luis Valley, where Fines Committee-funded housing sustained system relief).
- Cost-per-client metrics across Fines Committee-funded housing demonstrate both variability and strong value compared to inpatient costs, underscoring housing as the highest-impact investment.

FY 2027 actions:
- Fund ASL/SNF-level capacity expansions (urban and rural), plus assisted living for SMI and high-acuity placements.
- Create step-down pathways from restoration/Fines Committee-funded programs to supportive housing or clinically-supported longer-term options (explicitly plan for the ≈43 step-down cohort).

- Pair capital expansions with funds to cover the first months on an individual's stay in any non-level of care dependent bed while they receive services and treatment.
- Use master-lease strategies (e.g., 20 units at 30–50% AMI ≈ $192,000/year) to add near-term capacity while larger capital projects come online.

## 3. Stabilize the First 90 Days Post-Release

What the data say: Lack of stabilization funding at release undermines engagement in AOT and other programming; SSI/SSDI application timing (≤30 days pre-release; ~18 months activation) blocks placements that require active benefits.

FY 2027 actions:
- Create a 90-day stabilization fund (housing, monitoring, basic needs, care coordination) to bridge to benefits and billing eligibility.
- Integrate with diversion teams to suppress avoidable competency entries.
- Use waitlist projections and FST assignment data to size and target capacity.

## 4. Build Out the Coordinated Competency Risk, Needs, and Placement (CCRNP) System

The statewide infrastructure required–data integration, assessment tools, placement platforms, analytics, and cross-agency workflow development–cannot be established piecemeal.  To realize the full value of prior Fines Committee investments, CCRNP provides the operational backbone needed to coordinate all existing programs and guide future expansions more strategically.

What the data say:
- Colorado's current competency pathway remains fragmented, reactive, and burdened by inconsistent placement logic across counties, courts, and providers.
- Although Fines Committee–funded programs have expanded out-of-custody capacity and reduced reliance on inpatient restoration, the system continues to lack a unified mechanism to identify who is entering the competency pipeline, determine what services they need, and place them into the most appropriate setting.
- Even with expanded housing, treatment, and diversion options, demand continues to outpace the limited restoration system.
- Multiple program categories, including judicial support, case management, housing, and treatment function on their own, but there is no statewide coordination infrastructure to link them into a seamless continuum.
- Without a centralized placement logic model, individuals cycle through jail, inpatient care, and inadequate community placements, sustaining high waitlist pressure.

FY 2027 actions:
- Implement standardized screening at intercept points such as law enforcement contacts, jail booking, first appearance, and pretrial supervision.  This enables early identification of stabilization needs and reduces unnecessary competency filings by directing individuals to services sooner.
- Use statewide data (booking trends, behavioral health indicators, historical seasonal patterns) to anticipate spikes in competency referrals.  Predictive modeling allows stakeholders to plan early stabilization efforts, allocate housing, and deploy mobile treatment resources before waitlist pressure escalates.
- Enable shared care planning and warm handoffs across judicial forums, case management teams, housing providers, and clinical services.

**5. Fill Gaps for Hard-to-Place Populations**

What the data say: System outflow is bottlenecked by populations with IDD, TBI, dementia, and those with sexual-offense histories, severe medical-psychiatric comorbidity, or non-abstinence needs; many rural regions have no ASL/SNF options.

FY 2027 actions:
- Fund specialty placements and secure therapeutic environments.
- Prioritize rural ASL/SNF development with transportation and tele-consultation add-ons.

**6. Remove Regulatory & Reimbursement Barriers**

What the data say: MHTL access is constrained by sobriety requirements, criminal-history selectivity, and uncertainty about RAE contracting and rates; BHA endorsement still leaves capital and bed rent costs uncovered.

FY 2027 actions:
- Provide compliance and start-up technical assistance funding (life-safety upgrades, licensing fees, zoning, accreditation).
- Support MHTL endorsement efforts and co-fund non-billable components until RAEs finalize reimbursement pathways.

**7. Expand Long-Acting Injectables (LAIs)**

What the data say: LAIs stabilize individuals with serious mental illness, reduce decompensation, and lower re-entry into the competency cycle.

FY 2027 actions:
- Fund LAI continuity and targeted expansion to counties lacking access; support mobile/community administration to ensure continuity across jail, CMH, and community settings.
- Explore local county funding or JBBS redesign to sustain LAIs long-term (CEP ended June 30, 2025; consider CEP revival or JBBS statutory alignment for medication continuity).



