COLORADO
Office of Civil and Forensic Mental Health
Department of Human Services

**CENTER FOR LEGAL ADVOCACY, d/b/a**
**DISABILITY LAW COLORADO,**
**Plaintiff,**
**v.**

**MICHELLE BARNES,**
**in her official capacity as Executive Director**
**of the Colorado Department of Human Services, and**

**JILL MARSHALL,**
**in her official capacity as Chief Executive Officer**
**of the Colorado Mental Health Hospitals in Pueblo,**
**Defendants.**

# MONTHLY COMPLIANCE PLAN REPORT

**October 15, 2026**

EXHIBIT
A

## TABLE OF CONTENTS

**Background** **4**
Projection Model 4
Graph #1 - Competency Waitlist Projection Model 4
**Admission of Pretrial Detainees for Inpatient Competency Evaluations and Restoration Treatment [Paragraph 33(A)]** **6**
Inpatient Restoration Treatment 6
Graph #2 - Inpatient Restoration Treatment Orders 6
Inpatient Restoration Treatment Orders By Judicial District 7
Graph #3 - Tier 2 Daily 9
Table #1 - Snapshot of the Waitlist on the Last Day of the Month for Inpatient Restoration Treatment 10
Table #2 - Waits Ended for Inpatient Restoration 13
Table #2.1- Recent Wait Times for Inpatient Restoration 13
Table #3 - Inpatient Restoration Admissions and Discharges 15
Inpatient Restoration Treatment Length of Stay 16
Graph #4 - Incompetent to Proceed Restoration Length of Stay Distribution 16
Average Length of Stay Distribution of Discharged ITP Clients by Location 17
Median Length of Stay Distribution of Discharged ITP Clients by Location 17
Inpatient Competency Evaluations 18
Graph #5 - Inpatient Competency Evaluation Orders 18
Cumulative Inpatient Competency Evaluation Orders By Judicial District 19
Table #5 - Waits Ended for Inpatient Competency Exams 21
Civil Bed Freeze [Paragraph 39] 22
Table #6 - CMHHiFL Legal Population 22
Table #7 - CMHHiP Legal Population 22
Graph #6 - Monthly Census for Restoration Treatment Beds at CMHHiP 23
Inpatient Restoration Facilities Census 24
Graph #7 - Facilities Census 24
**Performance of Jail Competency Evaluations [Paragraph 33(B)]** **25**
Jail Competency Evaluations 25
Graph #8 - Jail Competency Evaluation and Community-Based Competency Evaluation 25
Outpatient Competency Evaluation Orders By Judicial District 26
Table #8: Snapshot of the Waitlist on the Last Day of the Month for Jail Competency Evaluations 28
Table #9 - Waits Ended for Jail Competency Evaluations 29
Develop and Implement a Triage System [Paragraph 43] 30
Incompetent to Proceed Rate 30

Forensic Support Team [Paragraph 42(A)] 32
Graph #9 - Total Number of FST Coordinated Care and Face Face Contacts 32
**Increase Community Restoration Services [Paragraph 41] 34**
Graph #10- Outpatient Restoration Treatment Orders 34
Outpatient Restoration Treatment Orders By Judicial District 35
Community Partnerships 37
Graph #11 - Percentage of Adult Individuals Court-Ordered to Community-Based Restoration 38
Graph #12 - Percentage of Jail-Based Evaluations Ordered to Community-Based Restoration Treatment 38
Outpatient Restoration Treatment 40
Outpatient Restoration Outcomes 41
Division of Outpatient Services 42
The Outpatient Clinic 42
Civil Conversion Program 43
Care Coordination Program 44
Mental Health Transitional Living Homes (MHTL) 46
MHTL Admissions 47
MHTL Discharges 48
MHTL Discharges 49
Legislative Actions [Paragraph 44] 50
**Appendices 52**
Appendix A: Consent Decree Definitions 52
Appendix B: Timeframes and Fines for Competency Services 55
Appendix C: Comprehensive and Cohesive Plan [Paragraph 40] 57
Appendix D: Notification of Non-Compliance With Timeframes [Paragraph 38] 59
Appendix E: Interim Jail Mental Health Treatment [Paragraph 34] 60
Appendix F: CMHHiP Reopening of additional hospital Beds: L2 60
Appendix G: CMHHiFL Additional Beds: Team 4 (F2) & Team 6 (F3) Cottages 60
Appendix H: Data Management Team [Paragraph 42(B)] 61
Appendix I: Consent Decree Reporting 62

## Background

In its December 28, 2018, Order Appointing Special Master (Dkt. 130), the Court required the Department to provide monthly reports to the Special Master, the Court, and Disability Law Colorado (DLC) on the status of the waitlist, compliance toward reaching the goal, and what impediments, if any, exist. The first report was produced on February 28, 2019. The Special Master and the Parties will agree on the content and organization of those reports, which will include an update on all the aspects of compliance included in Sections VI and VII of the Consent Decree, as well as an update on the recommendations of the Special Master and the Department's efforts and responses to those recommendations.

Pursuant to the Joint Stipulation for Approval of a Modification of the Consent Decree filed on March 7, 2022, and granted by the Court on May 6, 2022, the reports shall be due fifteen days after the first of every month or on the next business day if the fifteenth day of the month falls on a weekend or holiday.

This monthly report was submitted on October 15, 2026, and covers the events of September 2026.

**Projection Model**
**Graph #1 - Competency Waitlist Projection Model**

There are two assumptions in the model the Department is looking at to project compliance and the impact to the waitlist. Both Projection Model curves are based on input from Inpatient Orders per day (September 2026 at 5.4) and Average Length of Stay for the past 12 months (168 days). They are based on different bed utilization numbers explained below.

1. Projection Model- Operation Bed Throughput Curve (black curve) is based on 80% bed utilization factoring in the reality of the civil conversions after admission at CMHHIP reducing bed capacity for restoration admissions.
2. Projection Model- Projected Number after Admissions (grey curve) is based on 95% bed utilization. This curve also factors in the number of admissions actually happening in the previous month (August 2026 at 2.9 per day).

Based on the metrics noted above, the projection model from the previous month had estimated a waitlist number in the range of 373-364 (black and grey lines) for September 30, 2026. The actual waitlist number was 389 on September 30, 2026. The projection model is showing an increase in the projected date of when the Department will be in compliance, which is now beyond May 2028.

The average number of those waiting for the month of September was 361 and the average number of those waiting for the month of August was 349, a 3.4% increase. The average monthly waitlist number increased more steeply than last month; up 3.1 percentage points from August's 0.3% increase.

- Admissions were 66 which is below the 12-month rolling average of 74.
- Cumulative bed utilization for September was 97.6% (447 out of 458 beds were occupied or reserved for ITP patients).




*(*This projection waitlist number may look slightly different from numbers reported elsewhere in this report because it includes all individuals still waiting in jail—some of these individuals may have bed offers and are awaiting transport to an inpatient bed and would not be counted in other waitlist calculations.)*

**Admission of Pretrial Detainees[1] for Inpatient Competency Evaluations and Restoration Treatment [Paragraph 33(A)]**

**Inpatient Restoration Treatment[2]**

**Graph #2 - Inpatient Restoration Treatment Orders**

Over the last 12 months, October 2025 - September 2026, the average number of orders received for Inpatient Restoration Treatment was 163 while the average number of individuals ordered for Inpatient Restoration Treatment was 147. September orders decreased 1.1% compared to the 12-month average and the number of individuals with orders decreased 0.1%.

The graph below demonstrates the total number of orders received for Inpatient Restoration Treatment and the total number of individuals ordered for Inpatient Restoration Treatment per month since September 2025. This data excludes all adolescents and all Department of Corrections inmates; it reflects adult orders only:




---

[1]"Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services. Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

[2]"Inpatient Restoration Treatment" means the Restoration Treatment of a Pretrial Detainee that is performed at the Hospital or at a separate locked facility that provides comprehensive Restoration Treatment to the Pretrial Detainee. This includes Restoration Treatment that is provided at the RISE program or a similar program located in a dedicated behavioral health unit at a county jail.

**Inpatient Restoration Treatment Orders By Judicial District**
The graph below demonstrates a breakdown by Judicial District for the number of orders received for Inpatient Restoration Treatment for September 2026. This data excludes all adolescents and all Department of Corrections inmates; it reflects adult orders only:

In September, the 2nd Judicial District had the most orders at 38 (23.3%).



**Cumulative Inpatient Restoration Treatment Orders By Judicial District**

The graph below demonstrates a breakdown by Judicial District for the number of orders received for Inpatient Restoration Treatment for 12 consecutive months, October 2025 - September 2026. This data excludes all adolescents and all Department of Corrections inmates; it reflects adult orders only:

There were 1978 Inpatient Restoration Treatment Orders Received during the 12 month period above which is a 12-month average of 165 per month. The 2nd Judicial District had the most orders at 382 (19.3%).



**Graph #3 - Tier 2 Daily**

The graph below demonstrates the number of Tier 2 Pretrial Detainees on the Inpatient Restoration waitlist according to the updated admission timeframes: at or under 28 days (red), greater than 28 days (blue).



**Table #1 - Snapshot of the Waitlist on the Last Day of the Month for Inpatient Restoration Treatment**

The chart below reflects the number of Pretrial Detainees waiting for admission to a CDHS facility for Inpatient Restoration on the last day of the month. All data is accurate as of the last day of the month it is intended to represent and may fluctuate based on updated data entry in subsequent reports.

The data points below reflect the total number of days a Pretrial Detainee has been waiting for Inpatient Restoration Treatment on the last day of the reporting month.

| *Total ITP Waitlist* | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Month* | *Average Days Waited* | *Maximum Days Waited* | *Total Number of Pretrial Detainees That Appeared on the Waitlist on the Last Day of the Month* | *Total Number of Tier 1 Pretrial Detainees That Appeared on the Waitlist <=7 Days on the Last Day of the Month* | *Total Number of Tier 1 Pretrial Detainees That Appeared on the Waitlist >8 Days on the Last Day of the Month* | *Total Number of Tier 2 Pretrial Detainees That Appeared on the Waitlist <=28 Days on the Last Day of the Month* | *Total Number of Tier 2 Pretrial Detainees That Appeared on the Waitlist >28 Days on the Last Day of the Month* |
| Sep-26 | 63 | 294 | 375 | 3 | 2 | 103 | 267 |
| Aug-26 | 61 | 350 | 363 | 4 | 5 | 113 | 241 |
| July-26 | 65 | 319 | 346 | 2 | 3 | 91 | 250 |
| June-26 | 66 | 289 | 354 | 0 | 7 | 84 | 263 |
| May-26 | 66 | 259 | 369 | 2 | 8 | 93 | 266 |
| Apr-26 | 63 | 293 | 364 | 5 | 5 | 89 | 265 |
| Mar-26 | 61 | 322 | 376 | 7 | 10 | 100 | 259 |
| Feb-26 | 60 | 368 | 372 | *3* | *14* | *109* | *246* |
| Jan-26 | 62 | 472 | 340 | *2* | *12* | *95* | *231* |
| Dec-25 | 63 | 441 | 331 | *2* | *14* | *91* | *224* |
| Nov-25 | 66 | 410 | 348 | *1* | *15* | *76* | *256* |
| Oct-25 | 57 | 380 | 327 | *1* | *17* | *87* | *222* |
| Sep-25 | 59 | 349 | 322 | *5* | *13* | *88* | *216* |

*The table below reflects the number of Pretrial Detainees waiting for admission to a CDHS facility for Inpatient Restoration on the last day of the month who received a Tier 1 court order.*