# APPENDIX A

# FINES COMMITTEE Allocated Funds Summary

The Competency Waitlist Fines Fund was created by a federal court consent decree in litigation addressing Colorado's Competency to Stand Trial system. The Fines Committee was established to oversee the Fines Fund; its purpose is to support programs that have potential to reduce the State's competency restoration waitlist.



## Valor Program at Embrave

**$11,152,175** - Allowing for the acquisition and renovation of a hotel in Colorado Springs to provide 60 beds for supportive monitored housing for individuals involved in the competency system or at risk of becoming involved in the competency system; grounded in a person-centered approach, Valor addresses individuals' behavioral health needs through competency restoration, life skills training, and recovery support



## Denver Competency Diversion & WellPower

**$1,873,918** - Diverting from prosecution those defendants who are likely to be found incompetent to proceed. The Fines Committee funds a program administrator, behavioral health navigators, and salaries for prosecutors and public defenders who work with clients in the program. Funding also provides for direct wraparound client services, including emergency and temporary housing, transportation assistance, mobile phone, hygiene items, clothing, and nutritional assistance.



## Larimer County Competency Docket

**$1,542,852** - Diverting individuals involved in the competency process from custody while coordinating necessary care in the community. The Fines Committee funds a competency services case manager, team lead, case specialist, training for staff, as well as ten short-term supportive beds for competency-involved individuals.



## University of Denver's Denver FIRST Program

**$948,729** - Identifying and assessing clients ordered to outpatient competency restoration programs for traumatic brain injury and acquired brain injury, to enhance appropriate interventions for those identified clients, and to provide training to jail staff and providers.



## Ananeo Competency Housing

**$3,601,115** - Providing housing and services associated with supportive monitored sober housing. Sixty dedicated beds are reserved for individuals, suitable for diversion from confinement, who are receiving outpatient competency restoration and treatment, referred by the Forensic Support Team or Bridges.



## Fidelity Behavioral Health

**$2,053,907** - Providing housing, treatment, wraparound services, and outpatient restoration to competency-involved individuals and those at risk of becoming competency-involved in Adams, Jefferson, Arapahoe, Douglas, and Weld Counties for three years.



## SummitStone Competency Hub

**$3,029,283** - Increasing psychiatric services in the Larimer County Jail and establishing a community-based competency hub that enables clients' medication management and provision of services.



## Aspen Haven Foundation

**$441,264** - Providing six beds in a sober-living facility to serve individuals referred for out-of-custody competency restoration in the 12th Judicial District. This program also connects clients to medically-assisted recovery treatment and other services to support competency recovery.



## Mesa County Sheriff's Office Long–Acting Injectables Program

**$360,000** - Providing in-custody clients with long-acting injectable medications to support mental health outcomes for those returning from the State hospital following competency restoration, and for newly booked inmates for whom the intervention is medically indicated.

## Ava Health

**$5,774,934** - Developing and operating a vertically-integrated treatment organization in Mesa County, providing a sub-acute stabilization and detox unit, a residential outpatient restoration program, intensive outpatient treatment, and partial hospitalization.



## Dirt Road to Recovery

**$329,244** - Providing three supportive recovery residence beds for males in Weld County, as well as wraparound services for individuals in or at risk of being in the competency system; funding covers salaries and benefits, wraparound services, housing, and transportation.



## Embark Recovery Residences

**$1,128,220** - Providing sober-living housing to serve individuals released from confinement who are receiving competency restoration, as well as supporting outpatient restoration clients with case management, treatment, peer specialists, and classes.



## Monarch Competency Housing

**$3,591,114** - Providing sober-living housing and supportive wraparound services and therapy, including an Intensive Outpatient Program and Partial Hospitalization Program.  The Fines Committee funding allowed for the purchase of a facility reserved for clients deemed appropriate to be released from custody for the restoration process and referred by the Forensic Support Team, Bridges, and other partners; Monarch has guaranteed to provide 60 beds to male and female clients for five years with no additional Fines Committee funding.

## 2nd Judicial District REACH Docket

**$220,000** - Establishing a Docket Coordinator position for two years to support the 2nd Judicial District Competency Docket (REACH).



## Mile High Behavioral Healthcare

**$286,745** - Assisting clients with acquiring treatment and wraparound services out of custody.  The Fines Committee funds two clinical case managers to support pre-release incarcerated clients with mental health and substance use disorders.