*The data points below reflect the total number of days Tier 1 Pretrial Detainees have been waiting for Inpatient Restoration Treatment on the last day of the reporting month, reflecting individuals still waiting for admission.*

| ***Tier 1 - Individuals Still Waiting for Admission for Inpatient Restoration on the Last Day of the Month*** | | | | | |
|---|---|---|---|---|---|
| ***Month*** | ***Tier 1 Average Days Waiting*** | ***Tier 1 Maximum Days Waiting*** | ***Total Number of Tier 1 Pretrial Detainees That Appeared on the Waitlist on the Last Day of the Month*** | ***Total Number of Tier 1 Pretrial Detainees That Appeared on the Waitlist <=7 Days on the Last Day of the Month*** | ***Total Number of Tier 1 Pretrial Detainees That Appeared on the Waitlist >7 Days on the Last Day of the Month*** |
| *Sep-26* | 7 | 21 | 5 | 3 | 2 |
| *Aug-26* | 32 | 87 | 9 | 4 | 5 |
| *July-26* | 43 | 105 | 5 | 2 | 3 |
| *June-26* | 34 | 99 | 7 | 0 | 7 |
| *May-26* | 38 | 153 | 10 | 2 | 8 |
| *Apr-26* | 40 | 210* | 10 | 5 | 5 |
| *Mar-26* | 16 | 54 | 17 | 7 | 10 |
| *Feb-26* | 25 | 120 | 17 | 3 | 14 |
| *Jan-26* | 39 | 134 | 14 | 2 | 12 |
| *Dec-25* | 39 | 114 | 16 | 2 | 14 |
| *Nov-25* | *78* | *299* | *16* | *1* | *15* |
| *Oct-25* | *65* | *268* | *18* | *1* | *17* |
| *Sep-25* | *46* | *237* | *18* | *5* | *13* |

*- Please note this number reflects the entire time on the waitlist. On two occasions this month, clients were converted to Tier 1 after a period of time on the waitlist as a Tier 2.

*The table below reflects the number of Pretrial Detainees waiting for admission to a CDHS facility for Inpatient Restoration on the last day of the month who received a Tier 2 recommendation.*

*The data points below reflect the total number of days a Tier 2 Pretrial Detainee has been waiting for Inpatient Restoration Treatment on the last day of the reporting month.*

| ***Tier 2*** | | | | | |
|---|---|---|---|---|---|
| ***Month*** | ***Tier 2 Average Days Waited*** | ***Tier 2 Maximum Days Waited*** | ***Total Number of Tier 2 Pretrial Detainees on the Waitlist on the Last Day of the Month*** | ***Total Number of Tier 2 Pretrial Detainees That Appeared on the Waitlist <=28 Days on the Last Day of the Month*** | Total Number of Tier 2 Pretrial Detainees That Appeared on the Waitlist >28 Days on the Last Day of the Month |
| Sep-26 | 64 | 294 | 370 | 103 | 267 |
| Aug-26 | 62 | 350 | 354 | 113 | 241 |
| July-26 | 66 | 319 | 341 | 91 | 250 |
| June-26 | 67 | 289 | 347 | 84 | 263 |
| May-26 | 67 | 259 | 359 | 93 | 266 |
| Apr-26 | 64 | 293 | 354 | 89 | 265 |
| Mar-26 | 63 | 322 | 359 | 100 | 259 |
| *Feb-26* | 61 | 368 | 355 | 109 | 246 |
| *Jan-26* | 63 | 472 | 326 | 95 | 231 |
| *Dec-25* | 65 | 441 | 315 | 91 | 224 |
| *Nov-25* | *65* | *410* | *332* | *76* | 256 |
| *Oct-25* | *58* | *380* | *309* | *87* | 222 |
| *Sep-25* | *61* | *349* | *304* | *88* | 216 |

**Table #2 - Waits Ended for Inpatient Restoration**

The chart below reflects a count of the number of Pretrial Detainees whose waits for Inpatient Restoration Treatment ended during the month. One Tier 2 wait that ended was a result of being prioritized for admission due to increased acuity level (Priority Admissions review process between FST and Bed Utilization Manager).

A Pretrial Detainee's' wait could have ended because they were admitted for restoration services to a CDHS facility or for other reasons:

- The Pretrial Detainee receives a bed offer for admission to a CDHS facility, including CMHHiP, CMHHiFL, RISE, Denver Restoration Treatment Unit, or private hospitals (Denver Health, Peakview).
- The Pretrial Detainee has their order for Inpatient Restoration Treatment converted to Outpatient Restoration Treatment.
- The Pretrial Detainee has their charges dropped, which would vacate their court order for Inpatient Restoration Treatment.

| Month | Average Days Waited | Maximum Days Waited | Total Number of Pretrial Detainees With Waits that Ended | Total Number of Waits that Ended Due Receiving a Bed Offer to a CDHS Facility | Total Number of Waits That Ended for Other Reasons | Total Number of Ended Tier 1 Waits that lasted >7 days | Total Number of Ended Tier 2 Waits that lasted >28 days | Percentage Over the Tier Assigned Timeframe |
|---|---|---|---|---|---|---|---|---|
| Sep-26 | 77 | 261 | 108 | 63 | 45 | 8 | 81 | 82% |
| Aug-26 | 74 | 288 | 116 | 72 | 44 | 6 | 83 | 77% |
| July-26 | 73 | 287 | 130 | 82 | 48 | 5 | 95 | 77% |
| June-26 | 91 | 264 | 118 | 74 | 44 | 8 | 90 | 83% |
| May-26 | 86 | 238 | 120 | 73 | 47 | 8 | 107 | 96% |
| Apr-26 | 74 | 346 | 126 | 79 | 47 | 19 | 86 | 83% |
| Mar-26 | 75 | 380 | 128 | 68 | 60 | 16 | 93 | 85% |
| Feb-26 | 74 | 477 | 112 | 57 | 55 | 15 | 77 | 82% |
| Jan-26 | 91 | 371 | 106 | 68 | 38 | 14 | 86 | 94% |
| Dec-25 | 89 | 358 | 120 | 60 | 60 | 13 | 100 | 94% |
| Nov-25 | 77 | 247 | 87 | 51 | 36 | 12 | 65 | 89% |
| Oct-25 | 74 | 232 | 106 | 61 | 45 | 14 | 79 | 88% |
| Sep-25 | 89 | 534 | 115 | 70 | 45 | 8 | 91 | 86% |

**Table #2.1- Recent Wait Times for Inpatient Restoration**
As requested by the Special Master, the Department will present a full breakout of waits that ended for Incompetent to Proceed (ITP) restoration per monthly tier status:

| Recent Wait Times for Inpatient Restoration for Pretrial Detainees | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Month** | **Total Number of Pretrial Detainees With Waits that Ended** | | **Average Days Waited for Pretrial Detainees With Waits that Ended** | | **Total Number of Pretrial Detainees that Waited Beyond their Assigned Timeframe** | | **Total Percent of Pretrial Detainees With Waits that Ended Within the Assigned Timeframe** | |
| | **Tier 1** | **Tier 2** | **Tier 1** | **Tier 2** | **Tier 1** | **Tier 2** | **Tier 1** | **Tier 2** |
| Sep-26 | 11 | 97 | 12 | 84 | 8 | 81 | 27.3% | 16.5% |
| Aug-26 | 11 | 105 | 25 | 79 | 6 | 83 | 45.5% | 21.0% |
| July-26 | 9 | 121 | 25 | 76 | 5 | 95 | 44.4% | 21.5% |
| June-26 | 10 | 108 | 37 | 96 | 8 | 90 | 20.0% | 16.7% |
| May-26 | 9 | 111 | 41 | 89 | 8 | 107 | 11.1% | 3.6% |
| Apr-26 | 22 | 104 | 30 | 84 | 19 | 86 | 13.6% | 17.3% |
| Mar-26 | 16 | 112 | 27 | 82 | 16 | 93 | 0.0% | 17.0% |
| Feb-26 | 17 | 95 | 35 | 81 | 15 | 77 | 11.8% | 18.9% |
| Jan-26 | 16 | 90 | 46 | 99 | 14 | 86 | 12.5% | 4.4% |
| Dec-25 | 13 | 107 | 95 | 88 | 13 | 100 | 0.0% | 6.5% |
| Nov-25 | 12 | 75 | 58 | 80 | 12 | 65 | *0.0%* | 13.3% |
| Oct-25 | 14 | 92 | 17 | 83 | 14 | 79 | *0.0%* | 14.1% |
| Sep-25 | 12 | 103 | 38 | 95 | 8 | 91 | *33.3%* | 11.7% |

**Table #3 - Inpatient Restoration Admissions and Discharges**

The chart below demonstrates the number of admissions and discharges for individuals receiving Inpatient Restoration Treatment at a CDHS facility, including CMHHiP, CMHHIFL, RISE, Denver Health, or Denver Restoration Treatment Unit (DRTU).

It is important to note that this chart includes admissions of Pretrial Detainees coming off of the waitlist but also includes admissions that function as transfers between facilities (e.g. if a Pretrial Detainee is transferred between a RISE location and CMHHiP, CMMHIFL or private hospitals to a RISE location, etc.).

| | Inpatient Restoration Treatment Admissions | | | | | | Inpatient Restoration Treatment Discharges | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | CMHHiP | CMHHiFL | RISE | Private Hospitals | DRTU | Total | CMHHiP | CMHHiFL | RISE | Private Hospitals | DRTU | Total |
| Sep-26 | 21 | 15 | 7 | 21 | 2 | 66 | 19 | 10 | 15 | 19 | 1 | 64 |
| Aug-26 | 27 | 15 | 18 | 19 | 6 | 85 | 18 | 11 | 14 | 15 | 6 | 64 |
| July-26 | 36 | 22 | 14 | 18 | 2 | 91 | 21 | 7 | 14 | 19 | 3 | 64 |
| June-26 | 15 | 7 | 15 | 25 | 4 | 66 | 23 | 3 | 15 | 20 | 5 | 65* |
| May-26 | 17 | 10 | 22 | 28 | 2 | 79 | 15 | 9 | 18 | 13 | 1 | 55* |
| Apr-26 | 26 | 21 | 25 | 25 | 6 | 103 | 25 | 7 | 21 | 12 | 5 | 70 |
| Mar-26 | 27 | 13 | 15 | 12 | 6 | 73 | 12 | 10 | 20 | 12 | 4 | 58 |
| Feb-26 | 29 | 3 | 12 | 5 | 6 | 54 | 15 | 4 | 16 | 16 | 8 | 59 |
| Jan-26 | 22 | 5 | 20 | 20 | 4 | 71 | 21 | 4 | 15 | 18 | 2 | 60 |
| Dec-25 | 21 | 11 | 15 | 17 | 3 | 67 | 18 | 7 | 17 | 17 | 5 | 64 |
| Nov-25 | 18 | 6 | 9 | 15 | 5 | 53 | 20 | 10 | 9 | 15 | 3 | 57 |
| Oct-25 | 26 | 10 | 18 | 18 | 4 | 76 | 14 | 5 | 14 | 18 | 6 | 56 |
| Sep-25 | 35 | 9 | 17 | 19 | 4 | 84 | 32 | 7 | 19 | 16 | 2 | 76 |

*One individual had discharges from two programs in the same month

## Inpatient Restoration Treatment Length of Stay

In an effort to decrease the number of days from when a patient is ready to discharge to when the patient is actually discharged, CMHHiP is reviewing all restoration cases where the length of stay has exceeded 90 days to determine the reason(s).

**Graph #4 - Incompetent to Proceed Restoration Length of Stay Distribution**

This measure is calculated by looking at all discharged ITP clients at the Hospitals and Jail-Based Restoration locations.