## Pulse Line Collaborative Training

**$1,058,270** - Providing training and resources to law enforcement, first responders, and caregivers to reduce unwarranted use of force incidences and the number of individuals with behavioral health disorders and disabilities being arrested and confined.



## Servicios de la Raza Peer Support

**$1,011,630** - Supporting a peer-led model to provide culturally and linguistically responsive recovery support services to individuals involved in or at risk of being involved in the competency system; funding provides for personnel, client support, supplies, and equipment.



## 12th Judicial District Competency Docket

**$61,466** - Establishing a Docket Coordinator to support the 12th Judicial District Competency Docket.



## Boulder County Community Justice Services

**$505,842** - Supporting aspects of the State Court Bridges Program, including the provision of access to services to enable the release from custody for competency clients.



## Second Chance Center in the City

**$1,372,502** - Providing onsite case management, peer mentoring, employment services, housing navigation, mental health services, and substance misuse services to individuals in or at risk of being in the competency system. The Fines Committee funds care managers, a behavioral health navigator, program manager, and peer navigator, and partial salaries for the director and assistant director, as well as costs directly related to clients' basic needs, emergency housing, community navigation, and leasing an office space.



## Homeward Alliance Larimer County

**$362,800** - Coordinating case management, wraparound services, and housing navigation for 25 clients.



## Boulder County Sheriff's Office

**$490,000** - Providing in-custody clients with long-acting injectables to support mental health for those returning from the State hospital following restoration, and for newly-booked inmates, as well as supporting clients transitioning to the community through temporary housing and ancillary items.



## City of Greeley Homeless Solutions

**$187,075** - Serving individuals in Weld County who are competency-involved by providing benefit acquisition, employment support, permanent housing vouchers, bridge housing, and wraparound services; funding also supports a .25 FTE case manager and .25 FTE peer specialist.



## Denver County Court Competency Support Docket

**$280,561** - Establishing a support docket for all misdemeanor cases in which competency has been raised to redirect cases from the State competency process; funding supports a  coordinator, clinical screener, and supportive wraparound services for clients, including emergency housing.



## Vital Healthcare Capital

**$50,000** - Providing direct technical assistance to at least two Fines Committee-funded programs, identifying and strengthening sustainability and preparing organizations for future growth.

# Previously-funded Programs
*Funded between 2018 and 2025*


## Denver Health

**$3,270,000** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.


## Mesa County Pretrial Community Alternative Placement

**$27,900** - Diverted individuals, deemed likely to be found incompetent to proceed, from confinement to supportive community-based treatment. The Fines Committee funded inpatient treatment for clients in the PreCAP program.


## IMPACT Integrated Insight Therapy

**$1,178,000** - Diverted 22 individuals on whom competency was raised by providing dedicated program housing with treatment and wraparound services.  The Fines Committee funded case managers, house managers, peer support professionals, monitoring services, and houses in rural Colorado.


## AllHealth Network Bridges to Care

**$56,729** - Supported the implementation of the Arapahoe County Competency Docket by doubling the capacity of Bridges of Colorado, providing client case management and treatment support.


## Denver Sheriff Department

**$663,114** - Supported the Denver Restoration Treatment Unit, a jail-based initiative that provides programming focused on competency restoration, general mental health needs, and enhancing life skills.


## REACH Docket Competency Screener

**$17,850** - Provided additional screening and evaluation capacity to the 2nd Judicial District REACH Docket.


## Colorado Mental Health Institute

**$669,850** - Purchased and provided cellular phones, access (minutes), and transportation for competency-involved individuals during the pandemic, as well as laptops and related expenses for providers and local jails to allow pandemic-era competency services to continue.


## Community Based Enhanced Restoration

**$400,000** - Provided Assertive Community Treatment to individuals so that they could be released on bond and restored to competency out-of-custody. The Fines Committee also funded housing options for clients who would otherwise be homeless.



## Assisted Living of Aurora

**$270,688** - Provided supportive temporary beds to enable client benefits enrollment to fund longer-term out-of-custody placement during restoration.



## Solange Assisted Living

**$600,000** - Offered assisted living residences, in-house outpatient restoration, treatment, case management, peer support, medication management, transportation, and other supportive services to competency-involved clients in Mesa County and throughout the Denver Metro area.



## SCAO Competency Docket Analyst

**$138,384** - Created an analyst position to support judicial districts operating special programs in the competency system; the analyst provided training, awareness of resources, data collection, and evaluation support for competency dockets and judicial programs.