The graph below demonstrates discharged incompetent to proceed clients (frequency) from all CDHS facilities between August 2025 and August 2026. A length of stay of "30 Days" denotes anyone who is discharged up to and including 30 days; a length of stay of "60 Days" is anyone who is discharged after 30 days but less than or equal to 60 days, and so on.



**Average Length of Stay Distribution of Discharged ITP Clients by Location**
This measure is calculated by looking at all discharged ITP clients from CDHS facilities and reflects the average length of stay by each month,as well as the average over the last 12 months. Smaller programs such as RISE, DRTU, and the private hospitals will have fewer discharges and thus higher variation in the average values.

| | Average Length of Stay | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep 25 | Oct 25 | Nov 25 | Dec 25 | Jan 26 | Feb 26 | Mar 26 | Apr 26 | May 26 | June 26 | July 26 | Aug 26 | Sep 26 | Average 12 months |
| CMHHiP | 218 | 205 | 179 | 136 | 178 | 168 | 291 | 228 | 187 | 242 | 302 | 146 | 233 | 210 |
| CMHHiFL | 190 | N/A | 82 | 119 | 128 | Slos1 67 | 205 | 125 | 93 | 85 | 93 | 118 | 132 | 122 |
| RISE | 115 | 217 | 117 | 205 | 125 | 140 | 138 | 159 | 234 | 63 | 144 | 133 | 177 | 152 |
| DRTU | 243 | 181 | 65 | 126 | 189 | 126 | 251 | 68 | 85 | 106 | 139 | 92 | 393 | 133 |
| Peak View | 142 | 189 | 128 | 144 | 133 | 185 | 150 | 113 | 119 | 168 | 143 | 105 | 174 | 157 |

** The 12-month average is calculated by using all data points over the past 12 months and is not an average of the individual average for each month.

**Median Length of Stay Distribution of Discharged ITP Clients by Location**
This measure is calculated by looking at all discharged ITP clients from CDHS facilities and reflects the median length of stay by each month, as well as the average of the median over the last 12 months. Median is provided in addition to the average above as it is more resistant to high variation.

| | Median Length of Stay | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep 25 | Oct 25 | Nov 25 | Dec 25 | Jan 26 | Feb 26 | Mar 26 | Apr 26 | May 26 | June 26 | July 26 | Aug 26 | Sep 26 | Median 12 months |
| CMHHiP | 130 | 113.5 | 113 | 110 | 136 | 122.5 | 228.5 | 123 | 148 | 167.5 | 238 | 104 | 167 | 142 |
| CMHHiFL | 176.5 | N/A | 97 | 113 | 110 | 182 | 204.5 | 114 | 92 | 85 | 93 | 120 | 71 | 109.5 |
| RISE | 91 | 147 | 114 | 124 | 121.5 | 98 | 133 | 90 | 199.5 | 59 | 79 | 106 | 98 | 105.5 |
| DRTU | 243 | 181.5 | 72 | 55 | 189 | 147 | 96 | 46.5 | 85 | 63 | 138.5 | 73 | 393 | 76 |
| Peak View | 96 | 189 | 103.5 | 124.5 | 88.5 | 126 | 104.5 | 109 | 122.5 | 73 | 84 | 89.5 | 126 | 114.5 |

**N/A- no discharges from this program occurred.*

## Inpatient Competency Evaluations[3]

### Graph #5 - Inpatient Competency Evaluation Orders

Since September 2025 the graph below demonstrates the total number of adult orders received for Inpatient Competency Evaluations monthly. This data excludes all adolescents and any Department of Corrections inmates:




** This graph previously filtered for only people who had been admitted for evaluation during the month and therefore did not count orders for that month. This has been updated to reflect all orders in the month regardless of location.*

[3] "Inpatient Competency Evaluation" means a Competency Evaluation of a Pretrial Detainee that is ordered to be performed at the Hospital or in a separate locked facility that is established for the purpose of providing Inpatient Competency Evaluations and Restoration Treatment. This includes Competency Evaluations conducted at the RISE program or a similar program located on a dedicated behavioral health unit at a county jail.

**Cumulative Inpatient Competency Evaluation Orders By Judicial District**

The graph below demonstrates by Judicial District a breakdown of adult orders received for Inpatient Competency Evaluations for 12 consecutive months, October 2025 - September 2026. This data excludes all adolescents and all Department of Corrections inmates:




The number of Inpatient Competency Evaluation Orders remains low due to the efforts and communication from the Forensic Services Division to the Courts.

## Table #4- All Inpatient Competency Evaluations

The chart below reflects the data for all Inpatient Competency Evaluations during the month, including those whose waits have ended.

| Month | Average Days Waited | Maximum Days Waited | Total Number of Pretrial Detainees on the Waitlist at any Time During the Month for an Inpatient Competency Evaluation | Total Number of Pretrial Detainees who waited for an Inpatient Competency Evaluation for <=14 days | Total Number of Pretrial Detainees who waited for an Inpatient Competency Evaluation for >14 days |
|---|---|---|---|---|---|
| Sep-26 | 9 | 9 | 1 | 1 | 0 |
| Aug-26 | 13 | 19 | 2 | 1 | 1 |
| July-26 | 54 | 60 | 2 | 0 | 2 |
| June-26 | 33 | 40 | 2 | 0 | 2 |
| May-26 | 40 | 41 | 2 | 0 | 2 |
| Apr-26 | 22.5 | 37 | 2 | 1 | 1 |
| Mar-26 | 0 | 0 | 0 | 0 | 0 |
| Feb-26 | 0 | 0 | 0 | 0 | 0 |
| Jan-26 | 0 | 0 | 0 | 0 | 0 |
| Dec-25 | 0 | 0 | 0 | 0 | 0 |
| Nov-25 | 22 | 53 | 6 | 4 | 2 |
| Oct-25 | 20 | 46 | 5 | 3 | 2 |
| Sep-25 | 26 | 26 | 1 | 1 | 0 |

**Table #5 - Waits Ended for Inpatient Competency Exams**

The chart below reflects the Pretrial Detainees who were waiting for admission to a CDHS facility for an Inpatient Competency Evaluation and are no longer on the waitlist each month.

An order for an Inpatient Competency Evaluation can end for a number of different reasons, including

- The Pretrial Detainee receives a bed offer for admission to a CDHS facility, including CMHHiP, CMHHiFL, RISE, or private hospitals (Denver Health, Peakview).
- The Pretrial Detainee has their order for Inpatient Restoration competency converted to an Outpatient Competency Exam.
- The Pretrial Detainees had their charges dropped, which would vacate their court order for a Competency Evaluation.

| Month | Average Days Waited | Maximum Days Waited | Total Number Pretrial Detainee With Waits that Ended | Total Number of Waits Ended with a Bed Offer to CDHS facility | Total Number of Waits That Ended for Other Reasons[4] | Total Number of Pretrial Detainees Waiting >14 days | Percent of People Waiting Longer than Time Frame | Completed at CMHHiP | Completed at RiSE | Completed at Private Hospitals |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep-26 | 9 | 9 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| Aug-26 | 13 | 19 | 2 | 1 | 1 | 1 | 50 | 0 | 0 | 0 |
| July-26 | 54 | 60 | 2 | 2 | 0 | 2 | 100% | 2 | 0 | 0 |
| June-26 | 40 | 40 | 1 | 1 | 0 | 1 | 100% | 1 | 0 | 0 |
| May-26 | 41 | 41 | 1 | 0 | 1 | 0 | 100% | 1 | 0 | 0 |
| Apr-26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mar-26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Feb-26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jan-26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dec-25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nov-25 | 30 | 53 | 3 | 0 | 2 | 1 | 50% | 3 | 0 | 0 |
| Oct-25 | 24 | 46 | 2 | 0 | 2 | 1 | 50% | 1 | 0 | 0 |
| Sep-25 | 26 | 26 | 1 | 1 | 0 | 1 | 100% | 1 | 0 | 0 |

[4] Other Reasons are defined as any reason that is not a bed offer. Other reasons can include, but is not limited to, having an order converted to outpatient or having their charges dropped, both of which would end a wait for an Inpatient Competency Evaluation.

## Civil Bed Freeze [Paragraph 39]

As a means to enter into mediation in good faith with DLC, and at DLC's request, the Department restored community civil admissions at the Colorado Mental Health Hospitals in Fort Logan (CMHHiFL) on February 7, 2019. The Department continues to allocate civil and juvenile psychiatric beds as agreed at the time of the execution of the Consent Decree and will not freeze or convert those beds to provide competency services for Pretrial Detainees unless the Department receives prior agreement from the Special Master to use un-utilized beds for such purposes. Consent Decree, ¶ 39.

**Table #6 - CMHHiFL Legal Population**
At the request of the Special Master and DLC, the table below demonstrates a snapshot of the patient population of the Colorado Mental Health Hospital in Pueblo as of September 30, 2026:

| CMHHiFL | |
|---|---|
| **Legal Commitment Type** | **Number of clients** |
| Involuntary Civil Commitment | 67 |
| Competency Exam | 0 |
| Incompetent to Proceed Restoration | 59 |
| Not Guilty by Reason of Insanity | 0 |
| Voluntary Civil Commitment | 0 |
| **Total Number of clients at CMHHiFL** | 121 |
| Civil cases housed at Highlands Behavioral Hospital | 24 |
| **Total Number of CMHHiFL clients** | 145 |

- Five patients have two legal statuses and are therefore represented in both Commitment Types

**Table #7 - CMHHiP Legal Population**
At the request of the Special Master and DLC, the table below demonstrates a snapshot of the patient population of the Colorado Mental Health Hospital in Pueblo as of October 11, 2026:

| CMHHiP | |
|---|---|
| **Legal Commitment Type** | **Number of clients** |
| Competency Exam | 1 |
| Involuntary Civil Commitment | 52 |
| Incompetent to Proceed Restoration | 187 |
| Not Guilty by Reason of Insanity | 106 |
| NGRI Approved for Conditional Release | 4 |
| Voluntary Civil Commitment | 9 |
| Sanity Exam | 1 |
| **Total Number of clients** | 360 |

**Graph #6 - Monthly Census for Restoration Treatment Beds at CMHHiP**

While CMHHiP does not have beds specifically dedicated to restoration treatment and provides treatment for restoration patients based on their individualized needs, the type of patient that has been prioritized by the Department for admission to CMHHiP are patients who have higher level crimes and higher mental health acuity needs. In an effort to ensure the Department fully utilizes every available bed, the Department established the expectation that CMHHiP admit and ensure that beds that meet the needs of these restoration patient units will maintain a census of at least 95%.




For September 2026, 95.7% of beds typically suitable for restoration treatment were filled with patients with an active legal status of ITP. CMHHiP reported an overall hospital bed utilization census of 91.0% for September 2026.

There are patients at CMHHiP occupying beds for other forensic reasons such as sanity evaluations and newly admitted NGRI patients. In addition, approximately 63 (as of October 2, 2026) individuals were admitted as ITP from the waitlist, but had their charges dropped by the court after admission. Their legal status is now either civil commitment or voluntary, and they are occupying beds where restoration patients are typically served, due to treatment needs.