## National Alliance on Mental Illness (NAMI) Colorado

**$91,030** - Provided evidence-based peer programming for patients and staff of the Colorado Mental Health Hospitals in Pueblo and Fort Logan



## Embark Assisted Living – Renaissance

**$420,820** - Provided eight licensed transitional assisted living beds, called Renaissance, in El Paso County to competency-involved individuals.  24-hour staffing supervision and programming geared toward participants' health optimization, reinteigration into the community, and assistance with long-term placement were also provided.



## Peak View Behavioral Health

**$440,800** - Provided psychiatric beds for out-of-custody competency clients on an emergency basis.



## 1st Judicial District Competency Docket

**$95,127** - Established a docket coordinator position to support the 1st Judicial District Competency Docket.



## Behavioral Treatment Services Day Reporting

**$96,578** - Provided a Day Reporting Center with treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## SAFER Opportunities Colorado

**$2,007,500** - Offered safe, continuous hotel sheltering in Arapahoe County with a continuum of community-based, client-centered safety net services. The Fines Committee funded numerous positions and wraparound services.



## Arapahoe County Sheriff's Office Data Diversion

**$347,000** - Utilized ForceMetrics to better identify behavioral health calls and individuals with behavioral health needs to more efficiently and effectively connect to the most supportive response, treatment, and resources; funding supports the cost of the ForceMetrics software.



## United Way of Weld County

**$510,720** - Transitioned competency-involved individuals from the Weld County Jail to the community by providing rapid rehousing and emergency housing services, case management, assistance with benefit acquisition, and wraparound services.



## Colorado Coalition for the Homeless (CCH)

**$4,964,964** - Provided modified Assertive Community Treatment level services to clients who were referred through the Office of Civil and Forensic Mental Health's Forensic Support Team as appropriate for Outpatient Restoration. Additionally, start-up funding was provided in 2019 to enable the program to purchase a 182-unit housing facility, out of which this, and other Colorado Coalition for the Homeless programs are operated.



## Aurora Municipal Court Sustained

**$719,284** - Screened individuals booked in the municipal jail and assessing appropriate individuals for competency. The program connected clients to treatment out of custody and works toward prosecutorial diversion. The Fines Committee funded a program administrator, paid for competency evaluations, and provided cell phones for clients.



## Gateway to Success Day Reporting Center

**$510,000** - Established a Day Reporting Center with access to emergency housing, treatment, medication management, daily classes, peer support, and case management in a warm and welcoming space to individuals receiving out-of-custody competency evaluation and restoration.



## Douglas County Sheriff's Office Data Diversion Project

**$679,300** - Developed a data-driven program to enable the 911 emergency system of Douglas County to rapidly connect callers with behavioral health resources to reduce the number of individuals who become involved with the state competency restoration system; funding supported software licensing fees, staff overtime, a project manager, treatment services, equipment, and supplies.



## Larimer County Public Defender's Office

**$262,000** - Established a dedicated Senior Public Defender position for two years to support the Larimer County Competency Docket.

# APPENDIX B - FACILITY LICENSING PROCESS

**Register with State**

Obtain EIN for Business Operations
$150

**7-10 DAYS**

**NPI Application**

Apply for National Provider Identifier (NP()

**24 HOURS**

**Insurance**

Proof of Professional Liability Insurance
$1,000 - $5,000

**Develop Policies and Procedures**

Standards - TJC, CARF, BHA

**Licensing and Accreditation**

BHA Provisional License and Joint Commission Accreditation (JCAHO)



---

**7-10 DAYS**

**What Level of Care Will Be Provided?**

·BHA: Colorado Sec of State Rules 2CCR 502-1
·DFPC: Colorado Sec of State Rules 8CCR 1507-31

**24 HOURS**

**BHA: Letter of Intent**

·Complete profile in LADDERS
·Application materials uploaded throughout process

**7 DAYS**

**Background Check and Fingerprints**

For owners and principals
$39.50/per person



**Identify Property and Space for Services**

Local zoning (city-county), housing, fire
DFPC :Create profile in DFPC system; Site drawings: Fire and safety plans, code review NFPC101 2012, architectural plans with fire ratings; Request walk through



**DFPC Inspection**

For CoC



**HCPF and RAEs**

Enroll with Medicaid and Credential with RAEs

**Estimated costs related to the process of licensing a facility do not include the costs for lease or purchase of property, operations, nor staff.**

# APPENDIX C – RECOVERY RESIDENCES TO SKILLED NURSING FACILITIES

| Recovery Residences - $1,766 | | |
|---|---|---|
| | **CARR** | **BHA\*** |
| License Fee | $500/year and $100/bed | $1371/year |
| Background Check | Not required | $39.50/per owner/employee |
| Local Zoning and Code | Yes | Yes |
| Register as Business | $150 | Not required |
| Certificate of Insurance | $824/year | Not required |

Lease or purchase of property<br>
Operations: Maintenance, Utilities<br>
Staff

*As currently written in pending legislation
Recovery Residences must also be licensed as BHEs if providing outpatient services to residents.