**Inpatient Restoration Facilities Census**
**Graph #7 - Facilities Census**

The census for CMHHIP is in the graph above. The remaining facilities have been split by State and Private for better visualization with a table showing monthly and 12-month averages. The private facility (Peakview) now has 110 beds under contract. Please note, this is an increase from 74 on April 13, 2026 and will result in lower percentages for a period of time while the facility safely increases capacity to full census. Additionally, the census at CMHHIFL will remain low over the next few weeks due to door replacements that need to occur on the forensic units.







| Facility | Aug Census | 12-Month Avg Census |
|---|---|---|
| CMHHIFL | 97.8% | 88.1% |
| Arapahoe Rise | 99.5% | 98.2% |
| Denver Restoration Treatment Unit (DRTU) | 100.0% | 99.5% |
| Peakview | 99.2% | 98.0% |

## Performance of Jail Competency Evaluations [Paragraph 33(B)]

Beginning June 1, 2019, the Department shall complete all Jail Competency Evaluations of a Pretrial Detainee pursuant to Table 1 of the Consent Decree after the Department's receipt of a Court Order directing the evaluation and receipt of Collateral Materials. Consent Decree, ¶ 33(b).

## Jail Competency Evaluations[5]

**Graph #8 - Jail Competency Evaluation and Community-Based Competency Evaluation**

The graph below demonstrates the total number of orders received for Jail Competency Evaluations and Community-Based Competency Evaluations[6] and the total number of individuals ordered for Jail Competency Evaluations and Community-Based Competency Evaluations per month since September 2025. This data excludes all adolescents and any Department of Corrections inmates; it reflects adult orders only:




[5] "Jail Competency Evaluation" means a Competency Evaluation performed in the County Jail where the Pretrial Detainee is being held.

[6] "Community-Based Competency Evaluation" means a Competency Evaluation of a Community-Based Services Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

**Outpatient Competency Evaluation Orders By Judicial District**
The following two graphs show a breakdown by Judicial District for the number of orders received for all Outpatient Competency Evaluations for September 2026 (first graph) and for the past 12 months, October 2025 - September 2026 (second graph). This data excludes all adolescents and all Department of Corrections inmates; it reflects adult orders only.




There were 302 Outpatient Competency Evaluation Orders received during September 2026 compared to a 299 12-month average. The 4th Judicial District had the most orders at 68 (22.2%) in September.




3592 Outpatient Evaluation Competency Orders were received during the 12 months reflected above which is an average of 299 per month. The 4th Judicial District provided 649 (18.1%) of the total orders.

**Table #8: Snapshot of the Waitlist on the Last Day of the Month for Jail Competency Evaluations**

The chart below reflects the number of Pretrial Detainees waiting for a Jail Competency Evaluation on the last day of the month and excludes anyone who is actively on the ISC List as of that day. All data is accurate as of the last day of the month it is intended to represent and may fluctuate based on updated data entry in subsequent reports.

| Month | Average Days Waited | Maximum Days Waited | Total Number of Pretrial Detainees on the Waitlist Waiting for a Jail Competency Eval on the Last Day of the Month | Total Number of Pretrial Detainees on the Waitlist Waiting for a Jail Competency Eval <=21 days on the Last Day of the Month | Total Number of Pretrial Detainees on the Waitlist Waiting for a Jail Competency Eval >21 days on the Last Day of the Month | Percentage Over the Assigned Timeframe |
|---|---|---|---|---|---|---|
| Sep-26 | 12 | 52 | 114 | 104 | 10 | 8.8% |
| Aug-26 | 10 | 34 | 118 | 113 | 5 | 4.2% |
| July-26 | 10 | 93 | 94 | 88 | 6 | 6.4% |
| June-26 | 11 | 34 | 118 | 107 | 11 | 9.3% |
| May-26 | 12 | 48 | 105 | 95 | 10 | 9.5% |
| Apr-26 | 10 | 49 | 113 | 105 | 8 | 7.1% |
| Mar-26 | 13 | 39 | 127 | 109 | 18 | 14.2% |
| Feb-26 | 11 | 55 | 146 | 128 | 18 | 12.3% |
| Jan-26 | 15 | 57 | 177 | 127 | 50 | 28.2% |
| Dec-25 | 19 | 56 | 170 | 122 | 48 | 28.2% |
| Nov-25 | 12 | 76 | 145 | 118 | 27 | 18.6% |
| Oct-25 | 12 | 46 | 129 | 110 | 19 | 14.7% |
| Sep-25 | 14 | 34 | 102 | 85 | 17 | 16.7% |

**Table #9 - Waits Ended for Jail Competency Evaluations**
The chart below reflects a count of the number of Pretrial Detainees whose wait for a Jail Competency Evaluation ended during the month.

A wait for a Jail Competency Evaluation can end for several different reasons, including

- The Pretrial Detainee receives a Jail Competency Evaluation and Court Services receives the report from their evaluator.
- The Pretrial Detainee has their order for a Jail Competency Evaluation converted to an Outpatient Competency Evaluation.
- The Pretrial Detainee had their charges dropped, which would vacate their court order, etc.

| Month | Average Days Waited | Max Days Waited | Total Number of Pretrial Detainees With Waits that Ended | Total Number of Waits that Ended Due to Evaluation | Total Number of Waits That Ended for Other Reasons[7] | Total Number of Pretrial Detainees Waiting for longer than 21 days |
|---|---|---|---|---|---|---|
| Sep-26 | 21 | 48 | 172 | 155 | 18 | 86 |
| Aug-26 | 22 | 313 | 162 | 149 | 13 | 80 |
| July-26 | 21 | 83 | 167 | 151 | 16 | 78 |
| June-26 | 21 | 61 | 155 | 148 | 8 | 72 |
| May-26 | 21 | 64 | 165 | 153 | 14 | 84 |
| Apr-26 | 22 | 70 | 179 | 168 | 12 | 94 |
| Mar-26 | 23 | 118 | 195 | 179 | 16 | 114 |
| Feb-26 | 27 | 92 | 214 | 202 | 12 | 160 |
| Jan-26 | 34 | 60 | 187 | 169 | 18 | 161 |
| Dec-25 | 29 | 83 | 152 | 140 | 12 | 129 |
| Nov-25 | 27 | 54 | 144 | 126 | 18 | 119 |
| Oct-25 | 26 | 46 | 153 | 95 | 58 | 124 |
| Sep-25 | 28 | 64 | 159 | 71 | 88 | 134 |

[7] Other Reasons are defined as any reason that is not a completed evaluation. Other reasons can include, but are not limited to, having an order converted to outpatient or having their charges dropped, both of which would end a wait for a Jail Competency Evaluation.

## Develop and Implement a Triage System [Paragraph 43]

The Special Master's Recommendation Number Four recognizes a need for the Department to prioritize a triage approach over traditional waitlist approaches. Therefore, by June 1, 2019, the Department shall develop and implement a triage system to screen each Pretrial Detainee and make recommendations to the committing court regarding the most clinically appropriate level of care to restore the Pretrial Detainee to competency. Consent Decree, ¶ 43.

The Department implemented the triage system on June 1, 2019. Evaluators began including Tier 1 and Tier 2 opinions and Inpatient and Outpatient recommendations in their reports and have consulted with the Court Services Director and the President of Medical Staff at CMHHiP on the triage process.

**Incompetent to Proceed Rate**
The graph below reflects the percentage of competency evaluations completed for individuals each month that resulted in incompetent to proceed (ITP) opinions. The graph includes all initial and re-evaluations.



## Table #10 - Competency Triage Table

The table below outlines the opinions resulting from competency evaluations per individual and includes the following information:

- The competency evaluation location demonstrates where the Competency Evaluation took place: in jail, in an inpatient setting, or in the community.
- The competency opinion demonstrates whether the evaluator found the individual competent to proceed or incompetent to proceed.
- The triage opinion outlines the number of individuals opined incompetent to proceed when their evaluation took place in an inpatient or jail setting and the triage opinion of the evaluator.
- The below data does not include Opinions of: No Opinion or Unlikely to be Restored.

| | Competency Evaluation Location | | | Competency Opinion (Jail or Inpatient) | | Competency Opinion (Community) | | Triage Opinion | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Month | Jail | Inpatient | Community | Competent | Incompetent | Competent | Incompetent | Tier 1 | Tier 2 | Community |
| Sep-26 | 159 | 0 | 116 | 66 | 93 | 55 | 61 | 10 | 52 | 30 |
| Aug-26 | 150 | 2 | 127 | 60 | 92 | 55 | 72 | 12 | 37 | 43 |
| Jul-26 | 157 | 0 | 92 | 66 | 91 | 29 | 63 | 6 | 47 | 37 |
| Jun-26 | 139 | 0 | 91 | 57 | 82 | 45 | 46 | 9 | 43 | 30 |
| May-26 | 162 | 0 | 94 | 63 | 100 | 28 | 66 | 8 | 54 | 38 |
| Apr-26 | 165 | 0 | 107 | 69 | 96 | 46 | 61 | 12 | 50 | 32 |
| Mar-26 | 174 | 0 | 114 | 72 | 102 | 48 | 66 | 11 | 56 | 35 |
| Feb-26 | 199 | 0 | 91 | 80 | 119 | 37 | 54 | 16 | 66 | 37 |
| Jan-26 | 172 | 3 | 101 | 80 | 95 | 53 | 48 | 15 | 50 | 29 |
| Dec-25 | 125 | 3 | 74 | 59 | 69 | 43 | 31 | 9 | 37 | 23 |
| Nov-25 | 126 | 0 | 104 | 59 | 67 | 50 | 55 | 8 | 34 | 25 |
| Oct-25 | 160 | 1 | 102 | 71 | 90 | 44 | 57 | 11 | 43 | 36 |

Out of the 159 competency evaluations reflected above that were completed in September 2026 **in a jail or inpatient setting**, there were 93 individuals (or 58.5%) opined incompetent to proceed.

Out of the 154 total individuals who were opined incompetent to proceed in all settings, 93 (or 60.4%) of those were evaluations completed **in a jail or inpatient setting** and, therefore, given a triage opinion. Triage opinions are only given to Pretrial Detainees when their evaluation takes place in an inpatient or jail setting.

Tier 1: 10 of the 93 triage opinions (or 10.8%) vs 12-month average of 11.6%
Tier 2: 52 of the 93 triage opinions (or 55.9%) vs. 12-month average of 51.8%
Community: 30 of the 93 triage opinions (or 32.3%) vs. 12-month average of 36.2%

The Department will continue to facilitate weekly case consultation meetings with the Forensic Evaluators in order to implement and improve the triage practice. Additionally, monthly training will occur with the Forensic Evaluators regarding competency, triage, and appropriate levels of care. The Department will continue to fine-tune the triage system in consultation with the Special Master.

## Forensic Support Team [Paragraph 42(A)]

By June 1, 2019, the Department shall submit a plan to the Special Master and DLC to hire the following positions by August 1, 2019. The Department's plans and job descriptions shall be guided by the recommendations of the Special Master and the January 28, 2019, Special Report. Consent Decree, ¶ 42. The Forensic Support Team will be formalized to follow the Special Master's Recommendation Number Six. The team will include a full-time Supervising Coordinator who is familiar with the Department's duties and obligations, as well as the Department's and Hospital's procedures in providing services to Pretrial Detainees. ¶ 42(a).

The Forensic Navigators have been meeting with individuals who are in jail waiting for competency evaluation, in jail waiting for admission to inpatient competency restoration services, and those who have recently returned from an inpatient restoration program before competency is officially resolved by the courts. The Forensic Navigators help identify individuals who are high acuity and would benefit from prioritized admission into an inpatient restoration program. They also coordinate care for individuals by working with Jail Mental Health teams, Competency Enhancement Programs, and Jail-Based Behavioral Services. Navigators also help create transition plans and make orders for individuals who may be more appropriate for outpatient restoration services.

The data below are monthly and reflective of data collected between the 26th of the previous month and the 25th of the current month. These figures may not precisely align with the Court Services numbers, as they represent the point at which clients are officially recorded as FST-assigned cases.