**Acronym Key:**

**BHA** Behavioral Health Administration
**BHE** Behavioral Health Entities
**CARF** Commission on Accreditation of Rehabilitation Facilities
**CDPHE** Colorado Department of Public Health and Environment
**CoC** Certificate of Compliance
**DFPC** Division of Fire Prevention and Control
**EIN** Employer Identification Number
**FGI** Facility Guidelines Institute
**HCPF** Health Care Policy and Financing
**HFEMSD** Health Facilities and Emergency Medical Services Division
**JCAHO** Joint Commission on Accreditation of Healthcare Organizations
**LADDERS** Licensing and Designation Database and Electronic Records System
**NFPA** National Fire Protection Association
**P&P** Policies and Procedures
**RAE** Regional Accountability Entity
**TJC** The Joint Commission

**Room and Board**

Room and board services (lodging and meals) are provided to members residing in a facility for at least 24 hours. Room and board are not covered Medicaid benefits and are not included in any per diem rate. Room and board are included in reimbursement when services are rendered in a hospital or PRTF and billed using a revenue code. BHA covers room and board for some Medicaid members when a facility is contracted with BHA for reimbursement. For example, Residential Substance Abuse Treatment Facilities bill room and board to BHA or their designee for Medicaid members. BHA covers room and board for uninsured/ underinsured members in some settings when all contractual and safety net criteria are met by a provider.

## ASAM 3.1 - $66,920

**BHA**

Application

Inspections

License-$500 Base, $600 Residential

**Secretary of State**

Business License-$150

Rules

**DFPC**

Permit- $1500 property (varies)

Site Drawings-Approx $100/site

Walkthrough

Checklist

Inspections-Life Safety Code-Purchase each booklet $175/each

Buildings with more than 8 people require sprinkling including closets. $38K

Standalone units (i.e. apartment) requires pull stations within 100 feet of entrance/exit $17K-$20K for building

CoC: $710-$1115/year

**HCPF**

Enroll

**Joint Commission Accreditation (JCHAO)**

Accreditation $1000-$4000+/year

**RAE**

Contract and Credential

**National Provider Identifier**

**Colorado Bureau of Investigation**

Background Check and Fingerprinting $39.50/pp

**Insurance**

Professional Liability Insurance $1K-10K

Lease or purchase of property
Operations: Maintenance, Utilities
Staff

32

## MHTL Level 1 Current-$77,145

**CDPHE**

Assisted Living Residence License $8K-$15K *(dependent on # beds)*

**CDHS**

Must be contracted with CDHS to provide services

**Secretary of State**

Business License-$150

Rules

**DFPC**

Permit- $1500property (varies)

Site Drawings-Approx $100/site

Walkthrough

Checklist

Inspections-Life Safety Code-Purchase each booklet $175/each

Buildings with more than 8 people require sprinkling including closets. $38K

Standalone units (i.e. apartment) require pull stations within 100 feet of entrance/exit $17K-$20K for building

CoC: $710-$1115/year

**HCPF**

Enroll

Requires HCBS waiver for residents

**Joint Commission Accreditation (JCHAO)**

Accreditation $1000-$4000+/year

**RAE**

Contract and Credential

**National Provider Identifier**

**Colorado Bureau of Investigation**

Background Check and Fingerprinting $39.50/pp

**Insurance**

Professional Liability Insurance $1K-10K

Lease or purchase of property

Operations: Maintenance, Utilities

Staff

*Reimbursement rate for ACF: $403.34/day*

## MHTL Level 1 - *Proposed BHA Rule Changes*

**BHA**

Application

Inspections

License-$500 Base, $600 Residential

**Secretary of State**

Business License-$150

Rules

**DFPC**

Permit- $1500property (varies)