**Graph #9 - Total Number of FST Coordinated Care and Face Face Contacts**

In September of 2024, FST realigned its service delivery model in higher population jails with Competency Enhancement Teams to focus exclusively on clients found incompetent to proceed while in custody to allocate resources more effectively. Previously, during the COVID pandemic, FST expanded its monitoring efforts outside the original Consent Decree populations due to delays in evaluations. Moving forward, in the 11 highest population jails with Competency Enhancement Programs (CEP), FST will pivot from monitoring individuals waiting in jail for competency evaluations and prioritize monitoring clients on the inpatient restoration waitlist and those recently returned to jail until court review. This includes Adams, Arapahoe, Boulder, Denver, Douglas, El Paso, Jefferson, Larimer, Mesa, Pueblo, and Weld.

**Note:** The visual presentation of this chart reflects an update to how FST captures care coordination contacts. In collaboration with our data teams, collateral and stakeholder contacts — previously tracked as separate categories — have been consolidated into a single, more reliable measure. This change improves both the accuracy and completeness of our data collection and better reflects the full scope of care coordination work occurring across the team.




Purple: Reflects the total number of monthly Navigator face-to-face contacts with clients.

Pink: Reflects the number of collateral and care coordination contacts FST Navigators have had with partners and stakeholders (courts, jails, attorneys, family, community programs) regarding assigned clients.

Green: Reflects the total number of clients FST has supported each month to include individuals in jails as well as inpatient inreach for continuity of care coordination purposes.

## Increase Community Restoration Services [Paragraph 41]

The Parties agree that the Department is responsible for directly providing or contracting with individuals or agencies to provide Competency Services. The Parties agree that County Jails are not the best place for Pretrial Detainees to wait for treatment or receive treatment. The Parties agree that increased community restoration is a key component to comply with the timeframes in this Consent Decree as to Competency Services. The Special Master's Recommendation Number Two is for the Department to "reduce the emphasis on inpatient beds and increase emphasis on community services." The Special Master's Recommendation Number Three is to "further prioritize outpatient competence restoration." As a result, the Department shall implement a coordinated, wide-scale outpatient (community-based) competency restoration (OCR) system. This system was integrated and submitted with the Comprehensive and Cohesive Plan in February 2020. Consent Decree, ¶ 41.

**Graph #10- Outpatient Restoration Treatment Orders**

Over the last 12 months, October 2025 - September 2026, the average number of orders received for Outpatient Restoration Treatment was 111.6, while the average number of individuals ordered for Outpatient Restoration Treatment was 104.2.

The graph below demonstrates the total number of Orders received for Outpatient Restoration Treatment and the total number of individuals ordered for Outpatient Restoration Treatment per month since September 2025. This data excludes all adolescents, adult orders from counties that are not involved in the Consent Decree, and any Department of Corrections inmates; it reflects adult orders only:



**Outpatient Restoration Treatment Orders By Judicial District**

The graph below demonstrates a breakdown by Judicial District for the number of orders received for Outpatient Restoration Treatment for September 2026. This data excludes all adolescents and all Department of Corrections inmates; it reflects adult orders only.




Of the 95 Outpatient Restoration Treatment Orders Received during September 2026, the 2nd Judicial District provided the most at 18 (18.9%).

**Cumulative Outpatient Restoration Treatment Orders By Judicial District**

The graph below demonstrates a breakdown by Judicial District for the number of orders received for Outpatient Restoration Treatment for 12 consecutive months, October 2025 - September 2026. This data excludes all adolescents and all Department of Corrections inmates; it reflects adult referrals only:




Of the 1330 Outpatient Restoration Treatment Orders Received during the 12 months reflected above, the 2nd and 4th Judicial Districts provided the most at 202 (15.2%) each.

## Community Partnerships

The program continues to partner with the Colorado Department of Human Services Division of the Behavioral Health Administration (BHA) and the Behavioral Health Administrative Service Organizations (BHASO) to continue to leverage the Outpatient Restoration rule requirement of the 20 Comprehensive Safety Net Providers (CSNPs) in Colorado. This has resulted in a consistent level of wraparound services for individuals found incompetent to proceed, including mental health and substance use issues, medication needs, and case management. Additionally, the Program continues to maintain contracts with 16 private providers located in areas of need for higher capacity than the CSNPs can provide. The Department hopes these efforts will compel the courts to consider outpatient services, where appropriate, with more comprehensive services available rather than ordering unnecessary inpatient restoration.

Although comprehensive providers are involved with community-based competency restoration, some gaps in community resources and service provision exist. To address these gaps, the Outpatient Restoration Program has created a significant partnership with the Momentum Program to provide comprehensive, person-centered support to help individuals with identified needs, create goals, and access resources. The individuals referred to Momentum can gain access to case management, benefits acquisition, peer support, and funding for needs such as housing, transportation, non-covered medical care, and any other assistance that creates long-term stability in the community.

The Outpatient Restoration Program continues to work with RMHS to utilize the Momentum Program to assist Outpatient Restoration clients with resources and support to ensure long-term stability in their community.

**Graph #11 - Percentage of Adult Individuals Court-Ordered to Community-Based Restoration**

The graph[8] below demonstrates the number of adult individuals ordered for Outpatient Restoration Treatment compared to the total number of adult individuals ordered for Restoration Treatment since September 2025. The data will be presented with a one-month delay as all restoration orders may not be received for the current month within the reporting time frame.




[8] Please note that this graph includes the 40% goal.The Special Master retained this goal early in 2021 and it remains in place. This goal was established in partnership with the Special Master as a requirement of the Consent Decree.

**Graph #12 - Percentage of Jail-Based Evaluations Ordered to Community-Based Restoration Treatment**

As requested by the Special Master in their August 2020 letter, the Department is now providing an additional calculation for Outpatient Restoration Treatment orders. The graph below demonstrates the percentage of Outpatient Restoration court orders that originated from a Jail-Based Competency Evaluation since September 2025.

Please note that this data assumes that all restoration orders came from a competency evaluation. The data will be presented with a one-month delay as all restoration orders may not be received for the current month within the reporting time frame.



## Outpatient Restoration Treatment

The Program continues its goal of increasing Outpatient Restoration Treatment orders by maintaining capacity and educating courts in each judicial district about the availability of services and resources in their communities. To enhance the current programming for community-based competency restoration, the Program has introduced a reimagined Outpatient Restoration delivery framework in the community. This shift will change how contractors deliver competency restoration services, focusing on a holistic approach to meeting the client's needs. This approach encompasses a three-pronged model.

- Provide psychoeducation and skill building to ensure competency clients have the knowledge and skill to understand the court proceedings, work effectively with their attorney, and participate appropriately in their own defense.
- Meaningfully connect clients to services that will address their barriers to competency as well as unmet needs that will enhance their quality of life.
- Connect clients to community resources that will promote long-term stability to positively affect recidivism, use of crisis services, and rehospitalization.

This framework shifts the focus of competency restoration from standard education to the individualized needs of the client. We continue to drive this initiative through statewide and nationwide stakeholder engagement. Notably, the recent training with leadership from our largest BHASO, Signal, to help them understand competency, competency restoration, and the importance of strong community services.

The Department is proud to offer Outpatient Restoration Treatment services in every county across Colorado, maintaining a statewide reach with no waitlist for any of our services.

To ensure the state's capacity needs are robustly met, the program currently supports a strong network of 34 contracted providers as of July 1, 2026. This network includes 20 comprehensive safety net providers, 3 essential safety net providers, and 13 private providers. Additionally, we are maintaining proactive coverage in all areas of concern through an active Request for Applications (RFA) process, which remains open through June 2027.

Our program is deeply committed to empowering providers as they enhance their capacity and broaden their service offerings. This initiative ensures that clients have consistent access to vital education, behavioral health services, intellectual and developmental disabilities (IDD) support, and community resources. Evidence from our intern case management and length of service programs demonstrates that integrating these three core components significantly lowers the risk of clients re-entering the competency system.

## Outpatient Restoration Outcomes

Beginning in February 2022, the Outpatient Restoration Program was reporting outcomes focusing only on evaluator opinions, which was not capturing the work of the outpatient program. For example, outcomes resulting in the client remaining in the community are considered successful outcomes. In October 2022, the data was updated to include court decisions that better capture all outcomes within the program.

The information below is based on clients whose services ended during the date range indicated, the evaluator's opinion as of the last report, and the court outcome.

| Monthly Outpatient Restoration Outcomes for Clients Whose Services Were Closed (*Adults ONLY)* | | | | | | |
|---|---|---|---|---|---|---|
| | **Evaluator Opinion** | | | **Court Outcome** | | |
| **Month** | **Restored** | **Unlikely to be restored within the reasonably foreseeable future** | **Incompetent** | **Restored to Competency** | **Found Not Restorable By Court/ Converted to an Inpatient Order** | **Case Dismissed or Services Stopped By Court** |
| Sep-26 | 17 | 1 | 26 | 19 | 4 NR/17 converted* | 19 |
| Aug-26 | 10 | 1 | 18 | 18 | 29 | 11 |
| July-26 | 17 | 4 | 21 | 15 | 29 | 36 |
| June-26 | 22 | 5 | 29 | 24 | 19 | 18 |
| May-26 | 16 | 4 | 22 | 17 | 22 | 19 |
| Apr-26 | 15 | 7 | 15 | 25 | 19 | 28 |
| Mar-26 | 13 | 5 | 18 | 18 | 38 | 38 |
| Feb-26 | 11 | 3 | 8 | 15 | 25 | 19 |
| Jan-26 | 17 | 2 | 16 | 19 | 30 | 26 |
| Dec-25 | 16 | 4 | 8 | 27 | 15 | 26 |
| Nov-25 | 24 | 5 | 17 | 24 | 20 | 17 |
| Oct-25 | 15 | 4 | 13 | 18 | 25 | 22 |
| Sep-25 | 20 | 6 | 44 | 11 | 40 | 25 |

*- Due to the large difference between these two outcomes going forward they will each be reported in their individual category instead of combined.

## Division of Outpatient Services

The Division of Outpatient Services (OSDV) was created in 2026 to expand civil and community-based services for individuals exiting the competency system. The division has hit significant milestones across all programs. These programs, making new treatment options for individuals with serious mental illness and ensuring regulatory compliance, are progressing on schedule. The following report highlights current program and project status, staffing developments, and facility readiness for the Outpatient Clinic, the Civil Conversion Program, and the Care Coordination Program.

### The Outpatient Clinic

The Outpatient Clinic allows for the treatment of voluntary and involuntary clients referred to CFMH through CDHS programs, courts conducting competency proceedings, or Bridges Wraparound care. Allowing for a level of care not currently available in the community, the Outpatient clinic will provide the option of a less-restrictive setting for individuals stepping down from hospitalization or leaving jail.

The Outpatient Clinic is approaching a critical transition from the development phase to active service delivery. The current status of focused efforts on facility construction, program design, regulatory compliance, and hiring is as follows:

- **Clinic Infrastructure:** Construction and remodeling of the clinic space, located on the Fort Logan Campus, have reached Phase 1 completion. This timeline puts the Clinic on track to commence initial clinical operations in the Winter of 2026.
- **Administrative Operations:** Leadership has successfully established administrative offices in close physical proximity to the clinical site. This location will support administrative and operational processes.
- **Licensure and Compliance:** The clinic's leadership team has submitted the application to the Behavioral Health Administration (BHA) for a license to operate an Essential Safety Net Provider. This will be approved by the BHA upon walk through and start date.
- **Staffing:** Active recruitment is underway, with all Phase 1 positions currently closed and advancing through the hiring process.