Site Drawings-Approx $100/site

Walkthrough

Checklist

Inspections-Life Safety Code-Purchase each booklet $175/each

Buildings with more than 8 people require sprinkling including closets. $38K

Standalone units (i.e. apartment) require pull stations within 100 feet of entrance/exit $17K-$20K for building

CoC: $710-$1115/year

**HCPF**

Enroll

**Joint Commission Accreditation (JCHAO)**

Accreditation $1000-$4000+/year

**RAE**

Contract and Credential

**National Provider Identifier**

**Colorado Bureau of Investigation**

Background Check and Fingerprinting $39.50/pp

**Insurance**

Professional Liability Insurance $1K-10K

Lease or purchase of property

Operations: Maintenance, Utilities

Staff

33

## MHTL Level II - $88,845

**BHA**
 Application
 Inspections
 License-$500 Base, $600 Residential
**Secretary of State**
 Business License-$150
 Rules
**DFPC**
 Permit- $1500 property (varies)
 Site Drawings-Approx $100/site
 Walkthrough
 Checklist
 Inspections-Life Safety Code-Purchase each booklet $175/each
 Buildings with more than 8 people require sprinkling including closets. $42K
 Standalone units (i.e. apartment) requires pull stations within 100 feet of entrance/exit $19K for building
 CoC: $710-$1115/year
**Local Permit** $10K
**Security System** $5,000
**HCPF**
 Enroll
 Requires HCBS waiver for residents
**Joint Commission Accreditation (JCHAO)**
 Accreditation $1000-$4000+/year
**RAE**
 Contract and Credential
**National Provider Identifier**
**Colorado Bureau of Investigation**
 Background Check and Fingerprinting $39.50/pp
**Insurance**
 Professional Liability Insurance $1K-10K
Lease or purchase of property
Operations: Maintenance, Utilities
Staff
*Estimated reimbursement rate: $500-$600/day*

## Assisted Living Residence - $95,000

**CDPHE**
 Assisted Living Residence License $8K-$15K (dependent on # beds)
**Secretary of State**
 Business License-$150
 Rules
**Colorado Bureau of Investigation**
 Background Check and Fingerprinting $39.50/pp
**DFPC**
 Permit- $1500 property (varies)
 Site Drawings-Approx $100/site
 Walkthrough
 Checklist

 Inspections-Life Safety Code-Purchase each booklet $175/each
 Buildings with more than 8 people require sprinkling including closets. $38K
 Standalone units (i.e. apartment) requires pull stations within 100 feet of entrance/exit $17K-$20K for building
 CoC: $710-$1115/year
**Assisted Living Administrator Training Course**
$750-$950
**Insurance**
 $5K-$50K
 Certificate of Liability Insurance
**CDPHE HFEMSD**
 Facility Guidelines Institute (FGI) Plan Review Approval
**HCPF**
 Enroll
 HCBS Certification Application
**RAE**
 Contract and Credential
**National Provider Identifier**
**Joint Commission Accreditation (JCHAO)**
 Accreditation $1000-$4000+/year
Lease or purchase of property
Operations: Maintenance, Utilities
Staff
*Reimbursement rate for ACF: $403.34/day*

34

## Skilled Nursing Facility - $90,000

**CDPHE**

$7,753.23

**Secretary of State**

 Business License-$150

 Rules

**CDPHE HFEMSD**

 Facility Guidelines Institute (FGI) Plan Review Approval

**DFPC**

 Permit- $1500 property (varies)

 Site Drawings-Approx $100/site

 Walkthrough

 Checklist

 Inspections-Life Safety Code-Purchase each booklet $175/each

 Buildings with more than 8 people require sprinkling including closets. $38K

 Standalone units (i.e. apartment) requires pull stations within 100 feet of entrance/exit $17K-$20K for building

 CoC: $710-$1115/year

**Insurance** *(only for facilities with 17+ licensed beds)*

 $5K-$50K

 Certificate of Liability Insurance

**Division of Insurance (DOI)**

 Approval required if self-insured retention or

 deductible is greater than $0

**Colorado Bureau of Investigation**

 Background Check and Fingerprinting $39.50/pp

**Centers for Medicare and Medicaid Services**

 Federally certified-$750

**HCPF**

 Enroll

**RAE**

 Contract and Credential

**National Provider Identifier**

**Joint Commission Accreditation (JCHAO)**

 Accreditation $1000-$4000+/year

Lease or purchase of property

Operations: Maintenance, Utilities

Staff

*Average Rate $288.78/day*

35

# APPENDIX D - RECOVERY RESIDENCES