**Chart 1.1: Outpatient Clinic Phase 1 Readiness Tracker**

| Strategic Pillar | Milestone | Current Status | Progress Indicator |
|---|---|---|---|
| **Facilities** | Fort Logan Clinic Space | Phase 1 Completion | [[redacted]] 100% |
| **Administration** | Office Acquisition | Acquired | [[redacted]] 100% |
| **Regulatory** | BHA License to Operate | Provisional Approval | [[redacted]] 100% application |
| **Workforce** | Phase 1 Hiring | All Current Postings Closed, moving to hire. | [[redacted]] 100% postings closed |
| **Operations** | Initial Go-Live | Winter 2026 | *On Target* |

**Civil Conversion Program**

The Civil Conversion Program allows those found incompetent to proceed to move to a short-term certification through two program functions: 1. By providing psychological evaluations and corresponding reports and requests to the courts confirming when an individual is eligible for short-term certification; and 2. By coordinating transitions for individuals moving through this process to contracted hospital beds. As such, this program employs both evaluation psychologists to opine on short term certification criteria and staff to support the transition to, placement in, and oversight of these contracted beds. Additionally, the program oversees the civil offset beds contracted to replace those in the F1 unit at Fort Logan that is transitioning to become an adolescent unit. These beds, like other civil beds at Fort Logan, are dedicated to CFMH's community civil waitlist, ensuring that CDHS will maintain capacity for those not involved in the criminal legal system.

The Civil Conversion Program is currently the most active program within OSDV, showing impact on waitlist reduction and system capacity. The program has successfully transitioned from the planning phase to utilization.

- **Hiring:** Recruitment efforts have been successful. CDHS has successfully hired all but one position for the program, creating a clinical and administrative team ready to handle patient flow and oversight of this critical work.
- **Bed Utilization:** The initial 24 Civil Waitlist beds, those dedicated to maintaining civil bed capacity for individuals not involved in the criminal legal system, are at full capacity, achieving the primary short-term goal for the quarter and alleviating immediate system pressures.
- **ITP to STC Transition:** Building on the success of the civil waitlist beds, the Incompetent to Proceed (ITP) to Short-Term Certification (STC) Conversion beds have officially opened and are actively filling with patients.

**Chart 2.1: Civil Conversion Program Capacity & Staffing**

| Metric | Target | Current Actual | Status / Fill Rate |
|---|---|---|---|
| **Program Staffing** | 100% Fully Staffed | 66% positions filled | [███░] 66% |
| **Civil Waitlist Beds** | 24 Beds | 24 Beds Occupied | [████] 100% |
| **ITP to STC Beds** | Open & Operational | Actively Admitting | [█░░░] 9% |

### Care Coordination Program

The Care Coordination Program supports the Incompetent to Proceed (ITP) to Short-Term Certification (STC) pathway by providing care coordination to all individuals in this process without an existing provider. This includes individuals who may be placed in the contracted beds overseen by the Civil Conversion program, and anyone else ordered through this process by the criminal courts, including those who time out of restoration treatment and those who are found unrestorable. This

program is comprised entirely of clinical staff and provides direct services for individuals in jails and other eligible settings through clinical support, coordination of benefits, and coordination of care to place these individuals in an inpatient treatment setting, primarily in private community hospitals.

The Care Coordination Program is currently in a foundational stage. A similar but much smaller program was previously operated by BHA, and the transition of responsibilities from BHA to CFMH is progressing.

- **Workforce Development:** Postings for the Care Coordination team are currently live or in interview stages, and CDHS is engaged in active interviews with qualified candidates.
- **BHA to CFMH Transition:** The overarching care coordination process has officially begun its transition from the BHA to CFMH. This transition from BHA to CFMH will allow for expanded reach of the program and greater impact due to the resources appropriated to CFMH to implement the new process and the support offered during the transition from the BHA.
- **Active Caseload:** Ahead of onboarding the Care Coordination staff, the Division has successfully coordinated its first case, which is pending placement in a reserved hospital bed.

**Chart 3.1: Care Coordination Transition & Implementation Phases**

| Phase | Objective | Status | Notes |
|---|---|---|---|
| Phase A | Establish Job Requisitions & Postings | Complete | Postings closed; offers have been extended to 50% of positions. |
| Phase B | BHA to CFMH Process Transition | In Progress | Phased Transition of care coordination. |
| Phase C | Initial Caseload Assumption | Active | 4 pilot cases for coordination. |
| Phase D | Full Team Onboarding & Deployment | Pending | 50% of team has offers or start dates. |

## Mental Health Transitional Living Homes (MHTL)

The chart below demonstrates the number of currently operating homes alongside their bed capacity, beds filled, waitlist, and beds available. Please note that while there are beds available for the various levels of care, there are also waitlists. The waitlist is due to client choice in terms of preferred location OR lack of gender bed availability (i.e. - no female beds available).

Status of Currently Operating Homes

| Home Name | Provider | Location | Status | Bed Capacity | Beds Filled | Waitlist | Beds Available | Total Provider Beds |
|---|---|---|---|---|---|---|---|---|
| Silver Maple (Level 1) | Sequoia | Littleton | OPEN | 12 | 11 | 1 | 1 | 52 |
| Warren (Level 1) | | Lakewood | | 12 | 11 | 0 | 1 | |
| Grant 75 (Level 1) | | Northglenn | | 14 | 13 | 0 | 1 | |
| Grant 55 (Level 1) | | | | 14 | 11 | 0 | 3 | |
| Cascade (Level 1) | Embark | CO Springs | OPEN | 8 | 8 | 0 | 0 | 24 |
| Clifton (Level 2) | | | OPEN | 8 | 7 | 1 | 1 | |
| Oakridge (Level 2) | | | OPEN | 8 | 8 | 1 | 0 | |
| Sheridan (Level 2) | Ananeo | Lakewood | OPEN | 10 | 10 | 0 | 0 | 20 |
| Mississippi (Level 2) | | Denver | OPEN | 10 | 8 | 1 | 2 | |
| Yank (Level 2) | Monarch | Lakewood | OPEN | 11 | 11 | 1 | 0 | 24 |
| 6th Ave (Level 2) | | | OPEN | 13 | 13 | 1 | 0 | |
| Bahama (Level 2) | Oakwood | Aurora | OPEN | 10 | 8 | 0 | 2 | 10 |
| Place (Level 2) | State-Run | Westminster | OPEN | 8 | 8 | 1 | 0 | 24 |
| Wiggins (Level 2) | | Pueblo West | OPEN | 8 | 4 | 0 | 4 | |
| Bayfield (Level 2) | | | OPEN | 8 | 5 | 0 | 3 | |
| Thornton Care Center (Level 3) | Vivage/ Beecan | Thornton | OPEN | 10 | 10 | 2 | 0 | 10 |
| **TOTAL BEDS** | | | | 164 | 146 | 9 | 18 | |
| **TOTAL Level 1** | | | | 60 | 54 | 1 | 6 | |
| **TOTAL Level 2** | | | | 94 | 82 | 6 | 12 | |
| **TOTAL Level 3** | | | | 10 | 10 | 2 | 0 | |

***Beds Available Totals exclude negative values in individual homes (pending discharge, with pending admission)***

**MHTL Admissions**

The table below demonstrates the total number of accepted clients in Mental Health Transitional Living homes. Any client with a "2030" date has been accepted to the MHTL Homes program, but does not yet have an official admission date.

## SM Compliance Report

| Bed Level | Year of Admission Date | |
|---|---|---|
| Level 1 | 2023 | 11 |
| | 2024 | 46 |
| | 2025 | 39 |
| | 2026 | 31 |
| | 2030 | 4 |
| Level 2 | 2024 | 7 |
| | 2025 | 120 |
| | 2026 | 113 |
| | 2030 | 9 |
| Level 3 | 2025 | 7 |
| | 2026 | 5 |
| | 2030 | 3 |

**MHTL Discharges**

The graph below displays discharges from the MHTL Homes by year and month since their inception. If a month is not listed, no discharges occurred during that month.



**MHTL Discharges**
The graph below displays total discharges from the MHTL Homes since their inception, categorized by reason.



## Legislative Actions [Paragraph 44]

The Parties agree that they will not propose, sponsor, or support any legislation that would violate the terms of this Consent Decree. The Department will provide DLC and the Special Master with all budget requests and proposed legislation affecting this Consent Decree when they are sent to the Colorado General Assembly. Consent Decree, ¶ 44.

On April 30, 2019, Senate Bill 19-223, "Concerning Actions Related to Competency to Proceed," was passed by the General Assembly. When a defendant's competency to proceed is raised, the bill changes the timing of various matters, clarifies where restoration services are to be provided, increases the role of the Court Liaisons, expands the requirements for a competency evaluation report, and clarifies when defendants are to be released following an evaluation or restoration services. The bill requires the Department to develop an electronic system to track the status of defendants for whom competency to proceed has been raised, convene a group of experts to create placement guidelines for use in determining where restoration services should be provided, and partner with an institution of higher education to develop and provide training in competency evaluations.

Along with this, Senate Bill 19-222, "Individuals at Risk of Institutionalization," was passed by the General Assembly on April 30, 2019. The bill requires the Department to develop and implement admission criteria to the Mental Health Hospitals at Pueblo and Fort Logan. The bill also creates a community behavioral health safety net system.

FY 2026-27 budget requests were released to the public and sent to the General Assembly on October 31, 2025. OCFMH was affected by CDHS budget requests R-04, R-11, and R-15. Requests R-11 and R-15 are both minor reductions to programs to assist the State in balancing the budget in a very lean year, and were accepted by the Joint Budget Committee (JBC) at OCFMH figure setting on February 27, 2026. Neither of these reductions are expected to significantly affect programs or services within the Office.

R-04 sought to allow OCFMH to increase the amount of budgeted revenue from insurance and patient payments for services at the State Mental Health Hospitals. For the past few years, actual hospital revenue has been larger than the amount of revenue that the State budget appropriates to OCFMH to spend. This request attempted to right size the hospital revenue appropriation and make a number of other technical budget adjustments, while reducing hospital General Fund needs and repurposing $2 million to increase funding for competency restoration services through contracted private hospital beds. With some modifications, this budget request passed, including the additional funding for contracted private competency beds.

The Executive Branch also brought a last-minute budget request related to the stagnant numbers on the waitlist to the JBC in late March. A formal budget request

related to this issue was finalized as quickly as possible in order to be included in the FY 2026-27 long bill ahead of final passage. The final request was released by the Governor's Office and sent to the JBC on March 31. On April 23, the JBC considered the request and approved most parts of it. The request includes approximately $30 million in funding for additional projects to address the competency waitlist.

As approved, the request will fund an additional 49 competency restoration beds, including additional contracted beds at private hospitals and moving the Adolescent Behavioral Treatment Unit from CMHHIP to Ft. Logan in order to use the existing unit at CMHHIP for an additional 22 secure restoration beds. It will also fund 24 contract beds at a private hospital for civil patients, allowing the Department to transfer civil patients in order to better utilize CMHHIP beds for restoration treatment, as well as working to move individuals off of the waitlist into civil beds before admission for inpatient restoration. The original request also included an expansion of the Jail-Based Restoration program, but the JBC denied this portion of the request, and instead dedicated the funding that would have gone to these beds to sustaining the current number of MHTL beds.

A bill that significantly overhauled the Colorado competency statutes and created a system of civil commitment and enhanced protective placement for individuals found incompetent to proceed and unlikely to be restored to competency who pose substantial risk of serious harm to others was introduced on March 26, 2026 as Senate Bill 26-149. CDHS did not play an active role in drafting the introduced version of this legislation. The bill was amended significantly throughout its time in the legislature, and the final version passed on May 11, 2026. The bill was signed by the President of the Senate and the Speaker of the House on May 20, and signed by the governor on May 21. Because the bill included a safety clause, it went into effect when it was signed by the governor.

The fiscal note for the bill includes resources for CDHS to provide additional placements for individuals who are court ordered to civil commitment or enhanced protective placement, as well as resources for CDHS to provide case management and care coordination for those individuals and to provide care coordination for others exiting the competency system who need ongoing inpatient psychiatric treatment. CDHS is actively hiring and seeking contracts to build teams and placements that will allow the Department to comply with the bill. The programs that will be developed with these resources include an outpatient clinic, a new secure Regional Center, contracted beds at a Skilled Nursing Facility, and new teams to provide care coordination and support new processes in the bill related to civil commitment and enhanced protective placement.

# Appendices

## Appendix A: Consent Decree Definitions

The following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Consent Decree), Consent Decree, ¶ 31:

(a) "Arrest Date" means the day, month, and year a Pretrial Detainee was arrested for the case in which competency has been raised.

(b) "Collateral Materials" means the relevant police incident reports and the charging documents, either the criminal information or the indictment.

(c) "Community-Based Competency Evaluation" means a Competency Evaluation of a Community-Based Service Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

(d) "Community-Based Restoration Treatment" means Restoration Treatment of a Community-Based Service Recipient that is ordered to be performed out of custody and in conjunction with a community-based mental health center or community organization.

(e) "Community-Based Services Recipient" means a defendant who has been ordered to receive a Community-Based Competency Evaluation or Restoration Treatment.

(f) "Competency Evaluation" means a court-ordered evaluation for competency to proceed, administered by the Department, and the accompanying report prepared by the Department and more fully described in C.R.S. §§ 16-8.5-103, 105.

(g) "Competency Services" means Competency Evaluations and Restoration Treatment.

(h) "Competency Services Recipient" means a Pretrial Detainee or a Community-Based Services Recipient.

(i) "Competent to Proceed" means that a court has ordered that a defendant in a criminal case does not have a mental disability or developmental disability that prevents the defendant from having sufficient present ability to consult with the defendant's lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents the defendant from having a rational and factual understanding of the criminal proceedings. C.R.S. § 16-8.5-101(4).

(j) "County Jail" means a jail or detention facility which houses a Pretrial Detainee. County Jail does not include a behavioral health unit located within a county jail (e.g., RISE).

(k) "Court Order" means a written order, issued by a court and signed by a judge that directs the transfer of custody of a Pretrial Detainee to the Department.

(l) "Court Liaison" means a person who is hired by the Colorado Judicial Branch's State Court Administrator's Office as a dedicated behavioral health court liaison in each state judicial district, pursuant to C.R.S. §§ 16-11.9-203, 204, who facilitates communication and collaboration between judicial and behavioral health systems, and keeps judges, district attorneys, and defense attorneys informed about

the availability of community-based behavioral health services.

(m) "Days Waiting" means the number of days elapsed between the Ready for Admission date and the Offered Admission date.

(n) "Department" means the Colorado Department of Human Services. Any reference to the Department includes the Office of Civil & Forensic Mental Health and the Hospital, which are divisions of the Department and do not have independent authority or obligations under Title 16, Article 8.5, C.R.S.

(o) "Department Plan" mean the Department's comprehensive description of its efforts to achieve long-term compliance with this Consent Decree by providing timely competency services without undermining the broader system of mental health care.

(p) "Evaluator Signed Date" means the date the Jail Competency Evaluation is signed by the evaluator after having been completed.

(q) "Hold and Wait Evaluation" means an in-custody evaluation of a Pretrial Detainee that is conducted in another facility, after transport by the sheriff of the commitment county to the alternative facility. For example, a sheriff in a county in which there are no evaluation services may transport the Pretrial Detainee to the nearest county where these services are available, wait for the evaluator to complete the interview and examination, and return the Pretrial Detainee to the jail in the county of commitment.

(r) "Hospital" means the Colorado Mental Health Hospitals in Fort Logan (CMHHiFL) or Colorado Mental Health Hospitals in Pueblo (CMHHiP).

(s) "Inpatient Competency Evaluation" means a Competency Evaluation of a Pretrial Detainee that is ordered to be performed at the Hospital or in a separate locked facility that is established for the purpose of providing Inpatient Competency Evaluations and Restoration Treatment. This includes Competency Evaluations conducted at the RISE program or a similar program located on a dedicated behavioral health unit at a county jail.

(t) "Inpatient Restoration Treatment" means the Restoration Treatment of a Pretrial Detainee that is performed at the Hospital or at a separate locked facility that provides comprehensive Restoration Treatment to the Pretrial Detainee. This includes Restoration Treatment that is provided at the RISE program or a similar program located on a dedicated behavioral health unit at a county jail.

(u) "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the timeframes in the Consent Decree.

(v) "Jail Competency Evaluation" means a Competency Evaluation performed in the County Jail where the Pretrial Detainee is being held.

(w) "Medically Cleared" means that a Pretrial Detainee is, in the opinion of the Department's medical staff, appropriate for Inpatient Competency Evaluation or Inpatient Restoration Treatment.

(x) "Offered Admission Date" means the date the Department offers the Pretrial Detainee admission for Inpatient Restoration Treatment or Inpatient Competency Evaluation. Before the Department offers admission to a Pretrial Detainee, the following three criteria must be satisfied: (1) the Department has an open bed for the Pretrial Detainee at the location for the Inpatient Evaluation or

Inpatient Restoration Treatment; (2) the location for Inpatient Evaluation or Inpatient Restoration Treatment is ready to receive the Pretrial Detainee for admission; and (3) the Department notifies the County Jail of the same.

(y) "Pretrial Detainee" means a person who is being held in the custody of a County Jail and whom a court has ordered to undergo Competency Services. Persons serving a sentence in the Department of Corrections and juveniles are excluded from this Consent Decree.

(z) "Ready for Admission Date" means the date on which the Department has received the Court Order for Competency Services and, in the case of Competency Evaluations or Restoration Treatment when the Competency Evaluation was not conducted by the Department, the Department has also received the Collateral Materials.

(aa) "Restoration Treatment" means mental health care and treatment provided for the purpose of restoring a Competency Services Recipient.

(bb) "Settlement Payment" has the meaning set forth in Part XIII.

(cc) "Special Master" means Court-appointed Groundswell Services and its team of Drs. Neil Gowensmith and Daniel Murrie (Dkt. 130), or any successor appointee whose duties and authority are set forth in Dkt. 130 and in this Consent Decree.

(dd) "Tier 1" means a Pretrial Detainee who has been ordered to receive Inpatient Restoration Treatment and whom a competency evaluator has determined either: (1) appears to have a mental health disorder and, as a result of such mental health disorder, appears to be a danger to others or to himself or herself, or appears to be gravely disabled or (2) has a mental health disorder, and as a result of either (1) or (2), delaying hospitalization beyond seven days would cause harm to the Pretrial Detainee or others.

(ee) "Tier 2" means a Pretrial Detainee who has been ordered to receive Inpatient Restoration Treatment and who does not meet Tier 1 criteria.

## Appendix B: Timeframes and Fines for Competency Services

Beginning June 1, 2019, the Department shall begin offering admission to Pretrial Detainees to the Hospital for Inpatient Restoration Treatment or Inpatient Competency Evaluations pursuant to Table 1 of the Consent Decree, ¶ 33(a).[9]

| TABLE 1: Timeframes and Fines for Competency Services | | | | |
|---|---|---|---|---|
| **Deadlines** | **Tier 1: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines** | **Tier 2: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines** | **Maximum Timeframes to Offer Admission for Inpatient Competency Evaluations and Corresponding Fines** | **Maximum Timeframes to Complete Jail Competency Evaluations and Corresponding Fines** |
| June 1, 2019 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 56 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-56 days, $500 per day for each Pretrial Detainee waiting more than 56 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days | 28 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 28 days |
| January 1, 2020 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 49 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-49 days, $500 per day for each Pretrial Detainee waiting more than 49 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days | 28 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 28 days |

[9] Table 1 appears on page 41 of the Consent Decree.

| Deadlines | Tier 1: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Tier 2: Maximum Timeframes to Offer Admission for Inpatient Restoration and Corresponding Fines | Maximum Timeframes to Offer Admission for Inpatient Competency Evaluations and Corresponding Fines | Maximum Timeframes to Complete Jail Competency Evaluations and Corresponding Fines |
|---|---|---|---|---|
| July 1, 2020 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 42 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-42 days, $500 per day for each Pretrial Detainee waiting more than 42 days | 14 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |
| January 1, 2021 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 35 days<br><br>Assess for admission every 10 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting 29-35 days, $500 per day for each Pretrial Detainee waiting more than 35 days | 14 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |
| July 1, 2021 | 7 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 7 days | 28 days<br><br>Assess for admission every 10 days<br><br>Fines: $500 per day for each Pretrial Detainee waiting more than 28 days | 14 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 14 days | 21 days<br><br>Fines: $100 per day for each Pretrial Detainee waiting more than 21 days |

## Appendix C: Comprehensive and Cohesive Plan [Paragraph 40]

The Special Master's first recommendation was to revise the Department's 2018 Plan[10] into a more comprehensive and cohesive plan. By or about January 2020, the Department will produce an initial plan resulting from a long-term visioning process with DLC, the Special Master, and stakeholders that will consolidate pieces of the Department's current plan, along with legislative initiatives, in a cohesive package for courts, administrators, service providers, and legislators to consider. Consent Decree, ¶ 40.

In April 2019, Governor Polis announced an initiative tasking the Department to assemble a task force to create a blueprint to reform Colorado's Behavioral Health System as a whole. This task force established a subcommittee that will be responsible for making recommendations for the Department's Comprehensive and Cohesive Plan for Competency Services. To set the subcommittee up for success, the Department compiled information that was useful in the creation of the plan. During the April 11, 2019 planning meeting with the Special Master, the below Competency Services Intercept Model was created to serve as the basis for the draft Comprehensive Plan:




In July 2019, the Department finalized a Comprehensive Plan document for the subcommittee's review. The document includes a description of the current state of the competency services system in Colorado, including resources available, and recommendations to improve the competency services system for the subcommittee

---

[10] "Department Plan" means the Department's comprehensive description of its efforts to achieve long-term compliance with this Consent Decree by providing timely competency services without undermining the broader system of mental health care.

to consider. The Department also compiled binders with helpful information to establish a strong foundation for the subcommittee.

The subcommittee voted on the Department's recommendations on November 18, 2019. In January 2020, the Department finalized responses in order to address each recommendation in the Comprehensive Plan and carefully revised the initial document presented to the subcommittee, incorporating feedback from the subcommittee and the Special Master. The document was reviewed internally and submitted to the Special Master for final review on February 14, 2020.

The Department incorporated final edits and submitted the Comprehensive Plan to the Court on March 2, 2020. The Department is working on the action items in the Plan and will continue to implement recommendations and action items as feasible and appropriate. As approved by the Court on December 31, 2020, the Department produced a briefer, focused version of the Comprehensive and Cohesive Plan on March 1, 2021. This brief version summarized the Department's plans to sustain competency-related services as the pandemic continues, including its plan to increase services as some effects of the pandemic begin to wane.

The Department produced the required version of an Annual Revision to the Comprehensive and Cohesive Plan during August 2021 and after several cycles of review, the plan was submitted to the Court on October 1, 2021.

The Department submitted the most recent updated Annual Revision to the Comprehensive and Cohesive Plan to the Court on October 15, 2026.

## Appendix D: Notification of Non-Compliance With Timeframes [Paragraph 38]

Beginning June 7, 2019, the Department shall notify the Special Master and DLC weekly regarding any non-compliance with timeframes. Consent Decree, ¶ 38.

Only one notice per Pretrial Detainee shall be provided and should include:

- (i) The name of the Pretrial Detainee;
- (ii) The Pretrial Detainee's location;
- (iii) The Pretrial Detainee's charges based on information available to the Department;
- (iv) The Pretrial Detainee's bond amount based on information available to the Department;
- (v) Whether a forensic assessment has been made on whether restoration in the community is appropriate;
- (vi) Whether the Pretrial Detainee has previously been found incompetent;
- (vii) What efforts are being made to provide timely Competency Services[11] to the Pretrial Detainee, including communications with the court, Court Liaisons, and community mental health providers.

Per the requirements of the Consent Decree, the Department began sending these weekly reports on June 7, 2019. Beginning in July 2019, the Department began accompanying its Monthly Data Report with a separate Fines Report, which includes the names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month, the number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance, and the total fines owed by the Department for the preceding month.

Paragraph 38(c) requires that the Department pay the total fines owed for any non-compliance with timeframes each month. These fines will be deposited into an account of Cordes & Company, the trustee for the Consent Decree, for the purpose of funding non-Department services for persons with mental illness. Cordes & Company will administer and distribute funds in accordance with the Consent Decree and at the direction of the fines committee (a representative from DLC, a representative from the Department, and the Special Master).

[11] "Competency Services" means Competency Evaluations and Restoration Treatment.

## Appendix E: Interim Jail Mental Health Treatment[12] [Paragraph 34]

If the court does not release the Pretrial Detainee to Community-Based Restoration Treatment and the Pretrial Detainee is awaiting receipt of Inpatient Restoration Treatment, the Department shall work with the County Jails[13] to develop a program to assist in the provision of coordinated services for individuals in accordance with C.R.S. § 27-60-105 to screen, treat, assess, and monitor for triage purposes Pretrial Detainees in the least restrictive setting possible. Consent Decree, ¶ 34.

Senate Bill 19-223 mandates the provision of interim mental health services for individuals who have been court-ordered for Inpatient Competency Restoration and who are awaiting admission to an inpatient facility.

Senate Bill 18-250 allocated additional funding to the Jail Based Behavioral Health Services (JBBS) program to address gaps in mental health services including screening, assessment, diagnosis and treatment, as well as psychiatric prescription services and the purchase of medication.

## Appendix F: CMHHiP Reopening of additional hospital Beds: L2

The CMHHiP was able to reopen 22 beds within the High-Security Forensic Institute (HSFI) that are designated for intensive treatment, while these beds are not typically used for ITP patients, the reopening of this unit will assist the hospital to have more beds available for patients in need of intensive treatment and freeing up space in the beds that are typically used and suitable for ITP patients This unit was reopened on May 10, 2021.

## Appendix G: CMHHiFL Additional Beds: Team 4 (F2) & Team 6 (F3) Cottages

The capital construction funding request of $17,835,851 for the CMHHiFL Team 4 (F2) & Team 6 (F3) Cottage renovation to increase capacity by 44 beds was approved by the Colorado General Assembly. Final approval was granted upon the Governor's signature of the Long Bill, which was signed on April 18, 2019, and funding became available on July 1, 2019.

As a result of the statewide healthcare workforce shortage, CMHHIFL was able to open only one of the two 22-bed units Team 4 (F2) on December 6, 2022. CMHHiFL opened the second of two 22 forensic beds (Team 6) on November 2, 2023. A total of ten clients will be transferred from Team 4 to Team 6 and admissions will occur on both

[12] "Interim Jail Mental Health Treatment" means mental health treatment of a Pretrial Detainee that is performed in the County Jail where the Pretrial Detainee is held while the Pretrial Detainee awaits Community-Based or Inpatient Restoration Treatment per Court Order consistent with the timeframes in the Consent Decree.

[13] "County Jail" means a jail or detention facility which houses a Pretrial Detainee. County Jail does not include a behavioral health unit located within a county jail (e.g., RISE).

teams to reach census. CMHHiFl was able to reach full census on both units on or before January 1, 2024.

## Appendix H: Data Management Team [Paragraph 42(B)]

By June 1, 2019, the Department shall submit a plan to the Special Master and DLC to hire the following positions by August 1, 2019.

The Department's plans and job descriptions shall be guided by the recommendations of the Special Master and the January 28, 2019, Special Report. Consent Decree, ¶ 42. The Data Management Team will be formalized to follow the Special Master's Recommendation Number Five. This team will be dedicated and designed to specifically assist with the implementation of the Department's Plan by collecting specific data on which the Department will base its projections and recommendations, calculate inpatient bed space, assess community restoration capacity, and determine financial estimates. Consent Decree, ¶ 42(b).

The Department will partner with the Office of Information Technology (OIT) to ensure the FTE and funding needed to administer this system are allocated correctly and that the Department's plan will be executed as outlined. Funding for FY 2019-20 was approved for $454,539, and approval was granted upon the Governor signing Senate Bill 19-223.

The Department worked with the Governor's Office of Information Technology (OIT) and contracted with a vendor that completed work on the data warehouse in July 2020. Between August 2020 and August 2021, the Information Management team worked to correct and update work in the data warehouse, including creating documentation for all data sources as well as adding functionality to develop automated reporting. Additionally, the Department completed comprehensive business documentation for the Forensic Services team to create data queries and quality assurance checks that more closely align with business practices. Additionally, in November 2020, the Information Management team hired a Database Administrator. An Analytics and Operations supervisor was hired in October 2022 that was promoted to the Data and Evaluation Manager in August 2023. The Data and Evaluation team has filled a DM III position, as well as two two analyst IIIs. One analyst position is assisting in the data reporting for the MHTL homes and the other analyst position is coordinating with the MHTL homes analyst, providing additional reporting assistance for the Consent Decree, and providing Forensic Services data requests and information gathering. The DM III position's primary focus is reporting for the Consent Decree and the build of data information in Tableau. The HIT team has already hired two data management III positions that assists with the Data warehouse reporting and a Data management supervisor that will assist in efforts as well.

## Appendix I: Consent Decree Reporting

| Consent Decree Reporting - December 2021 | | | | |
|---|---|---|---|---|
| **Requirements** | **Date** | **Frequency** | **Status** | **Progress Notes** |
| **Notification of Non-Compliance with the Timeframes [Paragraph 38]** | | | | |
| Send to the Special Master and DLC one notice for each Pretrial Detainee, including:<br>-The name of the Pretrial Detainee;<br>-The Pretrial Detainee's location;<br>-The Pretrial Detainee's charges based on information available to the Department;<br>-The Pretrial Detainee's bond amount based on information available to the Department;<br>-Whether a forensic assessment has been made on whether restoration in the community is appropriate;<br>-If the Pretrial Detainee has previously been found incompetent;<br>-What efforts are being made to provide timely Competency Services to the Pretrial Detainee, including communications with the Court, Court Liaisons, and community mental health providers. | Submitted weekly beginning July 7, 2019 | Weekly | Complete | Will begin weekly reporting on June 1, 2019. This report will be ongoing. |

| **Forensic Support Team reports to the Court Liaison every 10 days [Paragraph 34]** | | | | |
|---|---|---|---|---|
| Per the requirement of paragraph 34 in the Consent Decree to develop an interim jail mental health treatment program, a member of the Forensic Support Team shall report to the Court Liaison every 10 days concerning the clinical status and progress towards competency of the Pretrial Detainee. | Beginning once the FST Team is established | Every 10 days | | The Memorandum of Understanding is executed with the State Court Administrator's Office. The Department is determining how to implement reporting. |

| **Monthly Fines Report [Paragraph 38(B)]** | | | | |
|---|---|---|---|---|
| -The names of the Pretrial Detainees for whom the Department has accrued a fine during the preceding month;<br>-The number of days each Pretrial Detainee waited in the County Jails past the timeframes for compliance;<br>-The total fine owed by the Department for the preceding month. | Submitted July 15, 2024 | Monthly | Complete | Will begin reporting monthly on June 1, 2019. This report will be ongoing. |

| Requirements | Date | Frequency | Status | Progress Notes |
|---|---|---|---|---|
| **Compliance Plan Report [Paragraph 51]** | | | | |
| The Special Master and the Parties will agree on the content and organization of the report, which will include:<br>-An update on all aspects of compliance included in Sections VI and VII;<br>-An update on the recommendations of the Special Master and;<br>-The Department's efforts and responses to those recommendations. | Submitted July 15, 2024 | Monthly | Complete | This report will be ongoing. |
| **Monthly Data Report [Paragraph 52]** | | | | |
| The Pretrial Detainees for whom a Court Order for Restoration Treatment, Competency Evaluation, or Collateral Materials has been received by the Department (even if no other data is available during that month) to include:<br>-The name of the ordered Pretrial Detainee;<br>-The Pretrial Detainee's CMHHiP Patient ID number;<br>-The county or counties referring the Pretrial Detainee;<br>-The case number(s) of the criminal case(s) in which the Court Order was issued;<br>-The date of the Pretrial Detainee's arrest and bond amount, as shown in the Department's records;<br>-The date of the Court Order;<br>-The type and location of Competency Services ordered;<br>-The date the Court Order was received by the Hospital;<br>-The date that the Department learned that the Court Order was vacated or converted to another type of evaluation or Restoration process;<br>-The date the Collateral Materials were received by the Department;<br>-The Evaluator Signed Date;<br>-The defense attorney's name if shown in the Department's records;<br>-The criminal charges filed against the Pretrial Detainee as shown in the Department's records;<br>-The Ready for Admission date;<br>-The Offered Admission date;<br>-The Hospital's Offered Admission deadline for that specific Pretrial Detainee, based on the Ready for Admission date;<br>-The date of admission;<br>-The type of Competency Service;<br>-The location of the Competency Service;<br>-The number of Days Waiting for each Pretrial Detainee;<br>-The number of days between the Ready for Admission Date and the date of the monthly report for each Pretrial Detainee awaiting admission;<br>-A list of Pretrial Detainees for whom the Department has invoked individual Special Circumstances and its reasons for doing so;<br>-If there is a waitlist of backlog for Competency Services, | Submitted July 15, 2024 | Monthly | Complete | This report will be ongoing. |

| | | | | |
|---|---|---|---|---|
| a list of the Pretrial Detainees waiting the longest to the shortest number of days. | | | | |

| Requirements | Date | Frequency | Status | Progress Notes |
|---|---|---|---|---|
| **Monthly Cumulative Information Report [Paragraph 53]** | | | | |
| In a format accepted by the Special Master, this report will include the following information:<br>-The number of referrals for Competency Services each month, including the type and location for each;<br>-The number of staff employed each month by category (nursing positions, security positions, mental health professionals, etc.) and how many vacancies remain in each staffing category;<br>-The number of temporary staff and the number of security staff employed each month;<br>-The number of Pretrial Detainees identified for Community-Based Restoration Treatment and the movement of those Pretrial Detainees into the community;<br>-The Special Master shall also assist the Department at their request in developing reporting protocols, Pretrial Detainee data, and formats for updating the parties on Consent Decree activities.<br><br>Provide to DLC and the Special Master in Microsoft Access format and PDF format, unless another format is agreed upon in writing. | Submitted July 15, 2024 | Complete | Monthly | This report will be ongoing. |